**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| THE UNITED STATES OF AMERICA | : | |
| | : | Crim. No. 3:92CR68 |
| v. | : | |
| | : | |
| JAMES H. ROANE, JR. | : | |
| | : | |

**MOTION FOR IMPOSITION OF A REDUCED SENTENCE
PURSUANT TO SECTION 404 OF THE FIRST STEP ACT**

Section 404 of the First Step Act of 2018, enacted on December 21, 2018, authorizes a district court to impose a reduced sentence for crack cocaine convictions where the statutory penalties of the Fair Sentencing Act would have applied had that Act been in effect at the time of the original sentencing. James Roane is eligible for a sentence reduction under section 404 of the First Step Act and moves this Court to reduce his sentences.

Mr. Roane was convicted in 1993 of the following covered offenses: one count of possession with intent to distribute crack cocaine under 21 U.S.C. § 841(a)(1) (Count 32) and three counts of murder in furtherance of a Continuing Criminal Enterprise (CCE) under 21 U.S.C. § 848(e)(1)(A) (Counts 5, 8, and 11). On Count 32, Mr. Roane was sentenced to forty years' incarceration. He was sentenced to life on Counts 8 and 11. On Count 5, Mr. Roane was sentenced to death.

For the reasons set forth below, a sentence reduction would accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a) and appropriately reflects 1) changes to the statutory ranges currently applicable to Mr. Roane's case; 2) the fact that Mr. Roane is actually innocent of the murder for which he was sentenced to death; 3) mitigating factors that, under Supreme

Court jurisprudence, must be taken into consideration with respect to his death sentence; 4) Mr. Roane's positive prison adjustment since the time of his sentencing; and 5) the fact that other concurrent convictions that were taken into consideration in sentencing Mr. Roane are invalid.

## I.   Mr. Roane's Convictions under 21 U.S.C. §§ 841(a)(1) and 848 Are Covered Offenses under the First Step Act

Section 404 of the First Step Act, by its plain language, is broadly applicable to any defendant who was convicted of an offense 1) the statutory penalties for which "were modified by section 2 or 3 of the Fair Sentencing Act of 2010," 2) that was "committed before August 3, 2010" (the date the Fair Sentencing Act took effect).  First Step Act of 2018, S. 3747, 115th Cong. § 404(a) (2018).  For these eligible defendants, the sentencing court "may, on motion of the defendant . . . impose a reduced sentence as if Sections 2 and 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed."  *Id.* at § 404(b).[1]

The statutory penalties for Mr. Roane's §§ 841(a)(1) and 848 convictions were modified by the Fair Sentencing Act.  At the time of Mr. Roane's sentencing, his § 841(a)(1) conviction for possession with intent to distribute more than fifty grams of crack cocaine subjected him to sentencing under § 841(b)(1)(A), which imposed a mandatory minimum of ten years' incarceration and a maximum penalty of life imprisonment.  If he were sentenced today under

---

[1] This authority to resentence pre-Fair Sentencing Act crack defendants is limited in only two ways, neither of which is applicable here.  First, the Court shall not entertain a motion for resentencing under section 2 or 3 of the Fair Sentencing Act if the defendant was already sentenced under sections 2 and 3 of the Fair Sentencing Act.  First Step Act of 2018, S. 3747, 115th Cong. § 404(c).  And second, the Court shall not entertain a motion made under section 404 if a previous motion under section 404 was, after the First Step Act was enacted, "denied after a complete review of the motion on the merits."  *Id.*

the Fair Sentencing Act, Mr. Roane's conviction would fall under § 841(b)(1)(B), which carries a five-year mandatory minimum penalty and a statutory maximum of forty years.

In determining whether an offense is a covered offense under the First Step Act, the relevant inquiry regards the statute of conviction, not the quantities of crack involved in the offense. *See United States v. Wirsing*, 943 F.3d 175, 185-86 (4th Cir. 2019) (holding that "all defendants who are serving sentences for violations of 21 U.S.C. § 841(b)(1)(A)(iii) and (B)(iii), and who are not excluded pursuant to the expressed limitations in § 404(c) of the Act, are eligible to move for relief under that Act"); *see also United States v. Jackson*, 2020 WL 3563995, at *7 (3d Cir. July 1, 2020) ("§ 404 eligibility turns on a defendant's statute of conviction, not on his possession of a certain quantity of drugs"); *United States v. Shaw*, 957 F.3d 734, 735 (7th Cir. 2020) ("To determine whether a defendant is eligible for a reduced sentence under the First Step Act, a court needs to look only at a defendant's statute of conviction, not to the quantities of crack involved in the offense."). Additional quantities found as relevant conduct at sentencing, while certainly a proper consideration in a court's exercise of discretion, are not determinative of eligibility. Because the statutory penalty for Mr. Roane's § 841(a)(1) conviction was modified by the Fair Sentencing Act, this conviction is a covered offense and subject to resentencing under the First Step Act.

The statutory penalty for Mr. Roane's § 848 convictions was likewise modified by the Fair Sentencing Act, and these convictions are thus also covered offenses under the First Step Act. While § 848 was not directly amended by the Fair Sentencing Act, Mr. Roane's statutory maximum under § 848 was increased to a death sentence as a result of his possession with intent

3

to distribute cocaine base conviction that would no longer subject him to the death penalty.

Section 848(e)(1)(A) provides that

> any person engaging in or working in furtherance of a continuing criminal enterprise, or any person **engaging in an offense punishable under section 841(b)(1)(A)** of this title . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

(emphasis added). As discussed above, Mr. Roane's § 841(a)(1) conviction was, at the time of his 1993 trial, punishable under § 841(b)(1)(A). Today, under the Fair Sentencing Act, his § 841(a)(1) conviction would instead be punishable under § 841(b)(1)(B). Because conviction of an offense punishable under § 841(b)(1)(A) is incorporated as an element of § 848(e)(1)(A), Mr. Roane's § 848 convictions would no longer be subject to the death penalty.

The Fourth Circuit explained in *United States v. Wirsing* that "[t]here is no indication that Congress intended a complicated and eligibility-limiting determination at the 'covered offense' stage of the analysis." 943 F.3d 175, 186 (4th Cir. 2019). In this vein, the Government has taken the position that a defendant may be eligible for resentencing under the First Step Act even where he was convicted under a statute other than those directly amended by sections 2 and 3 of the Fair Sentencing Act. *See, e.g.*, United States' Mot. to Remand at 8, *United States v. Maupin*, No. 19-6817 (4th Cir. Aug. 29, 2019), ECF No. 26. This includes convictions under § 848. *See United States v. Davis*, 2020 WL 1131147, at *2 (W.D. Va. Mar. 9, 2020) ("The government acknowledges that the defendant is eligible for a sentence reduction under the 2018 FSA for . . . Count Two due to § 848's requirement of a § 841(b)(1)(A) violation."); *United States v. Brown*,

2020 WL 3106320 at \*4 (W.D. Va. June 11, 2020) ("As to whether any of the penalties for § 848 have been modified by the Fair Sentencing Act, the parties do not disagree.").

Indeed, courts have consistently found that a conviction under § 848 is a covered offense under the First Step Act.  *See, e.g.*, *United States v. Davis*, 2020 WL 1131147, at \*2 (W.D. Va. Mar. 9, 2020) ("[A] defendant's § 848(e)(1)(A) conviction is a covered offense because it relies on the drug quantity thresholds set by § 841 and, therefore, requires a jury finding that the defendant committed a murder in furtherance of a drug conspiracy to sell 280 or more grams of cocaine base."); *United States v. Brown*, 2020 WL 3106320 at \*4 (W.D. Va. June 11, 2020); Order at 5, *United States v. Kelly*, No. 2:94-CR-163 (E.D. Va. June 5, 2020); *Wright v. United States*, 425 F. Supp. 3d 588, 598 (E.D. Va. 2019); Order at 1, *United States v. Groves*, No. 5:94-CR-97 (E.D.N.C. Nov. 21, 2019); *United States v. Dean*, 2020 WL 2526476 at \*3 (D. Minn. May 18, 2020); *United States v. Jimenez*, 2020 WL 2087748 at \*2 (S.D.N.Y. Apr. 30, 2020); Order at 4, *United States v. Hines*, No. 5:94-CR-150 (N.D.N.Y. Nov. 8, 2019), ECF No. 607; Order at 4, *United States v. Walker*, No. 5:95-CR-101 (N.D.N.Y. Oct. 25, 2019), ECF No. 620; Order at 4, *United States v. Robinson*, No. 98-CR-60 (E.D. Wis. Sept. 27, 2019), ECF No. 606. Mr. Roane's convictions on Counts 5, 8, and 11 are thus also covered under the First Step Act.

## II.     This Court Should Conduct a Hearing to Consider the 18 U.S.C. § 3553(a) Sentencing Factors as Required by the First Step Act

Once a defendant has established eligibility under the First Step Act, as Mr. Roane has, section 404 requires a "complete review on the merits," Pub. L. No. 115-391, § 404(c) (2018), which must include consideration of those factors required to be weighed in imposing a sentence pursuant to 18 U.S.C. § 3553(a).  *See United States v. Shaw*, 957 F.3d 734, 742 (7th Cir. 2020)

(record must show that district court "considered the arguments presented" and "accounted for the 18 U.S.C. § 3553(a) factors."); *United States v. Boulding*, 960 F.3d 774, 776 (6th Cir. 2020) ("an eligible defendant is entitled to an accurate amended guideline calculation and renewed consideration of the 18 U.S.C. § 3553(a) factors"); *United States v. Smith*, 959 F.3d 701, 703 (6th Cir. 2020) (a district court must consider the factors in § 3553(a) to determine a sentence "not greater than necessary").

18 U.S.C. § 3553(a) provides that a court must "impose a sentence sufficient, *but not greater than necessary*," to effectuate the sentencing goals of reflecting the seriousness of the offense; affording adequate deterrence to criminal conduct; protecting the public from further crimes of the defendant; and providing the defendant with needed educational or vocational training, medical care, or other correctional treatment (emphasis added).  Section 3553(a) also requires a court, in determining the appropriate sentence, to consider various factors including "the nature and circumstances of the offense and the history and characteristics of the defendant."

Where, as here, the death penalty is implicated, Supreme Court jurisprudence similarly requires individualized consideration of the character and culpability of the defendant.  *See, e.g.*, *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("[T]he fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense.");  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (sentencer must consider, as a mitigating factor, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.");  *see also Eddings v. Oklahoma*, 455 U.S. 104, 117 (1982).

Accordingly, this Court should grant an evidentiary hearing to consider the § 3553(a) sentencing factors as required by the First Step Act.  Mr. Roane sets forth herein a proffer of evidence he would submit at an evidentiary hearing.  Specifically, Mr. Roane proffers evidence demonstrating that resentencing is appropriate in this case because the currently applicable statutory ranges are lower than they were at the time Mr. Roane was sentenced; the circumstances of the offense, including evidence uncovered after Mr. Roane's conviction, strongly suggest he is actually innocent of the murder of Douglas Moody, for which he was sentenced to death; significant mitigating evidence militates in favor of a sentence reduction; Mr. Roane's positive prison adjustment since the time of his sentencing militates in favor of a sentence reduction; and nearly all of the other convictions that were considered as part of the sentencing package are invalid.

## A. The Currently Applicable Statutory Ranges Are Lower than at the Time Mr. Roane Was Sentenced

The mandatory minimum sentences for Mr. Roane's convictions under §§ 841(a)(1) and 848 are lower now than they were at the time Mr. Roane was sentenced.  Mr. Roane's conviction under § 841(a)(1) subjected him, in 1993, to ten years' to life imprisonment.  He was sentenced to forty years on this count.  If sentenced today, Mr. Roane would be subject to five to forty years' imprisonment.  Thus, the sentence the Court imposed for Mr. Roane's § 841(a)(1) conviction was, at that time, at approximately the mid-point of the sentencing range; today it is at the maximum end of the sentencing range.  This Court should reduce Mr. Roane's sentence on this count accordingly.

