**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| THE UNITED STATES OF AMERICA | : | |
| | : | Crim. No. 3:92CR68 |
| v. | : | |
| | : | |
| JAMES H. ROANE, JR. | : | |
| | : | |

**APPENDIX VOL. I**

**App. 0001-0286**

## Appendix Index

1.    *U.S. v. John Doe, AKA Whitey, and John Doe, AKA O*, Grand Jury 92-1, Testimony of Denise Berkley, March 17, 1992……………………………………...0001

2.    *U.S. v. John Doe, AKA Whitey, and John Doe, AKA O*, Grand Jury 92-1, Testimony of Robert Davis, March 17, 1992……………………………………..0022

3.    *U.S. v. Richard Tipton, AKA Whitey*, Grand Jury 92-1, Testimony of Anthony Gwenn, April 20, 1992…………………………………………………….0041

4.    *U.S. v. Richard Tipton, AKA Whitey*, Grand Jury 92-1, Stanley Edward Smithers, April 20, 1992……………………………………………………………….0049

5.    *U.S. v. Tipton, et. al.*, 92CR68, Volume VIII, January 20, 1993, testimony of Denise Berkley…………………………………………………………………….0068

6.    *U.S. v. Tipton, et. al.*, 92CR68, Volume VIII, January 20, 1993, testimony of Paul Tuttle…………………………………………………………………………0128

7.    *U.S. v. Tipton, et. al.*, 92CR68, Volume IX, January 21, 1993, testimony of Robert Davis………………………………………………………………………0136

8.    *U.S. v. Tipton, et. al.*, 92CR68, Volume XII, January 27, 1993, testimony of Priscilla "Pepsi" Greene…………………………………………………………..0177

9.    *U.S. v. Tipton, et. al.*, 92CR68, Volume XIV, January 29, 1993, testimony of Gina Taylor…………………………………………………………………………..0199

10.    *U.S. v. Tipton, et. al.*, 92CR68, Volume XV, February 1, 1993, testimony of Detective Dalton…………………………………………………………………..0205

11.    *U.S. v. Tipton, et. al.*, 92CR68, Volume XVI, February 2, 1993, government closing argument…………………………………………………………………….0209

12.    *U.S. v. Tipton, et. al.*, 92CR68, Volume XVI, February 2, 1993, guilt phase instructions…………………………………………………………………………..0242

13.    *U.S. v. Tipton, et. al.*, 92CR68, Volume XXI, February 11, 1993, penalty phase testimony…………………………………………………………………..0269

14.    *U.S. v. Tipton, et. al.*, 92CR68, Volume XXII, February 12, 1993, penalty phase instructions…………………………………………………………………...0349

15.    Indictment, *U.S. v. Tipton, et. al.*, 92CR68…………………………...0373

16.    Government Exhibit, 9-2, *U.S. v. Tipton, et. al.*, 92CR68……………......0396

17.    Government Exhibit, 9-3, *U.S. v. Tipton, et. al.*, 92CR68………………0397

18.    Special Findings, *U.S. v. James H. Roane, Jr., a.k.a. "JR,"* Criminal Case No. 3:92CR68-03, February 16, 1993…………………………………………0398

19.    Presentence Investigation Report, *U.S. v. James H. Roane, Jr., a.k.a. "JR,"* Criminal Case No. 3:92CR68-03, prepared by Daniel Guertler, U.S. Probation Officer, April 20, 1993……………………………………………………0408

20.    *U.S. v. James H. Roane, Jr.,* 92CR68, June 21, 2002…………………...0465

21.    Declaration of James E. Aiken (2008)………………………………..0590

22.    Resume of James Evans Aiken……………………………………………0597

23.    Supplement, James E. Aiken (2016)……………………………………0602

24.    Declaration of James Aiken (2020)………………………………………...0604

25.    Declaration of Dr. Marcella Fierro……………………………………......0617

26.    Declaration of Dr. David Lisak…………………………………………0621

27.    Resume of Dr. David Lisak………………………………………………...0645

28.    Declaration of Daniel Martell……………………………………………0714

29.    Declaration of Dr. Natalie Novick Brown……………………………….0720

30.    Resume of Dr. Natalie Novick Brown…………………………………..0724

31.    Report of Dr. Jethro Toomer……………………………………………0739

32.    Declaration of Robert Tressel……………………………………………0746

33.    Declaration of Robert Barbato…………………………………………..0751

34.    Declaration of Lee Bassett………………………………………………0753

35.    Declaration of Cassandra Battle…………………………………………0755

36.    Declaration of Alfonza Bullock…………………………………………0756

37.    Declaration of Cathy Bullock…………………………………………...0758

38.    Declaration of Annette Coates…………………………………………..0760

39.    Declaration of Harold Coles……………………………………………………….0766

40.    Declaration of Aimee Coley……………………………………………………….0768

41.    Declaration of Richard E. Coles………………………………………………...0769

42.    Declaration of Carmella Coley………………………………………………….…0771

43.    Declaration of Willie Coley……………………………………………………..0772

44.    Declaration of Brandi Cooper…………………………………………………...0775

45.    Declaration of Briian Dargon…………………………………………..……..0777

46.    Declaration of Joan Dargon………………………………………………….0780

47.    Declaration of Melody Forrester………………………………………………...0782

48.    Declaration of Earl Granger (August, 2008)……………………………………0786

49.    Declaration of Earl Granger (September, 2008)………………………...0790

50.    Declaration of Clarence Harvey…………………………………………………0791

51.    Declaration of Delores Harvey…………………………………………………..0797

52.    Declaration of Marshall Harvey…………………………………………………0799

53.    Declaration of Victor Herbert……………………………………………………0802

54.    Declaration of Ronita Holman…………………………………………………..0804

55.    Declaration of Ann Jones…………………………………………………..0806

56.    Declaration of John Haywood Jones……………………………………………0811

57.    Declaration of Herbert Keys……………………………………………………..0813

58.    Declaration of Faye Malik……………………………………………………....0815

59.    Declaration of Antonio Marrow (2008)…………………………………………...0818

60.    Declaration of Antonio Marrow (2016)…………………………………………....0819

61.    Declaration of Antonio Mayo……………………………………………………...0824

62.    Declaration of Michelle Mayo-Jones………………………………………...0827

63.    Declaration of Lloyd McDaniels………………..……………………….…0832

64.    Declaration of Jeffrey Michaux……………………………………….……0834

65.    Declaration of Edward Morton…………………………………………..0837

66.    Declaration of Jeannette Pauley………………………………………....0839

67.    Declaration of Florence Roane…………………………………………..0841

68.    Declaration of Jeanette Roane (2008)…………………………………...0844

69.    Declaration of Jeanette Roane (2016)…………………………………...0850

70.    Declaration of Kevin Roane……………………………………………..0851

71.    Declaration of Rashad Roane…………………………………………....0859

72.    Declaration of Travis Roane………………………………………..…0860

73.    Declaration of Florence Roane-Coleman………………………………..0861

74.    Declaration of Claire Rosenbaum………………………………………0864

75.    Declaration of Keith Ross………………………………………………0865

76.    Declaration of Iris Smith………………………………………...…0867

77.    Declaration of James Tyrone Smith……………………………………..0869

78.    Declaration of Gina Taylor……………………………………………...0872

79.    Declaration of Haywood Tunstall……………………………………….0874

80.    Declaration of Ethel White……………………………………………...0875

81.    Declaration of Tonya Williams…………………………………………0877

82    Declaration of Reverend Katherine Wright…………………………..0880

83.    Declaration of Wanda Wright……………………………………...…0883

84.    Declaration of Kerry Younger…………………………………………..0884

85.    Certificate of Marriage, James Henry Roane and Jeannette Lee Jones, May
19, 1964……………………………………………………………..…0887

86.    Richmond Public School Records for James Roane, 1971-1980……….0888

87.    Report of Dr. William Lordi, March 7, 1972……………….……...0890

88.    Report of Dr. William Lordi, October 13, 1976…………….………......0892

89.    Report of Dr. William Lordi, October 1, 1980………….……………......0894

90.    Transfer Hearing Report, Roane, James Henry Jr., prepared by Alonzo N. Jones, Investigative Counselor, March 13, 1981……………….…………….…..0897

91.    Report of Guidance Counselor Claire Rosenbaum to Juvenile PO Jones, April 27, 1981……………….……………………………………………….......0898

92.    Report of Dr. Walter Draper, Memorial Guidance Clinic, Richmond Public School Consultation, March 22, 1982……………….………………………….....0900

93.    Bonnie V. Winston, *Many in city call it a haven for crime, but 2,300 call it home*, Richmond Times-Dispatch, December 29, 1985 at A-1, A-10, A-15…..0903

94.    Bonnie V. Winston, *The life is one of big dreams, little money*, Richmond Times-Dispatch, December 29, 1985 at A-10…………………………….…0906

95.    Incident Notification Report, From: Detective S.A. Dalton, Victim: Kariem Hakim aka Douglas Moody, January 13, 1992……………………………...…0907

96.    Metro Richmond Crime Stoppers Report, March 8, 1992……………...0908

97.    Forensic Synopsis Sheet, Forensic Detective Assigned: Paul Tuttle…....0909

98.    Virginia Department of Corrections Uniform Commitment Form, Roane, James H. Jr., July 29, 1993……………………………………………………..0910

99.    Christopher Silver, *The Racial Origins of Zoning in American Cities*, URBAN PLANNING AND THE AFRICAN AMERICAN COMMUNITY: IN THE SHADOWS. (Manning Thomas, June and Marsha Ritzdorf eds., 1997)……………………………………….…0911

100.    Bureau of Prisons Health Services Clinical Encounter, Inmate Roane, James H., Karl Norris, RN, February 22, 2012……………………………………….0923

101.    Michael Paul Williams, Richmond's segregation is by design, Richmond Times-Dispatch, April 2015, available at http://www.richmond.com/news/local/michael-paul-williams/article_7539dea6-9142-515a-9d56-c0adcd5f3fd1.html...............................................................0925

102.    Architecture Richmond, *Neighborhood Profile: Gilpin Court*, posted 1/29/16 at http://architecturerichmond.com/2016/01/29/neighborhood-profile-gilpin-court.........................................................................................................0928

Case 3:92-cr-00068-DJN    Document 17-1    Filed 07/22/20    Page 7 of 275 PageID# 140

103.    Interview of Priscilla "Pepsi" Green, January 28, 1992…………………...0936

104.    Verified Complaint, *James H. Roane, Jr. v. John F. Caraway, et. al*, United States District Court, Southern District of Indiana, Terre Haute Division, No. 2:14-cv-0377 JMS-WGH, December 10, 2014……………………………………...0962

105.    Declaration of Herman Taylor…………………………………………..0972

106.    Declaration of Tyrone Mayo…………………………………….…0975

107.    Declaration of Phyllis Washington…………...………………………0981

108.    *U.S. v. Tipton, et. al.*, 92CR68, Volume XXII, February 12, 1993, penalty phase closing argument……………………………………………………...0984

109.    Curriculum Vitae, Ralph Robert Tressel………………………….…..1019

Case 3:92-cr-00068-DJN   Document 17-1   Filed 07/22/20   Page 8 of 275 PageID# 141

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

                                        PAGES 20

UNITED STATES OF AMERICA

V.

JOHN DOE, AKA WHITEY

and JOHN DOE, AKA O.                    GRAND JURY 92-1


        TESTIMONY OF DENISE BERKLEY

        before a full quorum of the grand jury

        on March 17, 1992, at 4:20 p.m.


        Foreman:  CHRIS SNEED

        Assistant Foreman:  MARY A. McNULTY


        Assistant U. S. Attorney:  HOWARD C. VICK, JR.




        Reporter:  Rhonda D. Kasten








        ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
                    (804) 746-0746
                    1-800-428-2228

Page 2

DENISE BERKLEY, called as a witness, having been first duly sworn, testifies and says under oath as follows:

EXAMINATION BY MR. VICK:

Q        Would you state your full name for the record and grand jury please.

A        Denise Robin Berkley.

Q        You're 29 years old.  Is that correct?

A        Yes.

Q        You've got an 8th grade education?

A        Yes.

Q        You've got some misdemeanor convictions but no prior felony convictions.  Correct?

A        Right.

Q        You are here because you agreed to give information concerning individuals by the name of O., and Whitey, V., E.B., Sandra, and other individuals that you were involved with in some criminal conduct.  Is that correct?

A        Yes.

Q        In fact, you came forward to testify.  You came forward and contacted the police and have agreed to testify after the murder of a man named Linwood Chiles and Curtis Thorne.  Is that correct?

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 3

A        Yes.

Q        You believe their murder to be conducted by O. and Whitey, and you believe yourself to be threatened by these people.  Is that correct?

A        Yes.

Q        You've come forward to provide testimony for those reasons?

A        Yes.

Q        You met O. and Whitey in November of 1991.  Is that correct?

A        Yes.

Q        Just about four or five months ago, you met them.  You have come, since that point, to be associated with O., Whitey, a fellow by the name of E.B., who is a 15-year old juvenile.  Is that correct?

A        Yes.

Q        Mousey, Pepsi, Papoose, J.R., Jerry, Denise, Linwood Chiles, Sandra and Curt.  Those are the first names of people?

A        Yes.

Q        You refer to yourself as what?

A        Denise.

Q        No.  You refer to that group of people I've described as what?

A        As the family.

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 4

Q        Where did you get that name, the family?

A        From Whitey and O.

Q        Were you associated--was that group of people associated in the sale of crack cocaine?

A        Yes.

Q        Cook 'em up, it's called, too. Isn't it?

A        Yes.

Q        What were Whitey and O.'s roles in the family, as far as the cook 'em up goes?

A        O. was like the leader, as far as dishing it out to different people in the group. Whitey, he was like, he was more like--something like O., but he was more like, you know, listening to what O. was, you know.

Q        How about V., a man who was identified as V.?

A        V., he was more like-- I don't know, he was more like the aggressive type one.  He was more-- To me, he was more over the top of all of them, but he was mostly the one that was-- Like O. is the one that, as far as to tell who we give it to, but V., he was--

Q        V. was in charge of counting the

Page 5

money?

A        Yes, he was in charge of the money.

Q        He actually did a lot of the cooking of the cocaine. Didn't he?

A        Yes, he was mostly, you know, like bagging it and stuff like that.

Q        J.R. is J.R. Rome. Correct?

A        Yes.

Q        Jerry is Jerry Gathers?

A        Jerry Gathers.

Q        E.B., or E.V., as he's called, is a juvenile, 15 years old?

A        Yes.

Q        Are they all part of an organization, a group that banded together with each other to sell cocaine?

A        Yes.

Q        You met them through J.R. Rome. Did you not?

A        Yes, I did.

Q        You met Whitey through J.R. Rome?

A        Yes.

Q        You ended up cleaning his house for him. Did you not?

A        Yes.

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 6

Q    There came a point when you were actually cleaning the house-- Whitey lived with O.?

A    Yes, O. had started living with Whitey.

Q    Where was that?  What location was that?

A    On Norton Street.

Q    That's here in Richmond?

A    Yes.

Q    There came a point in January--on some point in January when you were asked to dispose of certain boxes that they had gotten.  Could you tell the grand jury about that?

A    Yes.  They had bought two Uzi's and two other little guns, and they told me to take the box that the guns came out of, told me to dispose of it.  So I had put it in a plastic bag and was taking it to throw it down the sewer.

Q    Did you do that?

A    Yes, I did.

Q    When you said, two other little guns, do you know what kind they were?  Handguns?

A    Yes, they was handguns.

Q    Pistols?

A    Yes, with the clips.

Case 3:92-cr-00068-DJN    Document 17-1    Filed 07/22/20    Page 14 of 275 PageID# 147

Q    So they were semiautomatic pistols?

A    Yes.

Q    For instance, it would be a 9 millimeter-- Are you familiar with guns at all?

A    Not too good, no.

Q    You also got involved with them, and you smoked some of the cocaine that they gave you. Didn't you?

A    Yes.

Q    You would get crack cocaine for cleaning their house?

A    For cleaning their house, going to the store for them, and basically cleaning the house up and making groceries for them.

Q    They had a group of people, O. and Whitey now, who sold cocaine for them.  Is that correct?

A    Yes.

Q    That they would give their cocaine to, to distribute?

A    Yes.

Q    Was Linwood Chiles one of those people?

A    Yes.

Q    Was Pracilla Green, also known as

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

App.0007

Page 8

Pepsi, one of those people?

A        Yes.

Q        Was Curt?

A        Yes.

Q        What's Curt's last name?

A        I don't know his last name.

Q        Would it be Curtis Thorne?

A        I think that's his last name.

Q        You're talking about the same Curt that was killed with Linwood Chiles in his automobile?

A        Yes.

Q        Mousey?

A        Yes.

Q        You also said that there were other people in the group.  For example, Wild Man?

A        Yes.

Q        Is that a nickname?

A        Yes.

Q        There came a point when you had a falling out with Whitey and O.  Is that right?

A        Yes, I had a falling out mostly with O.

Q        Could you tell the ladies and gentlemen of the grand jury about that falling out?

A        I had left after-- Me and Mousey had

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 9

left together.  We went over to her brother's house over on Church Hill, because he caught an attitude with me and her because he had gave me three of them things to sell.

Q        Three rocks of crack cocaine?

A        Yes, three rocks to sell.  And I smoked them.  We had went over to her brother's house. When I came back-- I came back by myself, and I tried to talk to him.  He hit me in my face.

Q        Who hit you?

A        O. hit me in my face with his fist. Then E.B. jumped on me and hit me with a stick. Sandra and O. went into the bathroom to talk.

Q        Who is Sandra?

A        Sandra was J.R.'s girlfriend.  She was in on the group too.

Q        That's J.R. Rome?

A        Yes.

Q        Do you know her last name?

A        No.

Q        Shortly after they beat you up or hit you in your face, you were asked to go talk to O. in the bathroom.  Is that correct?

A        Yes, after him and Sandra was in the bathroom.  Sandra came out and said that O. wants to

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 10

see me in the bathroom. So when I went in there, O. set me there and told me, he said, "I'm going to give you another chance." He said, "I want you to do something for me." So I asked him what. He told me, "I want you to off Mousey off, or I'm going to have Sandra to off you off."

Q    When you said off you off, what do you mean?

A    He wanted me to kill Mousey.

Q    Who was Mousey? What's her last name?

A    Mousey was Dorothy Armstrong.

Q    Did Dorothy Armstrong end up getting murdered?

A    Yes.

Q    When?

A    I guess that happened that same night or the next day. The next day, I know she was dead; her and her brother and another guy.

Q    You didn't actually do it. Did you?

A    No.

Q    Do you know who did?

A    I think they did. O. and Whitey, and V.

Q    Do you know whether O. and Whitey

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 11

were upset with her about something?

A    Yes.  They was upset because they said that she owed them some money.

Q    Money for what?  For the crack cocaine?

A    From the crack, yes.

Q    You left that evening and didn't see them for a couple of days.  Is that correct?

A    Yes.

Q    When did you next see them?

A    It was a couple of days afterwards when I seen them, when I seen them.  When me and Sandra was going to the 7-Eleven, I seen O. and Whitey walking down the street.  We picked them up, and they went to 7-Eleven where we was going to get something to eat.  Then they came back.  All of us came back and parked on Clay Street.  That's when they asked Linwood Chiles to take them somewhere, to take them out from around there.

Q    Where would they get the cocaine that they sold?

A    New York.

Q    Where would they cook it up?

A    First they was cooking it at Papoose's house.  Then his electric stopped.  Then

Page 12

they took and cooked it over on Peesue [sic.] house. Then they started cooking it on Moore Street.

Q    Did Linwood help them by driving them around where they wanted to to go?

A    Yes.

Q    Did he take them to New York to get cocaine?

A    He took them one time.

Q    Have you heard these people indicate that O. and Whitey, E.B., V., J.R. Rome, Jerry Gathers, have you ever heard them indicate that they wanted to hurt anybody?

A    Yes.   They was talking about Doug and K.K., you know, that they was going to do something to them because they heard something about a tape.

Q    Tell us about that tape, what you understood to be concerned about?

A    I was in a house on Norton Street, and they came.   They was checking the guns and getting--

Q    Who is they?

A    It was J.R., V. and Whitey and O.

Q    They were checking their guns?

A    Yes.

Page 13

Q        The Uzi's that you had seen them with before?

A        Yes.

Q        And the other handguns?

A        Yes.

Q        Where were they talking about going?

A        J.R. came in behind.  He had came in, but he left, and he came back in.  He said that he overheard Doug and K.K. talking about something on a tape.  I don't know.  It was something about a tape.

Q        Doug is Doug Moody?

A        Yes.

Q        Morris is Payton Morris Johnson?

A        Yes.

Q        They wanted to kill those people. Didn't they?

A        Yes.

Q        You heard them talking about wanting to kill these people because of something on a tape?

A        Yes.

Q        Do you know, Denise, whether Payton Johnson and Doug Moody have indeed been killed?

A        Yes.

Q        When were they killed in relation to that conversation?

Page 14

A        That night.  They had left out, and the next thing you know, Morris got killed.  He was shot.

Q        You actually witnessed the murder of Doug Moody.  Did you not?

A        Yes, I did.

Q        Tell the ladies and gentlemen of the grand jury about that.

A        Me and Mousey came out one night and went around to a club and went to the sky house, and we set in.  We smoked some rocks, crack, or whatever.  We heard some shots.  We heard one shot, and we didn't know what it was.  We thought it was the police or something.  So we stopped, got--

Q        In the house you were in, you heard a shot.  Didn't you?

A        Yes.  Then we heard another shot.  Then we heard a glass break.

Q        Who was in that house with you?

A        It was me, Mousey, Stanker [sic.] and another girl.  I don't know her name.

Q        Where did the shot come from in relation to where you were?

A        In the hallway in the back.

Q        Who was in the back in the location

Page 15

where the shot came from?

A        It was just another guy.  He was in the middle room.  He was like, selling liquor.

Q        Who was in the room where the shot came from?

A        At the time, I didn't know.

Q        Did you come to find out later who was in that room?

A        Yes.  It was him, and Whitey had got the struggler.

Q        Who is him?  Is that Doug Moody?

A        Doug Moody and Whitey got the struggler.  When I came back outside, when I went outside, that's when I seen Doug was hollering, "J.R., stop. Stop.  You're hurting me, trying to kill me." J.R. had ran back across the street.

Q        J.R. Rome?

A        Yes, had ran across the street with me, Mousey, Linwood, Pepsi--

Q        Pepsi is Pracilla Green?

A        Yes.

Q        She was shot the same night as Linwood Chiles and Curtis Thorne?

A        Yes.

Q        You saw J.R. Rome actually stab Doug

Page 16

Moody that evening.  Didn't you?

A          Yes, I did.

Q          How many times did you see him stab him?

A          At least about four times.

Q          What did he do with the knife that he used to stab him?

A          He gave it to Pracilla Green and told her to get rid of it.

Q          That's Pepsi?

A          Yes.

A          Did Pepsi leave that evening?

A          Yes.  All them left except me and Mousey.

Q          Who left?

A          Pracilla Green, Curt, Linwood, J.R., and Sandra.

Q          They left all together in Linwood's car?

A          In Linwood's station wagon.

Q          You had a conversation with Whitey later that evening where he admitted shooting Doug Moody in the back room.  Didn't he?

A          Yes.  All of us was over on Moore Street.  When me and Mousey came to the house, he was

Page 17

bragging about it, that he had took and shot him and they got to fighting and carrying on. He ran out of there.

Q      Are you familiar with a girl by the name of Annette Rosier?

A      Net. Okay, yes.

Q      What happened to her?

A      As far as I know, she got killed on the railroad tracks.

Q      Tell the ladies and gentlemen what you know about that.

A      I was on Moore Street that evening. When I looked out the window I seen Jerry Gathers coming to the house. When I opened the door, I told him, because most likely, they was coming in looking for O. and Whitey, and I told them they wasn't there. He told me that Net got killed. I said, "What you talking about?" He said, "Net, that's who they found up on the railroad tracks on Lumbardy and--" I don't know the name of the other street.

Q      Have you heard who killed Net?

A      I heard Jerry Gathers was the one that did it.

Q      Mousey has also been killed. Hasn't she?

Page 18

A      Yes.

Q      Tell the ladies and gentlemen of the jury about her murder, where that occurred and who else was killed with her.

A      Over on Church Hill, I think.

Q      In her brother's house?

A      Yes, in her brother's house.

Q      Bobby Long?

A      Yes.

Q      Bobby Long was also killed.  Is that correct?

A      Yes, and another guy.

Q      You don't know the other guy? Timothy Carter?  Does that mean anything to you?

A      No.  I mean, I seen him, but I don't know him.

Q      The three of them were murdered in there together that night.  Correct?

A      Yes.

Q      Do you know who murdered them?

A      It had to be them, because that night, they was talking about, they knew where she was.  You know, they knew that she was with her brother, but they didn't know where the house was.

Q      Who was they?

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

App.0018

Page 19

A        Mostly O. was doing the talking.

Q        Why was he concerned about where Mousey was?

A        Because he said she had owed him some money, and she had left.

Q        Was he going to look for her?

A        That's what he told me, he was going to look for her.

Q        Did they have firearms with them?

A        I don't know.  I know they kept it in the house with them, so I don't know.

Q        On the evening she was murdered, he was angry with her over money and was going to look for her at her brother's house?

A        Yes, that's what he told me.

Q        That was who again?

A        That was O.

Q        Do you know anything about the murders of Linwood Chiles and Curtis Thorne?

A        No, I heard that on the TV.  That's what made me come in.

Q        Did you sell some cocaine for them?

A        They wanted me to sell three, 20's. That was the first time, but I didn't sell it, I smoked it.

Page 20

Q    That's why they were mad at you?

A    Yes.

Q    You've been told that they want to kill you, too. Haven't you?

A    Yes.

Q    By whom?

A    I heard it by some people up where I lived at. They told me to stay away because they got the word that they wanted to kill a girl and two guys. I assumed then that, I was in with them, and Papoose was in with them. I would assume they was talking about me.

Q    When O. asked you to kill Mousey, was that the same time he was having a conversation about where Mousey was, that he knows she was up at her brother's house?

A    Yes.

Q    One further question. Denise, you have not given us all the knowledge you have here today. You've simply responded to the questions I've asked you. Is that correct?

A    Yes.

MR. VICK:    You're free to go at this point.

(Whereupon, the proceedings

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 21

concluded at approximately 4:39 p.m.)

CERTIFICATE OF REPORTER

STATE OF VIRGINIA

COUNTY OF HANOVER, TO WIT:

I, Rhonda D. Kasten, certify that I reported and transcribed the foregoing, which is complete and accurate, to the best of my ability.

I am not related to nor employed by any counsel, party or witness, and have no interest in this matter.

Given under my hand this 31st day of March, 1992.

_____
Rhonda D. Kasten, Court Reporter

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

PAGES 18

UNITED STATES OF AMERICA

V.

JOHN DOE, AKA WHITEY,

and JOHN DOE, AKA O.          GRAND JURY 92-1

TESTIMONY OF ROBERT DAVIS

before a full quorum of the grand jury

on March 17, 1992, at 4:40 p.m.

Foreman:  CHRIS SNEED

Assistant Foreman:  MARY A. McNULTY

Assistant U. S. Attorney:  HOWARD C. VICK, JR.

Reporter:  Rhonda D. Kasten

ORIGINAL

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 2

ROBERT DAVIS, called as a witness, having been first duly sworn, testifies and says under oath as follows:

EXAMINATION BY MR. VICK:

Q        You're Robert Davis.  Is that correct?

A        Yes.

Q        Is that your full name, Robert Davis?

A        Yes.

Q        Your nickname is Papoose?

A        Yes.

Q        The grand jury has heard some testimony about a lady by the name of Dorothy Armstrong, also known as Mousey.  That was your sister or half sister.  Correct?

A        My sister.

Q        Bobby Long, an individual who was killed along with your sister, he was your brother. Is that correct?

A        Yes.

Q        You are 40 years old?

A        Yes, I am.

Q        You've got no prior felony record?

A        Nope.

Q        You have been convicted of some

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

                                                    Page 3

misdemeanors?

          A          Yes.

          Q          Why did you choose to come forward
and cooperate?  You have chosen to de so as witnessed
by your testimony here today.  Why did you choose to
come forward and cooperate?

          A          I feel my life is in jeopardy.

          Q          Do you know an individual by the
name of O. and another individual by the name of
Whitey?

          A          Yes, I do.

          Q          Is that the only name by which you
know them?

          A          Yes.

          Q          In November of 1991, O. actually
ended up living with you for a short period.  Is that
right?

          A          Yes, he did.

          Q          How did that come to pass?

          A          I met him through a person named
Swain.

          Q          Would that be spelled S-w-a-i-n?

          A          I don't know how you spell it.

          Q          Am I pronouncing it correctly,
Swain?

ACCU—BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 4

A        Yes.

Q        Do you know whether O. was involved in the distribution of cocaine, crack cocaine?

A        Yes, I do.  Yes.

Q        How do you know that?

A        He sold from my house sometimes.

Q        Where do you live?

A        512 Hancock Street.

Q        Did you receive any cocaine from him?

A        Yes, I have.

Q        How much?

A        About five, $20 worth.  Sometimes he gave me a 20 or so just to keep, just for me to use at my house.

Q        Did your sister Mousey sell cocaine for him?

A        She, she did.

Q        How much cocaine did she sell for him?

A        Sometimes about $300 worth, $600 worth a day.

Q        Where would she sell that cocaine?

A        From my house.

Q        Is that on Norton Street?

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 5

A        No.  That's on Hancock Street.

Q        Do you know an individual by the name of V.?

A        Yes.

Q        How do you know the individual by the name of V.?

A        Through O.

Q        After O. moved in with you, when did you first meet Whitey?

A        A couple of days later.

Q        When did you first meet V.?

A        About a month later, in January.

Q        Do you know where they came from?

A        New York.

Q        Do you know what their purpose of being here in Richmond was?

A        At the time no, but now I do.

Q        What was that?

A        Drugs.

Q        Did you ever see them cooking their cocaine?

A        Yes.

Q        On how many different occasions, approximately, have you seen them cooking their cocaine?

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

App.0026

Page 6

A        How many occasions?

Q        Yes.  They used your house to cook cocaine.  Did they not?

A        Yes, my kitchen.

Q        Generally, what sort of quantities would they be cooking the cocaine?

A        They had sandwich bags.

Q        How many sandwich bags?

A        About three or four, four or five, sandwich bags.

Q        Three, four, five, six, seven bags?

A        Yes.

Q        On how many days in a week generally would they be cooking cocaine?

A        About once or twice, whenever they ran out.

Q        When they ran out, where would they go to get more cocaine?

A        They say they was going to New York.

Q        Do you know an individual by the name of Linwood Chiles?

A        Yes.

Q        Did he associate himself with them in the distribution of cocaine?

A        Yes, he did.

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 7

Q    He also drove them.  Did he not?

A    Yes.

Q    Do you whether he took them to New York?

A    I heard he drove them once.

Q    This individual, Swain also sold cocaine with them.  Is that right?

A    Yes.

Q    He got beaten up by O. and Whitey on one occasion.  Did he not?

A    Yes.

Q    How do you know that?

A    He owed them some money.

Q    He owed them money for cocaine?

A    Yes.

Q    Of the group that you've described, O., Whitey, E.B. -- Do you know E.B.?

A    Yes.

Q    Who is he?

A    He was a young guy from New York.

Q    Do you know a guy there by the name of Jerry Gathers?

A    Yes, he's my cousin.

Q    Was Jerry Gathers associated with them?

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 8

A        He used to sell for them, too.

Q        He used to sell for O. and Whitey?

A        Yes.

Q        How about V.?  What was his relationship to O. and Whitey?

A        He would cut up and count the money with them.

Q        Did anyone of this group seem to be in charge?

A        O.

Q        How was he in charge?  Did he give directions to the others?

A        They all sit there and talk, and he'll give them opinions.  They all listen to his words before they listen to anyone else's.

Q        You were present for those conversations?

A        Sometimes.

Q        J.R. Rome, do you know him?

A        Yes.

Q        Was he associated with Gathers, E.B, V., O., and Whitey?

A        Yes, he was.

Q        How was he associated with him?

A        He was one of the main guys, too.

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 9

Q    When you say--

A    Okay.  E.B., V., James Rome, Jr., O., Whitey.  All of them were the top five.

Q    Did they have people selling cocaine for them?

A    Yes.

Q    Approximately how many people did they have selling cocaine for them?

A    O., my sister, and Curt.

Q    What was his last name?

A    Curt Thorne.

Q    He was killed with Linwood Chiles. Was he not?

A    Yes, he was.

Q    Was Linwood Chiles actually selling cocaine for him?

A    I don't know about that.

Q    You sold cocaine for them too, small quantities?

A    Yes.  They had to give me some because they was using my house.  They would give me maybe five and give them half, and I keep the half for using my house.

Q    Did you have a conversation with your sister Mousey before she was killed about an

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

App.0030

Page 10

individual by the name of Annette Rosier?

A     Yes.

Q     What did Mousey tell you about that?

A     She said they killed Net.  Jerry killed Net.

Q     Jerry Gathers?

A     Yes.

Q     Killed Annette for what reason?  Do you know?

A     I don't know.  She was crying.

Q     When was that, approximately?

A     That was before I went in the hospital.

Q     Was it the day that she was killed?

A     No, my sister was killed--

Q     No.  The day that Annette Rosier was killed.

A     I don't know what day it was.  She just came do me and said that Net was killed by Jerry.

Q     Your sister Mousey also told you about the murder of Doug Moody.  Didn't she?

A     Yes.

Q     What did she tell you about that?

A     She said they killed Jerry, that had killed--not Jerry, but Whitey and J.R. killed Doug.

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 11

She had the scissors, and they took the scissors from her.

Q        What was done with those scissors?

A        I don't know.

Q        Were they used to stab them?

A        They used the scissors.  I heard on the news that he had been stabbed several times.

Q        Was O. involved in that in any way, do you know?

A        Not that I know of.

Q        So Whitey and J.R. Rome, according to your sister's testimony, killed-- According to your sister's--

A        Yes, she was crying.  She got scared.

Q        Did you ever hear this group that you've described, the same group; O., Whitey, E.B., V., J.R., Jerry Gathers, did you ever hear them talk about harming people, hurting people?

A        No, because I jumped on them.  I said, "I'm not for no killing nobody.  I just want to make some money."

Q        Did you hear whether they were upset with people over money?

A        I knew they were upset with some

Page 12

people.

Q          You used to hold guns for them. Didn't you?

A          Yes.

Q          Let me back up.  What people did you know them to be upset with?

A          They were upset with Swain about some money.

Q          They were upset with Mousey over money, too.  Weren't they?

A          Yes.  O. said one day, about two weeks before I went in the hospital, he said, "You know your sister is messing with the money."  I said, "Well, just don't give her no more."  But they kept on giving it to her.  She come jumped on me and messed my eye up, and I went in the hospital.

Q          You held guns for them.  Didn't you?

A          Yes.

Q          What type of guns did you hold for them?

A          It looked like a 45, a 9 millimeter. It was a long Uzi and a small Uzi.

Q          So you held two Uzi's and a 9 millimeter or a 45 semiautomatic gun.  Where would you keep them?

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

App.0033

Page 13

A    In the backyard in a trash can.

Q    Did they come and get these guns around the time that you know Morris to have been killed?

A    Yes.

Q    Tell us about that.

A    Okay.  I was in the house looking at the television, and they came in.  They said, "Papoose."  I said, "What?"  They said, "Let me get the guns."  And J.R. said, "Don't say nothing.  Just get the guns."

Q    Did you get them the guns?

A    Yes.

Q    Where did you keep them?

A    In the back yard in the trash can.

Q    About an hour later, they came back and brought you those same guns back.  Didn't they?

A    Yes.

Q    Who was there?

A    J.R., O., and E.B.

Q    Did they say anything to each other about the guns?

A    No.  Somebody said, "Did you empty it?"  He say, "Yeah, she was good."

Q    Who said that?

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 14

A       J.R.

Q       J.R. said--

A       That she was good.

Q       Who asked him, "Did you empty the gun?"

A       O.

Q       O. asked J.R., "Did you empty the gun?"

A       Right.

Q       J.R. said--

A       Yeah.

Q       You found out later that that was the time that Morris Moody was killed--or excuse me, Morris Johnson was killed?

A       Yeah.  Mousey told me the day she was killed.

Q       Just prior to that, you also held other guns, a 357 Magnum and a 22 caliber gun.  Isn't that correct?

A       Yes.

Q       You held that for these same people?

A       Yes.  I didn't know it was in the house until Mousey told me.

A       Did they get those guns, the 357 and the 22 from you sometime around the murder of Doug

Page 15

Moody?

A        Yes, they came and got it.    One was missing.

Q        Who came and got them?

A        J.R.

Q        Did they return those guns?

A        No.

Q        So you never saw those guns after Doug Moody's murder?

A        No.

Q        J.R. got that gun?

A        Yes.

Q        On the evening they came and got the guns, when Morris Johnson was killed, who got the handgun, the 9 millimeter or the 45?

A        All those were in the bag.

Q        Did J.R. have the Uzi?

A        He had one Uzi.    All of it was in the bag.

Q        Did O. have an Uzi?

A        O. had an Uzi.    J.R. had an Uzi and E.B. had the small handgun.

Q        Describe for us the type of bag you had.

A        A black nylon bag with a sealing on

Page 16

it, medium black.

Q    You were in the hospital when Mousey was killed. Were you not?

A    Yes.

Q    And your brother, Bobby Lee, and an individual by the name of Tony Carter?

A    Yes.

Q    They were killed by being shot?

A    Yes.

Q    Do you know who killed them?

A    The paper said Jerry Gathers.

Q    You just know what you have read in the newspaper on that particular murder?

A    Yes.

Q    Linwood Chiles, you know him to have been murdered, too. Don't you?

A    Yes.

Q    Do you know whether Linwood Chiles was associated with this group, O., Whitey, J.R.?

A    Yes.

Q    What did he do for them?

A    He was driving for them, and he used to go to his house.

Q    They used to do what?

A    Go to his house.

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

Page 17

Q       How about Curtis Thorne?  Was he associated with them?

A       Yes.

Q       What did he do for them?

A       He sold for them, too.

Q       The two girls who were in the car on the evening of their murder, Gwen and Pracilla Green, were they associated with these people?

A       They knew them.

Q       Did Pepsi, Pracilla Green, or did Gwen-- would they get people and direct them to O. and Whitey and E.B. and V. to purchase drugs?

A       Yes.  O. put me up.  After my first surgery, my sister got killed.  They put me in the hotel room-- Curt and Pepsi kept me in a hotel room to keep me out of the streets for a while.

Q       You got your eye taken out.  Didn't you?  That was your operation?

A       Yes.

Q       You were stabbed in that eye by your sister Mousey?

A       Yes.

Q       You know who actually sold for who within that group.  Don't you?

A       Yes.

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

App.0038

Page 18

Q    O. had Mousey and Curt selling his cocaine for him. Did he not?

A    Yes.

Q    Whitey had Jerry Gathers and Curt selling his cocaine?

A    Yes.

Q    J.R. Rome had Sandra, his girlfriend-- Do you know her last name?

A    I don't know.

Q    Sandra and Curt selling his cocaine?

A    Curt left J.R. and Whitey and started working with O.

Q    V. actually would cook up the cocaine and keep the money. Is that right?

A    And count it, yes.

Q    Who provided direction for this group?

A    Usually O.

Q    E.B. also sold cocaine. Did he not?

A    I know he was selling it, but he never did smoke none.

Q    He was here constantly associating with this group?

A    Yes. Like I say, all of them were from New York.

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

App.0039

Page 19

MR. VICK:  I have no further questions for Mr. Davis.  If the grand jury has any questions, ask them now.  You're free to step outside.

(Whereupon, the proceedings concluded at approximately 4:56 p.m.)

CERTIFICATE OF REPORTER

STATE OF VIRGINIA

COUNTY OF HANOVER, TO WIT:

I, Rhonda D. Kasten, certify that I reported and transcribed the foregoing, which is complete and accurate, to the best of my ability.

I am not related to nor employed by any counsel, party or witness, and have no interest in this matter.

Given under my hand this 31st day of March, 1992.

Rhonda D. Kasten, Court Reporter

ACCU-BETA DEPOSITIONS, VIDEOS & IMAGES, INC.
(804) 746-0746
1-800-428-2228

App.0040

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION                        MAY 04 1992

                                    8 PAGES

UNITED STATES OF AMERICA

V.

RICHARD TIPTON AKA WHITEY

NEWTOWN GANG                    GRAND JURY 92-1


        TESTIMONY OF ANTHONY GWENN

        before a full quorum of the grand jury

        on April 20, 1992, at 4:28 p.m.


        Foreman:   CHRISTOPHER F. SNEAD

        Assistant Foreman:   MARY A. McNULTY


        Assistant U. S. Attorney:

        Toby Vick, AUSA

        Buddy Parcell, Assistant Commonwealth's Attorney

                        City of Richmond


        Reporter:   Barbara D. Watts, RPR




        ACCU-BETA Depositions, Videos & Images, Inc.
                        App.0041

April 20, 1992                          4:28 p.m.

ANTHONY GWENN, called by the government, first being duly sworn, testifies and says, viz:

EXAMINATION BY MR. PARCELL:

Q        Your full name?

A        Anthony Gwenn.

Q        Sir, where are you presently living?

A        Richmond city jail.

Q        Why are you there at the city jail?

A        Why am I?

Q        Yes, sir.

A        I have two petty larceny charges, a grand larceny and a B and E charge.

Q        Sir, around February 17, 18, this year, did you hear Sterling Hardy on the phone?

A        Yes, sir.

Q        Do you know what he was talking to?

A        No, I didn't know.

Q        Do you know what he said on his end?

A        Yes, sir.

Q        Please tell us what he said.

A        He told whoever he was talking to that he wanted Linwood Childs dead, and two days later

ACCU-BETA Depositions, Videos & Images, Inc.

App.0042

599

Page 3

the man was dead.

Q        How do you know the man was dead?

A        I read it in the paper.  He showed me.  He was sitting in his room reading the paper, he showed me, and he said, look, I don't tell no lie.

Q        Was this the Richmond paper he showed you?

A        Yes, Richmond newspaper.

Q        The morning or the afternoon paper?

A        It was the morning paper and the afternoon paper.  It was in both.

Q        He showed you both?

A        Yes.

Q        What exactly did he say about those killings?

A        He said, I don't play.  Look, see, I don't play.

Q        Did he ever tell you why he had this done?

A        Because Linwood Childs could testify against him, Linwood Childs' testimony could send him to jail for a long time.

Q        Did he tell you for what?

A        Because Linwood followed him in a car to take somebody to kill somebody, and that is all

he really-- He told me some more stuff.

Q       What else did he tell you?

A       He told me that he took people, took two guys to kill somebody.  Linwood was following in the car.  When the guys had done what they had to do, he picked them up, dropped them off.

Q       Did he tell you what part of the City of Richmond he took them to?

A       No.

Q       Did he tell you who he took them to kill?

A       No.

Q       Do you know how long this happened prior to Childs' being killed?

A       It was, really Childs got killed while he was in jail.

Q       That is correct.  Starting, while Hardy was on the street how much times elapsed from the time he took the guys to do the killing until he bragged to you?

A       I don't know.

Q       Did he ever tell you what kind of business he was in?

A       It is common knowledge that he sells drugs.

Q    What kind of drugs?

A    Cocaine and heroin.

Q    What kind of cocaine?  Powder or--

A    Rock.

Q    Cook'em up?

A    Yes.

Q    Did he tell where he got his cocaine from?

A    No, he didn't.

Q    Did he ever tell you who else was in the business with him?

A    Two other guys that worked for him. It is whole lot of guys that work for him.

Q    Any names?

A    He showed me two of the guys.  Two guys in the paper.  They were profiled in the paper.

Q    Their profile or their photograph?

A    Photograph, yes.

Q    Do you remember what names they had?

A    No.  I forgot the names.  It was in the paper.

Q    They were arrested when he was arrested back in early February?

A    Yes.

Q    Has the United States government or

Page 6

the Commonwealth of Virginia made you any offers of leniency or made you any deals for testifying today?

A    No.

Q    Is there anything else he told you about these killings or this drug distribution?

A    He told me that it was a woman that got shot. He said he was there but he didn't shoot her.

Q    Did he tell her her name?

A    No. He didn't. But it was in the paper. I had it, the woman's name, but I forgot.

Q    Does the name Martha McCoy mean anything to you?

A    That is the woman's name.   ,

Q    Did he tell you where she was shot and killed?

A    She was just shot. She didn't die.

Q    Did he every tell you about the necessity to have her remain quiet or have her killed?

A    No.

Q    Did he tell you whether anyone else was there when she got shot?

A    No. He said he was just there when she got shot.

Q    Did he ever tell you whether or not

Page 7

he carried any weapons or shot anybody?

A    Yes.  He always carries weapons.

Q    How do you know that?

A    Because I have seen him on the street myself.

Q    What part of the city did you see him?

A    Southside.

Q    What kind of weapon did he usually carry?

A    Always like a nine millimeter or a .38.  He just, he wasn't shy about it.  He just walk around with it.

Q    How long have you known Mr. Harding?

A    About five years.  I haven't known him personally, just from seeing him on the street, because he is a big drug dealer in the neighborhood.

Q    How long have you known from your own personal knowledge that he dealt in cocaine and heroin?

A    For like five or 6 years.

Q    Have you personally bought any of those from him?

A    No.

Q    Has he ever given you any?

ACCU-BETA Depositions, Videos & Images, Inc.

604

Page 8

A    No.

Q    Have you ever seen him with heroin or cocaine?

A    No, but it is common knowledge that Sterling Hardy is the man to go to if you want it.

Q    Do you know of any other persons by name that worked with him or for him?

A    No.

MR. PARCELL:  No further questions. Do you have any questions?

JUROR:  We never heard his name.

MR. PARCELL:  This gentleman?

WITNESS:  Anthony Gwenn.

MR. PARCELL:  You are free to go, sir.

WITNESS EXITS AT 4:34 P.M.

ACCU-BETA Appe-0048itions, Videos & Images, Inc.

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA          MAY 04 1992

RICHMOND DIVISION

                                   18 PAGES

UNITED STATES OF AMERICA

V.

RICHARD TIPTON AKA WHITEY

NEWTOWN GANG                          GRAND JURY 92-1


     TESTIMONY OF STANLEY EDWARD SMITHERS

     before a full quorum of the grand jury

     on April 20, 1992, at 3:45 p.m.


     Foreman:  CHRISTOPHER F. SNEAD

     Assistant Foreman:  MARY A. McNULTY


     Assistant U. S. Attorney:

     Toby Vick, AUSA

     Buddy Parcel, Assistant Commonwealth's Attorney

                      Richmond City


     Reporter:  Barbara D. Watts

Page 2

April 20, 1992          3:45 p.m.

STANLEY EDWARD SMITHERS, called by the government,

first being duly sworn, testifies and says, viz:


EXAMINATION BY MR. VICK:

Q          Would you state your full name for the record.

A          Stan Smithers, Stanley Edward.

Q          You are 29 years old?

A          Yes.

Q          You went through the eighth grade in school, and got your GED after that?

A          Yes, sir.

Q          You have got a prior record for distribution of cocaine?

A          Yes, sir, I do.

Q          Eight years, and four of those suspended?

A          Yes, sir.

Q          So you served sometime in jail?

A          Yes, sir.

Q          That was in 1986?

A          Yes.

Q          You and I have had occasion to talk prior to your coming here to testify today.  You have

Page 3

chosen to cooperate with the United States in the investigation of drug dealing and violent activities that took place in the Newtown section of Richmond. Is that correct?

A    That is right.

Q    Would you tell the ladies and gentlemen of the jury why you are cooperating.

A    Because I saw what happened, and it was, I mean it was hurting me.  It was hurting my conscience.  I talked to my pastor about it.  He told me to go forward, tell the law what happened.

Q    You are working every day now as an office cleaner.  Is that correct?

A    Yes.

Q    And have been out of trouble every since your problems in 1986?

A    Yes, I have.

Q    You used to run an after hours spot up on Clay Street in the Newtown section.  Is that right?

A    That is right.

Q    What was the location of that?

A    1200 West Clay.

Q    Could you tell us what is an after hours spot?

Page 4

A        A nip joint where you go and buy drinks after hours.

Q        Do you know an individual by the name of O?

A        Yes, I do.

Q        Do you know an individual by the name after Whitey?

A        Yes, I do.

Q        Have you seen this photograph before?

A        No, I haven't.

Q        Do you know who that is?

A        That is O.

Q        Let the record reflect that he has identified a photograph of an individual known as Cory Johnson also known as O.  Have you ever seen this individual?

A        Yes.  That is Whitey.

Q        Let the record reflect that he has seen photograph of an individual known as Richard Tipton, Whitey.  Where did you first meet O and Whitey?

A        Met them up near the club one day. They were out there selling drugs.

Q        What kind of drugs?  Was it cook'em

Page 5

up?

A    Cook'em up.

Q    What time frame was this?  Wa this around Christmas, Thanksgiving, last year?

A    Between there.

Q    Did they all of a sudden show up? Had you seen them before?

A    I hadn't seen them before.

Q    They were associated in some way with an individual by the name of James Roane, JR?

A    Yes.

Q    What was that association as you understood it?

A    The way I get it is they were in partnership, selling drugs, that they would take over the city.

Q    Who told you they were take over the city?

A    I heard them speaking of it in general.

Q    You heard them?

A    Yes.

Q    Did Whitey, O, JR brag they were going to take over the city?

A    Yes.

Page 6

Q    In cook'em up distribution?

A    Yes.

Q    Crack cocaine.

A    Right.

Q    How often would they be out there on the streets of Newtown selling crack cocaine?

A    Well, you would never catch all three together.  You will see one of them every day, or one or two of them together.

Q    They recruited other people to sell crack cocaine with them?

A    Yes.

Q    Did you know Mousie Armstrong?

A    Yes.

Q    She sold cocaine?

A    Yes, sir.

Q    Saundra Reavis?

A    Yes, sir.

Q    Did she sell cocaine for them?

A    Yes.

Q    How do you know?

A    Because I done seen them take the package to her.

Q    You used to smoke some cocaine yourself?

Page 7

A        Yes.

Q        In fact, you bought some from Mousie Armstrong's house?

A        Yes.

Q        Papoose's, Robert Davis, Papoose lived there and let Mousie sell cocaine from them?

A        Yes.

Q        That cocained belonged to Whitey, O, and JR?

A        Yes.  It did.

Q        How do you know that?

A        Because I seen O give Mousie the Coke, cook'em up cocaine.

Q        You also know an individual by the name of Curt Thorn?

A        Yes.

Q        Did you know he also sold cocaine for Whitey?

A        Yes, I did.

Q        How do you know that?

A        Because Curt had told me.

Q        Were you and Curt Thorn good friends?

A        He used to be my neighbor.

Q        He told you he was getting cook'em

Page 8

up to sell from Whitey?

A      Yes.

Q      How often was he getting crack cocaine?

A      On a daily basis.

Q      All of these people you have talked about were getting crack from Whitey, O, or JR on a diagonally basis?

A      Yes.

Q      Saundra Reavis, Mousie, Curt?

A      Yes.

Q      How about Jerry Gaithers?

A      Yes.  He was selling for Whitey.

Q      He was selling for it for Whitey. How do you know that?

A      Because I usually let Jerry stay with me every now and then, he didn't have anywhere to stay at times.

Q      Did Jerry tell you he was selling for Whitey?

A      Yes, sir.

Q      He was out selling crack on almost a daily basis?  Actually on a daily basis.

A      Yes, daily basis.

Q      White and O told you they were

brothers?

A    Yes, they did.

Q    Now, so you ended up in essense buying cocaine from Whitey and O through Saundra Reavis.  Did you ever buy from Saundra Reavis?

A    Yes, I have.

Q    And from Jerry Gaithers?

A    Right.

Q    Curt Thorn?

A    Right, and Mousie.

Q    Did you ever buy directly from Whitey, O, or JR?

A    Not directly.

Q    You knew you were buying their cocaine.

A    Yes.

Q    What time frame was this again?

A    Like, I first noticed then between Thanksgiving or Christmas, like that.

Q    When did it end?

A    During the time the killing started.

Q    Whitey indeed bragged to you that he was in control.

A    Yes.

Q    --of the grouped who sold cocaine?

ACCU-BETA Depositions, Videos & Images, Inc.

Page 10

A   True.

Q   You have told me that Whitey was brought to the area, was partners with JR and O.

A   Right.

Q   And JR actually brought Whitey and O to the Newtown area.

A   That is correct.

Q   Do you know an individual by the name of V?

A   I have heard of him. I seen him, but I don't know him personally.

Q   You don't really know what role he played in this group?

A   No.

Q   Was it pretty clear that Whitey, JR Roane and O were on a level above the street level dealers who sold you cocaine?

A   Yes.

Q   Would they provide direction and control to these people?

A   Yes.

Q   How do you know that?

A   They couldn't get none without them giving it to them.

Q   In essence they set them up in a

Page 11

distribution chain.

A    Right.

Q    Linwood Childs, do you know him?

A    Yes.

Q    --or knew him.

A    Yes, sir.

Q    They used to ride them around in his car.  Is that right?

A    Yes.

Q    They would give him cook'em up for that, crack cocaine for that?

A    Yes.

Q    Who would he ride around?

A    JR used to ride Whitey around, whichever one asked him really.

Q    O?  Do you ever see him ride him around?

A    I never him ride O.

Q    But you saw him ride JR and Whitey around with him?

A    Yes.

Q    Jerry Gaithers told you that V and O and Whitey were from New York.  Is that correct?

A    Yes.

Q    And they were partners or associated

Page 12

together?

A      Yes.

Q      Is that right?  Did he tell you they were together?

A      He told me they was from New York.

Q      Do you know Pepsi?

A      Yes.

Q      Pepsi Green and Gwendolyn Green?

A      Yes.

Q      Did they sell crack cocaine, do you know?

A      No.  They was users.

Q      You used to listen to O and Whitey and JR bragging on the corner about doing violence to people.  Didn't you?

A      Yes.

Q      What did they say?  Tell us what they said.

A      Well, they used to say, excuse my impression, don't shit on me.  If you do, I will make you feel the sting.

Q      It was pretty clear they wanted everybody do know they were tough guys and nobody should mess with them.

A      Right.

Page 13

Q        And they would kill anybody who messed with them?

A        That is the impression.

Q        Is that what they wanted people to know, though, that they would kill whoever messed with them?

A        That is the way I felt.

Q        Indeed you witnessed a murder that took place.

A        Yes, I did.

Q        It was carried out by these people?

A        Yes, I did.

Q        You witnessed on January 14, 1992, at your after hours joint at the 1200 block of West Clay Street at the murder of Peyton Maurice Johnson?

A        Yes.

Q        Would you tell the ladies and gentlemen of the grand jury about that murder.

A        It started, Peyton came by the house said he was waiting for his girlfriend to give him a call up the street. He asked could he sit down. said yes. JR knocked on my door. He asked, was I open. I said, no, man, I'm not open yet. He said, all right. I'm gone.

Q        Was Peyton Maurice Johnson in the

Page 14

room when JR walked in?

A    Yes.

Q    Did JR see him sitting in the room?

A    Yes.

Q    What happened next?

A    JR left.  No more than two minutes later O and another dude came in the door, they just started shooting.  They kept on shooting the man like he was some kind of animal or something, you know.

Q    Who came in and started shooting?

A    O.

Q    O did?

A    Yes.

Q    Where was JR?

A    He wasn't with them when they came in.

Q    Did anyone else come in with O and start shooting?

A    It was a dude.  I still don't know him.

Q    Describe him.

A    Short dude, dark skin, I guess he might have been young looking or something.  I'm trying to get out of the way.

Q    What kind of gun were they firing?

ACCU-BETA Depositions, Videos & Images, Inc.

App.0062

Page 15

A        I don't know the name of the gun.  I know they clicked it back, and just started shooting.

Q        How do you know it was O?  You had seen him a number of times prior to that?

A        Yes.

Q        Did he say anything to Peyton Maurice Johnson that day?

A        No.  He just started shooting.

Q        What did you do after the shooting?

A        I ran after I could get out.

Q        You didn't see O, Whitey, or any of those individuals after the shooting?

A        When I left?  No.

Q        You took off.

A        Yes.

Q        You haven't seen them since then; hav eyou?

A        No.  I haven't

Q        Based upon your knowledge of Curt Thorn and Jerry Gaithers and the other individuals, did you know, did they tell you what the arrangements are that they had with Whitey, JR and O concerning the distribution of cocaine, what percentage?

A        O, I think it was like 70-30.  Like every $100, they give him $70.  They keep $30.

Page 16

Q    So there was a percentage arrangement.

A    Yes.

Q    Who told you that?

A    Jerry told me that.

Q    Do you know someone by the name of Little Keith?

A    Yes.

Q    What his his full name?  Do you know?

A    No.  All I know is Keith.  He used to live up the street from the club.

Q    Does he live on Clay Street?

A    Yes.

Q    Do you know the block?

A    1200.

Q    Describe what he looks like?

A    A young dude about 15, maybe 16 years old.  Small featured.

Q    Who does he live with?

A    His mother as far as I know.  His mother lives in that block.

Q    Her name?

A    We always call her Betty Lou.  I don't know her real name.

Page 17

Q        Do you have any knowledge of the murder on January 13, 1992, one day prior to the murder of Peyton Maurice Johnson, of Douglas Moody?

A        Only what I heard.

Q        Who was that from?

A        People that was standing around out on the corner the night that it happened.  It was in the front.  I could hear the people standing around outside talking.

Q        Where was that?

A        Right behind me.

Q        Who did you talk to about that?

A        What do you mean?

Q        What people told you about the murder?

A        Like I said, I was overhearing people talking, like outside my window.

Q        You didn't actually go out and talk to them, you just listened to what they were saying?

A        I just listened to what they were saying.

Q        Were there any guns in your house that you kept that were there on the day of Peyton Maurice Johnson's murder?

A        No, it wasn't.

Page 18

Q        I have no further questions from Mr. Smithers.  If the grand jury has any questions--

There was a gun seized from, taken from your house?

A        That was from my mother's house.

Q        Whose gun was that?

A        That was my mother's boyfriend's gun, after the incident happened.

Q        That wasn't yours or had nothing to do with the shooting.

A        No.

Q        You have just answered the questions I have posed you here today.  Correct?

A        Yes.

Q        I have no further questions.

You are free to go, Mr. Smithers. Let me walk you out.

WITNESS EXITS AT 3:58 P.M.

Page 19

C E R T I F I C A T E

State of Virginia    )
                     )  ss:
County of Hanover    )


          I, Barbara D. Watts, certify I reported and transcribed the foregoing, which is complete and accurate to the best of my knowledge.

          I do hereby further certify that I am not a relative, counsel, or attorney of either party or otherwise interested in the outcome of this action.

          Given under my hand this 2nd day of May, 1992.


_____
Barbara D. Watts, RPR

MR. BAUGH:  We were advised by the United States that Mr. Dennis Moody -- as the Court may remember I mentioned his name.  He was the person who allowed me to interview him during this case prior to trial who told me that my client had fired a weapon.  And we mentioned his name during opening.  I've been advised by the United States that Mr. Moody has, quote, flown the coop.  We were of course relying -- we mentioned that in chambers that as to those witnesses we would rely on that.  We would ask for a warrant to arrest Mr. Moody, that it be entered into NCIC.  And further, in the event he is not able to testify, that we continue the trial of Mr. Roane until his presence is secured.

THE COURT:  I'll issue a warrant for Mr. Moody.  You are not going to get a continuance under any circumstances.

MR. BAUGH:  I have a written request.  I'd like the mother of Mr. Moody, who lives at 3910 Chamberlayne Avenue, Apartment Q, who was present during the conversation, I would ask either for a subpoena or a warrant for her arrest as well so we can interview her as well as to what she overheard during the conversation.

THE COURT:  I'll subpoena her.

MR. BAUGH:  We run into a problem with witnesses not wanting to talk.  When they do talk, somebody told them that something happened in Court and they show up missing.  Mr. Moody was no problem.  Now all of a sudden he has flown the coop.  He couldn't be threatened by these defendants because his testimony is actually favorable.

THE COURT:  Mr. Moody is anticipated as a witness, and if he is not present when called, a warrant will be issued.  If you want to subpoena the mother, whether or not that testimony will be allowed, if you want to subpoena her, that's fine.  Is that it?  All right.  Let's bring in the witness.

(The witness entered the courtroom.)

MR. VICK:  Could I have 135-1, 1-1, to show to this witness?

THE COURT:  All right.

(The jury entered the courtroom.)

## I.  Denise Robin Berkley (1660)

DENISE ROBIN BERKLEY, called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    During your testimony, I'm going to ask that you speak up and speak into the microphone.  If you get too close to it it gives you feedback.  Speak up so everyone can hear.  Could you state your name for the Court, record and jury?
A    Denise Robin Berkley.
Q    And Ms. Berkley, how old are you?
A    30.
Q    How far did you go in school?
A    Eighth grade.
Q    Have you ever been convicted of a felony?
A    No.
Q    Have you ever been convicted of a crime involving lying, stealing, or cheating?
A    No.
Q    Have you been a drug user in the past?
A    Yes.
Q    What sorts of drugs have you used?
A    Crack, marijuana.
Q    When did you begin using crack?
A    About November.

1662
Q    Of what year?
A    Of 1990.
Q    All right.  And how often did you use crack cocaine?
A    I was using it every day.
Q    How many times a day?
A    Four or five times.
Q    When did you first start using marijuana?
A    I was about 18.
Q    And how often have you used marijuana since then?
A    Off and on, not as much as coke.
Q    Are you currently using any drugs?
A    No.
Q    How long has it been since you have used any drugs?
A    A year.
Q    You are testifying here for the United States Government; is that correct?
A    Yes.
Q    Could you state to the ladies and gentlemen of the jury what led you to testify for the United States Government in this trial?
A    Because of things I have seen and some of my friends that got killed.

1663
Q    Did you indeed contact members of this investigative team?
A    Yes.
Q    Who is it that you contacted?
A    Mr. Fleming.
Q    Detective Ralph Fleming?

A    Yes.
Q    Could you tell the ladies and gentlemen of the jury how it was you contacted him?
A    I went to the police station  --
        MR. BAUGH:  I object to this as irrelevant to the issue of the circumstances of the conspiracy.
        THE COURT:  Overruled.
BY MR. VICK:
Q    Go ahead.
A    I went to the police station and tried to turn myself in, and that's when I told them that I knew about what had happened, the murders and the people.
        MR. McGARVEY: I'm sorry, I couldn't hear the last response.
BY MR. VICK:
Q    Repeat that.
A    I said that I had went to the police station because of the murders and plus I felt that my life was on the line.

Q    All right.  Is that how you ended up speaking to Detective Fleming?
A    Yes.
Q    In preparation for your testimony, have you had occasion to meet with myself, Detective Fleming, Mr. Parcell, and other people involved with this investigation?
A    Yes.
Q    And approximately on how many occasions would you say that you have met with us in preparation for your testimony?
A    I'd say about three times.
Q    In any one of those meetings, has anyone from the prosecution team or the investigative team told you how you should answer any particular question?
A    No.
        MR. McGARVEY:  We will stipulate she will say no to that question.
        THE COURT:  We don't need that kind of stipulation, Mr. McGarvey.  How can you stipulate to what the witness is going to say?  Don't be ridiculous, please.
BY MR. VICK:
Q    I didn't hear your answer.  Has anybody told you how to answer any particular question?

A    No.
Q    Has anybody provided you, from the investigative team, has anybody provided you with the answers or any information concerning your testimony?
A    No.
Q    The subject of your testimony comes from where?
A    From me.
Q    I direct your attention to approximately

November of 1991.  Do you remember that time frame?
A    Yes.
Q    In that time frame, around Thanksgiving of 1991,
did you have occasion to meet an individual by the
name of "C.O." or "O"?
A    Yes.
Q    Where was that?  I withdraw that.  Did you have
an occasion in that same time frame to meet an
individual by the name of James Roane or "J.R."?
A    Yes.
Q    Did you have occasion to meet an individual by
the name of Richard Tipton or "Whitey"?
A    Yes.
Q    Do you know an individual by the name of Sandra
Reavis?
A    Yes.
Q    I'll ask you to stand up, look around if you

1666
need to, review the courtroom, and see if you can
identify, individually, Mr. Richard Tipton,
"Whitey."
A    There.
Q    Could you tell us how he is dressed?
A    Blue suit.
        MR. GEARY:  Stipulate.
        MR. VICK:  Let the record reflect the
identification of Richard Tipton.  Could you look
around and see if you see Mr. Cory Johnson?
        MR. McGARVEY:  Stipulate ID.
        THE COURT:  All right.
BY MR. VICK:
Q    James Roane?
A    Yes.
        MR. BAUGH:  Stipulate.
BY MR. VICK:
Q    Do you see Ms. Sandra Reavis?
A    Yes.
        MR. WAGNER:  Stipulate ID.
BY MR. VICK:
Q    Of these individuals, who did you meet first?
A    "Whitey."
Q    And where did you meet "Whitey"?
A    On the corner of Hancock and Clay.

1667
Q    And what was "Whitey" doing to your observation
on the corner of Hancock and Clay when you met him?
A    He was standing out on the corner talking.
Q    Who introduced you to "Whitey"?
A    "J.R."
Q    How did you come to know "J.R."?
A    By "Pea Sue."
Q    Do you know "Pea Sue's" full name?
A    No.
Q    How do you know "Pea Sue"?

A    I was living with her.

Q    Approximately two days after that introduction, did you have occasion again to see "C.O." and "Whitey"?

A    Yes.

Q    Where was that?

A    On the corner.

Q    What were they doing on that corner?  Same corner?

A    Yes.

Q    What were they doing?

A    They was talking to people and selling drugs and stuff like that.

MR. McGARVEY: I object.

MR. VICK:  Based upon your own personal observation what were they doing?

THE WITNESS:  Selling drugs.

BY MR. VICK:

Q    Did you have occasion to have a conversation with Mr. James Roane concerning whether you wanted to make any money or not?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury what that conversation consisted of?

A    He asked me did I want to make money or get drugs, and I told him yes.  He wanted me to go to -- to clean a house on Norton Street for "Whitey."

Q    Could you describe that house?

A    The house is like yellow, with bricks.  It is a big house.  It is a two-story house.

Q    Did you indeed agree to do that?

A    Yes.

Q    After you agreed to do that, what did you do, what occurred?

A    They gave me money to go to the store and get cleaning supplies, to go to the house, and gave me the key to go to the house and clean it.

Q    When you say "they," who do you mean?

A    "Whitey" and "J.R."

Q    When approximately was that?

A    It was a couple days before Thanksgiving.

Q    Of 1991?

A    1991.

Q    Did you continue your association with them after that time?

A    Yes.

Q    Tell the ladies and gentlemen of the jury what your continued association with them was.

A    I was to clean up the house for them, go make groceries, and do little odd things, watch out for them and stuff like that.

Q    When you say "them," who do you mean?

A    "J.R.," "O," "Whitey."
Q    All right.  Where did you live at that time?
A    I was staying with "Pea Sue" and them, but then I moved up to the house on Norton Street.
Q    Who was living in that house?
A    It was "Whitey," "O," "J.R."
Q    What were you given in return for cleaning that house and doing the odd jobs that you testified about?
A    Crack cocaine.
Q    How often would you be given crack cocaine?
A    Every day.
Q    How many times a day?

1670

A    About four or five times.
Q    Is that  --
A    Maybe more.
Q    You have testified about your drug use.  Is that where you got the drugs that resulted in your drug use?
A    Yes.
Q    There came a time in February of 1992 -- let me withdraw that.  Do you know an individual by the name of Dorothy "Mousey" Armstrong?
A    Yes, I do.
Q    How do you know her?
A    Because we used to hang together.
Q    Did there come a time in February of 1992 that you came to find out that she had been murdered?
A    Yes.
Q    Were you at that point, when you found out that Dorothy Armstrong, "Mousey," had been murdered, were you still involved with "J.R.," "Whitey," "C.O."?
A    Yes, I was.
Q    Were you still doing the same things you have testified to?
A    Yes.
Q    Where were you living at that point?
A    I was staying on the street, on Norton Street,

1671

and then I started staying with some other people.
Q    What other people did you start staying with?
A    I was staying with this one old guy across the hall from Sandra, where she lived.
Q    When you found out that "Mousey" had been killed, what did it cause you to do?
A    That's what caused me to know it was time for me to leave.  I had to get out because I knew I was next.
        MR. BAUGH:  Objection.
        THE COURT:  Overruled.
BY MR. VICK:
Q    Is that when you approached Detective Fleming?
A    Yes.

Q    All right.  From the time of around Thanksgiving, 1991, through the date that "Mousey" was killed in February of 1992, were you continuously involved with these people that you have testified about here this morning?

MR. COOLEY:  He has to narrow it to the specifics, what involvement she had with each individual.

MR. VICK:  We will get into that.

MR. COOLEY:  Same objection.

BY MR. VICK:

1672

Q    Between November of 1991  --

THE COURT:  Hold on, Mr. Vick.  The objection will be overruled.  Go on.

BY MR. VICK:

Q    Between November of 1991 when you first met these individuals and the killing of "Mousey," were you associated continuously with these people?

A    Yes.

Q    All right.  After the killing of "Mousey," when you went to see Detective Fleming, did you associate in any way with these people anymore?

A    No.

Q    Now, did there come a time  --  withdraw the question.

Do you know an individual by the name of "V"?

A    Yes, I do.

Q    And I will show you what has been previously marked Government Exhibit 135-1 and ask if you can identify that.

(Document proffered to witness.)

A    Yes.  This is "V."

Q    How did you come to meet "V"?

A    I met him through "O" and "Whitey."

Q    When was it that you met him?

A    It was at the house on Norton Street.

1673

Q    Did you come to stay with him, live with him?

A    Yes.

Q    Where was that?

A    It was on Norton Street and Moore Street.

Q    I'm going to show you what has been previously marked Government Exhibit 139 and previously introduced into evidence for the record and ask if you can identify that.

(Document proffered to witness.)

A    This is 1212 West Moore Street, the house.

Q    If you first associated with them and moved into Norton Street, when was it that you moved into that house?

A    It was about somewhere in December.

Q    How is it you got to move into that house?

A    They had moved in  --

MR. BAUGH:  Objection.  Withdrawn.

THE COURT:  Go ahead.

THE WITNESS:  They had moved there and me and "Mousey" started going there and staying with them.

BY MR. VICK:

Q    When you say "they," who exactly do you mean?

A    "V," "E.B.," "Whitey," "O," "J.R."

Q    And do you know who "E.B." is?

1674

A    Yes, I do.

Q    Who is "E.B."?

A    He is the youngest of the group.

Q    I'm going to show you what has been previously marked and introduced into evidence as Government Exhibit Number 120 and ask if you can identify that.

(Document proffered to witness.)

A    Yes.  This is "E.B."

MR. VICK:  That's Government Exhibit 120, Your Honor.

BY MR. VICK:

Q    Did you come to find out how they were supporting themselves?

A    Yes.

Q    What was that?

A    By crack cocaine.

MR. COOLEY:  Same objection to that.

THE COURT:  Sustained.

BY MR. VICK:

Q    Did you come to find out how Richard Tipton, "Whitey," was supporting himself?

A    Yes.

Q    How?

A    By cocaine.

Q    Cory Johnson?

1675

A    Yes.

Q    How was that?

A    Cocaine.

Q    Did you come to find out how James Roane, "J.R.," was supporting himself?

A    Yes.

Q    How was that?

A    Cocaine.

Q    Did you come to find out whether Sandra Reavis was associated with them in any way in the sale or distribution of cocaine?

A    Yes.

Q    What was that that you determined?

A    She was in on it with the cocaine.

Q    How did you come to know that?

A    Because I was there when they was all together.

Q    Have you seen her receive cocaine from any one of these three individuals?

A    Yes.
Q    Who?
A    "J.R.," "O."
Q    What kind of cocaine?  You said they were distributing cocaine.  What kind of could cocaine?
A    Crack.
Q    Is that also called cook-'em-up?

1676

A    Yes.
Q    How often would these people be distributing in that time frame, distributing crack cocaine?
A    Every day.
Q    As to "V," did you come to find out how he was supporting himself, Lance Thomas or "V"?
A    Yes.
Q    How was that?
A    Crack cocaine.
Q    As to "E.B.," did you come to find out how he was supporting himself?
A    Crack cocaine.
Q    Do you know where it was that they were getting their crack cocaine?
A    Yes.
Q    Where?
A    New York.
Q    Do you know from whom in New York they were getting that crack cocaine?
       MR. McGARVEY:  I object as to  --
BY MR. VICK:
Q    Based upon your own knowledge and observations.
A    Yes.
Q    Who was it they were getting crack cocaine from?

1677

A    They called it New York Boyz.
       MR. WAGNER:  I object unless they are referring to Sandra Reavis, also.
       THE COURT:  When you talk about specific allegations of wrongdoing, you have to be specific about the defendants.
BY MR. VICK:
Q    Of the people you testified that you lived with, who was it that was responsible for getting crack cocaine and bringing it to Richmond?
A    "J.R.," "O," "Whitey," "V," "E.B."
Q    Did you know who those people, where they were getting their crack cocaine from?
A    From New York.
Q    Were you actually present when they would indeed show up with crack?
A    Yes.
Q    Were you present at Norton Street on occasions when they showed up with crack cocaine?
A    Yes.

Q    Were you present on Moore Street on occasions when they showed up with crack?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury how often it was that they would have crack cocaine, show up with new crack cocaine?  I'll withdraw that question.  Did you ever see Richard Tipton, "Whitey," cooking powdered cocaine into crack cocaine?

A    Yes.

Q    On how many different occasions would you say you have seen that?

A    I've seen it about three or four times.

Q    Where was it that you saw him do that?

A    Once on Hancock Street, and Moore Street.

Q    All right.  In what quantity did you see him cooking crack cocaine?

          MR. WHITE:  Objection, unless she can say how she knows.

BY MR. VICK:

Q    Did you see the cocaine?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury approximately the size  --  what was it contained in, the powdered cocaine?

A    Sort of a sandwich bag.

Q    How big?

A    About like this.

Q    Would you say approximately eight inches?  Eight inches apart?

A    Yes.

Q    How wide would that bag have been?

A    About like this.

     (Witness indicating.)

Q    Approximately six inches wide?

A    Yes.

Q    How much of that -- was it a clear plastic bag?

A    Yes.

Q    How much of that bag would be filled with powdered cocaine when you saw that?

A    About half, a little bit more.

Q    On how many different occasions did you see bags containing powdered cocaine of that sort?

A    I've seen it off and on, about four or five times.

Q    Did you come to find out based upon your association with those people whether they had any other people selling drugs or distributing drugs with them?

A    Yes.

Q    Do you know an individual by the name of Robert "Papoose" Davis?

App.0077

A    Yes.
Q    What did you come to find out his involvement was?

A    He was selling cocaine, crack cocaine for them.
          MR. BAUGH:  Your Honor, "them" again.
          THE COURT:  Let's get specific.
BY MR. VICK:
Q    As to Mr. Richard Tipton, "Whitey," Mr. Cory Johnson, "C.O.," Mr. James Roane, "J.R.," and Lance Thomas, "V," did you come to find out whether they were associated in some way?
          MR. BAUGH:  That's a multiplicious question.
          THE COURT:  Overruled.
BY MR. VICK:
Q    Did you come to find out what their relationship was in the sale of cocaine?
          MR. WHITE:  "Come to find" out suggests something other than personal knowledge.
BY MR. VICK:
Q    Based upon your own knowledge and observation?
A    Yes.
Q    What did you find out?
A    That all of them  --  well  --
Q    Name them.
A    "J.R.," "O," "Whitey," "V," "E.B.," all them, they was giving out the amount of what they wanted people to sell.

Q    All right.  Now, were you present when cocaine came back from New York?
A    Yes.
Q    What would they do with that cocaine when it came back from New York?
          MR. WAGNER:  Objection.
BY MR. VICK:
Q    "J.R.," "O," "Whitey," "V," "E.B."  --
          MR. BAUGH:  Multiplicious question.
          THE COURT:  Overruled.
          THE WITNESS:  What did they do when they came back?
BY MR. VICK:
Q    Right.
A    They would either go to Moore Street or either Harrison Street and they would, after they cook it up, they would break it down.
Q    Break it down how?
A    They would cut it up.
Q    All right.  And what would they do with it after they cut it up?
A    Put it in the little plastic bags.
Q    Who would get part of that cocaine, as to that group; what did they do with that cocaine?

A    After they cut it up and bagged it, they would count it up and put it in little bags.

Q    Would "Whitey" get part of that?

A    Yes.

Q    Would "C.O." get part of that?

A    Yes.

Q    Would "J.R." get part of that?

A    Yes.

Q    "V"?

A    Yes.

Q    "E.B."?

A    Yes.

Q    Did they ask you to do anything on those occasions while they were there cooking or cutting cocaine?

A    Yes, they asked me to watch out for the police.

Q    Based upon your involvement with that group of people, did you come to find out whether there were other people who were associated with them selling cocaine?

A    Yes.

Q    As to Ms. Dorothy "Mousey" Armstrong, what did you come to find out her role was?

A    She was selling it for them.

Q    Do you know Jerry Gaiters?

A    Yes.

Q    What was Jerry Gaiters doing?

A    Selling for them, too.

Q    Curt Thorne?

A    Selling.

Q    Do you know Linwood Chiles?

A    Yes.

Q    What was he doing?

A    He was mostly taking them around to different places where they had to go.

Q    What would he get in return for that?

A    Cocaine.

Q    Sandra Reavis?

A    She was  --  she would get some from them.

Q    Based upon your own personal observation and knowledge, was there a difference between the people you have just outlined: yourself, "Mousey" Armstrong, "Papoose," Jerry Gaiters, Curt Thorne, Linwood Chiles, and "Whitey," "C.O."?

        MR. GEARY:  I think she can say what she saw, observed; it is up to the jury.

        THE COURT:  She can answer the question.

BY MR. VICK:

Q    "Whitey," "C.O.," "J.R.," "V," and "E.B.," was there a difference between you and them?

A    Yes.

Q    What was that difference; could you explain that to the ladies and gentlemen of the jury?
A    They was, "V," "E.B.," "J.R.," "Whitey," and "O" and them, they was like, they was like one family; they was the boss.  And the people like me, "Mousey," and the rest of them, they was like the workers.
Q    Now, in anticipation of your testimony, has anyone told you to use those words?
A    No.
Q    Have you ever heard the word New York Boyz?
A    Yes.
Q    Who did you hear that from?
A    From all of them.
Q    What would they say about the New York Boyz?
A    They just said New York Boyz; they were going to see New York Boyz.
Q    How well did you know Dorothy Armstrong?
A    I knew her pretty well.
Q    In that time frame, where was she living?
A    She was staying on Hancock Street with her brother, "Papoose."
Q    And did you observe her sell cocaine?
A    Yes.
Q    On how many different occasions would you estimate for the ladies and gentlemen of the jury did

1685

you observe her sell cocaine?
A    Every day.
Q    Could you tell the ladies and gentlemen of the jury approximately how many people she was selling cocaine to on a daily basis?
A    Between 50 and 100.
Q    While you lived on Norton Street, and later at 1212 West Moore Street, could you tell the ladies and gentlemen of the jury approximately how many people would come and see "J.R.," "C.O.," "Whitey," "V," and "E.B." to get cocaine?
A    It was a lot.
Q    How many?  Give us an estimate.
A    About, I'd say, between 30 and 40 people maybe.
Q    Is that in addition to the people you have testified to specifically: yourself, "Mousey" Armstrong, "Papoose," Jerry Gaiters, Curt Thorne?
A    Yes.
Q    Did you know all of those people?
A    Yes, I did.
Q    Did you know all of their names?
A    Mostly knew them by their nicknames.
Q    Give us some nicknames.
A    Dorothy Armstrong was "Mousey."
Q    No, the other 30 or 40 people that used to come

1686

to the house.
A    Oh, one was "Wolfman" something.

Q    Did you know all of them, all the other 30 or 40 people?

MR. BAUGH:  Objection, asked and answered.

THE COURT:  She can answer.  Go ahead and answer.

BY MR. VICK:

Q    Did you know by name all of the other 30 or 40 people?

A    About one or two of them.  That's about it.

Q    Now, how often  --  withdraw the question.

Have you ever seen Mr. Cory Johnson, "C.O.," deliver cocaine to Dorothy Armstrong?

A    Yes.

Q    How many different occasions have you seen that?

A    About two or three times.  Maybe more.

Q    Have you ever seen "Whitey" deliver cocaine to Dorothy Armstrong?

A    About one or two times.

Q    Have you ever seen "J.R." deliver cocaine to Dorothy Armstrong?

A    Not really, no.

MR. BAUGH:  I could not hear that answer.

THE WITNESS:  No.

BY MR. VICK:

Q    Did there come a time  --  would there be times when Dorothy Armstrong would run out of cocaine?

A    Yes.

Q    How often would that happen?

A    I'd say about sometimes two, about three or four days.

Q    What would she do when that happened?

A    She would go and send word to "O" that she was out and that she needed some more.

Q    How often in an average week would you see that group that you have described: "J.R.," "C.O.," "Whitey," "V," "E.B.," cook and cut up cocaine and distribute it amongst themselves?

A    How often do I see them?

Q    On a weekly basis.

A    I'd say about twice a week, something like that.

Q    You have previously described the size of the bag that they would get their cocaine from and cut it up.  Was the size of that bag consistent?  What size would the bag be that you would see them cut up two or three times?

MR. WHITE:  Asked and answered.

MR. VICK:  She testified to only one occasion.

THE COURT:  Overruled.

BY MR. VICK:

Q    What amount of cocaine was it that they were cutting up two or three times a week and distributing amongst themselves?

MR. HENDERSON:  Objection to "they."

MR. VICK:  I've identified the group.

MR. WHITE:  Objection as to the amount.

THE COURT:  Overruled.

BY MR. VICK:

Q    Describe it.

A    Describe the bag?

Q    Right.

A    It is more like a sandwich bag.

Q    Hold your hands up and show the ladies and gentlemen of the jury.

A    It is a sandwich bag about like this, and this wide, and it be about half full, maybe more.

Q    Same as you described before?

A    Yes.

Q    Did you ever ask "Pea Sue" if "J.R." and "V" could use her house for something?

A    Yes.

1689

Q    What was it that you asked?

A    I asked her could they use her house for to cook cocaine.

Q    And what did she say?

A    She said yes.

Q    Did that indeed happen?

A    Yes, it did.

Q    Who went there?

A    It was "J.R.," "V," and some other two guys.

Q    How often would you see Robert Davis, "Papoose," selling cocaine?

A    Every day.  Just about every day.

Q    Did you ever know whether there was any cocaine cooked at his house?

A    Once sometime.

Q    Who was it that cooked that cocaine?

A    It was "O." Excuse me, it was "Whitey."

Q    How was that cooked?

A    In a coffee pot.

Q    How was it cooked at "Pea Sue's"?

A    I really don't know.  Because I had left.

Q    Did you come to find out how often Curt Thorne was selling cocaine?

A    Yes.  Every day.

Q    And did you ever have occasion to deliver

1690

anything to Curt Thorne?

A    Yes, I did.

Q    What did you deliver to Curt Thorne?

A    A bag full of crack.

Q    Who gave you that bag full of crack to deliver to him?

A    "O."
Q    Is that the only time you delivered cocaine to Curt Thorne?
A    Yes.
Q    How often would you see Jerry Gaiters selling cocaine?
A    Off and on.
Q    Do you know "Pepsi" Greene?
A    Yes.
Q    How do you know "Pepsi" Greene?
A    Because she and Curt was living together.
Q    Did you know whether she was involved with them in any way in the sale or distribution of cocaine?
A    Yes.
Q    What was that?
A    She was selling for them, crack.
Q    Do you know whether Linwood Chiles ever traveled out of town?
A    Yes, he did.

1691
Q    With who?
A    He traveled out of town, went to New York with "O," "V," "Whitey."
Q    And when they came back on that trip, were you around?
A    Yes, I was.
Q    What was it they came back with?
A    Crack cocaine.
Q    I'm going to show you what has been previously marked and introduced into evidence as Government Exhibit 1-1 and 4-5 and ask if you can identify those.
     (Photographs proffered to witness.)
A    Yes.
Q    What is 1-1?
A    It is a gray -- I don't know the name of it, but I have seen this car many times around the house on Norton Street.
Q    All right.  And as to the other, 4-5, I believe, can you identify that person?
A    Yes.  He was the guy that  --  this was his car.
Q    He drove that gray car, 1-1?
A    Yes.
Q    Do you know what that person did, did he ever

1692
make a trip out of town with these people?
A    Yes, he did.
          MR. BAUGH:  Objection to "these people."
          THE COURT:  Sustained.
BY MR. VICK:
Q    Who did he make a trip with?
A    It was mostly "O," "V," mostly "O" and "V."  And some other guy.

Q    And where was it that they would go?
A    To New York.
Q    Are you knowledgeable of the fact that Katrina Rozier, "Nat" Rozier, was murdered?
A    Yes.
Q    How did you know her?
A    She was my best friend; we used to hang together.
Q    Did there come a time when Linwood Chiles took some of the people that you have testified about, I'll ask you to be specific, to New York in that time frame?
A    Yes.
Q    Who did he take to New York in that time frame?
A    He took "V," "O," "E.B."
Q    To New York?
A    Yes.

1693

Q    All right.  When did you find out?  When was it that they left to go to New York?
A    They left on a Friday.
Q    What time of night?
A    It was around between nine or ten.
Q    When did you find out that "Nat" Rozier had been found murdered?
A    The next day, by Jerry Gaiters.
Q    I direct your attention to January 13th, 1992. I beg the Court's indulgence.
     (Counsel conferring.)
BY MR. VICK:
Q    Prior to that, the individual you have identified as driving the gray car went to New York with these people, with the people you identified; when they came back from New York, would they be in possession of anything?
A    Yes.  Cocaine.
Q    I direct your attention to January 13th, 1992. Are you familiar with the fact that on that date, an individual by the name of Doug Moody, "Little Doug," was killed?
A    Yes.
Q    Were you near where Doug Moody was killed?
A    Yes, I was.

1694

Q    Could you tell the ladies and gentlemen of the jury where you were at the time just prior to Doug Moody's killing?
A    I was at the house on the corner of Clay and Harrison.
Q    Whose house was that?
A    It was Albert Walters' house.
     MR. BAUGH:  I didn't hear the name.
     THE WITNESS:  Albert Walters.
BY MR. VICK:

Q    Who were you there to see?
A    Me and "Mousey" went to see -- I forgot his name.
Q    What occurred while you were there?
A    We had went in and we had sat around and we had just started smoking crack cocaine.
Q    And who was sitting with you?
A    It was me and "Mousey," the guy, and some other girl.
Q    Did there come a time when something happened after you had been in there for awhile?
A    Yes.  We heard a loud bang.
Q    What did it sound like to you?
A    Sounded like a gun or something.
Q    All right.  Where did that noise come from?

1695

A    From the back of the house.
Q    Where in the back?
A    It is a house -- it is another apartment in the back.
Q    I'm going to show you what has been previously marked Government Exhibits 9-1, 9-2, 9-6, and 9-7.
     (Photographs proffered to counsel and to witness.)
BY MR. VICK:
Q    I ask you to look at those photographs and see if you can identify them.
A    Yes.  This is the house.
Q    What number is on that picture?
A    9-1.
Q    And what house is that?
A    This is the house, in the back of the house that we was at on Harrison and Clay.
Q    The next picture?
A    This is the back door of the first house that we was in.
Q    What number is on that picture?
A    9-2.
Q    All right.  The next picture?
A    This is the alley between the house, the back of the house that we was at.

1696

Q    And what number is on that picture?
A    9-6.
Q    The next picture?
A    This is the back of the house.
Q    What number is on that picture?
A    9-7.
Q    Do those pictures depict the location you were at the evening Doug Moody was killed?
A    Yes, they do.
          MR. VICK:  I would move those exhibits into evidence.
          THE COURT:  They will be admitted.

BY MR. VICK:

Q    After you heard that shot, what occurred next? Or what sounded like a shot.  What occurred next?

A    We heard a window break.

Q    Where did the sound of that window breaking come from?

A    From the back of the house or the apartment.

Q    Would that have been in the same location that you heard what you thought to be a shot?

A    Yes.

Q    What did you do in response to that?

A    We thought it was the police, so we started gathering up the stuff and throwing it away.

Q    Then what did you do?

A    Then me and "Mousey" and the rest of us, mostly me and "Mousey," went outside.

Q    What did you start gathering up to throw away?

A    Gathering the crack cocaine.

Q    When you got outside, where were you and "Mousey"?

A    We was on the sidewalk.

Q    And what did you see when you got outside?

A    Doug Moody hollering and screaming, telling "J.R." to stop, leave him alone.

Q    And where was "J.R."?

A    "J.R." was -- he was standing near Doug Moody.

Q    And what was he doing?

A    He started stabbing him.

Q    Did you see what he was stabbing him with?

A    It looked like a butcher knife.

Q    Could you tell the ladies and gentlemen of the jury based upon your own observation that evening approximately how many times you think you saw James Roane stab Doug Moody?

A    Between 18 and 19 times.

Q    When you say "J.R.," did you indeed mean the James Roane you identified earlier?

A    Yes.

Q    What did you do when you saw that?

A    I just stood there and looked.

Q    What was Doug Moody saying, if anything?

A    He was trying to get away, he was telling him to leave him alone.

Q    Did he call a name when he said that?

A    He was hollering "J.R., please leave me alone."

Q    Who was present with you?

A    "Mousey," me, "J.R.," Sandra.

Q    Sandra who?

A    Sandra Rollins  --  I don't know her last name.

Q    Do you see that Sandra in the courtroom today?

A    Yes, over there.

Q    Who else was present?

A    Linwood, "Pepsi,", and Curt.

Q    After the 18 or 19 stabs, what occurred?  Where did they occur; where exactly did that occur that you saw "J.R." stabbing Doug Moody?

A    At first it was like in the yard then Doug Moody was trying to jump over the fence behind the house.

Q    What was behind that fence?

A    It was an alley.

Q    Is that the alley depicted in the pictures you just saw?

A    Yes.

Q    The fence he jumped, is that the fence you saw in the pictures you just looked at?

A    Yes.

Q    Okay.  Tell us where he ended up in that alley, Doug Moody?

A    He ended up in the middle of the alley.

Q    After the 18 or 19 stabbings, what did "J.R." do?

A    After he did that, he came back towards us and gave the knife to "Pepsi," and told her to get rid of it.

Q    Then what happened?

A    Then "Pepsi," "J.R.," Sandra, Curt, and Linwood got into Linwood's station wagon and pulled off.

Q    What did you and "Mousey" do?

A    We stayed there and watched.

Q    You watched what?

A    We was watching the police and ambulance and stuff.

Q    I'm going to show you what has been marked Government Exhibit 4-6.

     (Exhibit proffered to witness.)

A    This is Doug Moody.

Q    Is that the same man you saw "J.R." stabbing?

A    Yes.

          MR. VICK:  I would move Government Exhibit 4-6.

          THE COURT:  It will be admitted.

          MR. VICK:  We would move to have the Clerk change the number on that picture to 12-five.

          THE COURT:  All right.

BY MR. VICK:

Q    Where was it that you and "Mousey" went after this?

A    We went to "Papoose's" house on Hancock Street.

Q    What did you do there?

A    We told "Papoose" what had happened, and then we had left from there and we went up to Norton Street.

Q    Did you ever have a conversation with James Roane about Doug Moody and why he was killed?

A    Did I have a conversation?

Q    With James Roane, where James Roane said something about Doug Moody?
A    Something about  --  I heard something about a tape.
Q    What was it that you heard about that tape?
A    Something about it was some  --  I'm not sure what was on the tape.  He just said something about a tape.
Q    Do you know whether "Little Doug" Moody ever got

1701

cocaine from "Whitey," "C.O.," James Roane, "V," "E.B."?
        MR. BAUGH:  We object unless he is getting it from all of them.
        MR. VICK:  By one of those people.
        THE COURT:  Overruled.
        THE WITNESS:  He was getting it mostly from "O."
BY MR. VICK:
Q    Did "J.R." ever say anything about that?
A    Not that I recall.
Q    When you went to Norton Street, who was present  --  excuse me, when you and "Mousey" went to Norton Street, who was present there?
A    Nobody.
Q    All right.  Later you went to Moore Street; is that correct?
A    Yes.
Q    Who was present at Moore Street when you went there?
A    When I went there, when we got there it was "Whitey," "O," "V," "E.B."
Q    All right.  And what were they talking about?
A    What had happened.  Mostly "Whitey" was lying on the floor and he was saying that Doug was trying to

1702

kill him with a gun or something, and he was all excited, you know, about what had happened.
Q    All right.  What was he talking about?  When you say what had happened, what are you talking about?
A    Talking about what had happened, him and Doug Moody had gotten to fighting at the house on Harrison Street.
Q    And could you describe "Whitey's" demeanor that evening?  How did he seem when he was describing what had happened?
A    He was more excited.
Q    All right.  And was "J.R." there?
A    No, he didn't come until the next day.
Q    Did "V" and "O" and "Whitey" say anything about what they had to do because of what had happened?
A    Yes, "V" and "O" told "Whitey" that he had to get away from around there for awhile.
Q    When did you next see "J.R."?

A    The next day.
Q    All right.  If Doug Moody was killed on January 13th, 1992, you next saw "J.R." when?
A    The next day.
Q    So that would have been January 14th, 1992?
A    Yes.
Q    On that day, did you have occasion to come to

1703

find out that  --
         MR. BAUGH:  Objection to the leading nature.
         THE COURT:  Sustained.
BY MR. VICK:
Q    Did you see any guns that day, january 14th, 1992?
A    Yes, I did.
Q    And who did you see with guns that day?
A    "V" and "J.R." and them when they came in the house.
Q    Be specific as to who, "V" and "J.R." and them, who else was there?
A    "V," "J.R.," "O," "Whitey," me, and "E.B." was there.
Q    What house is that?
A    The house on Norton Street.
Q    What did they come in with?
         MR. GEARY:  I object, unless she says who came into the house with the guns.
         THE COURT:  Overruled.  Go ahead and answer.
         THE WITNESS:  "V" and "J.R." came in the house with the guns.
BY MR. VICK:

1704

Q    Who else came in the house with them?
A    It was them two.  The rest of us was already at the house.
Q    Who else?  Say again so we are perfectly clear as to who else was there.
A    It was me, "E.B.," "V," "O," and "J.R." But "V" and "J.R." came in the house with the guns.
Q    Did you see "Whitey" that day?
A    No.  "Whitey" didn't come in until late.
Q    When?
A    He came in about a half-hour after.
Q    What did they have, "V" and "J.R.," have with them when they came into that house?
A    They had a case that had guns in it.
Q    What kind of guns?
A    It was  --.
     (Counsel retrieving exhibits.)
         MR. BAUGH:  I don't believe the witness answered the question.
BY MR. VICK:

Q    What kind of guns?
A    They was something like handguns.
Q    I'm going to show you what has been previously marked Government Exhibit 104 and ask you have you seen a gun like this before?

1705

A    Yes, I have.  Because I took and held one in my hand.
Q    All right.  Was that type of gun present that day when "J.R." and "V" brought the guns?
A    Yes.  It was two of them.
Q    I'm going to ask you, have you seen what has been previously  --
         MR. BAUGH:  Can we have the first one identified by exhibit number?
         MR. VICK:  104.  I hand you 105 and ask you if that was the type you saw that day.
         MR. COOLEY:  Leading.  "Have you seen this?"
         THE COURT:  Overruled.
         THE WITNESS:  It was something like that.
BY MR. VICK:
Q    I'm going to show you what has been previously marked Government Exhibit 106 and ask you if that gun was of the type that you saw that day.
A    Yes, it was something like that.
Q    When those guns were in that house, was anybody using those guns or playing with those guns or controlling those guns?
A    Well, "J.R.," "V," "O," "Whitey," me, and "E.B.," all of us was  --  we was putting the bullets

1706

in the clips and they was holding it and playing with it.
Q    And what was their attitude?
         MR. BAUGH:  Objection to their attitude.
         THE COURT:  Sustained.
BY MR. VICK:
Q    Did they ask you to do anything in regard to those guns?
A    Yes.
Q    What was that?
A    They told me to take the case  --
         MR. BAUGH:  Excuse me.  Who told her to do what?
         THE COURT:  Sustained.
BY MR. VICK:
Q    Who told you?
A    It was all of them.  "J.R.," "V," "Whitey," "O." Not "Whitey." "J.R.," "O," "V," and "E.B."
Q    What did they ask you to do?
A    They asked me to take the case and throw it away.
Q    Did you give them anything that day?

A    I gave them a handbag.
Q    I'm going to show you what has been previously
marked Government Exhibit 107 and ask if you have

1707

ever seen that item.
A    Yes, I had bought that at the corner store off
of Hancock and Clay.
Q    Could you describe that?
A    It is a handbag.
Q    What's written on that?
A    "Salem Lights."
Q    Was that your handbag?
A    Yes, it was.
Q    What did you do with that handbag?
A    What did I do with it?
Q    Yes, what did you do with it?
A    I gave it to them.
Q    Who is them?
A    I gave it to "O," "Whitey," "V," and "E.B."
Q    And what did they use that handbag for?
A    They put the guns in it.
Q    On that day, January 14th, 1992, after they had
all played with the guns, what did they do with those
guns?
A    Took them with them.  Took them, put them in the
handbag.
Q    Did there come a time later that day when some
of those guns were retrieved?
A    Yes.

1708

Q    Who retrieved those guns and when was that later
that day?
A    It was later on that night.  The same night that
they got the guns.
Q    Who came and retrieved those guns?
A    It was "V" and "O," "E.B.," and "J.R."
Q    All right.  Did they say anything when they got
those guns?
A    Yes.  They said wasn't nobody was going to fuck
with them.
Q    And where were you later that evening when those
guns were retrieved by the people you just testified
about?
A    It was at the house.
Q    What house?
A    The one on Norton Street.
Q    Later that evening, did you have occasion to see
"J.R." and "E.B." on the street together?
A    Yes, I did.
Q    Where was that?
A    It was right there on the corner of Catherine
and  --  Harrison and Catherine.
Q    And did you talk to "J.R."?
A    Yes, I did.

Q    What did "J.R." ask you or say to you?

A    He asked me have I seen Maurice Johnson.
Q    What did you say?
A    I told him he had just went around the corner on Clay Street.
Q    Did he ask you anything else?
A    He asked me have I seen "V" or "O." And I told him that they was at Moore Street.
Q    Where did you go then?
A    Then I went back to the house on Norton Street.
Q    And what occurred when you got back there?
A    I'd say about 20 minutes later, I seen the police, sirens and lights out on the streets, on the corner from up the street.
Q    Did you have occasion to see what those were responding to?
A    Yes, I walked up to the corner of Clay and Harrison.
Q    What did you find that those police sirens were responding to?
A    Maurice Johnson was in the house, dead.
Q    I'm going to show you what has been previously marked Government Exhibit 20-7 and ask you if you can identify that.
     (Photograph proffered to witness.)
A    Maurice Johnson.

          MR. VICK:  I would move Government Exhibit 20-7 into evidence.
          THE COURT:  It will be admitted.
BY MR. VICK:
Q    Did you see those guns again after that?
A    Yes.
Q    When did you see those guns again?
A    On Moore Street.
Q    Now, from the time frame that you said  --  from January 14th when these guns were purchased through February, when exactly, if "Mousey" was killed, do you remember what day of the week it was when "Mousey" was killed?
A    on a Saturdayurday.
Q    "Mousey" was killed on a Saturday; when was it that you left these people?
A    A day after.
Q    From January 14th until the day after "Mousey" was killed and you left, did you see those guns again?
A    No.
Q    All right.  And did you see that bag again?
A    No.
Q    All right.  Did there come a time on Moore Street when you were asked  --  are you familiar with

the fact that --
          MR. BAUGH:  Objection to "familiar with the fact."
          MR. VICK:  I don't believe this will be a point in controversy.
BY MR. VICK:
Q    Are you familiar with the fact that indeed Moore Street was searched by the police?
A    Yes.
Q    What day was that?
A    Well --
Q    Do it for us in relation to the killing of "Mousey."
A    That Saturday morning.
Q    Before that, had you been asked by "O" to do anything with the Salem Lights bag?
A    Told me to take this bag with the guns in it and take them outside somewhere and hide them.
Q    Outside of where?
A    The house on Moore Street.
Q    Did you do that?
A    Yes.
Q    That bag that you have identified?
A    Yes.
Q    How soon was that prior to that house being searched by the police?
A    A couple of days before the house was searched by the police.
Q    And where exactly was it that you put those guns in relation to the house at 1212 West Moore Street?
A    Near the fence behind the house.  Near the fence, behind some trees.
Q    I'm going to show you what has been previously marked Government Exhibit 140.
     (Exhibit proffered to witness.)
A    Yes, this is the backyard of the house on Moore Street, near the highway.
Q    And Government Exhibit 140, do you see the area that you placed these guns in?
A    Yes.  It was back there behind -- near the fence with the trees.
Q    Did you tell anybody where you had placed those guns?
A    Only person I told was "O" where I had put it at.
Q    Directing your attention to "Nat" Rozier, do you know whether Katrina, "Nat" Rozier, was involved with these people in any way?  When I say these people, I mean "Whitey," "C.O.," "J.R.," "V," "E.B."?
A    She was buying crack from them.
Q    Did you have occasion to see whether she and "E.B." ever had a disagreement?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury about that?

A    Mostly it was me and "E.B." was at the house on Norton Street, and "Nat" came to the house and "E.B." went down the steps with a broom and started beating and hitting "Nat" and saying that "She is not allowed to be here."

Q    What was "E.B." upset about from what you observed?

A    He didn't like it because it wasn't nobody else -- none of the buyers was supposed to come to the house.

Q    What house was that?

A    The house on Norton Street.

Q    Was "O" present at that time?

A    No.

Q    Do you know why it was that "Nat" Rozier had come to that house?

A    She was looking for "O."

Q    Did "E.B." say anything to her after he hit her with the broom?

A    He told her, "Don't come back here no more" or he will hurt her.

Q    Have you ever heard "O" or "Whitey" or "V" say anything about "Nat" Rozier in regards to the cocaine that they had given her?

A    I have heard "O" say that "Nat" owed them money for the crack cocaine.

Q    What exactly did he say about that?

A    He just told her that she needed to have this money.

Q    Do you remember when it was that you found out that "Mousey" was killed?  You found out on what day that she was killed, the same day?

A    That Saturday.

Q    I direct your attention to approximately two days or three days prior to that.  Did you have occasion to go with "Mousey," or were you with "Mousey" at "Papoose's"?

A    At "Papoose's" house?

Q    Yes.

A    Yes.

Q    Did "E.B." have occasion to come and get you?

A    Yes, he came and got me and "Mousey."

Q    What did he want you to do?

A    He said that "O" wanted to see us.

Q    Where was it that "O" wanted to see you?

A    The house on Norton Street.

Q    Did you go with "E.B." to see "O"?

A    Yes.

Q    What occurred when you got there?

A    When we got there, we was sitting in one of the rooms waiting on "O" to get there.  When he got there, he asked us, you know, how was things and had told us that he had given us three twenties to sell.

Q    Who had given you three twenties?

A    "O."

Q    Is that the person you previously identified as Cory Johnson?

A    Yes.

Q    What had you done with those three twenties?

A    I told him I smoked them.

Q    When you say three twenties, what exactly do you mean?

A    In a little bag, three twenties of crack cocaine.

Q    Did you have the money to pay "O" for the cocaine he had given you?

A    No, I didn't.

Q    Did he say anything to you about that?

A    He told me I needed to get his money.

Q    And was he concerned about it?

1716

A    Yes, he was.

Q    Did "Mousey" say anything about this?

A    "Mousey" tried to tell him that it was her fault, but he didn't want to hear it.  He told her to shut up because she didn't have anything to do with it.

Q    What did "O" do after that?

A    Then there was like, on a dresser, there was a little piggy-bank, and some of his money was missing.  And he got mad at me and "Mousey" and took it and slammed it on the ground and broke it and told us it was our responsibility to get the money.

Q    What did you do after that?

A    Well, he left then.  Then after that, me and "Mousey" decided -- she said she had to get away.  So I went with her and we went to her brother's house in Church Hill.

Q    Who was her brother?

A    Bobby Long.

Q    Where was that house in Church Hill?

A    I'm not sure of the street.  It was across from a school.

Q    Why was it that she went to that house?

A    She wanted to go and stay for a couple days with her brother.

1717

Q    Why?

A    To  --

        MR. McGARVEY:  Hearsay.

        THE COURT:  Overruled.

        THE WITNESS:  She was scared and I was scared.

BY MR. VICK:

Q    Scared of what?

A    "O," "V," "Whitey," "J.R.," "E.B." and Sandra.

Q    What were you scared they were going to do to you?

A    They was going to kill me.

Q    How long did you stay there?

A    I stayed there until that Friday.

Q    The Friday before the murder of "Mousey"?

A    Yes.

Q    Then where did you go?

A    I came back on Hancock Street.

Q    What happened when you got back on Hancock Street?

A    I met Sandra.

Q    When you say Sandra, who do you mean?

A    Sandra Rollins.

Q    The person you previously identified here in the courtroom today?

A    Yes.

Q    What occurred when you saw her?

A    She told me that "O" was looking for me, that he was upset he didn't know where I was.

Q    So what did you do in response to that?

A    So I went over with her to the house on Moore Street.

Q    To see who?

A    To see "O."

Q    And why was it that you went to that house?

A    Because that's where they was.

Q    Who told you that's where they were?

A    She did.

Q    Who was present at that house?

A    It was "O," "V," "E.B.," and some other guys.

Q    Do you know the other guys' names?

A    "Man-Man."

Q    When you got there, who did you go into the house with?

A    I went in the house with Sandra.

Q    And did you see "O" when you got to that house?

A    Yes, I did.

Q    Where was "O"?

A    He was sitting on the couch.

Q    What was "O's" response upon seeing you?

A    He was upset.

Q    What occurred?

A    There was a coffee table in front of us, and I bent down to talk to "O" and he punched me in the face.

Q    With what?

A    His fist.

Q    Where on your face?

A    My right eye.

Q    What happened next?

A    Then him and Sandra went in the back room; they was talking.  And "E.B." had a stick and he started beating me with it.

Q    What kind of stick?

A    It was something like a tree branch or something.

Q    How long did he beat you?

A    He beat me for about five, ten minutes.

Q    What caused him to stop beating you?

A    "V" grabbed him.

Q    Did "V" say anything to you?

A    Yes.

Q    What did he say?

A    He told me that he didn't believe  --  he was upset, he couldn't believe that I had, you know, left

1720

and all this.  And then he just came out and told me, he said if he had a baseball bat he would have broken both of my legs.

Q    Where did you go after that?

A    Then Sandra came out and told me that "O" wanted to talk to me.

Q    And where did Sandra come from?

A    From out the back.

Q    Did you go in the back to talk to "O"?

A    Yes, I did.

Q    Where did you go to see him?

A    In the bathroom.

Q    What happened when you went in that bathroom?

A    I sat down in front of him and he told me he wanted me to do something for him.

Q    What was it that he wanted you to do?

A    He told me that he wanted me to kill "Mousey" or he was going to have Sandra kill me.

Q    Did he tell you why he wanted "Mousey" killed?

A    No, he didn't.

Q    What did you say?

A    I had no choice.  I told him, "Yeah."

Q    Did you leave that house at that time?

A    Yes, I did.

Q    Did you intend to kill "Mousey"?

1721

A    No.

Q    Where did you go?

A    Then "O" gave me $5 and told me to go get some oil for the house on Norton Street.

Q    Did you do that?

A    Yes.

Q    Then what happened?

A    After I got that, I went to do all that and then I came back to the house on Moore Street and I told him that's what I did, that I had got the oil.

Q    During that conversation in the bathroom between you and "O" where he asked you to kill "Mousey," who else was present, if anyone?

A    I think Sandra was.  I'm not sure.

Q    When was it that you left these people?

A    That Sunday after I found out "Mousey" was dead.

Q    Is that when you sought to get in contact with Detective Fleming?

A    Yes.

Q    I show you what has been previously marked Government Exhibit 141.  I ask you if you can identify that.

A    This is Bobby Long's house where I was with "Mousey."

Q    Is that where you last saw "Mousey"?

A    Yes.

        MR. VICK:  I would move Government Exhibit 141 into evidence.

        THE COURT:  It will be admitted.

BY MR. VICK:

Q    Have you talked to anyone about your testimony here today other than myself, Mr. Parcell, Mr. Fleming?

A    No.

Q    Have you talked to anyone else that you might think is a witness in this case about your testimony?

A    No.

Q    Have you even had occasion to see anyone else that you might think is a witness in this case?

A    No.

        MR. VICK:  Beg the Court's indulgence, Your Honor.

        THE COURT:  All right.

        MR. VICK:  I tender the witness, Your Honor.

        THE COURT:  Tipton's counsel.

        MR. GEARY:  Thank you.

                CROSS-EXAMINATION

BY MR. GEARY:

Q    I take it from your testimony that you were smoking crack from about November of 1990 until January of 1992?

A    Yes.

Q    And you were using, smoking three or four times a day?

A    Yes.

Q    What was that costing you per day?

A    Excuse me?

Q    What was it costing you per day to smoke crack?

A    I wasn't paying money for it.

Q    From November of 1990 until you met a person

described as "Whitey" or "O" in 1991, in that one-year period of time, was someone giving you cocaine?

A    No.

Q    Were you buying cocaine?

A    Before I met them, yes.

Q    How much a day were you spending between November of 1990 and November of 1991?

A    About $30.

Q    $30 or $40 a day?

MR. VICK:  She said $30.

BY MR. GEARY:

Q    $30 a day.  Who were you buying from from November of 1990 until Thanksgiving of 1991?

A    I was buying it from other people.

Q    Well, tell the jury who the other people are.

A    I don't know those people.

Q    Excuse me?

A    I do not know these people.

Q    What area of Richmond were you buying the crack in?

A    From the same area, but a different location.

Q    Does that area have a name where you lived?

A    It was Poe Street.

Q    Is it fair to say you were buying crack three or four times a day, or would you buy once a day and smoke four times a day?

A    Can you repeat that?

Q    How many times a day did you buy?

A    About twice every other day, something like that.

Q    So basically once a day.

A    Yes.

Q    So from November of 1990 to November of 1991, you would have bought maybe 350, 360 times; is that correct?

A    Yes.

Q    You are telling this jury that you can't give them the name of one person in that area of the City of Richmond who you bought crack cocaine from; is that correct?

A    Yes.

Q    You can't tell them who they are?

A    No.

Q    Maurice Johnson might be one of them?

A    No.

Q    Ronita Hollman?

A    One time from her.

Q    You did buy from Ronita Hollman?

A    Yes.

Q    Tell the jury now, honestly --

MR. VICK:  Objection to the

characterization.

THE COURT:  Overruled.

BY MR. GEARY:

Q    Before you met these people, who were you buying crack from; you know who they are.  Tell the jury who they are.  You are smiling, but tell them.

A    I was buying it from, Anita.

Q    Who else besides her?

A    I don't know the rest of them.

Q    Did they associate with Ronita Hollman?

A    No.

1726

Q    Who did they associate with?

A    They associated with other people besides her.

Q    How many people were buying crack in that area of the city with you between November of 1990 and 1991?

A    I seen a lot of people.

Q    Tell the jury some names of people.

A    I don't know their names.

Q    So the only person that you can tell this jury who was involved with crack in this area of the city for a whole year is that you are buying and Ronita Hollman is selling; is that correct?

A    Yes.

Q    All the rest of the people, you can't remember who they are?

A    No.

Q    You remember everything this man does over here; is that correct?

A    Yes.

Q    You have a perfect memory about him, don't you?

A    Yes.

Q    When did you start smoking marijuana?

A    When I was about 18 years old.

Q    Were you smoking marijuana and smoking crack during the same period of time?

1727

A    No.

Q    When you were smoking crack from November of 1990 until you stopped in January of 1992, were you ever smoking marijuana?

A    Not really.  Off and on.

Q    Off and on.  Tell this jury what the effects of crack cocaine are; why do you smoke crack?  What does it do for you?

A    It just gets you high for a little while and that's it.

Q    How long is a little while?

A    I'd say about 20 minutes.

Q    Have you ever drunk alcohol?

A    Yes.

Q    Have you ever gotten drunk?

A    Yes.

Q    Can you compare and tell the jury the difference between a high on crack and a high on alcohol?
A    Alcohol, it stays in your system a little longer.  You feel real loose and you feel real drunk.  It make you real sleepy.
Q    How about a high on crack?
A    The crack, it keeps you up, makes your eyes and whatever real big.
Q    How are your faculties in terms of being able to walk or drive a car when you are high on crack; does it affect you that way?
A    It can.
Q    Have you ever driven a car under the influence of crack?
A    I don't drive.
Q    Have you ever walked while you had crack in you; does it affect your walking ability?
A    Not really.
Q    If you were on crack right now would we be able to tell?
A    Yes.
Q    How would you be acting different from how you are acting now?
A    My eyes would be big, and I would be looking around real  --  real paranoid.
Q    "Paranoid" meaning what?
A    Paranoid, feel like somebody is watching you all the time.
Q    You were doing this three or four times a day; is that correct?
A    Yes, I was.
Q    Were you real paranoid during that period of time?
A    Not really.  Because I was mostly around them.

Q    Well, if crack makes you paranoid and you were smoking crack three or four times a day, why weren't you paranoid?
A    I was paranoid to a certain extent, but I was not really paranoid around them.  Mostly if I was walking by myself or whatever.
Q    You told Mr. Vick that you thought it was sometime around Thanksgiving of 1991 that you saw "Whitey" in that area where you lived; is that correct?
A    Yes.
Q    Did you know him as "Whitey"?  Is that the only name you knew him by?
A    Yes.
Q    You saw him, I think you said, on what street corner?
A    On the corner of Clay and Hancock.
Q    Is that what they call a drug corner where

people congregate to buy crack?
A     Yes.
Q     How many other corners in that area of the city can you tell this jury are crack corners?
A     That one mostly is the one.
Q     How about some others in the area?
A     Either the other corner, Hancock and Catherine.

1730

Q     Okay.  Now, beginning in the time period before you met "Whitey" in November of 1991, what was your address before you met him?
A     I was staying with "Pea Sue."
Q     What was the address?
A     On Hancock Street.
Q     Give me the address.
A     I'm not sure of it.
Q     Do you remember what hundred block of Hancock that was?
A     It was --
Q     1000 block?
A     Something like that.
Q     Where would that be, where you were living with "Pea Sue," in relation to the corner of Catherine and Hancock?
A     About a five-minute walk.
Q     Okay.  And would it be fair to say that any time you wanted to buy crack, you would leave your apartment in the 1000 block of Hancock and walk to Hancock and Catherine; is that fair?
A     Yes.
Q     Before you met "Whitey" you would walk down to that corner and buy crack; is that correct?
A     Yes.

1731

Q     Would you be able to buy crack any time of the day or night at that corner?
A     Sometimes.
Q     What would be the busiest time of the day or night for people congregating there and buying and selling crack?
A     The busiest time?
Q     Yes.
A     Any time.
Q     Any time.  Is the buying and selling more prevalent in the daylight hours or nighttime hours?
A     Mostly days.
Q     And when you would go there before Thanksgiving in 1991, when you would walk out there on a nice day in the daytime, typically, how many sellers would be out there on the corner of Catherine and Hancock?
A     Maybe one.
Q     Were there times it would be more than one?
A     One or two.
Q     Times it would be more than one or two?

A    No.
Q    Would there be a number of people buying?
A    I didn't keep up the count.
Q    As far as you know, did people from other areas in the city come to that block to buy crack besides the residents nearby?
A    Not really, no.
Q    Excuse me?
A    No.
Q    So if people came by, they usually walked up rather than come by car?
A    Yes.
Q    How soon was it after you met "Whitey" that you moved off of the 1000 block of Hancock?
A    I'd say about two days after.
Q    Two days afterwards?
A    Yes.
Q    Okay.  That move was from the 1000 block of Hancock to where?
A    To Norton Street.
Q    That's the two-story yellow house?
A    Yes.
Q    Tell the jury how far -- do you recall what block that's on on Norton Street, the 800 block?
A    I'm not sure.
Q    How many blocks would it be from where you were staying with "Pea Sue" in the 1000 block of Hancock?
A    About two-and-a-half blocks.
Q    And about how long do you think you stayed living in that yellow house on Norton Street?

A    I stayed there for awhile.
Q    Are you talking about a week, a month, do you have any idea?
A    About a month.
Q    From the Norton Street house, where did you go from there?
A    Moore Street.
Q    That's 1212 West Moore Street?
A    Yes.
Q    And how long do you think you stayed there?
A    Until after what happened to "Mousey."
Q    Okay.  So you would have stayed from just before Thanksgiving of 1991 until you went to see Detective Fleming, you would have stayed at a house on Hancock Street and one on Norton Street and one on Moore Street; is that correct?
A    Yes.
Q    When you saw Detective Fleming, is that the point in time when you stopped smoking crack?
A    Uh-huh.
Q    What did you have to do to give up your addiction; did you get medical treatment for it?

A    No.  I just gave it up.
Q    Cold turkey, so to speak?
A    Uh-huh.

1734

Q    Before "Whitey" and anyone else from New York
arrived here, the $30 a day you were spending on
crack, where would you get that money from?
A    From a friend.
Q    From a friend?
A    Yes.
Q    What's that friend's name?
A    I'm not going to say his name.
Q    Excuse me?
A    I am not going to say his name.
Q    Why don't you want to say his name?
A    Because.
Q    Because why?
A    I just don't want to say his name.
Q    Tell the jury, if you are so anxious to talk
about these people, why you are not willing to say
your friend's name?
A    Because these people did something that this
person does not do.
Q    What does this person do besides give you money
to buy crack?
A    He works.
Q    Where?
A    He works at a hospital.
Q    He supported your crack habit; is that correct?

1735

A    Yes.
Q    You never had to do anything illegal to support
your crack habit?  Did you ever have to do anything
illegal to buy crack?
A    Depends on what you are talking about.
Q    You know what "illegal" means.
A    Yes.
Q    You know what Richmond General District Court
means, don't you?
A    Yes.
Q    Did you ever have to do anything illegal to
support your crack habit?
A    No.
Q    After January 13th of last year, did you ever
see "Whitey" again until you came into the courtroom
this morning?
A    No.
Q    That was the day that Doug Moody was killed,
correct?
A    I guess it was, yes.
Q    If it is.  You saw him that night, you saw
"Whitey" that night at 1212 West Moore Street,
correct?
A    Yes.

Q    He told you, among other people, that Doug Moody had a gun, had tried to kill him.

A    Yes.

Q    Is that what he said to you?

A    Yes.

MR. GEARY:  May I have a minute, Judge?

THE COURT:  Sure.

(Counsel conferring.)

MR. GEARY:  Pass the witness, Judge.

THE COURT:  All right.  Mr. Johnson's counsel?

CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Ms. Berkley, starting with Katrina Rozier, you indicated that you had lived with "Mousey" as well; had you lived with "Mousey" other than those days prior to --

A    Well, we was  --  I was staying over at the house, over at the other house on Hancock Street with her, yes.

Q    You also indicated that you had lived with "Papoose," right?

A    Yes.

Q    Did you and Katrina and "Papoose" live together?

A    No.

Q    Now, with respect to Ms. Rozier, you indicated she was your best friend; is that correct?

A    Yes, she was.

Q    And Ms. Rozier did a lot of crack, correct?

A    Yes, she did.

Q    And isn't it a fact that Ms. Rozier would get crack wherever she could get crack for the most part?

A    Yes.

Q    And her sole source were not these individuals; she got crack from just about anybody she could get it from.

A    Besides them, yes.

Q    And one of those people that she would get crack from even before, say, these individuals came -- you indicated that you met "O" back in what, November? Correct?

A    (Witness nodded.)

Q    You have to say it.  I'm sorry.

A    Yes.

Q    The court reporter can't hear it unless you say it.

A    Yes.

Q    How long have you known Jerry Gaiters?

A    I knew him for a little while.

Q    And Mr. Gaiters hung around in that particular

area as well as in the Fan; is that correct?

A    Yes.

Q    And Ms. Rozier, or "Nat" as you knew her, is it "Net" or "Nat"?

A    "Nat".  N-A-T.

Q    "Nat" got cocaine, long before you met "O," from Jerry; Jerry was one of the people she got cocaine from; is that correct?

A    Before I met "O" and them?

Q    Yes.

A    No.

Q    Are you telling the ladies and gentlemen of the jury that Jerry and "Nat" didn't smoke cocaine?

A    Oh, they smoked it, yes.

Q    They had smoked cocaine together for years, correct?

A    As far as I know.

Q    And is it fair to say that if "Nat" had some cocaine, that she might sell it or share it with Jerry?

A    Yes.

Q    Prior to that.  And is it fair to say that if Jerry had some cocaine, he would share it or sell it to "Nat," correct?

A    Sometimes.

1739

Q    For years, right?

A    As far as I know.

Q    In terms of Ms. Rozier, with respect to her drug habit, Ms. Rozier also owed a number of people money for drugs; isn't that correct?

A    Probably so.

Q    And in fact, it was almost a joke in the community -- not necessarily a joke; I don't mean to characterize it that way -- but that Ms. Rozier would just about do anything for drugs, correct?

A    Yes.

Q    And that included beating people out of drugs if she could do it, right?

A    Yes.

Q    Now, you indicated that Mr. Gaiters was the one who told you that "Nat" was murdered, correct?

A    Yes.  Dead.

Q    And he told you that the next morning; is that correct?

A    Yes.

Q    That was the morning that she was found dead; is that correct?

A    Yes.

Q    Now, when you indicated that Mr. Chiles, Linwood Chiles, took  --  and if I don't have this right,

1740

please correct me  --  but "O," "J.R.," who else did he take up to New York?

A    It was "O," "V," "E.B.," and some other people.

Q    Didn't "Whitey" go, too?

A    Not that I know of.

Q    In other words, you didn't see him leave with them; is that correct?

A    Yes.

Q    You saw all of them leave.  Somebody indicated to you that they were going to New York and you saw them leave about 9 o'clock the morning before this happened; is that correct?

A    Yes.

      MR. VICK:  She testified it was 9 o'clock the evening before it happened.

      MR. BAUGH:  The witness just answered the question.

      MR. VICK:  He is prefacing the question with a misstatement of fact.

      THE COURT:  Mr. Vick, you can clear it up on redirect.  Go ahead.

BY MR. McGARVEY:

Q    You indicated that it was Jerry Gaiters who told you the following morning when "Nat" was found dead.

A    Yes, he came to the house on Moore Street and told me.

Q    Wasn't that about 9:00, 9:30 the next morning?

A    It was around about that time in the morning.

Q    About 9:00 or 9:30 a.m. the morning her body was found; is that correct?

A    Yes.

Q    Now, you also indicated that Dorothy Armstrong, to your recollection -- and again, ma'am, I'm not trying to put words in your mouth, but these are what my notes say that you said -- sold about 50 to 100 pills what, per day?  50 to 100 $10 hits of cocaine per day?

A    They was twenties.

Q    They were twenties?

A    Yes.

Q    You are talking about during the period of time, November to December, right?

A    Yes.  To the date that she was killed.

Q    I'm sorry, November to January.  And each one of these sold for $20 apiece?

A    Yes.

Q    50 to 100 per day?

A    Yes.

Q    And you also indicated that the gentlemen that you have talked about here, "O" and "Whitey" and "J.R.," were also selling a lot more than that, correct?

A    Yes.

Q    What was that amount?  How much did you say they

were selling?

A    It was 20 capsules -- 25 capsules of twenties in a bag.

Q    You indicated that they were getting a bag about like eight inches, I believe was the U.S. Attorney's estimate, and it was about half full.

A    Maybe more.

Q    Maybe even more?

A    Yes.

Q    That was powder?

A    Yes.

Q    And how many times a week would they be getting that?

A    About -- when they was was going up there to get it?

Q    Yes.

A    It was like every two weeks or something like that.

Q    Every two weeks?

A    Yes.

Q    They would take that bag and cook that up; is

1743

that right?

A    Yes.

Q    And that's a lot more than 50 to 100 twenties per day?

A    Right.  I'm just giving estimates.

Q    I understand that.  So I presume that selling it at that amount, they were making a tremendous amount of money, correct?

A    Yes.

Q    Tremendous.

A    Yes.

Q    Did "Whitey" own a car?

A    He was using a car.

Q    Did he own a car, to your knowledge?

A    No.

Q    You were there.  Did "O" own a car?

A    Yes.

Q    "O" owned a car?

A    Yes.

Q    What kind of car was that?

A    It was something like a Grand Prix.

Q    Grand Prix.  Do you have any idea, was it a late model, or older car, or what?

A    It was a used car.

Q    A used car?

1744

A    Yes.

Q    Can you estimate about how old it was?

A    No.

Q    What did it look like?  Were there rust spots on it?

A    It was black.

Q    I understand it was black.  But you indicated it was a used car.  Was it beat up?
A    No, it wasn't really beat up, no.
Q    And "J.R.," did he own a car?
A    No.
Q    Did "O" have a lot of diamonds, gold, jewelry, all that good stuff?
A    Not that I know of, no.
Q    How about "Whitey," did he have a bunch of diamonds, gold, jewelry or anything?
A    No.
Q    How about "J.R.," did he?
A    No.
Q    Now, you indicated that you moved in with them back in November, 1991.  And you were basically a housekeeper, and the way you were paid was with cocaine, correct?
A    Yes.
Q    And you indicated it was about four to five a day.  Four to five what, tens or twenties?
A    Some of them was tens, some was twenties.
Q    When you were given this, did you smoke this immediately?
A    Some days, yes; some days, no.
Q    Would you explain to the ladies and gentlemen of the jury how you smoke cocaine?  What do you smoke it in?
A    Some people use  --
Q    What did you use?
A    At first I was using a can, and then I started using a pipe.
Q    Since you were getting this where, both at Norton and 1212 West Moore Street?
A    Yes.
Q    Since you were using it there, I presume that you kept it there; is that correct?
A    Yes.
Q    The pipe or the can, whatever?
A    Yes.
Q    When you use a pipe, you have to use steel wool; is that right?
A    Yes.
Q    Do you use steel wool?
A    Yes.
Q    I don't mean to belabor this, but I'm not sure the ladies and gentlemen of the jury understand. What all implements would you have to have to use cocaine, to smoke cocaine?
A    A lighter.
Q    Steel wool?
A    Yes.
Q    Some kind of a pipe, correct?

A    Yes.
Q    And the type of pipe that you used was?
A    It was a long stem.
Q    Was it glass?
A    Yes.
Q    It was glass.  Were other people using drugs at the 1212 West Moore Street house?
A    "Mousey."
Q    "Mousey" was?
A    Yes.
Q    Did she smoke out of the same pipe or did she have her own?
A    She had her own.
Q    Did she keep that there?
A    Yes.
Q    You indicated  --  withdraw that.  You were asked by Mr. Vick whether or not you had any prior

1747
criminal record, correct?
A    Yes.
Q    You indicated that you  --  excuse me, that's not what you were asked.  You were asked if you were convicted of any felonies?
A    Yes.
Q    You were asked if you were convicted of any misdemeanors giving falsehoods, or lying, stealing, or cheating; is that correct?
A    Yes.
Q    You indicated you had not, right?
A    Yes.
Q    You were born December 11, 1962; is that correct?
A    Yes, I was.
Q    Is your Social Security Number 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?
A    Yes.
Q    Isn't it a fact that you were convicted on August 30th, 1991 of petty larceny in the General District Court of Richmond?
A    Petty larceny?
Q    Petty larceny, stealing less than $200, shoplifting, something like that, petty larceny?  Were you convicted of that August 30th of 1991?
A    I don't recall.

1748
Q    You don't recall?
A    No.
Q    When you answered the question from Mr. Vick, did you not understand it then?
A    I understood the question.
Q    Are you saying you were or you don't recall?
A    I don't recall.
Q    So when you said no, now you don't recall; is that correct?
A    Yes.

Q    Okay.  Now, you indicated that you went to the Richmond Bureau of Police right after "Mousey" Armstrong was discovered, was killed.  You have also indicated in your direct testimony that you tried to turn yourself in.

A    Yes.

Q    That's an interesting phrase, ma'am.  What do you mean by that?

MR. VICK:  Objection to the form of the question.  He needs not editorialize.

THE COURT:  Sustained.

BY MR. McGARVEY:

Q    What did you mean by trying to turn yourself in?

A    I was trying to do something -- I don't know, trying to get myself turned in.

Q    Turning yourself in for what?  Did you feel that you had committed some crime?

A    No, I just felt that I needed to get behind bars away from these people.

Q    Ma'am, when you indicated that you saw Doug Moody killed, and you waited out there and watched the police and the ambulance and all of that, did you go up and tell the police anything?

A    No, I didn't.

Q    Anything that you have told here today?

A    No.

Q    When you were with these individuals you have testified to and you were helping them clean up and cook up crack and the like, did you tell anybody about that before you talked to Detective Fleming?

A    No.

Q    Okay.  When you talked to Detective Fleming or anybody else associated with the United States Government, including Mr. Vick, including Mr. Parcell, did anyone ever say to you that you might be charged with a conspiracy?

A    No.

Q    No one ever said that to you?

A    No.

Q    As a practical matter, you haven't been charged with any conspiracy, have you?

A    No.

Q    You haven't been charged with being an accessory after the fact to a murder or anything like that, have you?

A    No.

MR. McGARVEY:  Your Honor, if I might have one minute, please.

THE COURT:  Sure.

BY MR. McGARVEY:

Q    Now, you indicated that you were at "Mousey's"

house and you got a message from -- I'm sorry, my notes don't reflect that, but that "O" wanted to see you; is that correct?

A    Yes.

Q    And you have indicated earlier that these individuals were selling, according to your testimony, a massive amount of crack cocaine; is that correct?

A    Yes.

Q    And the reason when you got there that "O" told you that he wanted you there was because he wanted you to sell three twenties?

A    No, you got that backwards.  He wanted to see me because I had  --  he wanted to find out how was I doing as far as selling those three.

Q    He had given you three twenties to sell?

A    Yes.

Q    Three.

A    Yes.

Q    These are the same  --  this is the same individual that you indicated was going to New York every two weeks and getting  --

A    Yes.

Q    And that he wanted you to kill "Mousey," you?

A    Yes.

Q    Ma'am, when you were associated with this group, had you ever killed anybody?

A    No.

Q    Had you ever done any violence to anybody?

A    No.

Q    Are you known in the neighborhood as a bad kind of a person, a real vicious person?

A    No.

Q    But he asked you to kill "Mousey"?

A    Yes.

Q    I see.

        MR. McGARVEY:  Thank you.

        THE COURT:  All right.  Counsel for Mr. Roane?

        MR. VICK:  Your Honor, once again, I would object to Mr. McGarvey's comments after answers, editorializing.

        THE COURT:  All right.

                CROSS-EXAMINATION

BY MR. BAUGH:

Q    Ms. Berkley, my name is David Baugh.  I'm one of the lawyers for Mr. Roane.  How much cocaine was being brought back from New York?

A    Sandwich bag.

Q    About how much in weight?

A    It was about half and maybe more.

Q    Have you ever seen an ounce before?

A    Have I seen an ounce before?

Q    Yes.

A    Yes.

Q    Have you ever seen two ounces or three ounces before?

A    Not really.

Q    Being as how you have seen an ounce before, can you estimate how much was in that bag that they were bringing back from New York each time?

A    Like I said, about half of the bag.

Q    You have seen an ounce; can you estimate the weight of it?

A    It was a little bit more than an ounce.

Q    A little bit more than an ounce?

A    Yes.

Q    And how often would these people bring back a little bit more than an ounce?

A    Every other two weeks.

Q    They would bring back an ounce every other week?

A    Yes.

Q    And you were living with these people daily for some of that time, weren't you?

A    Yes, I was.

Q    Did you ever see a half a kilogram?

A    No.

Q    Now, you lived up in the  --  what do you call that part of town up there around Harrison and Clay?

A    Newtowne.

Q    You call it Newtowne?

A    Yes.

Q    You have lived up there for some period of time?

A    Yes, I have.

Q    About how long?

A    I was living there ever since I was 18 years old.

Q    And during the whole time you have lived up there, have you ever had a job?

A    No.

Q    When was the last time in your life you ever had a job?

A    I was about 20 years old.

Q    What type of job was that?

A    It was working at a brickyard company on Southside.

Q    That was about ten years ago?

A    Yes.

Q    In fact, up there it is not unusual for people not to have jobs, is it?

A    Up there?  What you mean?

Q    Newtowne.  A lot of people in Newtowne don't

have jobs.

A    Right.

Q    Now, during the time that you have been smoking crack cocaine, did you ever buy any crack cocaine or receive any crack cocaine from Jerry Gaiters?

A    No.  Not that I recall.

Q    What about "Bip" Gaiters?

A    Don't know him.

Q    What about Peyton Maurice Johnson; did you get

1755

asked that already?

A    I have bought one or two times from him.

Q    You bought one or two times from Peyton Maurice Johnson.  Was that before November of 1991?

A    Yes, it was.

Q    Was Peyton Maurice Johnson selling cocaine up there in Newtowne before November of 1991?

A    Yes, he was.

Q    Who did Peyton Maurice Johnson have selling for him?  Was Lewis Johnson working for him?

A    Old man Lewis Johnson?

Q    I don't know.

A    I don't know.

Q    What about somebody named "Little Keith"?

A    Yeah.

Q    "Little Keith" was selling up there before November of 1991?

A    Yes.

Q    And am I correct that "Little Keith" is about 15 or 16 years old, about five-foot-three, five-foot-four, very dark-complected?

A    I think so, yes.

Q    But real young.

A    Yes, he is young.

Q    And he was selling drugs for about a year prior

1756

to November of 1991; am I correct?

A    I'm not sure.

Q    Did you ever buy from him?

A    I bought about one or two times from him, yes.

Q    Crack cocaine; it wasn't that hard to get off of it?

A    What you mean?

Q    To give it up?

A    Not to me it wasn't.

Q    Once you made up your mind.

A    Yes.

Q    Have you ever done powder cocaine?

A    Yeah, I have a long, long time ago.

Q    Is there that much difference in the high?

A    Not really.

Q    Well, do only black people do crack cocaine? Have you ever seen a white person do crack?

A    Yes.

Q    You have.  Thank you.
          MR. VICK:  What possible relevance?
          MR. BAUGH:  I'm trying to find out if I should be asking about other people selling drugs and other people buying drugs.
          THE COURT:  The objection is sustained.
BY MR. BAUGH:

1757

Q    You knew Doug Moody's mother over on Catherine Street; you have seen her, haven't you?
A    I might have seen her one or two times.  I'm not sure who she is, no.
Q    You also know that 1200 West Clay is a nip joint, right?
A    It was.
Q    Back when all this was going on it was a nip joint, right, a guy named "Stinker" ran it?
A    Yes.
Q    His mother, actually "Stinker" helped her.
A    Yes.
Q    1200 West Clay Street is on the corner of Clay and Harrison; am I correct?
A    Yes.
Q    Directly behind that is 810 North Harrison Street, right?
A    I guess that's the address.
Q    Now, you were in 1200 West Clay Street?
A    I was in the front, yes.
Q    The deal you have with the United States, have they given you immunity?
A    Immunity?
Q    What have they told you they are going to do for you?  Have they told you you won't be prosecuted for

1758

anything you talk about?
A    Yes.
Q    All right.  And further, have they been paying your bills?
A    Yes.
Q    Did they move you?
A    Yes.
Q    And when you say they are paying your bills, they pay your food, clothing, your rent, everything?
A    Yes.
Q    And when this is all over they are going to  -- did they say anything about getting you a job?
A    Yes.
Q    So am I safe in assuming it is your plans never to go back to Newtowne and the hard life in Newtowne ever again?
A    That's right.
Q    The United States is going to help get you out of there.
A    As far as I know, yes.

Q    Now, did they tell you that you could pick and choose what you talk about?

A    What you mean by pick and choose?

Q    Did they tell you that you have to answer every question and tell the truth?  Right?  They told you that, didn't they?

A    Yes, I have to tell the truth.

Q    Who bought drugs for you?  Tell me the truth.

A    Who bought drugs --

Q    You said someone was helping support your drug habit.  You have to tell the truth to keep your deal.  Who was buying drugs for you?  Tell us in order to keep your deal.

A    I was buying my own drugs.

Q    Who was giving you money to buy drugs?

A    I can't say that.

        MR. BAUGH:  Your Honor  --

        MR. VICK:  What relevance?

        THE COURT:  The objection is sustained.

BY MR. BAUGH:

Q    So is it your understanding you don't have to tell the truth unless they ask it, right?

        MR. VICK:  Objection, Your Honor.

        THE COURT:  Sustained.

BY MR. BAUGH:

Q    When Doug Moody was getting stabbed was he lying down or standing up?

A    At first he was standing up.

Q    All right.  Is it your testimony that James Roane sat on his chest and stabbed him?

A    No, it wasn't my testimony.

Q    All right.  How was James Roane, according to your testimony, how was his body situated while he was stabbing him?

A    He was standing in front of him.

Q    When he fell down, did James Roane continue to stab him?

A    I think so.

Q    All right.  Now, is it your testimony, and you mean to tell this jury in response to this man's questions and in response to that man's questions over there that you stayed there from the time you came out and saw him being stabbed until the police and ambulance arrived; did you tell them that?

A    Yes.

Q    Did you see the woman come out of 810 North Harrison, come out and do CPR on Doug Moody and cut his clothes off and try to stop the bleeding?

A    All I seen was a lady come out of the house screaming.  That was it.

Q    How far away from Doug Moody were you standing?

A    When he was laying in the alley?

Q    When he was laying in the alley.
A    After all of this had happened?  Explain.  I don't understand what you are saying.

1761

Q    You saw Doug Moody fall in the alley.
A    Yes.
Q    How long was it before you left from the time he fell?
A    Right after "J.R." and all of them left.
Q    How long did you stay in the alley?
A    I didn't stay in the alley long.  I stayed on the corner of Clay and Harrison.
Q    How long did you stay in the vicinity watching Mr. Moody?
A    Until the police and ambulance got there.
Q    About how much time was that, ma'am?
A    It was about, I don't know, about 30 minutes.
Q    And during the 30 minutes, it is your testimony you did not see someone come out and attempt  --
          MR. VICK:  She has not testified to that.
BY MR. BAUGH:
Q    I'll rephrase it.  Did you see  --  you know what CPR is, don't you?
A    Yes.
Q    Chest compression?
A    Yes.
Q    Did you see someone come out other than ambulance attendants and attempt CPR on Doug Moody?
A    No, I didn't.

1762

Q    All right.  Did you see someone go back in, come out with a butcher knife and cut his clothing off?
A    No.
Q    I will ask you specifically  --  strike that.
     Did you see the police talk to the woman that you saw come out screaming, you say?
A    Yeah, she was talking to them, yes.
Q    Could you overhear what she was saying?
A    No.
Q    Was "Little Keith" a friend of yours?
A    Not really a friend, no.
Q    He was just someone you bought drugs from?
A    Yes.
Q    Did you see little Keith Barkley, age 15, dark-complected, sitting on Doug Moody's chest stabbing him to death on that night?
A    No.
Q    Have you ever seen the woman in 810 North Harrison before?
A    No.
Q    Before that night?
A    No.
Q    That's the house on the other side of the alley.

A    I know.  No.

Q    In all your drug dealing and drug running and using drugs up there for as long as you did, you never saw that woman using drugs, did you?

MR. VICK:  Objection to the form of the question.  There has been no basis for drug running, drug dealing, et cetera.

THE COURT:  She can go ahead and answer the question.

BY MR. BAUGH:

Q    In all the time you were up there, from November of 1990 up until the time that Doug Moody was killed, when you were, by your own admission, helping to bring drugs down, helping to move drugs, selling drugs and using drugs out on that street, you never saw that woman using drugs, did you?

A    No.

Q    All right.

Q    Is it also your testimony that from November of 1991 until February of 1992, you were involved in the distribution of crack cocaine with my client, Mr. James Roane?

A    Yes.

Q    And that involvement and periodic meetings with my client continued up until the time that Dorothy "Mousey" Armstrong was killed in Church Hill.

A    Yes.

Q    And that you would see my client every couple of days up until the time that "Mousey" Armstrong was killed; am I correct?

A    Yes.

Q    As far as you know, 1212 Moore Street was raided early in the morning before "Mousey" was killed; am I correct?

A    That's what I heard.

Q    All right.  Was he arrested that morning?

A    They said he was.

Q    In your discussions with the government, did they ever ask you about "Little Keith" and those other people selling drugs or did they just ask questions about these people?

A    They just asked questions about them.

Q    Did you ever volunteer any information or did you just tell them things they wanted to hear?

A    I volunteered.

Q    But you did not volunteer any of your other drug-dealing friends or you did not volunteer the name of the person who supported your habit; is that correct?

A    Right.

Q    Did they ever ask you that and you said you

App.0118

weren't going to tell them?

A    No.

Q    The things you knew about and they asked about you told.

A    I volunteered to tell them everything I knew.

Q    Did you tell them about "Little Keith"?

A    No, I didn't.

Q    What other parts of  --  strike that.
     Were you protecting "Little Keith" by not telling on him?

A    I wasn't thinking about "Little Keith."

Q    You were only thinking about these people.

A    Yes.

Q    And they seemed to be only concerned with these people.

A    I guess so.

Q    Were you looking forward to getting out of Newtowne and getting a job?

A    Yeah, I was going to do that anyway.

Q    And you were going to do that before you were --  before the police and the United States offered you money and all of this to leave?

A    Yes.

Q    You were going to do that?

A    I was going to leave anyway, yes.

1766

Q    While you are sitting here right now, tell me the name of one place you made an application for employment at in 1991.

          MR. VICK:  What relevance does this have, Your Honor?  That's a personal attack.

          THE COURT:  Sustained.

          MR. BAUGH:  Your Honor, excuse me, that is not a personal attack.  I have nothing personal against this woman.  I object to that.
Could I have a ruling on this editorial comment on personal attack?  That was not a personal attack.

          THE COURT:  The objection was sustained.
Ask a question.

BY MR. BAUGH:

Q    You said you were trying to get out.  You were taking steps to get away from the hard life in Newtowne before the government put you up someplace else; am I correct?

A    Yes.

Q    And included in those steps, I asked you, well, if you didn't make a job application, did you try to go back to school?

          MR. VICK:  All of this is irrelevant.  I object.

          THE COURT:  Sustained.

1767

BY MR. BAUGH:

Q    Ma'am, isn't it true that you didn't like living

in Newtowne and you had no way to get out?

MR. VICK:  Objection.  Same objection.

THE COURT:  The first part of the question is perfectly all right.

BY MR. BAUGH:

Q    Isn't it true, ma'am, that you hated living in Newtowne and you had no way to get out until these people moved you?

A    Not really, no.

Q    All right.  In light of that answer I will ask again, subject to the objection, about the steps you took to get out of there other than tell these people what they wanted to hear.  You didn't apply for a job.  Did you try to get  --

MR. VICK:  Same objection.

THE COURT:  Sustained.

MR. BAUGH:  Note my exception.  No further questions, Your Honor.

THE COURT:  All right.  Ms. Reavis' counsel.

CROSS-EXAMINATION

BY MR. WAGNER:

Q    Good afternoon.  You have given some testimony about a night on Moore Street, a night that Sandra Reavis brought you to Moore Street; do you remember that night?

A    Yes, I do.

Q    You said you had a bad time that night; isn't that right?

A    Yes.

Q    You were threatened that evening?

A    Yes.

Q    "O" threatened you?

A    Yes.

Q    He made that threat in the bathroom; is that correct?

A    Yes.

Q    You are not sure, though, if Sandra Reavis was in that bathroom or not; is that right?

A    Yes.

Q    You never planned to kill "Mousey," did you, after that threat?

A    No.

Q    You didn't kill "Mousey," did you?

A    No, I didn't.

Q    Sandra Reavis didn't kill you, did she?

A    No, she didn't.

Q    So that was an idle threat; wasn't it?

MR. VICK:  Objection.  It is his characterization.

THE COURT:  Overruled.

BY MR. WAGNER:

Q    That was an idle threat, wasn't it?
A    I guess it was.  I'm not sure.
Q    Turned out to be absolutely meaningless.
A    Seemed that way, yes.
Q    Now, Sandra Reavis never did anything to harm you, did she?
A    No.
Q    You were not scared of Sandra, were you?
A    To a certain extent, yes.
Q    All right.  You were scared of her, yet after you moved from the Norton Street-Moore Street group there, you moved to a house right next-door to Sandra, didn't you?
A    Yes, I did.
Q    You saw Sandra there on a regular basis, didn't you?
A    Every now and then, yes.
Q    You wouldn't avoid her, would you?
A    Would I avoid her?  I didn't have no choice.
Q    You chose to move right next-door to her, right?

1770

A    I was staying there before I even knew she was living next-door.
Q    You didn't know she was living next-door to the guy you moved in with there?
A    Not at first, no.
Q    After you found out you didn't move away, did you?
A    No.
Q    You didn't avoid her, did you?
A    Not really.
Q    You really weren't scared of her, were you?
A    In a way, I was.
Q    I see.  Now, you testified that you saw Sandra on occasion at Moore Street; isn't that right?
A    Yes.
Q    And at Norton Street; is that right?
A    Yes.
Q    She would be there with "J.R."; is that right?
A    Yes.
Q    She was romantically involved with him, wasn't she?
A    Yes, she was.
Q    You didn't speak to her that much, did you?
A    No.
Q    You might say, "Hey, how are you doing?"

1771

A    We would walk together down the street sometimes, yes.
Q    How many times would you say you saw her at Moore Street?
A    About two or three times.
Q    That's over about two months?

A    Yeah.

Q    How many times would you say you saw her at Norton Street?

A    About the same, two or three times.

Q    What was the first time that you saw her at either Moore Street or Norton Street?

A    The first time I seen her?

Q    Please.

A    It was on the corner of Harrison  --  Hancock and Clay.

Q    At either Moore Street or Norton Street, when is the first time you saw her at one of these locations?

A    The first time I seen her was on Harrison Street.

Q    I'm sorry, maybe I'm not being clear.  You say you have seen her at Moore Street two or three times, Norton Street two or three times.

A    That's right.

Q    When was the first time you saw her at Moore Street?

A    What you mean?

Q    You saw her two or three times there.  Can you give an approximate date for the first time?

A    No.

Q    How about the first time at Norton Street?

A    It was about a couple of days after they moved to Moore Street.

Q    I was talking about Norton Street now.

A    I don't understand.

Q    I first asked you about Moore Street.  You said you weren't sure when you first saw her at Moore Street.  Then I asked you about Norton Street.  I'm asking you now, what is the first time you saw her at Norton Street?

A    Right after  --  the Saturday after I cleaned the house.

Q    That would be in early December?

A    It was in November.

Q    Late November?

A    It was a couple of days before Thanksgiving.

Q    Was she there with "J.R."?

A    No.

Q    Now, just about all the time you were there on Moore Street and Norton Street, you were high on crack cocaine; isn't that right?

A    The majority of the time, yes.

Q    You say you were smoking crack cocaine four or five times a day; isn't that right?

A    Yes.

Q    You saw a lot of people come in and out of those two residences, didn't you?

A    Most of the ones that lived there, yes.
Q    But also people who came in to sell crack?
A    Yes.
Q    And to buy crack?
A    No, mostly to sell, for them to give the crack to.
Q    The night of the Doug Moody murder you were high on cocaine, weren't you?
A    A little.
Q    You testified that just right before you heard the shots you were smoking some cocaine with some people; isn't that right?
A    I had just started taking a hit.  Yes.
Q    After you heard the shots, you said you thought it was the police.
A    Yes.
Q    Who said it was the police?

1774
A    We all thought it was the police.
Q    And how long did it take you after you thought it was the police to put your cocaine away?
A    We just swept it off in the trash can.  It didn't take but a second.
Q    Put it in the trash can of the house?
A    Yes.
Q    What did you do with the trash can?
A    I don't know.  Just threw it and that was it.
Q    Left it there?
A    Yes.
Q    Did you keep any of the cocaine on yourself?
A    No.
Q    Any pipes on yourself?
A    No.
Q    Then you walk outside to where you say you heard the shots from, right?
A    Yes.
Q    Right outside to where the police were.
A    Right.
Q    Right after you had just smoked some cocaine?
A    Yes.
Q    You weren't afraid of the police?
A    No.  Not at the time I walked out, no.
Q    You have not been charged with any crimes by the

1775
government in this case, have you?
A    No.
          MR. VICK:  Asked and answered.
          THE COURT:  I'll give him the chance.
BY MR. WAGNER:
Q    Did they tell you that you could be charged in this conspiracy, the government?
A    No, they didn't.
Q    Did they tell you you could serve a minimum of ten years on a charge involving these people in the

conspiracy?

A    No.

MR. VICK:  Asked and answered.  We have been over this.  I will stipulate we have not so told her.

THE COURT:  Overruled.

BY MR. WAGNER:

Q    The same thing about any time  --  well now, you sold drugs, you have testified, for some of these people here; isn't that right?

A    Just that one time that I was supposed to have sold drugs for "O" but I didn't sell it.

Q    You just testified in response to Mr. Baugh's questions that you sold drugs for "J.R."  Isn't that right?

A    No.

Q    You didn't say that in response to Mr. Baugh's questions?

A    No, I didn't.

Q    You didn't get drugs from "J.R."?

A    I got drugs from "J.R.," but not to sell.

Q    You didn't sell?

A    No.

Q    But you had delivered drugs for one or more of these people; isn't that right?

A    Yes.

Q    In addition to selling the drugs, right?

A    Yes.

Q    Did you ever tell the government that you were selling drugs?

A    Yes.  They knew that.  I told them.

Q    But the government never told you about any charges you might face?

A    No.

MR. WAGNER:  No further questions.

THE COURT:  Mr. Vick?

REDIRECT EXAMINATION

BY MR. VICK:

Q    You are currently in the Federal Witness Protection Program; is that correct?

A    Yes.

Q    Pursuant to your being placed in the Federal Witness Protection Program  --  let me back up.  Why were you placed in the Federal Witness Protection Program?

MR. GEARY:  I object.

THE COURT:  Sustained.  We don't need the why.

BY MR. GEARY:

Q    Did you ask to be placed in the Federal Witness Protection Program?

A    Yes.

Q    For what reason?
A    For my safety.
Q    Was it in response to your testimony here, in anticipation of your testimony here?
A    Yes.
Q    Your being in the Federal Witness Protection Program, is that why you have been receiving money from the federal government?
A    Yes.
Q    Have you been relocated?
A    Yes.
Q    All right.  I'm going to show you what has been previously marked Government Exhibit 124.

1778

MR. GEARY:  This is beyond the scope.
MR. VICK:  No, it is not.  I can proffer if the Court wants.
THE COURT:  Overruled.
(Exhibit handed to witness.)
BY MR. VICK:
Q    Have you ever seen that weapon before?
A    Yes.
Q    Where have you seen that weapon?
A    "E.B."
Q    Have you ever seen anyone other than "E.B." with that weapon?
A    No.
MR. VICK:  I would move Government Exhibit 138 into evidence.
THE COURT:  Admitted.
BY MR. VICK:
Q    As to Government Exhibit 104, 105, 106, 107, the guns and handbag that you gave them, have you ever seen anyone other than the people you testified had those guns have those guns?
A    No.
Q    Has anyone else ever had access to those guns from what you know?
A    No.

1779

Q    So the only people that have ever had access to those guns are "Whitey," "C.O.," "J.R.," "V," and "E.B.", is that correct?
A    Yes.
Q    When was the last time you saw "Whitey"?
MR. GEARY:  I object to this.  He is going back into this witness after she has testified that she didn't see this fellow from January 13th until she walked into Court today.
THE COURT:  Overruled.
BY MR. VICK:
Q    Could you tell us the last time you saw "Whitey"?
A    The last time I saw "Whitey" was the night that

Doug Moody was killed.

Q   All right.  You had said that there were 50 or 100 customers coming -- on cross-examination you said there were 50 or 100 pills being sold.  Could you tell the ladies and gentlemen of the jury which, 50 to 100 customers coming and getting drugs, or were they selling 50 or 100 pills.

MR. COOLEY:  Objection.  That was not the testimony.

THE COURT:  Overruled.

THE WITNESS:  It was the customers.

1780

BY MR. VICK:

Q   On how many times a week would you see them with new bags of the cocaine?

A   About two, three weeks.

Q   Would they go to New York every two to three weeks or have new bags of cocaine every two or three weeks?

MR. GEARY:  Asked and answered.

THE COURT:  Sustained.

BY MR. VICK:

Q   Did these people make enough money, "J.R.," "C.O.," "Whitey," "V," did they make enough money to buy gold if they wanted to?

A   Yes.

MR. GEARY:  I object.

MR. BAUGH:  We ask the jury be asked to disregard the answer.

THE COURT:  Sustained.

BY MR. VICK:

Q   Do you know what they did with their money?

A   Counted it, wrapped it up, and would keep it until the next time they would go to New York.

Q   Who stabbed Doug Moody?

A   "J.R."

Q   Why were you scared of Sandra?

1781

A   Because she had her ways.  I mean, she was just -- one minute she is nice and the next minute she is, you know, she's got a bad attitude.

MR. VICK:  I have no further questions.

THE COURT:  Would counsel come up?

(The witness stood aside.)

(At Bench.)

THE COURT:  What's next?

MR. VICK:  We have a police officer witness that will not be that long.  We have got another protected witness  --

THE COURT:  Can we do the protective witness after lunch?

MR. VICK:  Should be here now or within the next 15 minutes.  If I do see her at lunch, we can put her on after lunch.

THE COURT:  So one more after lunch.  We will have to let the jury go early.

MR. PARCELL:  We have three more fairly short police officers that we can get to before the next protective witness.  There is one police officer who I told him we needed by  --

THE COURT:  If you have got a short one, we can take him.

(In Open Court.)

1782

THE COURT:  Ladies and gentlemen, we are going to take about ten minutes now to get ourselves together.  Then we will have some brief witnesses that will get us to around 1 o'clock, and then we will stop.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

MR. VICK:  Just for the Marshal's edification, may this witness be released pending recall as the others have?

THE COURT:  Absolutely.

(The witness stood aside.)

(Defendants removed from courtroom.)

(Recess taken from 12:15 p.m. to 12:30 p.m.)

MR. VICK:  I would move in Government Exhibit 140; Government Exhibit 107, the tote bag; Government Exhibit 104, which is the Glock pistol she identified; 105, a Tec-9 semi-automatic; and 107, which is a Tec-9, also.

THE COURT:  They will be admitted.  Let's bring in the jury.

(The jury entered the courtroom.)

Call your next witness.

MR. PARCELL:  Detective Rodney Rodriguez.

## II. RODNEY RODRIGUEZ

RODNEY RODRIGUEZ,

1783

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Would you please state your name?

A    "J.R." Rodriguez.

Q    Your occupation?

A    I'm a detective in the Organized Crime Division for the Richmond Police Department.

Q    How long have you been a police officer?

A    Approximately eight years.

Q    Were you so employed in that capacity on February 2nd, 1992?

statements.

MR. VICK:  I show you Government Exhibit 142 and ask you if you can identify that.

(Document proffered to defense counsel.)

BY MR. VICK:

Q    You made typewritten notes of that interview?

A    I'm sorry?

Q    You made typewritten notes of that interview?

A    Those are the typewritten notes.

(Document proffered to witness.)

Q    Can you identify that item?

A    This is the original copy of my typed notes.

Q    And that's Government Exhibit what?

A    142.

MR. VICK:  I would move Government Exhibit 142 into evidence, Your Honor.

THE COURT:  It will be admitted.  All right, you may stand down, detective.  Call your next witness.

MR. PARCELL:  Detective Paul Tuttle, please.

PAUL TUTTLE,
called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Would you please state your name and occupation?

A    My name is Paul Tuttle.  I'm a detective assigned to the forensic unit of the Richmond Police Department.

Q    Tell the ladies and gentlemen of the jury what you mean by being assigned to the forensic unit?

A    I respond to crime scenes to collect evidence, document, photograph, submit items of evidence to the appropriate agencies for further analysis if necessary.  I do fingerprint work.  I am recognized in both the state and the federal courts as a witness in crime scenes.

Q    And were you so employed in that capacity on January 13th, 1992?

A    I was.

Q    Did you have occasion to respond to the intersection of Clay and Harrison Street in the City of Richmond to investigate a shooting?

A    Yes, sir.

Q    Would you please tell the ladies and gentlemen of the jury when you arrived what you initially observed?

A    There was an area that had been roped off. There were some items of clothing in an alley and

there were some items of clothing in the street

across the street.  At that time I parked my van and I began videotaping the area.

Q    Sir, I'll ask permission for him to approach the jury and explain what this diagram represents.

(Witness approached jury.)

THE WITNESS:  This is an aerial photograph showing the location where I had gone to.  This is Clay Street, and if you could look up top, you can see it is labeled "Clay Street."  This street here is labeled "Harrison Street."  And the location to which I responded was right in here.  I have an arrow and a little marking here called "The Alley."  As you can see, it is right here.  That's the alley where the items of clothing were when I went to that location. And there was  --  it was across the street, approximately in this location, that other items of clothing were found.  Across the street on Harrison Street itself.

Q    Would you point out, did you have occasion to continue the investigation, go inside a house?

A    Yes, sir, I did.

Q    Would you please point that out to the jury, also?

A    There was an apartment located in the 800 block of North Harrison Street, and the entrance to that apartment is right here where this little arrow is. You can see, it looks like a porch right through there.  The actual entrance is over here on this side, but that little porch area is the apartment we are referring to.  The arrow is pointing to it right there.

Q    You can have a seat.

(Witness resumed witness stand.)

MR. PARCELL:  Judge, that will be Government Exhibit 17-1, sir.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    One of the first things you do when you arrive at a crime scene is what?

A    I videotape the area after I have talked to some of the witnesses, some of the police officers on the scene, to determine the extent of the crime scene itself.

Q    Did you do so in this situation?

A    Yes, sir, I did.

Q    I'll ask you to look at some video on the monitor.  Walk through it with the ladies and gentlemen of the jury and the Court and explain to them what you found and what observations you made while you describe the scene.

A    Yes, sir.
(Videotape began.)
That's the front door of the apartment right next to the alley.  If you are looking in the photograph, it will be on the right of the alley, that little house on the corner.  I'm standing on the sidewalk and I'm doing a 360-degree sweep of the area to show you the surrounding area, to give you a feel for what actually that neighborhood looks like down there on the street rather than from the air.

That intersection where the flashing light is is the intersection of Clay and Harrison streets.  That little porch you see directly in front of you is the porch I referred to earlier, the apartment.  I am just sweeping the alley itself so that you can see what I had seen when I first arrived.  At the center of that photograph right there, toward the lower right-hand corner, are some items of clothing.  There was a shoe -- it is on the left of the screen right now -- and some other items.

That's a kitchen knife that I found next to the porch.  That's a portion of the belt that was cut off and some other items of clothing that were tossed off to the side.  That area there, it doesn't show very well, but it is some blood spatter and some portions of blood that were left behind.  That's the shoe which I referred to earlier, and some more blood. These are some items of medical equipment that were discarded, box of an IV set, for example, some pads from a monitor, more items of clothing.

That's a bullet that was found in the alley.  As you can see, it is still a live round.  That is another area of blood that was left.  That is the other boot, the other shoe.  This is coming from the back of the house walking back toward that alley to give you another perspective.  That's a sock.  This is another sweep, 360-degree view.  That's the other item of clothing that I found across the street.  Now these items of clothing were left behind by the paramedics and the firefighters in the rescue attempts.  The clothes were cut off and tossed to the side.

That's just a close-up of the address where the clothing was found.  This is the door of the apartment which we spoke of earlier.  If you look at the top of the window, you can see that the glass is broken and part of the windowframe is missing.  The screen has been removed.  These are some shards of glass and part of the windowframe, some more pieces of the window here.  We are entering the kitchen area of the apartment.  This is the rest of the apartment.  It appeared to be a little living area

App.0130

with a bed.  That is a part of the window shade that had been pulled down from the window showing signs of some kind of a struggle.  That's the window that was broken.  We previously saw the outside view.  There is the curtain.  That spot there on that mirror is a bullet hole.  That doorway that you saw was going toward the bathroom.

(Tape ended.)

Q    As you processed this crime scene, you took photographs of what you indicated was the things you found in the alleyway as well as some things you found inside the residence: the broken window, the bedroom, and the hole in the mirror; is that correct?

A    Yes, sir.

Q    There are some other photographs, nine-whatever. I would ask that he be allowed to approach the jury and explain what those photographs represent.

THE COURT:  Go ahead.  Keep your voice up when you are over here, please.

THE WITNESS:  This photograph shows the entrance to that apartment I had just videotaped.

BY MR. PARCELL:

Q    If you would, please identify each photograph by its number.

A    This is 9-1.

Q    Thank you.

A    9-2 is a photograph of the window that was broken, and you can see on the sidewalk there is some shards of glass, the broken window up at the top, a piece of the frame missing.  Would you like me to do these in order, how they are numbered?

MR. PARCELL:  Yes, sir.

THE WITNESS:  Photograph 9-3 is a photograph of the inside of the window showing the broken window and part of the curtain or the shade that had been torn down.

9-4 is just another angle of the window, and you can see part of a curtain on the floor.  This is that portion right here.  And on the mirror, there is a spot right there, and that is the bullet hole.  This is the curtain, this is the bullet hole.  Photograph 9-5 is a photograph of the bullet hole in the mirror.  Photograph 9-6 is a portion of the alley showing back here one shoe, the sock, the other shoe, and the items of clothing, the shoe way back here with the sock, the other shoe and the clothing.

Photograph 9-7 is taken from the opposite side showing the shoe, the sock, but here you can see some blood over by the side of the building.  There was a pool of blood up next to the building, right here. This is from the back of the alley looking towards

Harrison Street.
     Photograph 9-8 is spots of blood in the alley. Some of the pieces of discarded medical equipment are here, and the shoe.
     Photograph Number 9-9 is more of the clothing, another angle of the clothing.  This is the corner of the house.  It doesn't show you too much, but this is the corner of the house right here.
     (The witness resumed the witness stand.)
BY MR. PARCELL:
Q    I move the admission of those photographs, 9-1 through 9, please?
          THE COURT:  They will be admitted.
BY MR. PARCELL:
Q    You indicated there was a butcher knife with blood on it near the clothing.  As you continued the investigation, was that knife of any significance to you?
A    It was significant.  At the time, we did not know where it came from, but as the investigation continued we found out that that  --  that an

individual with some medical training attempted a rescue and they used the knife to try to cut some of the clothing away from the wounds.
Q    So that had nothing to do with the death of Douglas Moody?
A    That's correct.
          MR. McGARVEY:  I object.  That's a conclusion this gentleman cannot make.
          THE COURT:  Overruled.
BY MR. PARCELL:
Q    As you continued your investigation, did you have occasion to go back with Detective Fleming seated to my right and retrieve the bullet that was recovered from behind the mirror?
A    Yes, sir.
Q    I'll ask that these photographs labeled 14-1, 2, 3, and 4 be proffered to you.
     (Exhibit proffered to counsel and witness.)
BY MR. PARCELL:
Q    Would you approach the jury briefly and explain those photographs?
     (Witness approached jury.)
A    Photograph 14-1 is Detective Fleming pointing to the mirror.  We removed the mirror from the wall. When we went back into the apartment, it appeared to

have been as we left it the night the incident occurred.  We took the mirror from the wall in an attempt to locate the hole behind the mirror. Obviously, that bullet had gone through the mirror. We did find that hole and this is a photograph showing the dresser pulled away from the wall with

the hole.  This is photograph 14-2.  You can see right here by my index finger, this is the hole that was made behind the mirror.  The mirror is up here next to the wall and this is the dresser.  This is the hole that was made.  Now, that hole did not go all the way through.  There was a hole that was made by the impact, and the actual projectile fell onto the floor.  We were prepared to open up the wall in an attempt to retrieve that bullet, but we did not have to.  This is a photograph of the bullet as it lays on the floor.  This is 14-3.  This one is a little difficult to see, but by my index finger here, right here, this is the actual bullet.  It had gone through the mirror, struck the wall, created that hole, and then fell to the floor.

MR. BAUGH:  Could we ask the witness to circle it?

THE COURT:  Sure.

(Witness complied.)

THE WITNESS:  That is now circled in blue. That's the bullet.  Photograph 14-4 is a close-up of the bullet with a scale to show you its relative size.

MR. PARCELL:  I'll move the introduction of those four photographs as Government Exhibit 14-1, 2, 3, and 4.

THE COURT:  They will be admitted.

BY MR. PARCELL:

Q    Did you retrieve that bullet and send it in for analysis?

A    Yes, sir.

Q    I'll show you Exhibit 15 and identify it if you can, sir.

(Exhibit proffered to witness.)

A    This is the bullet that I located on the floor that you saw in the photographs.

Q    And you later on submitted that to Anne Jones of the state firearms laboratory for analysis?

A    Yes, sir.

MR. PARCELL:  That will be Government Exhibit 15, please.

THE COURT:  Admitted.

BY MR. PARCELL:

Q    Can you identify this next item?

A    Yes, sir.  This is a bullet that was recovered from the body by the Medical Examiner.

Q    And you in turn submitted that to the state laboratory to Anne Jones for analysis as well?

A    Yes, I did.

MR. PARCELL:  That will be Government Exhibit 16.

THE COURT:  Admitted.

MR. PARCELL:  No further questions.

MR. GEARY:  No questions, Your Honor.

MR. McGARVEY:  No questions.

CROSS-EXAMINATION

BY MR. BAUGH:

Q    Good afternoon, Mr. Tuttle.

A    Good afternoon, sir.

Q    Did you see any evidence that anyone had jumped out of that window?

A    At the time, we did not know how the glass was broken.  But apparently the information was developed later on that that may have indeed been the case.

Q    And so someone told you or someone told someone else that the victim had jumped out of the window?

A    Well, at the time when I was doing the photographing and the videotaping, we had no information to that effect.

Q    Did you measure how big the opening is in that window?

A    No, sir.

Q    It is about the size of two panes; am I correct?

A    Yes, sir.

Q    It is kind of small?

A    Yes, sir.

Q    Additionally, whose shoes were those in the alley?

A    Those apparently were the shoes from the victim.  They were cut off by the paramedics and tossed to the side.

Q    I assume you checked the soles of those shoes to see if there was glass ground into them as though someone had landed on broken glass?

A    I didn't have the capability of doing that at the time.

Q    Has it been done since?

A    No, sir, I don't believe so.  Those shoes were collected and taken to our property section.

Q    Did you inspect the clothing of the deceased for broken glass in the fabrics?

A    No, sir, I didn't.  Not at the time.

Q    Well, based on the shoes or the clothing or footprints in the broken glass, at the time you were there you saw no indication anyone had jumped out of that window, had you?

A    As I stated, we did not know how the glass was broken at the time.  So no, we didn't have any idea that anyone had jumped out.

Q    The question is, now that you have seen it, looking back on it a year later, as you look back on your crime scene with all the information that's developed since, do you recollect any indication that

someone jumped out of that window or through that window?

A    At the time, no.

Q    I'm asking now.

A    I can see how that could have occurred.

Q    Could you show the jury the height and width of the opening in the window?

A    The height?

Q    How big is the opening?

A    It would be two panes of glass side by side, about like that.  So we will say  --

Q    12 by 18?

A    I would say that would be a fairly close guess, sir.

        MR. BAUGH:  Pass the witness.

        THE COURT:  Anything, Mr. Wagner?

        MR. WAGNER:  No questions.

        MR. VICK:  We need to move the equipment.

        THE COURT:  Go ahead.  You may stand down, sir.

    (Witness stood aside.)

    We are going to take ten minutes now and get the next witness situated and get this equipment out of the way.  Everyone remain seated while the jury leaves the courtroom.)

    (The jury left the courtroom.)

    (Recess taken from 2:55 p.m. to 3:10 p.m.)

## III. Pamela Denise Williams (1834)

                PAMELA DENISE WILLIAMS
called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

                DIRECT EXAMINATION

BY MR. VICK:

Q    Speak up and speak up toward that microphone so your voice can be heard by everyone in the courtroom.  Could you state your name for the Court, record, and jury, please?

A    My name is Pamela Denise Williams.

Q    How old are you?

A    29.

Q    How far did you go in school?

A    To the tenth grade.

Q    Do you have any children?

A    Yes, I do.

Q    How many?

A    Three.

Q    What's your prior criminal record; do you have any prior felony convictions or any convictions of any sort?

Johnson, James H. Roane, Jr., and Sandra Reavis.  The ninth day of trial.  Are the parties ready to proceed?

MR. VICK:  Government is ready.

MR. GEARY:  Defendant Tipton is ready.

MR. McGARVEY:  Defendant Johnson is ready.

MR. BAUGH:  Defendant Roane is ready, Your Honor.

MR. WAGNER:  Defendant Reavis is ready, Your Honor.

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

All right, the witness will be sworn.

## I.  Robert "Papoose" Davis (1875)

ROBERT DAVIS, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q   I'm going to ask that during your testimony today you speak up.  Everyone in the courtroom needs to hear you.  If you get too close to the microphone, you will get feedback.  Could you state your name for the Court, record, and jury, please?

A   Robert Davis.

Q   Are you known by a nickname?

A   "Papoose."

Q   How old are you, Mr. Davis?

A   40.

Q   And how far did you go in school?

A   I graduated from high school, went to college, Minnesota School of Art, Richmond Business College.

Q   Have you had any work experience?

A   United States Army, seven years, TASCOM, United States Finance Center, St. Louis, and Philip Morris.

Q   Are you currently on Social Security disability payments?

A   Yes.

Q   Do you have any prior felony convictions?

A   No felonies.

Q   You have some misdemeanor convictions; is that correct?

A   Yes.

Q   What sort?

A   Drunk in public, one petty larceny, shoplifting.

Q   Do you know the defendants in this case?

Specifically, do you know an individual by the name

of "Whitey?"
A    Yes.
Q    Also known as Richard Tipton.  Do you see
"Whitey" in the courtroom today?
        MR. GEARY:  Stipulate.
        THE COURT:  Record will reflect the ID.
BY MR. VICK:
Q    Do you know an individual by the name of "C.O.?"
A    Yes.
Q    Do you see him?
        MR. McGARVEY:  Stipulate.
        MR. VICK:  "J.R." or James Roane?
        MR. HENDERSON:  Stipulate.
BY MR. VICK:
Q    Sandra Reavis.
A    Yes, I do.
Q    Do you see her in the courtroom today?
A    Yes.
        MR. WAGNER:  Stipulate.
BY MR. VICK:
Q    Do you know an individual by the name of "V,"
Lance Thomas?
A    Yes.

1878

Q    Do you know an individual by the name of "E.B.?"
A    Yes, I do.
Q    I'm going to show you what has been previously
marked and entered into evidence Government Exhibit
120 and ask you if you could identify that person.
    (Document proffered to witness.)
A    This is "E.B." right here.
Q    That's who?
A    "E.B."
Q    Of those people that you have just identified,
who did you first meet?
A    "C.O."
Q    And when was it that you first met "C.O.?"
A    Between September and November.
Q    Of what year?
A    1991.
Q    And how was it that you came to meet him?
A    He was introduced to me by a guy named Swain.
Q    What's Swain's name, do you know?
A    No, I don't.
Q    Why did Swain introduce him to you; what was the
purpose?
A    He said that he had to have a place to stay
until he gets himself together.
        MR. VICK:  Could I see Government Exhibit

1879

135?
        THE CLERK:  135-1?
        MR. VICK:  Yes.
    (Document proffered to witness.)

BY MR. VICK:

Q    Do you know that person depicted in 135-1?

A    That's "V."

Q    That's already been introduced into evidence, Your Honor.

        MR. BAUGH:  The exhibit number?

        MR. VICK:  135-1.

BY MR. VICK:

Q    Now, when you first met "O," did you have occasion to talk to him?

A    Yes.

Q    What was it that you talked about?

A    He wanted to know if he could stay there, make some money selling some crack cocaine.

Q    Stay where?

A    At my crib.

Q    When you say "your crib," what do you mean?

A    Hancock Street, my apartment.

Q    What area of town is that located in?

A    Newtowne.  Well, Central Gardens  --  not Central Gardens, Newtowne.  The Carver District.

Q    Near Carver School?

A    Yes.

Q    Did "O" indeed end up staying at your apartment for some time?

A    Yes.

Q    How long did he stay at your apartment?

A    About one or two weeks, off and on.

Q    What would he do while staying there?

A    Sell some crack cocaine.

Q    Who would he sell crack cocaine to?

A    People I bring to the house.

Q    So would you go out and actually find people who wanted crack and bring them to him?

A    Yes.

Q    Why did you do that?

A    I was on welfare.  I needed some money.

Q    Did you get anything for doing that?

A    Yes, I got $20 of crack cocaine.

Q    Each time you brought in people?

A    No, different days.

Q    How many people would you bring him on a daily basis?

A    Between one and ten.

Q    There came a time about two weeks later that he drifted away from you?

A    Yes.

Q    I direct your attention to approximately November of 1991.  Did you have occasion to once again come in contact with "O?"

A    Yes.

Q    Was he with anybody else at that time?

A    "Whitey."
Q    And did they talk to you about anything when you saw them?
A    Said he was a master cook, master chef.
Q    Who said that?
A    "O."
Q    Who was he saying that about?
A    "Whitey."
Q    Did he refer to him in any other way?
A    As his brother.
Q    Did they talk to you about getting involved in the sale or distribution of cocaine?
A    Yes.
Q    In November of 1991?
A    Yes.
Q    Tell us what they told you.
A    Would I sell some crack cocaine for them.
        MR. COOLEY:  Who?
BY MR. VICK:

1882

Q    Did "O" and "Whitey" talk to you about getting involved with them in the distribution of crack cocaine?
A    Yes.
Q    Which one of them spoke to you?
A    "O."
Q    What was it he said?
A    He asked me if I wanted to make some money.
Q    What did you say?
A    Yes.
Q    Did you get involved?
A    Yes.
Q    What was it that you did?
A    I gave him packages of crack cocaine to sell and I would pay them.
Q    Who gave you packages of crack cocaine to sell?
A    "Whitey"  --  I mean "O."
Q    Did you ever get any from "Whitey?"
A    No.
Q    How many pieces of crack cocaine would be in the packages you got?
A    Sometimes they would give me two or three, and sometimes five, six.
Q    Were you involved with them from November of 1991 when you saw them again?  How long were you

1883

involved with them after that selling cocaine?
A    Until I went to the hospital.
Q    When was it that you went to the hospital?
A    In 1992.
Q    Do you remember the date when your sister -- indeed, your sister is Dorothy Armstrong, "Mousey," is that right?
A    Yes.

Q    Your brother is Bobby Long?
A    Yes.
Q    Do you remember when it was that they were killed?
A    I was in the hospital.
Q    So you worked from November of 1991 until they got killed?
A    Right.
Q    For who?
A    For "O." "Mousey" worked for "O," Bobby Lee don't.
Q    Who did you work for?
A    "O."
Q    On an average week, how much crack cocaine did you get from "O" to sell?
A    A week?
Q    On an average week.

1884
A    Depends on how much I sold.
Q    What's the most you would ever get from them in a week?
A    In a week's time, about 30.
Q    When you say 30, you mean 30 rocks?
A    Yes.
Q    Now, did they ever use your apartment for anything else?
A    Yes.
Q    What did they use your apartment for?
         MR. WAGNER:  Objection to "they."
BY MR. VICK:
Q    Did "V," "C.O.," "J.R.," "Whitey," or "O" use your apartment?
         MR. BAUGH:  Again, same objection.
         THE COURT:  Overruled.  He can answer that question.
         THE WITNESS:  They come to the house and talk.
BY MR. VICK:
Q    Did they ever cook anything in your apartment?
A    Yes.
Q    Who cooked something in your apartment?
A    "Whitey."
Q    What was it that "Whitey" cooked in your

1885
apartment?
A    Powdered cocaine.
Q    On how many  --  how often on a weekly basis would "Whitey" use your apartment to cook crack cocaine?
A    About one or three times.
Q    One or how many times?
A    One to three times.
Q    Did you see the quantities of powdered cocaine that he was cooking into crack?

A    Yes.
Q    Could you describe that to the ladies and gentlemen of the jury?
A    Sandwich bags.
Q    How full would those bags be?
A    Half full.
Q    Of powdered cocaine?
A    Yes.
Q    What was it that "Whitey" would use to cook that powdered cocaine into crack cocaine?
A    A glass coffeepot.
Q    Would you be asked to do anything with that glass coffeepot after it was used?
A    Clean it up.
Q    Did you see what they did with that crack

1886

cocaine?
            MR. BAUGH:  Objection to "they."
BY MR. VICK:
Q    Did you see what "Whitey" did with that?
A    Put it in a plastic sandwich bag.
Q    When you say "they," who do you mean?
A    "Whitey" and "O."  They would put it in a sandwich bag and give me some for myself and tell me to clean up the rest and keep for myself and do what I want with it.
Q    When did you first meet "V?"
A    November, last November, December.
Q    Do you know where "V" was from?
A    I heard he was from New York.
Q    And how did you come to know him; who introduced you to him?
A    Swain.  Swain and "O."
Q    And "O?"
A    Yes.
Q    All right.  When was it you met "J.R." for the first time?
A    Through Swain.
Q    When was that?
A    Between October and November.
Q    Of 1991?

1887

A    Yes.
Q    Have you ever seen "V" cut up cocaine?
A    Yes.
Q    On how many different occasions have you seen "V" do that?
A    Once or twice.
Q    Where was that that you saw him?
A    Norton Street.
Q    Whose house?
A    "J.R.'s" father's house.
Q    Could you describe that house for me?
A    It was a yellow house on the corner of Norton

and Catherine.

Q    Do you know where it was that "Whitey" and "O" and "V" and "J.R." were getting their cocaine that they were processing?

MR. BAUGH:  That's assuming a fact not in evidence.  There has been no testimony about my client.

BY MR. VICK:

Q    I withdraw that question.  Was "J.R.," to your knowledge and based on your observations, involved in any way with "O," "Whitey," "V," and "E.B." in the sale or distribution of cocaine?

A    Yes.

1888

MR. BAUGH:  Indicate what he saw.

THE COURT:  That's a leading question.  The objection is sustained.  Ask a question.

BY MR. VICK:

Q    What do you know about "J.R.'s" involvement with those people?

A    To me he seemed a partner.

MR. BAUGH:  Objection.  "Seemed?"  There is a problem.

THE COURT:  That's his wording.

BY MR. VICK:

Q    What do you base that upon?

A    The business they did.

Q    Who else was partners with "J.R.?"

A    Sandra.

Q    Who else?

A    "E.B.," "V," "Whitey," "O."

Q    Were you a partner?

A    No, I don't consider myself a partner.  I was sort of like a worker.

Q    Your sister "Mousey" ended up selling cocaine?

A    Yes.

Q    Was she a partner?

A    I thought she was because she said she was going with "O."

1889

Q    Did you come to find out different?

A    Yes.

Q    What did you find out?

A    She came in crying and said that "O" had brought his girlfriend from New York  --

MR. McGARVEY:  I object.  This is a statement out of Court.

THE COURT:  Sustained.

BY MR. VICK:

Q    Do you know Jerry Gaiters?

A    Yes, I do.  He is my cousin.

Q    And was Jerry Gaiters, did you see whether he was involved in any way in the sale or distribution of crack?

A    Yes, I do.
Q    From whom was he getting his cocaine?
A    Sometimes from "J.R."
Q    Did you actually witness that?
A    Once.
Q    Was he a partner or worker?
A    He was a worker.
Q    Do you know an individual by the name of Curt Thorne?
A    Yes, I do.
Q    Do you know if he was involved in any way?

1890

A    Yes.
Q    How was he involved?
A    He was a worker.
Q    All right.  Doing what?
A    He would sell.
Q    On how many  --  have you ever seen Sandra Reavis receive crack cocaine?
A    Yes.
Q    On how many different occasions have you seen Sandra Reavis receive crack cocaine?
A    Once or twice.
Q    From whom?
A    "J.R."
Q    Did you witness that?
A    Yes.
Q    Do you know an individual by the name of Denise Berkley?
A    Yes, I do.
Q    Who is she?
A    She is a friend of mine.  She was sort of the made of the house that they were staying at on Norton.
Q    When you say "they," who do you mean?
A    "O," "Whitey," and "V," "E.B.," where they stayed at.

1891

Q    Did you consider her a partner?
A    She was a worker.
Q    Who was Curt working for?
A    "O" and "Whitey."
Q    Now, your sister, "Mousey," Dorothy Armstrong, where was she living in this time frame?
A    Okay, before she was living in a vacant house with her boyfriend.  I told her to move in with me.
Q    Did she move in with you?
A    Yes.
Q    Where was your apartment?
A    On Hancock Street.
Q    And was she distributing cocaine from your apartment?
A    Yes, she was.
Q    What kind of cocaine?

A    Rock, crack.
Q    Where was she getting it?
A    From "O."
Q    On how many different occasions have you seen "O" deliver her cocaine?
A    Many times.
Q    And how many people would you say would come to your house on a daily basis to get cocaine, crack cocaine from your sister, "Mousey?"

A    Well, sometimes it was so crowded, sometimes there were 20 people in the house.
Q    What's the most you would say you have ever seen come to your house on a single day to get crack cocaine?
A    In one day?  From 1 to 20, 1 to 50.
Q    Did there come times when she would run out of cocaine?
A    Yes.  And she would take mine.
Q    Would you see "O" when she ran out of cocaine?
A    Yes.
Q    What would he be coming for?
A    Money and to give her some more.
Q    Did you see her give him money?
A    Yes.  She give me money to give to him.
Q    Do you know "Pepsi" Greene?
A    Yes, she is my cousin.
Q    Was she involved in any way in what you are testifying about?
A    She was going with Curt Thorne.
Q    Do you know an individual by the name of "Nat" Rozier?
A    Yes.
Q    Was she involved in any way?
A    She used to bring people to come and get some

rock cocaine.  She knew the people who wanted to buy it.
Q    Of those people who were selling cocaine that you have testified to, who controlled the money that was being made from the sale of that cocaine?
A    Usually if "O" didn't have it, "V" was the one that I saw mostly have it.  The times I've seen "V," he had most of it.
Q    Have you ever talked to "O" about other areas of the City of Richmond:  Southside, Church Hill?
A    I haven't talked to him, but he has mentioned Southside, Central Gardens, North Side, West End.
Q    How did he mention that?
A    Have to go places like that.
Q    What did he say he had to go get?
A    I heard him mention money.
Q    Did you ever hold any guns for "O" or "J.R." or "Whitey" or "V" or "E.B.?"

A    I held guns for them.

Q    Do you remember the killing of "Little Doug" Moody?

A    Yes.

Q    And were you living in that area when "Little Doug" Moody was killed?

A    Yes.

Q    Were you holding guns for these people in that time frame?

MR. GEARY:  I object.

THE COURT:  Sustained.

BY MR. VICK:

Q    Were you holding guns for anyone at that time?

A    At that time I was holding two pistols.

Q    Describe those pistols.

A    One was a long chrome pistol, looked like a .357.  The other one was a long black pistol, looked like a .22 or 30-aught.

Q    Who were you holding those guns for?

A    For "O."

Q    When did you get those guns?

A    I got the .22 and  --  the two hand pistols from "O" and "J.R."

Q    When did they give them to you?

A    Well  --

Q    In relation to when Doug Moody was killed, when did you get those guns?

A    About a week before.

Q    Did there come a time around the murder of Doug Moody that anyone came and retrieved those guns?

A    One of the pistols disappeared and "J.R.," he asked about one.

Q    When was that in relation to the murder of Doug Moody?

A    That was like a day or two before.

Q    Did you give a pistol to "J.R." a day or two before the murder of Doug Moody?

A    Yes.

Q    Did you ever see that gun back again?

A    No.

Q    Where were you when Doug Moody was killed?

A    I was at the house with my sister.

Q    And you came to find out that he was killed?

A    My sister came to me and she was crying because she was high, drunk, talking about mad, and I didn't know what was wrong.  She wouldn't talk to me.  Next I no, someone else came down.  I'm not sure, I think it was a young lady who came to the house.  She said, "Do you know they  --"

MR. McGARVEY:  Objection, hearsay.

BY MR. VICK:

Q    Did you come to find out that Doug Moody had

been killed?

A    Yes.

Q    Did you have occasion to see "J.R." and "Whitey" after that?

A    Yes, I did.

1896

Q    Where did you see "J.R." and "Whitey?"

A    They came to my house in the rain; running, huffing, and puffing.

Q    How soon was that after you found out Doug had been killed?

A    My sister came and told me.

Q    How soon after that did "Whitey" and "J.R." show up?

A    "Mousey" left and they came.

Q    Same evening that Doug Moody was killed?

A    Yes.

Q    Did they say anything?  Did you hear them talk about anything when they were in your house that night?

A    At the bottom of the steps in my doorway, they said, "Yeah, I got him, I got him."  Said, "Yeah, man, we can't stay out here, man.  This is hot anyway."

Q    Who were they talking to?

A    They were talking to each other, but they were referring to my house.

Q    If Doug Moody's murder took place on January 13th, 1992, on January 14th, the very next day, did you have occasion to get any other guns from these people?

1897

A    Yes.

Q    Who specifically on January 14th, 1992 did you receive guns from?

A    I got a black bag, a Salem black bag that had two Uzis and a black 9mm.

Q    Who did you get those from?

A    "O," "J.R.," and "E.B."

Q    I'm going to show you what has been previously marked and introduced into evidence as Government Exhibit 107, a black bag; 105, a black semi-automatic weapon; 106, a black semi-automatic weapon; and 104, a black handgun.  And I ask if you have ever seen those items and if you can identify those items.

A    Yes, I have seen them before.

Q    Where have you seen those items before?

A    They are the ones that "O" and "E.B." and "J.R." brought to my house.

Q    The day after the killing of Doug Moody?

A    Yes.

Q    What did you do with those guns when they brought them to your house?

A    They asked me to put them away.  So I took them

in the back yard and put them in the trash can.  I didn't want them in the house.  I'm against guns.

Q    What time of day was that when they brought you those guns?

A    It was about between five and seven.

Q    Later that evening, did they come back and get those guns from you?

A    Yes.

Q    About what time did they come back and get the guns from you?

A    After 7 o'clock.

Q    Who came back to get those guns?

A    "J.R.," "O," and "E.B."

Q    Did you come to find out that evening that Peyton Maurice Johnson had been killed?

A    Yes, I did.

Q    After you found out that Peyton Maurice Johnson was killed, did you have occasion to see "E.B.," "J.R." and "O" again?

A    Yes, I did.

Q    Where did you see them?

A    They came back to the house.

Q    To your house?

A    Yes.

Q    What did they have with them when they came back to the house?

A    The same weapons.

Q    Did they ask you to do anything about those weapons?

MR. BAUGH:  Objection to "they."

BY MR. VICK:

Q    Did any of those three people ask you to do anything?

MR. BAUGH:  Objection, irrelevant.

THE COURT:  Overruled.

THE WITNESS:  "J.R.," "O," and "E.B.," they sat on the bed -- on the couch, rather, by my bed, took them out of their clothes  --

Q    Took them out of what?

A    Out of the clothes.  Said, "Hey, you got towels; wipe these off."

Q    Who said that?

A    "O."

Q    Wanted you to wipe the fingerprints off what?

A    Off the weapons.

Q    Did you do that?

A    Yes, I did.

Q    Did you hear them talking to each other that evening?

A    Yes.  The words, somebody said, "I was in the kitchen."  And they said, "Yeah?  How did they shoot?"  "Shoot cool.  Shoots all right."  "Did you

get them?"  "Yeah, man.  All of them."

Q    When you wiped the fingerprints off those weapons, what did you do with those guns?
A    Threw them back outside in the trash can.
Q    The next day, January 15th, 1992, did anyone come and get those weapons?
A    Yes.
Q    Who was that?
A    "O."
Q    And have you seen those weapons since then?
A    I saw them one time.
Q    Where was that?
A    On Norton Street.
Q    On January 14th, 1992, when they asked you to wipe the fingerprints off those weapons and you did that, were you given anything for doing that?
A    I got a rock.
Q    A rock of what?
A    Crack cocaine.
Q    Who gave you that rock of crack cocaine?
A    "O."  He said they was out there target practicing.
Q    Later on Norton Street when you saw those guns, who had those guns?
A    They was on the floor upstairs at Norton Street.

Q    What house was this?
A    "J.R.'s" father's house.
Q    Who had the guns?
A    "O," "E.B.," "V," anybody that was in the house.
Q    When you say "everybody," who do you mean?
A    "O," "Whitey," "E.B.," "V," "Mousey," Denise.
Q    Did you ever have a conversation with "O" about your sister and your sister's distribution of drugs?
A    Yes.  My sister stabbed me in the eye.
Q    With what?
A    A pair of scissors.
        MR. GEARY:  Objection.
        THE COURT:  Sustained.
BY MR. VICK:
Q    That's what the patch is about?
A    Right.
Q    Did you have a conversation with "O" about the sale of drugs?
A    He sent me out to get some reefer for him.  He said, "Your sister messing up our money, you know?"  I said, "What can I do about it?  You should give me some."  He said no.  I said, "Well, just don't give her more, that's all."
BY MR. VICK:

Q    Where were you when you heard of the murder of your sister?

A    I was in the hospital, just had surgery.

Q    Could I retrieve the pictures I passed around over here?  Do you know the exact date your sister was murdered?

A    No.

Q    I'm going to show you what has been previously marked Government Exhibit 48-5 and ask you if you can identify the person depicted in that picture.

A    My baby sister, "Mousey."

Q    I would move Government Exhibit 48-5 into evidence.

THE COURT:  It will be admitted.

BY MR. VICK:

Q    I show you what has been previously marked Government Exhibit 53-7 and ask you if you can identify that.

A    My brother, Bobby Lee Long.

Q    I would move Government Exhibit 53-7.

THE COURT:  Admitted.

BY MR. VICK:

Q    In both of those pictures those people are dead; is that correct?

A    Yes, they are.  After they told me  --

MR. McGARVEY:  Objection.

THE COURT:  Sustained.  There is no question.

BY MR. VICK:

Q    After you had been discharged from the hospital  --  you were in the hospital when you found out your sister was killed?

A    Yes.

Q    What did you do?

A    I went to the nurse's station and I asked him could I have permission to leave.  They said no, I had to wait.  I didn't wait.  I put on my clothes and left the hospital.

Q    And for what reason?

MR. BAUGH:  Objection.

THE COURT:  Sustained.

BY MR. VICK:

Q    Do you remember the day that Linwood Chiles and Curt Thorne were killed?

A    Yes.

Q    Did you have occasion on that date to see Linwood and Curt?

A    Yes, I did.

Q    Where was it that you saw Linwood and Curt?

A    I saw Linwood.  Linwood was at his car.  The police was talking to him about an accident.

Q    What kind of car did he have?

A   A station wagon.  And after the police finished talking to him about the accident, he turned to me and asked me did I want to make some more money.  He told him yeah.  He said, well, I can go out in the county with him and cut some grass, help him cut some grass and have some money in my pocket.

Q   Did you see Curt that day?

A   Yes.

Q   Curt Thorne?

A   Yes.

Q   When did you first see Curt that day?

A   I saw him that same morning.

Q   Did you ask him for anything?

A   I asked him did he have any rock cocaine.

Q   What did he say?

A   He said yeah, but I needed some money.  So I went out to try to hustle a couple of dollars, people that owed me some money.  When I came back, I had the money.  He said he had smoked it all and he was scared because he had to go talk to  --  get some more from "O" and stuff and didn't have all the money.

Q   Later that evening, did you have occasion to see Curt and Linwood together in a car?

A   Yes.

Q   Who was with them?

A   "Pepsi" and Gwen.

Q   Whose car were they in?

A   They was in Linwood's car, a station wagon.

Q   Did you ask Curt for any cocaine?

A   Yes.

Q   What did Curt say to you?

A   He said he would be back at his house.  He was going to see "O."  He knew where he was at because he had his beeper number.

Q   Why did he say he was going to see "O?"

A   To pay him and get some more.

Q   Was he nervous at that time?

A   Yeah, he was scared.

MR. McGARVEY:  Objection.  That's a conclusion.

THE COURT:  Sustained.

BY MR. VICK:

Q   Describe his demeanor.

A   He was scared.

MR. McGARVEY:  Same objection.

THE COURT:  Overruled.  Go on.

THE WITNESS:  He was acting like  --  I know Curt, right, and he was mumbling with his words and he said, "Man, I don't have all the money.  I don't know what he is going to do."

MR. McGARVEY:  Sustained

MR. McGARVEY: I object.

THE COURT:  Sustained.

BY MR. VICK:

Q    You never saw them again?

A    No.

Q    Did you have occasion to speak with your sister, "Mousey," and find out whether she was scared in any way?

A    Yes, I did.

MR. BAUGH:  I object.

THE COURT:  Sustained.

MR. VICK:  This is the question I was dealing with.

THE COURT:  I read the cases.  You can come up and make a proffer.

MR. VICK:  No need.  The Court knows where I was going.

THE COURT:  All right.

BY MR. VICK:

Q    Why are you testifying?

A    My brother and sister got killed.  And I felt

1907

that I would be next.

Q    Have you had any conversations with anyone involved with the prosecution about immunity or anything?

A    No.

Q    Has that been part of your thought process concerning why you testified?

A    No.

MR. VICK:  I tender the witness.

THE COURT:  Mr. Geary?

CROSS-EXAMINATION

BY MR. GEARY:

Q    Mr. Davis, do you have any idea how long you were in the hospital after your sister's stabbing?

A    Excuse me?

Q    How long were you in the hospital after you were stabbed?

A    About two days.  One or two days.

Q    Was that at MCV?

A    Yes.

Q    I think you said you were not in the hospital on January 15th, 1991; is that correct?

A    Yes.

Q    You were in there on February 1st when your sister was killed, correct?

1908

A    Yes.

Q    Before you first met "O," I think you said it was between September and November of 1991; is that correct?

A    Right.

Q    Had you used crack before that time?

A    Oh, yeah.
Q    How long a period of time before then had you used crack?
A    Off and on, about a year.
Q    That would have been off and on back to September of 1990 or November of 1990?
A    Yes.
Q    And when you say off and on, that year's period of time, how many days would you say in that year you used crack?
A    Two or three.
Q    Two or three times a week?
A    Yes.
Q    Were you living on Hancock Street during that time?
A    No.  I moved around.
Q    Where were you living between September of 1990 and November of 1991?
A    I moved from Catherine Street, moved from

1909

Marshall Street.  From Marshall Street I moved to Clay Street.  From Clay Street I moved to Hancock Street.
Q    Is that all in the Newtowne area?
A    Yes.  I was on welfare.  It was hard to get a place to rent.
Q    Tell the ladies and gentlemen of the jury who you were buying your crack from?
A    Different people.
Q    Who were they?
A    I can't call the names.  People I see in the street and stuff.
Q    People you see in the street?
A    Yes.
Q    Could they have nicknames?
A    Just people I know from the streets.
Q    What streets are you talking about?
A    Downtown, Church Hill.
Q    Newtowne?  You didn't buy crack in Newtowne?
A    Yes.  I don't know the names.
Q    Peyton Maurice Johnson?
A    Yes.
Q    Jerry Gaiters?
A    Yes.
Q    Ronita Hollman?  Did you buy from her?

1910

A    No.
Q    Where did you go in Newtowne?  What corners would you go to buy crack?
A    Corners?  I just walked down Moore Street.
Q    100 block of Moore Street?
A    Anybody would confront me.
Q    You had no trouble buying crack in Newtowne before you first met "O.," is that correct?

A    I had trouble with rock.
Q    When is the last time you used rock?
A    Last time I used it?  This is 1993.  1992.
Q    What month in 1992?
A    March.
Q    March of 1992?
A    Yes.
Q    Who were you buying crack from in March of 1992?
A    I did it once, not March, when is the last time -- before I went to the hospital.
Q    Before you went to the hospital?
A    After I came from the hospital.
Q    So your testimony to the jury is that after you were released from the hospital until -- from the stab wound until today, you have not used any rock, crack cocaine; is that correct?

A    Yes.
Q    Have you used any other illegal drugs since that time until today?
A    I smoked a reefer.
Q    Just marijuana.
A    Yes.
Q    Did the people you have referred to, "O," "Whitey," the rest of them, did they smoke marijuana?
A    Yes.
Q    A lot, didn't they?
A    Yes.
         MR. GEARY:  That's all I have, Judge.
Thank you.
                 CROSS-EXAMINATION
BY MR. COOLEY:
Q    Good morning to you, Mr. Davis.
A    Good morning.
Q    Mr. Davis, were you approached by the police at some point on this?
A    Well, I approached and they also approached.
Q    It was a mutual walking toward each other?
A    Yes.
Q    When did that first occur?
A    I was in the Salvation Army.  And I was going to save me enough money so I could buy me a pistol.
Q    So while you were there at the Salvation Army saving up to buy a pistol, did a detective come see you, find you there?
A    The detective didn't know who I was.  No one knew who I was.  I was pointed out.
Q    You were pointed out by somebody?
A    Yes.
Q    To a detective or police officer?
A    Right.

App.0153

Q    They approached you?
A    We approached each other.
Q    Somebody, the policeman, came to the Salvation Army.  Do you remember who that was?
A    The policeman?
Q    Yes.
A    Or the person who pointed me out?
Q    The policeman.
A    Yes.  There was two of them.
Q    Who were they?
A    Detective Fleming.
Q    Mr. Fleming over here?
A    And another.  I don't see him here.
Q    Another gentleman.  You don't remember his name.  Would it have been Mr. Woody, or Mr. Jackson?  You

don't remember his name?
A    No.
Q    Was it Mr. Scott?
A    Yes.
Q    And the two of them, you were pointed out to them by somebody else at the Salvation Army and as they began to walk toward you, you began to walk toward them; is that right?
A    Right.
Q    That was the first contact you had and the first beginning of any discussion?
A    I wasn't planning on coming to the police.  I was saving my money to buy my own weapon, get even one by one, to pay them back for killing my sister.
Q    You were anticipating revenge?
A    I was.
Q    That was your purpose in saving enough to buy the gun.
A    And protect being myself in case I needed protection.  I knew I needed protection.  If they killed my brother and sister, I knew I was  --
          MR. McGARVEY:  Objection.
          THE COURT:  Sustained.
BY MR. COOLEY:
Q    Your anticipation of buying a gun is to get

revenge if somebody injures you or harms you?
A    Yes, protection.
Q    Your comment that you were going to get even one by one would seem more than just protection.  You had an intention  --
A    If they approached me I would have some protection on me.
Q    And as I understand it, the first time that you met "O," he was going to stay at your house.
A    Right.
Q    And he stayed, in fact, for a week?
A    A week or two, yes.

Q    A week or two?
A    Yes.
Q    And at first, I take it he just stayed there, and then you wanted to get something, you wanted some extra money; is that what you said?
A    No.  I was on welfare, right.
Q    You were on welfare and needed some extra money?
A    They asked me if I wanted some extra money.  I said, "Yeah."
Q    Instead of money, you got a little bit of  --
A    I got money, too.  I got money sometimes, sometimes cocaine.

Q    It wasn't cocaine each day.  You got some money, also?
A    Yes.
Q    Then you began to sell for him and you would get, as I understand your answer to the U.S. Attorney in terms of what you got to sell, you said you got sometimes two, sometimes three, five, or six pieces?
A    Right.
Q    So this would have been like  --  was this a $10 piece?
A    20.  20 or 10.
Q    20 or 10.  So you might get to sell two $10 rocks, and sometimes you might get to sell three $20 rocks, some mixture; is that right?
A    Right.
Q    And the most  --  now, how many times  --
A    Some of them will be big enough where I can split them in half and double my money.
Q    You could take them, cut them in two and make a little extra and then the other folks, they would never know that, right?
A    They would know it.
Q    Whatever you could get for it as long as you gave back to them  --
A    What they wanted.

Q    If you got a $10 rock, how much money were you supposed to give back to them?
A    They wouldn't get it.
Q    You said two sometimes.
A    Two.  They get $5 or $10 back.
Q    So if you could double your money and sell, make two for one, sell it for $20, and you got to keep 15 and give them five back?
A    No.  They will get more than I do.
Q    All right.  Now, the testimony you have given would seem to indicate that you were selling in Newtowne.
A    Yes.
Q    You were out selling crack cocaine?

A    I wasn't out selling.  I would be in my house mostly.

Q    Okay.  You were inside your home selling.  And you understand that that was illegal, don't you?  You knew that then, didn't you?

A    Well, I knew that was illegal.  But I needed the money.

Q    You understand now that was illegal, don't you?

A    Yes.

Q    You were working with other folks as you described selling for them; is that right?

1917

A    Right.

Q    You understand what the charge of conspiracy to distribute crack cocaine is, don't you?

A    Yes.

Q    And you understand that you could be charged with those things, can't you?

A    Yes.

Q    But you are not going to be charged, are you?

A    I don't know.

Q    You don't know.  Nobody has suggested to you that if you testify, that your testimony will not be used against you?

A    No, I don't know.

Q    And nobody has suggested that if they find independent evidence about your sales and involvement in any kind of conspiracy that you would not be prosecuted?

A    I do not know.

Q    You don't know.  And do you have an attorney?

A    No.

Q    I see.  Has the government ever said to you that you are not going to be prosecuted?

A    No.

Q    But you are not being prosecuted; is that correct?

1918

A    I don't know.

Q    You have no charges against you now, do you?

A    No.

Q    All right, sir.  You have told them all about what you did on these occasions; is that right?

A    Yes.

Q    All right.  Now, you said there was a time when you were cooking  --  excuse me, someone was cooking at your house.  Now, your house at that point in time and "Mousey's" house were the same thing; is that right?  She lived with you at that time?

A    At that time, yes.

Q    Can you remember how many times you saw somebody cooking cocaine?

A    It was between one and three times a week.

Q    One to three times a week?

A    Yes.
Q    Who was present besides you when that was happening?
A    Well, sometimes my sister.
Q    "Mousey?"
A    Yes.
Q    And who else?
A    "Whitey," sometimes "J.R.," he comes through.
Q    How about Denise Berkley; do you know her?

1919

A    Yes.
Q    Was she there?
A    Yes, once or twice.
Q    Did "Mousey"  --
A    "Whitey" or "O" sat out there.
Q    As I understand it, you said "Mousey" was "O's" girlfriend; is that right?
A    That's what I thought, because she had a very big crush on him.
Q    And you got  --  your suggestion when some mention was made that she was messing up the money, your suggestion was "You ought to be letting me do it.  I won't mess it up."
A    No, I just said, "Hey, you know, you said she is messing the money, right?  Well, don't give her no more."
Q    Don't give her any more.  I thought you also said  --
A    "I would be glad to sell some for you."
Q    So it was not only don't give her any  --
A    I would be glad to sell some.
Q    You volunteered your services.
A    Yes.
Q    Nobody was forcing you to do any of these things?

1920

A    No.
Q    And you maintained some of these guns, including what you have described as Uzis, at your premises; is that right?
A    Right.
Q    And I think you said that, as I understand it, at least your first response to Mr. Vick, that there was a time that you saw Linwood Chiles and Curt and that Curt said to you he was going to pay "O" and get more drugs from him; is that right?
A    Yes.
Q    And that was the day of the situation, the day that he was killed; is that right?
A    Yes.
Q    That he was going to give him money and to get more drugs?
A    Right.
Q    All right, sir.  And did you indicate that there

was some point in time when you were told that they had been target practicing?

A    Yes.

Q    That's why you were wiping off the pistols?

A    Yes.

Q    Though Mr. Vick asked you about fingerprints, you were just asked to wipe off the guns?

1921

A    Wipe off the guns and get rid of the fingerprints.

Q    That exact language was used?

A    Yes.

Q    But you kept them.  Did you wear gloves when you were doing this?

A    No.

Q    Just wiped them off and took them and put them down into the trash can?

A    I put them back in the bag.

Q    Then you put the bag in the trash can?

A    Yes.

Q    Okay.  As I understand it, in terms of the timing of this, let me ask you this:  You indicated that you saw "Mousey" selling.

A    Right.

Q    That's your sister.  And at different times you thought she might sell to from 1 to 20 people a day?

A    Right.

Q    That's what you saw?

A    That's what I saw, yes.

Q    Might be one person a day for three or four days and then one day it might jump up some?

A    Right.

Q    And just so I can understand the timing of this

1922

now, you had these guns and you held these guns at different times.

A    Uh-huh.

Q    And stored, I think, was the word you used?

A    Stored?  No.  I just put them out in the trash can.

Q    You kept them there.  Didn't the government ask you didn't you store these guns for them?

A    Yes.

Q    From your military service, clearly you know how to use guns; is that right?

A    Yes.

Q    And as I understand it timing-wise, your sister stabbed you in the eye?

A    Yes.

Q    And then am I correct that two days later she was killed?

A    Two days later?

Q    Yes, sir.  I think that's what you responded to Mr. Geary's question.

A    It wasn't two days later.

Q    A week later?

A    Because I went to the hospital.  I was in the street for a week before I went to the hospital.  It was "O," "Whitey," Jerry Gaiters, all of them gave me reasons to tell me to go to the hospital.

MR. COOLEY:  Can I ask him to be responsive to the question?

THE COURT:  It sounds responsive to me.

MR. COOLEY:  I asked him the time, how much time, and he started telling me  --

THE COURT:  He was telling you it was a week and how he recalls it was a week.

THE WITNESS:  I was being told by these people  --

MR. BAUGH:  That's not responsive.

THE COURT:  There is no question pending.

BY MR. COOLEY:

Q    So it was about a week from the time you were stabbed and your sister was killed?

A    Yes.

MR. COOLEY:  That's all the questions I have.

THE COURT:  All right.  Mr. Baugh?

CROSS-EXAMINATION

BY MR. BAUGH:

Q    Sir, you didn't see Mr. James Roane out there in October of 1991, did you?

A    Excuse me?

Q    You didn't see James Roane out in the streets in October of 1991, did you?

A    I said between September and November.  That's when I seen him.

Q    You know, of course, that he was in prison until the middle of November

A    I don't know when he was in prison.

Q    Did you see him out there in October?

A    I said between October and November.

Q    Now, also, you know that at the time of your sister's death, Mr. Roane was in jail; you know that, don't you?

A    No, I did not know until I read the paper.  Like I said, I don't know who killed my sister.

Q    You read in the paper about this?

A    Yes, and I saw it on the news.

Q    You read the facts contained in the newspaper articles?

A    Yes.

MR. VICK:  May we approach?

MR. VICK:  Once again, Mr. Baugh is stating as a fact in his question something that he knows is not a fact.  "Mousey" was killed on February 1st.

"J.R." was arrested on February 2nd.  He knows that.  It is improper.

MR. BAUGH:  I didn't know that.

MR. VICK:  That's part of the indictment.

THE COURT:  Clear it up.

BY MR. BAUGH:

Q    I may have made a false statement.  Mr. Roane was arrested on February 2nd, 1992.

A    Right.

Q    What day did your sister and your brother die?

A    Well, in the paper and on television, I think --

Q    No, no.

A    Excuse me.  I do not know what day it was.  I think it was the first of February.

Q    When was their funeral?

A    Like I say, I do not know the date it was my sister got killed.  I was in the hospital.  My mind was on being in the hospital.

Q    When you heard your sister had died you were so frightened you immediately ran out of the hospital, correct?

A    No, I wasn't frightened.

Q    You stayed for two days, correct?

A    I left the hospital after I had an operation.  They let me out of the hospital, right, put me on a heart monitor, right, they said I was all right.  They put me in room.  On the television there was a big shooting, and it was happening at my brother's house, Bobby Lee Long, on the corner of 29th and whatever street it is.

Q    You don't know where they lived?

A    Bobby Lee is on 29th Street.

Q    29th and what, sir?

A    I don't know the other street.

Q    Did you get stabbed actually inside the eyeball?

MR. VICK:  I thought this was found objectionable by counsel on direct.

THE COURT:  Sustained.

MR. BAUGH: Was that an objection?

THE COURT:  It was objected to about getting into the details of his eye, which I sustained, and I sustain it now.

MR. BAUGH:  I don't remember someone objecting to that, the details about how he was stabbed.

THE COURT:  Go on and ask another question.

BY MR. BAUGH:

Q    Sir, you said that you didn't like having guns around?

A    Right.

1927

Q    Isn't it true you were convicted of carrying a concealed weapon in 1981?

A    No.

MR. VICK:  Improper use, again.

MR. BAUGH:  No, Your Honor, this is impeachment.  I can ask him that question.

MR. VICK:  If you have a basis for it.

MR. BAUGH:  I have a basis.

(At Bench.)

MR. VICK:  You know, we have been through those before.  They are not accurate.

MR. BAUGH:  That is a good-faith basis.

THE COURT:  No.  I think you have a basis to ask the question.

(In Open Court.)

BY MR. BAUGH:

Q    Are you known as Robert M. Davis?

A    M?

Q    Have you ever been known as Robert M. Davis, C. or W?

A    Robert Caheemis McLain Ward Davis.

Q    What is your date of birth?

A    ███████.

Q    And am I correct that your Social Security Number is ███████-6049?

1928

A    Yes.

Q    And you were living in the City of Richmond in 1980?

A    Yes.

Q    And you lived continually -- you were there in 1990; am I correct?

A    Yes.

Q    All right.

MR. BAUGH:  Your Honor  --

BY MR. BAUGH:

Q    Have you ever given a false date of birth or a false Social Security Number on one of your arrests?

A    No.

Q    All right.  How many misdemeanor  --

MR. VICK:  I object.  That criminal print-out has a different birth date.

MR. BAUGH:  I object.  This has 3 DOB's and two  --

THE COURT:  The objection is overruled. Just ask the question.

MR. BAUGH:  Would you please admonish the United States not to offer trivial, unnecessary objections to information he knows is incorrect?

THE COURT:  I would only do that unless I got in the habit of addressing all counsel when they

1929

address trivial objections, and I won't do that.

BY MR. BAUGH:

Q    Now, you have been arrested on several occasions in the City of Richmond, correct?

A    Oh, yes.

Q    Each time, police officers would take your name and your Social Security Number based upon what you gave them; am I correct?

A    Yes.

Q    And you would of course give them your date of birth, correct?

A    Yes.

        MR. VICK:  Objection.  This whole line of questioning is so far out of the bounds of what we are here for.  It is irrelevant.  It is improper impeachment.

        THE COURT:  Overruled.

BY MR. BAUGH:

Q    Now, you told in response to this man's questions that you had one petty larceny conviction, right?

A    I had one petty larceny?  I have a petty larceny charge.

Q    How many?

A    One that I know of.

Q    One that you know of.  Let me ask you this:  Did you get one on February 21st, 1980, some four days before one of your birthdays?

A    That was Safeway?  That's the only thing I know.

Q    What about November 12th, 1982, Columbus Day?

A    I don't know about that.

Q    Do you remember going to court in the City of Richmond on a petty larceny?

A    That must be  --  only thing I know is when I got locked up for that Safeway.

Q    What year was that?

A    I don't know.

Q    You also had one in 1990; am I correct?

A    1990?

Q    Yes, April 1st.

A    1990?  Petty larceny?

Q    April 1st, 1990.

A    No.  Not me.

Q    All right.

A    Only thing I've been to jail for is not paying my fine.  I had a concealed weapon, a stick with two razors on the edge of it.

Q    You have gone to jail one time for petty larceny?

A    Yes.

Q    Have you possibly been convicted of others and

only got a fine?

A    All I got were fines for not appearing in court.

Q    You said that when you were first  --  when someone approached you about selling drugs out of your house, you said you were on welfare so you agreed to do it to make some money.

A    Right.

Q    And did you need that money?

A    Yes.  Because the guy I rented from, I can't remember his name now, he let me stay there for a month because I didn't have the money to pay him.  My check didn't come.

Q    Did you have any qualms about breaking the law to make money at that time?

A    Well, yeah, I did.

Q    All right.  Now, when you had this conversation about your sister messing up the money, you offered to take it over and cut her out, right?

A    Yes.  Because she was taking from me.

Q    She was stealing from you, too?

A    Yes.

Q    You offered to cut her out of the drug business

1932

and you take over that profit?

A    Not to cut her out, but just go ahead and give me the majority of it.

Q    So you could sell it.

A    No, I was going to buy it.

Q    And also, did you need the money?  Did you need money?

MR. VICK:  Asked and answered.

THE WITNESS:  The majority of the time  --

THE COURT:  Hold up.  The objection is overruled.  And sir, don't answer unless you are asked a question.

BY MR. BAUGH:

Q    Am I correct the only source of income you had while you were doing drugs was either welfare or money you were making off the sale of drugs; am I correct?

A    No.

Q    What other source of income did you have?

A    I'm an artist.

Q    You were selling artwork?

A    Yes.

Q    And you were still receiving welfare?

A    Yes.

Q    Now, could I ask you ball park figures?  How

1933

much would you receive a week in welfare?

A    A week?  In welfare?

Q    Or a month.

A    I think welfare is 100-some-dollars a month.

Q    100-some-dollars a month?
A    Yes.
Q    Any other aid such as food stamps?
A    Food stamps, yes.
Q    Rent assistance?
A    No.
Q    Fuel assistance?
A    Fuel assistance during the wintertime.
Q    How long after your sister's death did you come forward to tell the United States what you knew?
A    After my sister's death?  Two weeks.
Q    Two weeks?
A    About one or two weeks.
Q    Two weeks after your sister's death in the middle of February, you were staying at the Salvation Army; that's your testimony?
A    Yes.
Q    You came forward to tell the police that?
A    About four days, four or five days a week.
Q    As a consequence of your coming forward and doing this, did you go into witness protection?

MR. VICK:  Could we approach?
(At Bench.)
MR. VICK:  He has been instructed a number of times not to tell people that.
THE COURT:  Don't ask that question.  Tell him that he can't answer that.
(In Open Court.)
THE COURT:  The question is whether or not you were placed into the Witness Protection Program.  Yes or no?
THE WITNESS:  Yes, I was.
BY MR. BAUGH:
Q    And do you receive money from them now?
A    I receive lodging.
Q    What?
A    They give me -- like coming here to Court, they pay my way.
Q    Do they pay your rent?
A    No, I'm on SSI.
Q    You are on SSI?
A    Yes.
Q    Disabled?
A    Yes.
Q    As a consequence of your eye injury?
A    Yes.  And seizures.  And hip problems.  I'm trying to get on disability, too.
Q    Trying to get on disability, too?
A    Right.
Q    You read in the newspaper article what had happened?
A    Yes.

Q    And when did you read that in the paper?
A    In the room in the hospital.
Q    What room?
A    I saw it on television.
Q    Did you ever read an article about all these allegations?
A    All allegations on who?
Q    On everybody.
A    Who is "everybody?"
Q    Did you ever read the newspaper article about all of this?
A    I read the article about my sister getting shot and all that, yes.
Q    That was the only one?
A    And my brother.
Q    Now, prior to the time that you first met these people, you had no trouble getting drugs out there, did you?
A    Who, me?

1936

Q    Yes.
A    Well, being this is my home  --
Q    Sir, did you have trouble getting drugs out there?
A    Yes and no.
Q    All right.  Could you find drugs any day if you needed them over there?
A    Not any day, no.
Q    Did you know a large number of people over there who were either using drugs or selling drugs?
A    Yes.
Q    In fact, would it be fair to say that a significant portion of the people over there use drugs or sell drugs, or live off the profits of drugs?
A    Not a whole lot, but  --
Q    What percentage would you estimate?
A    I'd say about five or ten percent.
Q    And this is in what area?  How big an area is Newtowne?
A    Oh, I can't say.  What size population?
Q    How many blocks is it?
A    How many blocks?
Q    Yes.
A    Well, Newtowne and Carver District is a whole

1937

lot of blocks.
Q    Approximately how many?
A    About 40.
Q    About 40?
A    40, 50 blocks.
Q    When you were an artist, were you trying to get out of Newtowne?
A    When I was an artist?

Q    Yes.

A    No, I came back to Carver District because I had just came from St. Louis.

Q    Were you trying to get out of that area, sir?

A    Yes.

Q    And are you out of it now?

A    Yes.

Q    And are you out of it as a consequence of the United States paying your way?

A    No, I planned on leaving anyway.

Q    Excuse me?

A    I planned on leaving anyway.

Q    They helped you go, didn't they?

A    Well, yeah.

Q    Now, all these things  --  strike that.
     If you went and first saw the police a few days after your sister was killed, did you continue to go back and live in Newtowne?

A    No -- yes.  Yes.

Q    Which one was it, yes or no?

A    Yes.

Q    Wait a minute.  Where were you living when you told the police about your sister's death and your knowledge?

A    Okay, I stayed for awhile, then I moved in with a friend of mine on Leigh Street.

Q    The Leigh Street portion of Newtowne?

A    Yes.  I went back to my house.

Q    How long did you stay there?

A    Two or three days.

Q    Were you buying crack cocaine then?

A    No.

Q    Where did you move after that?  Was it witness protection or did you say someplace else?

A    Witness protection.

Q    When did you go into witness protection?

A    I couldn't tell you.

Q    Give me a ball park figure in relationship to when your sister died, which was February 1st, in case you forgot --

A    In March.

Q    In March you went into witness protection?

A    Yes.

Q    Didn't you just tell this jury that you were using crack cocaine up until March?

A    No, I didn't.

Q    You didn't say you were using crack cocaine  --

          MR. VICK:  The memory of the jury controls.  He has answered the question.

          THE COURT:  Sustained.

BY MR. BAUGH:

Q    I'll ask you this.  When is the last time you

used crack cocaine?

MR. VICK:  Asked and answered.

THE COURT:  He can answer.

THE WITNESS:  February, March of 1992.

BY MR. BAUGH:

Q    Excuse me?

A    February or March of 1992.

Q    And you were getting it from Curt Thorne at that time?

A    Curt Thorne, yes.

Q    While you were living with Curt Thorne, were you continuing --

A    I never lived with Curt Thorne.

Q    You didn't stay in a hotel room with Curt Thorne?

1940

A    One time.

Q    Were you continuing to receive  --  you weren't still selling drugs or helping direct drugs, were you?

A    No.

Q    Were you still receiving your welfare payments? How were you buying drugs at that time?

A    How was I buying drugs?

Q    Yes.

A    That was from money I saved.  I saved a couple dollars.  I received one check, right, when I got out of the hospital.

Q    You saved up your money?

A    I tried to save up some money.

Q    And you used the money that you saved to buy crack cocaine?

A    I was going to leave.

Q    I thought you said you were using some of it also to buy crack cocaine at this time?

A    I wasn't using no money as to buy crack cocaine.  I said I was saving the money to  --

Q    How were you buying crack cocaine?

A    How was I buying it?

Q    Yes.

A    With the money I had.

1941

Q    Now, were you saving your money to leave or were you using your money to buy crack cocaine?

A    Both.

Q    All right.  When you went forward to the police, was that partly in revenge?

A    Not really.

Q    And you were not guided or driven by animosity or anger in any way?

A    I was angry, yes.  Really it was not anger. Okay  --

Q    Did you visit while you were doing this -- did you go to your sister's funeral?

A    No, I didn't.

Q    Were your sister and your brother buried together?

A    No.

Q    How old was your sister when she died?

A    I think "Mousey" was 27, 28.

Q    What was her date of birth?

A    November 22nd.

Q    How was your  --  how old was your brother, Bobby?

A    Bobby Lee was 35, 36.

Q    Do you know?

A    34 or 35.

Q    Do you know?

A    No.  It took me 26 years to find my family.

Q    I assume for the last ten years you have known where they are?

A    I met Bobby Lee.  I have been knowing Bobby Lee about seven years.

Q    And it was concern and revenge about these people in part that drove you to talk to them?

          MR. VICK:  Misstatement.  He has never stated that.

          THE COURT:  Sustained.

BY MR. BAUGH:

Q    Now, you mentioned that these people, you mentioned they were partners.  Did you see drugs come from New York?

A    I wasn't there when they came from New York.  I just know --

Q    Were you there when the drugs were divvied up?

          MR. VICK:  If he could quit cutting the witness off.

          THE COURT:  He wasn't finished answering your question.

          MR. BAUGH:  He was getting into hearsay and I did not ask for hearsay.

          THE COURT:  The objection is sustained.

Let him finish.

BY MR. BAUGH:

Q    Did you see drugs come down from New York?

A    I saw drugs come from their state, "O"  --

          MR. BAUGH:  Non-responsive.  Did he see drugs come from New York?

          THE COURT:  The question is, did you see drugs come from New York?  If you didn't  --

          THE WITNESS:  Yes, I saw them.  Powdered coke.

BY MR. BAUGH:

Q    Come from New York?

A    I don't know whether they come from New York.  They said they came from New York.

BY MR. BAUGH:

Q    Here is the question.

MR. VICK:  He has gotten a full response on this.

THE COURT:  Ask the question again and listen carefully to it.  If you didn't see the drugs come from New York, then your answer should be no.

BY MR. BAUGH:

Q    Did you see drugs come from New York?

A    I saw drugs that it was stated they came from New York.

Q    All right.  And did you see these drugs get divvied up?

A    Yes.

Q    All right.  And is it your testimony that you saw these defendants divide the drugs amongst themselves?

A    Yes.

Q    All right.  Now, am I correct that, say, for instance Mr. Roane, would get some of those drugs for himself to either use or sell or do what he wanted to do with them; am I correct?

A    Yes.

Q    And other people would get drugs to use or sell or do with what they wanted to; is that correct?

A    Yes.

Q    Now, based upon your -- whatever the term they use -- knowledge and observation, whatever it is -- was it your understanding that Mr. Roane could do anything he wanted to do with his drugs?

A    Yes.

Q    All right.  And what he did with his drugs wasn't dependent upon what anybody else did with their drugs; am I correct?

MR. VICK:  Objection.

THE COURT:  Overruled.

MR. BAUGH:  Thank you.

MR. VICK:  Your Honor, Mr. Baugh's theatrics  --

THE COURT:  Mr. Baugh, please, nobody asked for your expressed gratitude.  Ask the question.  The objection was overruled.  Ask the question.

BY MR. BAUGH:

Q    In case somebody has an objection, is it correct, sir, that Mr. Roane was not dependent upon anybody else as to what he did with his drugs; am I correct?

A    I'm not aware of that.

Q    All right.  Now, did you ever see these people put money together?

A    Yes.

Q    All right.  And am I correct, the money would be

put together --

MR. WAGNER:  I object to "these people,"
Your Honor.

BY MR. BAUGH:

Q    Did you ever see Mr. Roane, Mr. Tipton, or Mr.
Johnson put money together?

A    Yes.

Q    All right.  And after they put their individual
money into a pot, to buy drugs?

1946

A    I don't know who they did it for, but I know
they put their money together.

Q    When you saw this, sometime later would you see
drugs come in?

A    Yes.

Q    They would divide the drugs up the same way we
talked about the other drugs, right?

A    Yes.

Q    Were the drugs divided up equally or based on
how much money they put in?

A    I'm not aware of that.

Q    Okay.  You mentioned that your sister,
"Mousey -- " did she ever buy drugs from James Roane,
my client?

A    No.

Q    She certainly never worked for him?

A    No.

Q    And you never saw her take any orders or
directions from him?

A    Once or twice.

Q    What sort of things?

A    Well, she asked him questions and he said,
"Well, go on and ask 'O.'"

Q    He wouldn't answer her?

A    Right.

1947

MR. BAUGH:  Thank you.  Pass the witness.

THE COURT:  Mr. Wagner?

CROSS-EXAMINATION

BY MR. WAGNER:

Q    Good morning.  Mr. Davis, you have testified
that you were using a lot of cocaine over the past,
say, three or four years?

A    I didn't say three or four years.  I said about
one year.

Q    Just for one year?

A    About one year, yes.

Q    During the time you knew these people you were
using a lot of cocaine; isn't that right?

A    Yes.

Q    You were also drinking a lot of alcohol, weren't
you?

A    Yes, I'm alcoholic.

Q    How much alcohol would you say you were drinking

over the period you knew these people?
A   I drink wine and beer every day.
Q   How much wine would you drink?
A   About four or five fifths.
Q   A day?
A   Yes.  If I could buy it.
Q   How about beer?

1948

A   About three or four quarts.  I took top and bottom, mix my wine and beer together.
Q   How were you paying for the wine?
A   I would go out and do favors for people and make money and go out and buy it.
Q   How many times would you say you smoked crack in the course of a day?
A   If I had it, I would smoke probably three-fourths of it, sell the rest, have some money in my pocket.
Q   But how many times would you be smoking the crack, four or five times a day?
A   Not that much.
Q   How much?
A   About two or three times, if I had it for myself.
Q   All right.  You testified about some of the people you have bought drugs from.  Did you ever buy any drugs from someone named Rochelle?
A   Yes.
Q   That's Ronita Rochelle Hollman?
A   I don't know her.  I only know her by the name Rochelle.
Q   How many times would you say you went by her house to buy drugs?

1949

A   If I couldn't find more and I knew she had some.
Q   How many times would you say you bought from her?
A   Six or seven times.
Q   How many times did you go by Norton Street?
A   I used to live on Norton Street.
Q   You lived there?
A   Used to.
Q   The house that James Roane's father owned.  How many times did you go by that house on Norton Street?
A   By the house or to the house?
Q   Did you go into the house and see people who were in the house?
A   About ten times.
Q   Ten times.  How many times would you go to the Moore Street house where some of these people hang out?
A   Nope.

Q    Never went to Moore Street?
A    No.
Q    You knew that Sandra Reavis was involved in a romantic relationship with "J?"
A    I didn't know, but I had a pretty good idea.

Q    Pretty good idea of that.  You say you saw Sandra Reavis get drugs from James Roane on one or two occasions; is that right?
A    Right.
Q    Did you refer to Sandra Reavis as a worker or partner?
A    I considered her a partner.
Q    She was in a romantic partnership with James Roane, wasn't she?
A    I don't know.
Q    But you only saw her receive drugs from "J.R." on one or two occasions; is that right?
A    Yes.
Q    You testified you wanted to pay all these people back for killing your brother and sister; isn't that right?
A    I said revenge.
Q    I'm sorry?
A    Protection and revenge.
Q    Revenge.  But your words were that you wanted to pay these people back.
A    Well, I think that's a pretty good answer.
Q    You wanted to do whatever you could to see these people punished?
A    I will let the law do it.

Q    Now, you have testified about people giving you instructions to other people.  You never saw Sandra Reavis give instructions to anyone, did you?
A    Yeah.
Q    You never saw her give drugs to anyone, did you?
A    Yes.
Q    Did you ever  --  did anyone from the government ever tell you that you could be charged for your involvement with some of these things that are going on that you have testified about?
A    No.
Q    No one from the government ever told you that? They didn't tell you you could be charged for distribution of cocaine?
A    No.
Q    You were helping them with their cocaine, weren't you, at times?
A    I was helping them?  I was helping myself, mostly.
Q    But you sold cocaine, didn't you?
A    Yes.

Q    You helped them with their guns, didn't you? You testified to that?

A    Yes, I did.

Q    But the government never told you you could be charged with anything despite this; is that correct?

MR. VICK:  Asked and answered three or four different times.

MR. BAUGH:  I object.

THE COURT:  You are objecting to the objection?

MR. BAUGH:  Yes, I am.  Because counsel well knows that question  --

THE COURT:  Sit down, Mr. Baugh.  The objection is sustained.  It has been asked three or four times.

BY MR. WAGNER:

Q    You have been put in protective custody; is that correct?

A    Yes.

Q    And you are staying in a pretty nice place?

A    I don't call it nice.

Q    Is it a hotel?

A    No.

Q    It is a house?

A    No.

THE COURT:  Mr. Wagner, that's enough of that.  Don't answer anything else.

BY MR. WAGNER:

Q    Before you were placed in protective custody, you were moving around a lot, weren't you?

A    I was staying at the Salvation Army.

Q    All right.  You were selling drugs to help pay for things; isn't that right?

A    I was  --  out of the Salvation Army?

Q    Before the Salvation Army, in the year before you were put in protective custody.

A    I needed money in my pocket, and did that instead of going and stealing and knocking somebody upside the head.

Q    You didn't have any stable job?

A    I was on welfare.

Q    You were on welfare at the time?

A    I had seizures.

THE COURT:  Mr. Vick?

REDIRECT EXAMINATION

BY MR. VICK:

Q    Who suggested that you go into the Witness Protection Program?

A    Denise.

Q    And that was not  --

MR. BAUGH:  Can we get a full name on that, please?  What Denise suggested he go into witness

protection?

1954

BY MR. VICK:

Q    Denise who?

A    I don't know her last name.

Q    When was that suggested to you?  Was it after you began cooperating?

A    I was in the Salvation Army and I was approached by Denise.

Q    Where were you when "Mousey" got killed?

A    In the hospital.

Q    Did you kill "Mousey?"

A    No, I didn't.  I was crazy about my sister.

Q    Did you ever see Sandra receive directions from "J.R.?"

A    Not directions, but I seen them pass  --

        MR. BAUGH:  Objection, not responsive, Your Honor.

        THE COURT:  Sustained.

BY MR. VICK:

Q    Who did you see Sandra give instructions to?

A    I saw her talking to some young ladies.

Q    Who did you see Sandra give drugs to?

A    Couple of young ladies.

        MR. VICK:  No further questions.

        MR. BAUGH:  We would ask for recross in light of that last answer concerning Denise.

1955

        THE COURT:  Go ahead.

                RECROSS-EXAMINATION

BY MR. BAUGH:

Q    The Denise who suggested that you go into witness protection, is that a black woman, kind of stocky, actually built like me, actually?

A    No.  She is not built like you.

Q    Denise Berkley?

A    Yes.

Q    All right.  I used to be young.  Denise Berkley, that's the one you are talking about?

A    Yes.

Q    And she was a friend of Ms. Rozier's, a friend of "Nat" Rozier's and "Mousey's" and "Pea Sue?"

A    Yes.

Q    And this was a few days after your sister's death?

A    Yes.

Q    And before you went to the police, she walked up to you and suggested you go into witness protection?

A    She advised me she thinks that I should go and talk to the police because I might be next.

Q    Did you and Ms. Denise Berkley go over what you knew and what you had heard about some of these killings?

1956

A    No.
Q    Did you discuss it that day at all?
A    No.
Q    You and Denise talked about your going into witness protection, but you never talked about any murders?
A    I was told by Denise, she said, "You should get yourself some  --"
Q    I'm asking you were you not told  --
        MR. VICK:  Allow him to answer the question.
        THE COURT:  All right.  The objection is overruled.  But finish up this examination, Mr. Baugh.
BY MR. BAUGH:
Q    Am I correct then that you never, ever discussed murders with Denise before you went into witness protection?
A    She told me that my sister got killed and my brother got killed and all.  She had the feeling she knew who did it and who was involved.
Q    She had a feeling she knew who did it?
A    Yes.
        MR. BAUGH:  Pass the witness.
        MR. WAGNER:  I have a little recross.

1957

                RECROSS-EXAMINATION
BY MR. WAGNER:
Q    You said that Ms. Reavis gave instructions to some young ladies.  Who were they?
A    I don't know their names.
Q    You don't know their names?  When did she give these instructions?
A    Various times.
Q    Can you remember the dates or approximate times?
A    Two years ago, sir.
Q    Two years ago?
A    Yes.
Q    Okay.  And is it the same about when she gave the drugs to some ladies, that was two years ago?
A    Yes.
        MR. WAGNER:  Thank you.  No further questions.
        THE COURT:  All right.  The witness may stand down.  I need to talk to you all.
    (At Bench.)
    What's the status?
        MR. VICK:  We have another prisoner witness and we have got some police officers to fill in.  We are trying to get the other protective witness here

1958

around one or two.  I don't know that we can.  They are trying.  But that means going through Washington

and everything else.

THE COURT: I just wanted to know.

(In Open Court.)

All right, we are going to take about ten minutes now. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.).

All right, Mr. Marshal, you can remove the witness.

(The witness left the courtroom.)

(The defendants were removed from the courtroom.)

(Recess taken from 11:25 a.m. to 11:47 a.m.)

THE COURT: All right, let's bring in the jury.

(The jury entered the courtroom.)

RONITA HOLLMAN, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q   Ma'am, I'm going to ask you to speak loudly into the microphone so the ladies and gentlemen of the jury can hear you. Tell us your name.

A   Ronita Hollman.

Q   How old are you?

A   21.

Q   Do you have any children?

A   Yes, three.

Q   Their ages?

A   Four, two, and one.

Q   Where are you presently residing right now?

A   VCCW, Virginia Correctional Center for Women.

Q   Is that as a result of an arrest on January 8th, 1992 at Norton Street in the City of Richmond?

A   Yes.

Q   What were you charged with?

A   Distribution of cocaine with intent.

Q   Possession of a firearm?

A   Yes.

Q   You were found guilty of those offenses in state court?

A   Yes.

Q   Has the United States Government made you any promises for your testimony today?

A   No.

Q   You have already been sentenced for those crimes you were involved in?

A   Yes.

Q   Going back prior to January 8th, 1992, can you tell the ladies and gentlemen of the jury have you

MR. BAUGH:  No questions, Your Honor.

MR. WAGNER:  No questions.

THE COURT:  All right.

MR. VICK:  The government would call "Pepsi" Greene, Priscilla Greene.

THE COURT:  All right.  Go ahead and remove the witness.

(The witness was removed from the courtroom.)

All right, Priscilla Greene is next?

MR. VICK:  Priscilla Greene.

## Prisilla "Pepsi" Greene (2540)

PRISCILLA "PEPSI" GREENE,

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    I'm going to ask you just to speak toward that microphone during your testimony.  Don't get too close to it.  Could you state your name for the Court, record, and jury, please?

A    My name is Priscilla Greene.

Q    They also call you "Pepsi?"

A    Yes.

Q    That's your nickname, "Pepsi?"

A    Yes.

Q    How old are you?

A    32.

Q    "Pepsi," I direct your attention to February 19th, 1992.  Do you remember that day?

A    Yes.

Q    You are hard of hearing, are you not?

A    I'm deaf because of my injury.  I'm deaf on the left side.

Q    You got shot on February 19th, 1992, didn't you?

A    Yes.

Q    Where did you get shot?  Where in your body did you get shot?

A    On the left side of my head.

Q    Is that what caused your hearing problem?

A    Yes.  And I'm paralyzed on the left side of my face.

Q    We know you have a cane and a limp.

A    Yes.

Q    Did the shot also cause that?

A    Yes.

Q    When you were shot, did you go to the hospital?

A    Yes.

Q    Did you have a number of operations?

A    Three.
Q    Have you lost some of your  --  a portion of your brain based upon those operations?
A    Yes.
Q    Prior to those operations and prior to your being shot, you didn't have any of the physical problems that you have now, did you?
A    No.
Q    Do you have any children, "Pepsi?"
A    Three.
Q    Are you able to care for your children now?
A    Not right now, no.

2543
Q    You are living in a handicapped house; is that correct?
A    Yes.
Q    Do you know the defendants in this case, Richard Tipton, also known as "Whitey?"
A    Yes.
Q    Take your time, look around, and see if you see him in the courtroom.
        MR. WHITE:  We will stipulate identification.
BY MR. VICK:
Q    Do you know the defendant Cory Johnson, also known as "O," "C.O.?"
A    Yes.
Q    Take your time and look around and see if you see him in the courtroom today.  Stand up if you need to.
A    That's "Whitey," that's "O."  (Witness pointing.)
        MR. McGARVEY:  Stipulate.
BY MR. VICK:
Q    Do you know James Roane?
A    Yes.
Q    Look around and see if you see James Roane, also known as "J.R.?"

2544
A    Yes.
Q    Do you know Sandra Reavis?
A    Yes.
Q    Do you see Sandra Reavis in the courtroom today?
A    Yes.  That's her.
        MR. VICK:  Could the record reflect the identification of all respective defendants?
        THE COURT:  The record will so reflect.
BY MR. VICK:
Q    Did you know an individual by the name of Curt Thorne?
A    Yes.
Q    What happened to Curt?
A    "O" killed him.

Q    All right.  Had you dated Curt Thorne?
A    Yes, I had.
Q    In November-December of 1991 and into the early months of 1992, were you dating Curt Thorne?
A    Yes.
Q    How was Curt Thorne supporting himself, "Pepsi?"
A    Well, cocaine.
Q    Selling cocaine?
A    Yes.
Q    What kind of cocaine?

2545

A    Cook-'em-up.
Q    When you say cook-'em-up, you mean crack cocaine?
A    Crack, uh-huh.
Q    Where was he getting his cook-'em-up, his crack cocaine?
A    From "Whitey" and "O."
Q    And did you actually witness them giving him crack cocaine?
A    Yes.
Q    Is that how you met "Whitey" and "O?"
A    Yes.
Q    When you were shot on February 19th, 1992, how long prior to that, prior to your being shot, was it that you met "Whitey" and "O?"  How soon prior to your being shot did you meet them, "Whitey" and "O?"
A    I don't understand.
Q    If you were shot in February of 1992, when was it that you met "Whitey?"
A    Okay, that was in like November of 1991.
Q    Same time you met "O?"
A    Yes.
Q    How about "J.R.?"
A    I met "J.R." before them.
Q    Do you know Linwood Chiles?

2546

A    Yes.
Q    Do you know what happened to Linwood Chiles?
A    "O" shot him.
Q    Did that happen on February 19th, the same time you were shot?
A    Yes.
Q    Do you know if Linwood Chiles, prior to his being shot by "O," was involved with "O" and "Whitey" and "J.R." in the sale of cocaine?
A    Well, Linwood Chiles, he used to take them to go pick up cocaine.
Q    Did he ever take them to New York?
A    Yes.
Q    For what?
A    To pick up some drugs.
Q    How long were you involved with "O" and "Whitey" and "J.R.," were you involved in the sale of cocaine

with them?

A    I never sold cocaine.

Q    Did you help Curt Thorne when he sold cocaine?

A    Yes.

Q    Based upon your involvement, do you know what the relationship was between "J.R.," "O," and "Whitey" in the sale of cocaine?

MR. GEARY:  She can properly testify to what she saw and heard.

THE COURT:  Overruled.

THE WITNESS:  Partners.

BY MR. VICK:

Q    What?

A    Partners.

Q    What was Curt Thorne, a partner?

A    He wasn't really a partner.  He was just selling drugs.  He wasn't like they were.

Q    Have you ever seen any of them give orders to Curt?

MR. BAUGH:  Objection to "any of them."

THE COURT:  Sustained.

THE WITNESS:  Yes.

BY MR. VICK:

Q    Who have you seen give orders to Curt?

A    "Whitey" and "O."

Q    What sort of orders?

A    Like when they needed the money.

Q    What would they say to him?

A    Tell him like  --

MR. WHITE:  Objection to "they."

THE COURT:  Overruled.

BY MR. VICK:

Q    Go ahead.

A    Like they would tell him a certain time they would need their money, and when he was to come pick up the drugs, go on up.

Q    Did you know a man by the name of Doug Talley?

A    Yes.

Q    Did Doug Talley -- do you know whether Doug Talley helped "O" or "Whitey" or "J.R." in their drug distribution?

A    No.  Talley used to take them to New York before Linwood did.

Q    And what did he take them to New York for?

A    To pick up some drugs.

Q    What kind of car did Talley drive; do you remember?

A    All I know is it was a gray car.

Q    "Pepsi," do you remember an individual by the name of Doug Moody, "Little Doug," he was called?

A    Yes.

Q    Do you know what happened to him?

A      Yes.
Q      What happened to him?
A      "J.R." killed him.
Q      Were you  --
A      Finished killing him.
Q      Who started killing him?

2549

A      They was in the house.  "Little Doug" jumped out the window.
BY MR. VICK:
Q      Who was in the house?
A      "J.R.," "Whitey."
Q      Were you there?
A      I was on the corner.
Q      In the house where "Little Doug" was killed at?
A      I was on the other side of the street.
Q      Did you hear any shots that night?
A      About two or three.
Q      After you heard those shots, did anyone come out of that house?
A      Did anybody come out?
Q      Right.
A      "J.R." came out, "J.R." and "Whitey."
Q      Where did they go when they came out of that house?
A      Well, Linwood had came  --
Q      I'll withdraw that.  When "J.R." and "Whitey" came out of the house, was it after you heard the shots fired?
A      Uh-huh.
Q      What did they do when they came out of that house?

2550

A      Well, after they came out I didn't have any reason to leave because I was going back in the house.  So I went back in the house to straighten up the house.  Then "J.R.," he came back in the house and asked me for the knife.
Q      What knife?
A      It is a military knife.
Q      All right.  And could you describe that military knife?
A      It had a black handle on it, kind of a big knife.
Q      All right.  Where had you gotten that knife?
A      Well, I got that knife  --  the knife was laying on the table.  They used to bring the knife to Curt for Curt to keep.
Q      Who is they?
A      "Whitey" and "O" and "J.R."
Q      Prior to the night that "Little Doug" was killed, did they ever bring you that knife before?
A      Yes.
       MR. McGARVEY:  I object to "they."  Who

brought it?

BY MR. VICK:

Q    Who brought you that knife?  Was there a particular night where they brought you that knife,

2551

where somebody brought you that knife and it was covered with something?

A    Blood.

Q    Who brought you that knife when it was covered with blood?

A    "O."

Q    And was that prior to or after the killing of Doug Moody?

A    That was before.

Q    All right.  On the night of the killing of Doug Moody, did you give that knife to anyone?

A    "J.R."

Q    Did you see "J.R." use that knife that night?

A    I didn't see him use it on him because I had left out the house.

Q    Did "J.R." come back and give you that knife later that night?

A    Yes.

Q    All right.  What did he give you that knife for?

A    He wanted me to get rid of the evidence.  I took and threw it across the fence.

Q    When he gave you that knife back, did it have anything on it?

A    Blood on it.

2552

Q    Is that the same night Doug Moody was killed?

A    Yes.

Q    After Doug Moody was killed, did you go anywhere?

A    Up on Norton Street.

Q    With who?

A    With Linwood, Curt, "J.R.," Sandra.

Q    Do you know whether Sandra Reavis was involved in any way with "J.R.," "C.O.," or "Whitey" in the sale or distribution of cocaine?

A    Yes.

Q    What do you know?  Tell the ladies and gentlemen of the jury.

A    She used to get cocaine from them to sell it.

Q    Did you witness that?

A    What?

Q    You saw that?

A    Yes.

        MR. WAGNER:  I object to "them," Your Honor.  If he would ask specifically who.

        THE COURT:  Mr. Vick, make it specific.

BY MR. VICK:

Q    Specifically, who do you know that Sandra got

cocaine from?

A    "O."  Because "O" was the head man.

2553

Q    Did you ever see her get it from "J.R." or know whether she got it from "J.R.?"

MR. BAUGH:  Objection to know.  First question, "Did you see her," next question, "know."

THE COURT:  Let her answer one question at a time.

BY MR. VICK:

Q    Has Sandra ever told you who she got cocaine from?

A    Yes.

Q    Who did she say she got cocaine from?

A    From "O."

Q    Do you know why "Little Doug" Moody was killed?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury why "Little Doug" Moody was killed?

A    He was killed because "O" and "Whitey" and them didn't want Maurice and "Little Doug" to work in that area.

Q    Work in that area doing what?

A    Selling cocaine.

Q    When you say Maurice, do you mean Peyton Maurice Johnson?

A    Yes.

Q    Are you familiar with the fact that Peyton

2554

Maurice Johnson was killed?

A    Yes.

Q    All right.  When Peyton Maurice Johnson was killed, the night he was killed, do you remember that?  Do you remember the night he was killed?

A    Yes.

Q    Did you see "O," "V," "J.R.," and "E.B." that night?

A    Yes.

Q    Where did you see them?

A    I was standing -- I had went to the store and got me some beer, and I was standing beside the truck talking to this man.  And they came through the alley running.

Q    All right.  What did they have with them?

A    Okay, "O" and "J.R." came through the alley and "V" and "E.B." came around the corner.  And "J.R." gave "Papoose" the knife  --  I mean the gun -- to put up.

Q    Who was "Papoose?"

A    "Papoose" was  --  who is "Papoose?"

Q    Who is "Papoose?"

A    "Papoose," he used to sell drugs for them, too. He is a neighbor.

Q    Do you know where it was that Peyton Maurice

2555

Johnson was killed?  Where was he killed?

A    On Clay Street.

Q    Do you know whose house?

A    No.

Q    Did you know "Mousey" Armstrong?

A    Yes.

Q    All right.  Do you know what happened to "Mousey" Armstrong?

A    Yes.

Q    What's that?  What happened?

A    "O" and "V" killed her.

MR. McGARVEY:  I object, unless she is testifying from her personal knowledge.

THE COURT:  Overruled.

BY MR. VICK:

Q    Why do you say that?

A    Because they asked Linwood to take them over to Southside that night.

Q    All right.

A    And Linwood Chiles had told me that they did it.

Q    All right.

MR. McGARVEY:  Same objection, Your Honor.

THE COURT:  That objection will be sustained.

2556

BY MR. VICK:

Q    Did you see "O" and "V" that night in Linwood's car?

A    I saw them, yes.

Q    "Pepsi," I'm going to direct your attention to February 19th, 1992, the day you were shot.  Did you have occasion to go someplace on that day with your sister, Gwen, in Linwood's car?

A    What?

Q    On that day, the day you were shot, did you go someplace with your sister, Gwen, in Linwood's car?

A    Did we go someplace?

Q    Yes.

A    Yes.

Q    Where did you go?

A    We went on Southside to the apartments over on Southside.

Q    Whose apartment did you go to?

A    It was "O's" girlfriend's apartment, I think.

Q    Who did you go over to Southside to see?  What were you going over there for?

A    We went over there to see "O."  Well, Curt went to see "O" but Linwood asked me to go by Southside with him.

Q    Where was that apartment?

2557

A    That apartment was by the Philip Morris parking

lot, right up from the Philip Morris parking hot.

Q When you got to that apartment, did you see "O" and Curt?

A Yes.

Q Were they together?

A They was together.

Q All right. What did you do when you got there?

A Nothing, just sat down.

Q You got back in Linwood's car after being at that apartment, didn't you?

A Yes.

Q Who got in Linwood's car with you?

A It was me, my sister, Linwood, and "O."

Q Could you tell the ladies and gentlemen of the jury, did Curt Thorne get in the car with you?

A Yes, Curt was in there with us, too.

Q Where were you seated in the car?

A I was sitting in the front seat on the passenger's side.

Q Who was driving the car?

A Linwood.

Q Where was Curt seated?

A Curt was sitting behind me in the back.

Q Where was your sister, Gwen?

A My sister was in the middle.

Q Where was "O?"

A "O" was sitting behind Linwood.

Q Did you go someplace in that car?

A Yes. I thought we were going home, but we pulled in something like an alley.

Q Did you see another car behind you that night?

A I can't recall the car, but there was a car behind us.

Q What color car?

A Gray.

Q What happened to you that night, "Pepsi?"

A "O" shot me.

Q All right. Did you see "O" shoot anyone else that night?

A Linwood.

Q Tell the ladies and gentlemen of the jury how "O" shot Linwood. What happened?

A Okay. He told Linwood to turn around and put his head on the steering wheel. He turned around and laid his head on the steering wheel and I saw "O" put the gun to his head, but I never heard the gun go off.

Q What kind of gun? Did you see the gun?

A I don't know exactly what kind of gun it was.

Q Do you remember what happened after that?

A No.

Q How long were you in the hospital, "Pepsi?"

A    For seven months.

Q    The last thing you remember was "O" saying to Linwood, "Lay your head on the wheel?"

A    Uh-huh.

MR. VICK:  Beg the Court's indulgence.

BY MR. VICK:

Q    Could you tell the ladies and gentlemen of the jury exactly where you were shot and where the bullet went?

A    I was shot right up in here.  It came out like on the side of my face.  I'm totally paralyzed on my left side.

MR. VICK:  I have no further questions.

THE COURT:  Mr. White?

CROSS-EXAMINATION

BY MR. WHITE:

Q    Good morning, Ms. Greene.

A    Good morning.

Q    Ms. Greene, you were living in Newtowne; is that correct?

A    Newtowne?

Q    Do you know where Newtowne is?

2560

A    Yes.  I was living on Clay Street.

Q    Where on Clay Street were you living, ma'am?

A    I can't recall the address.

Q    Do you recall who any of your neighbors were?

A    I can't hear you.

Q    Do you recall who any of your neighbors were?

A    Do I believe my neighbors?  I just don't understand what you mean.

Q    Ma'am, do you know -- you say you know "Papoose?"

A    Yes.

Q    Did you live close to "Papoose?"

A    Weren't far from him, about a block.

Q    And do you know where Curt was living?

A    Yes.

Q    Where was Curt living, ma'am?

A    On Clay Street.

Q    Okay.  And was that close to "Papoose" as well?

A    About a block up from "Papoose," yes.

Q    Were you staying with Curt from time to time?

A    Yes.

Q    Okay.  Now, ma'am, did you know a lot of people in that area?

A    No.

Q    All right.  Ma'am, would it be fair to say that

2561

your memory has been affected by your being shot?

A    It has affected it.  But I remember that, though.

Q    Remember what, ma'am?

A    What happened.

Q    Do you know Denise Berkley?
A    Yes.
Q    Okay.  Do you know "Peaches?"
A    "Peaches?"
Q    Yes.
A    I know of her.
Q    Do you know Peyton Maurice Johnson?
A    Yes.
Q    Do you know Ronita Rochelle Hollman?
A    No.
Q    Do you know the little girl who got locked up because of her dealings with Peyton Johnson?
A    No.
Q    Do you know "K.K.?"
A    Yes.
Q    Do you remember Keith West?
A    I can't recall.
        MR. GEARY:  May I speak to Mr. White, please?
    (Counsel conferring.)

2562

BY MR. WHITE:
Q    Ma'am, do you recall ever speaking to a detective by the name of Dalton?
A    No.  I can't think of it right now.
Q    Did you say you couldn't understand?
A    No, I don't remember right now.
Q    Do you remember being served with any papers by a police officer in January of last year?
    (Witness pausing.)
A    I can't recall that.  I'm sorry.
        MR. WHITE:  Your Honor, if the Court please, could we approach briefly?
    (At Bench.)
        MR. WHITE:  Your Honor, if the Court please, rather than belabor the point with this witness, it seems that she is not in a position to recall many statements that she made.  We want to know if the Court is going to consider her unavailable for purposes of cross-examination so that we can bring in her prior statements through Detective Dalton.
        THE COURT:  The answer is no.
        MR. McGARVEY:  We join in that.
        MR. VICK:  While we are here, she stated she doesn't remember.  I don't want to go through the

2563

whole process of reading the transcript again when she says she doesn't remember.
        THE COURT:  Well  --
        MR. WHITE:  Based on the Court's ruling, I was wondering if I could ask her specific questions about statements that she made.
        MR. BAUGH:  For prior inconsistent

statements.

THE COURT:  The woman says she doesn't remember.

MR. BAUGH:  Your Honor, we have to say it was prior inconsistent, either by the statement  -- we have to get the predicate through her or the statement.

MR. VICK:  It is there.

THE COURT:  You can do it by putting Dalton on.

MR. BAUGH:  That's fine.

MR. WHITE:  We can ask Detective Dalton?

THE COURT:  Yes.

MR. BAUGH:  You don't need that from her.

THE COURT:  You don't need it from her is what I am telling you.

(In Open Court.)

MR. WHITE:  No further questions, Your Honor.

THE COURT:  All right.  Any questions, Mr. McGarvey?

MR. McGARVEY:  Yes, sir.

CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Good morning, Ms. Greene.

A    Good morning.

Q    Ms. Greene, after you were shot, is it fair to say that you didn't have any recollection of the shooting itself for a long period of time after you were shot?

A    I couldn't hear you.

Q    You couldn't hear me?

A    No.

Q    Is it fair to say that you didn't have any recollection, you couldn't remember, until recently, what happened the day you were shot?  I'm not talking about before the day you were shot.  But the day that you were shot, you didn't have any recollection until recently of that; is that correct?

A    Yes.

Q    And is that after you talked to the government, after you talked to Mr. Vick?

A    No.

Q    After you talked to the detectives?  Have you talked to them at all about this case?

A    No, not that I remember.

Q    You have never talked to them about this case?

A    Yes.

Q    Can you recall who you did talk to about this case with respect to the government?  Am I talking loud enough?

A    I don't hear what you are saying.

Q    Did you talk to anybody with respect to the government -- I'm talking about Detective Fleming over here, Mr. Parcell, Mr. Vick -- about this shooting?

A    Yes, I talked to them.

Q    Is that when you got your memory back about the day of the shooting?

A    No.

Q    How recently was it that you got your memory back about the day of the shooting?

A    Because I kept thinking about it.

Q    How recently, though, relative to when you are testifying here today; do you recall?

A    Do I recall what now?

Q    How recently did you get your memory back about the shooting?

2566

A    From the time I was in the hospital.

Q    Okay.  Ma'am, do you remember a red 4X4 pickup that day being parked behind you?

A    What?

Q    A red 4X4 pickup?

A    What about it?

Q    Did you see one at Stony Run?

A    When?

Q    The day you were shot.  When you were shot.

A    I didn't see no pickup.

Q    Okay.  And ma'am, you indicated on direct examination that you were on the passenger's side in the front, that Mr. Chiles was in the driver's seat, correct?

A    Yes.

Q    That your sister was in the back in the middle, Gwendolyn?

A    Yes.

Q    And Curt was to the right of her, correct?

A    Yes.

Q    And you said that "O" or Cory was to the left; is that correct?

A    Yes.

Q    Okay.  And you have testified that you don't recall hearing a shot.  Is that correct?

2567

A    Right.

Q    You recall, though, "O" telling Linwood to put his head down, correct?

A    On the steering wheel.  He pointed the gun at the back of his head.

Q    And you had not heard a shot up until that.  Did you not hear a shot, period?

A    No.

Q    Okay.  Your sister wasn't shot before this, was she?

A    What?

Q    Was she shot before this, before he told him, according to you, told Mr. Chiles to put his head on the steering wheel?
A    Shot before then?
Q    Yes.
A    No.
Q    You are sure about that?
A    Yes.
Q    Ma'am, was Peyton Maurice Johnson killed on Southside?
A    Peyton Maurice?  No.
Q    Did I misunderstand you?
A    Peyton Maurice was killed on Clay Street.
Q    He was killed on Clay Street?

2568

A    Yes.
Q    Didn't you indicate that you said that Mr. Chiles took them to Southside when they asked about Peyton Maurice Johnson.
        MR. VICK:  Objection, misstatement of the evidence.
        THE COURT:  That is incorrect.  Your understanding is incorrect, Mr. McGarvey.
        MR. McGARVEY:  I apologize, Your Honor.
        MR. McGARVEY:  That's all, Your Honor.
        THE COURT:  Any questions, Mr. Baugh?
                CROSS-EXAMINATION
BY MR. BAUGH:
Q    Ms. Greene, I just have a few questions for you.  My name is David Baugh, and I represent Mr. Roane.  The knife that you say that Mr. Roane came and got from you on the night that Doug Moody was killed, you said it was a black knife?
A    It was a silver knife with a black handle.
Q    Was it a military-type knife like a bayonet or something?
A    Curt said it was a military knife.
Q    Excuse me?
A    Curt, he told me it was a military knife.
Q    Did you see it yourself?  Did you see it?

2569

A    Did I see it?
Q    Yes.
A    Yes.
Q    All right.  Are you familiar with the kind of knife that soldiers put on the end of their guns; have you seen one of those knives before?
A    No.
Q    All right.  Can you show me about how long was the knife?  About how long was it?
A    It was a long knife.
    (Witness indicating.)
Q    Certainly longer than like your foot?
A    I don't know.

Q    And can you tell me, can you show me with the fingers of your left hand how wide the blade would have been?

A    Like this.  Wide blade.

Q    Big blade?

A    Yes.

Q    Would you agree that's about three inches or two inches?

A    I don't know.  I can't say.

Q    Could you hold it up again so the jury could see it?

     (Witness indicating.)

     That's how wide the blade was, about that long?

A    Yes.

Q    Now, is it your testimony, is that the same knife that you say one of these gentlemen brought over to you covered with blood after Doug Talley was killed?

A    Brought to Curt, yes.

Q    And who told you that Doug Moody jumped out of a window?  Or did you see that?

A    No.  Curt told me.

Q    You didn't see Doug Moody jump out of a window?

A    No.

Q    And who told you that James Roane, quote, finished him off?  Who told you that?

A    Nobody.  I saw him do it.

Q    Do I have this correct: You were out on the corner talking with someone when you heard some gunshots; am I correct?

A    Uh-huh.

Q    And then you went in your house to clean up.

A    Yes.

Q    And where was your house in relation  --  where was your house from where Doug Moody was, across the street, on the next street, where?

A    Well, Doug Moody was out on the porch.

Q    Doug Moody was on the porch.  But I mean, that house that he was in on the porch, where was your house from his?

A    My house was on the corner.

Q    If Doug Moody's  --  the house that Doug Moody was killed at is on the corner of Clay and Harrison; am I correct?

A    Yes.

Q    All right.  Where was the house you went to clean up at?

A    The same house just by the window, Curt's place.

Q    Where was Curt's place, in the same building?

A    Yes.  That was the apartment he was in.

Q    The corner of Clay and Harrison?

A    Yes.

Q    All right.  Now, after you heard the gunshots you went upstairs.  How long later was it that you --

MR. VICK:  She never stated that.

THE COURT:  Go ahead.

BY MR. BAUGH:

Q    Didn't you say that after the gunshots you heard the gunshots, you went to your house -- went to Curt's house and started cleaning up?

2572

A    No, I did not.

Q    How much longer was it before you went to the house, approximately?

A    Maybe an hour.

Q    And then after you got to the house an hour later, is that when James Roane came and asked you for the knife?

A    No.  James Roane asked for the knife because -- okay, "J.R." asked for the knife the first time I went back in the house because I was going in there to get my clothes.

Q    You went to the house twice?

A    Yes.

Q    After Doug Moody was shot, how much  --  you heard the shots.  How much time was it before you went back to the house to clean up the first time?

A    About five, ten minutes.

Q    All right.  So you heard the shots, and then you went to the apartment or to the house to clean up?

A    Not directly to the apartment.

Q    Okay.  Like sometime later.  How much time did you say?

A    About five or ten minutes later.  Because weren't nobody in there.

Q    Then after you went to the house five or ten

2573

minutes later, you started cleaning up.

A    Yes.

Q    And how long had you been cleaning up before Mr. Roane came up and asked you for the knife?

A    Well, he came in the house behind me asking for the knife.

Q    So if I have this correct, you heard gunshots, you stayed out on the corner five or ten minutes  --

A    Yes.

Q    Then you went to Curt's house.

A    Wasn't nobody in there.  That's why I went back in the house.

Q    Wasn't anybody where?

A    In Curt's house.

Q    Could you get in without Curt?

A    The door wasn't locked.

Q    Okay.  You heard the shots.  You stayed outside

for five or ten minutes.  And then you went over to Curt's house and Mr. Roane came with you.

A    Yes.

Q    And when he came with you, you are saying he asked you for this knife which was about this long and about this wide; am I correct?

A    Yes.

Q    And he left with that knife about what, ten minutes after you heard the gunshots?

A    He didn't go nowhere but on the porch.

Q    He went on the porch?

A    Yes.

Q    Did you go out on the porch with him?

A    No, I looked out the window.

Q    You looked out the window  --

A    I saw him on the porch.

Q    Mr. Roane?

A    James Roane and "Little Doug."

Q    On the porch of the house?

A    Yes.  Doug was laying on the porch.

Q    And did James Roane sit on him?

A    I don't know.

Q    Well, did you see James Roane stab him?

A    No.

Q    So all you are talking about, about seeing Doug Moody and all that, that's all stuff people told you about, right?

A    Yes.  That's the last time I seen him, laying on the porch.

Q    Did you ever see Mr. Roane when he came back from New York  --  strike that.

    Who told you that Mr. Roane went to New York to get drugs?

A    Curt.

Q    Did you ever see him get in the car to go to New York?

A    Yes.

Q    And you saw him when he came back?

A    Yes, I seen him when he came back.

Q    Did he have drugs when he came back?

A    "O" and "Whitey" had the drugs.

Q    Did you ever see Mr. Roane bring back drugs from New York?

A    No.

Q    All right.  Do you know how Mr. Roane got his drugs, of your own knowledge?

A    No.

Q    What was Sandra Reavis' relationship with James Roane, if you know?

A    That's his  --  they are boyfriend-girlfriend.

        MR. BAUGH:  Doug's  --

        THE COURT:  She said girlfriend and

boyfriend.

MR. BAUGH:  Forgive me.

BY MR. BAUGH:

Q    They were girlfriend and boyfriend?

A    Yes.

Q    Thank you.  What was the closest you saw Mr. Roane get to Mr. Moody while Mr. Moody was on the porch; did Mr. Roane go over and touch him?

A    Yes.  Slapped him in the face, tried to wake him up.  But the man came through.

Q    What man came through?

A    "Little Doug."

Q    "Little Doug" came through?

A    Yes.

Q    All right.

A    Because he was unconscious.  He was out on the porch.

Q    Were you there when the police showed up?

A    No.

Q    Were you back inside?

A    No.

Q    Where did you go by the time the police showed up?

A    Linwood, we all got in the car and went over on Norton Street.

Q    Who got in the car and went to Norton Street?

A    Okay.  Me, Curt stayed up there on Norton Street, and Linwood and "O" and "J.R." and Sandra, I don't know where they went.

MR. BAUGH:  Could I have a moment with counsel?

THE COURT:  Yes.

(Counsel conferring.)

BY MR. BAUGH:

Q    Do you know Denise Berkley?

A    Uh-huh.

Q    Was Denise Berkley with you at Curt's before you went out on the corner?

A    I don't know.  I didn't see her.

Q    Let me ask you this:  Were you, Denise Berkley, Curt Thorne, and Linwood Chiles doing drugs, doing crack cocaine in Curt's apartment when the shots were fired?

A    No.

Q    All right.  When you went back to the apartment to clean things up, were you cleaning up crack?  Were you cleaning up drugs?

A    No.

Q    Was Denise Berkley out there on the corner with you that night?  Did you see?

A    I didn't see.

Q    And you were on the corner of Clay and

Harrison?

A    Yes.

Q    Did you hear the ambulance or the police  --  did you hear them when they came?

A    No.  Because I was on Norton Street.

Q    So you had gotten all the way  --  if I have this right, you heard the shots, you waited five or ten minutes, you went to  --

MR. VICK:  Objection to the form of the question.

THE COURT:  Do not summarize everything that's come out so far.

BY MR. BAUGH:

Q    How long was it after you heard the shots that you got to Norton Street, approximately?

A    Maybe 15, 20 minutes.

Q    And in those 15 to 20 minutes, the police or an ambulance had not arrived?

A    I don't know, because I wasn't there.

Q    Well, ma'am, in ten of those minutes you would have been upstairs  --

MR. VICK:  Objection.  He is summarizing again.  It is not a question.

THE COURT:  Mr. Baugh, go ahead and ask the question.

BY MR. BAUGH:

Q    Am I correct that during ten of those minutes you would have been upstairs in 1200 West Clay Street on the corner of Clay and Harrison; am I correct?

A    Upstairs?

Q    Yes.

A    No.  He doesn't have a stairs.

Q    Would you have been in the building on the corner of Clay and Harrison for ten of those minutes?

A    Yes.

Q    That's the same building that Doug Moody was in; am I correct?

A    Yes.

Q    And when you came out of that building to go to Norton, which door did you come out of?

A    The same door I went in.

Q    Which door was that?

A    It was the front door.

Q    All right.  And when you came out, you would be on Clay Street?

A    I would be where?

Q    You would be on Clay Street when you came out the front door?

A    No, Harrison Street.

Q    And then you got in the car with Linwood and he drove over to Norton Street, which is the next street

over; am I correct?
A    Yes.

2580

Q    Are you saying that Mr. Roane brought that knife back to you that night, or someone else?
A    No.  He brought it back to me.
Q    Mr. Roane did?
A    Yes.
Q    This was the same big knife?
A    Yes.
        MR. VICK:  Objection to the summarization again.  It was not a question.
        THE COURT:  Sustained.  Do you have any more questions, Mr. Baugh?
BY MR. BAUGH:
Q    You are talking about the same knife you described earlier?
A    Yes, the same knife.
        MR. BAUGH:  Thank you.  Pass the witness.
        THE COURT:  Mr. Wagner, do you have anything?

                    CROSS-EXAMINATION
BY MR. WAGNER:
Q    Good morning, Ms. Greene.
A    Good morning.
Q    Ms. Greene, you have made statements to the police, haven't you?
A    I can't hear you.

2581

        MR. VICK:  Asked and answered.
        THE COURT:  No.  Mr. Wagner, you have to speak up.
BY MR. WAGNER:
Q    You have talked to the police, haven't you?  Have you talked to the police about what happened, what you have testified to?
A    Do I have to answer that question?
        THE COURT:  She has already answered it about three or four times, Mr. Wagner.
        MR. WAGNER:  Very well.
BY MR. WAGNER:
Q    Did the police help you with your testimony at all?
A    No.
Q    Did they go over any of the questions that they were going to ask you today?
A    I can't recall.
Q    You talked about some things that Sandra Reavis said.  Did you talk to Sandra Reavis very often?
A    At that time, I used to talk to her.
Q    You used to talk to her?
A    Uh-huh.
Q    Isn't it true that you really thought that Sandra Reavis didn't like you?

2582

A    Didn't matter whether she liked me or not.

MR. VICK:  Completely irrelevant.

BY MR. WAGNER:

Q    Didn't you tell Detective Dalton that you thought Sandra Reavis didn't like you?

A    I can't recall.

Q    Now, you never did see "O" actually give drugs to Sandra Reavis, did you?

A    No.  I just went by what she told me at the time we was getting along and she was telling me.

Q    When did she tell you this?

A    I can't recall when.

Q    Now, you said that you were standing outside with Sandra Reavis the night Doug Moody got killed; is that right?

A    Yes.

Q    You didn't see Doug Moody get killed, did you?

A    No.

MR. WAGNER:  Thank you.  No further questions.

THE COURT:  All right.  May the witness stand aside?

REDIRECT EXAMINATION

BY MR. VICK:

Q    Have myself, Detective Fleming, Mr. Parcell, has

2583

anybody told you how to answer any question?

A    No.

Q    You have had occasion to look at pictures of a knife that was drawn before, haven't you, last night?

A    Yes.

Q    I'm going to show you what's been previously marked Government Exhibit 146 and ask if the knife you got back from "J.R." after Doug Moody was killed -- point out which one of those knives that are drawn there looks like the one you saw?

A    The first one.

Q    At the top of the page?

A    Yes.

Q    Did the knife have any of those edges drawn on the second knife on that page?

A    No.

Q    At the end of that knife, I assume it was a pointed knife  --

MR. BAUGH:  Objection to the assumption.

THE COURT:  Overruled.

BY MR. VICK:

Q    It is a pointed knife at the end like any other knife?

A    Yes.

2584

MR. BAUGH:  Withdraw the objection.

MR. VICK:  I have no further questions.

THE COURT:  All right.  The witness may stand down.

(Witness stood aside.)

MR. VICK:  We would recall Detective Fleming.

## Det. Ralph Fleming (re Green sisters) (2584)

RALPH FLEMING, called as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Detective Fleming, you are under oath, having been previously placed under oath.  You were one of the lead detectives investigating the incidents that gave rise to this indictment; is that correct?

A    That's correct.

Q    Have you worked since February 19th, or as soon as Gwen and "Pepsi" Greene were physically able to respond, have you worked with them in this investigation?

A    I have interviewed them in reference to what they recalled about the incident.

Q    Could you tell the ladies and gentlemen of the jury what if any information you provided them about the subject of their testimony?

A    I don't provide them with any information.  I keep asking them what they remember and they would tell me.  And in the case of Priscilla Greene, as time went on she began to remember more and more and more.  It was just amazing because  --

MR. GEARY:  Objection.

MR. WHITE:  Objection to the characterization.

BY MR. VICK:

Q    At first, what was her memory like?

A    She had very little  --

MR. WHITE:  He is not qualified to make that assessment.

MR. VICK:  He talked to her.

THE COURT:  The objection is overruled.  Let's wrap this up.

THE WITNESS:  She had very little recollection at first, but as time went on it got better and better.

BY MR. VICK:

Q    Did you provide her any of the subject of her testimony here today?

A    No.

MR. BAUGH:  Ms. Gina Taylor, please.

GINA TAYLOR,
called as a witness by and on behalf of defendant Roane, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BAUGH:

Q    Please state your name for the Court and for the record, spelling your last name.

A    Gina Stella Taylor, T-A-Y-L-O-R.

Q    You have a very soft voice, so speak all the way to the gentlemen in the back.  How old are you?

A    I am 24.

Q    What do you do for a living?

A    I am a working mother of three as well as a full-time student at J. Sargeant Reynolds.

Q    Where do you live at this time?

A    810 North Harrison.

Q    Were you living there on January 13th, 1992?

A    Yes, I was.

Q    Now, could you tell the members of the jury where 810 North Harrison is in relationship to the intersection of Harrison and West Clay?

A    In the middle.

Q    Excuse me?

A    In the middle.

Q    About how many feet from the intersection would your home be?

A    Feet?  You are asking me feet?

Q    I'm sorry, what runs -- as you look out your front door, what is on the right side of your house?

A    Clay.

Q    What?

A    When I am looking out my front door.

Q    No, on the side of your house is there an alley?

A    Yes, there is an alley.  It is a driveway, alley.

Q    Calling your attention to January 13th, did you have occasion in the evening hours to look out into that alleyway?

A    Yes, I did.

Q    What caused you to look out there initially?

A    The dogs barking in the back.

Q    You have dogs?

A    No, my neighbors do.

Q    Where did you look from?

A    I have a laundry room that's on that side.

Q    When you looked out of your laundry room window, what did you see?

A    At first I looked out the back door and didn't see anything.  And I turned to the left.  The curtain

was open and I looked out the window, and there was a man lying on the ground and someone was over him.

Q    What was the person over him doing or appear to be doing?

A    Jabbing him.

Q    Jabbing him?

A    Something to that effect.  I mean, you know, there is someone over someone.

Q    What did you do then?

A    Went in  --  well, I looked out again.  Then I turned the laundry room light off to look out again to make sure I was seeing what I thought I was seeing.  And once I established that I was actually seeing it, I went to my front door.

Q    When you went to your front door, what happened, if anything?

A    There was only one person there, and he asked me to help him.

Q    Were there people standing in the street nearby watching this?

A    Down on the corner.

Q    All right.  This person who was in the alleyway asked you to help him?

A    Yes.

Q    What did you do?

A    I told him that I would, but first I needed to get someone to call 911.  I yelled to the people on the corner to call, just yelled "Dial 911" and went back to him.  And he was bleeding, so I had to go back in and get a knife to try and cut, because he had layers of clothing on, to try and cut through the layers to stop the bleeding.

Q    Did you do that?

A    I attempted to.  Once I got through the first layer, I think nearly through the second layer, I don't know if it was the police, fire squad, or ambulance that pulled up.  But someone did, and they told me I had to move.

Q    All right.  During the time that you were working with him, did he say anything to you?

A    Other than to help him and don't leave him alone, no.

Q    About how long did you stay with him before the medical people got there?

A    It was minutes.  It wasn't seconds.  It was, at the most, maybe two, three minutes.

Q    All right.  Now, had you seen the person that you were helping before?

A    Yes.

Q    Did you know who he was?

A    The name he gave me was Hakim.  At that time I was going to C.T.C.

Q   What is that?
A   Career Training Center, to obtain my certification as a nursing assistant.  And he told me that he used to go there and that he wanted to get back into going.  He was going for business or something and he wanted to go back.
Q   Did you recognize the person that was sitting on this person and jabbing him?
A   No.

2905

Q   Could you make out the person's face?
A   No.
Q   Could you give us a description, however, of the person that you saw doing the stabbing or jabbing?
A   A physical description, basically, yes.
Q   Give it to us.
A   I would give it as I myself am five-six-and-a-half.  They would be shorter than me and much, much smaller.  They were a thin person.  You could tell by the way they were bending as to their physical stature, and this was not a big person.
Q   How long have you lived in that neighborhood?
A   Two years.
Q   Have you ever seen this gentleman here in the blue shirt, this gentleman here in the green shirt, or James Roane over there in the blue blazer and white shirt, ever seen these gentlemen before, any or all of them?
A   Yes.
Q   You have seen them around the neighborhood?
A   Yes.
Q   I will ask you specifically, the gentleman over there, James Roane, was that the man you saw sitting on Hakim's chest jabbing him?

2906

A   No.
Q   Did you tell the police that that night?
A   They didn't ask me that.
Q   What did they ask you?
A   Could I identify the person.  They didn't ask me was there a particular  --  did I think that it was a particular person.  They asked me could I identify them facially.  No, I couldn't.
Q   Did you give a statement to Detective Dalton of the Richmond Bureau of Police?
A   Yes.
        MR. BAUGH:  Thank you, ma'am.
            CROSS-EXAMINATION
BY MR. VICK:
Q   In your statement to the police, Ms. Taylor, you have told the police, in fact you have told Detective Fleming, that you could not, based upon what you saw, even state whether the person who was stabbing the

victim was a man or a woman.

A    Yes.  That's true.

Q    You don't even know whether it was a man or a woman.

A    That's true.  I don't know the gender, no.

Q    All you can say is that you saw somebody bending down over the victim stabbing that person.

2907

MR. BAUGH:  Objection.  That is assuming a fact not in evidence.  She has given a description.

THE COURT:  It is a question.  She can answer.

THE WITNESS:  Well, like I said, I went to Career Training Center to obtain my certification for nursing assistant.  One of the skills that we were taught was observation.  It takes a few seconds to give a very good observation if you observe carefully, and that's what I did.  I said I could give physical stature, size, and height.  But as far as characteristics  --

BY MR. VICK:

Q    If you will just listen to my question.

MR. BAUGH:  She is answering the question. She said "No, I saw more."

THE COURT:  Overruled.

BY MR. VICK:

Q    You saw the person actually bent down over the victim?

A    Yes.

Q    You did not see the person standing up at full height, either, did you?

A    No, but if I was to sit out here and stoop, you could tell I'm a moderately large woman, fairly

2908

tall.

Q    You are basing that  --

A    On my observation.

Q    Just based on the fact somebody was stooped over stabbing someone?

A    From my observation skills and what I have learned as far as observation goes, yes.

Q    You know "Whitey" because you dated him, didn't you?

A    We were friends.

Q    Didn't you date him?

A    Kind of.

Q    Aren't you good friends with "Whitey's" family?

A    Yes.  But I need to clarify that before you go any further.

Q    I don't need to go any further.  You are good friends with the family?

A    To say that, you would assume that I have known "Whitey" as well as the whole family, and that since this has happened I have had contact with them.

Growing up in the neighborhood that I grew up in, yes, his uncles and cousins lived down the street, grandmother around the corner.  Since leaving that neighborhood when I was 17, I'm now 24, constant contact has not been there.

2909

Q    You have dated him since then, haven't you?
A    We were close friends.  Not really dating.  It started out that way, but we recognized that friendship was better and left it at a friendship.
Q    You stated to Detective Dalton there was a long time between the shots you heard and  --  you heard shots prior to looking out the window?
A    Yes.
Q    There was a long time between the shots and the stabbing?
A    Yes.
Q    Did you see the murder victim, Doug Moody, actually get stabbed?
A    I wouldn't say that.  At the time of looking out my window I was seeing him being stabbed.  Until I saw him when I went out my door, I didn't know that what they were doing was stabbing him.  I thought they were robbing him.  But once going out my door, it became clear what they were actually doing.
Q    You have known for some months that James Roane has been charged with that murder, haven't you?
A    No.  When he came he did not  --  he didn't mention "J.R." at all.  He only talked to me about "Whitey."  The only way I found out that you were trying to say it was "J.R." was when the defense

2910

attorney came.
Q    Are you telling the ladies and gentlemen of the jury that you have dated "Whitey"  --
          MR. GEARY:  She never said that.
BY MR. VICK:
Q    Excuse me, that you were good friends with "Whitey" but that you have not noticed in the newspaper that "Whitey" and James Roane have been charged with a series of murders?
A    To answer that, I would say I have three children; I go to school full time; I work six days a week.  The only day I have off is Sunday, and basically I sleep.  I don't read the paper.  I rarely watch TV.  I rarely socialize with people because there is no time.  To be a mother, full time student, and working, what time do I have to do all of that?
Q    My question is simple.  You did not know that James Roane  --
A    No, I did not.
          THE COURT:  Overruled.
BY MR. VICK:
Q    You did note know that "Whitey" and James Roane

were charged with a series of murders, including the murder of Doug Moody?

A    No.

2911

Q    Can't identify whether it was a man or a woman who was stabbing that person?

A    Gender?  No, I cannot.

MR. VICK:  Beg the Court's indulgence. Nothing further.

REDIRECT EXAMINATION

BY MR. BAUGH:

Q    Ms. Taylor, if it was a woman, was that woman smaller, about the same size or smaller than you?

A    Way smaller than me.

Q    And if it was a man, was that man way smaller than you?

A    Way smaller.

Q    If it was a man or woman, was it smaller than Mr. Roane?

MR. VICK:  Leading.

THE COURT:  I'll let it in.

BY MR. BAUGH:

Q    If it was a man or woman, was it smaller than Mr. Roane?

A    Yes.

MR. BAUGH:  Pass the witness.  No further questions.

THE COURT:  The witness may stand down.

MR. BAUGH:  We have no objection to her

2912

being excused.

(Witness stood aside.)

Subject to Mr. Dalton's availability, we will rest.

THE COURT:  Mr. Wagner, have you got your other witness?

MR. WAGNER:  I have no further witnesses.

THE COURT:  You have no further witnesses.

MR. BAUGH:  Perhaps if we took a 15-minute break, the attorneys could get together and we could talk about what we are going to do with Mr. Dalton.

THE COURT:  Let's do that.  I really can't tell you how long it will be, but 15 or 20 minutes. We are trying to figure out what we are going to do the rest of the afternoon and so forth.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Mr. Marshal, remove the defendants, please.

(The defendants were removed from the courtroom.)

THE COURT:  All right, we will take a few minutes, let you see if you can resolve your Dalton issue.  If it is resolved, I would probably take the

conducted with Priscilla Greene back on January 28th, do you recall asking her about the Douglas Moody killing?

A    Yes, sir, I do.

Q    All right.  If you would refer to page three of the transcript of that interview?

A    Yes, sir.

Q    About three-quarters of the way down, question by Detective Blaylock:  "You saw "J.R." stab him."  Greene:  "He had the knife."  You asked her what type of knife.  She said, "We left and went around the corner.  He was the only one left around there."  You asked her once again, "What type of knife was it?"  She replied "I don't know."  Is that correct?

A    That's correct.

Q    She did not know what type of knife it was.

A    That's her response.

Q    Do you recall after the murder of Peyton Maurice Johnson going to interview Stanley Smithers?

A    Yes, sir.

Q    And did you come in contact with someone you later found out to be Stanley Smithers?

A    That's correct.

Q    At the time you first tried to interview him, did he give you his correct name?

A    No, sir, he did not.

        MR. McGARVEY:  Thank you, sir.  That's all I have.

        THE COURT:  Mr. Baugh?

            DIRECT EXAMINATION

BY MR. BAUGH:

Q    Detective Dalton, as part of your duties for the Richmond Bureau of Police, were you assigned any part of the investigation concerning the death of Kareem A. Hakim, also known as Douglas Moody?

A    Yes, sir, I was the investigator.

Q    As a consequence of your investigation, did you meet a Ms. Gina Taylor?

A    Yes, sir, I did.

Q    Additionally, did you interview other witnesses?

A    Yes, sir, I did.

Q    As a consequence of your conversations with witnesses, did you identify an initial suspect?

A    Yes, sir, I did.

Q    Am I correct that that initial suspect was a gentleman known as Mr. Keith Barley or Barkley?

A    Keith Barley, B-A-R-L-E-Y.

Q    And Mr. Barley is a juvenile?

A    That's correct.

Q    Kind of a short little juvenile?

A    I recall him being sort of tall and lanky.  Not

over six foot or anything, a small-featured type person.

Q    Did you get a physical description of him?

A    Yes, sir.

Q    All right.  Did you put it in your notes?

A    I'm sure I put it in there if I got one.

Q    We will come back to that, if I might.

Now, when you identified Keith Barley, was that predicated in part upon statements given to you by Gina Taylor and statements given to you by Mr. Moody's mother, Ms. Catherine Wallington?

A    Keith Barley came into the picture through Ms. Wallington.  Ms. Taylor did not know anybody by names or descriptions.

Q    All right.  The description of the person that you were looking for given to you by Ms. Taylor, was that person described as the smaller black male in the dark clothing who was on top of the victim?

A    Yes, sir.

2929

Q    And you know, of course, that Mr. Moody, as per the autopsy reports, the decedent was only five-foot-six.

A    Yes, sir.

Q    Based on that, did you get the impression that the assailant was smaller, either in weight or height, than the victim?

A    I don't recall whether there were two parties involved or just the two, the victim and the suspect.  I would have to review my notes.

Q    Please take your time.  I'll refer you to your first page of your handwritten notes.  Excuse me, if I might.  "She then observed two males out of her window facing the alley.  Both were on the ground and the smaller black male in dark clothing was on top of the victim."

A    That would be the accurate statement she gave me that date.

Q    So based on that, am I correct in assuming that she only saw two people, one the victim, one the assailant?

A    Yes, sir.

Q    All right.  Now, did Ms. Wallington give you information that led you to identify Keith as the suspect?

2930

A    Yes, sir.

Q    And in her statement that she gave that led or contributed to your identifying Keith, did she tell you that someone named Keith had been by the house two hours before her son was killed looking for the victim?

A    Yes, sir.

Q    All right.  Did she also give you information,

other information, concerning Keith coming by the house earlier?  Referring to page three of your notes.

A    Which paragraph?

Q    Let me put it this way.  Without knowing the truth or falsity of her statement, did you receive information that someone, or friends of Keith, had kicked the door in while armed with machine guns?

A    Yes, sir.

Q    All right.

MR. VICK:  I would just note that Mr. Baugh has Detective Dalton on direct and not cross.

MR. BAUGH:  I have him on cross.

THE COURT:  Go ahead and ask your questions.  Finish up.

BY MR. BAUGH:

Q    I'm sorry, without knowing the truth or falsity, did she tell you that some friends of this young man named Keith had been to her house several weeks before armed with machine guns?

A    The way I have it written, "Approximately a week ago she came home to find the front door open.  Later a neighbor told her it was some friends of Keith that kicked in the door while armed with machine guns."

Q    Of course you didn't know if that was truthful or not?

A    No, sir.

Q    Additionally, did you receive information that her son had been hiding under a house next-door all that day?

A    Yes, sir.

Q    And that he was hiding out of concern for someone named Maurice?

A    That's correct.

Q    And that Maurice thinks that the victim had killed Maurice's brother a year earlier?

A    That's correct.

Q    Now, am I correct also then that Keith was cleared as a suspect or removed from the category of suspect because approximately two weeks later, Ms. Priscilla Greene, also known as "Pepsi" Greene, said she saw James Roane stab the man?

A    That's correct.

Q    Now, when Ms. Priscilla Greene told you that James Roane killed Douglas Moody and stabbed him, did you take a picture of James Roane back to Gina Taylor and ask her "Does this look like the person that killed Douglas Moody?"

A    I don't recall anything like that.

Q    All right.  So then am I correct that based on your recollection, without further reference to Gina Taylor, the eyewitness, the word of Priscilla Greene

cleared Keith Barley as a suspect?

A    Yes, sir.

MR. BAUGH:  Thank you.  Pass the witness. No further questions.

THE COURT:  Mr. Wagner, do you have any questions?

MR. WAGNER:  No questions, Your Honor.

THE COURT:  All right.  Government?

CROSS-EXAMINATION

BY MR. PARCELL:

Q    Detective Dalton, when you talked to Ms. Greene about the knife, you asked what type of knife it was; is that correct?

A    That's correct.

Q    You didn't ask her to physically describe the

2933

knife, did you?

A    No, sir.

Q    You indicated that you eliminated Keith Barley as a suspect.  When you talked to Wallington, she never saw Keith at her house, did she?  Everything she knew was something told  --

MR. BAUGH:  Objection.

THE COURT:  Ask one question at a time.

BY MR. PARCELL:

Q    When she related to you the incident about people coming by for Keith with machine guns, she didn't see that herself; that's what somebody told her?

A    I believe so.

Q    Do you want to confirm with your notes?

A    You are talking about the time the door was kicked in by friends?

Q    Yes, sir.

A    That's second-hand information she received from a neighbor.

Q    In regards to Maurice looking for Doug, that's not Peyton Maurice Johnson, is it?

MR. BAUGH:  Objection, unless there is a basis for his knowing.

THE WITNESS:  The only thing I have is the

2934

"Maurice."  Never were able to identify the exact Maurice.

BY MR. PARCELL:

Q    Never able to confirm that it was Peyton Maurice Johnson?

A    No, sir.

Q    Gina Taylor told you she did not identify or physically describe anyone in relation to the other person she saw in the alleyway with "Little Doug" Moody; is that correct?

A    That's correct.

Q    In fact, she didn't tell you she even saw him

didn't want to have to break it up with lunch.  So we will let you eat first.  So let me release you now. And let me say this:  If you all want to take a walk or whatever, you don't have to be confined to the room during this period.  The lunch will come in, and if you want to take a walk or do whatever, that's fine, as long as you are back in time to start at 1 o'clock.  You will notice as we go on, we will become a little bit more restrictive.  You won't be allowed to come and go.  I will feed you where you are and that kind of thing.  But today, I think it will be all right if you want to take a walk or something.  1 o'clock.  Your lunch will be there by, hopefully, between a quarter of 12 and 12.

(The jury left the courtroom.)

All right, remove the defendants.

(Defendants removed from courtroom.)

Mr. Vick, after we get started in the argument, at some point in the afternoon I think we need to get

2956

the video set up in the jury room.  You can either use ours or  --

MR. VICK:  We have the signal TV here that plays  --  if the Court thinks a single TV is enough, that plays the videotape correctly.

THE COURT:  That's fine.  As I say, we have smaller equipment than that as well.  Just so it is set up.

All right, 1 o'clock for arguments.

(Luncheon recess taken from 11:35 a.m. to 1:00 p.m.)

MR. VICK:  Your Honor, I believe Government Exhibit 149, the telephone toll records summary, has been redacted to everyone's satisfaction.

THE COURT:  All right, fine.  Let's bring in the jury, please.

(The jury entered the courtroom.)

All right, Mr. Vick?

## Vick Closing (2956)

MR. VICK:  Thank you, Your Honor.  Good afternoon, ladies and gentlemen.  As you know from the Judge, this is the government's opportunity to give its closing statement.  Closing statement is intended much like opening statement, to give you an outline of what we feel the evidence has shown and to give us an opportunity to argue to you what we

2957

believe, what inferences we believe you should draw from the evidence that has been presented to you from the witness stand.  Remind yourself as we stated in opening that evidence is just that.  It is what has come to you from the witness stand.  It is not what I

say, it is not what any defense counsel says. It is not what any argument that has gone on in the courtroom is. It is what has come from that witness stand.

And the purpose of my closing is to recount for you the evidence that has come before you in the last several weeks from that witness stand, and to summarize it in a fashion that I hope will allow you to go back to the jury room and make it easier for you to render your verdict.

But first I'd like to thank you. I'd like to thank you on behalf of all the lawyers involved. Your attention over the last few weeks has been admirable. We know we have taxed you at times. We know that the process of getting to this point is indeed a frustrating process to you people at some points. It is a very important chore that you are doing. We apologize if indeed at certain times it seems like we have stood in the way of that chore. But believe me, we are all trying to do our job and

2958

make it for you most possible to render the right jury verdict.

I told you at the beginning of this trial that the fact that this was a death penalty case would permeate the entire process. And I'm sure for you, just like for everyone else in this case, that fact has permeated the entire process. It would be humanly impossible for you to sit there and listen to the evidence that we have put on and think about that evidence and not to be considering the fact that we are seeking to put to death certain defendants in this courtroom.

But as I told you in opening, I'll remind you again now. Now is the time that you must put that aside. The fact that we are going to ask you to put to death certain defendants based upon their conduct need be set aside at this point. As you know from the voir dire and as you know from the Court's instructions to you, this is a bifurcated trial process. We are now entering into your decision-making process on the guilt phase alone. That is, are these defendants guilty as charged in the indictment. And until you render verdicts of guilty against these defendants on the particular capital counts involved in the indictment, you need

2959

not even worry about what the possible punishment should be. So put that aside to the extent that you can and concentrate only on the evidence and whether the evidence is sufficient to allow you to find each and every one of these defendants guilty. Is the evidence sufficient to prove to you beyond a reasonable doubt that each one of these defendants is

guilty as charged in the indictment.

I submit to you, ladies and gentlemen, that based upon the evidence that's been put forth from that witness stand over the last several weeks, that indeed your decision should be a fairly simple one as to the guilt of each one of the defendants. I don't suggest to you that that will make your job easy. I don't suggest to you that that makes your job less than important. I just suggest to you that the government has proven, well beyond any reasonable doubt -- again we don't have to prove it beyond all doubt, but beyond any reasonable doubt -- that these men and that woman are guilty as charged

Once you have found that, then we will go on to the second phase. But for this portion, ladies and gentlemen, remember that you must find only that the defendants have been proven beyond a reasonable doubt to be guilty of the crimes charged in the indictment.

I suggest to you that the evidence has been clear and unequivocal. That Richard Tipton, also known as "Whitey," is a ruthless murderer; that Cory Johnson, also known as "C.O.," is a ruthless murderer; that James Roane, also known as "J.R.," is a ruthless murderer. That 11 people lie dead in the streets of Richmond, Virginia because those men with others, including "V," wanted to make themselves rich selling drugs, wanted to protect their drug business. 11 bodies bled on the streets of Richmond, Virginia because of those men and their actions. I suggest to you also, ladies and gentlemen, that as to Count One of the indictment, the conspiracy count, that those gentlemen haven't truly argued to you, in either opening or in the questions presented to witnesses during the trial, that they are not guilty of Count One. They have implicitly conceded that indeed they have sold drugs, that indeed they sold drugs together. Count One in this case has been implicitly conceded by defendants James Roane, Cory Johnson --

MR. BAUGH: I must object on that issue.

THE COURT: Objection overruled. This is argument, Mr. Baugh.

MR. BAUGH: Note our exception.

MR. VICK: What you must find to find that they are guilty of conspiracy is very simple. The Court will instruct you as to what the law is. What I say is the law, what any one of these counsel says is the law, is not necessarily what the law is. What the Court instructs you that the law is is what the law is. What the Court tells you is the law is the law that you must follow. I will tell you that the

Court will instruct you that the law as to conspiracy is fairly simple. That is, ladies and gentlemen, if two people come together and agree to commit a crime together, if two people come together and agree to sell drugs together, they have indeed committed the crime of conspiracy. And I suggest to you that through opening and through the questioning of the witnesses that have been put on in this case, there can be no great issue as to the guilt of James Roane, Richard Tipton, and Cory Johnson as to Count One of the indictment, the conspiracy count. Each of them has admitted tacitly, if not implicitly, that they sold drugs. Each of them have admitted tacitly, if not implicitly, that they were together often. Each of them has admitted tacitly, if not implicitly, that they sold those drugs together in concert one with each other. So I suggest to you that your verdict as to Count One is a fairly simple verdict to render as to those three gentlemen. They indeed conspired. That is, they agreed, very simply, with each other to sell crack cocaine.

Remind yourself in rendering your decision on Count One of the testimony of Greg Scott. He told you from the witness stand about the existence of the New York Boyz, a group of people who grew up at 155th and Amsterdam Avenue -- and others who joined them -- but a group of people who grew up at 155th and Amsterdam Avenue in New York decided in 1989 to go to New Jersey and sell drugs. Included in that group was "Whitey" and "C.O." That because of a string of events that occurred in Trenton, New Jersey, a number of the New York Boyz got arrested. And unfortunately for the people of the City of Richmond, and particularly unfortunately for the 11 people who died as a result of their actions, Richard Tipton chose to bring some of the New York Boyz south. He brought with him Cory Johnson, "C.O.," Lance Thomas, "V," "Hess" came south with him. Paul, the Jamaican from Blackwell, came south with him. And the New York Boyz continued their actions here in the City of Richmond.

The question you need to render as to James Roane is whether indeed he chose to join that conspiracy and the New York Boyz here in the City of Richmond. And indeed, the evidence was clear and unequivocal that he did choose to join that conspiracy. The question as to Sandra Reavis is whether indeed she chose to join that conspiracy. Now, you will be instructed by the Court that to find someone guilty of a conspiracy, to find someone guilty of joining that conspiracy, you must have the mental agreement, that is, the agreement to join

together in crime.  But that mental agreement must result only in one small transaction.  A single event is enough to make one guilty of the conspiracy.  So you need not find that each one of these defendants joined in each one of the conspiratorial acts in order to find them guilty of Count One, the conspiracy.  You need not find that Sandra Reavis joined in each and every one of the murderous acts of this conspiracy in order to find her guilty of Count One.  You need only to find that she agreed to help these people sell drugs, and that she indeed did help these people in some way.

When you receive a copy of the indictment in the jury room, you will see that the trial has proceeded

2964

in about the same fashion as the indictment is drawn.  So I'll outline the specific evidence as to each count through my closing, and hopefully to aid you when you go back in the jury room to deliberate as to your rendering of the verdict on each particular count.

First, however, I would like to digress for a bit.  In opening and throughout the questioning in this case, counsel for the defendants have openly attacked, at times in an inappropriate and personal manner, the government's witnesses.  Remind yourselves, ladies and gentlemen, of Mr. Baugh's calling Dennis Moody a lying little man, an inappropriate and personal attack upon Dennis Moody. That same sort of personal attack was done again against Johnny Lee Byrd and a number of the other government witnesses in this case.

Some of our witnesses unfortunately let these personal attacks affect them and responded in kind in their responses to defense counsel.  Perhaps they should have been a bit more thick-skinned, but I think any of you who sat here and saw those personal attacks would know that they were calculated to elicit just such a response.  They were calculated to get the people on the witness stand mad, and

2965

hopefully get the sort of responses that Johnny Lee Byrd and Dennis Moody gave to defense counsel.  That does not mean that those people weren't telling the truth.  It just means that perhaps they weren't as thick-skinned as they should have been.

It has been implied throughout this trial, and indeed was stated openly in opening, that the witnesses of the sort the government has put on cannot be believed, and that therefore, your jury verdict shouldn't be rendered guilty based upon their testimony.

I suggest to you, ladies and gentlemen, that that is preposterous.  There is no way, absolutely no

way that you can look inside the inner workings of a criminal conspiracy and fully outline for the fact finders, fully outline for the jury, what is going on inside that criminal conspiracy without receiving the testimony from participants in that criminal conspiracy. It is necessary. Conspiracies, by their very nature, are secretive. They don't invite Detective Ralph Fleming in to see what they are doing. They don't invite Detective C.T. Woody or anyone of the other detectives that you have heard testify here in to see what is going on inside that conspiracy. They keep a dark veil over their actions. And that dark veil can only be peeled back through the testimony of the participants in the conspiracy. So the suggestion in opening and the implicit suggestion throughout the questioning of our witnesses that somehow this case cannot be proven with testimony of participants is wrong.

Now the Court will instruct you that you must look very closely at such testimony. You must scrutinize very closely testimony from witnesses of that sort. And we invite that, too. As I said in opening, and as I say again, I suggest to you that if you indeed scrutinize the testimony of the witnesses who have come forth for the government, you will see that they have told you the truth.

I remind you what I said in opening. Take their testimony and watch how it meshes one with the other. Watch how it meshes with the unimpeachable testimony from the police officers, from the custodians of the records which have been stipulated, from the other evidence that we know to be true. And I will suggest to you again that it shows that those witnesses who were participants in this conspiracy were indeed telling you the truth.

There is no evidence, ladies and gentlemen, with the exception of Hardy, Sterling Hardy and Gaiters, that any of the people brought forth by the government and placed on this witness stand to provide evidence to you knowingly and willingly engaged in a murder. And I ask you to consider that when making your decision as to whether or not to believe the witnesses brought forth by the government.

Now, as I said in opening, you are brought here for a very simple reason; and that is to apply your common sense to the facts that you hear from that witness stand and to determine, based upon your common sense, whether those people are telling you the truth. We as lawyers tend to get caught up in things that aren't commonsensical. We as lawyers tend to look at things through somewhat jaded vision

sometimes.  But apply your common sense to each and every witness that took that stand and say were they telling me the truth?  Even though they are criminal participants, many of them, were they telling me the truth?  And I suggest to you that when you do that, you will find that they were telling you the truth, that they are not murderers.  That the government has indeed cut deals, as you will hear from the defense attorneys, for their testimony; that the government indeed has told these people that the words that they

give to you from that witness stand will not be used to prosecute them, with the exception of Hardy and Gaiters, who were knowingly involved in murders by their own testimony, who are facing sentencing in this Court, by this Judge, for their involvement in those murders.  Ladies and gentlemen, again I remind you, you cannot penetrate a conspiracy without some of the participants in the conspiracy cooperating with you.  It is not an exact science.  Use-immunity agreements had to be given.  We feel like we gave use-immunity agreements to only those people who were not murderers in this case.  There has been no evidence that anyone other than Richard Tipton, Cory Johnson, James Roane, Lance Thomas, Sterling Hardy, and Jerry Gaiters were involved in the murders.

Ask yourself again to apply your common sense to the giving of use-immunity to these witnesses.  We have told these witnesses that if you come in and if you tell us the truth, each and every one of them predicated their testimony upon telling the truth.  That's the condition upon which they received use-immunity.  If you come in and if you tell us the complete truth, we won't use those words against you.  Think if you were them.  Think if you were sitting in their shoes what you would do.  Would you

hold something back from the government knowing that the government is speaking to a number of other people who are also getting use-immunity, or would you be fearful that the other people were telling them about your involvement, that portion of the involvement that you were holding back and not telling the government about.  You wouldn't do that.  It makes no sense.  If you are going to be given use-immunity for what you are going to testify about, it is in their best interest to tell the government each and every thing that they have done criminally.  Because then they won't be prosecuted for it.  To withhold that information could subject them to prosecution.  And again, remember, they don't know what the others are telling us about their involvement.  It is in their best interest.  And I'm not suggesting to you that many of these people came

forward through some sense of magnanimous citizenship. They came forward because they cut a deal. But that deal made it in their best interest to tell the complete truth. Apply your common sense to that.

It has been openly argued that the government has bought witnesses' testimony and that each witness in turn has been told how to testify. There has been absolutely no evidence about that presented in the courtroom. Each witness has unequivocally stated that their testimony has been the result of their own participation, as a result of their own knowledge. Each witness, without exception, said that the government did not provide them with the answers to their testimony. That's proven by the nature of the testimony itself.

Again, apply your common sense to what you have heard from that witness stand. For example, look at the testimony of Sterling Hardy and Jerry Gaiters concerning the murder of Louis Johnson on January 29th, 1992. Sterling Hardy said that when the car in which James Roane was driving pulled up and "V" and "C.O." got out of the car, that all three men walked around, surrounding Louis Johnson, and all three men fired, killing him. Jerry Gaiters, on the other hand, testified that the car pulled up just as Sterling said, that all three men got out of the car, just as Sterling said, but unlike Sterling, that James Roane walked over, put a gun to Louis Johnson's head, pulled the trigger, and it misfired. He said "V" then fired a single shot into Louis Johnson, and that Cory Johnson fired the rest of the shots into Louis Johnson. Does that mean that one of those gentlemen is lying? No, it doesn't mean that one of those gentlemen is lying. Indeed, it is indicative of the truth. If we had indeed orchestrated the testimony as has been argued by counsel, don't you think we would have orchestrated such inconsistencies out? You have seen those inconsistencies from other witnesses. "Man Man," Charles Townes, testified as to the amount of cocaine coming into town on a weekly basis, which was not consistent with the testimony given by Denise Berkley as to the amount of cocaine coming into town each week. Does that mean that they are lying? No. Ask yourselves, ladies and gentlemen, if anyone of you went out of here and described what had gone on in here the last three weeks, do you really think you would describe it in exactly the same way as the person sitting next to you? I don't think so. That's human nature. Each of us sees things a little differently. It doesn't mean that Sterling Hardy was lying, but it does

indeed prove to you that we have not orchestrated the testimony. We would have orchestrated such inconsistencies out of the testimony. We have brought you our witnesses, warts and all, ladies and gentlemen. It is a necessary thing to peel back the cover of this conspiracy.

One last thought on that. Sterling was completely justified, if indeed he is wrong, as to how it happened and Gaiters is right. He is completely justified in thinking that when three men get out of a car and surround a fourth man, who they clearly want to kill, and gunfire emanates from that very location, that all three of them fired if all three of them had guns. Is that a man who is trying to lie or is that a man who is trying to recount for you what he believes happened that day?

Ladies and gentlemen, your common sense, when applied to the testimony, indeed tells you that our witnesses were telling the truth. Another interesting note about that particular piece of testimony. Mr. Baugh in his argument and in cross-examination made a great point of the fact, indeed I would say conceded, that James Roane had indeed been there and tried to fire and kill Louis Johnson, but his gun had misfired. That makes not a whit's bit of difference. If indeed that is what happened, James Roane is guilty of that murder. Do you think because his gun misfired when he intended to fire into the head of Louis Johnson that that absolves him of that murder? No, all three of those men were there with the pure and simple intent to

kill Louis Johnson. If Roane's gun misfired, it does not mean that he is not guilty of that. Listen to the Court's instructions. See what the law is, and you will see that that was an attempt to mislead you as to what the law is in an effort to confuse you as to the guilt or innocence of James Roane on that particular instance.

MR. BAUGH: I must object to this. That is a personal attack and that is not what happened.

THE COURT: Overruled.

MR. VICK: It was argued, as I stated earlier, that we have bought testimony. Let me back up a second. I would suggest to you, too, ladies and gentlemen, that despite the minor inconsistencies of testimony in this case from the government's witnesses, there has been no inconsistency whatsoever concerning the crucial aspect of what this case is all about. There has been no inconsistency whatsoever concerning the involvement of these individuals, one with another, in the sale and distribution of cocaine. There has been no

inconsistency whatsoever concerning the fact that these men operated a murderous, treacherous conspiracy, laying bodies in the streets of Richmond, Virginia.  Don't lose sight of that.  Don't lose sight of the forest for the trees, so to speak. Don't lose sight of the fact that it has been remarkably consistent testimony from each and every one of the witnesses concerning the overall scheme of this conspiracy.

Now, moving on, as to the argument that we bought the testimony in this case, there has only been evidence elicited from that witness stand of money given to witnesses in this case in one regard and one regard only:  Money has indeed been given to certain witnesses who testified here as a necessary expense for their relocation in the Witness Protection Program.

Think about what it costs to relocate somebody. Think about what it means to take somebody from a city, put them in another city, find them an apartment and get them back on their feet, having ripped them from their place of residence.  Indeed, that costs money.  That's not big testimony, ladies and gentlemen.  We would be an irresponsible government if we asked witnesses of the sort who came forward and testified in this case to testify against people like these and not offer them protection. Does that make them bounty hunters?  No, it doesn't.

We would be an irresponsible government, ladies and gentlemen, to expect that Martha McCoy and Montez McCoy would come forward and testify as they testified and then be patted on the behind and sent outdoors and told take care of yourself.  You heard the testimony of Valerie Butler, that they wanted to go back and kill all the survivors to that shooting. We would be an irresponsible government to allow those people to stay in their place where these people could get their hands on those witnesses. Does that make Montez McCoy a bounty hunter, because we have paid for his relocation?  Does that make Stanley Smithers a bounty hunter, because we have paid for his relocation?  No.  That simply means that we have acted responsibly as a government in order to bring forth the sort of testimony that's necessary to peel back the cover of this conspiracy.

You ultimately must decide whether such witnesses told you the truth.  Again, listen to their testimony, apply your common sense, listen to how it meshes one with the other, and listen to how it meshes with the testimony from unimpeachable sources. And I suggest to you that when you do that you will render a very clear choice that indeed the witnesses

brought to you by the government were telling the truth.

2976

Now, let me talk as to the specific testimony as to each count. Count One, as I've already spoken about shortly, deals with the conspiracy to distribute more than 50 grams of crack cocaine. That is, the knowing coming together, the knowing agreement of these people and other people to get together in concert, one with the other, to aid each other in the sale and distribution of more than 50 grams of crack cocaine. I would suggest to you that there is not an issue in this case as to what the substance was. Each and every witness said it was crack cocaine, cook-'em-up, that was sold. Counsel, I would suggest again, has not argued the fact that Richard Tipton, "Whitey," Cory Johnson, "C.O.," James Roane, "J.R.," sold crack cocaine. They have not argued otherwise.

As to the 50-gram amount, ladies and gentlemen, you have heard testimony of kilograms of cocaine. I remind you of Maurice Saunders' testimony. You have heard testimony of ounce after ounce of cocaine being cooked up and sold on a weekly basis here in the City of Richmond. There is absolutely no issue concerning whether there was more than 50 grams of crack cocaine sold by these people.

Again I suggest that each one of the defendants,

2977

with the exception of Sandra Reavis, has implicitly conceded to you their guilt on Count One of the indictment. So let's concentrate for Count One of the indictment on Sandra Reavis.

You need to determine whether Sandra Reavis indeed joined the remnants of the New York Boyz when they came south and set up shop here in Richmond, Virginia, set up shop with James Roane. You need to determine whether indeed Sandra Reavis decided that she would join them in the sale of cocaine. I'll remind you of the testimony about the New York Boyz, 155th and Amsterdam Avenue, went to Trenton, and came then south through "Whitey" and set up shop in Richmond. And I'll show you how the testimony meshes in that regard, and is an example of how you should go back and weigh the testimony that you received from the witness stand and see how it meshes. Remember what Greg Scott told you about that, 155th and Amsterdam Avenue, the New York Boyz, "Whitey" and "O" got cocaine, and this is very important, "Whitey" and "O" got cocaine. Their primary source of cocaine was from a fellow named "Light." Remember that testimony? Maurice Saunders later testified he doesn't know Greg Scott from Adam. Has never met Greg Scott. But Maurice Saunders testified to you

that indeed he went to 155th and Amsterdam Avenue in New York with Hess and "Whitey" to get cocaine. And who did they get cocaine from? "Light."

Again, that clearly rings true, that testimony. It shows you that those people are telling you the truth, and the only way they wouldn't be telling you the truth is if you indeed believed that we got together and orchestrated their testimony in some way, told them how to testify. If you don't believe that, then indeed that proves their testimony to be true. How could two people testify about the same thing when they have not had an opportunity to talk to each other, don't know each other? The only way they could is if that is indeed a fact.

As to Sandra Reavis, there have been a number of witnesses who have come forward and testified to her joining that conspiracy, her joining the New York Boyz. You have heard testimony from Denise Berkley, Robert "Papoose" Davis, Valerie Butler, Jerry Gaiters, Priscilla Greene, and others that indeed said that she sold cocaine for James Roane, "Whitey," and "O." Indeed, Valerie Butler accounted to you on February 11th, 1992 that she took a packet of cocaine from "O" to Sandra Reavis and delivered it to her at Willow Lawn. Let me stop for a second and tell you, Sandra Reavis is only charged in the first count. That's all you need to determine about her, whether she indeed did join the conspiracy. She is not charged with any of the murders, only with the conspiracy count. So as to her guilt or innocence, you need only concentrate on deciding Count One of the indictment.

Later witnesses have told you that she indeed delivered a handgun to Richard Tipton. You got that testimony from the reluctant Greg Noble, who had to be led through his testimony because he didn't want to testify against his cousin, "Whitey," and you got it from Leroy Slater and Valerie Butler, that Sandra Reavis, indeed when "Whitey" came back from New York and set up shop in Blackwell, delivered him a .38. Remember, Leroy Slater said it was wrapped in plastic. Remember what Detective Rodriguez testified to you; that on April 9th, 1992 he went to that residence that "Whitey" had set up shop at and seized a .38 revolver which was wrapped in plastic. Again, it tells you Lee Roy Slater is telling you the truth, unless you think we got together and orchestrated his testimony and told him "Leroy, tell us it was wrapped in plastic." Unless you believe that, then J. Rodney Rodriguez confirms that Leroy Slater was telling you the truth about that. And ask yourselves to apply

your common sense to that testimony.  Why would "Whitey" allow Sandra Reavis to bring him a .38 for use, a .38 that had a dead body on it, a .38 that had been used to kill Katrina "Nat" Rozier, unless she was one of the initiated.

Criminals do not knowingly associate with the uninitiated.  Criminals, conspirators, do not allow the uninitiated to look inside their criminal empire.  They would not have allowed Sandra Reavis to have the knowledge that she had unless she were a member of the conspiracy.

Remind yourself of the testimony, when rendering the verdict against Sandra Reavis, of Denise Berkley; that at the time just prior to the murder of "Mousey" Armstrong, that "O" summoned her to 1212 West Moore Street to tell her that she had problems because of the drug debt, and that she better kill "Mousey." Remind yourself of the testimony of Denise Berkley that "O" said to her, "If you don't kill 'Mousey,' Sandra is going to kill 'Mousey.'"  Sandra Reavis. Excuse me, "Sandra is going to kill you."  Remind yourself of that testimony, ladies and gentlemen.

And all of that testimony, the repetitive testimony about her involvement in the sale and distribution of cocaine, is proven true by a single thing.  When you go back, look at the government exhibit, the Western Union wire transfers, march 5th, 1992.  Money was transferred from the City of Richmond to New York City in the amount of several thousands of dollars, about $1,400 or so, to get "O" out on bond.  And look at the name on those wire transfers.  Look at the name, and those records are -- have been stipulated to as true and accurate. Who sent that money?  Sandra Reavis sent that money. Apply your common sense to that.  And it tells you that indeed she is guilty as charged in Count One.

"O" is in jail not under his real name, Cory Johnson, but in jail under his name Kevin Hill, having been caught with the Glock in his waistband that was used to kill Linwood Chiles and Curt Thorne.  He was anxious to get out of jail before the ballistics tests came back on that gun.  And who does he get in touch with but Valerie Butler and Sandra Reavis?  Would a man in that situation get in touch with the uninitiated in an effort to get himself out before the ballistics tests came back?  No.  Would he contact someone other than a member of the conspiracy to help him get out of that situation?  No.  That single piece of evidence, ladies and gentlemen, proves to you that what all the witnesses said about Sandra Reavis was true.  She is guilty of Count One of that indictment.  She is guilty of providing

"Whitey" the gun that was used to kill Katrina Rozier. She is guilty of holding that gun, that gun that the conspiracy used -- we are not sure which one -- but that the conspiracy used to kill Katrina Rozier came from Sandra Reavis.

Apply your common sense and you will have no problem, I suggest to you, rendering a verdict of guilty against Sandra Reavis on Count One of the indictment.

Count Two of the indictment charges "Whitey," "C.O.," and "J.R." with operating a Continuing Criminal Enterprise. Now, the Court is going to apprise you of what the law is, but a Continuing Criminal Enterprise is also a fairly simple concept. A Continuing Criminal Enterprise means that you have an ongoing series of felony violations of the drug laws of the United States. And that's simple. Each and every sale of crack cocaine perpetrated by these people was a felony. Each and every one of them. So clearly, you would have no problem determining that there was an ongoing series of felony narcotics violations. You need the instructions to show --

2983

we will show you, you need to find that there have been at least three. You had three sales of crack cocaine given in the testimony probably in a ten-minute period on any particular day during the life of this conspiracy. I would suggest to you there is no issue as to the series, the continuing series of violations of the felony drug laws of the United States. Remind yourself that each and every distribution of crack cocaine is a felony violation.

The next thing we must have proven to you in order to find them guilty of a CCE is that it was undertaken with five or more people acting in conjunction. And in deciding this, remind yourself of the testimony of Greg Scott about the New York Boyz. There were 30 or so New York Boyz operating in Trenton, each of whom recruited to themselves workers. In Richmond, when the New York Boyz came south with "Whitey," you had the following people, at least, who were working with them in the sale or distribution of cocaine. You had Denise Berkley, Priscilla Greene, Curt Thorne, Linwood Chiles, Jerry Gaiters, Sterling Hardy, "Papoose" Davis, Hussone Jones, Charles Townes, "Man Man," Maurice Saunders, Antwoine Brooks. You had the people from Charles City that were testified about. You had Pam

2984

Williams, Charlotte Moore, Greg Noble, Sam Taylor, and a number of others you have heard testimony about. Well in excess of five people just here in the City of Richmond who these people recruited to sell crack cocaine with them.

So that aspect of the CCE is also very clearly proven in this case. That is not an issue.

What is an issue -- let me back up as to the five or more people. You need not find that each and every one of these people charged with the CCE, and charged with the CCE are "Whitey," "C.O.," and James Roane, you need not find that each and every one of these people supervised five or more people themselves. You need find only that as a group, there were five or more people involved. And I suggest to you it is clear from the evidence that there were five or more people involved in the distribution of cocaine, just here in the City of Richmond.

But what will be an issue and what you do need to determine in order to determine that indeed a CCE was operated by these people, Continuing Criminal Enterprise was operated by these people, is whether "Whitey," "C.O." and "J.R." occupied a position of organizer or supervisor. And I suggest to you in that regard, the testimony is also clear and unequivocal. They came down with their source of supply from New York, their source of cocaine, and they orchestrated, organized the people we have already mentioned to you in a distribution outlet, a distribution network. Each and every witness who took that stand testified remarkably consistently concerning their relationship one with another; that "J.R.," "O," "Whitey," "V" were partners or bosses; that they were the people who organized the workers, who went out and recruited the workers, who supplied the workers with the cocaine, and that those workers went forth and sold their cocaine on the streets of the City of Richmond. That's all that is required by the law. It is not required by the law, as will be argued, I suggest, that they needed to provide explicit directions in and orders to each and every one of the people that sold cocaine for them. Although there has been testimony that indeed they supplied directions and orders to these people, that is not necessary in order for you to find them guilty of operating a Continuing Criminal Enterprise. The language is clear there. All you need to find is that they organized people. And indeed the evidence is clear and unequivocal that they organized a number of people here in the City of Richmond to sell drugs.

The final thing that you must determine in order to find them guilty of Count Two, that is, operating the Continuing Criminal Enterprise, is that indeed they received substantial income. I told you in opening that substantial income is a fairly nebulous

term.  It is a subjective standard which you must render in determining the verdict here.  The law and the instructions will show you that it must be ample income; that these people supported themselves doing that.  I suggest to you there is no contest whatsoever that that's exactly how these people supported themselves; that indeed they generated enough money selling crack cocaine to live on.  That's all that's necessary to prove substantial income.  We don't need to prove, as was implicitly suggested to you through the questioning by defense counsel, that they were rich, that they had Rolls Royces, that they had mansions.  We do not need to prove that under the law.

Now, I don't know how these men came about choosing what they wanted to spend their money on.  But it is clear that they had enough money if they wanted to buy a car, had enough money if they wanted to take fancy trips or have gold jewelry.  But they didn't choose to do that.  Denise Berkley told you that their money went back to the New York Boyz.  But it is clear that thousands of dollars a day changed hands because of their crack distribution.  Remind yourself of the testimony about "Mousey" Armstrong selling to as many as 50 people a day.  If she sold only one $20 rock to each one of those people, she has generated a thousand dollars of income a day for that conspiracy.  It is not net income, it is just the amount of money that's generated.

Remind yourself of the testimony of Maurice Saunders; that on one occasion he took $18,000 to New York to purchase cocaine, and on the another occasion he took $40,000 to New York to purchase cocaine.  The money came from "Whitey."  $40,000 is a lot of money, ladies and gentlemen.  And from unimpeachable sources we know that they generated substantial money.

Remember the $3,000 that was seized in New Jersey by Officer Jeanne Keim.  Remember on March 20th, 1992 when she stopped "Whitey" and "Man-Man" and Hussone together, they had $3,000 cash that they were going to New York and buy cocaine with.  Look at the firearms purchases, the thousands of dollars spent on firearms, cash.  Look at the rental car agreements.  There was substantial money spent on the rental car agreements.  Look at the wire transfers to New York to get "O" out on bond, thousands of dollars.  That in and of itself is ample income from a continuing series of drug violations.  We don't need to prove that these men made themselves rich.  We need to only prove that they made ample income, and indeed the evidence is clear and unequivocal that they made ample income.

The next group of charges deals with Count Two, the Continuing Criminal Enterprise.  The next group of charges are predicated upon the Continuing Criminal Enterprise.  And that is the murder charges.  They are predicated upon two things, the murder charges.  There are a number of charges outlined in here that are charged under 21 U.S.C. Section 848.  That is, murder in furtherance of a Continuing Criminal Enterprise.  Each and every one of those murders, with the exception of Torrick Brown -- we will speak about that later -- all of the murders with the exception of Torrick Brown are charged under 21 U.S.C. 848, murders in furtherance of Continuing Criminal Enterprise.  And each of the murders is charged also under Title 18 United States Code Section 1959, violent crimes in aid of

2989

racketeering.  So for the Title 21 murder charges, you need to find that there was in existence a CCE, a Continuing Criminal Enterprise, as a predicate for finding these defendants guilty on those murder counts.  Let me talk about that for a second.

That does not mean that you must find that "Whitey" was guilty of operating a Continuing Criminal Enterprise.  It does not mean that you must find that "C.O.," or that James Roane, was guilty.  I tell you that indeed the evidence is clear and unequivocal that they were indeed guilty of that, of operating a Continuing Criminal Enterprise.  But you don't need to find that each one of them is guilty of operating a Continuing Criminal Enterprise in order for the murder charges to flow therefrom.  You need only find that the murder charges were done in furtherance of or during a Continuing Criminal Enterprise.  You might indeed find that indeed "Light," the head of the New York Boyz, ran the Continuing Criminal Enterprise.  If that is your finding, then indeed you could acquit -- and don't get me wrong, I think each one of these defendants is guilty of Count Two with the exception of Sandra Reavis; she is not charged -- but you could still find them guilty of the murder charges that flow from

2990

the murder in furtherance of the Continuing Criminal Enterprise.

The murders are also charged as violent crimes in aid of racketeering.  In order to prove that, we must show there was a racketeering enterprise.  A lot of this is duplicative, ladies and gentlemen.  If you find a conspiracy to sell and distribute drugs, then in essence the law will tell you you have found a racketeering enterprise.  Because racketeering is defined as drug distribution.  So if you find there is a conspiracy, then you have got a racketeering

enterprise, if another technical requirement is met, if you show it affected interstate commerce. That's easily dismissed. You know about the trips to New York to get cocaine. That affects interstate commerce. They go back and forth in interstate commerce. And indeed, you have the gun purchases, which are guns flowing in interstate commerce. So you have the necessary prerequisites for the 1959 charges. You don't need to find them guilty of violent crimes in aid of racketeering to find that a CCE was operated.

Don't get me wrong. Very clearly, the evidence has shown that each one of these gentlemen are guilty of operating a Continuing Criminal Enterprise, but you don't need that to find them guilty of 1959.

Let's move now to the specific counts in the indictment that flow -- the specific murder counts that are a result of the CCE and the racketeering enterprise. Count Three charges the incredibly brutal murder on January 5th, 1992 of Doug Talley. Remind yourself that you heard the testimony from Charles Townes, "Man Man," and Hussone Jones, and Johnny Lee Byrd about that murder. That man, Doug Talley, was brutally murdered by that man, with the aid of James Roane -- by "Whitey" with the aid of James Roane -- because they thought he was "5-0." They thought he was a snitch. They thought he was cooperating with the police. They did it to protect the Continuing Criminal Enterprise. It was a murder during a Continuing Criminal Enterprise.

So they are guilty, if you believe they committed that murder, of an 848(e) murder. Richard Tipton is guilty of an 848(e) murder if you believe he indeed committed the murder of Doug Talley. And I suggest to you, ladies and gentlemen, that the testimony of Charles Townes, Hussone Jones, and Johnny Lee Byrd about his involvement in that murder, about the stabbing of Doug Talley more than 80 times, many of them to the head, about the stabbing that Hussone Jones told you about that resulted in the knife getting stuck in his head by Richard Tipton, I suggest to you that that testimony, too, was all proven true by a single item, a single damning piece of evidence: Richard Tipton's bloody fingerprint on the door of that car. Cross-examination by defense counsel tried to mislead you there, also, asking could that fingerprint have been there, sir -- in questioning the FBI fingerprint expert -- how long could that fingerprint of blood have been there? That fingerprint in blood came from the blood of Doug Talley. Your common sense tells you only that. That single piece of evidence tells you that what Hussone

Jones witnessed did indeed occur. Richard Tipton's bloody fingerprint was found on that car door.

There was another piece of interesting cross-examination that flowed from that particular murder testimony. You might remind yourself and remember the testimony of the doctor who testified in the defense case about the fact that James Roane had no gashes, no puncture wounds in his hand. Who said he did? Hussone Jones never testified that he had a puncture wound. Nobody ever testified he had a puncture wound. Again, it was an attempt to mislead you from the truth. Because the brutal truth, these defendants can't stand up to. The brutal truth is that "Whitey" stabbed that man in the head over 80 times because they thought he was police, to protect the conspiracy. Hussone Jones told you that James Roane put his arm around Doug Talley's neck and then removed it once Tipton started stabbing him and came back to his car. Remember his testimony? Check your notes. "Man, he almost got me, 'cuz almost got me." He didn't say he had been punctured. They tried to mislead you in another regard about that particular murder, crossing Dr. Fierro about what kind of cut in the body would be left by a serrated knife. Nobody from the government's witnesses ever testified anything about a serrated knife. Hussone Jones didn't say the knife was serrated. "Pepsi" Greene, who identified the knife later, did not say it was serrated. In fact, she drew a picture showing you it wasn't. Yet there was cross-examination of Dr. Fierro about a serrated knife. "Wouldn't that leave a different kind of imprint?" Again, an attempt to mislead and misdirect you, because the facts are damning.

Count Four is the 1959 murder of Doug Talley. That is, a murder in aid of racketeering. I won't belabor that as to each count. Each one of these murders, again with the exception of Torrick Brown, has charged a murder in violation of the Continuing Criminal Enterprise, an 848 murder, and a 1959 murder. They are guilty if you believe that they murdered them, based upon the recitation of the law, as to each one of those counts, if you believe that the people who are charged in there did indeed commit those murders.

Also charged, beginning with the Doug Moody murder which we will talk about next, is use of a firearm during a drug trafficking crime or a crime of violence. It couldn't be any more simply stated than that. If you find them guilty of murdering the people as the evidence and as the government has argued, through the use of a firearm, they are guilty

of that.  So each one of these counts that follow hereafter also have firearms charges with them.  I won't belabor that issue.

Counts Five through Seven deal with the murder of Doug Moody.  He was shot and stabbed.  Count Six, by the way, deals with the use of a firearm.  Moody was killed over drug turf.  Remind yourself of the testimony on January 13th, 1992.  He was killed in the house there on Clay Street, shot in the back room, went out the window, and was stabbed repeatedly

2995

by James Roane over drug turf.  "Pepsi" Greene told you that.  And the other witnesses' testimony meshes in that regard.  Remember, Doug Moody worked for Peyton Maurice Johnson.  They didn't want anyone else operating in their territory, consistent with the testimony of Greg Scott.  They would kill anybody who came in their way in order to take over turf.  He didn't say "kill," he said "harm."  Remind yourself of what they did to Anthony Howlen in New Jersey, with all the cuts in his face because he tried to sell cocaine on the same corner that "Whitey" and "O" were selling cocaine.  That is the motive for the killing of "Little Doug" Moody.  That makes it an 848 murder.  That makes it a murder in furtherance of the Continuing Criminal Enterprise.

Remember the testimony of "Pepsi" Greene, that she indeed disposed of the knife that had been used to stab Doug Moody, and that she had been given that knife by James Roane.  Remind yourself of the testimony of Robert "Papoose" Davis, that he heard James Roane and "Whitey" when they came to his house after the killing of Doug Moody brag about how they really fucked up Doug.  Remember that?  They came back and bragged about how they really messed up "Little Doug."

2996

Ask yourself why "Pepsi" Greene, Denise Berkley, and Robert Davis would come forward and testify that way if it is not the truth.  What do they have to gain by testifying that way?  What does "Pepsi" Greene have to gain by testifying that way if it is not the truth?  She only wants justice done, ladies and gentlemen.  She is paralyzed for the rest of her life.  She only wants justice done.  Denise Berkley and "Papoose" Davis have received use-immunity if they tell the truth.  What do they gain by lying about this?  They gain absolutely nothing.  They have no motive to lie.  They have every motive to be telling the truth.

The testimony put on by the defense concerning that particular murder underscores the fact that their complaints about our witnesses ring hollow.  If you will remember, they put on Ms. Gina Taylor to

testify that she indeed had looked at out her back window and saw the person, saw some person kneeling over the body of "Little Doug" Moody.  She didn't say that she had seen the person stabbing, so we don't even know if she was looking at the person who stabbed him or someone who came up afterwards.  But think about her testimony anyway.  She didn't tell you in direct examination that she had a relationship

2997

with "Whitey."  She didn't tell you in her direct examination that she was "Whitey's" girlfriend.  Mr. Baugh didn't tell you about that.  He wanted you to believe that there was an unimpeachable witness here who had seen it and was going to tell you that James Roane was not the murderer.  An unimpeachable witness who just happens to be "Whitey's" girlfriend.  And she told you that she couldn't even tell the police whether it is a guy or a girl who was over that body.  Yet she is sure it wasn't James Roane based upon some course she took at the College Training Center.  It makes no sense.  Her testimony makes no sense.

She said in a very telling statement that her boyfriend, "Whitey," that she didn't even know that her boyfriend, "Whitey," or James Roane had been charged with these murders.  She didn't come forward and tell anybody about the fact that it couldn't have been James Roane before taking the stand.  She didn't know they had been charged?  An absolutely incredible statement, ladies and gentlemen.  She knew they had been charged.  She told you she didn't know until she came in here that day.  She lied to you.  Reject her testimony.

Counts Eight, Nine, and Ten deal with the murder

2998

of Peyton Maurice Johnson on January 14th, 1992.  Remind yourself about the testimony of Pam Williams that on January 14th, 1992 she went to Southern Police Equipment here in the City of Richmond and bought them three guns.  You have seen them.  The Tec-9, the Intratec, and the 9mm Glock.  You have seen those any number of times.  I don't need to pull them out and show them to you now.  As soon as that conspiracy got their hands on those weapons, they set about their murderous chore with dispatch.  As soon as they got those guns they went after Peyton Maurice Johnson.

Remind yourself of Denise Berkley.  They bought the guns, she gave them a tote bag, they took the guns.  Who was there for the purchase of the guns?  "O," "J.R.," and "V."  When they got back to 1212 West Moore, what did they do with the guns?  "Whitey" and "E.B.," the other core group participants, came together and all played with the guns.  They were

quite happy.  They now had their murder instruments. They gave them to "Papoose."  That very night they came back and got those guns from "Papoose" and went and killed Peyton Maurice Johnson.  Why?  Because he was selling drugs in Newtowne and they wanted that turf themselves.  That testimony is clear from Ronita

Hollman, that "Whitey" and "J.R." had come in an effort to recruit her and she had rejected them on two occasions.  "Whitey" said, "We will lay bodies in the street if we have to.  You don't think we are serious?  We will lay bodies in the street."

The first body that they laid in the street because of that rejection was Peyton Maurice Johnson.  They burst into Stanley Smithers' house and shot Peyton Maurice Johnson a number of times. Stanley Smithers corroborates the testimony of Ronita Hollman.  He is not a participant in this conspiracy.  Use-immunity is of no use to him.  He did nothing wrong.  Stanley Smithers, as you know, is also in the Witness Protection Program.  Is he a bounty hunter because he has had to be relocated to protect his own life?  What reason does he have to come in and testify as he testified about who killed Peyton Maurice Johnson?  He has only the motivation of the truth.  He has placed his life on the line. Do you think he placed his life on the line so we could orchestrate testimony?  Or do you think he is telling you the truth?

Remind yourself of the testimony of "Papoose" Davis that after the murder of Peyton Maurice Johnson they came to his house with those weapons and "O"

asked him to wipe the fingerprints off, and that he put those guns away for them.  Remind yourself of the testimony of Denise Berkley, that about a half-hour after that murder, shortly after the murder she saw them run out, saw "J.R.," "V," and "O" and "E.B." running together with the guns in their hands.  Does that tell you that "J.R." just wandered in the house aimlessly, as has been suggested by defense counsel Baugh, and then wandered out and the murder happened to follow from that?  Or does that tell you that he walked in to make sure that Peyton Maurice Johnson was there so he could kill him?  That's exactly it. Your common sense tells you that.  "J.R." went into Stanley Smithers' house just to make sure that indeed Peyton Maurice Johnson was there.  Gaiter's testimony tells you that, also.  An hour-and-a-half later, he saw James, and James Roane was asking him if he had seen Stanley Smithers.  They knew they had left a witness alive.  They were looking for Stanley Smithers to go back and kill Stanley Smithers.  And we are criticized for having paid money to put that

man in the Witness Protection Program, the only responsible thing we could have done. The ballistics confirm that indeed that conspiracy, those criminals, committed that murder. Remember, you have a positive ballistics match on this murder and each murder after this that was testified to by Anne Jones. You have two guns, the Glock and the AA Arms, that have been positively matched as being used to kill Peyton Maurice Johnson. Remind yourself again, where were those guns seized? They were seized from 1212 West Moore on February 2nd, 1992 in that same blue tote bag that Denise Berkley had given them. Denise Berkley testified that only "J.R.," "V," "C.O.," "Whitey," "E.B.," had access to that tote bag. Only they could use those guns. And those guns were used in each of the murders after that point after their purchase on January 14th, 1992 until they were seized on February 2nd, 1992.

So that unimpeachable testimony proves that indeed the testimony of the people who came before that were telling you the truth. That conspiracy killed that man, killed Peyton Maurice Johnson.

Counts Eleven, Twelve, and Thirteen deal with the murder and the use of the firearm concerning Louis Johnson. Again, we have drug turf. Now, you haven't had anyone state explicitly to you in this regard that they were killing him over drug turf. You have had several people testify that "O" didn't like him, that "J.R." didn't like him because they had seen Louis Johnson up in the Newtowne area with a shotgun, and Jerry Gaiters testified that Louis Johnson indeed had been protection for other drug dealers in the neighborhood. The Court will instruct you that circumstantial evidence is just as strong as direct evidence. And although you have not heard direct evidence that that's why they killed Louis Johnson, I submit to you that circumstantially, and use your common sense again, proves to you that that's exactly -- that they killed him because of drug turf. They were making good their claim that "We will lay bodies in the street to take over this area."

Remember you heard from a number of witnesses that they were going to take over up there. Well, he is somebody that had to be killed in order to take over up there, circumstantial proof of the fact that indeed he was killed because of the operation of the Continuing Criminal Enterprise.

Three people intended to kill Louis Johnson that night, on January 29th, 1992: "J.R.," "V," and "C.O." I spoke a little while ago about how defense counsel would have you believe that if indeed the gun

of "J.R." did not go off, he is not guilty of that murder. That's preposterous. That's not the law.

3003

If indeed "J.R." was there intending or aiding or counseling or helping in any way the murder of Louis Johnson, then he, too, is guilty of that murder. And the evidence is clear that he got out, intended to kill him. Some would say he did indeed fire the first shot; others would say his gun misfired. It doesn't matter. It is legally insignificant. He is guilty. "C.O." finished that man off with a number of shots to his body. It was ballistically proven that the guns seized at 1212 West Moore were used to kill Louis Johnson. Again, confirmation from unimpeachable sources about the testimony that you have received from that witness stand.

I would suggest to you that in regards to the testimony about the killing of Louis Johnson there has been no real contest by defense counsel concerning the facts; that the only contest they made is whether "J.R.'s" gun misfired or not. There has been no contest about the fact that "C.O." and "J.R." were present there intending to murder that man. And whether his gun misfired or not, he is guilty of those murders.

Counts Fourteen, Fifteen, and Sixteen deal with the murder of Torrick Brown and the wounding of Martha McCoy. There is no 848 murder charged here,

3004

no murder in furtherance of the Continuing Criminal Enterprise charged here, because we know it was a murder over a woman. We know that Robin Cooper was the cause of that murder of Torrick Brown. Why it is charged as a violent crime in aid of racketeering is because we also know that despite the fact that that murder occurred, as admitted to by Mr. Baugh on behalf of James Roane, despite the fact that that murder occurred and was done by James Roane over a woman, other members of the conspiracy joined him to help that murder. Remember, "C.O." and "V" had no domestic dispute with Torrick Brown. They had no problem with Torrick Brown over Robin Cooper. They could have cared less I would guess, since they didn't know Robin Cooper or have any relationship with her. Yet they joined James Roane in that murder. Why? It is clear why. Remind yourself again of the testimony of Greg Scott. Remember what he told you about the New York Boyz? They got together for protection and for going back to New York and re-upping cocaine. And when they got together for protection, each and every member of the New York Boyz had to go in on a crime of violence or they were no longer a member of the New York Boyz. 1959 says that you must find that the murder was

3005

either paid for or done to maintain one's position within an organization. And I suggest to you that's the critical language in that statute as to each one of these murders. Those murders were done to maintain the individual defendants' stature within the conspiracy. They were done so that "C.O." and "V" could help James Roane kill Torrick Brown and prove what a macho drug dealer, what a macho, murdering drug dealer they were. Remember, they would have been ostracized had they not.

Another little telling piece of evidence here: Greg Scott told you that the workers didn't have to go in with the crimes of violence. Remember that? Only the New York Boyz themselves, the bosses, the partners, had to agree and follow up on the agreements to commit violence.

That's what they did with Torrick Brown. Remind yourself of this: Charles Townes, when he was in the car prior to the triple homicide on Church Hill, prior to going to kill "Mousey" Armstrong, they let him get out of the car. He did not have to go with them to commit that murder. Remember, they called him a pussy for not going, but he didn't have to go. He was a worker. It proves that the story that is being told is true. The New York Boyz, the partners,

3006

bosses, the heads of this Continuing Criminal Enterprise, had to help each other commit murders to maintain their position. That's why Torrick Brown was shot and killed. That's why Martha McCoy, who had absolutely nothing to do with this, was shot in front of her seven-year-old son, Montez McCoy. Those bounty hunters. Those people who we were being criticized for paying money to hide because they witnessed the murder of Torrick Brown.

And remind yourself again about the testimony of Valerie Butler that these murderous people, "Whitey," "C.O.," "V," and "J.R.," talked about going back and finding Martha McCoy and killing her and all the other witnesses so their conspiracy wouldn't be found out. There is also proof of 1959 violation. They intended to hide the conspiracy. They didn't want the veil to be rolled back on this conspiracy through the murder of Torrick Brown. It wasn't simply a domestic dispute. It was another murder done by this conspiracy for whatever reasons they defined to be the goals of the conspiracy, to protect the conspiracy. "Whitey" is charged in that count, although he wasn't there. We haven't put on evidence that put "Whitey" in that shooting. He is charged in that count because if you will remember the testimony

3007

of Valerie Butler, he aided at the end of all of

that.  They talked about "Yeah, we will go back.  We will find those people, Martha and Montez.  We will kill them, the survivors.  We will help the conspiracy, hide this thing up.  We will kill all the witnesses."  So he is charged in that count.

Remember, you mess with one of the New York Boyz, you mess with them all.  That's what Greg Scott told you.  That's what Torrick Brown's murder proves to you.

The testimony of Martha McCoy and Montez McCoy meshes with the testimony about that murder that you heard from Sterling Hardy and Jerry Gaiters.  Remember the testimony of Martha and Montez.  And I suggest to you, what possible reason in the world do these people have to come in here and tell you a lie?  They have none.  Their brother and uncle were killed.  She was shot a number of times.  The only thing she could be motivated by is making sure that the right people go to jail for that.  What reason would she have to send the wrong people to jail for that?  And their testimony corroborates what Gaiters and Hardy said.  Remember how they both testified the others were dressed?  One in a black hoodie, the other with a big black coat on.  Hardy and Gaiters

3008

both testified that that was the way "V" and "O" were dressed.  Martha and Montez, remember, weren't asked to identify "V" and "O" particularly, but they were able to describe how the others were dressed.  The ballistics match also confirms the testimony.  The ballistics show that a Glock and an Intratec, those guns seized from 1212 West Moore, were used to kill Torrick Brown and shoot Martha McCoy.  That's completely consistent with the testimony of Sterling Hardy and Jerry Gaiters.  Remind yourself of the testimony of Sterling Hardy, what "J.R." said when he got back, when "V" asked him -- "V" said, "The bitch ain't dead."  Sterling said, "Yes, I know she is.  I know I can shoot straight."

Unbelievable testimony, ladies and gentlemen, concerning the violence of these people to kill anybody or anything that stood in their way, to hide up the conspiracy, the existence of the conspiracy so that they could make more money selling drugs.

The violence continued on February 1st, 1992.  Remember, Torrick Brown was shot that day.  And later that evening, in the early portion of that evening -- Torrick Brown was shot over in Lynhaven.  Later that evening, Cory Johnson, "C.O.," "Whitey," and Jerry Gaiters went to Church Hill where they perpetrated

3009

the triple homicide of "Mousey" Armstrong, Tony Carter, and Bobby Long.  Why?  Because "Mousey" Armstrong owed them a drug debt.  This was told to

you by Denise Berkley.  And because, as you heard from "Man-Man" and Jerry Gaiters, "the bitch knew too much," according to "C.O."  She had to be killed.  He couldn't wait until 10 o'clock.  She had to be killed.  That's Count Seventeen, Eighteen, Nineteen, Twenty, Twenty-one, Twenty-two, and Twenty-three of the indictment.  That triple homicide gives rise to all of those counts.  Some are use of a firearm in the commission of that offense; the others are 848 murders; and the others are 1959 murders.

There has been a suggestion here that indeed Jerry Gaiters as to this particular murder must have been lying to you because in his Grand Jury testimony he said that "C.O." had a gun behind him and that's why he went over on that murder.  Jerry took the stand and testified for you and said that "Look, if I said that, if that's what I said, then yeah, yeah, that was a lie."  But what he said here is completely consistent with that.  What he said in this courtroom is completely consistent.  He told you the whole time they are driving there, "C.O." indeed sat right behind him with a gun and he was completely convinced

3010

that had he not gone through with showing them where his cousin lived, he would have been killed.  We are talking about semantics here, trying to make him a liar over semantics.  Whether the gun is actually held to his head or figuratively is a matter of semantics and it doesn't matter.  It doesn't mean that Jerry Gaiters was lying to you.  He felt fearful for his life if he didn't go through with that.  That doesn't absolve him of his crime.  Indeed, he has pled guilty of those murders and he will be sentenced because he knowingly aided those people in the killing of "Mousey" Armstrong, Bobby Long, and Tony Carter.  And he will pay for that.  But he came in here and told you what happened that night based upon his own involvement.  Again, you have to have people like Jerry Gaiters to pull back the veil of this conspiracy.

His testimony is proven consistent and truthful by the ballistics.  There was one shooter in that house, according to ballistics.  The Glock was used to kill all three of those people.  Cory Johnson had the Glock that night.  They will say that indeed, this eyewitness who hasn't testified, but who was in Detective Woody's notes, shows that perhaps Jerry Gaiters was wrong.  The eyewitness said that there

3011

were four people, and that Jerry Gaiters and "C.O." both went in the house and firing started.  Tell yourself, does that show that Jerry Gaiters is lying?  No, it doesn't show that at all.  Put yourself in that man's position across the street.

The house gets burst into, you see two people go in, which is what Jerry Gaiters told you was what had happened. Firing starts. Do you look? Are they both shooting? No. You just assume both are shooting. Four people he sees at that house. That could be completely consistent with what Jerry Gaiters told you. Remember, three of them went up there together: Gaiters, who went to the door, "C.O.," who came in after him, and "Whitey," who was in the car. Gaiters doesn't know where "Whitey" was. "Whitey" could have come right up to witness the whole thing. There was a fourth person who came out of that house, too. Bobby Long. Poor, old Bobby Long mowed down on the outside by Cory Johnson as he tried to get away. Four people. That doesn't mean Jerry Gaiters is lying. It is completely consistent with what Jerry Gaiters stated.

Bobby Long and Tony Carter, ladies and gentlemen, were killed that evening, ruthlessly murdered by "C.O.," because they happened to be in the wrong place at the wrong time. He had learned his lesson from earlier in the day where they left witnesses and from earlier in the conspiracy where Stanley Smithers had been allowed to escape. They didn't leave any witnesses on Church Hill. Tony Carter and Bobby Long were simply innocent bystanders who were caught up in this murderous web by Cory Johnson and Richard Tipton and "J.R." so that they could put more money in their pockets dealing crack cocaine.

Counts Twenty-four, Twenty-five, Twenty-six, Twenty-seven, Twenty-eight, Twenty-nine, and Thirty deal with the February 19th, 1992 stalking and killing of Curt Thorne, Linwood Chiles, and the maiming of "Pepsi" Greene and Priscilla Greene. You saw their testimony. You saw the testimony of "Pepsi" and Gwen. They told you who was there when they shot them. They told you that the last memory that they had, the last memory "Pepsi" has is when "C.O." told Linwood, "Put your head on the wheel." And indeed that's exactly the way Linwood was found dead, shot in the back of the head. Gwen tells you the last thing she saw was when this man said, "Gwen --" when "Whitey" said, "Gwen," and she turned around and that's the last thing she remembers. Look at the ballistics, the Medical Examiner testimony there. A terrible, terrible, terrible photograph of Curt Thorne with sewing needles through his neck showing the crossfire. Two people were there, ladies and gentlemen. Two people were firing guns. Walter Tuck confirms that. Walter Tuck and Gwen's testimony, again, meshes perfectly. And unless you

believe we have orchestrated this whole thing, it shows you that indeed "Whitey" was there and perpetrated that crime, along with "C.O." Walter Tuck said the person he saw leaving that scene was dressed in a brown leather coat with a scarf. How did Gwen say "Whitey" was dressed that night? Brown leather coat with a scarf. How did Walter Tuck describe the skin color of that man who walked away? He described it as this skin color, the color of the wood on this piece of chair. Look at him. It is exactly the same skin color as "Whitey." How did Valerie Butler tell you that "C.O." was dressed that evening? "C.O." was dressed in his usual black hoodie. In fact, you have seen it introduced into evidence. That black hoodie was what he wore that night when he killed his victim and retrieved his bounty of his coat. Remember that? Disgusting. He took the coat of Curt Thorne and left it in the

backseat of her car. That testimony meshes, ladies and gentlemen. It shows you that Gwen is telling the truth about who was there. What possible reason does Walter Tuck have to come in here and lie? What possible reason does "Pepsi," or Gwen have to come in here and lie? Gwen wants the people who put her in the condition you saw her in to get justice. That's what is driving her, ladies and gentlemen. Is she a bounty hunter? I suggest to you not. I suggest to you it is irresponsible of the government not to protect those people, also.

Remember that there were the guns seized on February 2nd, 1992 at 1212 West Moore Street. The Glock, the Intratec, and the AA Arms weapons were seized, leaving those people who were left in there -- you have to remember, also, it is important, that arrested there that night at 1212, or in the early morning hours of February 2nd at 1212, were "J.R.," "V," Sterling Hardy, Sandra Reavis, and "E.B." and the guns were seized, leaving "Whitey" and "C.O." out on the street without a gun. So what did they do? They repeated themselves as they did with Pam Williams. They got Charlotte Moore to buy guns for them. She testified she bought them two Glocks and she gave them those Glocks on February 5th, 1992,

three days after the seizure at 1212 West Moore Street.

Her testimony is proven true by the unimpeachable testimony of Officer Santo Gutierres from the New York Transit Police. Officer Gutierres arrested Cory Johnson on February 29th, 1992 in the subway in New York with that Glock bought by Charlotte Denise Moore in his belt, showing you that indeed what she said is true. She gave that Glock to

"C.O." and another one to "Whitey."  He was in New York with it.  That's the same Glock that ballistics have shown you unequivocally, unimpeachably, without a doubt, to be the gun that was used to kill Curt and Linwood and to shoot and maim "Pepsi" and Gwen. Unimpeachable testimony that proves the other testimony that you have received from the government's witnesses is true.

Apply your common sense to that, and you have absolutely no doubt that Cory Johnson was there and killed those people.  And apply your common sense to what you heard from Gwen and Walter Tuck and you have no doubt that "Whitey," too, was there to kill those people.  They wanted to kill Linwood because they thought he was a snitch.  Remember C.T. Woody's testimony.  He told them that Linwood had made some

3016

statements.  Sterling Hardy said "V" was going to get that taken care of, "Don't worry about Linwood snitching.  I've helped "Whitey" and "O" before, I'll take care of this."  Curt Thorne was killed for a couple of reasons.  One, he had a drug debt to them. But two, he was killed because he was there.  Why are "Pepsi" and Gwen in the shape they are in now? Because they were there.  Again, they learned their lessons well at the shooting at Lynhaven of Torrick Brown and the shooting of Peyton Maurice Johnson where witnesses escaped.  They weren't going to let any other witnesses escape.  That's why Gwen will be in this that chair for the rest of her life.

The defense witness called as to this particular case is also an example of why the defense complaints about the government's witnesses ring hollow.  They called Gloria Bridges to say that "Whitey" was with her every evening, every night, from January through March, there on February 11th, 1992 when Valerie Butler said he rented a car and had gone to New York; there on February 22nd when Valerie Butler said he had rented a car and gone to New York.  Perhaps you don't believe Valerie in that regard, but how could you possibly not believe Officer Jeanne Keim, who said she had arrested "Whitey" in Trenton, New Jersey

3017

on March 20th, 1992?  Remind yourself that I specifically asked Gloria Bridges "Was he there on that date?"  "Yes, he was there, each and every night, including March 20th, 1992."  She lied to you.  He couldn't possibly have been there that night.  She was going to come in here and say whatever it took to protect "Whitey," including that he couldn't have been there on February 19th, 1992 for the murder of Curt and Linwood.  Notice in her testimony she didn't even say what time of night he came there that evening.  She didn't even

successfully establish an alibi funneled her.  The murder took place at 10:17, according to Walter Tuck.  We don't know when it was "Whitey" showed up at her house.  There was no testimony establishing what time of night he showed up at her house.  But I suggest she lied anyway.  It is pretty clear from her testimony, she is a liar.

I will touch briefly on the murder of "Nat" Rozier.  No defendant has been charged, but the evidence is telling.  "Nat" Rozier was shot right between the eyes with a .38, that same .38 that was recovered from "Whitey" over in Blackwell wrapped in plastic.  Remind yourself of the testimony about the bullets used to kill her.  A particular grain of bullet that Anne Jones, Dr. Anne Jones, in all her years of testing firearms, had never seen before.  But that same type of ammunition was found in the blue tote bag seized from 1212 West Moore Street on February 2nd, 1992.  We don't know who pulled the trigger.  But we do know that that conspiracy, that that gun that had been held by Sandra Reavis and given to "Whitey," was the murder weapon and we know that there was a motive.  She owed them money for drugs.  And they believed her to be snitching to the police.

Count Thirty-three of the indictment deals with the January 15th, 1992 distribution by "C.O." to "Papoose" of cocaine.  Remember, "Papoose" said it pretty simply.  He said, "I got a rock of crack cocaine from "Whitey" when I wiped the fingerprints off the guns the night they were returned from the Peyton Maurice Johnson murder."  That's the distribution count.  Count Thirty-two deals with possession by the conspiracy of cocaine at 1212 West Moore Street on February 2nd, 1992.

The lab report shows it, Exhibit 85, that there were 18-point-some grams of crack cocaine seized that day in 120 different vials, crack cocaine that the partnership possessed together.  You will receive an instruction on that, joint and several ownership of property, mutual control over that possession of that cocaine.  And that's what that is.  That conspiracy, the testimony is pretty clear, used to go to New York, re-up together, resupply themselves with cocaine, give it to their workers.  Some of that happened to be caught when the police caught that bag on February 2nd, and that's why they are charged.  Under the conspiracy law -- it is important to remember this throughout the case -- each one of those conspirators were guilty if they knowingly joined that conspiracy of the possession of that cocaine, whether they actually knew it was there or

not.  By virtue of joining the conspiracy, they were guilty of the possession of that cocaine because they knew that's what that conspiracy was all about.

Count Thirty-three deals with the drugs seized on April 10th, 1992 from South Richmond by Detective Richard Farmer.  After "Whitey" was arrested they went back in and searched.  Remember, according to the stipulation, they found drugs and the .38, the firearm seized by Detective Rodriguez, wrapped in plastic.  Count Thirty-three deals with just the cocaine seized from that location, which cocaine belonged to "Whitey" and was distributed by him.

Remember when you go back what I have told you that I think you should concentrate on.  Apply your common sense to what you have heard; the meshing of the testimony here from 70-some different witnesses.  It all goes hand in hand.  That tells you that the government's witnesses were telling you the truth, unless you truly believed that we orchestrated that testimony in some way.  Indeed, if you believe that, I suggest you will probably go back there and just dismiss this indictment.  But unless you don't think we orchestrated this whole thing, then it is clear that the meshing of the testimony proves that these people have been telling you the truth.

I note one other thing.  Look at the plea agreements of Sterling Hardy and Jerry Gaiters and the language that's built into that plea agreement to ensure their providing truthful testimony here.  And ask yourself, were we intending to structure a case or were we looking for the truth to be presented from that witness stand?  Read that plea agreement.  Look at what the government is seeking to get from these people.  And I suggest to you that it will show that all the government wants in this case is to present truthful testimony.

Again, I thank you.  I'm sure you are sick of hearing from me.  I have been up here for an hour-and-a-half now.  And you have got many more arguments to go.  It is an important chore.  It is a very important chore.  I know it has been frustrating, and at times I'm sure you would have liked to have yelled and told all of us to sit down.  And I will in just a second.

It is a tough job you are about to undertake.  You have taken an oath and you can't shirk from that oath.  That oath says you will truly render the facts to a verdict.  When you do that, you have no choice but to find these defendants guilty of each and every count in that indictment.  We have proven each one of these defendants guilty beyond a reasonable doubt of each and every count in that indictment.  Ladies and

gentlemen, eleven human beings have lost their lives to this murderous conspiracy. You owe it to them to go back and render the proper verdict. Thank you.

THE COURT: All right. We are going to take a brief break before we get started with the defense closings, in the neighborhood of ten minutes. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

(Recess taken from 2:30 p.m. to 2:45 p.m.)

THE COURT: Let's bring in the jury, please.

(The jury entered the courtroom.)

All right, Mr. Geary?

## Geary Guilt Phase Closing (3022)

MR. GEARY: May it please the Court, ladies and gentlemen of the jury: We don't know who shot. That's what the government tells you about Katrina Rozier. If you look in the indictments, and you will have the indictment back in the jury room with you, it provides a real guide on the front page, sort of an index. When you go through there you find that there are ten people's names who were murdered. You don't find eleven. You don't find Rozier in the indictment because we don't know who shot her. The government tells you they don't know who shot Katrina Rozier. Detective Blaylock doesn't know who shot Katrina Rozier. C.T. Woody doesn't know who shot her. When you are in the back in the jury room deliberating, the Court is going to give you a videotape showing an interview by Detective Woody of Jerry Gaiters in regard to the Church Hill murders. You can see the interaction between the detective and informant, detective and informant, being told what to say.

The government had a severe problem in the bringing of this case, in the bringing of a conspiracy, stretching all the way back, as Mr. Vick likes to point out, to New York City, to Harlem, to Central Gardens, to Newtowne, Blackwell. The problem is this: If you have a Continuing Criminal Enterprise charge as set forth in Count Two, and you wish to have executed two New York Boyz out of their teens, how do you deal with the jury when the jury is told to forget Jerry Gaiters? Forget Jerry Gaiters, who killed Katrina Rozier. The government can say, "Well, we will just have Jerry plead to that murder because he pleads to everything." He is an informant. He can plea to that.

But then in the second phase of the case it will

The United States Government does not apologize to you for the photographs you have had to see.  We don't owe to you the apology.  We didn't kill them.  It is part of our job to produce those photographs so you will see how horrendous and horrible these people were and are.

I, too, appreciate you listening on behalf of the United States Government.  The government would also want to encourage you to go through all of these exhibits and evidence.  You go through your notes.  What I have said, Mr. Vick said, or the defense lawyers say, is not fact.  It is not law.  The facts are what you recall.  Judge Spencer will give you the law.

One other thing about Judge Spencer:  These lawyers have been saying 5K.1, 5K.1, 5K.1.  There is only one human being in the whole world that can cut a sentence in this case, and that's that man.  You

3192

heard Gaiters and Hardy both tell you they pled in front of Judge Spencer.  The government can make the motion.  But it is in that man's discretion.  And you go back and look at Gaiters' and Hardy's plea agreements, and what do they tell you?  They have to be truthful in their cooperation with the government, all the people that are getting 5K's.  That man knows it, these men know it.

MR. GEARY:  I object.  Greg Scott is a key witness in this case.

MR. PARCELL:  Ladies and gentlemen, thank you very much.

MR. GEARY:  Another misstatement by Mr. Parcell.

THE COURT:  Objection overruled.  We are going to take about 10 or 15 minutes, then we will get started with the instructions.  They are going to take awhile, and you have been sitting awhile.  So we will give you a break.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

(Defendants removed from courtroom.)

(Recess taken from 11:50 a.m. to 12:05 p.m.)

## Court Instructions to Jury re Guilt (3192)

THE COURT:  All right, let's bring in the jury.

3193

(The jury entered the courtroom.)

Members of the jury:  You have now heard all of the evidence in the case as well as the final arguments of the lawyers for the parties.  It becomes my duty therefore to instruct you on the rules of law that you must follow and apply in arriving at your

decision in this case.

In any jury trial there are, in effect, two judges. I am one of the judges. The other is the jury. It is my duty to preside over the trial and to determine what testimony and evidence is relevant under the law for your consideration. It is also my duty at the end of the trial to instruct you on the law applicable to the case. You as jurors are the judges of the facts. But in determining what actually happened in this case, that is, in reaching your decision as to the facts, it is your sworn duty to follow the law I now am in the process of defining for you. Unless otherwise stated, you should consider each instruction to apply separately and individually to each defendant on trial. And you must follow all of my instructions as a whole. You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. That is, you must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I give it to you regardless of the consequences. By the same token, it is also your duty to base your verdict solely upon the testimony and evidence in the case without prejudice or sympathy. That was the promise you made and the oath you took before being accepted by the parties as jurors in this case, and they have the right to expect nothing less.

The indictment, or formal charges against a defendant, is not evidence of guilt. Indeed, the defendants are presumed by law to be innocent. The law does not require a defendant to prove his or her innocence or produce any evidence at all. The government has the burden of proving him or her guilty beyond a reasonable doubt. And if it fails to do so, you must acquit him or her.

Thus, while the government's burden of proof is a strict or heavy burden, it is not necessary that the defendants' guilt be proved beyond all possible doubt. It is only required that the government's proof exclude any reasonable doubt concerning the defendants' guilt.

Now, as I've stated earlier, it is your duty to determine the facts. And in so doing, you must consider only the evidence I have admitted in the case. The term "evidence" includes the sworn testimony of the witnesses and the exhibits admitted into the record, and any stipulations or agreements between the parties.

Remember that any statements, objections, or arguments made by the lawyers are not evidence in the

case. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case; and in so doing, call your attention to certain facts or inferences that might otherwise escape your notice.

In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in this case. What the lawyers say is not binding upon you.

Also, during the course of the trial I occasionally make comments to the lawyers or ask questions of a witness or admonish a witness concerning the manner in which he or she should respond to the questions of counsel. Do not assume from anything I may have said that I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

Now, while you should consider only the evidence in the case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts and which have been established -- facts which have been established by the testimony and evidence in the case. You should not be concerned about whether the evidence is direct or circumstantial. Direct evidence is the testimony of one who asserts actual knowledge of a fact such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating that the defendant is either guilty or not guilty. The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

Now, I have said that you must consider all of the evidence a number of times. This does not mean, however, that you must accept all of the evidence as true or accurate. You are the sole judges of the credibility or believability of each witness and the weight to be given to his testimony. In weighing the testimony of a witness, you should consider his or her relationship to the government or the defendants; his or her interest, if any, in the outcome of the case; his or her manner of testifying; his or her opportunity to observe or acquire knowledge concerning the facts about which he or she testifies; his or her candor, fairness, and intelligence, and the extent to which he or she has been supported or contradicted by other credible evidence.

You may in short accept or reject the testimony

of any witness in whole or in part.

Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact. You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

A witness may be discredited or impeached by contradictory evidence by a showing that he or she testified falsely concerning a material matter, or by evidence that at some other time the witness has said or done something, or has failed to say or do something, which is inconsistent with the witness' present testimony. If you believe that any witness has been so impeached, then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.

The fact that a witness has been previously convicted of a felony or a crime involving dishonesty or false statement is also a factor you may consider in weighing the credibility of that witness. The fact of such a conviction does not necessarily destroy the witness' credibility, but is one of the circumstances you may take into account in determining the weight to be given to his or her testimony.

In this case, the government called as some of its witnesses an alleged accomplice named as a co-defendant in the indictment with whom the government has entered into a plea agreement providing for the dismissal of some charges or providing that the government may in its discretion file a motion informing the Court that the witness has provided substantial assistance to the government in its investigation or prosecution of the defendants in this case or of other persons. If such a motion is filed by the government, the court may elect to impose a lesser sentence than the witness would otherwise have received for the offense to which he pled guilty.

Such plea bargaining, as it is called, has been approved as lawful and proper and is expressly provided for in the rules of this Court.

An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from testifying. On the contrary, the testimony of such a witness alone may be sufficient weight to sustain a verdict of guilty. However, the jury should keep in mind that such testimony is always to be received with caution and weighed with

great care.  You should never convict a defendant upon the unsupported testimony of an alleged accomplice unless you believe that testimony beyond a reasonable doubt.  The fact that an accomplice has entered a plea of guilty to the offense charged is not evidence in and of itself of the guilt of any other person.

The testimony of an alleged accomplice and the testimony of one who provides evidence against a defendant as an informer for pay or for immunity from punishment, or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.  You the jury must decide whether the witness' testimony has been affected by any of those circumstances or by the witness' interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received, either financially or as a result of being immunized from prosecution.  You should keep in mind that such testimony is always to be received with caution and weighed with great care.  You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

The testimony of a drug or alcohol abuser must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs or alcohol.  The jury must determine whether the testimony of a drug or alcohol abuser has been affected by drug or alcohol use or the need for drugs or alcohol.

Now we come to the offense instructions, starting out with Count One.  Title 21 of the United States Code Section 846 makes it a separate federal crime or offense for anyone to conspire or agree with someone else to do something which, if actually carried out, would be a violation of Section 841(a)(1).  Section 841(a)(1) makes it a crime for anyone to knowingly distribute, dispense, and/or possess a controlled substance with the intent to distribute.

So under the law, a conspiracy is an agreement or a kind of partnership in criminal purposes in which each member becomes the agent or partner of each other -- of every other member.  In order to establish a conspiracy offense, it is not necessary for the government to prove that all of the people named in the indictment were members of the scheme or that those who were members had entered into a formal type of agreement.  Also, because the essence of a conspiracy offense is the making of the scheme

itself, it is not necessary for the government to prove that the conspirators actually succeeded in accomplishing their unlawful plan.  What the evidence in the case must show beyond a reasonable doubt is this:  First, that two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment.  And second, that the defendant knowingly and willfully became a member of such conspiracy.

A person may become a member of a conspiracy

3202

without knowing all of the details of the unlawful scheme and without knowing who all of the other members are.  So if a defendant has an understanding of the unlawful nature of a plan, and knowingly and willfully joins in that plan on one occasion, that is sufficient to convict him or her for conspiracy, even though he or she did not participate before, and even though he or she played only a minor part.  Of course, mere presence at the scene of a transaction or event, or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of a conspiracy.

Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one, does not thereby become a conspirator.

The first element which the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that two or more persons entered the unlawful agreement charged in the indictment.  In order for the government to satisfy this element, you need not find that the alleged members of the conspiracy met together and entered

3203

into any express or formal agreement.  Similarly, you need not find that the alleged conspirators stated in words or writing what the scheme was, its objective or purpose, or every precise detail of the scheme, or the means by which its object or purpose was to be accomplished.  What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to accomplish an unlawful act.  You may of course find that the existence of an agreement to disobey or disregard the law has been established by direct proof.  However, since conspiracy is, by its very nature, characterized by secrecy, you may also infer its existence from the circumstances of this case and the conduct of the parties involved.

In a very real sense, then, in the context of

conspiracy cases, actions often speak louder than words.  In this regard, you may, in determining whether an agreement existed here, consider the actions and statements of all of those you find to be participants as proof that a common design existed on the part of the persons charged to act together to accomplish an unlawful purpose.

It is charged in Count One of the indictment that the conspiracy distributed and possessed with

3204

intent to distribute a particular amount or quantity of narcotic controlled substance.  The evidence in the case need not establish the exact amount or quantity of the substance containing cocaine, except you must find beyond a reasonable doubt that the conspiracy distributed or possessed with intent to distribute, or attempted to possess with intent to distribute at least 50 grams or more of crack cocaine.

The second element which the government must prove beyond a reasonable doubt to establish the offense of conspiracy, the first count of the indictment, is that the defendant knowingly, willfully, and voluntarily became a member of the conspiracy.  If you are satisfied that the conspiracy charged in the indictment existed, you must next ask yourself who the members of that conspiracy were.  In deciding whether the defendant whom you are considering was in fact a member of the conspiracy, you should consider whether the defendant knowingly and willfully joined the conspiracy; did he or she participate in it with knowledge of its unlawful purpose and with the specific intent of furthering its business or objective as an associate or worker.

In that regard, it has been said that in order

3205

for a defendant to be deemed a participant in a conspiracy, he or she must have had a stake in the venture or its outcome.  You are instructed that while proof of a financial interest in the outcome of the scheme is not essential, if you find that the defendant has such an interest, that is a factor which you may properly consider in determining whether or not the defendant was a member of the conspiracy charged in the indictment.

As I mentioned a moment ago, before the defendants can be found to have been a conspirator, you must first find that he or she knowingly joined in the unlawful agreement or plan.  The key question, therefore, is whether the defendant joined the conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement.

It is important for you to note that the defendants' participation in the conspiracy must be

App.0248

established by independent evidence of his or her own acts or statements and the reasonable inferences which may be drawn from them.

A defendant's knowledge is a matter of inference from the facts proved. In that connection, I instruct you that to become a member of a conspiracy, the defendant need not have known the identities of

3206

each and every other member. Nor need he or she have been apprised of all of their activities. Moreover, the defendant need not have been fully informed as to all of the details or the scope of the conspiracy in order to justify an inference of knowledge on his or her part. Furthermore, the defendant need not have joined in all of the conspiracy's unlawful objectives.

The extent of a defendant's participation has no bearing on the issue of a defendant's guilt. A conspirator's liability is not measured by the extent or duration of his or her participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles while others play minor parts in the scheme. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw the defendant within the ambit of the conspiracy.

I want to caution you, however, that the defendant's mere presence at the scene of the alleged crime does not by itself make him or her a member of the conspiracy. Similarly, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person

3207

may know or be friendly with a criminal without being a criminal himself or herself. Mere similarity of conduct, or the fact that they may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.

I also want to caution you that mere knowledge or acquiescence without participation in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant without knowledge may happen to further the purposes or objectives of the conspiracy does not make the defendant a member. More is required under the law. What is necessary is that the defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy, and with the intention of aiding in the accomplishment of those unlawful ends.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised, or assisted in it for

the purpose of furthering the illegal undertaking. He or she thereby becomes a knowing and willing participant in the unlawful agreement; that is to say, a conspirator.

Now, let me move on to Count Two.  Count Two of

3208

the indictment charges that in at least January, 1991 and continuously, beginning at least January, 1991 and continuously up to the date of the indictment, in the Eastern District of Virginia and elsewhere, the defendants Richard Tipton, Cory Johnson, James H. Roane, and Vernon Lance Thomas engaged in a Continuing Criminal Enterprise, in that those defendants committed a violation of certain narcotic laws as part of a continuing series of such violations; and that further, this series was done in some type of agreement with at least five other persons who were managed or supervised or organized by those defendants, and that from this continuing series of narcotics violations, those defendants received substantial income or resources.

You are instructed that Title 21 of the United States Code Section 848 reads in pertinent part:  Any person who engaged in a Continuing Criminal Enterprise shall be guilty of an offense against the United States.  The statute also provides as follows:  For the purpose of Subsection (a) of this section, a person is engaged in a Continuing Criminal Enterprise if he violates any provision of this subchapter or Subchapter 2 of this chapter, the punishment for which is a felony; and two, such

3209

violation is a part of a continuing series of violations of this subchapter or Subchapter 2 of this chapter.  When I talk about subchapter, it relates to narcotic felony violations, which are undertaken by such person in concert with five or more persons in respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and from which such person obtains substantial income or resources.

Now, in order to sustain its burden of proof for the crime of engaging in a Continuing Criminal Enterprise as charged in Count Two of the indictment, the government must prove the following five essential elements with respect to each individual defendant charged beyond a reasonable doubt:  One, the defendant committed a felony violation of the federal narcotics laws; two, such violation was part of a continuing series of related violations of federal narcotics laws; three, the continuing series of violations was undertaken by the defendants in association or in concert with five or more other persons; four, the defendant was an organizer of

App.0250

these five or more other persons, or occupied a management or supervisory position with respect to these five or more other persons; five, the defendant obtained substantial income or resources from the continuing series of narcotic violations.

I will now discuss in more detail and define for you the meaning of certain terms used in the Continuing Criminal Enterprise statute and in these instructions relating to the elements of the Continuing Criminal Enterprise offense charged in Count Two.

The first phrase:  "Felony violation."  The phrase "felony violation of the federal narcotics laws" as used in these instructions means the commission of any act specifically prohibited by certain sections of the United States Code for which a defendant could be imprisoned for more than one year.  The distribution or possession with intent to distribute cocaine or crack cocaine in violation of 21 U.S. Code Section 848(a)(1) is a felony violation of the narcotics laws.

What is a continuing series of violations?  A continuing series of violations means at least three violations of the federal drug laws as charged in Counts One, Three, Five, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-four, Twenty-five, Thirty-one, Thirty-two, and Thirty-three of the indictment before you.  It also requires a finding that those violations were connected together as a series of related or ongoing activities as distinguished from isolated and disconnected acts.

The phrase "in concert with five or more other persons" means some type of agreement or joint action, whether direct or indirect, with at least five other persons who were involved in the continuing series of narcotics violations.  The phrase "in concert with five or more other persons" does not require proof from the government that the five or more other persons actually had contact with each other or knew each other, or committed each violation together or operated together continuously at the same time.  The government is not required to prove that the defendant managed, supervised, or organized these five or more persons at the same time.  The government must prove beyond a reasonable doubt, however, that the defendant and at least five or more other persons were part of an agreement or joint action to commit the continuing series of violations of the federal narcotics laws alleged in the counts I've outlined: One, Three, Five, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-four, Twenty-five, Thirty-one, Thirty-two and/or

Thirty-three of the indictment.

The term "organizer" and the terms "supervisory position" and "position of management" are to be given their usual and ordinary meaning. These words imply the exercise of power and authority by a person who occupies some position of management or supervision. This person need not be the sole or only organizer, supervisor, or manager of the activities in question.

An organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them in their activities in one essentially orderly operation or enterprise.

A supervisory position can be defined as one who manages or directs or oversees the activities of others. For purposes of this element, a person may occupy a position of organizer, a supervisory position, or any other position of management without having a direct personal contact with each of the persons he is organizing, supervising, or managing. It is not required that the defendant have personal contact with five or more subordinates in order to satisfy the organizer, supervisor, or position of management element. It is entirely possible for a single Continuing Criminal Enterprise to have more than one organizer, supervisor, or other person in a position of management.

You are further instructed that the term "substantial income or resources" as it appears in Title 21 United States Code Section 848 is defined as money or other material resources or property received or gained directly from illegal dealings in controlled substances by the defendants. Controlled substances are a material resource for purposes of this definition of income.

Furthermore, the term "income" does not necessarily mean net income. That is to say, it could mean gross receipts or gross income. It would follow that the phrase "substantial income or resources" should be construed as far as possible in an objective manner; that is to say, that the defendant would have to have -- would have to receive what any reasonable person would consider to be considerable or ample economic benefit from engaging in a Continuing Criminal Enterprise. In determining income, you may consider a defendant's position in the enterprise, the quantity of controlled substances involved, and the amount of money that changed hands.

Now, in a moment I'm going to begin to instruct you on the law governing those counts in the

indictment that involve homicide.  When I do so, you will notice that defendants Richard Tipton, Cory Johnson, and James H. Roane, Jr. have been charged with two very specific, very distinct types of homicide:  Killing while engaged in or in furtherance of a Continuing Criminal Enterprise in violation of Title 21 Section 841(e) of the United States Code, and killing for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity in violation of Title 18 Section 1959 of the United States Code.

The reason you are being asked to limit your deliberations to these two very specific types of killings is that you are sitting as a jury in a federal court.  In criminal cases, federal courts may try a defendant only for violations of federal law.  Most types of homicide, that is, murder in the first degree or the second degree, voluntary manslaughter, are crimes under state law, not federal law.  And therefore, they cannot be tried by this Court.

As I am about to explain to you, if in your deliberations you find that a particular defendant has killed another person, that would not be enough for you to find that defendant guilty of a federal crime.  Instead, you must be convinced beyond a reasonable doubt that each of the specific elements of a federal crime charged in the indictment has been proved by the government.

The indictment charges that defendants Richard Tipton, Cory Johnson, James Roane, Vernon Lance Thomas, and Jerry Gaiters, between January 5th of 1992 and February 19th, 1992, within the Eastern District of Virginia, while engaged in or working in furtherance of a Continuing Criminal Enterprise, intentionally killed, counseled, commanded, induced, procured, or caused the intentional killing of certain individuals.

Note however that no defendant is charged with all the murders discussed in the indictment. Specifically, the following defendants face these charges with respect to the following killings.  With respect to the killing of Douglas A. Talley, the defendant, Richard Tipton, is charged.  With respect to the killing of Douglas Moody, defendants Richard Tipton and James H. Roane, Jr. are charged.  With respect to the killing of Peyton Maurice Johnson, defendants James H. Roane and Cory Johnson are charged.  With respect to the killing of Louis Johnson, Jr., defendants James H. Roane and Cory Johnson are charged, along with defendant Vernon Lance Thomas.  With respect to the killings of Bobby Long, Anthony Carter, and Dorothy Mae Armstrong,

App.0253

defendants Richard Tipton and Cory Johnson are charged, along with defendant Jerry Gaiters. With respect to the killings of Curtis Thorne and Linwood Chiles, defendants Richard Tipton and Cory Johnson are charged, along with defendant Vernon Lance Thomas.

Again, I emphasize that in your deliberations you must give individual consideration to each defendant with respect to each separate count charged against that defendant. The verdict forms which will be provided to you by the Court, and which I will discuss with you in more detail in a few minutes, will list the specific charges in the indictment which you must consider with respect to each of these defendants.

Title 21 United States Code Section 848(e)(1)(A) provides in pertinent part that any person engaging in or working in furtherance of a Continuing Criminal Enterprise who intentionally kills, or counsels, commands, induces, procures, or causes the intentional killing of an individual, and such killing results, is guilty of an offense against the United States.

Before you can find an individual defendant guilty of this offense, you must be convinced beyond a reasonable doubt of each of the following elements: First, that the defendant was engaged in or working in furtherance of the continuing enterprise charged in Count Two of the indictment; second, that while the defendant was so engaged, the defendant either intentionally killed, or counseled, commanded, induced, procured, or caused the intentional killing of the individual victim named in a particular count; and three, that the killing of that victim actually resulted.

The indictment charges that defendants Richard Tipton, Cory Johnson, James H. Roane, Jr. and Vernon Lance Thomas, and Jerry Gaiters, and Sterling Hardy, between January 5th, 1992 and February 19th, 1992, within the Eastern District of Virginia, murdered or maimed certain individuals as consideration for the receipt of or as consideration for a promise or agreement to pay anything of pecuniary value and engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

Now, this is the 1959 counts. These are the 1959 counts. They are Four, Seven, Ten, Thirteen, Fourteen, Sixteen, Twenty-one, Twenty-two, Twenty-three, Twenty-seven, Twenty-eight,

Twenty-nine, and Thirty.  Again, however, no single defendant is charged with all of the killings and maimings discussed in the indictment.

Specifically, the following defendants face these charges with respect to the following killings and maimings:  With respect to the killing of Douglas A. Talley, the defendant Richard Tipton is charged.  With respect to the killing of Douglas Moody, defendants Richard Tipton and James H. Roane, Jr. are charged.  With respect to the killing of Peyton Maurice Johnson, defendants James H. Roane and Cory Johnson are charged.  With respect to the killing of Louis J. Johnson, Jr., defendants James H. Roane, and Cory Johnson are charged, along with defendant Vernon Lance Thomas.  With respect to the killing of Torrick Brown, defendants Richard Tipton, James H. Roane, Jr., and Cory Johnson are charged, along with defendants Vernon Lance Thomas and Sterling Hardy.

With respect to the maiming of Martha McCoy, defendants Richard Tipton, James H. Roane, Jr., and Cory Johnson are charged, along with defendants

3219

Vernon Lance Thomas and Sterling Hardy.  With respect to the killings of Bobby Long, Anthony Carter, and Dorothy Mae Armstrong, the defendants Richard Tipton and Cory Johnson are charged, along with defendant Jerry Gaiters.  With respect to the killings of Curtis Thorne and Linwood Chiles, and the maiming of Priscilla Greene and Gwendolyn Greene, defendants Richard Tipton and Cory Johnson are charged, along with defendant Vernon Lance Thomas.

Again, I emphasize that in your deliberations you must give individual consideration to each defendant with respect to each count charged against that defendant.  The verdict forms, as I mentioned, will assist you in this respect.

You are instructed that Title 18 United States Code Section 1959 reads in pertinent part as follows:  Whoever, as consideration for the receipt of or as consideration for a promise or agreement to pay anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a

3220

crime of violence against any individual in violation of the laws of any state or the United States, or attempts or conspires to do so, is guilty of an offense against the United States.

To find a defendant guilty under this statute, you must find that the government has proven each of

the following elements beyond a reasonable doubt: First, that a racketeering activity actually did exist; second, that the racketeering activity affected interstate commerce; third, that an individual defendant did knowingly and intentionally commit or conspire to commit the crime charged in the particular count under consideration.  Fourth, that the defendant acted for the purpose of gaining entrance to the racketeering activity or for the purpose of maintaining or increasing his position in the racketeering enterprise; or that the defendant received or was promised that he would receive something of pecuniary value from the racketeering enterprise in exchange for his acts.

I will now explain and define for you the meaning of certain terms found in the statute and within these instructions relating to the elements of the 1959 murders referred to as violent crimes in aid of racketeering activity.

As I've outlined for you, those offenses are in Counts Four, Seven, Ten, Thirteen, Fourteen, Sixteen, Twenty-one, Twenty-two, Twenty-three, Twenty-seven, Twenty-eight, Twenty-nine, and Thirty of the indictment.

"Racketeering activity" means any act or threat involving murder or dealing in narcotic or other dangerous drugs.  An enterprise includes any group of individuals associated in fact which is engaged in or the activities of which affect interstate commerce. The phrase "anything of pecuniary value" means anything of value in the form of money or negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage.

It is charged in the indictment that within the Eastern District of Virginia, between on or about January 13th, 1992 and on or about February 19th, 1992, the defendants Richard Tipton, Cory Johnson, James H. Roane, Jr., Vernon Lance Thomas, and Sterling Hardy used a firearm during and in relationship  --  or in relation to the commission of a crime of violence or a drug-trafficking crime.

Now again, as I mentioned with respect to some of the charges I discussed earlier, no single defendant is charged in each of these counts.  The verdict form will assist you in keeping track of which defendants are charged in which counts and in giving individual consideration to each defendant for each count against him or her.

Let me read the firearms statute.  And the firearms violations are contained in Counts Six, Nine, Twelve, Fifteen, Twenty, and Twenty-six.  Title

18 United States Code Section 924(c)(1) provides in pertinent part:  Whoever during and in  relation to any crime of violence or drug trafficking crime for which he may be prosecuted in a Court of the United States uses or carries a firearm shall be guilty of a crime against the United States.

In order to sustain its burden of proof of the crime of using or carrying a firearm during and in relation to a crime of violence or drug trafficking crime as charged in Counts Six, Nine, Twelve, Fifteen, Twenty, and Twenty-six of the indictment, the government must prove the following two essential elements beyond a reasonable doubt:  One, the defendant committed the crime as charged in the indictment; and two, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm.

The term "crime of violence" means an offense that is a felony and has as one of its essential elements the use, the attempted use, or threatened use of physical force against the person or property of another, or an offense that by its very nature involves a substantial risk that such physical force may be used in committing the offense.

The term "drug trafficking crime" means an offense that is a felony and involves the distribution, manufacture, or importation of any controlled substances, or the conspiracy to distribute, import, or manufacture controlled substances.  The offenses alleged in Counts Three, Four, Five, Seven, Eight, Ten, Eleven, Thirteen, Fourteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty-one, Twenty-two, Twenty-three, Twenty-four, Twenty-five, Twenty-seven, Twenty-eight, Twenty-nine, Thirty, Thirty-one, Thirty-two, and Thirty-three are crimes of violence or drug trafficking crimes.

Title 18 United States Code Section 92(1)(a)(3) defines firearm is including any weapon which will or is designed to, or may readily be converted to expel a projectile by the action of an explosive, the frame or receiver of any such weapon.  You need not find that the firearm was loaded or that it was operable at the time of the offense.

The phrase "uses or carries a firearm" means a firearm or firearms available to assist or aid in the commission of a crime of violence or a drug-trafficking crime charged in the indictment.

In determining whether a defendant used or carried a firearm, you may consider all of the factors received in evidence in the case, including the nature of the underlying crime of violence or drug-trafficking crime alleged:  the proximity of the

defendant to the firearm in question, the usefulness of the firearm to the crime alleged, and the circumstances surrounding the presence of the firearm.

The government is not required to show that the defendant actually displayed or fired the weapon. The government is required, however, to prove beyond a reasonable doubt that the firearm was in the defendant's possession or under the defendant's control at the time that a crime of violence or a drug-trafficking crime was committed.

It is charged in the indictment that on or about January 15th, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, Cory Johnson, did knowingly and intentionally distribute a

3225

Schedule II narcotic controlled substance; that is, a mixture and substance described in Title 21 United States Code Section 841(b)(1)(A)(ii), which contains cocaine base commonly known as crack, or cook-'em-up, in violation of Title 21 United States Code Section 841(a)(1).

The prosecution on this count is based on a statute which is federal law, Title 11 U.S. Code Section 846, and Section 841(a)(1), which reads in pertinent part as follows:  It shall be unlawful for any person knowingly or intentionally to distribute a controlled substance.

In order to sustain its burden of proof for the crime of distribution of a controlled substance as charged in Count Thirty-one of the indictment, the government must prove the following two essential elements beyond a reasonable doubt:  The defendant, Cory Johnson, knowingly and intentionally distributed the controlled substance, crack cocaine described in the indictment; two, at the time of such distribution, the defendant knew that the substance distributed was crack cocaine, a controlled substance.

The term "to distribute" as used in these instructions means to deliver or to transfer

3226

possession or control of something from one person to another.  The term "to distribute" includes the sale of something by one person to another.  You are instructed as a matter of law that crack cocaine is a controlled substance.  It is solely for the jury, however, to determine whether or not the government has proved beyond a reasonable doubt that the defendant distributed a substance which was crack cocaine.

The evidence received in this case relating to Counts Thirty-two and Thirty-three need not prove the actual amount of the controlled substance that was

part of the alleged transaction or the exact amount of the controlled substance alleged in the indictment as distributed by the defendant. The government must prove beyond a reasonable doubt, however, that a measurable amount of the controlled substance was in fact knowingly and intentionally distributed by the defendant.

Count Thirty-two reads as follows: It is charged in the indictment that on or about February 2nd, 1992 at Richmond, Virginia, in the Eastern District of Virginia, defendants Richard Tipton, Cory Johnson, James H. Roane, Jr., Sterling Hardy, Vernon Lance Thomas, and Jerry Gaiters did knowingly and intentionally possess with intent to distribute a Schedule II narcotic controlled substance, that is, a mixture and substance described in Title 21 United States Code Section 841(a)(1)(ii) which contains cocaine base commonly known as crack or cook-'em-up in violation of Title 21 United States Code Section 841(a)(1). And Title 18 United States Code Section 2.

It is charged in the indictment in Count Thirty-three the following: That on or about April 10th, 1992 at Richmond, Virginia, in the Eastern District of Virginia, the defendant, Richard Tipton, did knowingly and intentionally possess with intent to distribute a Schedule II narcotic controlled substance; that is, more than 50 grams of a mixture and substance described in Title 21 U.S. Code Section 841(b)(1)(A)(ii), which contains cocaine base commonly known as crack or cook-'em-up, in violation of Title 21 United States Code Section 841(a)(1), and Title 18 United States Code Section 2.

Section 841(a)(1) of Title 21 of the United States Code provides in pertinent part that it shall be unlawful for any person knowingly or intentionally to possess with intent to distribute a controlled substance. In order to sustain its burden of proof for the crime of possession of a controlled substance with intent to distribute that substance as charged in Counts Thirty-two and Thirty-three of the indictment, the government must prove the following three essential elements beyond a reasonable doubt: The defendant possessed the controlled substance described in the indictment; the defendant knew that the substance was a controlled substance; and the defendant intended to distribute this controlled substance.

The law permits the jury in proper circumstances to infer intent to distribute from the quantity of the substance possessed, and/or the manner in which it is packaged. However, the ultimate question of

intent to distribute should be resolved by the jury upon all of the evidence in the case.  The law recognizes two kinds of possession:  actual possession and constructive possession.  A person who knowingly had direct physical control over a thing at a given time is then in actual possession of it.  A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

3229

The law recognizes also that possession may be sole or joint.  If one person alone has actual or constructive possession of a thing, possession is sole.  If two or more persons share actual or constructive possession of a thing, possession is joint.  You may find that the element of possession as that term is used in these instructions is present if you find beyond a reasonable doubt that the defendant had actual or constructive possession, either alone or jointly with others.

The guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged.  The law recognizes that ordinarily, anything a person can do for himself may also be accomplished by that person through direction of another person as his agent or her agent, or by acting in concert with or under the direction of another person or persons in a joint effort or enterprise.  So if another person is acting under the direction of the defendant, or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conducts of such other persons, just as though the defendant had committed

3230

the acts or engaged in such conduct.  Notice, however, that before any defendant may be held criminally responsible for the acts of others, it is necessary that the accused deliberately associate himself in some way with the crime and participated in it with the intent to bring about the crime.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons,

and that the defendant voluntarily participated in its commission with the intent to violate the law. You will note that the indictment charges that the offense or offenses were committed on a certain date. The proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

The word "knowingly" as that term has been used from time to time in these instructions means that the act was done voluntarily and intentionally and not because of a mistake or accident. The word "willfully" as that term has been used from time to time in these instructions means that the act was committed voluntarily and purposefully with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

A separate crime or offense is charged against one or more of the defendants in each count of the indictment. Each offense and the evidence pertaining to it should be considered separately. Also, the case of each defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any offenses charged should not control your verdict as to any other offense or any other defendant. I caution you, members of the jury, that you are here to determine the guilt or innocence of the accused from the evidence in the case. The defendant is not on trial for any act or conduct or offense not alleged in the indictment. Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case.

Also, the punishment provided by law for the offenses charged in the indictment should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the accused.

Any verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate in an effort to reach agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight of the evidence or the effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times you are not partisans. You are judges, judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

Now, upon retiring to the jury room, you should first select one of your number to act as your Foreperson, who will preside over your deliberations and will be your spokesperson here in open Court.

Now, I have prepared verdict forms for you, and I need to give you some explanation in that regard. There is a verdict form that relates to each individual defendant. And the way you can tell which verdict form relates to which defendant, at the top you will see the style of the case and that defendant's name. The United States of America versus Richard Tipton. And then you will have the verdict form. Now, the verdict forms will vary. They are different because each defendant is charged differently under the indictment. But there is one thing that I want to make clear, and this will relate to the verdict forms of Mr. Tipton, Mr. Johnson, and Mr. Roane.

The first thing you will do is deal with Count One, which is the conspiracy. It says, "We the jury find as follows on Count One, which is conspiracy to distribute controlled substance:" And then there will be a line where you will write in guilty or not guilty. When you are finished with Count One, you move to Count Two. Now, Count Two is the Continuing Criminal Enterprise count. And when you go down under Count Two, the first thing you see will be a question. And the question is as follows: "Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?" And there is a line, yes or no. You have got to answer that question first before you go any further. You have got to answer this question. And it says, as I say, this relates to both Mr. Johnson and Mr. Roane, that question is presented, and you have to answer that question on each verdict form.

If you indicated above that a Continuing Criminal Enterprise did not exist, you must find the defendant, Richard Tipton, Cory Johnson, or James H. Roane, as the case may be, not guilty as to Count

Two.  If you indicated that a Continuing Criminal Enterprise did exist, then you must go further and now determine whether the defendant, Richard Tipton, is guilty or not guilty of the crime of engaging in that Continuing Criminal Enterprise as charged in

3235

Count Two, and you would enter your finding below, guilty or not guilty.  And you have to do this as to Mr. Johnson and as to Mr. Roane.  You see, it is a process.  Answer the question:  Was there a Continuing Criminal Enterprise?  If no, then obviously no one can be guilty of engaging in that Continuing Criminal Enterprise, so you would have to be not guilty as to Count Two.  If yes, it doesn't follow then that they are automatically guilty of it.  You have to then decide is this defendant guilty of engaging in the continuing enterprise you have found.  Does everybody understand?
    (No response.)
    Then as you go through the indictment, and you get to the charges which allege killings of certain individuals while engaged in or working in furtherance of a Continuing Criminal Enterprise, you will see a parenthesis after each one of those charges.  For instance, this is Mr. Tipton.  Count Three, the killing of Douglas Talley while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Beneath that is a parenthetical to remind you.  If you indicated in response to the question set forth under Count Two above that a Continuing Criminal Enterprise did not exist, you

3236

must find the defendant not guilty as to this count.  Again, it follows as the night does day.  If you all do not find a Continuing Criminal Enterprise, then you cannot find a defendant guilty of engaging in killing somebody while engaging in or working in a Continuing Criminal Enterprise.
    The other counts are self-explanatory as you go through them.  The 1959 count, which I've described to you in detail, the elements there, you would consider those independently, as well as the drug counts, the firearm counts.  Consider those independently based on the evidence.  But remember that the Continuing Criminal Enterprise count is tied to the allegations of murder while engaged in or working in a Continuing Criminal Enterprise.
    You go through each individual defendant, through their verdict form, and when you have completed it the Foreperson will sign the form and date it.  And you will have done your job as to that defendant.  And then you will go to the next defendant and you would go through the same process.  Make your decisions.  And you do that as it relates

App.0263

to each individual defendant.

When you have reached unanimous agreement and dealt with all the defendants, you simply let us know. You will just have to knock on the door and the Bailiff, Marshal, will be standing there.

If you have some question during the course of your deliberations, do the same thing. Just knock on the door. We want you to write your question down and have your Foreperson sign the question. Knock on the door, give it to the Marshal, and he will bring it to me. If it is a question that I can't answer, and sometimes I can't, I just can't answer it. You may ask me something about the evidence. You heard it. You are going to have to determine what the evidence is. But if there is something technical or something that you want to know from me, I will usually bring you back in and then give you the answer as best I can in open Court from the bench.

Now, if during your deliberations you all have some question and need to come out here, please don't tell me how you stand as it relates to any defendant or any count. We don't want to hear from you until you have a unanimous verdict. If you come out here and you ask a question and you come out and the Foreperson stands up and says, "Judge, we are six to six on this," that would be tragic because it would result in a mistrial. We don't want to hear that from you. So don't do that.

Now, the exhibits will be going out with you. They will follow momentarily. Like I said, your first order of business, just select your Foreperson. Lunch should be waiting on you, probably. And you all can eat your lunch. The exhibits will follow. Take your time. You have as much time or as little time as you wish. It is up to you, whatever you need to do justice to this trial and the parties.

All right, counsel, any objections other than those previously stated?

MR. VICK: May we approach?

(At Bench.)

MR. VICK: I understood the way you read the verdict form, I thought it might be misleading. They need to find, one, CCE existed. If they find that the CCE existed then there is almost a two-part second question. Two, were these people charged, Roane, Tipton, or Johnson, leaders of the CCE, organizers, managers, or supervisors of the CCE, then they go to two. But the way it is written, when they say engaged in, they could indeed be found not guilty of Count Two but still be found guilty of the murders if, as I argued, there was a CCE, "Light" was the

head of it, the organizer, supervisor, or manager.

The guilt would still follow under the other counts. The language in the second part said "engaged in." That's not really what Count Two is about. That's what the other counts are about.

And there is one other thing, my oversight as to Count Thirty-one. We charged, just like we did in Count Thirty, might be Thirty-two, we charged more than 50 grams. It will be less than 50 grams so it needs to be deleted. Just drug distribution.

MR. BAUGH: I thought the Court did.

MR. VICK: That was one count. There is also a second one.

MR. BAUGH: Your Honor, in light of the argument of the United States, I have prepared a multiple instruction. I'm concerned about that. We have asked for that because of the New York Boyz thing. Because there might be a question for the jury whether the New York Boyz activity led to this conspiracy. The United States argued that yesterday. I think we would ask for that.

THE COURT: I think it is clear enough.

MR. VICK: My concern as to Count Two, they need to be -- to be found guilty of Count Two, they need to be found to be managers, supervisors, or organizers.

THE COURT: I don't know how much more I can say about that.

MR. VICK: Yes, sir. But my concern is not with the jury instruction, only with the verdict form. The verdict form says they need to be found guilty of Count Two only to have been engaged in. Am I making my distinction clear?

MR. BAUGH: On behalf of defendant Roane, I think you are correct. It seems to apply to Count Two if a CCE existed.

MR. VICK: Our argument is that they could find a CCE, find them not guilty of Count Two, but still find them guilty of the murder counts in furtherance of the CCE.

THE COURT: No, I explained that to them. I didn't put all the elements in the verdict form. I'm going to leave it alone.

MR. VICK: Okay. Could I show the Court the other --

THE COURT: Thirty-two?

MR. VICK: The April 10th count. That should be "less than." We didn't prove the 50 grams, so it should be just plain possession.

MR. GEARY: I offer Number 18 in regard to the five or more persons.

THE COURT:  Oh, sure.

(Court perusing instruction offered by Mr. Baugh.)

MR. VICK:  There has been no evidence of multiple conspiracies here.  There has been argument by counsel, but evidence of only one conspiracy.  Certainly there has been no evidence of any conspiracy with any other goal other than murder and distribution of drugs.

MR. WHITE:  On behalf of Mr. Tipton, Your Honor, we would suggest that the New Jersey information is separate as well as the separate Central Gardens information is separate.  That's for the jury.

THE COURT:  You can suggest all you want.  I'm trying to recollect.  And what's in evidence, separate conspiracy?

MR. BAUGH:  I can tell you this.  The United States cannot put my client in New Jersey, period, dot.

MR. WHITE:  That argument could be made in regard to the Central Gardens period before Mr. Roane was arrested and also surrounding the Sandy Lane stuff.  There was no violence alleged in connection with that.

THE COURT:  I'm not going to give it.  Your objection is noted.

MR. BAUGH:  May I stick it in as an exhibit?

MR. WHITE:  We object on behalf of defendant Tipton as well.

THE COURT:  All right.

(In Open Court.)

All right, let me say one other thing about Count Thirty-three.  The indictment will read as follows when you receive it:  The Grand Jury charges that on or about April 10th, 1992 at Richmond, Virginia in the Eastern District of Virginia, the defendant Richard Tipton did knowingly and intentionally possess with intent to distribute a Schedule II narcotic controlled substance, that is, a mixture and substance described in Title 21 U.S. Code Section 841(b)(1)(A)(ii) which contains cocaine base, commonly known as crack or cook-'em-up.

All right.  As I indicated to you, the alternates, the other day, we will have to excuse you for now.  You will be outside of this process during the deliberations.  We will, if necessary, call you back and have you sit with us and be with us during any penalty or sentencing phase that might be required.  So we can't obviously give you any estimate as to when these deliberations will be

over.  We will simply call you and give you a time to come when we know what that time will be.

If you would be excused now, I think we have lunch for you.  Go get your lunch out of there and then be excused until we call you again.  Thank you very, very much for your participation so far, and I'll thank you in advance in case we do need you again.  Thank you so much.  You all can be excused.

(The alternate jurors left the courtroom.)

Do we have the video in the jury room?

MR. VICK:  The TV is right here.  It just simply needs to be plugged in.

THE COURT:  Let's go ahead and do that.

(Mr. Vick left the courtroom with television monitor.)

All right, we will excuse you now to begin your deliberations.  Elect your Foreperson, have your lunch, and get to work.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

MR. VICK:  I don't know how close the Court wants us to stay.  Can we go back to our offices?

THE COURT:  Give us a number where we can reach you and you can get here within minutes.  We will be in recess.

(Recess to await call of the jury taken at 1:25 p.m.)

(Court was reconvened at 5:15 p.m.)

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

All right.  I'm going to send you home now.  You all have had a long day.  And I'd like for you to come back tomorrow at 9:30 unless that's a problem for somebody, so you can get an early fresh start in the morning.  As I've indicated to you over and over again, I really want to emphasize this now, do not discuss this case with anyone and don't allow anyone to discuss it with you.  Don't review any newspaper, TV, radio items related to this case.

In the morning when you come in at 9:30, we have to do it this way.  Don't start deliberating as soon as you get grouped together.  I have to bring you in here and then send you right back out to begin your deliberations.  So wait until I do that.  You all have a good evening.  Everyone remain seated until the jury leaves the courtroom.

(The jury left the courtroom.)

All right.  You can remove the defendants.

(The defendants were removed from the courtroom.)

We will be in adjournment until 9:30 tomorrow morning.

(Proceedings adjourned at 5:20 p.m.)