**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| THE UNITED STATES OF AMERICA | : | |
| | : | Crim. No. 3:92CR68 |
| v. | : | |
| | : | |
| JAMES H. ROANE, JR. | : | |
| | : | |

**APPENDIX VOL. VII**

**App. 0714-0823**

## DECLARATION OF DR. DANIEL A. MARTELL
## PURSUANT TO 28 U.S.C. § 1746

1.  My name is Dr. Daniel A. Martell. I am the president of Forensic Neuroscience Consultants, Inc. (a professional psychological corporation founded in California in 1998), and I have been an independent contractor providing forensic neuropsychological consultation and testing services in association with both Park Dietz & Associates, Inc. (a forensic neuropsychological consultation and litigation consulting firm and California corporation), and the Threat Assessment Group, Inc., (a workplace violence prevention consulting firm incorporated in Virginia) since 1994. My research and professional practice has centered on brain damage and its relationship to violent criminal behavior.

2.  I received a Ph.D. in clinical psychology and a Master's Degree in psychology from the University of Virginia. I received a Bachelor's Degree in psychology with honors from Washington and Jefferson College.  I am licensed as a clinical psychologist by the States of California and New York.

3.  I am Board Certified in Forensic Psychology by the American Board of Forensic Psychology of the American Board of Professional Psychology, Diplomate Number 5620.  I am a Fellow of the American Academy of Forensic Psychology, a Fellow-at-Large of the American Academy of Forensic Sciences, and a Professional Member of the National Academy of Neuropsychology.

4.  I am a frequent presenter and lecturer to various prosecutors' groups on issues of neuroscience and mental disorders arising in capital litigation.  Some of the state and county-level groups to whom I have presented include the Missouri District Attorneys Association, the

Page 1 of 6

App.0714

California District Attorney's Association, the State of Connecticut Attorney General's Office, the New York Prosecutor's Training Institute, the Monterey County District Attorney's Office, the Los Angeles County District Attorney's Office, and the Manhattan District Attorney's Office. In 1996, I received the New York District Attorney Association's "Distinguished Lecturer" award.

5.      I have also conducted seminars at the National College of District Attorneys' Conference on Complex Litigation, and have participated in numerous trainings for federal prosecutors. I have presented at the Department of Justice, the U.S. Attorney's Office of Legal Education in Los Angeles, California, and Dallas, Texas, and at the United States Attorney's Office in Philadelphia, PA. I am a frequent guest faculty member at the Navy Justice School in Newport, RI, and in Jacksonville, FL, where I have taught prosecutors from all branches of the military.

6.      I have been admitted to testify as an expert witness in approximately two hundred trials, and have served as the prosecution's expert witness in multiple cases in which the death penalty was sought and obtained, including Florida v. Albert Holland, and Tennessee v. Paul Reid.

7.      In federal court, I testified for the prosecution in the United States v. Lisa Montgomery, which was distinguished at the time as being only the second case since 1988 in which United States successfully obtained a death sentence against a female federal prisoner. I have also consulted with the federal government in cases which were prepared for litigation, but disposed of via negotiated guilty pleas, such as in the prosecution of "Unibomber" Theodore Kaczynski.

Page 2 of 6

8.    I have also testified for federal prosecutors in capital post-conviction proceedings, including the United States v. Paul Hammer.

9.    I have reviewed records relating to Mr. Roane's childhood, adolescence, early adult years, and incarceration, including Mr. Roane's school records, juvenile adjudication and supervision records, Virginia Commonwealth University medical records, Virginia Department of Corrections inmate records and inmate medical records, the pre-trial notes of investigator Lee Norton, the penalty phase testimony for James Roane in U.S. v. Tipton, Judge Spencer's Findings of Fact and Conclusions of Law, dated May 1, 2003, in U.S. v. James Roane, Bureau of Prisons records, and more than 30 declarations from Mr. Roane's family, neighbors and teachers. In my professional opinion, Mr. Roane is an appropriate and worthy candidate for clemency.

10.   It is notable to me that Mr. Roane was identified in early childhood as having "organic brain syndrome." This is a form of brain damage that was likely present at the time of Mr. Roane's birth, and was most certainly impacting his behavior by the time he reached elementary school. Perhaps the easiest way to conceptualize the effect that this kind of brain damage has upon the sufferer is to imagine existing in a state of cognitive chaos: to be constantly taking in stimulus, yet lacking the ability to impose order over it effectively, or to control one's reactions to it properly. Not surprisingly, the kinds of behaviors associated with organic brain syndrome include poor judgement, impulsiveness, fearfulness, agitation, impaired intellectual function, and difficulty in regulating emotion and reaction. Mr. Roane demonstrated all of these behaviors as a young person.

11.   While this form of brain damage is not curable, the negative behaviors associated with it diminish dramatically if the sufferer is placed in a rigorously structured environment. In

Page 3 of 6

fact, imposing structure is central to treating this type of organic brain disorder, in that a heightened degree of external structure serves to counter the mental disorganization that the sufferer experiences.

12.    At the other extreme, if an individual with this kind of brain damage is bombarded, day in and day out, with unpredictable, hostile, or violent stimulus, then the negative behaviors associated with organic brain syndrome become increasingly evident and severe.

13.    The background materials in this case demonstrate, to a striking degree, the interrelationship between Mr. Roane's brain damage and his environment. At delinquency placements like Adventure Bound and Beaumont Learning Center, Mr. Roane was subjected to intensive structure and control. After an initial adjustment period, Mr. Roane not only submitted to authority at these institutions, he actually began to thrive and develop in positive ways normal for a teenage boy. By the time of his discharge from the Adventure Bound program, counselor Minton M. Garrison wrote: "James was a hard-working, enthusiastic student, who thrived on earned positive feedback and attention from both staff and peers." Unfortunately, when Mr. Roane returned home and could no longer rely on an institution to structure his daily life, he showed significant behavioral regression.

14.    In sharp contrast to the delinquency placements, Mr. Roane's home life was anything but structured.

15.    Characterized in the records as stinking, filthy, and utterly chaotic, Mr. Roane's family home was populated by a revolving cast of drug addicts, transients, and abusers of women and children.

16.    Mr. Roane went hungry.

Page 4 of 6

17. He wore dirty clothing that he had to share with his brothers and sisters.

18. Many of the adults around the young Mr. Roane behaved more like predators than protectors, forcing him and other little boys to fight one another for sport, supplying James with drugs to use or sell, and, most devastatingly, subjecting him to rape.

19. One of these predators – a man by the name of Haywood "Sweet Love" Tunstall, who is fourteen years James's senior – admits to having a sex with Mr. Roane beginning when he was only nine years old. Mr. Roane was also molested by "Ed," an adult who drove the neighborhood ice cream truck and was a frequent overnight guest at the Roane home.

20. It is impossible to pinpoint the precise moment in Mr. Roane's life when the negative influences in his home and community finally overwhelmed his neurological, brain-based vulnerabilities and caused his personality to develop in destructive ways.

21. Nor is there any way to know now what misery could have been avoided if Mr. Roane had simply gotten early and appropriate treatment for organic brain syndrome, as was recommended from a young age by his psychiatrist Dr. Lordi.

22. What is clear, however, is that Mr. Roane still exhibits the ability to respond favorably to structure and close confinement. While incarceration is ordinarily a poor substitute for residential mental health treatment, prison has provided Mr. Roane with the structure that could have been the cornerstone of a long-term treatment program. Mr. Roane has benefitted from the predictable, highly controlled prison environment, developing as a "relaxed" and "cooperative" prisoner, who is consistently evaluated as a low threat of risk to himself and others. Over the course of his incarceration at USP-Terre Haute, Mr. Roane has had only one disciplinary violation for improper phone use, which is a nonviolent offense.

Page 5 of 6

23. He has forged a positive relationship with his family, and encourages them to seek better paths in life.

24. I believe that if Mr. Roane was granted clemency, he would continue to adjust positively to his prison environment.

25. For all of the foregoing reasons, I support Mr. Roane's petition for clemency.

26. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Dr. Daniel A. Martell

Location: Irvine, CA
Date: 9/18/08

Page 6 of 6

**Affidavit of Natalie Novick Brown, PhD**
**PURSUANT TO 28 U.S.C. §1746**

I, Natalie Novick Brown, PhD, hereby declare under oath as follows:

1.  I am over the age of eighteen, mentally competent, and make this declaration based on my own personal knowledge.

2.  I am a licensed psychologist in the States of Washington, Florida, and Arkansas.

3.  I completed post-doctoral fellowship training in fetal alcohol spectrum disorders (FASD) with pioneer FASD researcher Ann Streissguth, PhD. I also received formal pre- and postdoctoral training in forensic psychology. I am certified by the State of Washington as a specialist in developmental disabilities.

4.  In my private clinical and forensic practice, I have specialized in the forensic assessment of FASD, child development, and neurodevelopmental disabilities. I have treated hundreds of patients with FASD and other neurodevelopmental disorders.

5.  I am Program Director of FASDExperts, an informal group of mental health experts who specialize in training other mental health professionals about FASD. In conjunction with this group or with other mental health experts around the United States, I conduct FASD assessments in capital murder cases. I have testified in numerous pre- and postconviction capital cases regarding the impact of FASD on Central Nervous System functioning and how such brain damage influences lifelong adaptive behavior, including criminal conduct. In several pretrial cases, such testimony has been relevant in sentences of life without possibility of parole rather than the death penalty.

6.  I am a Clinical Assistant Professor (courtesy staff) in the University of Washington's School of Medicine, Department of Psychiatry and Behavioral Sciences. In this role, I train researchers in the Fetal Alcohol and Drug Unit on criminal conduct in FASD and also conduct research on assessment and treatment of FASD, which I have published in

numerous peer-reviewed journals over the years. I have presented on FASD at state, national, and international conferences.

7.  My resume is attached as Exhibit C.

8.  **Referral:** The case of James Henry Roane, Jr. (DOB: 10/27/65) was referred by the Federal Public Defender's Office in Philadelphia, Pennsylvania, in the context of clemency proceedings. Mr. Roane is currently on death row in Terre Haute, Indiana, stemming from his murder conviction in 1993. I was asked by current counsel to review documented information about Mr. Roane's lifelong developmental and behavioral history to determine its consistency with FASD and, if so, whether it is likely FASD influenced his offense conduct. I was asked to conduct this assessment from the perspective of what a competent psychologist would have known and done at the time of trial in 1993.

9.  **Procedures:** This assessment involved review of thousands of pages of records (Exhibit A), telephonic interview with Jeanette Roane (biological mother), and supervision of psychometrician Joanne Sparrow's telephonic administration of two behavior rating measures (i.e., Vineland Adaptive Behavior Scales-Second Edition and Behavior Rating Inventory of Executive Function-Adult or BRIEF-A) to three individuals: Jeanette Roane, Annette Coates (oldest sister, a twin), and Melody Forrester (childhood friend). I consulted with Russell Stetler (National Mitigation Coordinator for the federal death penalty projects).

10. **SUMMARY OF FINDINGS:**

   (a) Biological mother Jeanette Roane confirmed alcohol consumption throughout the pregnancy with her son James in amounts sufficient to produce Fetal Alcohol Syndrome or Fetal Alcohol Effects. Her self-report was supported by numerous individuals who witnessed the important role alcohol played in her daily life. Jeanette Roane's documented acknowledgement to Dr. Lordi in 1980 of an alcohol problem was a red flag indicating a high likelihood of FASD.

   (b) Convergent evidence across Mr. Roane's lifespan indicates a complex pattern of behavior and central nervous system abnormalities that are inconsistent with

developmental level and cannot be explained by familial background or environment alone. Such a finding meets the Institute of Medicine's diagnostic criterion for central nervous system dysfunction in FASD. Mr. Roane's central nervous system abnormality and confirmed prenatal alcohol exposure described in this Declaration would have met diagnostic criteria for Fetal Alcohol Effects in 1993.

(c) The scientific community had not yet identified FAS or FAE by the time of Mr. Roane's birth in 1965, and medical doctors and mental health professionals were unaware of the consequences of fetal alcohol exposure. Thus, neither Jeanette Roane nor her doctor could have been aware of the consequences of her alcohol consumption during the pregnancy with her son James. In addition, because the medical community had yet to identify the type of neurological impairments Mr. Roane suffered in utero, those impairments went undiagnosed and generally ignored in childhood when appropriate interventions could have reduced risk of criminal behavior.

(d) Given the brain damage Mr. Roane was born with, he was unable to cope with the emotional and psychological trauma of his childhood adversity and develop adult maturity, judgment, and reasoning as he entered his 20s. Consequently, by the time of the instant offense, his adaptive functioning remained childlike due to brain damage over which he had no control. Just as his central nervous system dysfunction impaired and negatively influenced his behavior throughout life, it similarly influenced his capacity to reason, reflect, and control his impulses during the offense conduct. Put another way, at the time of the offense Mr. Roane's capacity to cope with stressful situations was equivalent to that of an adult with mental retardation.

(e) The importance of focusing evaluation resources on the issue of *in utero* alcohol exposure should have been apparent to a competent forensic psychologist in 1993. Such information would have helped explain Mr. Roane's offense conduct to the trier of fact. Using the same procedures I followed in this assessment, a competent psychologist could have been able to conclude Mr. Roane met diagnostic criteria for Fetal Alcohol Effects and testify accordingly during 1993 sentencing proceedings.

11. I can provide a more detailed discussion of each of the summarized findings upon request.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. §1746.

Natalie Novick Brown, PhD

Seattle, Washington
DATED: 11/4/2016

Exhibit C

RESUME

**Natalie Novick Brown, PhD, SOTP**

**Northwest Forensic Associates, LLC**

Mailing Address: 12345 Lake City Way NE, #106   Seattle, WA  98125

206-361-6000 (office)  /  425-275-1238 (cell)  /  888-807-5991 (fax)

drnataliebrown@gmail.com

**Curriculum Vitae**

## LICENSES - PSYCHOLOGY

| | |
|---|---|
| #PY1965 | Washington |
| #2606 | Oregon |
| #PY6219 | Florida |
| #14-12P | Arkansas |

## CERTIFICATION

Certified Psychologist (CPQ #3258), Association of State & Provincial Psychology Boards

Certified Sex Offense Treatment Provider (Washington State SOTP #FC112)

Polygraph Examiner / Certified in Post-conviction Sex Offender Testing (PCSOT)

Certified Psychologist/Evaluator for Department of Corrections, Division of Developmental Disabilities, Department of Social & Health Services (Washington State)

Certified Parenting Evaluator, University of Washington Department of Psychiatry and Behavioral Sciences

National Register of Health Service Providers in Psychology, #49892

## EDUCATION

App.0724

| 2003-04 | International School of Polygraph (Fort Lauderdale, FL) and Post-Conviction Sex offender Polygraph Training |
| 1995-96 | Internship, Sex Offense Treatment Provider (SOTP) |
| 1994-95 | Post-Doctorate in FASD, U. of Washington Fetal Alcohol and Drug Unit |
| 1993-94 | Parenting Evaluation Training Program, University of Washington |
| 1989-94 | Ph.D. in Clinical Psychology, University of Washington |
| 1978-79 | M.H.A. in Health Care Administration, University of Washington |
| 1974-75 | M.L.S. in Library and Information Sciences, University of Washington |
| 1964-68 | B.A. in Sociology (Psychology minor), UCLA |

## CLINICAL EXPERIENCE

2007 – present    **Program Director / Chief Psychologist: FASDExperts**

Pre- **and** post-conviction case review, assessment/evaluation, consultation, and testimony re Fetal Alcohol Spectrum Disorders (FASD)

1996 – present    **Clinical and Forensic Psychologist / Expert Witness**

- **Adult and juvenile sex offense and risk assessment evaluation** (criminal state and federal prosecution; civil commitment cases under Sexually Violent Predator law]

- **Adult, adolescent, and child psychological evaluation** (general psychological assessment, competency, dependency, FASD, neurodevelopmental disability, child abuse/neglect)

- **Parenting evaluation** (court-appointed and stipulated cases involving such issues as physical and sexual abuse allegations, neglect, parental alienation, and relocation)

App.0725

- **Private therapy practice, 1995-present** (adult and adolescent therapy involving multiple issues, including sexual offending and SVP, developmental delay, parenting, and FASD)

2005 – present     **Clinical Assistant Professor** (courtesy staff)**,** Department of Psychiatry and Behavioral Sciences, School of Medicine, University of Washington, Seattle

- Research involving FASD prevention, intervention, and assessment

- Assessment of recidivists referred by King County Mental Health Court and King County Drug Court to screen for FASD/organic brain impairment; consultation regarding FASD secondary disabilities; supervision of doctoral students and psychologists in training re FASD

1994 - 1995     **Postdoctoral Fellowship / Faculty Appointment** (1994-2000), Fetal Alcohol and Drug Unit (Dr. Ann Streissguth), University of Washington

- Research on maternal substance abuse and treatment needs

- Evaluation/treatment of FAS/FAE patients with sex offense and non-sexual criminal issues; research on Secondary Disabilities related to FAS/FAE in Washington State Prison system

1992 - 1994     **Pre-doctoral Internships** (University of Washington)

- Specialized training and certification in forensic evaluation and expert testimony (18 months)

App.0726

- Specialized training in pain management, Pain Clinic, University of Washington (2 months)

- Specialized training in individual psychotherapy, Group Health Cooperative, Seattle (2 months)

- Specialized training in rehabilitation psychotherapy (including traumatic brain injury), University Hospital, University of Washington (2 months)

## PRE-DOCTORAL WORK EXPERIENCE

1979-89          Hospital CEO / Clinic Administrator

1975-79          Hospital Medical Librarian

## RESEARCH

2005 – present    Clinical Assistant Professor (courtesy appointment), Fetal Alcohol and Drug Abuse Unit, Department of Psychiatry and Behavioral Medicine, University of Washington

Research on suggestibility; research in conjunction with Parent-Child Assistance Program (PCAP)

1994 - 1995      Postdoctoral Fellow: Fetal Alcohol Unit, University of Washington

Research on FASD in Washington State prison system (men's and women's correctional facilities at Shelton and Purdy)

1991 - 1994      Dissertation: Relation between Psychological Correlates of Alcoholism Risk and Stress-Response Dampening Across the Blood Alcohol Curve

| | |
|---|---|
| 1991 - 1993 | Research Coordinator:  Prediction of High Risk Drinking in Young Adults |
| 1990 - 1992 | Research Coordinator:  Alcohol and Social Influence |
| 1989 - 1991 | Research Coordinator:  Self-Esteem in Young Adults |

## PEER-REVIEW

***Criminal Behaviour and Mental Health***
Wiley Online

***International Journal of Law and Psychiatry***
International Academy of Law and Mental Health, Harvard University

***Addiction***
Society for the Study of Addiction

## PUBLICATIONS

Greenspan, S., Brown, N.N., & Edwards, W. (2016). FASD and the concept of "intellectual disability equivalence." In M. Nelson & M. Trussler (Eds.), *Law and ethics in fetal alcohol spectrum disorder.* Amsterdam: Springer.

