**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA | : | |
| | : | Crim. No. 3:92CR68 |
| v. | : | |
| | : | |
| JAMES H. ROANE, JR. | : | |

**APPENDIX VOL. IX**

**App. 0903-0927**

# Richmond Times-Dispatch

**Sunday,** December 29, 1985     Richmond, Virginia 23219     135th Year, No. 363     —     **75 cents**

## Lebanese warlords approve peace pact

**From wire dispatches**

BEIRUT, Lebanon — Leaders of Lebanon's three most powerful militias yesterday signed a Syrian-backed peace accord meant to end nearly 11 years of civil strife that has killed more than 100,000 people.

"The agreement ends a war that lasted for at least 3,913 days," said the state-run radio. War-weary Lebanese, however, were more skeptical.

No major clashes were reported in Beirut immediately after the signing, but sniper fire continued along the "green line" dividing Christian East Beirut from the mostly Moslem west. A heavy rainstorm later ended the sniping.

Official sources said the document calls for a cease-fire and an end to the state of war within a year, and clears the way for political reforms to scrap a 42-year-old political system that favored Christians over Moslems.

The peace accord was signed in the Syrian capital of Damascus by Shiite Moslem militia leader Nabih Berri, Christian Lebanese Forces boss Elie Hobeika and Druse Moslem chieftain Walid Jumblatt in their first face-to-face meeting.

"I feel like a groom on his wedding day," said Hobeika, 28, after shaking hands with former foes Berri and Jumblatt in the presence of Syrian Vice President Abdel Halim Khaddam, the architect of the plan.

"I am so happy. It's all over," Berri said, referring to the civil war.

Khaddam, who oversaw three months of negotiations, signed as witness, to show that Syria will act as the pact's guarantor.

The three warlords met separately with Khaddam before the signing ceremony. He then convened them in a one-hour conference at his office.

The four men emerged from the closed-door conference to an adjacent hall where more than 35 Christian and Moslem politicians, invited from Lebanon, were waiting.

Reporters and photographers were called in. The signatories shook hands

Continued on page 8, col. 3

## Mostly smoke

Where there's "smoke, there's fire, but, in yesterday's case, not much fire.

Traffic became snarled and black smoke darkened the western Henrico sky just before sunset yesterday when roofing materials began burning on the roof of the Embassy Suite Hotel under construction near Broad Street and Interstate 64.

The fire did little damage to the building, though. Fire officials said the blaze would probably not even delay the opening of the building, which is scheduled for this spring.

The cause of the fire is still being investigated.

Details, page B-1

## Penitentiary now to house 'harder cases'

**By Michael Hardy**
**Times-Dispatch staff writer**

The State Penitentiary — the scene of numerous stabbings, disturbances and two killings in the past year — is being turned into a special-security prison reserved exclusively for long-term disruptive and aggressive convicts, prison officials confirmed last week.

The overhauling of the 900-inmate prison, to house only "harder cases," they said, is an attempt to break its cycle of violence and to make the prison safer both for inmates and the staff.

"It's a change in philosophy there and an attempt to alter the mind-set of most people who believe that violence is inevitable and acceptable at the penitentiary," said Corrections Director Edward W. Murray explained.

"When someone's killed there now, people say, 'That's just the State Penitentiary!'" Murray said. "I'm not going to accept that. I'm not saying this will wipe out all violence but I want it so that violence is the exception, not the norm in the prison."

"How can we have a good program when even inmates are frightened to death? How can you expect to turn around an inmate or make him a

Continued on page 6, col. 3

# U.S. urges restraint by Israel; toll is 18 in two airport attacks

## Nations asked to intercede

**From wire dispatches**

The United States asked several governments yesterday to bring pressure on Israel not to retaliate for the terrorist attacks aimed at check-in counters of Israel's airline in Rome and Vienna.

President Reagan, in a message to Israeli Prime Minister Shimon Peres, expressed condolences but also urged caution, officials said.

White House officials declined to identify the governments that had been asked to intercede with Israel. The requests were said to have been conveyed through the U.S. ambassadors in the respective capitals.

A White House official said the communications reflected concern that an Israeli response to the terrorist attacks would raise the level of violence in the Middle East and disrupt U.S.-supported peace efforts.

The Israeli Foreign Ministry has blamed the Palestine Liberation Or-

Continued on page 4, col. 1



Associated Press

Victor Simpson comforts his wounded son, Michael, 9

## Israeli raid cited in note

**From wire dispatches**

Officials sought to establish the identities and affiliation of the assailants who mounted the attacks on the airports in Rome and Vienna Friday that killed at least 18 people, including five Americans.

The evidence collected yesterday seems to indicate that scattered Palestinian renegades who are opposed to any negotiated Middle East peace were behind the attacks aimed at the check-in counters of Israel's El Al Airlines.

In Rome, fourteen Americans remained hospitalized after the Friday morning onslaught with automatic weapons and grenades that killed 15 people, including three attackers, and injured 74 at Leonardo da Vinci Airport.

One gunman was captured. There were unconfirmed reports that a fifth man may have been involved.

In an attack at nearly the same time by three other terrorists at Vien-

Continued on page 4, col. 1

# Brothers' meeting ended in terror

NEW PORT RICHEY, Fla. (AP) — A holiday rendezvous by three brothers ended in tragedy, with one brother dying and another suffering a broken leg in the terrorist attack at the Rome airport, their father said yesterday.

"It's unreal. You wonder why they had to get caught in this. You just don't believe it," said Ray Maland, whose 30-year-old son, Don, died early yesterday during surgery at a Rome hospital. Son Mark, 37, was in good condition.

Maland first learned about what happened to his sons Friday evening while watching Cable News Network. Later, he and his wife saw a bedside interview with Mark on NBC News.

Don, Mark, and a third brother, Tim, 32, met in Rome Tuesday and spent Christmas together.

Tim had flown from Rome to Munich, West Germany, shortly before Friday morning's attack at Rome's Leonardo da Vinci airport.

Tim was flying back to Rome yesterday, Maland said. Trans World Airways was flying his two

daughters, Ellen of Arlington, Va., and Jane of Baltimore, to Rome free of charge.

The brothers "called us the night after Christmas. They couldn't get through on Christmas," said Maland, a retired bank employee who moved to Florida with his wife, Grace, five years ago from New York's Long Island.

"They were just happy," he said. "They said they walked from one end of Rome to the next. They saw the Colosseum, the museums, everything. They saw it all."

The brothers had also planned to visit Athens, Greece, together, he said.

Maland said Don, unmarried, worked for Ford Aerospace in Cairo, Egypt, as a finance officer. Mark is an Elizabeth City, N.C., tax lawyer, and Tim works for Ramada Inns.

Maland said he hadn't talked to Mark but was told he was in good spirits and that he probably will be released soon from the hospital for his return to the United States.

Efforts will be made to bring Don's body from Rome for burial in Florida, he said.

In the NBC interview, Mark Maland recalled: "We could hear the pop. . . . But it kept going pop, pop, pop, pop, pop, pop, and you thought, 'Shoot them. Shoot them. Kill them.

"Finally, the shooting stopped and nobody moved and nobody moved, and then my brother, he yelled to me and said, 'Huh, Mark, are you OK?' And I said I had been hit in the leg, how about you."

"And I turned around and there was blood all over the floor," he said.

Mark Maland was "in very good condition," in Rome's San Eugenio Hospital, said L.P. Hornthal Jr., one of his law partners in the firm of Hornthal, Riley, Ellis and Maland.

A Tampa, Fla., television station, WTVT, found an Italian-speaking area resident who called the Rome hospital Friday night to get information about his sons, Ray Maland said.

## Budget aides said to urge defense cuts

**New York Times Service**

WASHINGTON — White House budget officials, under pressure from a new anti-deficit law, have urged President Reagan to cut a scheduled military pay raise, payments to weapons companies for basic research and other Pentagon spending plans in the budget he will send Congress in February, Pentagon and other administration officials say.

Pentagon officials, however, say Defense Secretary Caspar Weinberger insists on a budget of $314.7 billion, about 10 percent higher than Congress appropriated for the current year. Weinberger has argued that such an increase is needed to catch up to the level Reagan and Congress agreed on in May, long before passage of the law to eliminate the deficit by 1991.

In signing the anti-deficit measure Dec. 12, Reagan said he intended to avoid "cuts in defense that endanger

Continued on page 12, col. 1



UPI/Reuter

## Naturalist slain

American naturalist Dian Fossey, who spent the past 18 years befriending and defending Rwanda's rare mountain gorillas, has been found slain at her home in a preserve in the African nation. (Story, page A-8.)

## Index

**There is no Section F today**

| | |
|---|---|
| Area | Section B |
| Art | H-4 |
| Books | K-5 |
| Bridge | H-11 |
| Business | Section E |
| Calendar | H-14 |
| Classified | J-5-32 |
| Consumer | G-12 |
| Crossword | H-14 |
| Dear Abby | G-14 |
| Editorials | K-6 |
| Food | G-8 |
| Garden | G-17 |
| Hobbies | H-11 |
| Horoscope | G-15 |

| | |
|---|---|
| International | Section A |
| Jumble | H-4 |
| Leisure | Section H |
| Living Today | Section G |
| National | Section A |
| Obituaries | C-7 |
| People | A-5 |
| Perspective | Section K |
| Real Estate | J-1-5 |
| Religion | A-7 |
| Rowe | H-2 |
| Sports | Section D |
| State | Section C |
| Travel | H-12-13 |
| TV, radio | H-5-9 |
| Weddings | G-2-7 |

**The Weather . . .** Mostly cloudy today; high around 40. Fair, cold tonight with the low in the low 20s. Mostly sunny tomorrow with the high temperature in the mid-40s. Data, page A-2.

*Virginia's State Newspaper*

# Many in city may call it a haven for crime, but 2,300 call it home

**By Bonnie V. Winston**
**Times-Dispatch staff writer**

Living in Gilpin Court is like being tied to an albatross: It carries a weight that is both uncommon and troublesome.

Inez Hill recalled the time she was summoned for jury duty, and after a long night of deciding someone's fate, a fellow juror offered her a ride home.

"No," she said, declining the offer, knowing in the back of her mind the stigma attached to the housing development where she has lived for 14 years. She'd lost dates before when they found out where she lived.

But the man insisted, saying it was late and that a woman shouldn't



RICHMOND REDEVELOPMENT AND HOUSING AUTHORITY

**GILPIN COURT**

OFFICE
1000 ST. JOHN STREET

**A World Apart**

be left alone at night to find her way home.

Again she said no, and yet he insisted.

"Finally, I told him OK," Mrs. Hill said. "Then he asked me where I

lived and when I said Gilpin Court, he said, 'Oh, ma'am. I'm sorry. I can't take you there.'"

Mrs. Hill walked home that night, as she has many others, the burden again making its weight felt.

She was not afraid. "But he was," she said. "And he's a man. A big, strong man."

He'd never been in Gilpin Court, she said. "Most people never [have been]. It has a lot to do with the news media and what they've heard about it and what they've read about it. But the thing is, they've never been here and many have never talked to anybody who lives here.

"Sometimes I'm ashamed I live out here because of that," she said. In many ways, Gilpin Court is a world apart, a foreign territory that

most Richmonders have never visited and others never care to see.

Although situated on about 25 acres just north of downtown, it is isolated from much of the progress that has touched the rest of the city.

It is an area that labors under the stigma of drugs, guns and homicides. Residents and housing officials say the spotlight of public attention focuses on Gilpin Court only when the television cameras record the discovery of another homicide victim.

Gilpin Court also is a label residents live with. It is a label many of them have begun to believe. It is another weight, another burden that hangs heavy on this urban island

Continued on page 10, col. 1




Staff photos by Bob Brown

Some sections of Gilpin Court, city's oldest public housing project, are being renovated



A-10 Richmond Times-Dispatch, Sunday, December 29, 1985

# The life is one of big dreams, little money

**By Bonnie V. Winston**
Times-Dispatch staff writer

The men stood around a barrel of fire on St. Paul Street, fire made in a barrel left by construction workers who have left many materials out during the two years they've been working on the exterior of Gilpin Court.