Most critically, the statutory ranges for Mr. Roane's convictions under § 848 are lower now than they were when he was sentenced in 1993.  Mr. Roane's § 841(a)(1) conviction, punishable under § 841(b)(1)(A), subjected him to a death sentence under § 848(e)(1)(A).  Today, since Mr. Roane's § 841(a)(1) conviction is no longer punishable under § 841(b)(1)(A), he would instead be subject to sentencing under § 848(a) to twenty years' to life imprisonment.  Mr. Roane was sentenced to death on Count 5 and to life imprisonment on Counts 8 and 11.  As Mr. Roane's conviction under Count 5 no longer renders him death eligible, he should be resentenced to a sentence less than death.  And since the jury found that a sentence less than the maximum was appropriate on Counts 8 and 11, Mr. Roane's sentence should be reduced on those counts as well.

**B.  The Circumstances of the Offense Militate in Favor of a Reduced Sentence**

Mr. Roane was sentenced to death on Count 5 for the murder of Douglas Moody.  The facts of the Moody murder, "[r]ecounted in summary form and in the light most favorable to the Government," *U.S. v. Tipton*, 90 F.3d 861, 868 (4th Cir. 1996), are as follows:

> On the evening of January 13, 1992, Tipton and Roane went to the apartment of Douglas Moody, a suspected rival in their drug-trafficking area, where Tipton shot Moody twice in the back.  After Moody fled by jumping through a window, both Tipton and Roane pursued.  Roane, armed with a military-style knife retrieved from an apartment where the knife was kept for co-conspirator Curtis Thorne, caught up with Moody in the front yard of the apartment, where he stabbed him eighteen times, killing him.

*Id.*  However, eyewitness, forensic, and alibi evidence establishes that Mr. Roane did not kill Mr. Moody.

### 1.  Witnesses Confirm that Keith Barley, Not James Roane, Killed Douglas Moody

On the day of the murder, the police spoke with two witnesses—Catherine Watlington, Mr. Moody's mother,[2] and Gina Taylor, an eyewitness who attempted to resuscitate Mr. Moody.  As a result of these interviews, the police identified Keith Barley, a local drug dealer who fit Ms. Taylor's description of Mr. Moody's attacker, as a primary suspect in Mr. Moody's murder.[3]  At trial, Richmond Police Detective Steve Dalton confirmed that Mr. Barley was initially identified as a suspect.[4]

Witnesses establish that Mr. Barley was looking for Mr. Moody days and even hours before he was killed.  According to Detective Dalton, the victim's mother told police that two hours before the murder, someone named "Keith" came to her house looking for Mr. Moody, and that approximately a week earlier, friends of the same man had kicked in her door, armed with guns, looking for her son.[5]  Richard Coles, a neighborhood resident, recalls that "Little Keith" was looking for Mr. Moody, armed with a gun, only one hour before Mr. Moody was killed.[6]

Gina Taylor, a nursing student who lived next door to the alley where Mr. Moody was killed, saw him being stabbed and went to his aid.  Ms. Taylor, unlike the alleged eyewitnesses who testified for the prosecution, had never been involved in any criminal activity and was not testifying in exchange for leniency.  Ms. Taylor testified she knew Mr. Roane from seeing him

---

[2] The Presentence Investigation Report ("PSI") incorrectly stated that Mr. Moody had "no known immediate survivors," and therefore was silent with regard to victim impact for the Moody murder.  App. 0427 at ℙ 97.  In 2008, Ms. Watlington told her long-time friend, Earl Granger, that she "[did] not wish to see James Roane executed for her son's murder….[and] that she [was] upset that her son, Douglas Moody, was portrayed in court as a drug dealer.  She said that her son was not a drug dealer.  She said that her son was a drug addict who never had any money at all and in fact used to ask her for money."  App. 0788.  Ms. Watlington died on November 1, 2015, in Richmond, Virginia.  https://www.mimmsfuneralhome.com/obituary/3390195 (last visited July 14, 2020).

[3] App. 0205-08; 0907.

[4] App. 0205-06.

[5] *Id.*

[6] App. 0769.

around the neighborhood and that he was not the person she saw stabbing Mr. Moody.[7]  She described the killer as an individual who was shorter than her (i.e., less than 5′6½″ tall) and very thin.[8]  Mr. Roane, who was 6′1″ tall and 170 pounds, clearly did *not* fit this description.[9]  However, at 5′2″ tall and weighing 120 pounds, "Little Keith" Barley clearly did.[10]

Ms. Taylor provided post-conviction counsel with additional evidence, which the jury did not hear, directly implicating Mr. Barley in Mr. Moody's killing.  At trial, Ms. Taylor said only that James Roane did not kill Mr. Moody.  She now admits that she knew Mr. Barley had killed Mr. Moody, but did not identify him at trial out of fear for her life.[11]  In a declaration, Ms. Taylor fully described what she actually saw that night:

> At that time, I lived at 810 N. Harrison Street near the corner of Clay and Harrison.  Doug Moody was killed right next to my house.  I heard yelling and looked outside.  I saw Keith Barley, who I knew as "Little Keith."  He was stabbing Doug.  He was the person who killed Doug.  At first, I thought he was just punching him, but when I got outside and saw all the blood it was clear that Keith had stabbed him.[12]

Ms. Taylor describes Mr. Barley as a "violent and dangerous guy."[13]  Many others who knew him describe him similarly.[14]

---

[7] App. 0201.

[8] *Id*.

[9] App. 0910.

[10] App. 0908; *see also* App. 0114.

[11] App. 0872-73.

[12] App. 0872 at ¶ 2.

[13] *Id*. at ¶ 3.

[14] *See, e.g.*, App. 0766 (Decl. of Harold Coles); App. 0768 (Decl. of Aimee Coley); App. 0770 (Decl. of Richard Coles); App. 0773 (Decl. of Willie Coley); App. 0804-05 (Decl. of Ronita Holman); App. 0832 (Decl. of Lloyd McDaniels); App. 0840 (Decl. of Jeannette Pauley); App. 0865 (Decl. of Keith Ross); App. 0883 (Decl. of Wanda Wright).

Ms. Taylor also says that Mr. Barley confessed to her that he had killed Mr. Moody over a drug debt.[15]  Mr. Barley told at least two other people, including his best friend Lloyd McDaniels, that he killed Douglas Moody.  In his declaration, Mr. McDaniels stated: "James Roane did not kill Doug Moody.  Keith Barley, my best friend, did it.  He told me he killed Moody. . . . Keith told me that he killed Moody because he owed him money for drugs."[16]  Willie Coley, another friend of Mr. Barley's, stated that Mr. Barley confessed that he killed Mr. Moody: "Keith told me that he killed Doug over money.  I don't want to see James Roane get killed for something Keith Barley did.  And I know that he did it because Keith told me."[17]

### 2.  No Physical Evidence Supports the Government's Theory that Mr. Roane Killed Douglas Moody

The investigation of the crime scene and physical evidence in this case was inexcusably sloppy.  The crime scene video shows numerous bloody items located within feet of Mr. Moody's body, including a knife, clothing, and personal items (cigarettes, pen, etc.).  Yet none of these items—not even the bloody knife—was secured by the police, or subjected to forensic testing.[18]  And while some hairs and fibers were collected from the scene, they were not submitted for testing.[19]  Mr. Moody's clothing was likewise not submitted for testing.[20]

Lacking any physical evidence to connect Mr. Roane to the Moody murder, the Government relied on the testimony of two alleged eyewitnesses, both of whom received governmental immunity in exchange for their testimony.  Priscilla "Pepsi" Greene and Denise

---

[15] App. 0872 at ⁋ 4.

[16] App. 0833 at ⁋ 6.

[17] App. 0774 at ⁋ 5.

[18] *See* Crime Scene Video DVD; *see also* App. 0748 at ⁋ 7 (Declaration of forensic investigation and crime scene reconstruction expert R. Robert Tressel expressing "serious concerns about the police crime scene investigation in Mr. Roane's case."); App. 0750 (chart of uncollected and/or untested crime scene evidence prepared by R. Robert Tressel).

[19] App. 0909 (Forensic Synopsis Sheet).

[20] 0748 at ⁋ 7; App. 0750; App. 0909.

11

Berkley, whom police did not locate until well after Mr. Moody's death, were not credible eyewitnesses. Both women admitted to smoking crack minutes before they allegedly witnessed the attack on Mr. Moody. Their testimony is contradictory, inconsistent with the physical evidence, and also inconsistent with the testimony of the only eyewitness to speak to police on the night of the killing, Gina Taylor.

The first alleged eyewitness, "Pepsi" Greene, was shot in the head after Mr. Roane was arrested and suffered memory loss as a result.[21] She repeatedly contradicted herself during her trial testimony.[22] She testified that she saw Mr. Roane "finish[] killing" Douglas Moody,[23] but later admitted that she didn't actually see Mr. Roane stab Mr. Moody.[24] She testified that she saw Mr. Moody jump out the window,[25] but later said she did not actually see this and merely heard about it.[26]

Further, Ms. Greene's pre-trial statement is so significantly different from her trial testimony that it calls into question whether or not she actually saw anything on the night Mr. Moody was killed. At trial, she testified that after she heard gunshots, Mr. Roane came to her nearby apartment and asked for a knife. Mr. Roane took the knife, "finished killing" Mr. Moody, and then asked her to dispose of the knife.[27] She described the knife as a "big" "military knife" that was "wide," indicating two to three inches.[28] However, in her pre-trial statement to Detective Dalton, Ms. Greene made no mention of Mr. Roane retrieving a knife from her and,

---

[21] App. 0177-78; 0185-88; 0196.

[22] Ms. Greene's testimony was also inconsistent with the testimony of Denise Berkley. While Ms. Greene claimed that after the shooting, Mr. Roane walked to her apartment and asked her for the knife, Ms. Berkley testified that the shooting and stabbing were virtually simultaneous. *Compare* App. 0181-82 (testimony of Greene) *and* App. 0014-16 (testimony of Berkley).

[23] App. 0181.

[24] App. 0193, 0197.

[25] App. 0181.

[26] App. 0191.

[27] App. 0181-82.

[28] App. 0181; 0190-91.

further, did not know what kind of knife Mr. Roane allegedly had because she saw only its handle.[29]

The second alleged eyewitness, Denise Berkley, was a "worker" in the criminal enterprise, and testified for the prosecution in exchange for leniency.[30]  Like Ms. Greene, Ms. Berkley did not speak to police on the night of the murder, and the police reports make no mention of her at the scene.  At trial, she admitted that on night of the murder, she was smoking crack when she heard a loud bang from another apartment, followed by the sound of breaking glass.  Thinking it was the police, Ms. Berkley and her companions threw away their drug paraphernalia and went outside, where, she testified, she saw Mr. Roane stand in front of Mr. Moody and stab him eighteen or nineteen times.[31]  This testimony conflicts with Ms. Berkley's grand jury's testimony that Mr. Moody was stabbed approximately four times.[32]  Ms. Berkley further testified at trial that she saw Mr. Roane give the knife to "Pepsi" Greene and tell her to dispose of it.[33]  She described the knife she saw as a "butcher knife."[34]

Ms. Greene and Ms. Berkley's trial testimony is called into question by the findings of the medical examiner who conducted the autopsy on Mr. Moody's body and testified for the prosecution at trial.  At current counsel's request, the medical examiner, Marcella F. Fierro, M.D., reviewed her previous reports and files, the crime scene video (which she had never seen), her own trial testimony, and the trial testimony of Ms. Greene and Ms. Berkley.[35]  Dr. Fierro concluded that the width and depth of Mr. Moody's stab wounds show that he could not have been stabbed with either the military-style knife described by Ms. Greene or the butcher knife

---

[29] App. 0938.
[30] App. 0111-16.
[31] App. 0086, 0116.
[32] App. 0016.
[33] App. 0087.
[34] App. 0086.
[35] *See* App. 0617-20.

described by Ms. Berkley.[36]  Further, contrary to Ms. Berkley's trial testimony that "James Roane was standing in front of Moody when he started stabbing him," the positioning of Mr. Moody's stab wounds made it "more likely . . . that Mr. Moody had his back to the perpetrator."[37]  Finally, with regard to Ms. Berkley's claim that she saw Mr. Moody stabbed eighteen or nineteen times, Dr. Fierro states:

> It took me several hours of examination to determine that the total number of wounds on Mr. Moody's body which consisted of nine stab wounds, three cuts, and six puncture wounds—eighteen total, plus two gunshot wounds. The variable nature of the wounds in this case, makes Ms. Berkley's testimony suspect. She could not have known the exact number of the wounds unless she had seen or been told about my autopsy report before she testified.[38]

The jury at Mr. Roane's trial never heard about these discrepancies between the alleged eyewitness testimony and the medical examiner's findings.