Grant, T.M., Brown, N.N., & Dubovsky, D. (2015). Screening for Fetal Alcohol Spectrum Disorders: A critical step toward improving treatment success. In: *Suchtgefährdete Erwachsene mit Fetalen Alkoholspektrumstörung.* G. Becker, K. Hennicke, & M. Klein (Eds). Berlin, Germany: De Gruyter Publisher.

Brown, N.N., Burd, L., Grant, T. M., Edwards, W., Adler, R., & Streissguth, A. (2015). Prenatal alcohol exposure: An assessment strategy for the legal context. *International Journal of Law and Mental Health.*

Brown, N.N., & Connor, P.D. (2014). Executive dysfunction and learning in children with fetal alcohol spectrum disorders (FASD). *Cognitive Sciences, 8,* 47-105.

Brown, N.N., & Connor, P.D. (2014). Impact of executive functioning on learning in fetal alcohol spectrum disorders (FASD). In: Bennett, K.P. (Ed.), *Executive functioning: Role in early learning processes, impairments in neurological disorders and impact of cognitive behavior therapy (CBT).* Hauppauge, NY: Nova.

Grant, T., Graham, J.C., Ernst, C.C., Peavy, K.M., & Brown, N.N. (2014). Improving pregnancy outcomes among high-risk mothers who abuse alcohol and drugs: Factors associated with subsequent exposed births. *Children and Youth Services Review, 46,* 11-18.

Brown, N.N., Clarren, S., & Grant, T. (Winter 2014). Fetal alcohol spectrum disorders: What judges and other legal professionals need to know. *Judges' Page, Court Appointed Special Advocates.*

Rich, S.D., & Brown, N.N. (2014). A case for a diagnostic code for neurodevelopmental disorder associated with prenatal alcohol exposure: A child/adolescent psychiatrist and forensic psychologist speak out. *Psychiatric News, http://psychnews.psychiatryonline.org/newsarticle.aspx?articleid=1792237.*

Brown, N.N., & Rich, S.D. (Winter 2013). A neurodevelopmental paradigm for fetal alcohol spectrum disorder. *Judges' Page, Court Appointed Special Advocates.*

Grant, T.M., Brown, N.N., Graham, J.C., & Ernst, C.E. (2013). Substance abuse treatment outcomes in women with fetal alcohol spectrum disorder. *International Journal of Alcohol and Drug Research,* http://ijadr.org/index.php/ijadr/article/view/112/213.

Brown, N.N., Wartnik, A., & Rich, S.D. (2013). Diagnosing FASD in the era of DSM-5: Good news for the forensic context. *Fetal Alcohol Forum, 10,* 34-37.

Grant, T.M., Brown, N.N., Dubovsky, D., Sparrow, J., & Ries, R. (i2013). The impact of prenatal alcohol exposure on addiction treatment. *Journal of Addiction Medicine, 7,* 87-95.

Grant, T.M., Brown, N.N., Graham, J.C., Whitney, N., Dubovsky, D., & Nelson, L.A. (2013). Screening in treatment programs for Fetal Alcohol Spectrum Disorders that could affect therapeutic progress. *International Journal of Alcohol and Drug Research, 2,* 37-49.

Brown, N.N., Adler, R.S., & Connor, P.D. (2012). Conduct-disordered adolescents with fetal alcohol spectrum disorder: Intervention in secure treatment settings. *Criminal Justice and Behavior, 39,* 789-812.

Brown, N.N., O'Malley, K., & Streissguth, A.P. (2012). FASD: Diagnostic dilemmas and challenges for a modern transgenerational management approach. In S. Adubato & D. Cohen (Eds.), *Prenatal Alcohol Use and Fetal Alcohol Spectrum Disorders: Diagnosis, Assessment, and New Directions in Research and Multimodal Treatment.* Bentham Online Publishing.

Brown, N.N., Gudjonsson, G., & Connor, P. (2011). Suggestibility and Fetal Alcohol Spectrum Disorders (FASD): I'll Tell You Anything You Want to Hear. *Journal of Psychiatry and Law, 39,* 39-71.

Brown, N.N. (Spring 2011). Evidence-based interventions in children with Fetal Alcohol Spectrum Disorders. *Paradigm, 16,* 12-17.

Brown, N.N., Wartnik, A.P., Connor, P.D., & Adler, R.S. (2010). A proposed model standard for forensic assessment of FASD. *Journal of Psychiatry and Law, 38,* 383-418.

Brown, N.N. (June 2008). FASD Experts: Multidisciplinary Forensic Assessment for a Multidimensional Condition. *Iceberg,* 18.

Brown, N.N. (2007). ADHD and FASD: Comorbidity and Its Effect on Sexual Behavior Problems. In K. O'Malley (Ed.), *ADHD and FASD: Diagnosis, natural history, and therapeutic issues across the lifespan.* Hauppauge, NY: Nova Pub.

Brown, N.N. (1998). FAS: Preventing and treating sexual deviancy. In A.P. Streissguth & J. Kanter (Eds.), *The challenge of fetal alcohol syndrome: Overcoming secondary disabilities.* Seattle: University of Washington Press.

Novick (Brown), N.J. (1996). *Sexual victimization and inappropriate sexual behavior in children: Recommendations for evaluation and treatment.* Proceedings of 1996 International Conference on Fetal Alcohol Syndrome, Seattle, Washington.

Novick (Brown), N.J., & Streissguth, A.P. (1995). Identifying clients with possible fetal alcohol syndrome: Fetal alcohol effects in the treatment setting. *Treatment Today, 7(3),* 14-15.

Novick (Brown), NJ, & Streissguth, AP (1995). Some thoughts on the treatment of adults and adolescents impaired by fetal alcohol exposure. *Treatment Today, 7(4)*, 20-21.

Novick (Brown), N.J., Cauce, A.M., & Grove, K. Competence self-concept. In B.A. Bracken (Ed.), *Handbook of self-concept.* New York: Wiley.

Novick (Brown), N.J., & Brown, J.D. (1992). *The influence of self-esteem on response to mood.* Paper presented, 100th Annual Convention of the American Psychological Association, Washington, D.C., August, 1992.

Brown, J.D., Novick (Brown), N.J., Lord, K.A., & Richards, J.M. (1992). When Gulliver travels: Social context, psychological relatedness, and self-appraisals. *Journal of Personality and Social Psychology, 62,* 717-727.

Norris, J, Novick (Brown), N.J., & Kerr, K.L. (1992). *Alcohol and violent pornography: Impact of social influence on sexual arousal.* Poster presented at the Research Society on Alcoholism Meeting, San Diego, California, June, 1992.

Brown, J.D., & Novick (Brown), N. (1991). *Social context, psychological relatedness, and self-appraisals.* Paper presented at the 99th Annual Convention of the American Psychological Association, San Francisco.

## INVITED PRESENTATIONS, WORKSHOPS, TRAININGS

04/29/16      Gudjonsson Suggestibility Scales (GSS). American Institute for the Advancement of Forensic Studies, St. Paul, MN.

09/11/15      FASD: Identification, Assessment, and Treatment. Co-presented with Therese Grant and Paul Connor. Western State Hospital, Tacoma, WA.

08/20/15      FASD and Sexually Inappropriate Behavior. FASD Train-the-Trainer Workshop for Casey Family Programs, Indian Child Welfare, University of Washington, Seattle, WA.

07/13/15      (1) One Size Does Not Fit All: Forensic Assessment of Sex Offenders with FASD. XXXIV International Conference on Law and Mental Health, Vienna, Austria (2) FASD in the Courtroom: FASDExperts Approaches Its Eighth Year (3) Panel: The Central Role of Neuropsychology in Forensic FASD Assessment (4) Panel: Forensic Assessment of FASD: The Impact of Suggestibility. XXXIV International Conference on Law and Mental Health, International Academy of Law and Mental Health, Vienna, Austria.

06/25/15      (1) Plenary: Identifying Fetal Alcohol Syndrome (2) Panel: Fetal Alcohol Syndrome: Experts and Presentation at Evidentiary Hearing. Capital Habeas Unit (CHU) National Conference, Denver, CO.

05/29/15      FASD: What You Should Know. Court Improvement Training Academy (CITA), University of Washington Law School, Suquamish Nation, Poulsbo, WA.

10/23/14      Insights from Poverty to Death Row: ND-PAE Diagnosis and DSM-5. American Academy of Child and Adolescent Psychiatry Annual Meeting, San Diego, CA.

05/23/14      Plenary: Forensic Assessment of FASD: Update on Diagnosis and Latest Research. FASD and the Law Conference, Woodbury, MN

05/14/14    FASD: Diagnosis and Intervention. Washington State Developmental Disabilities Administration, Seattle, WA

04/29/14    Sex Is *Not* a Four-Letter Word: FASD and Sexuality. Living With FASD: 2014 Summit Conference (international webinar)

02/05/14    FASD: Dawn of a New Era in Diagnosis. Minnesota Organization on FAS (MOFAS), MN (webinar)

11/26/13    Fetal Alcohol Spectrum Disorder. Washington State Developmental Disabilities Administration, Kent, WA

10/16/13    Neurodevelopmental Disorders in the DSM-5. Skype workshop for Pathways Counseling Center, St. Paul, MN

09/27/13    FASD: Back (and to) the Future: 1973 – 2013. 40th Anniversary Professional Summit, New Jersey Task Force on FASD, Atlantic City, NJ

09/25/13    FASD: Practical Supports for the Legal Context. 2013 FASD Summit, The Arc of Arkansas, Little Rock, AR

08/28/13    Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center, Missoula, MT

08/22/13    Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center, Fargo, ND

08/04/13    FASD: Moving Beyond Prevention to Practical Supports. The Arc: 2013 National Convention. Bellevue, WA

07/26/13    Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center, Boise, ID

07/15/13    FASD and Criminal Justice: Cognitive and Social Deficits Associated With FASD. 33rd International Congress on Law and Mental Health, Amsterdam, Netherlands.

| | |
|---|---|
| 06/25/13 | Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center. Cheyenne, WY |
| 06/25/13 | Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center, Cheyenne, WY |
| 05/03/13 | Understanding and Treating Developmentally Delayed Sex Offenders. American Institute for the Advancement of Forensic Studies; St. Paul, MN |
| 04/06/13 | Seeking the Standard of Care in Custody Assessments in WA State. AFCC-WA Spring Conference; Seattle, WA |
| 09/06/12 | Understanding the Link Between FASD and Sexual Offending. Indian Health Service; Seattle, WA |
| 07/20/12 | Forensic Assessment of Developmental Disabilities. American Institute for the Advancement of Forensic Studies; St. Paul, MN |
| 07/13/12 | FASD and Competency. WI Association of Criminal Defense Lawyers; Stevens Point, WI |
| 04/19/12 | Changing Public Policy in the Juvenile Courts: What Works? Fifth National Biennial Conference on Adolescents and Adults with FASD: It's a Matter of Justice, Vancouver, BC, Canada |
| 03/29/12 | Fetal Alcohol Spectrum Disorders. Death Penalty Institute, Lexington, KY |
| 02/03/12 | Alcohol Related Birth Disorders and the Law. Mid-year ABA Conference, Interagency Coordinating Committee on FASD in Collaboration with U.S. Dept. of Justice and Minnesota Organization on FAS, New Orleans, LA |
| 02/02/12 | FASD and Neurobehavioral Issues in the Criminal Justice System. Capital Defense Project of SE Louisiana, New Orleans, LA |

11/18/11      Assessing and Understanding Fetal Alcohol Spectrum Disorders in Capital Clients. Virginia Bar Assoc., 19th Annual Capital Defense Workshop, Richmond, VA

10/07/11      FASD and the Criminal Justice System. Seattle City Attorney's Office and University of Washington, Seattle, WA

09/21/11      FASD: Preventing and Treating Sexual Deviancy. Indian Health Service FASD Training, Seattle, WA

07/09/11      FASD and Competency. Capital Mitigation – Beyond Atkins, Center for American and International Law; Houston, TX

06/23/11      FASD in the Courtroom. Ninth Annual Statewide Conference, Arizona Public Defenders Association; Tempe, AZ

05/20/11      FASD and Intellectual Disability/Mental Retardation. Metropolitan Public Defender, Oregon Capital Resource Center, Oregon Criminal Defense Lawyers Association; Portland, OR

03/11/11      Forensic Aspects of Fetal Alcohol Spectrum Disorders. Sponsored by Pathways Counseling Center, MOFAS, Minnesota DOC, MN Community Corrections Association, & American Institute for the Advancement of Forensic Studies; St. Paul, MN

10/27/10      FASD: Its Relevance Throughout the Legal Process from Competency to Stand Trial to Clemency. 2010 Appellate Judicial Attorneys Institute, Burlingame, CA

10/02/10      Forensic Assessment of FASD in the Habeas Context. Federal Defenders Annual Death Penalty Conference, Boise, ID

07/16/10      Team Approach to Litigating FASD (plenary). Center for American and International Law, Plano, TX

07/10/10     Fetal Alcohol Spectrum Disorder in the Courtroom: The 20th Anniversary of Dr. Ann Streissguth (plenary + break-out). NAACP LDF, Airlie, VA

04/22/10     Forensic Assessment of FASD with State-of-the-Art Facial Analysis, Diffusion Tensor Imaging and MRIs. 7th National Seminar on the Development and Integration of Mitigation Evidence (plenary). American Bar Association, Seattle, WA

04/17/10     Suggestibility in FASD: Forensic Assessment and Implications. 4th International Conference on Fetal Alcohol Spectrum Disorder, Vancouver, BC, Canada

03/31/10     Fetal Alcohol Spectrum Disorder and Justice. Alcohol Healthwatch, Parnell, New Zealand. (Abbreviated presentations also provided on 4-1-10 to New Zealand Ministry of Health and Ministry of Justice.)

02/25/10     Fetal Alcohol Spectrum Disorder (FASD). Texas Criminal Defense Lawyers Association, Austin, TX

02/12/10     FASD and Justice: A Multidisciplinary Assessment Model for Adults and Adolescents. CACJ/CPDA Capital Defense Seminar, Monterey, CA.

02/06/10     Fetal Alcohol Syndrome: Practical Tools. 3rd Interdisciplinary Program: UW School of Law & Washington Death Penalty Assistance Center, Seattle, WA.

03/11/09     FASD in the Legal System: A Multidisciplinary Assessment Model for Adults and Adolescents. 3rd International Conference on Fetal Alcohol Spectrum Disorder, Victoria, BC.

11/18/08     Screening for FASD in Family Practice. Family Practitioners, University of Washington/Swedish Hospital, Family Practice Medical Residents In-service.