The fire department had not been called yet to extinguish the flames in this barrel as they had several nights earlier on St. John Street.

So the men stood around the flames, talking, warming their hands, which were either gloved or stuck deep into pockets. They drank from Styrofoam cups something that looked like grapefruit juice but smelled like alcohol and was poured from a jar. They would finish the liquid, throw the cups into the fire and then listen to the slow hiss as they burned.

Heads wrapped in scarves or buffered in hoods, they said they liked the "outdoor life," that they wanted to be together outside "around a campfire."

From there, they looked around the neighborhood, talking about the many things they see, about the forces that oppress them.

"You all are the only two out here with jobs," one man said to the photographer and reporter. "I've looked for years and I can't find anything."

He's known a world of disappointments, beginning with school integration and high school basketball, when the coach told him, "Don't even come in this gymnasium because you all aren't going to play."

"We were never given the opportunity, and yet we were the baddest guys out here, 'cause we used to play out here and around the city and we were the best."

He talked about a loss of opportunity when he sees Gilpin Court ringed with mom-and-pop markets often owned by later-day refugees who, he said, charge high prices and try to take advantage of the children.

"They came over here with nothing — couldn't even speak English — and now they got a home, two cars and a business. And we been here all this time and we ain't got nothing."

One man said he'd finished high school and had two years at a Richmond business college before it went out of business. He was taking bookkeeping and accounting, but never went on to school somewhere else.

He said he'd grown up in Gilpin Court with kids he sees now "working at Thalhimers or Burger King or McDonald's."

Asked whether he would take a job at McDonald's if it were offered, he said no. "I need more than $3.35 an hour. I have seven children. What is $3.35 going to do?"

He said he is 27 years old.

When asked whether he takes care of his children, he said he tries. When asked how, since he has no job, he replies that he has ways.

All alluded to being involved with the sale of drugs. What are the other alternatives? one asked.

They said Gilpin Court's name has been maligned, that the things that happen there are done by outsiders. Those shot are outsiders and those doing the shooting are outsiders as well.

"And it all boils down to trying to get something that you don't have," one man said. "That's what the crime is caused by."

When asked what they will do about it all, about their lives, they said nothing. "It will just be this way," one said. "Nothing will change. Not the face lifts on the buildings or anything can change the way things are," he said. "The face lifts will affect the view from outside in, but not the view from inside out."

★ ★ ★

The women sat clucking and clutching coffee cups around a table in a kitchen warmed by the oven.

While the oven was overbaking the small cinder block apartment on St. John Street, it had been a saving grace two days earlier when, inexplicably, the heat went off, and the tiny apartment was raw with cold.

The boilers that usually clanged and churned audibly through the cinder block walls of the downstairs living room had fallen silent. No steam hissed through the pipes that run exposed through each room of the house.

The apartment was built that way. Designers of the 338 units built in 1957 and known as the Gilpin Court extension wanted as little wood as

> "Nothing will change. Not the face lifts on the buildings or anything can change the way things are. The face lifts will affect the view from outside in, but not the view from inside out."

possible inside. Consequently, there are no doors on the closets upstairs, only sheets that have been strung on the rods across the recessed spaces in the cinder blocks.

The women competed with the noise of the boilers that had come to life. One woman was particularly upset because someone reported to the Gilpin Court manager that she had drugs in her apartment. Consequently, she was called to the hous-



Staff photo by Don Long
Fire, camaraderie provided warmth for these men on a recent cold night in Gilpin Court

ing office and questioned by the manager.

She was angry.

Her glasses bobbed on her nose as she vowed to find the person who told such a lie.

"I smoke a little reefer — that's all," she said.

★ ★ ★

It's not unusual for residents to tell on one another, said Solomon O. Akinwande, housing manager at Gilpin Court. The tattling about drugs and boyfriends in apartments occurs, he said, after disputes between friends or even disputes between their children.

The residents are like crabs in a bushel basket, all wanting to be the first out, but so entangled that few can break free.

"How can anybody report somebody when nobody out here is living honest?" said the woman, her glasses bobbing again with emphasis. "Everybody out here has some game."

To the half-dozen women, the major illegality is living with a man. But they all admit they need a man to help them make it through the month. Welfare checks just don't stretch that far.

The men, they said, may have apartments somewhere else, a wife across town, or they may simply move in with them. They pay no rent. They are hidden from the management.

But the men all give something — groceries at the end of the month, clothes for the kids, $20 for this bill or that necessity.

It's a peculiar arrangement: The men come and go as they please, see other women if they want.

While infidelity is tolerated, beatings are not. One lick and he's out, the women said.

★ ★ ★

Akinwande knows of the illegal activities.

"You must realize that no one, not even the housing manager, can effectively police things," he said. "Someone can go there and visit at

an apartment. We don't know if they are a permanent resident. We may look at what types of clothes are hung on the line, things like that, but there is no sure way to tell."

Privacy legislation of the 1970s has made it legally almost impossible for him to use a pass key to go into apartments to check on people's personal activities.

★ ★ ★

The women, however, note many of their neighbors' personal activities. While chatting, they turned to look out of the window each time someone crossed the courtyard.

At one point, a white man in a Volvo drove up and picked up a black woman resident. It was midmorning.

When asked whether she was a domestic worker about to go off to the man's home, the women replied, "She's not going to do any housework. She's out making fast money."

"It's not just black people coming into our neighborhoods to commit crimes," said one.

★ ★ ★

Later, the furniture man came to the door. He wanted to introduce the new man who would be coming by to collect for the furniture, the washing machine and the TV. It was all bought on credit and amounted to the largest single bill — $70 — in this family's household.

"In many ways, the people here are taken advantage of," Akinwande said. "People sell furniture to them for $500 that's only worth $200. But they buy it because they're told they can get credit. Then when they can't afford the monthly furniture bill of $70 or $100, the furniture is repossessed and they turn around and sell it again to someone else."

The people are being preyed upon, Akinwande said. "They have to learn to be better shoppers."

He talked about an elderly woman who could not pay her rent because she had paid her monthly insurance premium. When he calculated how much she paid monthly over the number of years she'd paid it, the

woman, he said, had given the company $5,000. "Yet the face value of the policy was only $3,000," he said.

"How can they afford all that when they have only $70 or $80 left after welfare?" he asked.

★ ★ ★

Life in Gilpin Court is one of big dreams and little money. People must rely on their resourcefulness to survive.

One woman took ceramics classes at Calhoun Center and made the pottery decorations that adorned her Christmas tree. She sold Tupperware, and Avon and other home products to make money and earn bonus prizes that decorate the walls of her home.

They all want more for their children, if they have to punish them, beat them or bargain with them to

> "There is so much out here. You try to protect your children. You try to keep them away from it. But you can't lock them inside. If they are a little bit weak in something, it's going to find them."

stay off the streets and in school. They want their children to have, to achieve, to grow up to live somewhere else besides Gilpin Court.

They don't want their children to be branded as they believe they have. And yet some already have fallen into the pattern. In school, many have been labeled emotionally disturbed, learning disabled and handicapped.

One woman said her son, who has

been placed in that category, was chastised by the teacher in front of the other pupils in his grade-school class about being lazy "like his mother who lives in Gilpin Court and just wants to sit around and collect welfare."

"The teacher doesn't know me," said the woman, who holds a job and collects some child support from her former husband for his children and welfare for the others. "She has no right to say that to my son in front of the class. She admitted she said it, but tried to brush it off by saying she was just playing with him. She has no right to play with him like that."

Roland L. Turpin, executive director of the Richmond Redevelopment and Housing Authority, said officials have noticed the numbers of children from the city's projects who are placed in special education classes. "We're looking into that to see if there is a reason," he said.

★ ★ ★

As much as they might like to, the mothers cannot shield their children from the harsh judgments of others or the detrimental influences of the housing project community.

"My son found needles in the hallway of our complex," a woman said. "I told my children if they see anything on the ground to leave it there. I don't want them to catch hepatitis or some kind of disease by touching an addict's needle. I pick them up with tissues and break them in half and flush them down the toilet," she said.

"You've got to be strong to live here," said the woman who was called in by the manager. She was talking about her daughter's pregnancy at age 15 and was grateful it had ended in a miscarriage.

"There is so much out here. You try to protect your children. You try to keep them away from it. But you can't lock them inside. If they are a little bit weak in something, it's going to find them. And everybody's got a weakness. I didn't start smoking dope till two years ago when that man got me hooked. That was my weakness."

# Many call it a haven for crime, but 2,300 call it home



Staff photo by Bob Brown
Inez Hill displays the trophies won by her children

Continued from first page

that is home to 2,300 people, more than 300 of whom are children under the age of 13. They fearlessly traverse the network of sidewalks, courtyards and alleyways at all hours. This, they say, is their home, their neighborhood.

With its 783 units roughly bounded by Chamberlayne Parkway, Baker Street, and Second and Hill streets, Gilpin Court is the oldest, largest and most densely populated public housing development in the city. It was Richmond's first foray into public housing, with construction on the first portions begun in 1941.

It was the city's first response to slums and decaying housing. Ironically today, the project is largely ringed by ramshackle shanties and drafty wooden structures that many residents moved into Gilpin Court to escape.

These people are the city's poor — 50 percent of the residents have incomes of less than $5,000 annually — and their housing options were therefore limited in the private market. Qualifying to move into public housing because of their income, they now

pay 30 percent of that income to rent a unit at Gilpin Court. Heat and all other utilities are included.

But many residents say their move to Gilpin Court was merely trading one set of problems for another. While the physical facilities are better, they have to contend with the closeness of the worst elements of street life. All of the symptoms of society's sickness can be found here.

It is a place described by residents and police alike as a jungle, a modern slave quarters, a rogues' hangout and a shooting gallery.

Residents themselves say it's a bad place to raise children. Children who live there talk about the shooting and say they wish they could live someplace else.

But many families have lived in Gilpin Court for years and it is with more than a little irony that many adults, both longtimers and recent residents, say they wouldn't move anywhere else. They say that compared with what they had in the past, Gilpin is like heaven.

There is something about this cinder block and concrete heaven that appears to lull some families into a false sense of security, and into de-

pendence. For some it appears to be a haven for personal insecurities, a place to hide from low self-esteem.

Social workers say family and personal adjustment counseling is the service most sought by Gilpin Court families. Such counseling includes learning to resolve family disputes, dealing with relationships with male figures, marital problems, personal finances and how these affect the family and the individual, and assistance with the emotional problems of adults, including nervousness, fear, anxiety and lack of self-esteem.

Many residents are afraid to move out because of their dependence on their children's income, their poor work history and a fear that they cannot survive in a world of work and high rent. Some have moved out into private housing, lost their jobs and wound up back in the projects, according to both residents and Solomon O. Akinwande, Gilpin Court's manager.

According to housing authority statistics, Gilpin's residents mirror national poverty trends: 70 percent are members of single-parent families headed by women; 10 percent are elderly, age 62 or older, or disabled; and

50 percent to 60 percent of the household heads did not complete high school.

In interviews, many residents said they dropped out of high school to have babies, and in many families, their children are doing the same. Of the 77 live births in 1984 in census tract 301, of which Gilpin Court is a major part, 28 were to girls age 19 and under, according to the health department.

Thus begins a cycle of limited choices spawned by limited education and limited opportunity. With no job and a couple of children — the average Gilpin family has three or four children — the single mother depends on welfare and often the beneficence of a man to help the family through the month.

That's when outsiders come in, both as "illegal residents" and hucksters who, because of Gilpin's sheer density, find a market for whatever their wares.

Gilpin's residents are a people preyed upon because of their lack of education, poor credit histories and

Continued on page 11, col. 1

Richmond Times-Dispatch, Sunday, December 29, 1985  A-11



# 'Sometimes I'm ashamed I live out here' at Gilpin

Continued from page 10

job record, Akinwande said.

In a society that reveres the trappings of success, it is the poor who end up ensnared, particularly as they turn to the underworld of fast money and illegal activities. To gain the material riches they crave and seemingly cannot attain in the normal, accepted manner, many turn to peddling drugs and sex, or to robbery and theft, several residents said.

And yet the fact that the poor lack material possessions is often translated by the outside world as a sign of a lack of ambition or desire. Some residents say the activities signal — to the contrary — an overwhelming desire. An ambition gone awry, that did not move on the accepted path but found its place on a different track.