Another important aspect of Ms. Greene and Ms. Berkley's testimony is contradicted by evidence discovered since trial.  These witnesses told the jury that Mr. Moody jumped out a window prior to being stabbed,[39] and this was also the Government's theory.[40]  This window, and the two broken panes of glass Mr. Moody allegedly broke while jumping out of the window, are clearly visible in the police crime scene video and the Government's trial exhibits, photographs 9-2 and 9-3.[41]  R. Robert Tressel, an expert in forensic investigations,[42] reviewed the crime scene video and photographs R-2 and R-3, and concluded that it was not possible for

---

[36] App. 0619 at ⁋ 6.

[37] App. 0618-19 at ⁋ 5.

[38] App. 0619-20 at ⁋ 7.

[39] Ms. Greene testified that Mr. Moody jumped out a window in an attempt to escape his assailants.  App. 0181.  Ms. Berkley testified that she heard breaking glass just before seeing Mr. Moody outside the house.  App. 0086.

[40] App. 0228 (Government closing argument).

[41] App. 0396-97; *see also* App. 0135 (testimony of Det. Paul Tuttle, estimating that the area of broken glass in the upper sash of the window was approximately twelve by eighteen inches).

[42] App. 1019-26.

14

Mr. Moody to have made this leap.[43]  The crime scene video and the photographs taken on the

night of Mr. Moody's death show that the largest single hole in the window was on the upper

sash, and involved only two panes of glass and one piece of wood trim.[44]  Mr. Tressel concluded

that it would have been physically impossible for an adult to jump through that window without

breaking additional panes of glass and wood trim.[45]

The only other evidence presented by the Government to prove Mr. Roane's guilt for the

murder of Douglas Moody was the testimony of Robert Davis, who admitted at trial to being a

frequent crack smoker and dealer.[46]  He claimed that on the night Mr. Moody was killed, Mr.

Roane and a co-defendant came to his house "running, huffing and puffing," saying, "I got

him."[47]  However, significant evidence refutes Mr. Davis's testimony.  First, Mr. Davis's

testimony that Mr. Roane and Mr. Tipton ran to his house on Hancock Street immediately after

the killing is contradicted by the testimony of Government witnesses "Pepsi" Greene and Denise

Berkley.  Ms. Greene testified that immediately after the killing, Mr. Roane went with her, not

on foot as Mr. Davis claimed, but in Linwood Chiles's car to Norton Street, which is the opposite

direction from Hancock Street, where Mr. Davis lived.[48]  Denise Berkley testified that

immediately after the killing, "'Pepsi,' [Mr. Roane], Sandra, Curt and Linwood got in Linwood's

station wagon and pulled off."[49]  Second, Mr. Davis had a motive to fabricate, because his two

siblings had been recently killed in drug-related activity.[50]  He had a further motive to fabricate

as he admitted to selling drugs and hiding guns but was never charged with anything.[51]  Finally,

Mr. Davis's testimony at the grand jury contradicted the Government's theory of the case.  There

---

[43] App. 0746-49.

[44] *See* n.41, *supra*.

[45] App. 0747-48 at ⁋⁋ 3-5.

[46] App. 0139, 0151-52.

[47] App. 0146.

[48] App. 0182.

[49] App. 0087.

[50] App. 0139-40.

[51] App. 0156-57.

15

he testified that his sister told him that Mr. Moody was killed with a pair of scissors that she provided.[52] "Pepsi" Greene, however, testified at the trial that she, not Mr. Davis's sister, provided the knife used to kill Mr. Moody to Mr. Roane, who returned it to her afterwards.[53]

### 3. Mr. Roane Has an Alibi that Shows He Was Not Present When Douglas Moody Was Killed

At the time of Mr. Moody's murder, Mr. Roane was several miles away at a Richmond hotel. Documentary evidence of this alibi was presented during a federal post-conviction hearing.[54] This evidence included hotel receipts that support what Mr. Roane has always maintained: that on the date and time Mr. Moody was killed, he was with Sandra Reavis in a hotel room that had been rented on his behalf by Linwood Chiles and Carmella Coley.[55]

The jury that convicted Mr. Roane and sentenced him to death never saw these receipts and never heard this compelling alibi evidence for a number of reasons. First, Sandra Reavis was facing criminal charges of her own and therefore could not testify at Mr. Roane's trial about his whereabouts.[56] She did, however, testify during the post-conviction hearing that she was with Mr. Roane at the hotel on the night Mr. Moody was killed.[57] The hotel receipts match the dates of Sandra Reavis's alibi testimony and corroborate her account. Carmella Coley, who did not testify at trial, corroborates this evidence in a signed declaration, confirming her recollection that she drove Mr. Roane and Ms. Reavis to the hotel along with Linwood Chiles.[58]

Second, the jury did not hear the alibi evidence because Mr. Roane's attorney failed to find and present it. David Baugh, trial counsel for Mr. Roane, readily admitted that Mr. Roane

---

[52] App. 0031-32.
[53] App. 0181.
[54] App. 0467-75.
[55] *See* App. 0510-16; App. 0528-29.
[56] App. 0534.
[57] App. 0476-88.
[58] App. 0771.

told him about the alibi and that he should have developed and presented this alibi evidence to the jury.[59]

In 2003, the Honorable James H. Spencer, who was the same judge who presided over Mr. Roane's trial, agreed that counsel's failure to uncover this vital alibi evidence amounted to ineffective assistance of counsel, warranting the grant of a new trial. Order at 8-11, *United States v. Roane*, No. 3:92CR68 (E.D. Va. May 1, 2003). The Fourth Circuit reversed, finding that counsel's minimal alibi investigation was sufficient. *United States v. Roane*, 378 F.3d 382, 411 (4th Cir. 2004).

Evidence that Mr. Roane was in a hotel when Mr. Moody was killed, in conjunction with all of the evidence establishing that Keith Barley killed Mr. Moody, supports Mr. Roane's claim that he is innocent of this murder, a claim he has maintained since the day of his arrest.[60]

### C. James Roane's History Militates in Favor of a Sentence Reduction

Section 3553(a)(1) requires that a court, in sentencing, consider "the history and characteristics of the defendant." In a similar vein, Supreme Court precedent makes clear that, where the death penalty is implicated, the sentencer must take into consideration "mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). This includes "*any* aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis added). As set forth below, James Roane's background and life circumstances militate in favor of a reduced sentence.

---

[59] App. 0532.
[60] App. 0510-16; App. 0528-29.

**1.  Mr. Roane Was Deprived of Virtually Everything a Child Needs for Normal Growth and Development**

Mr. Roane (also "James" and "James Jr.") grew up in the Gilpin Court Housing Projects, in Richmond.  Gilpin Court, Richmond's first public housing project, was built in 1942 as segregated housing for Blacks by the all-white Richmond Redevelopment and Housing Authority, as part of a so-called "slum clearing" effort targeting the Jackson Ward neighborhood, which was the center of Black economic and cultural life in Richmond.[61]  In 1958, Interstate 95 was routed through a portion of Jackson Ward that lay just to the south of Gilpin Court, creating a physical barrier between Gilpin Court and Richmond's thriving Broad Street corridor.[62]  Gilpin Court is further isolated by an undeveloped ravine at its northern border.

James Roane was born on October 27, 1965.  In the 1980s and '90s, Gilpin Court, like many other poor, high-density public housing projects, experienced "a rising tide of crime and violence" associated with "the widespread presence of drugs and guns." *Richmond Tenants v. Richmond Redev. & Housing Auth.*, 751 F. Supp. 1204, 1205 (E.D. Va. 1990).  The *Richmond Times-Dispatch* reported about life in Gilpin Court in 1985:

> It is an area that labors under the stigma of drugs, guns, and homicides. . . . All of the symptoms of society's sickness can be found here.  It is a place described by residents and police alike as a jungle, a modern slave quarters, a rogues' hangout and a shooting gallery.  Residents themselves say it's a bad place to raise children. Children who live there talk about the shooting and say they wish they could live someplace else. [63]

---

[61] App. 0903-05; App. 0921-22; App. 0924-27; App. 0929-31; *see also* App. 0782.

[62] App. 0924-27.

[63] App. 0903-04.

The sound of gunfire was common.  James's childhood next door neighbor, Clarence Harvey, describes hearing and feeling bullets "whizz[ing]" past him after "[s]omebody had fired a gun in the distance."[64]  Death by violence was also common, particularly among the young.[65] Social Worker Herman Taylor worked in Gilpin Court through the 1970s and 1980s,[66] and it seemed to him as if dead bodies were being found in the neighborhood "every weekend."[67] James's friend Briian Dargon recalls how as children, he and James "sometimes walked past dead bodies."[68]  "Looking back on it now," Mr. Dargon says, "the mentality was that life was worthless."[69]

In 1975, Roane family friend Randy "Floyd" Mayo was shot in the chest and bled to death just steps away from the Roane family's front door.[70]  Floyd was eighteen at the time, and was someone who James had looked up to.[71]  The shooting happened in full view of James and his young siblings: "[t]here was blood everywhere and the kids were just standing there looking at it and crying."[72]  James had nightmares for years after.[73]

---

[64] App. 0791 at ℙ 2.

[65] App. 0306; *see also* App. 0972-74.

[66] App. 0972-73 at ℙℙ 2-12.

[67] App. 0974 at ℙ 12.

[68] App. 0777 at ℙ 3.

[69] *Id.*

[70] App. 0761 at ℙ 7; App. 0829-30 at ℙ 7; App. 0841 at ℙ 2; App. 0857 at ℙ 18; *see also* App. 0895 (Report Dr. Lordi).

[71] App. 0857 at ℙ 18.

[72] App. 0812 at ℙ 12.

[73] App. 0829-30 at ℙ 7; App. 0849 at ℙ 24; *see also* App. 0630 at ℙ 26 (Report of Dr. Lisak).

Many of the adults in James's life were addicted to illegal drugs, which were openly sold and used in Gilpin Court. [74]  Social Worker Herman Taylor recalls that "[o]n nice summer nights, there would be 100-150 people out on Saint John Street trying to buy drugs."[75]  Family friend Joan Dargon says that "[t]here were so many people in Gilpin Court who were addicted to drugs[,] . . . it was nothing to see an addict shooting up as you were walking down the street."[76]  Other crimes, like prostitution, theft, and assault, also occurred out in the open, and were unavoidable facts of life.[77]

James was the fourth child born to a seventeen-year-old mother, Jeannette Roane.[78]  His father, James Roane Sr., first met Jeanette when she was twelve.[79]  She became pregnant and had the couple's first set of twins at thirteen.[80]  James Sr. and Jeanette married when Jeanette was fourteen, and moved to Gilpin Court.[81]  James Sr. exerted absolute control over his young wife. He confined her to the apartment, and would not let her leave even to receive prenatal care when she was pregnant with James.[82]  He also refused to let her obtain birth control.[83]  Consequently,

---

[74] *See* App. 0763 at ⁋ 18; App. 0778-79 at ⁋ 8; App. 0800-01 at ⁋ 7; App. 0830-31 at ⁋⁋ 8-9; App. 0842 at ⁋ 5; App. 0848 at ⁋ 20; App. 0877-78 at ⁋⁋ 2-3; App. 0978-79 at ⁋ 13, 17.
[75] App. 0974 at ⁋ 12.
[76] App. 0781 at ⁋ 7.
[77] App. 0851 at ⁋ 2; App. 0878 at ⁋ 8; App. 0885 at ⁋ 6.
[78] App. 0302.
[79] App. 0844 at ⁋ 3.
[80] App. 0760 at ⁋ 1; App. 0787-78 at ⁋ 4.
[81] App. 0787-78 at ⁋ 4; App. 0887.
[82] App. 0845 at ⁋ 7.
[83] App. 0303; App. 0845 at ⁋ 6; App. 0795 at ⁋ 13.