10/25/08        Cross-Examination of Adverse Expert Witnesses in SVP Commitment Trials. Sex Offender Commitment Defense Association (SOCDA), Atlanta, GA

05/30/08        Fetal Alcohol Syndrome and Fetal Alcohol Effect: Identifying Clients and Understanding Consequences. Fifth National Seminar on the Development and Integration of Mitigation Evidence, Habeas Assistance & Training Counsel Project, Baltimore, MD

11/03/07        Direct and Cross Examination of Experts in SVP Cases. Sex Offender Commitment Defense Association (SOCDA), San Diego, CA

08/18/07        Fetal Alcohol Syndrome / Fetal Alcohol Effects. 12th Annual Federal Habeas Corpus Seminar, Nashville, TN

05/23/07        Fetal Alcohol Spectrum Disorders: History, Diagnosis, and Mitigation Issues. Capital Federal Public Defender Unit (capital habeas and trial attorneys, Federal District of Nevada)

04/14/07        What Attorneys and Policy Makers Need to Know About FAS and FASD. American Bar Association/Harvard Law School National Conference on Children and the Law, Cambridge, MA

02/18/07        Fetal Alcohol Spectrum Disorders (FASD). California Attorneys for Criminal Justice/California Public Defender Association (CACJ/CPDA) Annual Death Penalty Conference, Monterey, CA

06/30/06        Sexually Violent Predator Evaluation, Risk Assessment, and Testimony, Florida Public Defenders Sexually Violent Predator Conference, Orlando, FL

04/19/06        Screening Protocol for Fetal Alcohol Spectrum Disorders (FASD). King County Mental Health / Drug Courts, Seattle, WA

02/26/05      FASD: Problems of Witness Suggestibility and False Confessions. International FASD Conference, Victoria, British Columbia, Canada

## PROFESSIONAL ORGANIZATIONS

1990 – present      American Psychological Association (APA)

2008 – present      American Society-Law Society (APA)

2015 – present      International Association of Law and Mental Health (IALMH)

2005 – present      Association for the Treatment of Sex Abusers (ATSA)

2004 – present      Association of Family & Conciliatory Courts (AFCC – National) (WA-AFCC - Washington State; Board of Directors, Treasurer)

2000 – present      American College of Forensic Examiners

2011 – present      Midwest Alliance on Shaken Baby Syndrome (Board of Directors)

2001 – 2003         Jacksonville Youth Authority Advisory Board

1996 – 2000         Chairman, Social Issues Committee, Washington State Psychological Association

1994 – 2000         Washington State Psychological Association, Board of Directors

**Jethro W. Toomer**
**Consulting Psychologist**

| | |
|---|---|
| **Diplomate** | **Florida International University** |
| **American Board of** | **ZEB 244A** |
| **Professional Psychology** | **11200 S.W. 8th Street (Tamiami Trail)** |
| | **Miami, Florida** |
| | **33199** |
| | **Telephone (305)348-2089** |
| **Diplomate** | **348-2552** |
| **American Board of** | **Telefax (305) 348-4125** |
| **Forensic Examiners** | **Mailing Address : P.O. Box 650144** |
| | **Miami, Florida 33265-0144** |
| | **\*\*\*** |
| | **Emerald Park Office Center** |
| | **2699 Stirling Rd., Suite A-105** |
| | **Ft. Lauderdale, FL 33123** |
| | **(954)288-0202** |
| | **Telefax: (954) 962-4926** |

Billy H. Nolas
Defender Association of Philadelphia
Federal Court Division, Capital Habeas Corpus Unit
The Curtis Center, Suite 545-W
Independence Square West
Philadelphia, PA 19106

September 16, 2008

**Referral:**     **James Henry Roane Jr.**
              **Social History**

Dear Mr. Nolas,

In response to your request for a psychiatric evaluation, I saw James Henry Roane, Jr. on June 12, 2008 at the Bureau of Prisons facility at Terre Haute, Indiana. Mr. Roane was convicted of murder and sentenced to death. In addition, I have reviewed all of the records and materials provided.

**Qualifications of the Examiner**

I have enclosed a copy of my resume that states my qualifications to perform this evaluation.

**Mental Status Examination**

App.0739

James Henry Roane, Jr.
Social History, page 2

**Appearance and Behavior**
Mr. Roane presented to his interview as a light skinned African American man neatly dressed in prison clothing. He was cooperative with the examination. His eye contact was good.

**Cooperation**
Mr. Roane was exceedingly open and cooperative.

**Speech**
His speech was of normal rate, rhythm, and volume.

**Background Information**

Mr. Roane provided detailed background information. In all instances the information he provided was consistent with or corroborated by other affidavits, reports and records.

James Henry Roane, Jr. was born on October 27, 1965 in Richmond, Virginia. He was the fourth child born to Jeanette Roane and James Roane, Sr. His mother became pregnant at only fourteen years of age and gave birth to her first children, twin daughters. His parents were subsequently married and had children successively in close proximate age to one another. Mrs. Roane was seventeen when Mr. Roane, her fourth child, was born. Mrs. Roane ultimately had seven children, all but the final child were fathered by James Roane, Sr.

Mr. Roane lived with his mother and siblings in the Gilpin Court Housing projects. However, his father was a constant presence during Mr. Roane's early childhood, as he reaped physical, sexual and emotional abuse on Mrs. Roane and her children.

James Roane Sr.'s abuse was violent. Neighbors and family members describe hearing the sounds of violence in the Roane apartment, including the blows Mrs. Roane received and her screams of pain. Mr. Roane witnessed this abuse as a very young child.

Further, Mr. Roane recalls that the adult males he knew were always fighting with him. They would put up their fists and demand to "play fight" with him. But James doesn't recall ever having received a hug from any of them. Worse, at times the fights went beyond playing and young James was forced to fight other children by older males in the neighborhood.

Mr. Roane also recalls receiving violent beatings by his mother, who would often make him get into the bathtub just prior to a beating so the he would be wet when beaten, thereby making it more painful.

The childhood home was also sexually charged. It is reported that Mr. Roane heard and/or saw his mother being raped in the home by his father. Reports are that many individuals in the neighborhood would come to the Roane house as a place to have sex and do drugs. Mr. Roane himself was raped repeatedly by at least two different men.

Mr. Roane discussed Ed, the local ice cream truck driver and friend of Mr. Roane's mother, befriended the Roane children by giving them free ice cream and offering them rides on the ice cream truck. Mr. Roane's dysfunctional and violent home, combined with the extreme poverty and neglect he suffered, made him vulnerable to such a predator. Mr. Roane was anally

James Henry Roane, Jr.
Social History, page 3

raped by Ed, both in the ice cream truck itself while parked in an empty lot, and in his own home. Mr. Roane described his feelings of isolation and rage he felt thereafter. Because Ed continued to befriend his family and even lived with the Roane family for a short period, the abuse continued over several years.

The neighborhood in which Mr. Roane's family lived, the Gilpin Court Housing Project, was a violent and drug infested neighborhood. In addition to being forced at a young age to fight other children, fights upon which older boys and men would place bets, Mr. Roane had to deal with bullies and drug dealers. He witnessed a murder for the first time at the age of nine.

One bully in the neighborhood, Haywood Tunstall, went by the nickname "Sweet Love." Sweet Love was known as a person that sodomized young boys. Other boys learned to stay away from Sweet Love. Apparently, even his own brothers would warn young boys to stay away from Sweet Love. James describes that Sweet Love offered him some marijuana, which they smoked together. Thereafter Sweet Love demanded that Mr. Roane pay him for the drugs. Mr. Roane did not have any money and explained that he thought the drug had been a gift. Sweet Love demanded "repayment" in the form of sexual favors. When Mr. Roane was unwilling to comply voluntarily, the event became violent. Sweet Love, or Haywood Tunstall, has admitted to have a sexual relationship with Mr. Roane when Sweet Love was twenty three years of age and Mr. Roane was nine years of age. Obviously, there can be no consensual sexual relationship between a nine year old and an adult.

Worse, after Sweet Love raped Mr. Roane, it became known in the community. Rather than respond with support, outrage, or even sympathy, Mr. Roane was ridiculed by the community and even his own mother for having been victimized.

Mr. Roane described a chaotic childhood. His father was a drug dependent and drug dealing man who was unable to care for his children and was severely abusive of Mr. Roane's mother. His mother was an overwhelmed teenage mother suffering from her own anxiety and depression, completely unable to cope with the poverty and violence in her life.

While in this dysfunctional setting, Mr. Roane did not receive support from other sources. This traumatic developmental history provides significant mitigating and extenuating information for the capital sentencing component of a death penalty case. Such a dysfunctional developmental history is also significant because it causes lasting psychological, emotional and cognitive impairments. Kaplan and others describe this correlation, which mental health professionals recognize.

He expressed to me that his way of trying to make amends was to be an actively engaged parent. He spoke with pride of his children and his relationships with them.

The impairments associated with a dysfunctional rearing history include impaired ability to form healthy relationships with others; difficulty recognizing, expressing, and coping with emotions; pervasive fear and distrust of others; suspiciousness and even paranoia; impaired impulse control; mood swings; impaired judgment; poor self-image; lack of self-esteem; shame; depression; panic attacks; self-destructive behavior; and primitive defense mechanisms, such as splitting and dissociation. The records reviewed demonstrate that Mr. Roane has such problems. These mental health impairments are significant.

Mr. Roane was first seen by a psychologist at the age of just six years old after having been placed in special education. Dr. Lordi performed various psychological testing and family interviews. Dr. Lordi determined that Jeanette suffered from toxemia during the last five months of pregnancy with James. Toxemia is high blood pressure and hypertension during pregnancy. Severe cases of toxemia restrict blood flow to the placenta and have severe effects on a baby's brain development. Further, Dr. Lordi determined that James underwent surgery at the age of five for a congenital hernia, an abnormal development of James's diaphragm which occurred in utero. Dr. Lordi determined James suffered from hyperkinetic disorder, what today is known as Attention Deficit-Hyperactivity-Disorder (ADHD). This disorder is highly heritable. Accordingly, Dr. Lordi determined James Roane Sr. also had this same condition. Dr. Lordi found James had other psychological problems. Dr. Lordi diagnosed James with brain dysfunction and found that he had well-defined chronic brain syndrome, as a result of Jeanette's toxemic pregnancy, and would have learning and behavioral problems. Dr. Lordi recommended neurological evaluations, daily medication, psychotherapy and placement at a special school.

Mr. Roane was not placed at the school that Dr. Lordi recommended. While he was placed on medication, his mother did not regularly get the prescription filled and Mr. Roane did not take the medication consistently.

In school, James was identified as severely emotionally disturbed. He attended a series of schools for children with special needs, but never was in good consistent attendance and never received the treatment his teachers and counselors recommended. Mr. Roane was repeatedly recommended for residential treatment to assist him with his very significant problems. Further, James himself asked to be taken away from him home and placed in treatment. James did not receive this treatment.

Instead, his use of drugs and alcohol escalated. Several months after James requested to be taken out of his home and placed in treatment, James's delinquent behavior resulted in his placement in the Adventure Bound program at the age of 15. After an initial adjustment period, he thrived in a structured setting such as this. He was a "hardworking, enthusiastic student who thrived on earned positive feedback and attention from both staff and peers. He grew into a position of a positive group leader, and was known by his peers to be helpful and empathic. James showed improved self-esteem through his helping behaviors towards other peers." After six months in the program, he was discharged.

He was discharged however, into the home of his sister - who was eighteen years old and had just obtained her first housing project apartment. By that point, his sister Annette was fully a heroin addict, and just as Jeanette had opened her apartment to all manner of miscreants, so too did Annette open her apartment to drug users of all kinds. James, who had been using marijuana since the age of eight or nine, immediately became involved in intravenous drugs. He was using heroin and preludin and became deeply addicted.

It is not unusual for people from dysfunctional homes to try to ease emotional pain by turning to drugs and alcohol. Mr. Roane's likelihood of abusing drugs and alcohol was exacerbated both by his family history of substance abuse (both his mother and father abused alcohol, as well as nearly all his extended family members) and by its prevalence and availability in his neighborhood. Mr. Roane began using drugs at about age nine. It appears he started with

James Henry Roane, Jr.
Social History, page 5

alcohol and marijuana. He graduated to heroin, pills and cocaine provided by his father for him to sell. By the time he was sixteen, he was heavily using heroin, which was the primary drug his father trafficked at that time.

The fact that alcoholism and drug addiction are so prevalent in Mr. Roane's family is significant because alcohol dependence runs in families and children of alcoholics are at high risk of developing alcohol abusing behaviors. Given this predisposition, it is not surprising, therefore, that Mr. Roane became an alcoholic and drug addict.

Once the addiction was in full swing, Mr. Roane's existence revolved around getting high. He reports that he was very unhappy and that he initially attempted to use drugs to alter his self-perception and make his day-to-day existence more bearable. I would characterize his crack-cocaine and herion addiction as severe and long-lasting, spanning many, many years prior to the offense in this case.

Chronic crack-cocaine and heroin abuse such as that exhibited by Mr. Roane leads to memory loss; irritability; impaired judgement; memory impairment; impaired perception; paranoia; changes in sociability; hypervigilance; interpersonal sensitivity; anxiety; tension; anger; impaired social and occupational functioning; a delusional state; emotional lability; rambling speech; paranoid ideation; hallucinations; and headaches. Crack-cocaine abuse also causes mood changes such as depression; suicidal ideation; and disturbances in attention and concentration Based upon my clinical interview and review of the affidavits, I have concluded that Mr. Roane suffered from the negative impacts of crack-cocaine addiction outlined above.

Heroin and crack-cocaine are both powerfully addictive. Issues such as sleep, safety, money, morality, loved ones, responsibility, and, in some cases, survival become largely irrelevant. Chronic crack-cocaine use and/or a prolonged crack-cocaine binge also causes depression, paranoia, irritability, acute toxic psychosis, and a severe state of transient panic.

The type of chronic crack-cocaine use displayed by Mr. Roane also impacts the chemistry of the brain, depleting the brain's supply of essential neurotransmitters. This can lead to overt depression, dysphoria, hallucinatory experiences and destructive antisocial behavior.

Chronic crack-cocaine abuse also causes the abuser to misinterpret events and to often respond more aggressively to a perceived provocation than is actually warranted by the situation.

Heroin and crack-cocaine withdrawal also cause a constellation of serious cognitive impairments. For example, withdrawal from cocaine causes severe depression, anxiety, and sleep disturbance. Withdrawal from heroin can be much worse, causing elevations in blood pressure, pulse, respiratory rate and temperature. The individual withdrawing from heroin may also experience goose bumps, watery eyes, runny nose, yawning, loss of appetite, tremors, panic, chills, nausea, muscle cramps, and insomnia. Depression is also a symptom of heroin withdrawal. During withdrawal, many individuals experience such a deep and overwhelming depression and a feeling like they're going to die, that they are not able to make it through the withdrawal process, which leads to relapses.

His drug abuse is noteworthy for his attempts to get treatment. From a young age, he sought more restrictive treatment for himself that was required. In fact, just approximately twenty one months before his arrest for this case, he voluntarily turned himself in to prison in desperate need for drug treatment. Mr. Roane expressed to me his deep remorse for his past

dealing of drugs and harming his community by his behavior. He did not blame his actions on his drug addiction, but acknowledged that they were related.

In addition, his remorse, feelings of guilt and desire to change should also be noted. He sought treatment prior to his arrest. His treatment records indicate a desire to confess for past behavior, and get help, particularly for his drug problem.

**Conclusions**

Mr. Roane suffers the long term effects of the physical, sexual and emotional abuse he endured as a child.

The first years of Mr. Roane's life were insufficient to provide the necessary pattern and duration of safe, predictable, nurturing experiences required to fully express his capacity for developing and maintaining healthy relationships.

From very early childhood the emotional, behavioral and cognitive manifestations of this early emotional, sexual and physical abuse and neglect were apparent. The problems Petitioner manifested so dramatically in school had their origins in his early life emotional and relational neglect. It is common for children with extreme relational problems to have these identified only when the child becomes older.

Mr. Roane began to manifest behaviors consistent with the trauma and chaos in his early life. The malleability of the developing brain is such that early experiences like his result in the development of a poorly- regulated, hypersensitive stress response neurobiology. The common emotional and behavior consequences of this include inattentiveness, hypervigilance, behavioral impulsivity, increased motor restlessness, irritability, aggressivity and difficulties with peers. Again, these symptoms are reported to be present in varying degrees in Mr. Roane throughout childhood and into adult life.

Neuropsychological testing reveals impairments consistent with Mr. Roane's history.

Mr. Roane suffers from significant cognitive and emotional impairments, consistent with a brain damage involving frontal lobe impairment. This neuropsychiatric condition had its origins in the abuse and neglect of his earliest life. In addition, he also has a history of emotional and behavioral symptoms - impulsive, aggressive and inattentive behaviors - consistent with early life exposure to trauma.

Mr. Roane's extremely savage childhood and adolescence, including the ongoing effects of this trauma, constitute significant mitigating evidence that should have been considered by the jury at the penalty phase of his trial. As noted above, his childhood and adolescence were characterized by repeated victimization, his exposure to repeated extreme violence, and the absence of parental nurturance, support and direction during critical phases of his development. In addition to being mitigating circumstances, these are the sorts of factors appropriately considered in support of clemency.

I have reviewed Mr. Roane's records of incarceration. There is no reason to believe that Mr. Roane would present a particular risk or danger in the highly structured environment of a maximum security prison. He has a history of substance abuse problems, which will likely not be a factor in prison.

James Henry Roane, Jr.
Social History, page 7

Further, Mr. Roane has supportive relationships with friends and family that he has nurtured. He continues to have a parental role in the lives of his children and the children apparently value their relationships with their father.

Mr. Roane's positive adjustment in prison, and his positive relationships with family and friends, are all the more remarkable because of the particularly savage childhood discussed above. His trauma had an early onset and was unrelenting in nature. Generally the earlier the onset, the less favorable the prognosis for improvement. However, despite an early onset and a lack of respite, his development is remarkable. He has come to some insight about the nature of the trauma he endured and the impact it made for the person he became. That is an essential component to rehabilitation- one Mr. Roane has clearly mastered. He has perspective and insight.