That misplaced ambition, too, contributes to the burden of living in Gilpin Court.

"We can't deal with the crime problem in a constructive way unless we deal with the socio-economic and value system," said Roland L. Turpin, executive director of the Richmond Redevelopment and Housing Authority, the agency that oversees all of Richmond's public housing.

"We are reaping the negatives from a forgotten group who have lost hope because they have missed out on the educational system, the economic system and certain family and social values. We cannot successfully eradicate the problem of crime until we are willing to address these kinds of issues."

Police, residents and housing officials say it is not insiders who are committing crimes in Gilpin Court, but outsiders who come in.

"The projects seem to be a haven for criminals. It's seen as a safe place to hide. They can just fold into the community," said police Capt. Randolph R. Carlisle, who is in charge of the city's 1st Precinct, in which Gilpin Court is located.

"There are a lot of people coming into the community who don't live there, who are not residents of record — boyfriends, others who come in and know that the density of the projects provides fertile field for their criminal activities. They also know they have a large number of people who are susceptible to their influence and young people who will buy drugs.

"Those who are involved usually are not the residents of record, but the hangers-on, the boyfriends, friends who visit and others who come," Carlisle said.

In late October, 8 percent of the city's 78 homicides so far that point had occurred in public housing, according to the latest available housing authority statistics.

"To call attention to that 8 percent alone is to lose sight of the overall problem," Turpin said.

Eighteen percent of the homicide victims at that time and 14 percent of those arrested were residents of public housing.

Public housing residents make up only about 7 percent of the city's population, while public housing is home to more than 40 percent of the households with incomes below the poverty level.

Last year, the homicide figures for public housing were more dramatic.

Almost 25 percent, or 20 of the 78 homicides in 1984, occurred in the projects.

Four of those were in Gilpin Court. "That's pretty startling when one in every four homicides is occurring in the projects," Carlisle said. "We wanted relief from that."

As a result, the police bureau began a special project patrol on Christmas Eve 1984 that became permanent in January and was expanded to 12 patrolmen and a sergeant in late November. The team is dedicated to patrolling the city's housing projects north of the James River.

Carlisle said the greater police visibility in the housing developments has been successful. This year, more recent police figures show that only eight of the nearly 100 homicides have occurred in the projects, which is less than half of last year's total, he said.

Five of the eight have occurred in census tract 301.

Other crime statistics released by the police department for January through November show that the occurrence of other major crimes, such as rape, robbery, assault, burglary, auto theft and larceny, is not higher — but lower — in the Gilpin Court area than in some of the surrounding sections of the city.

Still, many parents decry the many negative influences that can tempt and pull their children in the wrong direction.

"It's not all peaches and cream out there," said Tommy G. Edwards, director of housing management for the RRHA. "But there is a commitment on the authority's part to make things better. We want to make the area conducive for kids to do well in school, to achieve and take advantage of opportunities."

"We have a social purpose, not just a brick-and-mortar purpose," Turpin said. "We're never funded for that, but we act as a catalyst for other groups."

Through the community center serving Gilpin Court, outside groups and the authority itself, the RRHA has provided a range of "upward mobility" programs for residents that are aimed at attacking the problems of education, economics and unemployment.

Calhoun Center has numerous activities and classes for adults, children and senior citizens, ranging from swimming and ceramics classes to tenant and youth council meetings and worship services.

The center also has offices for health and welfare department employees who can readily work with Gilpin Court residents' health and social problems.

In addition to encouraging residents to return to school to complete a general equivalency diploma, the authority has a job training program and hires young people to work in RRHA offices.

The authority also tried a pilot project in connection with the $11 million worth of interior and exterior renovation being done at Gilpin Court and the $30 million worth of work being done overall to the city's oldest housing projects. Residents were given jobs learning to do exterior painting while working with a contractor

working on the various developments.

Officials said that 14 people participated in the program; two were hired by the contractor to work full time after the work in the projects was completed.

The authority also sponsors the Garfield F. Childs Memorial Fund, through which youngsters in Gilpin Court are tutored after school. In exchange, the children do household chores for elderly residents of the RRHA high-rise on North First Street by Gilpin Court.

According to officials, the program has proved that youngsters from the projects are able to achieve academically and socially if given special attention and motivated.

Such programs as STEP, Strategies to Elevate People, and Ebony Meld have been brought into Gilpin Court by outside groups.

STEP, which is sponsored by a co-



**FACES OF GILPIN COURT** — More than 800 children under age 13 live in Gilpin Court. Here are some of them who, attract- ed by the photographer's many lenses, jumped into a group eager to have their picture taken. The girls (from left): Kesha Roane, Helen Dandridge, Vivian Dandridge and Sonya Green. The boys (from left): Gerard Dean, Herbert Dean and Alvin Wyatt.

alition of churches, is aimed at helping people move up and out of the projects. Ebony Meld, sponsored by the Upsilon Omega chapter of Alpha Kappa Alpha Sorority Inc., is designed to help young girls realize there are more choices in life than having babies and dropping out of school.

Officials hope that the social programs will help more children and parents to care more about themselves and their destiny, to move out of the projects and into the mainstream of Richmond.

"There are a lot of people who've grown up in the developments and made it," said Jerry C. Crews, director of community services and facilities with RRHA.

He and other officials are fond of listing those success stories, including two Whitcomb Court brothers who have become college professors, one

at the University of Virginia's engineering school.

But for every success story, there are numerous others in the projects who don't make it, who never make it out.

Why do some make it and others don't?

"It goes back to the formative years and who they are and the influences they have," Crews said. "You can be the poorest person in the world, but if you have an environment of love, caring, attention and discipline, then you'll make it.

"I'll admit it is hard for a child living here because of the exposure to so many of those [negative] elements," Crews continued. "But if the family has a strong nucleus, then the child can make it."

Workers in the community say their programs must make up for what direction and strength the family may lack.

"I'm not saying parents [in Gilpin Court] don't care about their children. I'm saying many are so concerned with survival that they aren't able to do much for their kids," said Juanna Hayes, head of Ebony Meld.

"When you look, too, at the education level of the parents, many never had the opportunities, the information they needed to get a good education," she said. "And what they don't have, they can't give to their children."

"No matter where you live, you are not insulated from crime," Crews said. "But if a young person is around a strong family and others who are doing, then the child will identify with the dominant factor in his life," he said.

And it is the aim of all of the support programs to provide positive factors for the children in Gilpin Court to identify with.



Staff photos by Bob Brown

## Clotheslines give some clues to inhabitants; vacant, dilapidated houses ring the project

---

# History rooted in cry for housing in late '30s

Public housing.

Nationally, it was begun in the late 1930s to help solve the problems of many: the low-income, who, living in slums, were crying for safe, sanitary and decent housing; and the building industry, which was crying for work and increased employment for its people after the days of the Depression.

It was all political, said Kenneth J. Finlayson, regional administrator of the U.S. Department of Housing and Urban Development.

Those political forces swept with some controversy into Richmond a few years later with the ultimate creation in 1940 of a public housing authority.

According to newspaper accounts at the time, it was estimated that 40 percent of the homes in Richmond would have to be repaired or replaced if health and safety laws were enforced.

There were, reports said, 7,517 homes that were overcrowded, 13,977 without indoor private toilets, 13,221 without private baths, 2,635 without running water and 20,486 with cold water only.

The problem of Richmond's housing authority at the time was not to find a slum to clear, but to decide which area was the worst and needed immediate help.

Attention focused on an eight-



First section of Gilpin was completed in 1942; additions, in 1957 and 1971

block area north of Broad Street in which 319 of 321 structures were judged as substandard beyond any doubt.

In 1941, clearance and construction began on what by the end of 1942 was to become Gilpin Court, named for Charles Sydney Gilpin, a famed black actor who was born in 1872 at 200 Charity St., in the heart of the area. Gilpin was probably best-known for his role as Emperor Jones

in Eugene O'Neill's play.

The court was to be the first of three "high-standard, low-rent housing projects," according to accounts. It was to house blacks, 228 of whose families were displaced by the clearance on the site, which had a "record as a breeding spot of disease and delinquency," newspapers said.

As for the other two projects, one was planned for whites, while the other was to be for blacks.

However, with World War II interrupting, construction was slowed on the $1.2 million project. The materials were needed for the war effort. But the project later got a priority when housing officials agreed to let Gilpin Court be used for income-qual-ified blacks who were working on defense contracts at nearby installations.

In early 1943, the first of 300 families moved in.

The housing project later was expanded north and east in 1957, and again in 1971, so that the number of units now totals 783.

It houses more than 2,300 people, 800 of whom are children. About half of the households subsist on less than $5,000 a year.

Gilpin Court is the city's largest, most populous housing project. After the lessons nationally in public housing, and locally of Gilpin, housing officials here began building smaller, less densely populated projects. Since 1972, no single development has contained more than 60 units.

While it has its problems, Gilpin Court is not bad when compared with projects in other areas of the country that amount to little more than "warehouses for the poor," Finlayson said.

To attack the problems, Finlayson advocates a range of social programs that get at their roots — programs that provide employment training, day care for children and education.

"It's what you do internally to try to change things," he said. "And you look to the whole community for a solution rather than blaming. You're just shooting yourself in the foot if you blame Gilpin Court or who's managing it or who's living in it," he said.                          — WINSTON

Staff photo by Bob Brown

---

## Complexities of Gilpin life were focus

During the last five weeks, staff writer Bonnie V. Winston has interviewed numerous residents, housing officials and welfare workers and talked with more than a dozen others about public housing in general and Richmond's Gilpin Court in particular.

To get an even closer perspective on life in the projects, she lived with a family in Gilpin Court for four days, trying to see the complexities of life



Ms. Winston

there through their eyes and through the eyes of others who talked freely about their situations.

The resulting stories shed some light on the value systems and personal struggles of a segment of the Richmond community that otherwise seems to receive little attention aside from that connected to crime.

A native Richmonder, Ms. Winston graduated from Huguenot High School and Northwestern University. She returned to the city to work for The Times-Dispatch, where she has been covering welfare, police and crime stories as well as general assignments since April 1979.



# The life is one of big dreams, little money

By Bonnie V. Winston
Times-Dispatch staff writer

The men stood around a barrel of fire on St. Paul Street, fire made in a barrel left by construction workers who have left many materials out during the two years they've been working on the exterior of Gilpin Court.

The fire department had not been called yet to extinguish the flames in this barrel as they had several nights earlier on St. John Street.

So the men stood around the flames, talking, warming their hands, which were either gloved or stuck deep into pockets. They drank from Styrofoam cups something that looked like grapefruit juice but smelled like alcohol and was poured from a jar. They would finish the liquid, throw the cups into the fire and then listen to the slow hiss as they burned.

Heads wrapped in scarves or buffered in hoods, they said they liked the "outdoor life," that they wanted to be together outside "around a campfire."

From there, they looked around the neighborhood, talking about the many things they see, about the forces that oppress them.

"You all are the only two out here with jobs," one man said to the photographer and reporter. "I've looked for years and I can't find anything."

He's known a world of disappointments, beginning with school integration and high school basketball, when the coach told him, "Don't even come in this gymnasium because you all aren't going to play."

"We were never given the opportunity, and yet we were the baddest guys out here, 'cause we used to play out here and around the city and we were the best."

He talked about a loss of opportunity when he sees Gilpin Court ringed with mom-and-pop markets often owned by later-day refugees who, he said, charge high prices and try to take advantage of the children.

"They came over here with nothing — couldn't even speak English — and now they got a home, two cars and a business. And we been here all this time and we ain't got nothing."

One man said he'd finished high school and had two years at a Richmond business college before it went out of business. He was taking bookkeeping and accounting, but never went on to school somewhere else.

He said he'd grown up in Gilpin Court with kids he sees now "working at Thalhimers or Burger King or McDonald's."

Asked whether he would take a job at McDonald's if it were offered, he said no. "I need more than $3.35 an hour. I have seven children. What is $3.35 going to do?"

He said he is 27 years old.

When asked whether he takes care of his children, he said he tries. When asked how, since he has no job, he replies that he has ways.