Jeanette gave birth to six children in only forty-five months, including two sets of twins: Annette and Anne in 1963, Florence in 1964, James in 1965, and Kevin and Kathy in 1967.[84]

James Roane Sr. was an "extremely brutal man who subjected his wife and children to ferocious bouts of violence, maintained a tyrannical control over the family, and yet utterly neglected his role as a breadwinner, thus relegating his family to desperate poverty."[85] He was especially violent toward Jeanette, whom he terrorized with rapes and near-daily beatings.[86] She "was certain that one day James Sr. would kill [her]."[87] He beat her when she was pregnant, including when she was pregnant with James.[88] In 1967, when James was two, Mrs. Roane went into early labor after a beating.[89] She gave birth to the second set of Roane twins, Kevin and Kathy, on the living room couch.[90]

Neighbors knew of the violence Mrs. Roane suffered, either because they saw her being beaten,[91] heard the beatings through the apartment walls,[92] or saw evidence of the beatings on her body.[93] Mrs. Roane exhibited bruises, swelling, and bleeding wounds, and at times was in so

---

[84] App. 0302-03; App. 0806-07 at ℙ 3.

[85] App. 0624 at ℙ 4 (Decl. of Dr. Lisak); *see also* App. 0302-03; App. 0845-46 at ℙℙ 8-11; App. 0862 at ℙ 6; App. 0827-29 at ℙℙ 3-5; App. 0880-81 at ℙ 4; App. 0757 at ℙ 7; App. 0811 at ℙℙ 3-5; App. 0825-06 at ℙℙ 4-6; App. 0978 at ℙ 12; App. 0834 at ℙℙ 3-5; App. 0852-54 at ℙℙ 5-10.

[86] App. 0845-46 at ℙ 8; App. 0975 at ℙ 3, ℙℙ 7-8.

[87] App. 0846 at ℙ 11.

[88] App. 0845-46 at ℙℙ 7-8.

[89] App. 0828-29 at ℙ 4.

[90] *Id.*; App. 0793 at ℙ 9; App. 0798 at ℙ 4; App. 0981 at ℙ 3.

[91] App. 0802-29 at ℙ 4; App. 0975 at ℙ 3; App. 0981 at ℙ 2.

[92] App. 0792-93 at ℙℙ 7-8; App. 0799-800 at ℙ 3; App. 0828-29 at ℙ 4; App. 0976-77 at ℙℙ 7-8.

[93] App. 0792-93 at ℙ 7; App. 816 at ℙ 4; App. 0975 at ℙ 3; App. 0828-29 at ℙ 4; App. 0797 at ℙ 2.

much pain that she could barely walk.[94]  Friends and family describe the abuse as so

overwhelming that Mrs. Roane would shake with fear and could not think straight.[95]  Witnessing

the beatings, and their physical and mental aftermath, was traumatizing to the Roane children.[96]

No one successfully intervened to stop the violence.  James's maternal uncle, John

Haywood Jones, was once knocked out cold by James Sr. when he tried to defend his sister.[97]  A

neighbor from the adjoining apartment expressed regret for not calling the police.[98]  In all

likelihood, however, calling the police would have changed nothing: the one time Mrs. Roane

went to the police, she was told that the matter was between her and her husband.[99]

The physical and emotional abuse inflicted upon Mrs. Roane took its toll.  In time, she

was diagnosed with depression and anxiety, which was obvious to all who knew her. [100]  Like so

many of her neighbors, she resorted to drugs and alcohol to cope.[101]  She became violent, and

physically abused young James and her other children, using leather straps, switches braided

---

[94] App. 0792-93 at ℙ 7; App. 0816 at ℙ 4; App. 0975 at ℙ 3; App. 0828-29 at ℙ 4; App. 0797 at ℙ 2; App. 0807 at ℙ 6; App. 0844-45 at ℙℙ 5, 8.

[95] App. 0816 at ℙ 7; App. 0880 at ℙ 3.

[96] App. 0828-29 at ℙ 4; App. 0975 at ℙ 4; App. 0976-77 at ℙ 8; *see also* App. 0625 at ℙ 13 (Decl. of Dr. Lisak).

[97] App. 0811 at ℙ 3.

[98] App. 0799-80 at ℙ 3.

[99] App. 0846 at ℙ 10.

[100] App. 0846-47 at ℙℙ 14-15; App. 0878 at ℙ 7; App. 0978 at ℙ 15.

[101] App. 0846-47 at ℙℙ 14-15; App. 0850 at ℙ 2; App. 0878 at ℙ 7; App. 0978 at ℙ 14; *see also* App. 0895 (Report of Dr. Lordi, noting mother reported problem with drinking); App. 0721 at ℙ 10 (Decl. of Dr. Novick Brown).

together, or a doubled-up extension cord.[102]  At different times, James was so severely beaten by either his mother or his father that he was made to stay inside to prevent his injuries from drawing attention.[103]  "These beatings were not acts of parental discipline.  They were the gratuitous unleashing of the parent's pent up anger and frustration, using James Roane's body to gratify their need for a release of their own emotions and impulses."[104]

James's childhood psychiatrist, his teachers, and others familiar with the Roane family confirm Mrs. Roane's inability to give James the care he needed.[105]  She failed to fill his prescriptions.[106]  She did not bring him to medical appointments and mental health assessments.[107]  She was unable to get him to school consistently or on time.[108]  She missed meetings with teachers and social workers.[109]

Food ran often out in the Roane household, and when that happened, James and his siblings went hungry.[110]  James's brother Kevin said that "[i]t's impossible to describe what that

---

[102] App. 0794 at ⁋ 11; App. 0798 at ⁋ 5; App. 0801 at ⁋ 8; App. 0808-09 at ⁋⁋ 10-11; App. 0852-54 at ⁋⁋ 4, 7, 8.

[103] App. 0975-76 at ⁋ 5; *see also* App. 0625 at ⁋ 14 (Decl. of Dr. Lisak).

[104] App. 0625 at ⁋ 14 (Decl. of Dr. Lisak).

[105] App. 0282-83.

[106] App. 0282-83; App. 0290; *see also* App. 0891 (Report of Dr. Lordi); App. 0892-93 (Report of Dr. Lordi); App. 0894-96 (Report of Dr. Lordi).

[107] App. 0894-95 (Report of Dr. Lordi); App. 0898.

[108] App. 0888-89; *see also* App. 0816 at ⁋ 6.

[109] App. 0802 at ⁋ 4; App. 972 at ⁋ 5.

[110] App. 0758 at ⁋ 5; App. 0760-62 at ⁋⁋ 2-3, 14; App. 0778 at ⁋ 6; App. 0780 at ⁋ 3; App. 0782 at ⁋ 5; App. 0793-94 at ⁋ 10; App. 0797-98 at ⁋ 3; App. 0807-08 at ⁋⁋ 4, 8; App. 0811 at ⁋ 5; App. 0827-29 at ⁋⁋ 3, 5; App. 0881 at ⁋ 6; App. 0978 at ⁋ 12.

hunger was like."[111]  The family's desperation was intense.  Their father, who never provided a

penny to support his children, took what little money and food the family had for himself.[112]

Mrs. Roane turned to neighbors for help, but also resorted to stealing and prostitution.[113]

Beginning at an early age, James, too, stole to feed himself, his siblings, and the other children

staying in the Roane apartment.[114]

When James Roane Sr. went to prison for burglary and robbery,[115] there was some relief

from the daily violence he inflicted on Mrs. Roane.  But life for James Jr. did not improve.

Fearful of being alone, his mother opened their apartment to family, neighbors, and even

strangers, who were either down on their luck or looking for a place to hang out and get high.[116]

Jeanette recalls: "I think I liked to keep so many people around and keep things happy, like a

party, so I didn't have to stop and think about how bad things were."[117]  James's maternal uncle,

John Haywood Jones; Haywood's wife, Michelle Mayo-Jones; James's aunt, Phyllis Jones-

Washington; and all of their children stayed in the Roane apartment for months at a time, as did

---

[111] App. 0854 at ⁋ 9.

[112] App. 0760 at ⁋⁋ 2-3; App. 0829 at ⁋ 5; App. 0853-54 at ⁋ 8; App. 0976-77 at ⁋ 8; App. 0981-82 at ⁋ 4.

[113] App. 0825 at ⁋ 5; App. 0827-28 at ⁋ 3; App. 0852-53 at ⁋ 5; App. 0860 at ⁋⁋ 1-3; App. 0862 at ⁋ 6.

[114] App. 0757 at ⁋ 8; App. 0758 at ⁋ 5; App. 0813 at ⁋ 2; App. 0825-26 at ⁋ 6; App. 0860 at ⁋ 2; App. 0834 at ⁋⁋ 2-5; App. 0853-54 at ⁋⁋ 6-7; App. 0978 at ⁋ 12.

[115] App. 0792-93 at ⁋ 7; App. 0846 at ⁋ 12; *see also* App. 0441 at ⁋ 158 (PSI).

[116] App. 0758 at ⁋⁋ 1-4; App. 0761 at ⁋ 8; App. 0778-79 at ⁋ 8; App. 0795 at ⁋ 13; App. 0800-01 at ⁋ 7; App. 0806 at ⁋ 2; App. 0827 at ⁋ 2; App. 0846-49 at ⁋⁋ 14, 23; App. 0854-56 at ⁋⁋ 11-14, 16; App. 0861-62 at ⁋ 5; App. 0882 at ⁋ 7; App. 0974 at ⁋ 13; App. 0977-78 at ⁋⁋ 10, 13.

[117] App. 0846-47 at ⁋ 14.

James Roane Sr.'s sister and brother, Florence Roane-Coleman and Alvin Roscoe Roane, along with all of their children.[118] Jeanette also took in neighbors from Gilpin Court, including Kathrine Wright, Joan Dargon, Jeffery Michaux, and Herbert Keys, to name but a few.[119]

The Roane apartment was a place without rules, where teens and adults could gather to hang out, drink, and get high: behaviors the young Roane children watched and imitated.[120] It was chaotic and noisy.[121] There were so many visitors that the Roane children had to step over people to go the bathroom at night.[122]

Though "a lot of people hung out at Jeanette's apartment," "[t]he apartment wasn't nice."[123] "In the projects, everything was concrete—the floors, the walls, everything was made of cinderblock."[124] In summer, it got so hot that the walls would "sweat."[125] Dirty dishes lay in piles.[126] The youngest Roane children wore dirty diapers.[127] The apartment wreaked of urine.[128] The furniture was broken, filthy, or nonexistent.[129] Adults slept on couches, and children slept

---

[118] App. 0806 at ℙ 2; App. 0825 at ℙ 4; App. 0827 at ℙ 2; App. 0834-35 at ℙℙ 2, 8; App. 0848 at ℙ 20; App. 0855 at ℙ 12; App. 0861-62 at ℙ 5; App. 0882 at ℙ 7.

[119] App. 0834 at ℙℙ 2, 8; App. 0855 at ℙ 12; App. 0880 at ℙ 2.

[120] App. 0758 at ℙℙ 3-4; App. 0794-95 at ℙ 12; App. 0856-57 at ℙℙ 16-17; App. 0877 at ℙ 2; App. 0881 at ℙ 5; App. 0885-86 at ℙℙ 6-9.

[121] App. 0783 at ℙ 7; App. 0785 at ℙℙ 3-4; App. 0877 at ℙ 2.

[122] App. 0855 at ℙ 13.

[123] App. 0882 at ℙ 7.

[124] App. 0782 at ℙ 4.

[125] App. 0852 at ℙ 5.

[126] App. 0977-78 at ℙ 11.

[127] *Id*.; Malik at ℙ 6;

[128] *See, e.g*., App. 0800 at ℙ 5.

[129] App. 0783 at ℙ 7; App. 0792 at ℙ 6; App. 0798 at ℙ 4; App. 0799 at ℙ 5; App. 0977-78 ℙ 11.

on mattresses on the floor without sheets.[130]  Because of all of the extra people staying in the

apartment, sometimes children crammed together four to a mattress.[131]  The housing authority

documented the almost uninhabitable state of the apartment.[132]

"[T]he cops raided the apartment" multiple times, and would "come by there looking for

different people."[133]  One year "around Christmastime," police officers "broke the door down"

and found a suitcase full of drugs hidden in the bedroom that James and Kevin shared.[134]  The

suitcase belonged to James's uncle, Alvin Roscoe Roane, who sold drugs out of the apartment.[135]

James and Kevin were just small children at the time.

In their filthy, crowded apartment, the Roane children experienced few of the normal

comforts or joys of childhood.  "Nobody was there to tell them to brush their teeth or wash

behind their ears."[136]  One Gilpin Court neighbor recalls that "[f]or [the Roanes] it was strictly

survival.  No coloring books, nothing extra.  I don't remember any toys in their house."[137]

Sweets were so scarce that that the Roane children resorted to desperate tactics to get them.