I have participated in the evaluation of dozens of inmates sentenced to death over the past two decades and Mr. Roane's life story and positive adaptation since his incarceration are exceptional. For these reasons, I fully support his application for clemency.

Please do not hesitate to call with further questions.

Sincerely,

Jethro W. Toomer

Jethro W. Toomer

## DECLARATION OF R. ROBERT TRESSEL
## PURSUANT TO 28 U.S.C. § 1746

I, R. Robert Tressel, do hereby declare and affirm as follows:

1.      My name is R. Robert Tressel.   From 1973 to 1985, I was a police officer for the Cobb County, Georgia Police Department.  In 1975, I was assigned to the Crimes Against Persons Unit, commonly known as the Homicide Unit, and was subsequently promoted to sergeant in 1978.  In 1985, I transferred to the Cobb County Medical Examiner's Office as a Forensic Investigator.  In this capacity I was responsible for crime scene processing, collection of evidence, and documenting the conditions and circumstances under which the body was discovered on behalf of the Medical Examiner's Office.  From 1993 to 1998, I was the Operations Manager and chief investigator of the Medical Examiner's Office.  Since 1998, I have worked as private consultant in the field of forensic investigation, homicide investigation, crime scene reconstruction, and death scene processing.  I have testified numerous times in federal court and various state courts.  I have been accepted as an expert for the defense and the prosecution.  My Curriculum Vitae is attached.

2.      I have been retained by the Federal Community Defender for the Eastern District of Pennsylvania, Capital Habeas Unit on the case of United States v. Roane.  Counsel have asked that I review and analyze the crime scene and forensic matters pertaining to the killing of Douglas Moody on January 13, 1992.  As part of my consultation, I have reviewed a copy of the original police crime scene video; crime scene photographs; numerous police reports; the 1/13/92 autopsy report of Douglas Moody; and the trial testimony of Marcella Fierro, M.D., Officer Paul Tuttle, Officer John Dorman, Priscilla "Pepsi" Greene, and Denise Berkley.

3.      At trial, the Government presented evidence that prior to being stabbed, Douglas Moody allegedly jumped out of a window inside 1200 W. Clay St., Richmond, VA. This window, and the two broken panes of glass he allegedly broke while jumping out of the window, are visible in the police crime scene video and the government's trial exhibits, photographs 9-2 and 9-3. The window in question consists of lower and upper sashes, each of which contains six individual panes of glass. The crime scene video and the photographs taken on the night of Mr. Moody's death show that only two of the six small panes of glass and one piece of the wood trim between those two panes of glass were broken. Both broken panes were in the upper sash of the window and no other glass or wood, on either the upper or lower sash of the window, was broken or disturbed.

4.      Given the relatively small size of the panes on the upper window sash, it would have been physically impossible for an adult male to jump through that window without breaking additional panes of glass and wood trim. In addition, because of the height of the window, it would be impossible that anyone, especially an adult male, could have jumped through the upper sash without breaking or disturbing a portion the lower window sash. It also appears that there is a storm window outside the lower window sash, which is also undisturbed. Indeed, based on the visible damage to the window, or lack thereof, to jump through the window as alleged by the witnesses whose testimony I reviewed, Mr. Moody would have been required to simultaneously jump into the air, compress his arms and hands, and raise his legs and feet after his upper torso passed through the window. Such a "dolphin" or "swan" dive, resulting in the breaking of only two small panes of glass which were narrower than the body of an average adult male, is not possible. This evidence contradicts the government's evidence about Mr. Moody's alleged jump through a window and the accuracy of the witnesses who claimed to have observed that jump.

5.      The video and crime scene photographs also show a piece of the window stile with some broken glass, presumably the only broken piece from the window, on the sidewalk outside of 1200 W. Clay St.  Based on the distance this stile traveled, it would have had to have been hit with great velocity to end up at that location.  It would not have been possible for Mr. Moody to jump through that upper window, clear the porch, clear the railing at the end of the porch, clear the fence and the grassy area and land on the sidewalk, depositing the stile there.  Because of the height of the broken window and the distance to where this stile is located, it is simply not possible.  There is a flat rock laying right next to the stile.  It is much more likely that the rock was thrown through the window and caused the stile to travel to the location where it rests in the photograph and video.

6.      Additionally, there is no indication that the clothing Mr. Moody was wearing at the time he was killed contained any of the glass or wood fragments which likely would have been present had he actually jumped through and broken the window.

7.      Based on my review of these materials, I also have serious concerns about the police crime scene investigation in Mr. Roane's case.  The crime scene photographs and video depict a substantial number of items that were apparently never collected and/or never submitted for forensic testing.  A chart of this evidence is attached.  Proper police crime scene procedure and investigation required the collection and preservation of this evidence.  Had this evidence been properly collected and preserved, it may have provided significant forensic evidence regarding how Douglas Moody was killed and who killed him.

8.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C.A. § 1746.

R. Robert Tressel

Dated: *9/17/08*

Hiram, Georgia

From Photos

| Photo Number | Evidence | Tests or Examinations To Be Performed |
|---|---|---|
| 9-2 | Rock & Wood Stile from window on sidewalk | Fibers, Hairs, Blood |
| 9-3 | Window Stile and Window Pane | Fibers, Hairs, Blood |
| 9-4 | Malt Liquor Can, Heineken Beer Bottle | Finger prints, Saliva for DNA |
| 9-5 | Wallet | Examine Contents for Leads |
| 9-6 | Knife at Edge of Porch | Blood, Hair, Fibers and Examine for possible use as one of the weapons used |
| 9-7 | Clothing | Fibers, Hair, Blood, Wood or Tears Consistent with Passing through the Window |
| 9-8 | Boot | Fibers, Hair, Blood, Wood or Tears Consistent with Passing through the Window |
| 9-9 | Clothing | Fibers, Hair, Blood, Wood or Tears Consistent with Passing through the Window |
| 14-1 | Malt Liquor Can Still on Scene; Damage to Sheetrock | Finger prints, Saliva for DNA Sheetrock for Trajectory |
| 14-2 | Sheetrock | Trajectory |
| 14-3/4 | Bullet | Ballistics as to Type Weapon |

From Video

| Time | Evidence | Test or Examinations To Be Performed |
|---|---|---|
| 2:10 | Knife | Blood, Hair, Fibers and Examine for possible use as one of the weapons used |
| 2:24 | Beer Can | Finger prints, Saliva for DNA |
| 3:11 -3:36 | Clothing | Fibers, Hair, Blood, Wood or Tears Consistent with Passing through the Window |
| 3:56 | Bullet | Ballistics as to Type Weapon |
| 6:29 | Clothing (no photo of) | Fibers, Hair, Blood, Wood or Tears Consistent with Passing through the Window |
| 8:06 | Glass on Porch | Fibers, Hairs, Blood |

## DECLARATION OF ROBERT BARBATO

1. My name is Robert Barbato. I have been a teacher for 41 years. I hold a Masters degree in Special Education from the University of Michigan and a Masters degree in Educational Administration from the University of Arizona. I have been certified to teach in five states. I am currently a Special Education teacher in the Tucson, Arizona school district.

2. I have spent most of my career working with children with special needs. Here in Tucson, I helped start a program for severely emotionally disturbed children called the Mary Meredith School. In Michigan, I served as the Educational Director of the University Center, a residential treatment facility for children in Ann Arbor. I was also on staff at the University of Michigan's Children's Psychiatric Hospital.

3. I recall teaching a student at the Adams Corner school in Richmond, Virginia named James Roane, and I have reviewed an Annual Review dated May 5, 1980 which confirms that I was his teacher in the academic year 1979-1980. Adams Corner was an alternative school for children with behavioral problems. I taught there from 1978 to 1980. Most of our students were functioning well below grade level.

4. Teaching in the Tuscon school district certainly has its challenges. For many years, Arizona has ranked close to the bottom in terms of how much money is spent per pupil in the public schools. But even though resources in Tucson can be tight, the support our students get in Tucson is vastly better than what the students got at Adams Corner when I taught James Roane. The lack of support and services at Adams Corner was just horrendous.

5. The teachers who worked at Adams Corner were totally dedicated to the students, and I know that they made great personal efforts. The problem was that our students needed way more help than any one teacher could ever give them in a classroom setting. These children needed someone to take them to the clothing bank; someone to get them shoes; someone to make sure they had food in the refrigerator at home. There were no support services like this at Adams Corner. In Tucson – and in Texas and Michigan, where I have also taught children with behavioral problems – these kinds of services are so common in alternative schools that we take them for granted.

6. There were other problems at Adams Corner. Our students came from neighborhoods all over Richmond, but there was no school bus service to get them to school. Children who were not in walking distance of the school were left to catch the city bus. Not surprisingly, truancy was a huge problem. I remember days when out of a class of ten students, only one or two students would show up for school. We did not have a gym, so we had to use a park near the school for gym class. The park also happened to be a hang-out spot for guys who had dropped out of school. The principal of Adams Corner had a drug problem and was forced to resign. Instead of replacing him with a full-time principal, he was replaced with an administrator who split his time between Adams Corner and another alternative school for children with behavioral problems.

7.      The fact that Adams Corner had to get by with a part-time principal was just one of the many ways that we were shown that the school was not really valued. It was a program for throw-away kids; a program that mattered on paper only. Officials could point to it and say they were doing something for kids with behavioral problems, but it was really only designed to get those kids out of the mainstream schools and out of sight. There were no real academic standards. How could there be when so many of our students were not even getting their basic physical needs met? No one besides the front-line teachers really cared whether the program succeeded, or whether the children themselves succeeded.

8.      In reviewing James's Annual Review, dated May 5, 1980, I am struck by an inconsistency. The Review identifies James as emotionally disturbed and says that he "missed most of the last part of the school year and has outside influences affecting his behavior and ability to do tasks." Yet the report goes on to say that because James had been in special education for eight years, he should be given a chance at regular school. Clearly, this report shows that James was struggling: he needed more help, not less. Recommending that James attend a "regular" school, then, would seem to make no sense at all.

9.      What accounts for the inconsistency is the abysmal lack of services offered at Adams Corner. James was promoted to Maggie Walker High School because we at Adams Corner had done as much as we could with the meager resources we had. We sent him to Maggie Walker in the desperate hope that James would get more services at a bigger school. I recognize now that despite our good intentions, we were totally naive. If James couldn't make it in a classroom with seven or eight other students, how could he possibly make it in a school with three or four hundred students? We hoped it would work out for the best, but going to a "regular" school just was not in James's best interest.

10.     I have come to learn that James only lasted a few weeks at Maggie Walker School before he stopped attending. At that point, the school records show that James asked to be placed in a residential treatment facility. In all of my years working with emotionally disturbed children, I have never, ever heard of a child asking to be taken out of his home and put in residential treatment. That is a huge step. James must have known he was not going to make it out in the community. He crying out for help, and the schools did not listen. We dropped the ball.

## DECLARATION OF LEE BASSETT
## PURSUANT TO 28 U.S.C. § 1746

1.      My name is Lee Bassett. I grew up in the Gilpin Court housing projects. I knew James Roane, Jr. when we were growing up together. I am six years older than James, but I never realized how much younger than me he was until now. James always hung out with guys that were older than he was, I guess. I would say he came out of the backyard at a young age. By that, I mean that he started in the streets pretty young.

2.      By the age of sixteen, he was using narcotics. I actually didn't know James that well until he was a drug addict. I used drugs, too, so we have that in common.

3.      I remember "Sweet Love" Tunstall. He was gay, but he was a tough gangster, too. I remember that Sweet Love had a thing for me, and he was real aggressive with me. If he gave you something, like some drugs, he expected that he would have sex with you. Older guys, even his own brothers, warned me that he would manhandle kids, so anybody with any sense wouldn't go into his room with him. People knew to stay clear of him.

4.      James really struggled with drugs. He always wanted to be in the "In Crowd". Addiction took him to things he wouldn't otherwise do. He sold drugs to support his drug habit. If you use any real amount of drugs you gotta be really wealthy, or sell drugs, in order to continue using. And using does get that kind of control over you.

5.      I got clean a few years before James was arrested on this case. I've been clean 18 years now. At the time of his arrest I did Narcotics Anonymous (NA) work at the jail. We call it H & I for hospitals and institutions. I used to lead meetings at the jail. James was at all those meetings. Every single week he was there.

6.      At NA meetings, James would always say something inspiring for the other guys. He was just learning to get clean, but he always participated. He had a positive attitude, and he'd

1

share that with other addicts. He'd talk about how he got caught up with the wrong people. He always had an encouraging word. That's true, just to this day.

7.      I knew that James was serious about his recovery. You could tell that in his spirit. But also, a lot of guys in jail would come to the NA meetings to meet other addicts and try to score drugs. James never asked me or anyone else for dope. I was two or three years clean at that point. I was from the hood, and guys knew me as an addict. People did that all the time – ask me for dope. James never once did that. I respected him for that.

8.      During James's trial I sat in the courtroom. I was there for the whole trial to support him and his family, so I know what they say he did. I have a hard time imagining James doing those things. After he was convicted I used to visit him in prison. I could see his spirit. He felt that God was working for him.

9.      I talk to James now. He helps me. I was having some problems recently, and James called and said, "Whatever you going through, man, its gonna be alright." It made me feel better to talk to him. I feel his spirit.

10.     James also has been a real father from prison, a really great father. He calls and talks to me about his children. James has done his very best to help his sons go down the right path, and to teach them and keep them from following his path. You can hear the joy and pride for his children in his voice. He loves his children so much.

11.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Lee Bassett

Richmond, VA
DATED: 8.7.08

2

App.0754

## DECLARATION OF CASSANDRA BATTLE
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Cassandra Battle. I grew up in the Gilpin Court Housing Development in Richmond, Virginia. I lived on Saint Paul Street. I knew James Roane, Jr. and his family, who lived nearby us on Charity Street and then Saint James Street.

2. James Roane, Jr. was a family friend. I was one of four children. James was a friend to all of us but he was especially close to my older brother, Gary Liggons. Gary passed away in 1992. James spent a lot of time at our house growing up. James used to spend the night at our house every weekend when he was a kid. It was common for James to stay all day long until 10 o'clock in the evening. It got so late, my mother would have to ask James to go home. It seemed like James didn't want to go back to his own house. James used to say our house was a real happy place for him. I don't remember his mother calling after him when he would spend all that time at our house.

3. I remember that kids used to pick on James a lot. Children used to say that he was dirty. They teased him that he was always hungry, that he didn't wear new clothes.

4. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____
Cassandra Battle   8-12-6ß

Richmond, VA
DATED:

1

Alfonza
AB

## DECLARATION OF ALFANI BULLOCK
## PURSUANT TO 28 U.S.C. § 1746

Alfonza AB

1.    My name is Alfani Bullock. I knew James Roane as a child and adolescent. I know that my life was pretty different from James's. I stayed a "house boy" for a long time, meaning that I stayed inside to play or with my parents. We call kids "house boys" before they are really allowed to get outside to play and walk around the projects by themselves. James was out there really early.

2.    A lot of times James was hanging with kids that were older than he was, since he was on his own so early. I know that he was drinking and smoking weed by the time he was thirteen years old, if not way before. Back then there were liquor houses on every corner selling bootlegs. Dads would bring their children into the houses. It wasn't anything for them to serve kids. If you had a little money, you could get whatever alcohol or dope there was.

3.    It was hard to walk the streets in the neighborhood back then. Just walking over to the pool at Calhoun Center, you'd get beat up for no reason by other kids. You couldn't get out of sight of your friend and siblings or you were doomed to be beaten. You had to stick together.

4.    Even despite my being a houseboy for a long time, I was in a gang for a while. You just had to be in the game or not, and the only way to have any respect in the projects was to hustle. Otherwise you would be bullied mercilessly.

5.    I know that James was sexually abused. James told me that he was, but I didn't know how to respond, so I didn't say anything or ask him any questions about it.

6.    I never knew James's father to be around. I didn't even know if he was alive

1

when we were kids.  James never talked about him.

7.     James's family was really poor, even poor compared to other families in the projects.  James and the other Roanes wore each other's clothes.  I remember that kids made fun of them because James would wear a shirt one of his sisters had worn the day before and pants his brother had worn the day before, and vice versa.  The other kids noticed this and teased them for it.

8.     I know that James was going to the little stores in the neighborhood to steal food to bring home to his mama.

9.     I used to have a problem with drugs.  I've been clean for eighteen years now.  I don't drink alcohol at all anymore, or do any drugs.  James Roane is partly to credit for my being clean, as James is always pushing me to stay clean and stay with my wife and live right.  James calls me from death row, but he is always the one lifting me up and giving me hope for tomorrow.  James helped me get my life together and helps me to be inspired to keep going.

10.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746

*Alfonza Bullock*

~~Alfani~~-Bullock

Alfonza
AB

Richmond, VA
DATED:
8-8-08

2

App.0757

## DECLARATION OF CATHY BULLOCK
## PURSUANT TO 28 U.S.C. § 1746

1.      My name is Cathy Bullock. I live in Richmond, Virginia. I was twelve years old when I met the Roanes. I am the same age as the twins, Anne and Annette Roane. I was good friends with them as well as James, Jr., when we were children.