All alluded to being involved with the sale of drugs. What are the other alternatives? one asked.

They said Gilpin Court's name has been maligned, that the things that happen there are done by outsiders. Those shot are outsiders and those doing the shooting are outsiders as well.

"And it all boils down to trying to get something that you don't have," one man said. "That's what the crime is caused by."

When asked what they will do about it all, about their lives, they said nothing. "It will just be this way," one said. "Nothing will change. Not the face lifts on the buildings or anything can change the way things are," he said. "The face lifts will affect the view from outside in, but not the view from inside out."

★ ★ ★

The women sat clucking and clutching coffee cups around a table in a kitchen warmed by the oven.

While the oven was overbaking the small cinder block apartment on St. John Street, it had been a saving grace two days earlier when, inexplicably, the heat went off, and the tiny apartment was raw with cold.

The boilers that usually clanged and churned audibly through the cinder block walls of the downstairs living room had fallen silent. No steam hissed through the pipes that run exposed through each room of the house.

The apartment was built that way. Designers of the 338 units built in 1957 and known as the Gilpin Court extension wanted as little wood as possible inside. Consequently, there are no doors on the closets upstairs, only sheets that have been strung on the rods across the recessed spaces in the cinder blocks.

The women competed with the noise of the boilers that had come to life. One woman was particularly upset because someone reported to the Gilpin Court manager that she had drugs in her apartment. Consequently, she was called to the hous-

*"Nothing will change. Not the face lifts on the buildings or anything can change the way things are. The face lifts will affect the view from outside in, but not the view from inside out."*

ing office and questioned by the manager.

She was angry.

Her glasses bobbed on her nose as she vowed to find the person who told such a lie.

"I smoke a little reefer — that's all," she said.

★ ★ ★

It's not unusual for residents to tell on one another, said Solomon O. Akinwande, housing manager at Gilpin Court. The tattling about drugs and boyfriends in apartments occurs, he said, after disputes between friends or even disputes between their children.

The residents are like crabs in a bushel basket, all wanting to be the first out, but so entangled that few can break free.

"How can anybody report somebody when nobody out here is living honest?" said the woman, her glasses bobbing again with emphasis. "Everybody out here has some game."

To the half-dozen women, the major illegality is living with a man. But they all admit they need a man to help them make it through the month. Welfare checks just don't stretch that far.

The men, they said, may have apartments somewhere else, a wife across town, or they may simply move in with them. They pay no rent. They are hidden from the management.

But the men all give something — groceries at the end of the month, clothes for the kids, $20 for this bill or that necessity.

It's a peculiar arrangement: The men come and go as they please, see other women if they want.

While infidelity is tolerated, beatings are not. One lick and he's out, the women said.

★ ★ ★

Akinwande knows of the illegal activities.

"You must realize that no one, not even the housing manager, can effectively police things," he said. "Someone can go there and visit at

an apartment. We don't know if they are a permanent resident. We may look at what types of clothes are hung on the line, things like that, but there is no sure way to tell."

Privacy legislation of the 1970s has made it legally almost impossible for him to use a pass key to go into apartments to check on people's personal activities.

★ ★ ★

The women, however, note many of their neighbors' personal activities. While chatting, they turned to look out of the window each time someone crossed the courtyard.

At one point, a white man in a Volvo drove up and picked up a black woman resident. It was mid-morning.

When asked whether she was a domestic worker about to go off to the man's home, the women replied, "She's not going to do any housework. She's out making fast money."

"It's not just black people coming into our neighborhoods to commit crimes," said one.

★ ★ ★

Later, the furniture man came to the door. He wanted to introduce the new man who would be coming by to collect for the furniture, the washing machine and the TV. It was all bought on credit and amounted to the largest single bill — $70 — in this family's household.

"In many ways, the people here are taken advantage of," Akinwande said. "People sell furniture to them for $500 that's only worth $200. But they buy it because they're told they can get credit. Then when they can't afford the monthly furniture bill of $70 or $100, the furniture is repossessed and they turn around and sell it again to someone else."

The people are being preyed upon, Akinwande said. "They have to learn to be better shoppers."

He talked about an elderly woman who could not pay her rent because she had paid her monthly insurance premium. When he calculated how much she paid monthly over the number of years she'd paid it, the

woman, he said, had given the company $5,000. "Yet the face value of the policy was only $3,000," he said.

"How can they afford all that when they have only $70 or $80 left after welfare?" he asked.

★ ★ ★

Life in Gilpin Court is one of big dreams and little money. People must rely on their resourcefulness to survive.

One woman took ceramics classes at Calhoun Center and made the pottery decorations that adorned her Christmas tree. She sold Tupperware, and Avon and other home products to make money and earn bonus prizes that decorate the walls of her home.

They all want more for their children, if they have to punish them, beat them or bargain with them to

*"There is so much out here. You try to protect your children. You try to keep them away from it. But you can't lock them inside. If they are a little bit weak in something, it's going to find them."*

stay off the streets and in school. They want their children to have, to achieve, to grow up to live somewhere else besides Gilpin Court.

They don't want their children to be branded as they believe they have. And yet some already have fallen into the pattern. In school, many have been labeled emotionally disturbed, learning disabled and handicapped.

One woman said her son, who has

been placed in that category, was chastised by the teacher in front of the other pupils in his grade-school class about being lazy "like his mother who lives in Gilpin Court and just wants to sit around and collect welfare."

"The teacher doesn't know me," said the woman, who holds a job and collects some child support from her former husband for his children and welfare for the others. "She has no right to say that to my son in front of the class. She admitted she said it, but tried to brush it off by saying she was just playing with him. She has no right to play with him like that."

Roland L. Turpin, executive director of the Richmond Redevelopment and Housing Authority, said officials have noticed the numbers of children from the city's projects who are placed in special education classes. "We're looking into that to see if there is a reason," he said.

★ ★ ★

As much as they might like to, the mothers cannot shield their children from the harsh judgments of others or the detrimental influences of the housing project community.

"My son found needles in the hallway of our complex," a woman said. "I told my children if they see anything on the ground to leave it there. I don't want them to catch hepatitis or some kind of disease by touching an addict's needle. I pick them up with tissues and break them in half and flush them down the toilet," she said.

"You've got to be strong to live here," said the woman who was called in by the manager. She was talking about her daughter's pregnancy at age 15 and was grateful it had ended in a miscarriage.

"There is so much out here. You try to protect your children. You try to keep them away from it. But you can't lock them inside. If they are a little bit weak in something, it's going to find them. And everybody's got a weakness. I didn't start smoking dope till two years ago when that man got me hooked. That was my weakness."


Staff photo by Don Long
Fire, camaraderie provided warmth for these men on a recent cold night in Gilpin Court

# Many call it a haven for crime, but 2,300 call it home


Staff photo by Bob Brown
Inez Hill displays the trophies won by her children

Continued from first page

that is home to 2,300 people, more than 300 of whom are children under the age of 13. They fearlessly traverse the network of sidewalks, courtyards and alleyways at all hours. This, they say, is their home, their neighborhood.

With its 783 units roughly bounded by Chamberlayne Parkway, Baker Street, and Second and Hill streets, Gilpin Court is the oldest, largest and most densely populated public housing development in the city. It was Richmond's first foray into public housing, with construction on the first portions begun in 1941.

It was the city's first response to slums and decaying housing. Ironically today, the project is largely ringed by ramshackle shanties and drafty wooden structures that many residents moved into Gilpin Court to escape.

These people are the city's poor — 50 percent of the residents have incomes of less than $5,000 annually — and their housing options were therefore limited in the private market. Qualifying to move into public housing because of their income, they now

pay 30 percent of that income to rent a unit at Gilpin Court. Heat and all other utilities are included.

But many residents say their move to Gilpin Court was merely trading one set of problems for another. While the physical facilities are better, they have to contend with the closeness of the worst elements of street life. All of the symptoms of society's sickness can be found here.

It is a place described by residents and police alike as a jungle, a modern slave quarters, a rogues' hangout and a shooting gallery.

Residents themselves say it's a bad place to raise children. Children who live there talk about the shooting and say they wish they could live someplace else.

But many families have lived in Gilpin for years and it is with more than a little irony that many adults, both longtimers and recent residents, say they wouldn't move anywhere else. They say that compared with what they had in the past, Gilpin is like heaven.

There is something about this cinder block and concrete heaven that appears to lull some families into a false sense of security, and into de-

pendence. For some it appears to be a haven for personal insecurities, a place to hide from low self-esteem.

Social workers say family and personal adjustment counseling is the service most sought by Gilpin Court families. Such counseling includes learning to resolve family disputes, dealing with relationships with male figures, marital problems, personal finances and how these affect the family and the individual, and assistance with the emotional problems of adults, including nervousness, fear, anxiety and lack of self-esteem.

Many residents are afraid to move out because of their dependence on their children's income, their poor work history and a fear that they cannot survive in a world of work and high rent. Some have moved out into private housing, lost their jobs and wound up back in the projects, according to both residents and Solomon O. Akinwande, Gilpin Court's manager.

According to housing authority statistics, Gilpin's residents mirror national poverty trends: 70 percent are members of single-parent families headed by women; 10 percent are elderly, age 62 or older, or disabled; and

50 percent to 60 percent of the household heads did not complete high school.

In interviews, many residents said they dropped out of high school to have babies, and in many families, their children are doing the same. Of the 77 live births in 1984 in census tract 301, of which Gilpin Court is a major part, 28 were to girls age 19 and under, according to the health department.

Thus begins a cycle of limited choices spawned by limited education and limited opportunity. With no job and a couple of children — the average Gilpin family has three or four children — the single mother depends on welfare and often the beneficence of a man to help the family through the month.

That's when outsiders come in, both as "illegal residents" and hucksters who, because of Gilpin's sheer density, find a market for whatever their wares.

Gilpin's residents are a people preyed upon because of their lack of education, poor credit histories and

Continued on page 11, col. 1

## INCIDENT NOTIFICATION

CAPTAIN TERESA A. PEELE
OFFICER IN CHARGE, DETECTIVE DIVISION

DATE: ___1-13-92___

FROM: __Detective S.A. Dalton__

DATE OF OFFENSE: __January 13, 1992__    TIME OF OFFENSE: ___0005___

LOCATION: __Alley beside 810 N. Harrison Street__

CRIME: ___Homicide___    OFF.#: __92-01-13-0016-317__

VICTIM: _Kariem Hakim aka Douglas Moody___    DATE OF BIRTH: ___ ████

ADDRESS: _1310 W. Catherine Street___    SS NUMBER: █████

CITY: ___Richmond___    STATE; Va ___    ZIP CODE: ___

DETAILS:
On January 13, 1992 the victim, a Black Male, was found laying in the alley beside 810 N. Harrison Street. He had been shot and stabbed and was transported to MCV. He was declared dead at MCV at 0058 hours.

The victim had two gunshot wounds to the back, four stab wounds to the back, one stab wound to the front of the neck, and one stab wound to the chin.

Further investigation revealed that this offense apparently began in an apartment at 1200 W. Clay Street. At this time the owner of the apartment cannot be located.

The motive for this murder appears to be that the victim was accused of a murder in Brookfield Gardens in 1991. There are two suspects to this offense but at this time there is not enough to charge them with anything.

Detective Paul Tuttle responded for the crime scene.