Kevin Roane attended long, hot church services on the promise of getting just a single piece of

hard candy.[138]  Florence Roane fought other children for candy in school and outside a

[130] App. 0881 at ¶ 7; App. 0977-78 at ¶ 11.
[131] App. 0825 at ¶ 4.
[132] App. 0304-05.
[133] App. 0830 at ¶ 9.
[134] *Id.*; App. 0763 at ¶ 18.
[135] App. 0763 at ¶ 18.
[136] App. 0881 at ¶ 5.
[137] App. 0783 at ¶ 7.
[138] App. 0854 at ¶ 9.

neighborhood store.[139]  And most extreme of all, James would let his friend Kerry Younger "hit

him in the jaw with all [his] might" in exchange for candy.[140]  Mr. Younger believed that James

"didn't mind [being hit] because he was so used to getting beaten up."[141]  Later, at age ten,

James was arrested with two other children for breaking into a building and stealing "two six-

packs of Coke."[142]

　　　The Roane children's clothing, nearly all of which was "donated,"[143] was kept in garbage

bags on the floor.  From day to day, the children wore whatever was available, regardless of

whether it fit or was clean. [144]  Herbert Keys recalls going with James to steal clothing off of

clotheslines because "[w]e didn't have nice and clean clothes to wear at home."[145]  Shoes were

another perpetual problem for the Roane children.[146]  "The only shoes they had were donated

and they . . . usually didn't fit."[147]  Kevin Roane remembers he and his siblings wore shoes with

holes that made "our feet smell real bad when it rained, so kids would laugh and make fun of

---

[139] App. 0842 at ℙ 6.
[140] App. 0884 at ℙ 4.
[141] *Id*.
[142] App. 0430-31 at ℙ 120 (PSI).
[143] App. 0880-81 at ℙ 4; *see also* App. 0783 at ℙ 6.
[144] App. 0757 at ℙ 7; App. 0782-83 at ℙℙ 5-6; App. 0835 at ℙ 9; App. 0837 at ℙℙ 3, 6; App. 0842 at ℙ 6; App. 0854 at ℙ 10; App. 0880-81 at ℙ 4.
[145] App. 0813 at ℙ 2.
[146] App. 0760 at ℙ 2; App. 0835 at ℙ 9.
[147] App. 0880-81 at ℙ 4.

us."[148]  Jeffrey Michax recalls James being absent from school because he had no shoes to wear.[149]

As "dismal"[150] as life was inside the Roane apartment, life outside was no better.[151]  James ran home from school to avoid the men and older boys who "would put two young kids together and make them fight for entertainment.  The older guys would watch the fight and place bets—maybe a dollar or a bag of weed."[152]  "Beyond the fights, older boys would also tear your clothes off to really humiliate you. . . . [Y]ou'd have to walk home naked."[153]

James first began using marijuana and alcohol at age eight or nine.[154]  "At ten, [James and Jeffrey Michaux] were also using Valium" and a street drug called "Bam" (methamphetamine).[155]  Surrounded by family and neighbors who were heavy drug users, James progressed quickly from experimentation to addiction.  The Roane apartment had always been "a place to shoot up,"[156] and James injected diet pills, Dilaudid, and heroin beginning in early adolescence.[157]  In his teen years, James's father, a notorious drug dealer in the area,[158] recruited

---

[148] App. 0854 at ℙ 10.

[149] *Id.*

[150] App. 0877 at ℙ 2.

[151] *See, e.g.*, App. 0777 at ℙ 3.

[152] App. 0884-85 at ℙ 5; *see also* App. 0756 at ℙ 3; App. 0791 at ℙ 2.

[153] App. 0792 at ℙ 4.

[154] App. 0885 at ℙℙ 6-7; App. 0835-36 at ℙ 11; App. 0877 at ℙ 2.

[155] App. 0835-36 at ℙ 11.

[156] App. 0793 at ℙ 10.

[157] App. 0885-86 at ℙ 9.

[158] App. 0972 at ℙ 7; App. 0795 at ℙ 14.

him to sell drugs.[159]  "James was always looking to impress his father . . . [and] continued to want validation from his father.  He did this by selling drugs for him."[160]  James, however, could not keep from using the drugs he was supposed to sell.  One friend recalls seeing teenaged James "really strung out—foaming at the mouth, passing out" on heroin, and believed that "if someone [didn't] keep a close eye on him he could die."[161]  By eighteen, James was deeply in the throes of the heroin and crack cocaine addiction that would dictate the course of his life until his arrest.[162]

### 2.  Mr. Roane Was Repeatedly Sexually Abused as a Child

As a young child, James—hungry, dirty, and clearly neglected—was an obvious target for predators looking for unprotected children to exploit.  James's sexual abuse began between the ages of four and six, occurred over the course of years, and involved multiple perpetrators.[163]  At the age of eight, James was raped by the neighborhood ice cream truck driver, a pedophile named "Ed."[164]  Ed drove his truck through the neighborhood and enticed children with the offer of free ice cream.  This was particularly irresistible to the Roane children, who were often

---

[159] App. 0764 at ⁋ 21; App. 0856-57 at ⁋ 17; App. 0886 at ⁋ 10; App. 0788 at ⁋ 7; App. 0847 at ⁋ 16.

[160] App. 0979 at ⁋ 19.

[161] App. 0814 at ⁋ 5; *see also* App. 0809 at ⁋ 13; App. 0836 at ⁋ 12.

[162] *See* App. 0764 at ⁋ 19; App. 0809 at ⁋ 13; App. 0886 at ⁋ 10; *see also* App. 0443 at ⁋ 169 (PSI).

[163] App.0306; App. 0630 at ⁋ 28 (Decl. of Dr. Lisak); App. 0740-41 (Report of Dr. Toomer).

[164] Ed's last name is unknown.  *See* App. 0631 at ⁋ 29.

hungry.[165]  One day, Ed invited James onto the truck to help him sell ice cream, then drove him to an isolated building behind a locked fence.  Ed showed James a handgun and told him to do what he ordered him to do or else Ed would kill James's mother and brother.  Ed then raped James.[166]  Confused and overwhelmed, James could do nothing to stop it.  Ed raped James multiple times over the course of several years, and also raped his sister Annette. [167]

Ed was not just the neighborhood ice cream truck driver, he was also was one of the many acquaintances that Mrs. Roane allowed into her home.[168]  Some, including Ed, stayed for weeks at a time, and would sleep in the children's bedrooms.[169]  Ed used this access to James to rape him in his own home.[170]  Kevin recalls seeing Ed and James in bed together when Kevin and James were children, and being confused and distressed by what he saw.[171]  It was shortly after Kevin saw Ed sexually abuse James that Kevin attempted to commit suicide by taking an overdose of his mother's prescription pills.[172]  Kevin was eight or nine years old at the time.[173]

---

[165] App. 0762 at ₱₱ 11-13; App. 0809-10 at ₱ 14; App. 0811 at ₱ 6; App. 0829 at ₱ 6; App. 0848 at ₱ 21; App. 0855-56 at ₱ 14.

[166] App. 0631 at ₱₱ 30-31 (Decl. of Dr. Lisak); App. 0740-41 (Report of Dr. Toomer); *see also* App. 0762 at ₱ 12 (Annette Coates describing a similar incident involving Ed).

[167] *See* n.166, *supra.*

[168] App. 0762 at ₱ 13; App. 0809-10 at ₱ 14; App. 0811 at ₱ 6; App. 0829 at ₱ 6; App. 0843 at ₱ 8; App. 0848 at ₱ 21; App. 0855-56 at ₱ 14.

[169] *See* n.168, *supra.*

[170] App. 0855-86 at ₱ 14; *see also* App. 0631-32 at ₱ 32 (Decl. of Dr. Lisak); App. 0740-41 (Report of Dr. Toomer).

[171] App. 0855-86 at  ₱₱ 14-15.

[172] App. 0855-86 at ₱ 15; *see also* App. 0777-78 at ₱ 4; App. 0808 at ₱ 9.

[173] *See* n.172, *supra.*

When James was about nine years old, he was raped by Haywood Tunstall, known to everyone in the neighborhood as "Sweet Love."[174] Tunstall was a Gilpin Court drug dealer and street hustler with a reputation for preying on young boys.[175] He was openly gay and wore women's clothes and make-up, and was also violent, tough, and domineering.[176]

Tunstall lured James into his apartment in what experts called a "classic setup" routinely used by sexual predators.[177] He offered James marijuana. After smoking two joints, James stood up to leave, but Tunstall told him he had to "pay" for the drug. Tunstall picked up a handgun. Terrified, and without money, James was told he had to take off his clothes and do what Tunstall wanted as "payment." Tunstall then raped James, an event James remembers as violent, painful, and deeply traumatizing.[178]

In a declaration signed in 2008, Haywood E. "Sweet Love" Tunstall admitted that at age twenty-three, he had sex with James, who was just nine years old.[179] "Obviously, there can be no consensual sexual relationship between a nine year old and an adult."[180] Nevertheless, when it became known that Tunstall raped James, Tunstall suffered no social or legal repercussions, while James became an object of ridicule. Like Ed, Tunstall was friends with Mrs. Roane and

---

[174] App. 0753 at ₱ 3; App. 0792 at ₱ 4; App. 0973-74 at ₱ 11; App. 0977 at ₱ 9; *see also* App. 0632-33 at ₱₱ 33-36 (Decl. of Dr. Lisak); App. 0741 (Report of Toomer).

[175] App. 0753 at ₱ 3; App. 0813-14 at ₱ 4; App. 0977 at ₱ 9; *see also* App. 0741 (Report of Dr. Toomer).

[176] App. 0792 at ₱ 4; App. 0973-74 at ₱ 11; *see also* App. 0632 at ₱ 33 (Decl. of Dr. Lisak).

[177] App. 0632 at ₱ 35 (Decl. of Dr. Lisak); *see also* App. 0977 at ₱ 9.

[178] App. 0632-34 at ₱ 34-40 (Decl. of Dr. Lisak); App. 0741 (Report of Dr. Toomer).

[179] App. 0983 at ₱ 2.

[180] App. 0741 (Report of Dr. Toomer).

spent time in the Roane apartment.[181]  Tunstall told Mrs. Roane about the sexual contact he had

had with her young son.  Mrs. Roane's response, and the response of others in the community,

was to mock James.[182]  Likewise, Dr. Lordi (and, through him, the Richmond Public School

District) was on notice that James "had been sodomized at the age of 9," [183] yet no formal action

was taken to protect James or punish his rapist.

In 1975, approximately the same year that James was raped by "Sweet Love" Tunstall,

James was arrested on a charge of "sodomy."[184]  As described in the PSI, the incident echoes

James's own experience of sexual victimization: "the defendant [James] approached the victim,

who was six years old, and told him that if he would take his penis into his mouth and suck it, the

defendant would give him his orange juice and cookies."[185]  This matter, which was "resolved at

intake,"[186] does not appear to have triggered an investigation into whether James himself had

been a victim of child sexual abuse.

Dr. David Lisak, an expert on trauma and the impact of childhood physical and sexual

abuse,[187] summarizes James' experiences in this way:

> Even in a childhood marked by catastrophic abuse and neglect, the rapes stand out
> as uniquely traumatizing.  They brought the violence and brutality of his childhood

---

[181] App. 0977 at ⁋ 9.
[182] App. 0813-14 at ⁋ 4; *see also* App. 0741 (Report of Dr. Toomer).
[183] App. 0892 (Report of Dr. Lordi).
[184] App. 0430 at ⁋ 118 (PSI).
[185] *Id*.
[186] *Id.*
[187] *See* App. 0645-713.

into the most intimate spheres of his existence, and left him deeply scarred on the inside. The rapes left him with profound doubts about his masculinity and his sexuality, and about his capacity to protect the integrity of his most basic boundaries. The rapes branded him on the inside with rage, humiliation, helplessness and unbearable shame, emotional states he has struggled with his entire life. . . .[188]

### 3. Mr. Roane Suffers from Permanent Brain Damage

James Roane's brain damage has been apparent and documented throughout his life, but never appropriately treated. When James was about four years old and attending a pre-school for at-risk children, he was identified as "hyperkinetic" and believed to be of "borderline" intelligence.[189] In 1972, when James was six, he was referred to the Lor-Berg Family Guidance Clinic.[190] Pediatric psychiatrist William Lordi diagnosed him with "chronic brain syndrome," which is a form of brain damage, as well as a learning disability and hyperkinesis with impulse breakthrough.[191] Dr. Lordi recommended neurological testing with an electroencephalogram, as well as daily medication and individual psychotherapy.[192] But Mrs. Roane, who was overwhelmed by her own circumstances, did not follow these recommendations.