2.      I used to go over to the Roanes' apartment to hang out with James and his sisters. Their apartment was always a house full of people. At the time it seemed so fun. I remember staying there, along with Jeff, Brenda Lane, Roscoe, Haywood, and many other people that were in and out.   There was always something going on in that apartment.

3.      The inside of the Roanes' apartment was a madhouse.   With all those children it was chaos. Even if they were trying to clean up, it was impossible. The apartment would end up a big mess. As children the Roanes spent a lot of time outside. At the Roanes' apartment there were no rules. There was no control at all.

4.      As a kid, I thought it was so cool that the Roanes didn't have any rules. I used to tell my grandmother that I was staying at the Roanes' house so that I could stay out all night. The Roane kids and I would hang out on the street corners all night long. I was jealous that the James and his brother and sisters could do whatever they wanted without any adults stopping them.

5.      There wasn't enough food for all the kids, though. James, his brother and sisters would go over to other people's houses to eat because they didn't have any food at their apartment. I remember the Roanes would steal food to eat. James was like a brother to me. He stole food for me to eat when I was around.

6.      James always seemed older than his age. He taught me how to make money. I

1

remember he had little jobs, sorting papers or working at the coliseum. He helped me to get those same jobs and we worked together at both those jobs when we were kids.

7.      I remember Annette and the girls making fun of James for having to take crazy medicine. They said something about him having to go lay on a couch to talk to a doctor. I don't remember James acting out or fighting any more than all the other kids in the projects.

8.      James is a good person. I've never had an argument with James. He always treated me well and was never disrespectful. To this day I still miss having him around.

9.      I didn't know the Roanes' father, James Roane, Sr., until we were grown. I know he was a drug dealer though and had a liquor house in the 1980's.

10.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746

*Cathy C. Bullock*
Cathy Bullock

Richmond, VA
DATED:  8-8-08

2

## DECLARATION OF ANNETTE COATES
## PURSUANT TO 28 U.S.C. § 1746

1.      My name is Annette Coates.  James Roane, Jr. is my brother.  I was born in 1963 as a twin.  My twin, Anne, and I were the oldest two kids in the family.  Our sister Florence was just a year younger and James is two years younger.  After James was another set of twins, Kevin and Kathy, then our youngest sister, Kesha.  Our mother, Jeanette Roane, was only 13 when I was born.  So by the time James, her fourth, was born she was 16 years old.

2.      Our father was James Roane, Sr.   Our dad was in prison during a lot of our childhood.  But even when he wasn't in prison, he was no help to my mom.  He didn't do anything for us.  I do remember him coming home on furlough from the prison and buying us all plastic telephones.  Here we were without enough decent food in the house and he seemed to have all sorts of money.  And instead of buying us shoes, he bought us plastic telephones.  I guess he was hustling in prison too, to have had the money to buy those phones.

3.      We used to visit him at the penitentiary – right here in Richmond – 500 Spring Street.  My mama made us go.  It was so dark and cold.  My daddy used to come by the house wearing a new leather coat.  My mama told him, "We don't have no food."  He beat her up.  He loved to chase women.  He sold drugs, too.

4.      I don't remember him spending the night at our house ever.   When he and my mama  were together, I know my mama had a hard time.  I know my dad was quite violent.

5.      James was really young when he started to have problems.  I remember that he started a fire in the house.  After that fire, another fire happened.  My mama thought that he started the second fire, too.  It wasn't until much later that we all learned that my uncle did it.

1

His name is John Haywood Jones.  Everyone calls him Haywood.  Uncle Haywood had started that second fire, not James.  After the second fire, our neighbor Ms. Delores had to pull my mama off James because my mama was so upset.  She was just beating on him and yelling.  Haywood never spoke up and admitted that he had set the fire.  He let James take that beating.

6.      Haywood is my mama's brother.  He was about ten years older than James.  He was a teenager and was always over there at the house.  He always stayed or babysat.  He was closer to my mama than my other uncles or aunts.  He didn't work.  Haywood drank a lot.  He was always an alcoholic.  Roscoe Roane, my uncle on my dad's side, spent a lot of time at the apartment too.  He was a binge drinker.

7.      I remember that Haywood's best friend, Randy Floyd Mayo, was shot right outside of our apartment.  Everyone called him Clyde.  James was outside when Clyde was killed.  I heard an argument and then Clyde got shot.  I remember the ambulance coming.  I was only 12 years old when Clyde was shot.  James was nine years old when he saw that happen.

8.      There were always a lot of people staying at our house, or coming over.  My mama  felt safer with lots of people around.   I know there were a lot of bad things about our childhood, but I honestly don't remember a lot of things.  I think I have blocked out the worst memories from my childhood.

9.      James was just a little kid when he started to see Dr. Lordi for his problems.  He was already out of control.  He fought a lot as a child.  He also wet the bed.  A lot of us kids wet the bed late into our childhoods.  I can remember Dr. Lordi putting James on medication.  I know that James didn't always take the medication he was given.

10.      The projects where we grew up were rough.  We lived in Gilpin Court.  The

2

things I remember most about Gilpin Court are violence and drugs. There was violence all around us. The older boys used to make the younger boys fight all the time. There was a bully in the neighborhood by the name of Jody Dandridge. I remember that he sold birth control pills when he was young telling people that they were Valiums. He had a bunch of sisters and brothers. He used to have this dog that he would sick on people. Jody was real mean to James.

11. I remember when they talked about James being sexually abused at trial. It hurt me. I thought I was the only one. Ed used to mess with me too. I never told anyone. He drove the ice cream truck in the projects and he used to give all of my brothers and sisters rides on that ice cream truck. We didn't have no snacks in the house. He'd offer us free ice cream, offer to give us a ride. We never had a car. He was the only one in the neighborhood with a car.

12. I remember him taking me for a ride and making me do awful things to him. He raped me repeatedly between the ages of 10 and 13. He just pulled the ice cream truck into an empty parking lot and did what he wanted to me.

13. My mother was friends with Ed, and so was our Uncle Haywood. I remember a birthday party for Haywood at our house when Ed came. I know that part of the reason Ed was able to take advantage of me and James is because we were so poor. I guess everyone in the projects was poor, but the other kids definitely had more than us. There was no way my mama ever could have afforded to buy ice cream for all seven of us. We hardly had enough real food to eat. I guess because we didn't have ice cream, Ed knew he could get us to go for rides with him.

14. Whenever we did have any snacks in the house, they were gone right away. We'd sneak into the kitchen and eat them at night. We'd wake up in the morning and our bed was

3

covered in crumbs.   Mostly, we just had beans and oatmeal to eat.  I guess they were cheap to buy and make for so many kids.  To this day, I can't eat beans that you have to soak.  I just ate too many of them as a child and they bring back all those awful memories for me.

15.      Besides being sexually abused by Ed, I have another memory like that.  I was a young child and I remember being in a closet in our bedroom and an adult man messing with me.  I've even been to therapy, and I can't picture the face of who did this to me.  I can picture the bunk beds in the room and the way everything looked, but the man's face I can't see.   When I told my sister about this, she told me who she thought it was.  She said it was a particular family friend of ours.  It might have been him, but I'm not sure.

16.      I don't trust any men around children to this day.  Our entire family won't allow the children to go to daycare.  We don't let anyone outside the family keep our children.  I wouldn't even let the father of my daughter be with her alone.  I just have issues with trust.

17.      For me, I feel that low self-esteem got me into the drug life – always wanting more. I started smoking weed real young, but then started hard drugs at 15.  The first time I shot drugs I was like, "I really like this."  It made me just forget about all my awful feelings and memories and take me somewhere else.  I just assumed I would die getting high.  I *wanted* to die getting high.  Everyone around us was always getting high.  I was full into it by 16, living in the streets.

18.      I guess we were always around drugs.  People in our family and people on the streets- it was just a known way of life.  I remember one time our apartment was raided by the police.  The police found a big suitcase full of drugs in James and Kevin's bedroom.  It was Uncle Roscoe's drugs he was dealing from out of our apartment.

4

19.     When I was eighteen I got an apartment of my own, at Creighton Court Housing Projects. I know that James came to stay there when he came home from a program. He was around 16 or 17 years old. At that time, I was partying a lot – getting high. I was in and out. There were no rules in that house. We used all kinds of drugs, speed, cocaine, heroin, weed, alcohol. I preferred cocaine. James was into "speed ball," which is heroin with cocaine. I know that James was using really badly before he got locked up the first time.

20.     I got clean from drugs 18 years ago and went into treatment. It was my second attempt at treatment. The first time I went into treatment I didn't really want to get clean, but just wanted to get it under control. The first time I also went because I felt guilty for stealing from mama and wanted to get the addiction under control enough that I didn't steal. My daughter's father sold drugs in Creighton Court and was shot and killed there in July of 1985. I also lost my husband to a heroin overdose in 1992.

21.     When you use drugs, you sell drugs in order to support your habit. Our father was a drug dealer, and he gave his own children drugs as teenagers. My father gave me drugs. James learned to deal from our father. James got clean only when he got locked up on this case. Since getting clean, James has done everything he could to try and keep his kids from making the same mistakes he did. But our father has even given drugs to his grandchildren. It's hard to make up for your own mistakes and that of your daddy, too.

22.     But James is truly a changed person – the one I hear and see now is not the person I knew when he got locked up. He's totally against all violence now, and against all drugs. He is always telling all the young people in the family to stay in school and off the streets. I'm shocked he's grown to be the man he is.

5

23.    Even when James was in the county jail he went to the Narcotics Anonymous meetings and encouraged other people to get clean and to take any second chance at life they could get and live it right. He told them that this was not the right way to live. James has truly grown up in prison. Now when he calls he doesn't want to hear about anything negative and won't participate in gossip or games.

24.    But James understands that when he was on the streets he wasn't always doing right. He still gets really sad and angry with himself for all the people that he hurt. He wants to do whatever he can to try and make amends, so I think that's why he wants to convince others to live right.

25.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____
Annette Coates

Richmond, VA
DATED:
8-8-08

6

**AFFIDAVIT/DECLARATION OF** _Harold Coles_
**PURSUANT TO 28 U.S.C. §1746**

I, _Harold Coles_, do hereby declare and verify as follows:

1. I grew up in the Carver School Neighborhood with Little Keith Barley and Doug Moody. I lived on Catherine Street, near the location where Doug Moody was later killed.

2. I knew Doug Moody well and I never knew him to deal drugs. He was an addict and a drug user, not a seller. He'd get high off anything he could get his hands on.

3. Little Keith and I were close in age, I was a few years older than him. He was a known drug dealer in the neighborhood – the Carver School area. He was "muscle" for a local drug dealer. He was an aggressive guy. Once, he even went after my cousin with a gun. I saw this and had to jump in on behalf of my cousin.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to 28 U.S.C. §1746.

_Harold Coles_

Dated: _10-9-08_

**AFFIDAVIT/DECLARATION OF** Harold Coles
**PURSUANT TO 28 U.S.C. §1746**

I, Harold Coles , do hereby declare and verify as follows:

4. I knew "Pepsi" Greene from the neighborhood — that's all she did was chase after drugs. She got high every chance she got. I saw her after she was shot and she wasn't the same. I wasn't even sure that she knew who I was. She was limping along — still trying to get high.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to 28 U.S.C. §1746.

Harold Coles

Dated: 10-9-08

## DECLARATION OF AIMEE COLEY
## PURSUANT TO 28 U.S.C. § 1746

1.    My name is Aimee Coley. I used to be married to Willie Coley whose mother is

Carmella Coley.

2.    Around the end of 1991 or the beginning of 1992, when the killings happened around the

Carver School area, I had just rented a room in a rooming house on Clay Street in the ten hundred

block. Carmella lived upstairs.

3.    I knew Keith Barley, who was known as Little Keith. He lived in the neighborhood. He

was mean and violent. He would blow your head off if you looked at him funny. He was a drug

dealer and was known as a gangster who carried a gun and weapons all the time.

I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information and belief, subject to 28 U.S.C. § 1746.


Date: 9-9-08                 Signed: _Aimee L. Coley_

                                      Aimee Coley

**DECLARATION OF** Richard E. Coles Jr. RC
**PURSUANT TO 28 U.S.C. § 1746**

I currently reside in Whitcomb Court Projects, 1326 Bethel St. in Richmond, VA (apartment 1).

On January 13, 1992 I was at Charlie's house on the 1300 block of Catherine St. The house was on the corner of Catherine and Norton streets. This was a house where people used to go to get high.

At about 10:30 or 11:00 pm on the 13th of January, Little Keith, who I had known for many years, kicked in the door at Charlie's house and said he was looking for Little Doug. He had a gun in his hand and said he was looking for Doug because he owed him money. Little Doug was not in Charlie's house so Keith left.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746

Richard Coles

DATED: 5-8-08

**DECLARATION OF** <u>Richard E. Coles Jr.</u> RC
**PURSUANT TO 28 U.S.C. § 1746**

A little while later that night, I heard Doug had been killed. I knew right then, that Keith had killed him.

Later, when I heard he had been stabbed, I was sure it was Keith because he always carried a knife. He carried a long thin knife.

Little Keith was always a wild guy. Everyone knew he was violent. He was off the chain. His mind was not stable. He would shoot at people for fun and then laugh about it. He even shot at me one time and we were supposed to be friends.

I have never testified about these matters in any court of law

I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to

28 U.S.C. § 1746

<u>Richard Cole</u>

DATED:  5-8-08

**DECLARATION OF** Carmella Coley
**PURSUANT TO 28 U.S.C. § 1746**

My Name is Carmella Coley, I do remember that Linwood Chiles, Sandra Reavis, James Roane (JR) and myself Carmella Coley did go to Howard Johnson. At that time I went up to the room with Sandra and the Othrs. I stay their for No more than fifteen minutes and left with Linwood Chiles. Concerne I don't ~~remember~~ remember the dates I went to the hotel (Howard Johnson) with Sandra Linwood and James Roan JR.

I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to

28 U.S.C. § 1746

DATED: June 08, 2008

Carmelle Coley

App.0771

**DECLARATION OF** Willie Coley
**PURSUANT TO 28 U.S.C. § 1746**

1. My name is Willie Coley. I grew up in the Carver School area. I turned sixteen in December of 1991.

2. I knew Doug Moody from the neighborhood. He was older than me. He was a junkie. He was always asking around for money to buy drugs. He never dealt drugs, he just used them all the time. He always seemed to owe people money for drugs.

3. I knew Keith Barley who lived a little further up Clay Street. He was closer to my age. He used to sell in the

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746

Willie Coley

DATED: 10/8/08

②  of ③

**DECLARATION OF** _Willie Coley_
**PURSUANT TO 28 U.S.C. § 1746**

Carver School area where I lived, Keith was the kind of guy yous didn't want to have trouble with. He always carried a knife — he was fascinated with that stuff. There were a couple times when he got into shoot outs in the neighborhood over drug turf.

4. I remember one time when Keith stabbed a junkie over a drug debt. I don't know who the guy was; he was just one of the addicts who hung out on Catherine Street. He owed Keith money so Keith beat him up and stabbed him.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746

_Willie Coley_

DATED: 10/8/08

**DECLARATION OF** _Willie Coley_
**PURSUANT TO 28 U.S.C. § 1746**

5. I know that keith sold to Doug Moody some times, and Doug always seemed to owe money for drugs. I'm sure that's what happened here. Keith told me later that he killed Doug over money. I don't want to see James Roane get killed for something Keith Barley did. And I know that he did it because keith told me.

I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to

28 U.S.C. § 1746

_Willie Coley_

DATED: 10/8/08

App.0774

## DECLARATION OF BRANDI COOPER
## PURSUANT TO 28 U.S.C. § 1746

My name is Brandi Cooper. James Roane, Jr. is my dad. My mom and dad had me first, then my two brothers, Brandon and Brandale.

As a youngster I remember my dad taking care of us and taking us to the mall, or to get ice cream or candy. We were always laughing and playing when he was around us. After he got locked up I cried a lot. I am Daddy's little girl. My dad and I are just alike, we have always been tight. He can sometimes be overprotective of us kids. He tells us not to go down the path that he went. I have always tried to stay close to home and out of trouble, and I credit my dad for that. My brothers have had a harder time in some ways. Brandon especially has mood swings like my dad did. I think they were like that because they grew up running the streets and could not cry or show emotion. I've visited my dad since his incarceration. A few years back the entire family went out to Terre Haute, Indiana to see him. During that visit with my father, he cried. He said he wished he could change everything and not have ended up where he is. I've always been in regular contact with my dad, and he's always given me the advice to learn from his mistakes- and not repeat them. I think he says this now because he has had time to learn and think about his life and make himself better. He has changed a lot since he was arrested. He has calmed down a lot and listens more to what you have to say. He still tries to steer my brothers on the right path and tries to get them to learn from their mistakes.

My mother raised us by herself after my dad's arrest. My dad's arrest was hard on all of us. There were times when we did not have even basic things – nice clothes, food, things like that. My mother struggled with drugs a lot during that time.

We were poor and had to move to the Gilpin Court housing projects when I was ten or

eleven years old. That is when I really got to know my dad's mom and dad. My grandfather, James Roane, Sr., always gave my mom and us kids family food or money if we needed it. He was known to have women on the side other than my grandmother, Jeanette. He would sleep with women who did drugs. That was what men like that did, he was a ladies man, had lots of women.