SUSPECT: Keith ?/Maurice ?___    DATE OF BIRTH: ___

ADDRESS: Keith, 1216 W. Clay St./Maurice___    CITY: ___
                                Brookfield Gardens
STATE: ___    ZIP CODE: ___

CHARGES: None at this time___

ARREST MADE:  YES: ___    NO: xxxxx    WEAPON(S): _unk cal weapon & knife_

NEXT-OF-KIN NOTIFIED: YES: xxxxxxx NO: ___    DATE: 1-13-92___    TIME: 0105___

NAME: _Catherine Watlington___    ADDRESS: ___ ████

RELATIONSHIP: _Mother___    NOTIFIED BY: _Dalton___



**CRIME STOPPERS**

METRO RICHMOND

5101 MONUMENT AVE.
RICHMOND, VA 23230

CALL TAKEN BY: _K W MAKEZA_

DATE: _3/8/92_

TIME: _1930_

CALLER CODE ▬ **12911** HENRICO _____ RICHMOND _✓_ HANOVER _____ OTHER _____

DIVISION _Homicide_ ASSIGNED _____ INFORMATION ONLY (NO RESPONSE REQUIRED) _____

TYPE OF OFFENSE _HOMICIDE_

LOCATION _1200 W. CLAY ST_

DATE/TIME _____ SUMMARY OF OFFENSE _Caller STATES SUSPECT HAS BEEN QUESTIONED BY RPD INV. REF. HOMICIDES & GUNS BUT RELEASED. CALLER STATES HE HAS BEEN STAYING INSIDE SINCE THE JOHNSON Homicide OD KENNEY ST._

SUSPECT #1: NAME _KEITH BARLEY_ ADDRESS ███████████

RACE _B_ SEX _M_ AGE _15_ HT _5·2_ WT _120_ HAIR _BLK_ EYES _BRN_ CLOTHING _____

_____ OTHER _____

SUSPECT #2: NAME _____ ADDRESS _____

RACE _____ SEX _____ AGE _____ HT _____ WT _____ HAIR _____ EYES _____ CLOTHING _____

_____ OTHER _____

VEHICLE MAKE: _____ MODEL: _____ YR: _____ COLOR: _____ LIC: _____

OTHER VEHICLE INFO: _____

INVESTIGATOR'S RESPONSE: _____

_____ REWARD RECOMMENDED: YES _____ NO _____

INVESTIGATOR'S NAME: _____ DATE: _____

COORDINATOR'S RECOMMENDATION: _____

_____ AWARD AMOUNT: $ _____

COORDINATOR'S SIGNATURE: _____ DATE: _____

Information and form are property of Metro Richmond Crime Stoppers, Inc., Board of Directors

FORENSIC SYNOPSIS

## FORENSIC SYNOPSIS SHEET

FORENSIC DETECTIVE ASSIGNED: Paul Tuttle

OFFENSE REPORT NUMBER: 92-07-13-0016-317    LOCATION: 810 N. Harrison St.

CRIME SCENE DIAGRAM:  YES [ ✓ ]  NO [  ]     CRIME SCENE VIDEO:     YES [ ✓ ]  NO [  ]

CRIME SCENE PHOTOS:   YES [ ✓ ]  NO [  ]     AERIAL PHOTOS:         YES [  ]   NO [ ✓ ]

LAB ANALYSIS SHEET:   YES [  ]   NO [  ]     DRUG ANALYSIS SHEET:   YES [  ]   NO [ ✓ ]

MEDICAL EXAMINER REPORTS:  YES [ ✓ ]  NO [  ]    TOXICOLOGY REPORT:  YES [  ]   NO [  ]

NEIGHBORHOOD:  Carver

HOUSING TYPE:  SINGLE FAMILY [  ]    MULTIPLE FAMILY [ ✓ ]   SUBSIDIZED [  ]

PUBLIC HOUSING:  MOSBY [  ]    WHITCOMB [  ]    BLACKWELL [  ]    FAIRFIELD [  ]
                 HILLSIDE [  ]                  GILPIN    [  ]

BUSINESS TYPE:

WEAPON DESCRIPTION:  38/357/ 9 mm.        RECOVERED:  YES [  ]   NO [ ✓ ]

WEAPON OWNERSHIP:                         STOLEN:     YES [  ]   NO [  ]

SERIAL NUMBER:

FIREARM EVIDENCE:  SPENT BULLETS:     YES [ ✓ ]  NO [  ]
                   LIVE AMMUNITION:   YES [  ]   NO [  ]

LATENT PRINTS COLLECTED:    YES [  ]   NO [ ✓ ]
DENTAL RECORDS AVAILABLE:   YES [  ]   NO [ ✓ ]
HAIRS AND FIBERS TAKEN:     YES [ ✓ ]  NO [  ]

OTHER EVIDENCE COLLECTED:




PERSON DISCOVERED BODY:

RELATIONSHIP:   NONE

ADDRESS:                              PHONE NUMBER:  NONE

IS PERSON A SUSPECT:  YES [  ]   NO [ ✓ ]

HAVE BODIES BEEN PREVIOUSLY DISCOVERED IN RECOVERY SITE:  YES [  ]   NO [ ✓ ]
DESCRIBE CIRCUMSTANCES:

INVESTIGATOR'S NOTES:

DEPARTMENT OF CORRECTIONS
DIVISION OF INSTITUTIONAL SERVICES
UNIFORM COMMITMENT FORM

PAGE: 1
DATE: 07/29/93

INMATE NO: 206197 NAME: ROANE , JAMES H JR

SPN NO: 00218968  SID NO: 592700  FBI NO: 757510DA4

CURRENT LOCATION: 055-ADMINISTRATIVE VERIFICATION

SSN: ▮▮▮▮4306  SEX: MALE  RACE: BLACK

BIRTH: 27OCT1965  POB: RICHMOND CITY , VIRGINIA

AGE: 27  HGT: FT: 6 IN: 01  WGT: 170  BUILD: _____

HAIR: BLACK  EYES: BROWN  COMPLEXION: MEDIUM BROWN

SCARS/MARKS/TATTOOS: TATOO(S) ON ARM, RGHT NONSPEC.

AKA/ALIAS/NICKNAME: JONES , GARY

IN CASE OF EMERGENCY NOTIFY: JEANNETTE ROANE  MA
    STREET OR P O BOX NUMBER: 1184      ST PAUL STREET
    CITY, STATE AND ZIP CODE: RICHMOND    VA 23220
              PHONE NUMBER: AREA CODE: 804 PHONE: 788-4210

MARITAL: SINGLE              TRADE/PROFESSION:

PSYCHIATRIC:
    MEDICAL:
      DENTAL:

                              TESTED GRADE LEVEL:
OTHER:                        LAST GRADE COMPLETED:

CURRENT M/S OFFENSE: 0900-HOMICIDE/MURDER          DOC DATE: 04JUN1993

TOTAL CURRENT SENTENCE: 900-00-000          SENTENCE START DATE: 04JUN1993

PRIOR INMATE NO(S): 177709              MORE PRIOR NO(S)? NO

DETAINER: NO  ISSUED:          TYPE:          CODE:

DISCRETIONARY PAROLE ELIGIBILIT DATE:
    MANDATORY PAROLE RELEASE    DATE:

*------- INMATE CLASSIFICATION(S) -------*  *------- INMATE OFFENSE(S) -------*
DATE    REASON    SCORE/OVER CUSTODY    DATE    INFRACTION DESCRIPTION

# THE RACIAL ORIGINS OF ZONING IN AMERICAN CITIES

By Christopher Silver

From: Manning Thomas, June and  Marsha Ritzdorf eds. *Urban Planning and the African American Community: In the Shadows*. Thousand Oaks, CA: Sage Publications, 1997.

The introduction of zoning in the early 1900s launched a revolution in American land use regulation and planning. Beginning with height regulations in Washington, D.C., in 1899, efforts to control the type and intensity of land use spread to many cities. In 1908, Los Angeles adopted the nation's first citywide "use" zoning ordinance to protect its expanding residential areas from industrial nuisances. Over the next two decades, state legislatures nationwide granted to cities the power "to regulate the height, area, location, and use of buildings in any designated part or parts of their corporation limits." The U.S. Supreme Court's sanction of this exercise of a city's police power over land use came first in *Hadacheck v. Sebastian* (1915), which involved the Los Angeles ordinance, and culminated in the definitive *Village of Euclid v. Ambler Realty Corporation* case in 1926 (see planning-related documents, Part 5A)

The tendency of planning historians to focus on land use regulations principally as a way to shape the built environment and to stabilize land values obscures equally important (and less publicized) social objectives in America's early planning movement. In *Zoning and the American Dream,* Charles Haar points to the diverse interests that coalesced in the early 1900s to create the "remarkable socio-legislative phenomenon" of zoning. Haar contends that a "ragtag grouping of idealists and special interest groups of the most diverse origins" looked to zoning as a tool for social reform as well as land use control.[2] These social reformers believed that zoning offered a way not only to exclude incompatible uses from residential areas but also to slow the spread of slums into better neighborhoods. Reformer/planner Benjamin Marsh championed zoning in the early 1900s in an effort to combat urban congestion and thereby improve the quality of working-class neighborhoods. Despite the obvious social implications of early zoning initiatives, however, the noblest intention of reformers like Marsh soon gave way to political pressures from those less inclined toward broad civic improvement. "What began as a means of improving the blighted physical environment in which people lived and worked," writes Yale Rabin, became "a mechanism for protecting property values and excluding the undesirables." The two interest groups that were regarded as the undesirables were immigrants and African Americans.[3]

Rabin's study emphasizes the "social origins" of zoning and planning in the United States. He notes, as have other scholars, that Southern cities in the early twentieth century used zoning to enforce the newly created system of racial segregation. "While northern Progressives were enacting zoning as a mechanism for protecting and enhancing property values," Rabin observes, "southern Progressives were testing its effectiveness as a means of enforcing racial segregation."[4] Baltimore enacted the first racial zoning ordinance in 1910; within several years the practice was widespread in the region. The racial zoning movement received a sharp reversal in 1917, when the U.S. Supreme Court declared a Louisville, Kentucky racial zoning ordinance unconstitutional. Despite the Court's ruling

in *Buchanan v. Warley,* Southern cities persisted in seeking a legally defensible way to use zoning to control Black residential change. In the place of race zoning per se, Rabin contends, many cities turned to "expulsive zoning," which permitted "the intrusion into Black neighborhoods of disruptive incompatible uses that have diminished the quality and undermined the stability of those neighborhoods." The concept of "expulsive zoning" helps to explain how American cities made the transition from racial zoning to recent zoning that has a decidedly discriminatory impact on Black neighborhoods.[5]

## RACIAL OBJECTIVES OF ZONING

The purpose of this chapter is to examine the "racial" roots of the U.S. zoning movement by examining Southern cities both prior to and immediately following *Buchanan v. Warley*. The racial zoning movement in the urban South demonstrates clearly how certain social objectives were central to the early planning movement. While scholars have examined the racial zoning movement leading up to *Buchanan v. Warley,*[6] they have given relatively little attention to important racial zoning initiatives after 1917. It is in this post-1917 period especially that cities hired prominent planning professionals to fashion legally defensible racial zoning plans.[7] Throughout the early 1900s, and well beyond 1917, racial zoning and its objectives remained a mainstay of many American planners. Racial zoning was not just a manifestation of the backward South out of touch with the mainstream of urban reform. Although the South invented and made wide use of racial zoning, the region relied on Northern planning consultants to devise legally defensible ways to segregate Black residential areas.