In 1976, when James was ten, he returned to the Lor-Berg Clinic. According to Dr. Lordi, all of the professionals who encountered James since his last evaluation were in "concurrence" that James had "organic brain syndrome with a primary learning disability and has an explosive personality with dangerous acting out."[193] Organic brain syndrome is a

---

[188] App. 0630 at ⁋ 28.
[189] App. 0282.
[190] App. 0890-91 (Report of Dr. Lordi).
[191] App. 0891 (Report of Dr. Lordi).
[192] *Id*.
[193] App. 0892 (Report of Dr. Lordi).

33

physiologic disorder of the brain that has significant effects on mental functioning. As forensic neuropsychologist Dr. Daniel Martell[194] explains,

> the easiest way to conceptualize the effect [of] this kind of brain damage . . . is to imagine existing in a state of cognitive chaos: to be constantly taking in stimulus, yet lacking the ability to impose order over it effectively, or to control one[']s reactions to it properly. Not surprisingly, the kinds of behaviors associated with organic brain syndrome include poor judgement, impulsiveness, fearfulness, agitation, impaired intellectual function, and difficulty in regulating emotion and reaction. Mr. Roane demonstrated all of these behaviors as a young person.[195]

Despite the seriousness of James's condition, Dr. Lordi noted that James had received virtually no treatment since he was last seen in 1972: "there has been a trail of diagnostic work-ups, expulsions from school, [and] 'on again off again' treatments attempted-frustrated by the mother."[196] Dr. Lordi concluded his 1976 report with a blunt warning:

> At the present, we are faced with a potentially dangerous situation. . . . His thinking is becoming increasingly paranoid. There is also because of his depression and anger and rage turned on himself, the real possibility of suicide. It has not been possible to reach the mother or to convince the mother that the problem is serious and that she needs to do something about it. Child lives in a very high risk neighborhood, being a high risk child in his own right . . . it is felt of paramount importance for medical, psychiatric and personal danger reasons that this child be removed from this home.[197]

However, James was not removed from his home. Nor did he receive the kinds of emergency interventions that Dr. Lordi deemed necessary to meet his medical, psychiatric, and safety needs. Instead, in the years that followed, James continued to struggle—without meaningful parental assistance, and without sustained intervention from any child welfare agency—to meet his daily needs on his own. Not surprisingly, his efforts failed. People in the

---

[194]*See* App. 0714-16 at ‖‖ 1-8 (summarizing Dr. Martell's professional qualifications).
[195] App. 0716 at ‖ 10.
[196] App. 0892.
[197] App. 0892-93.

34

neighborhood called him "retarded,"[198] "crazy, stupid and dumb."[199]  If he came to school at all,

he came in dirty, ill-fitting clothes.[200]  He was hungry and irritable.[201]  Teachers suspected that

the free meals he got at school were his only meals of the day.[202]  It took very little for him to

become emotionally overwhelmed.[203]  He was desperate for acceptance and structure,[204] and was

a "follower" among peers.[205]  He tried to learn, but made little progress.[206]  As James's school

counselor Claire Rosenbaum recalls:

> When an emotionally disturbed child has to deal with uncertainty, like wondering where he's going to get his next meal from, or whether he's going to have to face violence in his home or in his neighborhood it's as if his brain becomes full.  With all that worry and anxiety, it becomes difficult to make room for learning and academics.  James was the poster child for this condition.[207]

In 1980, at the age of fourteen, James returned for a third and final evaluation with Dr.

Lordi.  With evident frustration, Dr. Lordi wrote that James' mother

> has been told repeatedly that this child has an organic brain syndrome with a primary learning disability and hyperkinetic [disorder, but] she has not really understood what this meant and expected the usual and customary behaviors from him.  The boy himself does not understand what is the matter with him.  He cannot be his own ally.  He has always felt overwhelmed by his poor impulses, his inability to modulate what comes in and goes out of him.  He finds himself constantly at odds.  He does have some awareness that something is seriously wrong and he wants help for it but he wants it on his own terms.[208]

Dr. Lordi emphasized the urgent need for help:

---

[198] App. 0809 at �token 12; App. 0835 at �token 6.

[199] App. 0831 at �token 10.

[200] App. 0757 at ⁊ 7; App. 0802 at ⁊ 5; App. 0837 at ⁊ 3; App. 0880-81 at ⁊ 4.

[201] App. 0802 at ⁊ 3; App. 0837 at ⁊ 5.  *See also* n.110, *supra*.

[202] App. 0802 at ⁊ 3; App. 0837 at ⁊ 5.

[203] App. 0837 at ⁊⁊ 4, 6.

[204] App. 0802 at ⁊ 7; App. 0837-38 at ⁊ 8; App. 0864 at ⁊⁊ 2-3.

[205] App. 0885 at ⁊ 6; App. 0972 at ⁊ 4.

[206] App. 0802 at ⁊ 2.

[207] App. 0864 at ⁊ 2.

[208] App. 0895 (Report of Dr. Lordi).

It is felt that in view of the above and of the fact that the recommendation has been made repeatedly over the years, that he does require a residential treatment program that has an intensive treatment program, that can provide him with remedication [sic] for his learning disability and psychotherapy for his learning problems. It is felt that this has become deeply imbedded into his personality structure and that time is passing. As was noted 4 years ago, it is of paramount importance that he get treatment at this time, intensively, and long enough to make a difference. The boy can be potentially dangerous to himself, to others and to property. It is felt he needs a school where he can get medication.[209]

James's school counselor and teachers had reached the same conclusion: if James was to have any chance at life, he needed to be removed from his home and placed in a highly structured environment.[210] James himself begged to be placed in a residential treatment facility,[211] prompting his special education teacher Robert Barbato to remark that:

[i]n all of my years working with emotionally disturbed children, I have never, ever heard of a child asking to be taken out of his home and put in residential treatment. That is a huge step. James must have known he was not going to make it out in the community.[212]

But once again, there was no effective intervention. On February 2, 1981, when James was fifteen years old, he was arrested for breaking into the YWCA building.[213] In connection with a hearing to determine whether James's case should be transferred to adult court, Investigative Counselor Alonzo Jones reported that he

[t]alked with officials of [James's] school recently. They were in the process of seeking a residential placement for James. Mrs. Rosenbaum, school counselor, indicated to this PO that James had requested such a placement and the only holdup in seeking that placement was a physical examination that James needed.[214]

Paperwork submitted to the juvenile court by Mrs. Rosenbaum explains further:

---

[209] App. 0896 (Report of Dr. Lordi).

[210] App. 0752 at ⁋ 10; App.0989; *see also* App. 0900-02 (Report of Dr. Draper).

[211] *See* App. 0894 (Report of Dr. Lordi); App. 0897.

[212] App. 0752 at ⁋ 10.

[213] App. 0432 at ⁋ 125 (PSI); App. 0897.

[214] App. 0897.

> [James's m]other . . . did not respond to request for residential placement some years ago nor to request for physical exam this year. . . . Had James been able to keep any of the appointments the school made for him for a physical examination, . . . he would have been staffed by the school system for residential placement.[215]

In other words, all that stood between James and the residential treatment that he so desperately needed was a ride to the pediatrician's office.

There can be little question that this was a lost opportunity. As Dr. Martell explains,

> [w]hile [James's] form of brain damage is not curable, the negative behaviors associated with it diminish dramatically if the sufferer is placed in a rigorously structured environment. In fact, imposing structure is central to treating this kind of brain disorder, in that a heightened degree of external structure serves to counter the mental disorganization that the sufferer experiences. At the other extreme, if an individual with this kind of brain damage is bombarded, day after day, with unpredictable, hostile, or violent stimulus, then the negative behaviors associated with organic brain syndrome become increasingly evident and severe.[216]

Looking back, James's special education teacher Robert Barbato said regretfully: "[James] was crying out for help. . . . [W]e dropped the ball."[217]

In the summer of 1982, the juvenile court finally placed James in a "special residential therapeutic program" called Adventure Bound.[218] Though he struggled initially, James "made an excellent adjustment and was graduated" in January.[219] "Unfortunately, adequate discharge planning did not take place. He was returned to the street rather than to an identified school or job."[220] By February, James "was put in the detention home because it was reported that he had

---

[215] App. 0898.

[216] App. 0716-17 at ⁋ 11.

[217] App. 0752 at ⁋ 10.

[218] App. 0900 (Report of Dr. Draper); *see also* App. 0432 at ⁋ 126 (PSI).

[219] App. 0900 (Report of Dr. Draper).

[220] App. 0900 (Report of Dr. Draper); *see also* App. 0433 at ⁋⁋ 127-28 (PSI).

become heavily involved in drug use, and his family members found needle marks on his arms."[221]

### a.  The causes of Mr. Roane's brain damage

When Dr. Lordi diagnosed James with organic brain syndrome in the 1970s, he identified James's mother's medical condition—toxemia during pregnancy—as the likely cause.[222] However, James was exposed to numerous other factors that are now known to cause brain damage.  In the decades since James's 1993 trial, there has been "a remarkable acceleration in our understanding of the neurobiology of [human] development." [223]  This includes our knowledge of the effects of alcohol on a developing fetus, and our awareness of how catastrophic trauma and neglect disrupt growth in critical areas of a child's brain.

### i.  Mr. Roane suffers from neurological impairments associated with prenatal exposure to alcohol

As discussed above, Jeanette Roane's alcohol abuse was well known to her friends and family.[224]  Regarding her alcohol use when she was pregnant with James, Mrs. Roane states:

> I drank on the weekends when I was pregnant with James Jr.  I don't remember becoming drunk but I was drinking before I realized I was pregnant and I continued to drink, although not too much, throughout my pregnancy.[225]

---

[221] App. 0433 at ℙ 128 (PSI).
[222] App. 0282; *see also* App. 0892 (Report of Dr. Lordi); App. 0894 (Report of Dr. Lordi).
[223] App. 0636 at ℙ 45 (Decl. of Dr. Lisak).
[224] *See, e.g.*, App. 0794-75 at ℙ 12; App. 0813 at ℙ 3; App. 0856 at ℙ 16; App. 0978 at ℙℙ 14-15; *see also* App. 0895 (Report of Dr. Lordi).
[225] App. 0856 at ℙ 16; App. 0850 at ℙ 2.

Natalie Novick Brown, Ph.D, a nationally-recognized expert in fetal alcohol spectrum disorder ("FASD"),[226] has reviewed thousands of pages of records, conducted an interview with Mrs. Roane, and supervised the administration of two behavior rating measures to Mrs. Roane, James's sister Annette, and James's childhood friend Melody Forrester.[227] Dr. Novick Brown has concluded that James's mother consumed alcohol throughout her pregnancy in sufficient quantities to produce Fetal Alcohol Syndrome or Fetal Alcohol Effects.[228] She explains:

> Jeanette Roane['s] . . . self-report [of alcohol use in pregnancy] was supported by numerous individuals who witnessed the important role alcohol played in her daily life. Jeanette Roane's documented acknowledgment to Dr. Lordi in 1980 of an alcohol problem was a red flag indicating a high likelihood of FASD.

> Convergent evidence across Mr. Roane's lifespan indicates a complex pattern of behavior and central nervous system abnormalities that are inconsistent with development level and cannot be explained by familial background or environment alone. Such a finding meets the Institute of Medicine's diagnostic criterion for central nervous system dysfunction in FASD.[229]

Dr. Novick Brown concludes: "[A]t the time of the offense his capacity to cope with stressful situations was equivalent to that of an adult with mental retardation."[230]

### ii. Mr. Roane's experience of trauma disrupted his brain development and impaired his ability to modulate his emotions

From a neurobiological perspective, it is now understood that extreme parental neglect, such as the kind that James Roane experienced, has catastrophic consequences for child brain development. As Dr. Lisak explains,

---

[226] App. 0720-21 at ¶¶ 1-7 (Decl. of Dr. Novick Brown); App. 0724-38.

[227] App. 0721 at ¶ 9 (Decl. of Dr. Novick Brown).

[228] App. 0721-22 at ¶ 10(a)-(e).