During that time, my grandfather spent a lot of time with my brothers and took them out around town. He never asked me to go with them. He would visit and give money to my two brothers but not to me. I was confused and hurt and didn't understand why. Later, when we were alone he would ask me to touch him or let him touch me – in a sexual way. It was only then that he would give me money. This went on from when I was 11 years old for about a year and a half. I did not tell anyone about what my grandfather was doing to me. I started to lose weight and my mother confronted me. I told her about what happened and it stopped soon after that. But he would still look at me that way and I tried to avoid him, get out of his way. He was obsessed with me. Later he apologized, but he said he could not help it, that he loved me so much. Years before he died, I told him I forgave him. I do not know if he did this with my cousins or other siblings. No one talked about it. I know there was a girl about my age that my grandfather used to call his daughter, and I think he was doing the same thing with her.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746

Brandi Corp

DATED:. 6/25/08

*Brian*

## DECLARATION OF ~~BRIAN~~ DARGON
## PURSUANT TO 28 U.S.C. § 1746

*Brian*

1. My name is ~~Brian~~ Dargon. I live in the Bronx, in New York City with my mother, Joan Dargon. Off and on I spent several years growing up in the Gilpin Court Housing Projects in Richmond, Virginia. I became close to the Roane family during that time. I knew the whole family but I was especially close to James, Jr., Kevin and Kathy Roane.

2. I moved from Harlem where I was living with my grandmother to Gilpin Court around 1977. People say New York was tough back then; Richmond was *tough*. The boys down there were bigger and tougher. They had a more grown up mentality than I did. People talk about the drug scene in New York – that was nothing compared Richmond, especially Gilpin Court. It was horrible.

3. As children James, Jr. and I sometimes walked past dead bodies and often saw people selling drugs or strung out from using drugs. It was ridiculous. Drugs were everywhere, heroin needles were all over the place. Looking back on it now the mentality was that life was worthless. It was as if life meant nothing. It was a very dismal place. It affected us to be around drug dealers, addicts and alcoholics all the time.

4. I can clearly remember the hopeless feeling I had while I lived in Gilpin Court. You think to yourself that you'll never get out. It was easy to feel suicidal. I remember when James' younger brother Kevin tried to commit suicide. I know he took a lot of pills and I remember the ambulance coming for him. Kevin was unconscious when they put him into the ambulance. Kevin was real young. I heard they had to pump Kevin's stomach.

1

No one talked about what happened. I remember Kevin acting differently afterwards – real quiet and down all the time. A lot of children had thoughts of killing themselves. Nobody knows another way. There was nothing positive going on there for kids.

5.      Initially the Roanes were living at 4 West Charity Street in the outskirts of the projects. After a few years they moved to Saint James Street in those same projects. That was definitely a step in the wrong direction. Saint James Street is in the inner projects and was where most of the bad stuff was going on in the area. It was a whole different world. A lot of murders happened in the vicinity where they lived on Saint James Street.

6.      James Jr.'s mother, Jeanette, really scrambled and struggled to feed her kids and give them the most basic things. There was always a scarcity of food. The kids tended to themselves a lot, too – the older ones trying to keep the younger ones in line. There were a lot of lean days for the Roanes. I remember being over there and feeling funny about making a sandwich. One of the Roanes would say something to me about it. They would say, "Why are you gonna eat my food?" James, Jr. and his brother and sisters used to always scramble for food. If there was any food in the apartment it was gone. The kids would maul anything that was put out.

7.      James, Jr.'s father, James Roane, Sr., was not present in the home. Jeanette raised all her kids by herself. She had another child by Alfred Coleman. I remember Alfred Coleman. I used to be at the Roane house all the time. Alfred wasn't living there – he would just stop by from time to time. Jeanette was alone trying to take care of those kids.

8.      For James, Jr. there were no men around – or they were the wrong men. Jeanette's younger brother, Haywood Jones, spent a lot of time at their apartment. He was on heroin

2

back then. I clearly remember seeing him nodding off from the drugs or just passed out.

I remember that he was always calling the kids "motherfuckers". He would say to James,

Jr., "You ain't gonna amount to shit, you ain't gonna be nothing." He would say that

when he was drunk which was routine because he was always high or drunk. Jeanette's

brother-in-law, Roscoe Roane, was always at the apartment. He drank heavily, too.

Every day was the party with Roscoe. There was a lot of noise all the time at their

apartment. There were always different adults and kids at their apartment. Jeanette took

in other kids. She had an open door policy.

9.      My situation was different than James Roane's. I was raised by my grandmother in New

York before I came down to Richmond and had a real strong foundation. She stressed

education and instilled that in me. The things that James experienced I will never know.

I moved out of Gilpin Court and then was able to leave Richmond. James and his family

stayed there. James had been living in Gilpin Court for about ten years before I ever

showed up.

10.     I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to

28 U.S.C. § 1746.

<br>

Brian Dargon

Brian Dargon

Bronx, NY
DATED: 8/13/08

3

## DECLARATION OF JOAN DARGON
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Joan Dargon. I live in the Bronx, in New York City. I used to live in Richmond, Virginia in the Gilpin Court Housing Projects at 8 West Charity. I knew the Roane family. They lived at 4 West Charity and later on Saint James Street. Jeanette Roane and I were close friends back then. My son, Brian Dargon, and Jeanette's oldest son, James Roane, Jr., are close in age and were childhood friends.

2. Jeanette Roane had seven children. The children's father, James Roane, Sr., was the daddy in name only. He didn't do anything for Jeanette or for all his kids. She struggled to raise those kids by herself.

3. The kids often went hungry. And if there was food the children used to creep up in the middle of the night and get it from the kitchen. They would get any food they could find. James, Jr. and his brother and sisters had a mentality that they had to sneak around. The mentality was like they didn't know if they were gonna eat again or not.

4. Jeanette Roane's younger brother, Haywood Jones, spent a lot of time in her apartment. But he wasn't a good role model for those kids. Haywood drank and used drugs. He was a heroin addict and used pollutants and uppers. I never heard him say anything positive to James, Jr. or his brother or sisters.

5. I know that Jeanette had a tough time herself, coping with raising those kids alone, not being able to provide James, Jr. and them with what they needed. Jeanette used to spend a lot of time up in her room alone. During those times she left the kids to tend to

1

App.0780

themselves.

6.  Jeanette let different people stay with her from time to time.  Her brother Haywood Jones stayed there often, so did her brother-in-law, Roscoe Roane, and her sister-in-law, Florence Roane.  I stayed with Jeanette for awhile too.  She was always letting people crash at her house, or stay with her and her kids while they sorted out problems in their own lives.

7.  Gilpin Court was really violent back in those days.  There were so many people in Gilpin Court who were addicted to drugs.  I struggled with drugs when I was living in Gilpin Court.  Back then it felt like the natural thing to do.  Back then it was nothing to see an addict shooting up as you were walking down the street.  I know my son and James, Jr. saw violence and drug use, too.  It was an everyday occurrence to see somebody chasing down somebody over a drug debt.  I got robbed right in front of my own apartment.

8.  I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Joan Dargon_
Joan Dargon

Bronx, NY
DATED:  8/13/08

2

## DECLARATION OF MELODY FORRESTER
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Melody Forrester. I am an attorney in Philadelphia practicing in corporate and commercial law.  I grew up in Jackson Ward in Richmond, Virginia.  Back then they called me "Penny."  From the time I was four years old until I was 11, I lived at 6 West Charity Street in Richmond, along with my grandmother, my parents, and my aunt, Katherine Wright.  We lived next door to the Roanes.

2. My family lived in that neighborhood of Richmond before the projects were built.  They used to live there before it was called Jackson Ward, back in the 1950s.  The area has a rich, proud history.  It used to the center of cultural life for people of color in Richmond. Count Basie and Duke Ellington used to play there, along with other jazz greats.

3. The projects came later.  Gilpin Court was where my grandmother lived alone until she could no longer take care of herself.  At that point my parents and I moved in with her so that we could help to take care of her.  James lived next door to me with his mother and six siblings.  My grandmother passed away when I was nine; we moved out of Jackson Ward two years later.

4. In the projects, everything was concrete -- the floors, the walls -- everything was made of cinder block.  It was a dangerous environment, too, with lots of drugs and violence.  Our block was the only block that I was allowed to go on and that was it.  My parents just felt that it was too dangerous to venture anywhere else.

5. Everyone who lived in the projects was poor, but James's family was the poorest.  His was the family other poor families made fun of.  The kids never had enough food and never had proper clothes to wear.  It is painful for me to say any of this because it almost seems disrespectful to be discussing this.  However, I know it is important that the true

AUG.05.2008 10:18  21586428810      MILLER FAUCHER PHILA PA      #4601 P.002/005

story of James's life be told.

6.    We used to give the Roanes our old clothes. I remember James's younger brother, Kevin, going to school wearing an old pair of my jeans. Kevin was so small his feet were in the knee part, the rest of the leg just dragged behind him. There was no one at the house to stop him before he went out the door, to tell him not to wear those pants. They kept all their clothes in garbage bags. They just pulled out whatever item of clothing they could find and wore it.

7.    There was so much chaos in the house. Being in that house was like being at the circus. There was so much activity, children running around everywhere, and Jeanette was overwhelmed. There were twin mattresses on the floor and they always smelled like urine. For them it was strictly survival. No coloring books, nothing extra. I don't remember any toys in the house.

8.    James's dad, James Sr., was never at home. I saw him in spurts, when he wasn't incarcerated. When he was there everyone was afraid because he used to beat the hell out of everybody. Jeanette took the brunt of the abuse.

9.    James didn't stay in school long. He went to an alternative school called Adams Corner. He might have started the 9th or 10th grade but he didn't finish high school. He was always the butt of the jokes. People teased him a lot about his clothing. He couldn't stand it and he just quit going to school. Looking back it breaks my heart to know that something like that kept him from getting the education he deserved. Even though I know I was just a kid at the time, I wish I could have done more to help him.

10.    James came to my house sometimes when we were kids. He always followed the rules set down by my parents and never violated them. He always did exactly what they told

#4601 P.003/005     MILLER FAUCHER PHILA PA     2158642810   10:19 2008,50.9UA

him to do. James was also very respectful to my father. My dad used to drive a yellow truck for the city. When he came home, James used to burst out their door to see him. He always ran out to greet him.

11.   I have no doubt that if I had been born in James's household or if James had been born in mine, James could be in my place and I could be in prison. We didn't have a lot materially, but I knew that my parents loved me and wanted to protect me. My life had so much structure it was impossible to go wrong. Every night, my parents were there to make sure my homework was done, and done well. My mom read more books in her lifetime than I have. For example, if I was supposed to be home at 7:00, at 7:01 my mom would be outside looking for me. James never had anything remotely close to that.

12.   After we left Gilpin Court I didn't see James as often, but our families were still close. Ultimately I lost touch with him after high school. I went to the University of Virginia in Charlottesville, and then to law school at Columbia University. Years went by and we fell out of touch. I heard about his trial, but didn't contact him or his family at that time. What had happened to James nagged me. One day I got on the internet and found the address for James in prison. That was nine years ago, and now we write each other often and talk on the phone regularly..

13.   James's letters to me are beautiful and insightful. James feels heartbroken that he committed crimes and hurt people. He is truly sorry. I know what he's done, and I know James is no angel. He's ashamed of the things he's done. I know James has accepted the consequences of what he has done. But James is not the same person he was. He has grown to be a loving son, father and friend.

I hereby certify that the facts set forth above are true and correct to the best of my

#4601 P.004/005          MILLER FAUCHER PHILA PA          2158642810   10:19   8002,50.9UA

personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to

28 U.S.C. § 1746.

Melody Forrester

Philadelphia, PA
DATED:  August 5, 2008

#4601 P.005/005        MILLER FAUCHER PHILA PA        21586428810  10:19 2008,05.AUG

## DECLARATION OF EARL GRANGER

## PURSUANT TO 28 U.S.C. § 1746

1.   My name is Earl Granger. I live in Richmond, Virginia. I grew up with James Roane, Sr., in the Fulton neighborhood and later in Creighton Court Housing Development in Richmond, Virginia. James Roane, Sr. was two years older than I was. James Roane, Sr. passed away in 2007. I knew James Roane, Sr.'s family and over the years have gotten to know his children well too, especially James Roane, Jr.

2.   James Roane, Sr. was one of six children born to Rosa Berkley and William Roane, Sr. Everyone called Rosa Berkley the nickname Mamie. Up until James Roane, Sr. was six years old or so, he lived in the Fulton neighborhood in Richmond. Fulton was a part of Richmond with little shanty houses and outdoor toilets. We used to live there, too. The Roanes though lived on the other side of the tracks in Fulton. That was even worse.

3.   James Roane, Sr.'s father was killed in an accident at a cement plant here in Richmond. This happened when the kids were quite young. My family and the Roane family both moved to the Creighton Court housing projects when I was about five years old and James Roane, Sr., was six.

4.   The children, including James, Sr., were raised mostly by their grandmother, Miss Ella Jackson. Miss Mamie favored her oldest daughter Ernestine. It seems like the rest of her children, including James, Sr., disappointed her. I don't believe James, Sr. went far in school. I remember that Miss Mamie had her son William discipline the other boys,

1

James, Sr. and Roscoe. I know that all the boys caught hell from Miss Mamie. I remember hearing her tell the boys, "You ain't gonna be no good anyway." I remember that when the boys were late getting home, Miss Mamie used to the lock the doors to her apartment. If the boys weren't in by that time they weren't getting inside. I remember that James's brother, Roscoe Roane, used to spend the night up at the service station near where we lived. I remember seeing the boys sometimes scale the building and slip back into their apartment through a window from the roof– so that they would have a place to sleep.

5. The Roanes grew up real poor. Miss Mamie and her mother raised those six kids on their own. They often didn't have food to eat or other basic things the kids needed. I, on the other hand, was lucky. My daddy was a butcher, so I always had food to eat. I know the Roanes missed a lot of school. Back then the schools didn't serve lunch so the Roane kids missed school a lot because they didn't have anything to eat.

6. James Roane, Sr.'s brother, William Roane, used to manufacture corn whiskey. William was shot in the head by a woman many years ago and suffered brain damage. William started receiving disability after that.

3. Miss Mamie tended to William after he was disabled and used his disability check to buy a house on 31st Street here in Richmond. When Miss Mamie died, Ernestine Roane took the house for herself and put William in a home out of town. The family has always been bitter over that. I know some of Miss Mamie's children believed the house rightfully belonged to William.

4. James, Sr. got together with Jeanette, the mother of James Jr. and had all those kids at a

2

App.0787

very young age. Jeanette was just 13 years old when the first set of twins were born. It was a doomed situation. They moved to Gilpin Court once they got married. In the space of about four years James, Sr. and Jeanette had six kids. Jeanette had another little girl a few years later. I feel that James Roane, Jr. never had a chance.

5.      I know that James, Sr. went to work for the city and then shortly thereafter went to sticking up people. He served over ten years in prison for an armed robbery. While James, Sr. was in prison for robbery he met another woman, and got married again.

6.      I moved out of Creighton Court as a teenager and joined the service. I never visited James, Sr. or Jeanette in Gilpin Court. Our lives drifted apart. I joined the service and reconnected with James, Sr. after he was released from prison. At that time James, Jr. was a teenager.

7.      James Roane, Sr. was always out for himself. He was a hustler. He was a drug dealer. It's like he had no principles. I know he used to give his children and grandchildren drugs to sell for him. The kids had drug addictions themselves and wouldn't always come back with the money for him. I know he used to give drugs to his family when they got released from prison. James Roane, Sr. was always about recognition. Anything he did it was to be recognized or to be able to brag about it.

8.      James Roane, Sr. was arrested in Hampton County for rape. He was accused of having a sexual relationship with his girlfriend's daughter. I've heard similar allegations about James Sr. and his granddaughter, Brandi Cooper. I've heard that James Roane, Sr. had sex with his granddaughter back when she was in her early teens.

9.      James Roane, Jr. reached out to me back when me and his father started our business

3

together. He didn't have a close relationship with his father. It was clear that he wanted that and that he didn't have it. I know James Roane, Jr. has told me things he's never told his father. James, Jr. means a lot to me and I'm happy to be a part of his life.

9.    James, Jr. and I have stayed in touch since his arrest. We talk on the phone often and send letters back and forth. He's changed so much since his arrest. I'm so proud of the person he's become. I know that the man he became was always in there, if only he had a chance. I told James, Jr. this recently. It made him cry. He's come a long way over the years. He realizes what he has done. He knows he hurt people and that he should be punished for the crimes he committed.

10.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Earl Granger

Richmond, VA
DATED: 8/4/08

4

## DECLARATION OF EARL GRANGER, JR.
## PURSUANT TO 28 U.S.C. § 1746

1.    My name is Earl Granger. I live in Richmond, Virginia. I know James Roane, Jr., who has been convicted of the murder of Douglas Moody.