Racial zoning practices also transcended the South. Select Northern and Western cities, especially those where the Black population increased rapidly, also experimented with racial zoning. The nation's planning movement, not just its Southern branch, regarded land use controls as an effective social control mechanism for Blacks and other "undesirables." According to H. L. Pollard, a prominent Los Angeles land use attorney, "racial hatred played no small part in bringing to the front some of the early districting ordinances that were sustained by the United States Supreme Court, thus giving us our first important zoning decisions."[8] Chicago, too, was a bastion of racial zoning enthusiasts.[9] Despite evidence that the racial zoning movement was national in scope, it initially concentrated in Southern cities owing to the relative size of the Black community (which ranged between 30 and 50 percent of the population in many places), and it then spread northward and later westward in response to the migration of Southern Blacks.[10]

It is also important to note that Southern cities experimented with racial zoning and comprehensive zoning in tandem with, and not merely in the wake of, land use regulation efforts elsewhere. The 1908 ordinance of Richmond, Virginia, to regulate the height and arrangement of buildings, which was upheld by the Virginia Supreme Court of Appeals in 1910, "was used by proponents of zoning in New York City as a precedent for persuading the city and state legislatures to act favorably on their recommendation," and led to the landmark 1916 zoning ordinance, Also on the basis of the 1910 decision, Richmond drafted and enacted a racial zoning scheme early in 1911.[11] Racial zoning in Southern cities was as much a foundation for overall land use regulations as were regulation of the garment

industry in New York City or encroaching industrial uses in Los Angeles.[12]

The experience in Southern cities suggests that zoning, land use regulations, and comprehensive planning proved to be effective tools to reshape the urban social landscape. Racial zoning persistently failed to withstand legal challenges. Nevertheless, planning that regulated urban development through implementation of master plans and capital improvement programs, as well as through a more subtle sort of "racially informed zoning," helped to create the racially bifurcated social geography of most contemporary American cities. In Southern cities, racial concerns infused a wide array of public initiatives beyond zoning, which explains why urban planning represented such an important component of Jim Crowism in the region. Existing historical scholarship fails to give sufficient attention to the way that planning, in concert with legal prohibitions against racial intermingling, influenced the social development of the New South. At the same time, the social impact of zoning and planning in the urban South has been obscured by the mythology of reform and progress that surrounds the early planning movement in the United States.[13]

Of course, other factors such as income, age and type of housing, real estate practices, and culture contributed to the highly segregated residential patterns of contemporary Southern cities. Yet the racial zoning movement launched what became a comprehensive set of public policies to contain Black residential expansion. Despite the short legal life of racial zoning, it continued to shadow public initiatives in community development as late as the 1960s. In Atlanta, for example, public officials went to great lengths to prove that their efforts to guide the expansion of the Black community in the 1950s were not illegal racial zoning, even though their brand of neighborhood planning effectively defined Black and White areas. By the time Atlanta's leaders ceased to support regulation of Black neighborhood change, the city was almost completely divided spatially between two separate worlds, one Black and one White. In this sense, the racial zoning movement is not just an historical aberration of the pre-civil rights era, but a central feature of American planning history throughout the twentieth century.[14]

EARLY RACIAL ZONING LAWS

The first comprehensive racial zoning ordinance in the United States appeared in the quasi-Southern metropolis of Baltimore in December 1910, although several California cities had for decades employed the "police power" to control the spread of Chinese laundries outside Chinese neighborhoods. Local attorney Milton Dashiel fashioned Baltimore's racial zoning plan immediately following the momentous decision of another attorney, George W. F. McMechen, to move into the fashionable Eutaw Place. With the support of Councilman Samuel L. West, Dashiel's plan to contain Black residents worked its way slowly, but methodically, through both branches of city council, despite immediate protests from Black residents.[15]

Mayor J. Barry Mahool, a nationally recognized member of the "social justice" wing of the Progressive movement, gave unequivocal support to the city's pioneering racial zoning ordinance and signed it into law on December 20, 1910. Like many reformers in Baltimore, Mahool subscribed to the position that "Blacks should be quarantined in isolated slums in

order to reduce the incidents of civil disturbance, to prevent the spread of communicable disease into the nearby White neighborhoods, and to protect property values among the White majority."[16]

Passage of the Baltimore ordinance, which came years before New York City's Fifth Avenue garment retailers even began to organize their pioneering zoning initiative, unleashed a flood of similar laws in Southern cities. Over the next few years, several Virginia cities, including Richmond, Norfolk, Portsmouth, Roanoke, and the town of Ashland, enacted modified versions of the Baltimore plan. Atlanta, Georgia; Greenville, South Carolina; Asheville and Winston-Salem, North Carolina; Birmingham, Alabama; and Madisonville and Louisville, Kentucky also embraced the idea of racial zoning.[17] Others, such as Charlotte, North Carolina; Charleston, South Carolina; Meridian, Mississippi; and New Orleans considered, but did not immediately enact, racial zoning ordinances prior to 1914.[18]

Virginia's racial zoning movement got underway in 1910 as soon as the Virginia Supreme Court of Appeals upheld the constitutionality of Richmond's 1908 act to regulate the height and arrangement of buildings.[19] Virginia's enabling legislation allowed cities to zone their entire area according to race, whereas the Baltimore plan applied only to all-White or all-Black blocks and not to mixed blocks. Richmond's 1911 ordinance, passed just twelve days after enactment of Baltimore's second racial zoning law, stipulated that "a block is White where a majority of the residents are White and colored where a majority ... are colored."[20]

Richmond's residential segregation ordinance received the blessing of the state's highest court in *Hopkins v. City of Richmond* in 1915.[21] The *Hopkins* case became a widely cited defense of racial zoning both prior to and following the Supreme Court's landmark *Buchanan v. Warley*. The *Hopkins* case involved a White and a Black who moved into a house together in a designated "White zone" after enactment of the racial zoning ordinance. The court maintained that Richmond's ordinance did not deny property rights since the complainants moved in following passage of the law. In particular, to counter "taking" objections to racial zoning, it cited the grandfather provisions of the Richmond and Atlanta laws, which allowed property ownership and right to access that property by both races in "mixed neighborhoods." As late as 1927, ten years after the *Buchanan v. Warley* ruling, proponents of racial zoning still pointed to the *Hopkins* case, as well as to a favorable lower court decision involving the constitutionality of Atlanta's 1915 racial zoning law, as proof that at least two state courts placed racial zoning within the legal limits of the police powers of cities.[22]

The courts paid little attention to the social implications of racial zoning, however. The practice of allowing ownership of property by Whites in Black neighborhoods (and, in theory, by Blacks in White neighborhoods) fostered absentee ownership and reduced the incidence of Black home ownership. Even as the Black population of Richmond moved out of its scattered residential enclaves in the early 1900s, and thereby changed the racial composition of other neighborhoods from White to Black, out-migrating Whites tended to rent rather than sell their houses to Blacks. In the absence of new housing construction, the

perpetual shortage of Black housing enabled absentee landlords to profit handsomely from neighborhood turnover. In Richmond, at least, one effect of the short-lived racial zoning law and subsequent controls over Black residential migration was a reduction in home ownership in the Black community.[23]

Both the Baltimore and Richmond racial zoning campaigns drew critical support from local housing reformers. In the case of Baltimore, middle-class reformers paid particular attention to blighted housing conditions in the predominantly Black Seventeenth Ward. A 1907 report illuminated "the horrors of the slums and the plight of the slum-dwellers" and offered various improvement strategies, such as model housing, enactment of housing codes and building regulations, and removal of alley dwellings. Although the city took no formal action on the 1907 report, interest in controlling the spread of blighted housing logically translated into support for racial zoning as Blacks crossed the color line after 1910 in search of better housing. Like their leader in the mayor's office, Baltimore's housing reformers offered no resistance to Dashiel's plan for regulating neighborhood change.[24]

Richmond's reform movement produced its own catalog of housing horrors when the Society for the Betterment of Housing Conditions published an equally graphic depiction of the city's dilapidated Black neighborhoods. Released in 1913, the Society's report made no direct reference to racial zoning as a remedial action but, instead, concentrated on housing codes, building regulations, removal of alley dwellings and, especially, the need for new model housing. The 1913 report, which appeared while the city's racial zoning law was still in force, did note the importance of determining appropriate areas for new Black residential development to eliminate the demand for substandard housing in deteriorated areas. If nothing else, its silence on the matter of racial zoning served as a tacit endorsement.[25]

A third factor, besides concern over housing blight and Black encroachment in existing White neighborhoods, explains the sudden widespread interest in racial zoning among Southern cities. One assessment of the origins of neighborhood associations in Baltimore suggests that the quest for a permanently restructured city, with neighborhoods functioning as separate "urban islands," increased the appeal of the legal sanctions afforded by zoning. At a 1911 Citywide Congress of Neighborhoods in Baltimore, attended by delegates from forty-one improvement and protective associations, participants debated the merits of improving housing through either cooperation or barriers to social interaction.

While a handful of delegates believed that "social problems" could be corrected through cooperation, especially by clearing and rebuilding "undesirable neighborhoods/' the Congress officially rejected cooperation in "favor of the more 'practical' segregationist policies advocated by the city planner."[26]

In Atlanta, the objective of racial zoning was legalized separation of the city into separate racial worlds. The city's racial zoning ordinance, enacted on June 16, 1913, followed the Baltimore formula except that, like Richmond, it assigned a racial designation to every city block based on the existing majority of the residents, not just to those that were already all-

White or all-Black. While Baltimore reformers were engaged in a study of blighted housing conditions in 1906, Atlantans were caught up in a violent race riot. Instigated, in part, by the "reckless anti-Negro agitation" of gubernatorial candidate Hoke Smith and his journalistic supporter, Tom Watson, the Atlanta race riot resulted in the deaths of twenty-five Blacks as White mobs assailed the city's Black residents.[27]

Ever the exponent of moderation and conciliation, Booker T. Washington rejected the view that the Atlanta riot represented a step backward in race relations. Rather, he contended, it provided an opportunity for "reconstruction." E. Franklin Frazier lent support to this view. Writing from Atlanta in 1923, he noted that the city's Black community began to organize itself following the 1906 riot. Not only was "segregation shutting out colored people from the wider community of Atlanta" but the Black community shifted from the eastside to the westside and separated from the White neighborhoods. As demographic factors propelled shifts in Black settlement, the prospect of controlling residential change through zoning gained widespread support among White Atlantans.[28]

Atlanta's racial zoning ordinance failed its initial court test in 1915, when the Georgia Supreme Court ruled that the law violated state and federal protection of "rights in property acquired previous to its enactment."[29] When Atlanta revised its ordinance to exempt residences acquired before passage of the ordinance, the Georgia high court sustained the city's racial zoning plan in 1917.[30]

The euphoria of Georgia's segregationists faded quickly, however, when the United States Supreme Court unanimously struck down a Louisville, Kentucky racial zoning ordinance later that year. In the landmark decision, *Buchanan v. Warley,* the Court ruled unanimously that the denial of the full use of property "from a feeling of race hostility" constituted inadequate grounds to uphold the Louisville racial zoning ordinance.[31] With such an unequivocal ruling from the nation's highest court, lower courts fell into line and overturned existing and subsequent racial zoning schemes. *Buchanan* did not end the racial zoning movement, however, but merely shifted it to new ground, as will be noted later.

Nonetheless, long after the 1917 decision, racial zoning proponents lamented the restrictions imposed by the *Buchanan* case. As late as 1926, in a study of the housing conditions of Blacks in several Virginia cities, Charles Knight lamented the inability of state and local governments "to keep separate Negro and White residential sections" through the use of zoning. "The results of this course," he maintained, were "to increase friction between the White race and the Black" and to exacerbate already deplorable housing conditions in existing neighborhoods.[32] In the concluding section of an analysis of various municipal zoning and segregation ordinances in 1927, George D. Hott warned that the commingling of the homes and places of abode of White men and Black men gives unnecessary provocation for miscegenation, race riots, lynching, and other forms of social malaise, existent when a childlike, undisciplined, inferior race is living in close contact with a people of more mature civilization.

He hoped that public opinion may come to preponderate so strongly in favor of sustaining municipal race segregation ordinances, drafted so as to be reasonable and not to deprive of

previously acquired property, that they will ultimately be held constitutiona1.[33]

The *Virginia Municipal Review* contended that "a gradual and natural encroachment of the colored population into White neighborhoods" was the obvious consequence of an unregulated residential market. Given that Richmond's racial zoning ordinance fell under the authority of the *Buchanan* decision, the editor noted that the city found itself "face to face with a problem of increasing significance whose solution deserves the thought and discussion of leaders of both races."[34]

## RACIAL ZONING AFTER BUCHANAN V. WARLEY

The decade following the *Buchanan* decision saw numerous efforts to fashion a legally defensible racial zoning system in Southern cities and in scattered areas outside the region. Atlanta, Indianapolis, Norfolk, Richmond, New Orleans, Winston-Salem, Dallas, Charleston, Dade County (Florida), and Birmingham, to name only the most prominent places, passed new racial zoning legislation after 1917. Many others discussed the topic seriously and looked to consultants to find a workable approach to planned apartheid.

This new movement to legalize residential segregation was different in several ways, however. Most of the residential zoning laws fashioned prior to 1917 were the work of non-planners who recognized the potential of land use regulation to achieve social objectives. After 1917, cities preferred to engage professional planners to prepare racial zoning plans and to marshal the entire planning process to create the completely separate Black community. The *Buchanan* decision undermined the use of zoning to segregate explicitly by race but not the use of the planning process in the service of apartheid. Charles Knight noted in the case of Virginia that cities employed sections "designated as Negro residential areas." Even if they did not legally enforce land use, these designations guided public and private developments. Data supplied by planners made it possible to monitor and influence land use trends based on social criteria.