[229] *Id.* at ¶ 10(a)-(d).

[230] App. 0722 at ¶ 10(d) (Decl. of Dr. Novick Brown).

> [t]he brain of a developing child is an extremely plastic organ that is shaped in many important ways by the environment in which it grows.  For example, there is mounting evidence that the millions of face-to-face interactions between and child and its care takers . . . are responsible for the growth of neural networks in critical areas of the frontal lobes of the brain.  The neural circuitry in the frontal lobes is what gives us our capacity to inhibit our impulses, to modulate our emotions, to reflect on our thoughts and feelings and therefore temper them.[231]

As shown in sections II.C.1-2, *supra*, "throughout the violent years of his childhood," James was deprived of basic love, care and attention from his parents.[232]  This "is not some 'warm and fuzzy' thing:" James's failure to receive adequate parental care and attention during childhood deprived him of "one of the most crucial building blocks of critical parts of the developing brain, in particular the frontal lobes of the brain."[233]  Further, James was exposed to abuse and trauma in childhood "that would have overwhelmed an adult."[234]  From a psychological and neurobiological perspective, the multiple traumas that James "experienced evoked extremely intense emotions and impulses, while the neglect he experienced deprived him of the neural development he needed to contain and modulate them."[235]

### D.  Mr. Roane's Character Militates in Favor of a Sentence Reduction

At the age of twenty-seven, James Roane made the regrettable choice to follow his codefendant Cory Johnson's lead[236] and become involved in the conspiracy at issue in this case.

---

[231] App. 0636-37 at ‖ 46 (Decl. of Dr. Lisak).

[232] App. 0627 at ‖ 19 (Decl. of Dr. Lisak).

[233] *Id.*

[234] App. 0637 at ‖ 48 (Decl. of Dr. Lisak).

[235] *Id.*; *see also* App. 0716 at ‖ 10 (Decl. of Dr. Daryl Matthews, M.D., Ph.D.) ("PTSD was still an emerging diagnosis when Mr. Roane was seeing Dr. Lordi. . . . Nevertheless, symptoms of this debilitating disorder are expressed throughout the records documenting Mr. Roane's early childhood and adolescence.").

[236] App. 0428 at ‖ 107 (PSI) ("It is Detective Fleming's opinion that Cory Johnson was the leader of this group of defendants.").

His involvement lasted eleven weeks.[237]  Mr. Roane is now fifty-four years old.  He has spent

half of his life in prison.[238]  He is what corrections experts call "terminally incarcerated,"

meaning that "the sentences imposed upon [him] can be expected to meet or exceed his natural

life."[239]  He has no expectation of ever being released from confinement.

And yet, under the harsh conditions of life on death row, Mr. Roane has somehow

managed to change himself in ways that would have been impossible if he had remained on the

street.  Forensic psychologist Daniel Martell observes that "[w]hile incarceration is ordinarily a

poor substitute for residential mental health treatment, prison has provided Mr. Roane with the

structure that could have been the cornerstone of a long-term treatment program."[240]

Mr. Roane's transformation began at the point of his arrest, when he was held by the

Virginia Department of Corrections.  Removed from the social pathology and corrupting

influences of his home and neighborhood, Mr. Roane took his first steps toward change.[241]  He

began the painful process of withdrawing from drugs and attended Twelve Step and parenting

meetings.[242]  Many years later, prison counselor Ethel White remembered that

> James came to each of those meetings faithfully.  [He] was really interested in what
> different programs had to offer.  The facilitators from the outside really inspired
> him.  It seemed to give him hope, that if they can do those things and change then
> so could he.[243]

---

[237] App. 0447 at ¶ 1 (PSI Worksheet).

[238] The same jury that imposed a death sentence on James also imposed three death sentences on codefendant Richard Tipton and seven death sentences on Cory Johnson.  *See* App. 0416-16 at ¶¶ 35, 39, 40 (PSI).

[239] App. 0605 at ¶ 5.

[240] App. 0718 at ¶ 22.

[241] App. 0592 at ¶ 9.

[242] *See* App. 0443 at ¶ 169 (PSI); App. 0875 at ¶ 3.

[243] App.  0875 at ¶¶ 3-4.

41

Lee Bassett, a Gilpin Court neighbor and childhood friend of Mr. Roane's, "got clean [from drugs]" and was leading Narcotics Anonymous ["NA"] meetings in jail at the time that Mr. Roane was arrested.[244]  Mr. Bassett recalls that Mr. Roane attended NA meetings "[e]very single week" while awaiting trial, "and would always say something inspiring for the other guys. He was just learning to get clean, but he always participated."[245]

Mr. Roane was held by the Virginia Department of Corrections (DOC) from 1992 until 1999, when the Federal Bureau of Prisons (BOP) began accepting inmates at its facility in Terre Haute, Indiana.[246]  James E. Aiken, a former prison warden and a nationally-recognized expert in the field of corrections, prisons, and criminal justice,[247] has reviewed Mr. Roane's records from the Virginia DOC from 1992 to 1999, and his records from the federal BOP from 1999 to 2016.[248]  Regarding Mr. Roane's almost eight year incarceration in Virginia, Mr. Aiken writes that "the disciplinary matters contained in these records are relatively minor."[249]  Upon arrival at the BOP's death row in Terre Haute in 1999,

> Mr. Roane immediately established a good record of conduct.  He systematically worked towards the goals that were set for him at his initial classification. . . . [A]fter a year of clear conduct, the warden and others approved Mr. Roane's promotion to Phase II classification, which accorded him more privileges.[250]

In 2003, 2004, and 2006, Mr. Roane remained discipline-free and "and displayed good conduct and an overall positive attitude."[251]  In 2007, Mr. Roane received his one and only write-up in

---

[244] App. 0753 at ℙ 5.

[245] *Id.* at ℙℙ 5-6; *see also* App. 0757 at ℙ 9.

[246] App. 0593 at ℙ 11.

[247] *See* App. 0597-0601 (curriculum vitae of James E. Aiken).

[248] App. 0593 at ℙℙ 11-12; App. 602; *see also* App. 0604 at ℙℙ 3-4.

[249] App. 0593 at ℙ 11.

[250] App. 0593-94 at ℙℙ 12-13.

[251] App. 0594 at ℙ 15.

eight years, for the unauthorized use of the prison telephone.  He accepted full responsibility for this non-violent infraction, and received a one year restriction on his phone privileges.[252]  In 2008, he returned to his familiar pattern of clear conduct and positive behavior.[253]

On February 22, 2012, Mr. Roane suffered a near-fatal stabbing by another inmate.  The attack stemmed from the perception that Mr. Roane was an "informant assisting the prison officials."[254]  In other words, Mr. Roane was nearly killed because other prisoners perceived him as being too closely aligned with the interests of prison administration and law enforcement.

Available BOP records contain no indication that Mr. Roane ever sought to retaliate against his attacker, or against the other prisoners who might have encouraged the attack, or against prison staff "for possible failures to protect him."[255]  Instead, Mr. Roane has addressed his issues appropriately, through the grievance system and eventually a civil lawsuit.[256]  Additionally, Mr. Aiken notes that Mr. Roane's small number of disciplinary write-ups from 2008 to 2016 are "minor" in nature, and do not reflect his participation in violence or "disregard for the life or safety of other inmates or staff."[257]  Moreover, "[a]dvancing inmate age, particularly in the case of the terminally incarcerated inmate like James Roane, is strongly associated with positive prison adjustment over time."[258]

---

[252] *Id.* at ¶ 16. ("A restriction of only six months was in light of Mr. Roane's admission of guilt and lack of previous disciplinary problems.").
[253] *Id.* at ¶ 17.
[254] App. 0602.
[255] *Id*.
[256] *Id*. *See* App. 0962-71.  The lawsuit sought, inter alia, an investigation of the incident and assurances that his attackers will not be allowed physical access to him the future.  No monetary damages were sought.
[257] App. 0603.
[258] App. 0605 at ¶ 5.

The fact that Mr. Roane would choose to pursue peaceful remedies rather than resort to retaliatory violence is just one example of how he has grown beyond the brutal, eye-for-an-eye mentality of Gilpin Court. Over the last twenty-eight years, Mr. Roane has developed insight into trauma—both from the perspective of one who has inflicted deep trauma, and from the perspective of one who has been deeply formed by his own experiences of trauma.[259] The process has not been easy. As Mr. Roane himself explained to Dr. Lisak,

> I learned that it hurts to care. It's easier to pretend not to care. But I do care, and I can't and don't want to go back to not caring. I care about a lot of things now. It's been a learning process. Believe it or not, death row changed my life. I've grown as a human being and I'm grateful for that.[260]

At the time that Mr. Roane was sentenced, his trial attorney, "David Baugh, advised that he did not want [Mr. Roane] to be questioned about his involvement in any of the offenses, because of the appeal process."[261] Since that time, however, Mr. Roane has repeatedly expressed his remorse for the harm he has caused.[262] James's sister, Annette Coates, observes that "James has truly grown up in prison. . . . He still gets really sand and angry with himself for all the people he hurt."[263] Mr. Roane's mother, Jeanette Roane, echoes Annette's sentiment that Mr. Roane has "grown up" in prison.[264] Over the years, he has expressed to her his sorrow "for the pain he's caused to everyone[, and h]e worries about the people he sold drugs to."[265] Likewise,

---

[259] *See* App. 0745 (Report of Dr. Toomer).

[260] App. 0639 at P 53 (Decl. of Dr. Lisak).

[261] App. 0430 at P 116 (PSI).

[262] *See* App. 0789 at P 9.

[263] App. 0765 at PP 23-24.

[264] App. 0849 at P 26.

[265] *Id.*; *see also* App. 0743 (Report of Dr. Toomer) ("Mr. Roane expressed to me his deep remorse for his past dealings of drugs and harming his community by his behavior. He did not blame his actions on his drug addiction, but acknowledged that they were related.").

Roane family friends Earl Granger and Melody Forrester say that Mr. Roane has shared with them the regret that he feels for his actions.[266]

Mr. Roane also carries with him the knowledge that, by his own actions, he has deeply hurt his children who, like him, have had to grow up with an absent father. However, by speaking honestly about his past, Mr. Roane offers his children important lessons for their future. As Mr. Roane's son James Tyrone Smith explains, "[a]t first he never told me what he had done. As I got a bit older we talked about it. He takes total responsibility for what he's done. That takes a strong man. He admits to the crimes he did. He knows he has hurt a lot of people and he is truly sorry for what he has done."[267] And despite having had a toxic relationship with his own father, Mr. Roane has, from the confines of his prison cell, managed to provide his children with fatherly love and nurturance.[268]

Mr. Roane understands and accepts that his criminal actions should result in his life-long punishment, and that the price he must pay is a high and painful one. But as Dr. Lisak observed, if Mr. Roane were executed now, "the government w[ould] be executing a different person than the one who was originally sentenced to death."[269] Mr. Roane's commitment to living peacefully and providing support and encouragement to his family, his resilience in overcoming the catastrophic trauma of his childhood and a near-death experience in prison, and his remorse and insight about his crimes and their consequences weigh heavily in favor of a reduced sentence. *See Pepper v. United States*, 526 U.S. 476, 492-93 (2011) (explaining that, where a

---

[266] App. 0784 at ⁋ 13; App. 0789 at ⁋ 9.

[267] App. 0871 at ⁋ 9; *see also* App. 0775-76.

[268] App. 0775-76; App. 0818-23; App. 0869-71; *see also* App. 865.

[269] App. 0642 at ⁋ 61 (Decl. of Dr. Lisak).

case has been remanded to the district court for resentencing, the court should consider evidence of a defendant's post-offense rehabilitation, which is "clearly relevant" to the history and personal characteristics of the defendant under § 3553(a)(1) and the selection of an appropriate sentence).

### E.  Nearly All Other Convictions that Were Considered as Part of the Sentencing Package Are Invalid

Along with the offenses at issue in this Motion, Mr. Roane was concurrently convicted of several other counts: conspiracy under 21 U.S.C. § 846 (Count 1); engaging in a CCE under 21 U.S.C. § 848 (Count 2); use of a firearm in furtherance of a crime of violence or drug trafficking crime under 18 U.S.C. § 924(c) (Counts 6, 9, 12, and 15); and commission of violent crimes in aid of racketeering under 18 U.S.C. 1959 (Counts 7, 10, 13, 14, and 16).  These convictions were taken into consideration as part of the sentencing package in sentencing Mr. Roane.  However, nearly all of these convictions have either since been vacated or are otherwise invalid.