2.    I am a longtime friend of Douglas Moody's mother, Catherine Watlington. Ms. Watlington and I have talked several times about her son's death and James Roane's case. Ms. Watlington told me that she understands that James Roane did not kill her son. Recently Ms. Watlington reviewed the affidavit of Gina Taylor, an eyewitness to Douglas Moody's murder. Ms. Watlington understands that Gina Taylor saw Keith Barley kill her son, that Barley confessed to Gina Taylor, and that Gina Taylor was not forthcoming with the facts in her affidavit because she was scared of Keith Barley and what he might do to her. Ms. Watlington told me that she does not want to see James Roane executed for her son's murder. Ms. Watlington told me that she does not want to see anyone else killed. Ms. Watlington also told me that she is upset that her son, Douglas Moody, was portrayed in court as a drug dealer. She said that her son was not a drug dealer. She told me that her son was a drug addict who never had any money at all and in fact used to ask her for money.

3.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Earl J. Granger Jr._
Earl Granger, Jr.

Richmond, VA
DATED: 9/9/08

## DECLARATION OF CLARENCE HARVEY

1.    My name is Clarence Harvey. I currently live in New Orleans, Louisiana. I am retired from the United States Air Force after over 21 years of military service. I was raised in Richmond, Virginia and for several years I lived in the Gilpin Court Housing Development. We moved in when I was in the fifth grade and moved out of the projects about the year after I graduated from high school in 1971. Our address was 2 West Charity Street, during much of that time our neighbors were the Roane family. They lived at 4 West Charity Street. I've known the Roane family since I was a young teenager myself and have stayed in touch with them over the years. I watched James, Jr. grow up.

2.    Gilpin Court is nowhere to live. It was a tough, tough scene. You had to fight every day, you had to fight to go on the street. I would have boys start fighting me so many times and I wasn't even looking for trouble. Sometimes I didn't even know why I was getting beat up. Gilpin Court was like a jungle. Police didn't come in there unless they were four deep, day or night. You would hear gunshots quite often – perhaps every other day. I remember there was a drive by shootings on our front porch. Nobody got shot but guns went off right where we lived. One time, me, Tyrone Henderson and Tyrone Mayo were outside. We were singing doo-wop, just standing around. We heard pow-pow-pow and then psst! psst! Somebody had fired a gun in the distance and the bullets whizzed right by us. I still have a scar on my leg where I was once hit by a bullet that somebody in the neighborhood had shot off. The violence was nothing nice.

Page 1 of 6

*CH*

App.0791

3.    While serving in the Air Force I sometimes saw guys who had been injured.  People would be getting sick.  I would think, 'This ain't nothing from what I'm used to seeing back in Gilpin Court.'  To me nothing was surprising.  I was numb to it.

4.    Beyond the fights older boys would also tear your clothes off to really humiliate you.  The Tunstall family in particular, they did that.  All of the Tunstall brothers were bad.  They had this thing about tearing your clothes off, you'd have to walk home naked.  It happened to me once.  I remember one of the Tunstall brothers well – Haywood Tunstall.  His nickname is Sweet Love.  He is gay but he is just as mean as his brothers.  He used to walk around Gilpin Court with make up on, dressed like a lady.

5.    Jeanette Roane was young when she moved in Gilpin Court, I believe she was just a teenager herself.  She had a lot of kids for her age.  I know she had two sets of twins, plus Florence and James all in the span of a few years.

6.    The apartments they lived in were nasty.  They never had much.  Everything they had was hand me down.  The kids peed all over everything.  It smelled like pee in there all the time.  I do remember that the dining room table had no chairs around it.  I believe one of the legs fell off the table and they just propped it up against the wall.

7.    The father of Jeanette's children was James Roane, Sr.    James Sr. was not a good guy.  James Sr. used to beat Jeanette mercilessly.  I could hear her screaming.  They had quite

a few fights. We would come over the next day and she would be battered and bruised and swollen. I don't know what provoked him – maybe he was drunk or high. She was scared of him. I really felt for her. Then something happened and James Sr. was arrested for robbery I think and he went to jail. She really struggled then. Not that James helped when he was home but she really struggled after he went to prison.

8.  I remember that when James Sr. and Jeanette were fighting that she would try to run. She would come over to our house. I know those kids saw the beatings too. There was a time I stepped in between them. I got in the middle of everything. I heard her screeching, screaming like she was dying. I heard that and I jumped up and went over there – to the dismay of my whole family. James, Sr. was really pissed at me that day. Jeanette used to tell us, 'Don't say nothing.' James Sr. would put on a better face for other people. James Sr. beat Jeanette when she was pregnant too.

9.  Jeanette went into labor with the second set of twins – Kevin and Kathy – at the apartment on Charity Street. I know James, Sr. had beat her earlier that morning or just the day before. One of them was born right there on the couch. The sofa wasn't clean and I remember seeing the baby. The baby's umbilical cord was still attached. I remember then the ambulance came and said she was gonna have another one.

10. Jeanette really struggled to care for her kids. It was common for them not to have any food in their refrigerator. We often tried to help and would give them food on a pretty

Page 3 of 6



regular basis. My mother is that type of woman. Jeanette got food stamps but two weeks later the food would be gone and she was out of money. She had anybody and everybody keep the kids. She had one guy – his name was Junior Perry – he was a drug addict. He used to use in their apartment. He said he wanted to watch the kids but it seemed like he just wanted a sanctuary – a place to shoot up, nod off. I remember seeing Perry at Jeanette's house once – I saw had a needle you would use for drugs in his pocket.

11.    Jeanette disciplined the kids too. I remember she whipped James, Jr. with an extension cord once. Big welts came up on him. He was real small then. It had something to do with him playing with matches. I went over there because I heard her screaming. I saw that she was beating James. She had a white extension cord, doubled up. He got a serious whipping that day. He didn't even have a tear in his eye. I'll never forget it. He had welts on his back side, his arms, his legs. I walked into the apartment in the midst of it. The walls were like tissue paper, you just heard everything. This was just a little while after the second set of twins had been born. James was only about seven or eight years old when I moved out so he was even younger than that when this happened.

12.    At the Roane house there was very little supervision. You could act up and nobody was there to call you on it. I remember all of us would run over there to play hooky from school. We'd wait until my mom left for work and then crawl in through Jeanette's window. She let you do stuff like that.   You could drink a beer over there too – if there was one in the fridge. Jeanette, she was like one of us. If there was a beer in the fridge,

Page 4 of 6



if she had left or if Perry had left it, you could just take it. My mother would have never allowed that.

13. Jeanette's house was a place where people hung out. It was a haven, you could go there and sit back and chill. It was like a revolving door of different people visiting, staying there from time to time. People were always there on the weekend drinking, especially at the first of the month. With Jeanette it was like a child raising a child. She never had a life like most teenagers. She would have Perry or her brother Haywood watch the kids for the weekend and she would go out. That was her way of trying to get out and have a life. Jeanette had no skills, she couldn't go to work, she was locked into the welfare system. She didn't know how to maximize what the system offered – the kids didn't have proper medical or proper schooling. The kids wore dirty clothes every day. They didn't have money for those things. Jeanette used to always tell my mom that James Sr. would not let her get on birth control. I remember hearing them talk about that. She had more kids than there was help.

14. I heard as James, Jr. got older and his father was out of prison that his daddy influenced him. I heard that James Sr. was a drug dealer and that James, Jr. was working for him. The word was that James Sr. was the man around town.

Page 5 of 6

C⁴A

15.    I grew up in a family environment different from James Roane, Jr.'s in many ways. My mother worked and struggled to provide for us but always made sure we were taken care of and always stressed the importance of an education. We had chores that had to be completed every day before she got home from work or there would be consequences. She taught us the Bible and really worked hard to keep us on the right track. We lived in Gilpin Court for several years but then moved to a house in the Northside neighborhood of Richmond. This was a much better neighborhood for my mother and my sisters to live.

16.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and that this declaration was executed in New Orleans, LA on July 2⁄ , 2008.

Clarence Harvey
Clarence Harvey

Page 6 of 6

App.0796

## DECLARATION OF DELORES HARVEY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Delores Harvey. I lived in the Gilpin Court Housing Development for several years. My address was 2 West Charity Street. I was neighbors with Jeanette Roane during that time. We were living there when the Roane family moved in. I don't think Jeanette Roane knew anyone in the neighborhood at that time. We shared a porch area together. During that time I got to know her and her children.

2. I remember the children's father, too. It seemed like he was always fighting with Jeanette. I used to always tell her to come to my house to avoid the fighting. The children's father was always beating on Jeanette. She always seemed like a pretty good lady – for what reason he beat her I don't know. They were always arguing. I would tell him, "Don't hit her no more." Their bed was next to my kitchen so I could hear them through the wall fighting. I do remember that sometimes after they had been in argument she was puffed up in the face. I think that Jeanette was scared of the children's father, frightened of him. Jeanette was always worried-looking. I remember that Jeanette never went any place. She stayed there with him. I remember Jeanette using my telephone to call her sister or her mother sometimes.

3. I know that Jeanette Roane struggled financially. Sometimes they didn't have things to eat. I gave them food sometimes. Whatever I had, I shared it with her. I gave her food maybe once a week – whenever I saw they didn't have anything. Sometimes she said that they didn't have this or that. She wouldn't come right out and ask for food. Jeanette had pride and didn't like to ask. I remember when James Jr. was just a boy he used to come to

1

the house and ask me to make a peanut butter and jelly sandwich for him. I would always try to give the kids a little something.

4.      I remember when Jeanette had the second set of twins. One of the babies was born at her apartment on the sofa. The sofa that child was born on was terrible. It wasn't clean. The children had slept on it. Jeanette didn't have anything underneath her. Jeanette's sister came and got me. I got to the door and went back to my apartment to call the ambulance. I couldn't deal with it. The sofa was dirty and smelly. Jeanette was taken to the hospital where the second baby was born.

5.      Jeanette disciplined the children herself. I remember she beat the kids. Sometimes I stepped in to tell her to take it easy. I remember Jeanette used to beat James Jr.

6.      Jeanette's children were playful. I remember little James chasing after me asking for a quarter to tie my shoe. People used to help Jeanette with the kids. We could see she was struggling.

7.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Delores Harvey

8-12-08

Richmond, VA
DATED:

2

## DECLARATION OF MARSHALL HARVEY
## PURSUANT TO 28 U.S.C. § 1746

1.     My name is Marshall Harvey. Delores Harvey is my mother, and Clarance

"Danny" Harvey is my brother. My family and I lived next door to James Roane, Jr., and his

family in the Gilpin Court housing project for almost four years. My family and the Roanes

shared a common wall and front porch. I also babysat for the Roane children from time to time. I

am 11 years older than James. My first memories of James are when he was a toddler.

2.     I remember what it was like to live next to the Roanes very well. They made a big

impression on me because everything that went on in their house was so extreme. For example,

even though my parents divorced, the split was amicable. There was never any violence in our

home. Over at the Roanes's house, though, things could get pretty rough.

3.     James Jr.'s father, James Roane Sr., would come around when he got out of jail. I

remember him cussing out James's mother, Jeanette, and humiliating her in public, which was

terrible to see. But even more terrible was what went on inside that house. The walls in the

Gilpin Court projects were extremely thin, and there were times when James Sr. beat Jeanette so

hard, I could hear the sound of individual blows making contact with Jeanette's body. I

remember Jeanette screaming as James Sr. beat her, and it was just awful to hear all of that

hitting and screaming coming through the wall. You would think that the children would have

been screaming, too, but the Roane kids never made any noise. I think they were too scared to

1

react. We should have called the cops all those times, but we didn't. I regret that now.

4.      James's mother, Jeanette, was well-liked in the neighborhood, and sometimes people would get angry about James, Sr., beating her up. One time, my older brother Danny got so fed up with the abuse that he went over the Roane house and confronted James Sr. Danny was only a teenager then, but he went right up to James, Sr. and told him to stop beating Jeanette. I don't think too many people stood up to James, Sr., and I'm not sure how he reacted to Danny. James, Sr., could be very charming when he wanted to be. Though the beatings stopped for a little while after Danny went over there, at some point, it all started up again. Things just went on as they had always been.

5.      I used to go over to the Roane house to babysit, and the conditions inside were pretty bad. They didn't have much furniture, but what they had was soiled with urine. All of the children wet the bed. The whole house smelled. I also know that there were times when they didn't eat. My mother would help out by bringing meals over to the house.

6.      My mother was pretty strict, and kept a close eye on my siblings and me. There wasn't the same kind of supervision over at the Roane house. Their house was the place where all the neighborhood kids could go and do bad things, like do drugs and fight, without adult intervention.

7.      Certain adults used to hang around the Roane house, too. I remember a guy by the

2

App.0800

name of Perry who stayed with the Roanes from time to time. He wasn't a relation to them, he was just some guy from the neighborhood who was supposed to be a babysitter. Perry was a heroin addict. He did drugs in the Roane house. I saw him shoot up one time while he was supposed to be tending to the children. It was disgusting, and not something I wanted any part of. I'm not sure if Jeanette knew what he was into. Another thing about Perry that struck me as weird was that he seemed to pay way too much attention to young boys. He gave me the creeps.

8.      I know it was hard for Jeanette raising all of those children and trying to keep things under control. I remember one time I saw her beat James Jr. I think she intended to discipline him, but she was beating him with an extension cord. The strangest thing about it was the fact that James didn't even cry. He just took the beating.

9.      My mother did everything she could to move our family out of the projects, and we moved away from Gilpin Court and the Roanes when the second set of Roane twins were still babies. I am very grateful to my mother for all she did to get us out of there. Gilpin Court was a dangerous, difficult place to live, and certainly not a good environment for children.

I declare under penalty of perjury that the foregoing is true and correct to the best of my *Aug. 15, 2008* knowledge and belief and that this declaration was executed in Richmond, Virginia on ~~July~~ __, *m. A* 2008.

Marshall Harvey

01/10/2002  02:55    2159280826                    FED COMM DEFENDER                      PAGE  02

## DECLARATION OF VICTOR HERBERT

1.  My name is Victor Herbert. I taught math and science at the at the Adams Corner and Westhampton Schools. These were special schools for children with disabilities. James Roane, Jr. was one of my students. I have spent my career working with children with special needs. James was a child who needed extra help.

2.  James struggled academically, and was definitely functioning below grade level. But he was never suspended or expelled. School was a safe environment for him. He was protected, and got lots of supervision. Sometimes James had tantrums, but that wasn't unusual for a child with emotional disturbances. He was never one of those kids who went into a blind rage where you couldn't reach him. James could always be re-directed. If he had a melt down, we could let him blow off steam and then we would process it together. After that, he'd be fine. James was always respectful towards me.

3.  Sometimes James was irritable because he came to school hungry. I believed he was malnourished. The school provided him with a good meal. I suspected that sometimes the school meal was the only meal he'd get for the day.

4.  You never really know what goes on in the home, but it seemed like there were problems. James never mentioned a father. His mom had lots of other children to care for and wasn't able to come to the school very often. James seemed depressed a lot and had low self-esteem.

5.  Also, James's hygiene wasn't good. I know other teachers worked with him on it. I believed James understood what he needed to do to take care of himself, but it seemed like James didn't have a way to get clean clothes. I suspected he didn't have soap. The other kids teased James for being smelly, but we teachers would intervene and put a stop to it.

6.  If James had a father -- or if he had some kind of long-term program outside of school -- he could have built on the skills we were teaching him. His time needed to be structured. He got what he needed in school, but then what about the other 18 hours of the day? There was just no continuity.

7.  James was not good at transitioning from one environment to another and needed lots of help. When he kept changing schools and getting new teachers and counselors, it was like he had to start all over again. He needed continuous support and structure. He needed expectations and reminding, but in a non-threatening way. When James got these things, he performed at this best. But when the structure broke down, James did poorly.

App.0802

01/10/2002  02:55    2159280826                    FED COMM DEFENDER                       PAGE  03

8.    I believe James Roane, Jr. deserves clemency. I always hoped that, somehow, things would turn out alright for James. He had been let down so much in his life.  I know that he suffered as a child.  And even though he and I have not spoken in many years, I still care for him.  It is my urgent prayer that James be shown mercy and granted clemency.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and that this declaration was executed in Richmond, Virginia on May 22, 08 2008.

Victor Herbert

## DECLARATION OF RONITA HOLMAN PURSUANT TO 28 U.S.C. § 1746

1. My name is Ronita Holman. I testified at the trial of James Roane and the others in federal court.

2. In the beginning of 1992, I was living in the Carver School Area. I knew Doug Moody who also lived in the neighborhood. He was a heavy drug user. He was not a dealer. He did not work for Maurice Johnson, who I also knew. Doug was a bad addict who always owed people money for drugs.

3. I knew Keith Barley from the neighborhood, who they called "Little Keith." He was younger than the other dealers in the neighborhood but was starting to get into the business around that time. He carried himself around the neighborhood in a very tough way.

R.H.

App.0804

4. Keith also had quite a temper. I remember one time when he got into a shootout with another dealer on Norton Street. They were supposedly trying to kill each other over who was controlling certain areas.

5. Maurice Johnson was also dealing in that area. He and Keith knew each other well.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to 28 U.S.C. §1746.

Signed: _Ronita Holman_
Ronita Holman

Date: _9-3-08_

## DECLARATION OF ANNE JONES
## PURSUANT TO 28 U.S.C. § 1746

1.  My name is Anne Jones. My mother is Jeanette Jones Roane and my father is James Roane, Sr. My father is deceased. I was born in Richmond, Virginia and currently live in an apartment in the Gilpin Court Housing Development in the Jackson Ward area of Richmond, Virginia. I was raised in Gilpin Court too. My mother raised my brothers and sisters and me at an apartment at 4 West Charity Street and later at 1220 Saint James Street.