In this way, racial zoning still operated in practice if not in law, reinforced by a planning process that supported the creation of a racially bifurcated society. In Knight's view, this was not necessarily detrimental to Blacks, however. He contended that planning was not an impediment to Black community development but rather an essential ingredient in the full realization of a segregated metropolis. Rather than thwarting Black social development, "zoning laws should preserve the residential character of the (Black) areas." Black neighborhoods "should be desirably located with respect to topography, industry, and convenience as the White areas," and should be large enough to accommodate future population growth. Finally, he observed, Black neighborhoods should benefit from "all necessary municipal services-paving, city water, sewers, electricity, fire and police protection," as well as sufficient parks and playgrounds and laws "to prevent housing and land crowding."[36]

The community development strategy outlined by Knight required far more than zoning laws to prevent cohabitation in neighborhoods on the basis of race. To bring about a totally separate Black community necessitated a comprehensive planning effort. This is what

happened in a number of Southern cities. In the wake of the *Buchanan* decision, racial zoning gave way to the broader notion of a race-based comprehensive planning process. Its ideal form, as Knight suggested, implied fundamental community improvements previously denied Blacks. In practice, however, race-based planning proved to be an ineffectual strategy for Black community improvement, although it did help create the segregated city.

The 1920s brought continued efforts to fashion a legally defensible racial zoning system in tandem with comprehensive city planning. Also, race-based planning spread into new places. Birmingham, Alabama, was one of the new converts to racial zoning as well as the broader version of race-based planning. Although the city lacked an official planning body, it hired Warren Manning, a Boston landscape architect, as its planning consultant and released the "City Plan of Birmingham" in 1919. The Manning plan offered a series of general recommendations about land use, transportation, and civic improvements for a city that during the previous decade increased its land area sevenfold and its population by 150,000 persons.[37]

Although slow to embrace the full range of planning proposals, especially the expensive items such as a new civic center, parks, and new roadways, city commissioners quickly recognized the need to control land uses in the midst of hectic development. In 1925, the city enacted a modified racial zoning ordinance "to protect the property holders against manufacturing plants and comer grocery stores which tend to spring up promiscuously about the city and to restrict the negroes to certain districts."[38] As late as 1926, Birmingham's zoning system provided for the rigid racial separation of residential areas, although it permitted property ownership by one race in districts allocated to members of the other race. The city commission used its power to issue or revoke building permits to prevent "construction of Negro housing contiguous to White neighborhoods." Racial zones dictated Birmingham's residential development patterns from 1926 to 1949.[39]

Robert Whitten's Atlanta Zoning Plan of 1922 was a prominent post-*Buchanan* attempt to link legalized residential segregation to comprehensive planning. Actually, what Whitten proposed differed little from the City's original "unconstitutional" racial zoning scheme, except that it employed the nomenclature of conventional zoning along with racial designations such as: R1-White district; R2-colored district; and R-3-undetermined. Whitten defended racial zoning on the grounds that the Atlanta plan allowed "adequate areas for the growth of the colored population," that residential separation would instill in Blacks "a more intelligent and responsible citizenship," and that racially homogeneous neighborhoods promoted social stability. Even in its new guise, Atlanta's racial zoning plan failed to survive its initial court challenge.[40]

This renewed attempt to institute racial zoning took place within the context of a major metropolitan planning initiative, under the guidance of planning consultant Warren Manning, to make Atlanta "a beautiful, orderly place, the wonder city of the southeast."[41] Even though the explicit racial designations in the city's zoning ordinance had to be excised, Atlanta still pursued the "controlled segregation" objective of race-based planning over the ensuing decades. According to the 1922 plan, Atlanta's Black residential

expansion was to be confined to the west and southwest sections of the city. That was, in fact, exactly the direction of Black residential expansion from the 1920s onward, even though the traditional heart of the Black community was in east Atlanta.[42]

Another newcomer to the racial zoning movement in the 1920s was New Orleans. Although the Crescent City discussed the implementation of racial zoning prior to *Buchanan,* not until the city secured zoning authority in 1921 did it attempt to frame an ordinance "to evade the ruling of the Supreme Court."[43] In 1923, New Orleans created an official city planning commission—being the first Southern city to do so—and quickly drafted a preliminary zoning ordinance. Two years later, the city created another advisory group, the Vieux Carre Commission, to suggest to city council ways "to protect the old colonial city from 'the encroachment of modern business.'"[44] In 1927, the city hired Harland Bartholomew to begin work on a master plan.[45]

Entwined within this sweeping set of planning initiatives was a racial zoning scheme. The New Orleans ordinance stipulated that Blacks could not occupy a house in a White block or a White person in a Black block unless the prospective occupant obtained written permission of a majority of the residents already in the block. Although sustained by a lower court, the Louisiana Supreme Court reversed the decision. The New Orleans race-based occupancy-by-permission-slip zoning arrangement proceeded to the nation's highest court for review. It was debated on March 8, 1927, virtually in the shadow of the landmark *Euclid* decision that sanctioned zoning. A week later, the court rejected the New Orleans ordinance, citing *Buchanan v. Warley* as the guiding precedent in its decision. While the decision was not unexpected, it is interesting to note how New Orleans attempted to frame its defense in terms of planning to achieve social rearrangement, not just property protection. The New Orleans city attorney contended that racial zoning was not merely an exercise of the authority recently upheld by the Court in the *Euclid* decision but also a corollary to an earlier court decision in *Plessy v. Ferguson* (1896). New Orleans argued that zoning and comprehensive planning should join the host of legal Jim Crow strategies being employed to transform the racially integrated Southern city into a bifur-cated racial world.[46]

In Charleston, South Carolina, another city that hopped onto the planning bandwagon in the 1920s, racial zoning took a backseat to historic zoning but it was, nonetheless, integral to the city's comprehensive plan. At the urging of the Society for the Preservation of Old Dwellings in Charleston, the city hired a planning consultant, Morris Knowles of Pittsburgh, to prepare a zoning ordinance "sensitive to the unique heritage of Charleston." In conjunction with the zoning ordinance, which was the first in the nation to contain explicit protection for a designated historic district, Knowles prepared a general plan that included recommendations for street widenings and new thoroughfares, new schools and parks, and the creation of different land use districts. The plan also delineated separate residential districts for Blacks and Whites, although explicit racial labels were left out of the official zoning nomenclature.[47]

It is significant not only that Charleston still experimented with racial zoning as late as 1931 but also that it was one of the first cities to link racial exclusion to neighborhood

preservation. According to the Knowles general city plan, the area embraced by the newly created Old and Historic District, which in 1931 still contained several thousand Black residents, was to become White. The testimony of local preservationists indicates that displacement of Blacks from the historic area was one of the implicit goals of the plan and a desired outcome of neighborhood revitalization.[48]

John Nolen's 1928 comprehensive city plan for Roanoke, Virginia, provides another example of how Southern cities, with the assistance of their planning consultants, dealt with zoning as a social control device in the aftermath of the U.S. Supreme Court's strictures against racial zoning. Nolen's 1928 plan constituted an expanded version of his 1907 "beautification" plan for Roanoke. Nolen acknowledged in his update that "Roanoke has shown inclination to include negroes of the city when making improvements for the betterment of the city as a whole."[49] Unlike Whitten in Atlanta, however, Nolen did not recommend explicit racial zoning, not simply because it would fail legally but also because its intent seemed to be a *fait accompli* by the late 1920s. Blacks in Roanoke were already segregated. As indicated in his Map of Existing Conditions, "negro residences" were concentrated south of Washington Park, with only a small pocket of Black households congregated adjacent to the Norfolk and Western railroad tracks to the west of the downtown.

Nolen dealt with the rationale behind residential segregation in a separate, one-page (two-paragraph) section of the plan titled" Areas for Colored Population." Here he noted that "zoning will protect their homes from the encroachment of business and industry in the same manner as in all other sections of the city."[50] As to what land uses would be allowed in existing Black neighborhoods, the 1928 plan remained silent. The "Existing Conditions" map treated Black neighborhoods as "special" areas without reference to the sort of land use classification scheme employed in White areas. Rather than establishing explicit racial residential zones, Nolen noted only that "general expansion (of Black residences) coordinating with that of the whole city will be an important part of the city planning program."[51]

One further example of the initial *post-Buchanan* approach to racial zoning can be seen in another Nolen project, the planning of the resort city of Venice, Florida, in the mid-1920s. While the impetus for Venice was the Florida coastland boom of the 1920s, and the desire to market property to the state's affluent new migrants, as a Southern new town, Nolen had to make a place for Black residents. As Nolen noted,

> In all Southern developments adequate provision for the negro working population is of great importance....The only satisfactory answer is the setting aside of a tract large enough (and yet not too large), and planning it completely for negro village life.[52]

Nolen first outlined his rationale for a separate "village" in his plan for Kingsport, Tennessee, a decade earlier. The Kingsport plan included: a negro village of a high order with their own schools, churches, lodges, etc., providing the same grade of housing and general development as is furnished the White population of the same economic

condition.[53]

Nolen regarded Kingsport's Armstrong Village as an alternative, as he put it, "to the squalid 'Nigger-districts' so common in Southern communities."[54]

Nolen resurrected the village scheme for his work in Venice, proposing a community of substantial house lots (50 by 200 feet) and space for other amenities of community life, including a small park, a village square for stores and community buildings, four church sites, a community school, and a swimming lake. Although the developers of Venice had Nolen reduce the size of the house lots and increase their number, the village was never built. The fate of the Negro Village for Venice may be explained by the general condition of many plans prepared by Nolen and others involved in the Florida land boom. As John Hancock put it so aptly, "City planning in Florida typified the twenties dilemma of not wanting to be without a plan and not wanting to do anything about it once made."[55]

When it came to implementing plans for model Black communities in Southern cities, the dilemma was not quite so profound. As an alternative to merely segregating Blacks in the least attractive sections of existing towns and cities, the Negro village or new community approach seemed too grandiose and, hence, unnecessary.

BEYOND RACIAL ZONING: PLANNING IN THE 1930s AND 1940s

By the 1930s, the racial zoning movement had run its course. This is not to suggest that the racial imperatives of zoning disappeared, however. The 1930s and 1940s constituted an important period in local planning since many cities had just recently devised plans that called for separate Black sections regulated in various ways. Federal initiatives in public housing and slum clearance provided additional resources for reconstructing the social landscape, and Southern and non-Southern cities eagerly participated in these efforts. With these new tools for social engineering, Southern cities ceased to confront head-on the legal objections outlined in the *Buchanan* decision. In Virginia, for example, the final court test of Richmond's racial zoning plan occurred in 1929 when a Black property owner brought suit after being denied access to a house he owned in a "White" neighborhood. Resting squarely on the 1917 Supreme Court decision, a federal circuit court of appeals upheld a lower court ruling that the city's ordinance was intended to restrict property use on the basis of race and declared the city zoning law unconstitutional.[56] A state court struck down a general zoning ordinance in Winston-Salem, North Carolina, which provided for racial districts. Birmingham continued illegally to enforce a racial zoning code until 1951.[57]

The substitute for racial zoning was a race-based planning process that marshaled a wide array of planning interventions in the service of creating separate communities. Street and highway planning served as a means to erect racial barriers as early as the 1920s.[58] The siting of public housing projects explicitly (and legally) for Black occupancy proved particularly effective in furthering residential segregation. Slum clearance, neighborhood planning, private deed restrictions, and racially charged real estate practices all served the cause of segregation as effectively as racial zoning. As the planning movement abandoned efforts to create a legally defensible system of racial zoning, support for race-based lanning

moved outside the Southern region.