### 1.  Mr. Roane's Conviction for Conspiracy under 21 U.S.C. § 846 Was Vacated on Appeal

Along with his convictions under § 841(a)(1) and § 848(e)(1)(A), Mr. Roane was also convicted of conspiracy under 21 U.S.C. § 846 (Count 1) and engaging in a CCE under § 848 (Count 2).  The Fourth Circuit found the convictions cumulative because the § 846 conspiracy as charged was a lesser included offense within the § 848 CCE as charged.  *United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996).  The court accordingly remanded for vacatur of Count 1.  *Id.* Thus this Count, which was considered as part of the sentencing package at trial, is now void.

### *2.* **Mr. Roane's Convictions under 18 U.S.C. § 924(c) Are Invalid Pursuant to *United States v. Davis***

Mr. Roane was also concurrently convicted of four counts of using a firearm in the commission of a crime of violence or drug trafficking crime under 18 U.S.C. § 924(c)(3) (Counts 6, 9, 12, and 15). As set forth in his Application to File Second or Successive Motion Pursuant to 28 U.S.C. § 2255(h), which was filed on May 22, 2020, and is currently pending before the Fourth Circuit, Mr. Roane's § 924(c)(3) convictions, which were considered as part of the sentencing package in this case, are no longer valid following the Supreme Court's 2019 decision in *United States v. Davis*.[270] In *Davis*, the Supreme Court held that the residual clause of § 924(c)(3) is unconstitutionally vague. 139 S. Ct. 2319, 2336 (2019).

Prior to the Supreme Court's decision in *Davis,* in order for a predicate offense to qualify as a crime of violence, the underlying crime had to fall under one of § 924(c)'s two definitions: § 924(c)(3)(A)'s "force clause" or § 924(c)(3)(B)'s "residual clause." In *Davis*, however, the Supreme Court held that the residual clause of 18 U.S.C. § 924(c)(3) is unconstitutionally vague. 139 S. Ct. at 2336. Thus, Mr. Roane's convictions are no longer supported by this provision.

Nor are Mr. Roane's convictions valid under the force clause. To qualify as a crime of violence under the force clause, an offense's elements must "require the actual, attempted, or threatened use of physical force." *United States v. Simms*, 914 F.3d 229, 233 (4th Cir. 2019). To determine whether a predicate offense qualifies as a crime of violence under § 924(c), courts

---

[270] As set forth in Mr. Roane's Motion to Hold Matter in Abeyance, filed concurrently with the instant Motion, the disposition of the pending Application impacts this Court's consideration of resentencing on Mr. Roane's First-Step-Act-covered offenses because the § 924(c)(3) convictions that are the subject of the Application were considered as part of the sentencing package at the time Mr. Roane was originally sentenced. Therefore, this Court should hold the instant Motion in abeyance pending disposition of the Application.

must use the categorical approach. *See Descamps v. United States*, 570 U.S. 254, 260 (2013).
This approach requires that courts "look only to the statutory definitions—i.e., the elements—of
a defendant's [offense] and not to the particular facts underlying [the offense]" in determining
whether the offense qualifies as a crime of violence. *Id.* at 2283 (citation omitted).

The predicate crimes with which Mr. Roane was charged and that the jury was instructed
it could find include 18 U.S.C. § 1959, which permits a finding of guilt upon proof of
conspiracy, and 21 U.S.C. § 848(e), which permits a finding of guilt based upon proof that the
defendant counseled or procured the killing of another.  Neither of these offenses requires, as an
element, the use of force by the defendant.  Accordingly, after *Davis*, Mr. Roane's four
convictions under § 924(c)—which were considered as part of the sentencing package at the time
Mr. Roane was sentenced—are void.

Mr. Roane filed an Application to File Second or Successive Motion Pursuant to 28
U.S.C. § 2255(h) in the Fourth Circuit on May 22, 2020, seeking leave to move in this Court for
vacatur of his § 924(c) convictions based on the new rule of law announced in *Davis*.  On July
15, 2020, the Fourth Circuit ordered the case placed in abeyance pending the Court's decision in
*United States v. Taylor*, No. 19-7616.  Thus the Application remains pending.

### 3. Mr. Roane's Convictions under 18 U.S.C. § 1959 Are Invalid because They Were Not Properly Charged

In the indictment under Counts 7, 10, 13, 14, and 16, Mr. Roane was charged with
committing violent crimes in aid of racketeering activity under 18 U.S.C. § 1959, "said
racketeering activity being dealing in narcotic or other dangerous drugs."  App. 0380-85.
However, the Court, in instructing the jury, defined "racketeering activity" as "any act or threat

48

involving *murder or* dealing in narcotic or other dangerous drugs." App. 0256 (emphasis added). In so doing, the Court constructively amended the indictment by instructing the jurors that they could find there was an enterprise that engaged in murder, while the indictment charged only that the enterprise's racketeering activity consisted of dealing in narcotic or other dangerous drugs. The instruction thus expanded the indictment and allowed the jury to convict based on conduct that was not charged.

> As the Fourth Circuit explained in *United States v. Randall*, where
>
> the district court, through its instructions to the jury . . . broadens the bases for conviction beyond those charged in the indictment, a constructive amendment— sometimes referred to as a fatal variance—occurs.  .  .  . A constructive amendment is a fatal variance because the indictment is altered to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment.

171 F.3d 195, 203 (4th Cir. 1999) (internal quotations and citations omitted).

Where constructive amendment occurs, "it cannot be said with certainty that with a new basis for conviction added, [the defendant] was convicted solely on the charge made in the indictment the grand jury returned." *Stirone v. United States*, 361 U.S. 212, 217 (1960). As such, constructive amendment "destroy[s] the defendant's *substantial right* to be tried only on charges presented in an indictment returned by a grand jury." *United States v. Floresca*, 38 F.3d 706, 712 (4th Cir. 1994) (en banc) (quoting *Stirone,* 361 U.S. at 217) (emphasis in *Floresca*).

Constructive amendments "are erroneous per se and require reversal regardless of preservation." *United States v. Whitfield*, 695 F.3d 288, 309 (4th Cir. 2012) (quoting *United States v. Robinson,* 627 F.3d 941, 958 (4th Cir.2010)); *see also Floresca*, 38 F.3d at 712 (a constructive amendment is "not subject to review for harmlessness"); *Randall*, 171 F.3d at 203 ("[A] constructive amendment violates the Fifth Amendment right to be indicted by a grand jury,

is error *per se,* and must be corrected on appeal even when the defendant did not preserve the issue by objection.").  This is so "even if there was sufficient evidence to convict the defendant on the specific charges made out by the grand jury."  *United States v. Nieves*, 108 F. App'x 790, 793 (4th Cir. 2004) (citing *Floresca,* 378 F.3d at 711).

Here, the constructive amendment of Mr. Roane's § 1959 counts was not raised on appeal or in any other proceedings in this case.  However, in consideration of resentencing Mr. Roane, this Court can and should consider the fact that these invalid convictions were weighed as part of the sentencing package on which his death sentence was based.

### 4.  The Invalid Convictions Impacted the Jury's Determination Regarding the Death Penalty

On Counts 5, 8, and 11, because Mr. Roane was subject to the death penalty under § 848(e)(1)(A), the jury was required to make the sentencing determination.  In making this determination, the jury was required to assess several statutory aggravating and mitigating circumstances.  As an aggravating factor, the jury found that Mr. Roane had "a substantial criminal history."  App. 0402.  As for mitigating factors, the jury declined to find that Mr. Roane "did not have a significant prior criminal record."  App. 0404.  At the same time, the jury found substantial mitigation.  For instance, the jury found unanimously the following mitigating factors: "That another defendant or defendants, equally culpable in the crime(s), will not be punished by death"; "That the victim(s) consented to the criminal conduct that resulted in his (their) deaths"; that Mr. Roane "was subjected to emotional, physical and sexual abuse, abandonment and neglect as a child, and was deprived of the parental guidance and protection that he needed"; that Mr. Roane "grew up in an impoverished, violent and brutal environment,

and was exposed to extreme violence as a child and throughout his life"; and that Mr. Roane, "if not sentenced to death, will be sentenced to life in prison without any possibility of parole." App. 0404-05.  A majority of the jurors also found that Mr. Roane "suffers from neurological impairments which were identified and which could have been treated when he was a child or adolescent" and that Mr. Roane "has responded well to structured environments, and would likely make an adaptation to prison if he were sentenced to life imprisonment."  App. 0404-05.

In light of the considerable mitigating evidence the jurors found, it is likely that the jury's finding of substantial prior criminal history—including the invalid concurrent convictions—had an outsized impact on its decision to sentence Mr. Roane to death.  Indeed, the record shows that the Government relied almost exclusively on evidence from the guilt phase of the trial and "did not put on a great deal of evidence" during the penalty phase.  *See* App. 0985, 0989.  In doing so, the Government urged the jury to rely upon its findings "in your guilt phase verdict."  App. 0989. In consideration of resentencing Mr. Roane, this Court should thus consider that these invalid convictions weighed heavily on the jurors' sentencing determination.  *See, e.g.*, *Johnson v. Mississippi*, 486 U.S. 578, 586 (1988) (use of invalid conviction in capital sentencing determination was prejudicial and required reversal of death sentence due to possibility that the prior felony "would be decisive in the choice between a life sentence and a death sentence").

**III.    Because Mr. Roane's Resentencing Consideration Implicates the Death Penalty, He Must Be Resentenced by a Jury**

Because Mr. Roane's § 848 counts implicate the death penalty, resentencing must be done by a jury, just as the original sentencing on those counts was done by a jury at trial.  Years of Supreme Court jurisprudence have made clear that a death sentence must be based on a jury's

verdict, not a judge's fact-finding.  *See Hurst v. Florida*, 136 S. Ct. 616, 624 (2016); *Ring v. Arizona*, 536 U.S. 584, 609 (2002).  This includes the resentencing context, and federal law provides accordingly.  *See* 18 U.S.C. § 3593(b)(2)(D) (where defendant is subject to the death penalty, a sentencing hearing shall be conducted "before a jury impaneled for purposes of the hearing if . . . after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary").

While section 404 of the First Step Act does not require a court to impose a reduced sentence for a covered offense, it does require reconsideration of the original sentence.  Pub. L. No. 115-391, § 404(c) (2018); *see also United States v. Shaw*, 957 F.3d 734, 742 (7th Cir. 2020) (record must show that district court "considered the arguments presented" and "accounted for the 18 U.S.C. § 3553(a) factors."); *United States v. Boulding*, 960 F.3d 774, 776  (6th Cir. 2020) ("an eligible defendant is entitled to an accurate amended guideline calculation and renewed consideration of the 18 U.S.C. § 3553(a) factors"); *United States v. Smith*, 959 F.3d 701, 703 (6th Cir. 2020) (a district court must consider the factors in § 3553(a) to determine a sentence "not greater than necessary").  Where, as here, the sentencing consideration implicates the death penalty, *Ring* and its progeny make clear that such consideration must be conducted by a jury. *Hurst*, 136 S. Ct. at 624; *Ring*, 536 U.S. at 609; *see also* 18 U.S.C. § 3593(b)(2)(D).

## IV.   REQUEST FOR RELIEF

Wherefore, Mr. Roane respectfully requests that this Court:

(1) Grant an evidentiary hearing regarding imposition of a reduced sentence on Counts 8,

   11, and 32 pursuant to section 404 of the First Step Act;

(2) Order a resentencing hearing before a jury on Count 5; and

(3) Grant any other relief to which he may be entitled.


Respectfully Submitted,

/s/ Matthew Engle
Matthew Engle
Bernadette Donovan
Donovan & Engle
1134 East High St. Unit A
Charlottesville, VA 22902
(800) 428-5214
engle.matthew@gmail.com
bernadettemarydonovan@gmail.com

Counsel for James H. Roane, Jr.


Dated: July 22, 2020

**CERTIFICATE OF SERVICE**

I, Matthew Engle, hereby certify that on this 22nd day of July 2020, I submitted the

foregoing Motion for filing with service to:

Richard D. Cooke
United States Attorney for the Eastern District of Virginia
919 E. Main St.
Suite 1900
Richmond, VA  23219

/s/ Matthew Engle
Matthew Engle