2.  4 West Charity Street was a three bedroom apartment with two bedrooms upstairs and one downstairs. My brothers, James and Kevin, stayed in the downstairs bedroom, my mother had a bedroom upstairs and all of us girls stayed in the third bedroom. In addition to my mother and my brothers and sisters various friends and family stayed with us when we were coming up. At various times that included: Roscoe Roane, Michelle Mayo, Patricia Griffin, Haywood Jones, Florence Roane, Sr. and Alfred Coleman. Also my cousins and our friends sometimes stayed with us in the Charity Street apartment, too. At various times that included: Marcus Roane, Tra´vis Roane, Vanessa Roane, Antonio Mayo, Shaunta Mayo, Herbert "Rayful" Keys, Jeff "Pee-Squeak" Miles and Jeff Michaux.

3.  My mother, Jeanette Jones Roane, had seven children. From oldest to youngest, it is me and my twin sister, Annette Jones Coates, then my sister Florence Roane, then my brother James Roane, Jr., then the second set of twins, Kevin and Kathy Roane, and then

1

lastly Kesha. My twin sister and I have my mother's maiden name because she and my father got married after we were born.

4. It was a struggle for my mom to raise us. We grew up rough. We had to make our food stretch. We never had cold cereal for breakfast like some of our friends. Our friends used to have chicken and gravy but we ate dry beans and oatmeal. I don't eat beans you have to soak to this day because we ate so much of that growing up. We used to eat bologna when we could afford it. We would get it sliced so thin you could see through it. The apartment on Charity Street was always hot in the summertime. We slept with the door open and we used to sleep on the porch because it was so hot inside the house, all of us kids. On days that we had field trips at school, our mamma would send us to her sister or her mother's house and they would make us up a lunch. We would get a little shoebox with a sandwich or something because we didn't have enough at home.

5. My father's name is James Roane, Sr. He is the father to all of my brothers and sisters, except for my youngest sister Kesha. Her father is Alfred Coleman. My father never lived with us. I never remember a night my daddy ever spent at the house, ever. He just came home to fight my mamma.

6. During those times that my daddy came by Charity Street, he and my mother sent all of us to the store. We would cross Saint James Street and go to Jimmy's store. We would come back from the store and we could tell that my daddy had been fighting my mamma. My mamma would be crying and bleeding – sometimes from her mouth. Sometimes I actually saw him hit her. One time he came in and hit her, she was in the kitchen. She was cutting some biscuits and he just came in and hit her.

2

7.  I remember another time my daddy came by Charity Street. We came in the back door and heard the glass break. We saw my daddy jump out the living room window. Then we heard police banging on the front door. They were looking for him. We were small then, and I'm the oldest.

8.  My mamma was scared of my daddy. He was real mean. He liked to fight all the time. My daddy he never brought us anything when he would come by the apartment, no clothes, nothing. My mamma didn't like to ask her family for anything. Sometimes she would ask our neighbors, Miss Delores Harvey or Miss Lomax, for food and other things.

9.  I remember the time that my youngest brother, Kevin, took pills that were on my mamma's night stand. He was young, maybe eight or nine years old. We found him and he was sick, out of it. The pills were on the floor next to him. My mamma was hollering and crying. She grabbed him and went to the next door neighbor's apartment for help. The ambulance came and they took Kevin to the hospital.

10. My mamma struggled to raise all of us by herself. We all got into trouble from time to time. My mom used to beat us with a razor strap. She got it from the barber down the street. She used to cut tassels into the strap. She also used to collect switches. She would braid five or six switches together and she would beat us. We all used to hide under the bed and she would push a broom under the bed to get us out. She used to beat us on the butt and on the legs. She would sometimes hit our arms with the switch. I remember one time I got beaten when I was in the third grade. I had talked smart to a teacher and my mamma starting beating me while the teacher was still at the house. My mamma really struggled to raise us all by herself.

3

11.    My brother, James, Jr., used to get in trouble and my mamma used to beat him a lot too. One time he had set a mattress on fire. My mamma and I were returning home and we saw the burnt up mattress on the front porch. My mamma really beat James. I thought she was gonna kill him. James was hopping around, he would just look at her, he wouldn't cry. It seemed like the more he wasn't going to cry the more she was gonna beat him. It went on for an hour or two. My mamma had to be exhausted from beating him so much. They were in the living room. The rest of us were standing on the steps watching. Some of us were crying but James didn't shed a tear. Other times my mamma usually beat us in the bathroom.

12.    I remember that James was on medication at a young age and used to go see Dr. Lordi, a psychiatrist. We used to tease James about that. We would say, "He's retarded, 1,2,3, retarded." We used to tell James, "You better go get your medicine before you go off."

13.    My brother James, Jr., got addicted to drugs as a teenager. I believe James was addicted to heroin. Sometimes months would go by and no one had heard from him. He would come by and be all sweaty, he would be walking around, his eyes would be really big. When James got high he would act like he was scared. I know he was using heroin when he was involved with Robin Cooper, the mother of his daughter, Brandi. Often times when I saw James and he was high he would be dirty. He looked worn out. He looked like he hadn't had any sleep.

14.    My brother James, Jr., was molested by a family friend, Ed, who drove the ice cream truck in Gilpin Court. Ed would stay at our apartment on Charity Street sometimes and sometimes he would take us kids for a ride on his truck. He was dating my aunt for a

4

period of time.  I was molested too as a child.  I remember lying in bed and being terrified that it would happen again.  I never told my mamma.  At the time we were scared and thought that she wouldn't believe us and would beat us for lying.  I know now that if we had told her she would have protected us.  The person that molested me was a friend of my uncle, Haywood Jones.  Haywood was supposed to be babysitting us.  He would leave the apartment to be with his girlfriend and that was when his friend fondled me.  I was in elementary school when this happened.  I'm hurt about what happened because my mother was being nice to these men, just letting them hang out of the house.  They took advantage of her and of her children.

15.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____
Anne Jones

Richmond, VA    8-8-08
DATED:

## DECLARATION OF JOHN HAYWOOD JONES
## PURSUANT TO 28 U.S.C. § 1746

1.      My name is John Haywood Jones.  Everyone calls me Haywood.   Jeanette Roane is my older sister.  I lived with my sister a lot from the time I was about a little kid on.  I just didn't want to live by my mother's rules, and Jeanette didn't make me follow any rules.  So I stayed with her.  Even when I didn't live with Jeanette, I would be at her house every single day and would spend the night on the weekends.

2.      When I was about three years old my mother had a nervous breakdown.  Our oldest brother went off to the military, but my sisters and I lived in foster care for a few years.

3.      My sister married James Roane, Sr. when they were both quite young.  I remember James, Sr. beating on Jeanette.  I tried to intervene and James, Sr. knocked me out cold.  I know it was at least two or three times that James, Sr. knocked me completely unconscious.  I don't want to talk more about that time, but I can tell you that I lived in Jeanette's house at the same time as James, Sr. and it was bad.  Everyone was afraid of James, Sr.

4.      I am seven years older than James, Jr.  So I was there in the house when James was a little kid.  I know that James saw his father beat his mother.

5.      I know there were times in which there was nothing in the ice box at all at Jeanette's house.  Many times the children would go to bed hungry and then have to go to school hungry in the morning.  But Jeanette never complained.

6.      In our family we keep our personal lives to ourselves.  But I heard about what Ed and another man each did to James.  I remember Ed because he drove the ice cream truck in the area and he stayed at Jeanette's house back then.

1

7.    One time I was babysitting for all Jeanette's kids and my best friend Randy Floyd Mayo was there. Everyone called him "Clyde". I went in the house to get some beer and told Clyde to watch the kids. James and the rest of the kids were outside on the porch. When I came back outside Clyde was laying on the sidewalk with a shotgun blast to his chest. He was dead. There was blood everywhere and the kids were just standing there looking at it and crying. The ambulance took a really long time to get there and there was just blood pouring out of him. James would have been about ten years old when he saw that happen. It had a terrible effect on me. I know it hurt James something terrible too.

8.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_John Haywood Jones_

Richmond, VA
DATED:

8-08-08

2

## DECLARATION OF HERBERT KEYS
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Herbert Keys. My nickname is Rayful. I knew James Roane, Jr. from growing up in Richmond, Virginia. I was raised by my brother but used to spend a lot of my time at James's apartment when we were young.

2. As a kid I often slept over at James's house. We rode bicycles, played cards, gambled and drank beer. We stole a lot too. We stole bicycles or lawnmowers to get money for food to eat. James and I did it so much we didn't think we were doing anything wrong. We weren't looking for trouble, we were just looking for money to put food in our stomachs. I remember that we also ate fruit out of the trees – apples, pears, peaches and plums. James and I skipped school often and went up to nice neighborhoods and stole there. We often sold stolen bicycles to buy food or clothes for ourselves or a pair of sneakers. When we were in a nice neighborhood sometimes we saw nice clothes hanging off a clothesline. We stole what we liked so that we had something nice and clean to wear. We didn't have nice and clean clothes to wear at home.

3. I remember the apartment where James, his brother and all his sisters lived. There were so many people running in and out of the house. Sometimes the mom was there, sometimes she wasn't. Everybody used to drink everyday. There was trouble in that house, a lot of trouble. The apartment was a mess. I remember they had a raggedy couch and a raggedy bed. There was peanut butter everywhere and no food in the refrigerator.

4. One thing I remember from that time is that people in the projects used to tease James

1

about an older boy named Sweet Love.  People teased James about having sex with Sweet Love.  I remember seeing James and Sweet Love together a few times.  He was older than us.  Sweet Love used to try and mess with me.  He often tried to get me to go into his apartment.  He wanted me to come inside so that he could make me have sex with him.  Sweet Love gave money to boys that had sex with him.  Sweet Love and his brothers had a reputation for being real mean and violent.  Even James's mother knew that Sweet Love messed with James.

5.    As a teenager James got addicted to heroin.  He was really into it bad.  I've seen James really strung out – foaming around the mouth, passing out.  When James was high he was in a strange state of mind.   He used to fall everywhere like he had done too much.  I remember thinking if someone doesn't keep a close eye on him he could die.  I know James was using drugs at 15 or 16 years old.  I remember that he, his brother Kevin and his sisters used to smoke weed in the apartment they lived in when they were all really young.

6.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____
Herbert Keys

Newark, NJ    8/28/2008
DATED:

2

## DECLARATION OF FAYE MALIK *F.M.*
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Faye Malik. I live in Richmond, Virginia. I am a first grade schoolteacher. I grew up in Gilpin Court Housing Development on Saint James Street. I remember the Roane family. James Roane, Jr. is younger than I am. I remember James Roane's parents, Miss Jeanette and James, Sr., and the apartment in which the Roane family lived.

2. I mostly remember the apartment on Charity Street. I remember that adults were frequently playing cards for money on a small table in the front of that apartment, mostly at night. It seems like there was always alcohol there, especially if Roscoe Roane or James Roane, Sr. were there. Jeanette's brother, Haywood, spent a lot of time there, too. He was a disrespectful young man and drank at a young age. He didn't treat his girlfriend Michelle right either.

3. I didn't see James, Sr. at the apartment a lot. I remember that for a time James, Sr. wore work clothes and boots – as if he had a job working for the city. When he did come, he would come to the apartment drunk. Every time that my sister and I saw James, Sr. come to their apartment we would run to the window to watch. I remember that he would beat Jeanette. James, Sr. beat the children too. I remember that when the beatings were particularly bad, Miss Jeanette would get a taxicab and she and the kids would stay at the grandmother's house. There were times when Jeanette and the kids would be gone for days. We knew it had been a real bad fight when that happened. When James, Sr. came by the apartment he usually went into the house. I heard them fighting, I remember hearing Jeanette say, "I'm a' call the police." There were times when the police would come out.

4. James, Sr. beat Jeanette routinely. I remember that sometimes he locked her out of the apartment. Her neighbor, Delores Harvey, would call the cab for her. I remember that clearly – a Madden cab would pull up – and take her away. I've seen Jeanette with a black eye. I've seen her when her hands were swollen. I remember thinking to myself, "How can her body keep taking it?"

5. I remember times when Jeanette would run out of the house during the fights. Whenever he came in they fought, not only at night. I heard James, Sr. holler at the kids, "Get your ass in bed."

6. Jeanette had a lot of children and she struggled to care for them. I remember that Jeanette used to get money from her family to help with things she needed for the children. Jeanette used to try and hide it from James, Sr. I distinctly remember her putting a few dollars in her shirt, in her bosom. The children were dirty a lot of the time. People were always giving things to them. It was normal for the Roanes to have no food, for the children to be dirty. Those kids were raggedy all the time. The apartment itself was smelly. Jeanette's kids were running around with dirty diapers. A lot of times the Roane kids didn't go to school, I know that. Growing up I remember wishing that I could go to the Roanes' house because they never went to school.

7. It seemed like all of the chaos took a toll on Jeanette Roane. She was always shaking – a real nervous person. I truly believe that Jeanette was afraid of James Roane, Sr. He seemed like the type to look for her if she had tried to run.

8. James Roane, Jr. was teased a lot as a young boy, picked on by neighborhood kids. They would say, "Your daddy beat your mama, your dad was drunk." James, Jr. got teased about his daddy being in prison too. Neighborhood kids also teased him about being

App.0816

poor. People would call him pissy because he smelled like urine all the time. They would tease him for having no clothes. His older sister Anne teased James, Jr. too.

9. With all that fighting and beating and with all those children, in the section of Gilpin Court I was raised in, the Roanes were the worst off of all the families.

10.


11. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Faye Malik
F.M.

Richmond, VA
DATED: 8/8/2008

3

**Declaration of Antonio L. Marrow**

1. My name is Antonio Marrow. My father is James Roane, Jr. My mother is Antonita *aln* Marrow. I am their only child.

2. I am 21 years of age. I went into the Navy out of high school and began training to be a medic. Unfortunately, I received a serious knee injury while training and had to be medically discharged from the Navy.

3. After the Navy, I began training to become a minister. While I have always been active in my church, I wanted to obtain a minister's license, and I have now done so. I have been a minister since 2006 at my church, the Cathedral of Life.

4. I am also very active in the church's youth activities, and I currently serve as Vice President of the Youth Department at Cathedral of Life as well. I feel I have an important role with the youth of my church. As a young person myself, I feel that I am best suited to encourage the young people in the church to follow God's teachings and to serve Him. I think that they listen more to me than they would to an older person, since I am closer to their age and understand the struggles that they face. I try to hold myself up as a role model to them, and also to my dad's other kids, Brandi, Brandale, Brandon and James, to the extent that I can.

5. In addition to my church duties, I also go to school full time, studying computers at John Tyler Community College. I plan to enroll in a four-year college or university here in Virginia as soon as possible, and I am studying hard in order to do that.

6. Whatever I have pursued in my life, my parents have encouraged me. Even though my dad has been in prison most of my life, he has worked hard over many years to be a real presence in my life. I visited him while he was in prison in Virginia and most recently, I traveled to Terre Haute with my aunts and my grandmother to see him last year. We talk just about every two weeks by phone and have for years. My dad has always tried to give me good, fatherly advice and has always told me to stay in school, be good to my mom, stay out of trouble, and not to make the same mistakes that he made in life. I have tried to take his advice to heart and will continue to do so. I hope that I can make my parents proud all of my life. I miss my dad, and I love him very much. If he were executed, I would have a huge hole in my heart that nothing could ever fill.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and that this declaration was executed in Richmond, Virginia on May 28, 2008.

Antonio Marrow

1

Declaration of Antonio Marrow
Pursuant to 28 U.S.C §1746

1. My name is Antonio Marrow. I am James Roane Jr's son. In 2008, I Signed a declaration at the request of attorneys working for my father. I have reviewed that declaration and it is accurate. There is more information I would like to add.

2. I am an ordained minister at Elohiem christian outreach center in Henrico, Va. I teach sunday school and run the sound board for all services. I also work full time at a call center. I'm about to start my own business. I graduated with an Associates degree in network systems administration.

3. In September of 2015, I was in the hospital.

An

continued

I went in because I had shortness of breath. It turned out that I had congestive heart failure. I almost died. I had no Idea I was that sick.

4. I had been in the hospital for about a week when my father finally got a call through to me. I was feeling better at that point, but I could tell he had been in agony trying to get a hold of me to find out how I was doing. I could hear it in his voice: he was anxious and concerned, and I think also frustrated that he couldn't do anything for me.

3

5. I'm a father now, and I can only imagine what it would be like to have a child in trouble and not be able to go to my childs side to help. There are always ups and downs in life, but I know that when I need my father, he will be with me.

6. When I first became a father, I was very nervous about it because I didn't have a father day-to-day when I was growing up. I didn't have those father-son moments

4

Continued

to draw in. But my father told me that he knows that I'll be a good father and he's proud of me. I needed reassurance and he gave it to me. That meant a lot to me. There are some things you can only get from your father. That doesn't stop when you're an adult, or even when you yourself are a father.

7. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and

⟶ An

belief, subject to the penalty of perjury, pursuant

to 28 U.S.C. § 1746

Signed: _____ Antonio Marrow

Henrico, VA
11/6/16

App.0823