All of the nation's major cities, especially those outside the South, experienced huge increases in Black population after 1940. The ensuing battle between Blacks and numerically declining Whites for space in the center city produced "powerful social consequences." While it may be too much to argue that the national urban planning movement was consumed by racial issues beginning in the 1920s, it is fair to suggest that a widely shared underlying premise of planning was the need to pursue community improvements within the context of separate racial worlds. Planners such as Nolen proposed opportunities to realize substantive community improvements under the aegis of apartheid, but rarely were these ideals realized. Indeed, as the planning movement expanded beyond racial zoning to "racially informed comprehensive planning," it became more difficult to distinguish between planning for general community improvement and planning merely to reinforce and sharpen "the color line." The widespread practice of communities seeking to exclude "undesirables" through exclusionary zoning had its greatest impact on African Americans (see Ritzdorf, Chapter 3).[59]

Both public housing and urban renewal exemplified the difficulty of positively addressing the problems of the Black community within the murky context of race-based planning. Black leaders and citizens were wary of, and in some cases openly hostile toward, low-income housing projects as early as the 1930s, even though reformers and planners maintained that an impoverished group was being offered substantially improved housing and community facilities. Of course, some opposition by African Americans stemmed from expropriation of land from some Blacks to build public housing or carry out the slum clearance. Still, the land expropriation cannot explain the depth of the hostility to an otherwise legitimate community improvement effort.[60]

The explanation may lie in the experiences of the previous two decades, in which the motives for planning, not only in the urban South but also in the inner-city communities of the North, became clearly associated with the prerogatives of race-based planning. The legacy of the racial zoning movement had an enduring influence on how Blacks perceived the methods and intentions of city planning. In urban communities throughout the South, beginning in the 1930s, Blacks quietly but decidedly launched a tradition of challenging the ideas of their supposed benefactors, the city planners. At times, the planning legacy of racial zoning may have blinded Blacks to the benefits of certain community projects and planning approaches. As African Americans emerged as a dominant social and political force in American cities in the 1960s, planners quickly discovered that they had cultivated some rather strident opponents. Among their Black clients, in particular, the social legacy of the early zoning movement lived on in the politics of urban America, and challenged planners to adopt a more inclusionary approach to urban development.

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name: ROANE, JAMES H JR | | Reg #: | 32923-083 |
| Date of Birth: 10/27/1965 | Sex: M   Race: BLACK | Facility: | THP |
| Encounter Date: 02/22/2012 14:32 | Provider: Norris, Karl RN | Unit: | X02 |

Emergency encounter performed at Housing Unit.

**SUBJECTIVE:**

> **COMPLAINT 1**       **Provider:** Norris, Karl RN  *K— 22 RN*
>
> **Chief Complaint:** Altercation/Fight
> **Subjective:**   Inmate c/o SHOB/Stab wound to left middle lateral neck
> **Pain Location:**
> **Pain Scale:** 5
> **Pain Qualities:**   Sharp
> **History of Trauma:**
> **Onset:**   <30 Minutes
> **Duration:**
> **Exacerbating Factors:**
> **Relieving Factors:**
> **Comments:**

**OBJECTIVE:**

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 02/22/2012 14:15 THX | | 86 | Via Machine | | Norris, Karl RN |
| 02/22/2012 14:09 THX | | 80 | Via Machine | | Norris, Karl RN |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 02/22/2012 | 14:15 THX | 24 | Norris, Karl RN |
| 02/22/2012 | 14:09 THX | 28 | Norris, Karl RN |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 02/22/2012 14:15 THX | | 121/88 | Right Arm | Lying | | Norris, Karl RN |
| 02/22/2012 14:09 THX | | 117/68 | Right Arm | Lying | | Norris, Karl RN |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 02/22/2012 | 14:15 THX | 98 | Oxygen 15 L | Norris, Karl RN |
| 02/22/2012 | 14:09 THX | 81 | Room Air | Norris, Karl RN |

**Exam:**

**ASSESSMENT:**

> Laceration(s)
> A medical emergency was called in the SCU (Special Confinement Unit) Upon arrival to the SCU this inmate along with escorting officers met medical staff and Lt's at the entrance of the SCU. Inmate is believed to be stabbed by a sharpened steel weapon approximately 9 inches, Ambulance was called at this time. Inmate was placed on a backboard with elevation of the head due to the inmate c/o SHOB. Inmate was taken to medical on a stretcher and brought to the urgent care room. The inmate was transferred to the bed from the stretcher. 15 LPM of 02 applied by non-rebreather, Vitals

Generated 02/22/2012 15:05 by Norris, Karl RN          Bureau of Prisons - THP          Page 1 of 2



| | | | |
|---|---|---|---|
| Inmate Name: ROANE, JAMES H JR | | | Reg #: 32923-083 |
| Date of Birth: 10/27/1965 | Sex: M Race: BLACK | | Facility: THP |
| Encounter Date: 02/22/2012 14:32 | Provider: Norris, Karl RN | | Unit: X02 |

obtained, Bilateral IV's initiated 18g right AC of normal saline wide open, 20g Left AC Normal saline wide open, Both initial IV attempts successful, Approximately 300cc infused, Inmate is AOx3, PERRL, Skin Pink Warm and Diaphoretic, No JVD, Respiration clear equal bi lateral, No pulmonary edema upon auscultation of all lung fields, Equal rise and fall of chest, Laceration/Puncture noted to left neck approximately 3 cm in length with depth unknown, No air exchange through the wound, Bleeding controlled with pressure although hematoma noted to anterior neck left of trachea approximately quarter dollar in size, No tracheal deviation noted, No subcutaneous emphysema noted, No distention to ABD, pulse motor sensory x4 extremities, No other trauma noted throughout this inmates body. Report given to ambulance crew and care turned over.

**PLAN:**

**Disposition:**

Transfer to Local Hospital

**Patient Education Topics:**

| Date Initiated Format | | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 02/22/2012 | Counseling | Plan of Care | Norris, Karl | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** Yes
**Telephone/Verbal Order:** No

Completed by Norris, Karl RN on 02/22/2012 15:05
Requested to be cosigned by Wilson, William E. MD/CD.
Cosign documentation will be displayed on the following page.
Requested to be reviewed by Ndife, Z. MLP.
Review documentation will be displayed on the following page.

App.0924

Case 3:92-cr-00068-DJN Document 17-9 Filed 07/22/20 Page 24 of 26 PageID# 1073

# Williams: Richmond's segregation is by design

**MICHAEL PAUL WILLIAMS**

**mwilliams@timesdispatch.com | Posted: Monday, April 20, 2015 10:00 pm**

A lot of hard work went into the segregation of Richmond.

After all, this was a place where black people, free and enslaved, lived in close proximity to white people in the 19th century, and where Jackson Ward, a historically black enclave, originally housed a large German immigrant community.

But the progressive land-use reform movement of the early 20th century, intended to improve the quality of working-class neighborhoods, paradoxically laid the groundwork for the racially and economically segregated communities of the 20th and 21st centuries.

"The nation's planning movement, not just its Southern branch, regarded land use controls as an effective social control mechanism for Blacks and other 'undesirables,'" wrote Christopher Silver, a former professor of urban studies and planning at Virginia Commonwealth University, in "The Racial Origins of Zoning in American Cities."



## JACKSON WARD

Construction of parts of the Richmond-Petersburg Turnpike - now Interstate 95 - steamrolled through Jackson Ward and other black communities. This 1957 photograph gives a view of the construction looking east from Chamberlayne Avenue. But spared was the 6th Mount Zion Baptist Church.

Baltimore, in 1910, became the first city in the nation to adopt a race-based zoning ordinance. Richmond would enact its own ordinance the following year designating where blacks and whites could live.

"More particularly, it was designed to prevent blacks from moving into white neighborhoods," says John V. Moeser, a senior fellow at the Bonner Center for Civic Engagement at the University of Richmond and a professor emeritus of urban studies and planning at VCU.

Richmond's ordinance was upheld by the Supreme Court of Virginia in Hopkins v. City of Richmond, a 1915 case involving a black person and a white person who had moved together into a house in a designated "white" zone.

Two years later, the U.S. Supreme Court declared racially biased zoning unconstitutional in Buchanan v. Warley. But the ruling pertained to public policy, not private real estate transactions.

The result was an increase in restrictive covenants in deeds, which weren't outlawed until 1948. Moeser recalled that when he and his wife purchased a home in the Carillon neighborhood in the 1970s, its deed had

App.0925

Case 3:92-cr-00068-DJN Document 17-9 Filed 07/22/20 Page 25 of 26 PageID# 1074

an X-ed out covenant prohibiting the sale of the house "to any person not of the Caucasian race or Christian religion."

Also in the aftermath of Warley, what Richmond did "was to essentially effect the same outcome by doing it based on the state's racial purity laws," said Moeser, referring to the 1924 Racial Integrity Act designed to prevent the mixing of the races.

What followed was the embrace of eugenics in Virginia, with its proponents in the Old Dominion and Nazi Germany becoming correspondents, Moeser said. The result, when coupled with the state's anti-miscegenation law, could be tragically absurd. One short-lived Richmond zoning ordinance, overturned by the Supreme Court, dictated that a person could not live in a neighborhood where they couldn't marry a resident.

Without zoning laws in the toolkit, the private sector became the instrument of housing segregation in Richmond and beyond.

Newspapers, including the Richmond Times-Dispatch, had dual home listings for blacks and whites.

The lending industry began redlining in the 1930s, shading in red on a map areas deemed unfit for investment. The Federal Housing Administration prohibited the sale to any home purchaser in a neighborhood whose population was "inharmonious" with the prospective homebuyer, Moeser said. The practice stunted the opportunity for black homebuyers to get an FHA loan in the suburbs.

The absurdity of this practice was laid bare in the 1940s, when residents in adjacent black and white neighborhoods of Detroit couldn't obtain an FHA loan because of their proximity to an "inharmonious" racial group. The solution, at least for loan-seeking white residents, was the construction of a foot-thick wall between the communities.

As Richmond's black community expanded to such neighborhoods as Barton Heights, Highland Park and Byrd Park in the 1950s and '60s, the real estate industry took advantage through "block busting," a predatory practice that allowed it to purchase properties at a discount from panic-stricken whites and sell them at an inflated price to black homebuyers. The industry also engaged in steering of homebuyers toward or away from certain neighborhoods based on race.

Elected and public officials, meanwhile, were among those who adjusted to the demise of race-based zoning laws.

"The substitute for racial zoning was a race-based planning process that marshaled a wide array of planning interventions in the service of creating separate communities," wrote Silver, now dean of the College of Design, Construction and Planning at the University of Florida.

"Street and highway planning served as a means to erect racial barriers as early as the 1920s. The siting of public housing projects explicitly (and legally) for Black occupancy proved particularly effective in furthering residential segregation. Slum clearance, neighborhood planning, private deed restrictions, and racially charged real estate practices all served the cause of segregation as effectively as racial zoning."

App.0926

Case 3:92-cr-00068-DJN Document 17-9 Filed 07/22/20 Page 26 of 26 PageID# 1075

In Richmond, that playbook can be seen in the mass demolition of neighborhoods such as Fulton, the decimation of black neighborhoods by Interstate 95, and the concentration and isolation of poverty.

The Fair Housing Act of 1968 ostensibly ended redlining, expanding homebuying opportunities for African-Americans, who joined whites in an exodus from the city to the suburbs. "A lot of the black neighborhoods, that's when they began to collapse," said Moeser, citing the departure of black teachers, lawyers, professionals and civic leaders who helped serve as their glue.

As concentrated poverty became racially defined, Richmond's urban neighborhoods gentrified, pricing out black renters. This flight of the urban poor and an influx of immigrants have led to a dramatic increase in poverty in Chesterfield and Henrico counties. Meanwhile, for the first time since 2010, growth in exurban counties is exceeding that of the urban core, according to an analysis by the Brookings Institution.

The walls that divide the Richmond region by class and race are so profound that we hardly need the sort of physical barrier once erected in Detroit. But they are not so impermeable as to prevent the spread of poverty to the suburbs.

Public policy and private-sector practices created this segregated terrain. This intended outcome can be undone only by intentional actions.

## Public Square 56: Why is Richmond still segregated?

At the Richmond Times-Dispatch's next Public Square, we'll explore the issue of segregation in the region. The 56th Public Square will be held from noon to 1:30 p.m. Thursday in The Times-Disp…

## Study cites lack of affordable housing in area

A lack of affordable housing has direct ties to Richmond's legacy of racial segregation and has resulted in less diverse neighborhoods than ever before. And it's leading to calls for regional …

App.0927