**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| THE UNITED STATES OF AMERICA | : | |
| | : | Crim. No. 3:92CR68 |
| v. | : | |
| | : | |
| JAMES H. ROANE, JR. | : | |
| | : | |

**APPENDIX VOL. XI**

**App. 0936-1026**

Today is January 28, 1992, 10:55 a.m.  Being interviewed is Priscilla Juliette Green, 1018 W. Clay Street.  Priscilla is not being charged with any crime, she is being interviewed reference to homicides that occurred in the area of 1200 block W. Clay Street and the 1100 block W. Leigh Street, involving a subject known as Little Doug, Maurice and Katrina Rozier.  Priscilla we talked a little bit before we turned the tape off.  Present in the interview is Det. Allan Reid, Det. Billy Blaylock, and myself, Det. Steve Dalton.  We served a Circuit Court capias on you.  Have we made any promises to you at all?

Green:      No.

Dalton:     Okay.  You hesitated a little bit, I think we did promise you that we would protect your identity for your cooperation, is that correct?

Green:      Yeah.

Dalton:     But as far as the charges go, we just said that we would check into them but we could not make any promises on them, is that correct?

Green:      Yes.

Dalton:     Okay.  Are you saying that you want to go ahead and tell us what happened to these three people, Little Doug, Maurice, and Katrina Rozier?  We are just going to let you talk.

Green:      As long as you all promise that I will be protected.

Dalton:     You will be protected.  Your identity will be protected 100%.

Green:      Okay.

Dalton:     Just start off with Little Doug, tell us about Little Doug, what happened to him.

Green:      (can't understand) all right.  It is three of them        1200 block Clay Street.  All right.  Me and Cliff, we were sitting in the room, so uh G. R., Whitey, came in there, so they had told me to excuse myself cause they had a tape player and I was in the kitchen while they was in the room. All right, so really didn't nobody (can't understand) about the chase.  So Cliff was telling me, this guy Linwood Carter, okay, he promised to take them around.  So when I opened the door to let him in, I said what are you all doing out there, I can hear the tape all the way outside, you know, I figured there had to be something that was wrong when they get in a little huddle like that.  All right, so, then Cliff told me,        table, Cliff told me yeah you run your mouth so much, so what is wrong.  Some of the boys think that you heard the tape.  I said well what is wrong with the tape, see what I'm saying.  But see you don't like to be around cause that is not him.  So next thing I know he had uh, Cliff had said nothing to me, then I was just sitting in there on the bed, they had left and came back. So Darwin came in there with him, with J.R. and Whitey.  Then they asked us to leave for a minute, so we talked to Doug, asked what is going on. So we went on outside.  Me and Cliff and Sandra was standing on the corner, like going to White's Market

2

Dalton:    Right.

Green:    and J.R. was going down the street so as I heard Cliff and J.R. must have gone to get uh what is his name, KK.                    killing this fool. As so we heard somebody in there hollering and I said Cliff what the hell is that noise coming from, somebody hollering duck.  So Cliff had called J.R., come on let's go back in the house, but J.R. had already knew, you know, what had happened, so.  As I heard that the girl when she was selling drugs, what is her name, uh, little colored guy that live on North Street sell drugs up there with him. (can't understand) motel up there on North Street.

Dalton:    Are you talking about the other girl that got killed?

Green:    No, this girl, Marie uh huh.

Dalton:    Short girl that got arrested for Maurice?

Green:    Uh huh.

Dalton:    Okay.

Green:    So, we're trying to find out, she had set Maurice and Doug up, she had a tape, right.  The tape in the house playing and what is she played the tape for them, for J.R., Whitey and them.  The other day when she got locked up Maurice didn't get her out of jail or something.  That was the reason for her to set that up.  Follow me.

Dalton:    Okay.  You are saying the tape.  You are talking about the video tape?

Green:    No, a cassette tape.

Dalton:    What is on that cassette tape?

Green:    See I didn't hear that tape.  When the tape was set up, she had the tape set up at her house, okay, well Doug supposedly killed Whitey, that it all boils down to.  Doug was setting

Dalton:    Doug was supposed to kill

Green:    Kill them.

Dalton:    Kill Whitey?

Green:    Uh huh.  Yeah and it fell right in line, cause after the tape was played that is when Doug came to the house.

Dalton:    Do you know where the tape is at now?

Green:    No, as far as, I don't know what they did with the tape.  I don't know if they destroyed the tape or what.

Dalton:    Okay.  Let's step back to this a minute.  You heard the hollering help inside the house

3

Green:      Okay, back to that okay.

Dalton:     by Little Doug.  Who was in the house when he was hollering help?

Green:      Wasn't nobody but Whitey.

Dalton:     Just Whitey?  Did you hear any gun shots?

Green:      We heard, Cliff and them was on the way in the house, or was in the house, (can't understand) but we heard three (3) gun shots, it was three.

Dalton:     Okay.  You heard three gun shots, Whitey was the only one in the house, Cliff and J.R. were headed back to the house.

Green:      Back to the house.

Dalton:     Okay.

Green:      Doug jumped out the window.  He jumped out the window.  So we left.

Dalton:     Okay, so.  Little Doug jumped out the window?

Green:      Out of the room, uh huh.  Then J.R., we was going to leave, and J.R. said no, that he can't be dead, see what I'm saying.  Then J.R. went back and finished him off with a knife.

Dalton:     J.R. is the one that stabbed him?

Green:      Uh huh.

Blaylock:   You saw J.R. stab him?

Green:      He had the knife.

Dalton:     What type of knife?

Green:      We left and went around the corner, he was the only one left around there.

Dalton:     What type of knife was it?

Green:      I don't know.

Dalton:     But you heard him say, he can't be dead, and he went back up there with a knife in his hand?

Green:      Uh huh.  I mean he had the knife, you could see like a handle on the knife, he didn't pull it out so we could see it.

Dalton:     Did you actually see him stab him, Little Doug?

Green:      He was the only one.  we heard him hollering, we be going around the corner, J.R. was the only one that went back around there. Wasn't nobody else out there.

4

Dalton:    Okay. Where was Whitey at that time?

Green:    Whitey had run out. Whitey had left after the gun shot went off. See what I'm saying. Whitey was gone.

Dalton:    Was there anything unusual about the mirror in your house before all this started?

Green:    No,

Dalton:    Were there any gun shot holes in your mirror in your bedroom?

Green:    No, not as a I know of. I ain't look.

Dalton:    No bullet holes in your mirror? Okay. Whitey was inside, you heard the three shots, okay. J.R. and Whitey and who else first came there?

Green:    Cliff. Who is that other one. Doug.

Dalton:    Not Doug, you said somebody else had brought drugs around to them.

Green:    Oh, some drugs. Who was out there, okay somebody else. (can't understand) called his brother C.O., then they got another one there, these boys they can't have came from New York, I don't know where they came from.

Dalton:    Do you know Whitey's real name?

Green:    No.

Dalton:    Where does he stay at?

Green:    Well we was going. You know                question. I can tell you, I ain't say anything    . This is difficult. I don't know who is at his house at home, then they got another one, a little yellow one on North Street.

Dalton;    With a fence around it?

Green:    No, people stay across from those. Right here on the end, like you come to Catherine Street, that big yellow house

Blaylock:    Fence around it?

Green:    Yeah, they stay up there.

Blaylock:    Who else lives up there?

Green:    What do they call that rest area, stay there. They have a girl Mousy, she is        and another one named Denise, but Denise she may be over there at        home with them.

Blaylock:    Are they dealing out of both of these houses?

5

Green:       (can't understand) with him, might have more drugs.

Blaylock:    In the house?

Green:       Uh huh.

Dalton:      Just far away he looks a little bit like him. Okay. Whitey is a black male, right, about how old?

Green:       I don't know where the boy lives. Whitey is real red.

Dalton:      Real red?

Green:       Uh huh.

Dalton:      Why don't they call him Red instead of Whitey?

Green:       That is why they call him Whitey cause he red. He is a black person.

Dalton:      Black person that is red that is called Whitey, okay.

Green:       Whitey, all got a hair cut Afro. Maurice got    . All of them have it cut real short. Whitey got two golds in front of his mouth.

Blaylock:    Any design in the teeth or just solid gold?

Green:       No, just solid gold.

Dalton:      So they were living in the house right there behind where Katrina was found, she was found right there behind their house?

Green:       Yeah, they were found up there. Uh, right there by the school, Maggie school?

Dalton:      Yeah. They live on that street that you all were headed towards, W. Moore Street, that is the name of it isn't it?

Green:       I don't know.

Dalton:      1212 W. Moore, that is where you all were headed?

Green:       Okay.

Dalton:      And she was found right behind their house then.

Green:       If she was down behind their house, I thought they found her behind the school, back up that way. Okay. Now

Dalton:      How about Maurice?

Green:       All right.

Dalton:      What happened to Maurice?

6

Green:      I thought you wanted a description of him, or you already got that.

Dalton;     You gave it to me.  Short hair, gold teeth.

Green:      You don't know how many it is.

Blaylock:   How much did he weigh?  How tall was he?

Green:      He weighs about 130.  About 5'6", 5'7", 5'8", I don't know, a little taller than me.

Dalton:     He had two golds in the front

Green:      Uh huh.

Dalton:     Couple of other guys up there that look like him do they?

Green:      Yeah there is a whole lot of them.

Dalton:     Okay.  If we were to come up on him on the street, which one would we know to be Whitey?

Green:      The tall, red one with two white golds, but he don't come out that much now.

Dalton:     He is staying low?

Green:      Uh huh.  Well I think he got around like, right after (can't understand) can't see too much at night.

Dalton:     Is he an albino?

Green:      Yeah, most likely, cause when he reads he has to put his eyes down on the table, then he got, you can tell him by the big coat and always wears a cap on the head or hood over top.

Dalton:     What color hair does he have?

Green:      Who Whitey?  Red.

Blaylock:   Red hair?

Green:      Yeah.  He always wear a big coat, then he got another one named (can't understand) big heavy set dark one.

Dalton:     How does V come into this?

Green:      When they went to pick up them drugs from New York that is when he came down.

Dalton:     Okay.  Was he involved in the shooting?

Green:      Uh, I think it was Maurice and (?) Maurice and, really the one that get down there, I can't say it was them, but it could have the way it

App.0941

7

happened, it could have been planned cause he said he was going out of town, she got killed the same night, that J.R.

Dalton:    That is J.R.?

Green:    Uh huh.

Dalton:    Okay.  He involved in any way?

Green:    This is (?) too.  Naw, Keith West, he is not involved in none of this.

Dalton:    Okay, he is not involved.

Green:    No, not involved, no not in this stuff.

Dalton:    How about Samuel Lawson?

Green:    He used to sell drugs but one of them got rid of him or not, I haven't seen him

Dalton:    You haven't seen him around lately?

Green:    No.  He used to work for him, too.

Dalton:    Okay.  Course you know this gentleman, that is no problem?

Green:    Uh huh.

Dalton:    Two boys there.  I don't have single.

Green:    Now what is him?  I ain't seen him.  Well I know Stan cause he kin to me.

Dalton:    He is kin to you?  Okay.

Green:    Way back.

Blaylock:    (can't understand)

Green:    How did Maurice get in the house?

Dalton:    Maurice was suspected of killing Little Doug at first.  Word on the street was, he was up with Little Doug, but you are saying that Little Doug and Maurice had did a tape in front of Mousy.

Green:    No sir, the girl that got locked up, when they bust up here on Norton Street, that was how that tape came down.  She set them up with the tape, up till that she knew that Maurice and Doug was going to try to do Whitey, then she must have got mad cause her mother didn't get her out of bed. Then she took the tape down to J.R.

Dalton:    Gave it to J.R.?

Green:    And J.R. brought the tape to our house and the boys was sitting in there listening to it.  And it seemed at the time that you know she gave the

tape to him time, cause that is when Doug came.

Dalton:    How did Doug come there, did he come on his own?

Green:    On his own.

Dalton:    Okay, so he was coming in there to see you and Cliff?

Green:    Yeah he was coming round there, and the way I can't say he really came right on, cause he came in the house with J.R. and Whitey. Then they must, they knew, but somebody just come into the house like he did, they didn't know nothing about the tape, you know.

Dalton:    Okay. So all three of them came to the house together?

Green:    Yeah.

Dalton:    And you and J.R. and Cliff left.

Green:    We left.

Dalton:    Then you heard the shots, Little Doug came through the window, J.R. said he ain't dead yet, went up that a way, you and Cliff got out the other way.

Green:    We left, definitely. But I knew he finished him up, like I said.

Dalton:    Have you talked to him since this happened?

Green:    Talked to who?

Dalton:    J. R. and Whitey? Well you were heading to Whitey's house today, so you all got

Green:    See that is what I'm saying, Cliff was telling me last night, you know, they was telling me I talked, I don't talk, I stayed in the house, cause it's deadly. I can't go to the store or to my mama's house (can't understand).

Dalton:    Have they threatened you, personally, have they come up to you and threatened you?

Green:    Well, they, yeah I mean they be saying I talk too much. I be saying, what do I say, I don't say anything. And that is exactly what I been saying so.

Dalton:    During that time have they actually told you that they killed Little Doug or is it just presumption that you know it? And they

Green:    They know I know it. They know. I mean, same people you (?), you know who did it. Why you always deal with him telling me, can't say nothing, say what. I could have been saying something. But like Cliff was telling me last night, I was like I would never. Cliff was saying, you know they was telling him the man said the only reason they ain't did nothing to me

App.0943

9

yet is cause of him.  I said for what, I haven't said anything.  Told Cliff that he know I could have been down here saying something.

Dalton: What type of gun.  Do you know anything about guns?

Green: No.  I don't know what kind of gun it was.

Dalton: You didn't see the gun?

Green: Nope, not at all.

Dalton: How about Maurice, what happened to him?

Green: Now I didn't see that, but the way it happened, you know.  I had went. That was, I think about 5 or 6 of them, that evening and I was going to the store.  Cause we were across the street and I was going to the store and there was gun shots, probably about 5 times, cause I was standing on the side and got my (?) standing on the side talking to this white guy in a truck and there was another guy who was standing out there.  So we was talking to the guy in the truck and we heard gun shots and I said I'm getting the hell out of here, I'm going in the house.  Okay.  It was J.R. running through the alley, it was, oh, there was V and the other guy, V they came from on the other corner.

Dalton: V and Z came from the other corner, but that was after the shots?

Green: Uh huh.  And J.R. was coming through the alley, he was running, you know, he looked like he was tucking a gun or something down in his pants, okay, that is how I feel. I knew (?).  I didn't see it.

Dalton: You heard the shots and he was running down the alley sticking something into his pants?

Green: Yeah, (can't understand) the one alley and the other two came on the side. Quite natural you divide up, if you took a lot of money like this, we know he did it cause the way he, he had a gun, I don't know what you call that gun.  Cause when they went down in the basement,

Dalton: Basement of what?

Green: Uh, right down there at 510, where, right down on the side by the store.

Dalton: You say 510.

Green: Not 510, that my mama's house, 512.

Dalton: 512?  Okay.

Green: That be right next to my mama.

Dalton: And went down in the basement there?

Green: Down in the basement.

*10*

Dalton:    What did it look like, what type gun did it look to be?

Green:     It was a black, I don't know these guns.

Dalton:    I can't help you, was it like the guns we carry?

Green:     Not really. Not like that one either. Yeah something like that one right there. Long black (can't understand). Not a tiny gun I know. I don't know the name of the gun.

Dalton:    It is bigger than these. In other words, I'm going to point this. Have it out like this.

Green:     Not any bigger than that.

Blaylock:  Did this part right here have a round thing in it, right here where the bullets are in?

Green:     Uh huh. Little round thing like that. An Uzi, is that what it is?

Blaylock:  I don't know, we are going to try to find out.

Green:     But that is what it is

Blaylock:  How long was it?

Green:     It was something like that.

Dalton:    About a foot long?

Green:     Yeah, black gun with little round.

Blaylock:  Like had a clip in the bottom of it?

Green:     Yeah he took that down, pushing it. I don't know the name of them, but I know when I see one.

Dalton:    And they put it in the basement of 512?

Green:     That is where all of them went, cause I figured they had followed. J.R. had that gun.

Dalton:    Who lives at 512?

Green:     The white man live upstairs, he rents out downstairs to a guy name Papoo and Mousy she a sister.

Dalton:    Is the white man involved in this, too?

Green:     No, God, he put them out.

Dalton;    He put them out?

Green:     He put them out, yeah.

//

Dalton;    So if we went and asked him if we could look at his basement later on, he would probably say yes?

Green:    He put them out cause of the drug activity (can't understand).

Dalton:    Let's see.  I apologize if I sound confused but.  Were you on the corner of Hancock or were you back up on the corner by your house on Harrison?

Green:    I was on Hancock Street.

Dalton:    You were on Hancock Street, you all heard the shots,

Green:    Right beside the store, you know where 510 is

Dalton:    Yes.

Green:    right there at the alley, like going through these houses

Dalton:    And J.R. came back with an Uzi type gun, he came running back down the alley and went into the basement of 512?

Green:    Then they all came one way

Dalton:    Him and the other one?

Green:    And V and Z came out

Dalton:    They came from the other way.  They came back down Clay Street and back down?

Green:    No, Catherine Street.  You know where Hancock going around the corner, okay, that is the way V came and J.R. came through the alley.

Dalton:    Okay.  Catherine Street.  Now, O, Z and V are all from New York?  Do they look like Whitey also?

Green:    No.

Dalton:    Are they all staying at 1212 and 814?

Green:

Dalton:    Did you see any of them with guns in their hands when they were running?

Green:    No.  I'm pretty sure they all had them, believe me.  They always carry them.

Dalton:    So Whitey wasn't in that group on the night of Maurice's shooting?

Green:    Whitey wasn't around when whatchacallit got killed either.

Dalton:    Katrina?

Green:    Uh huh, he wasn't around, he said he was staying over in, what the name of

12

those apartments, in Henrico. I just really, I don't know.

Blaylock:   (?) Village? Off Laburnum?

Green:      I don't know where he supposed to live, Henrico.

Dalton:     Highland Bells Village?

Green:      No, something like a project, I don't know the name of the apartments.

Dalton:     But he said he was staying out there?

Green:      Yeah, he hasn't been around though, he be around but we wouldn't know, when Maurice and Katrina got killed.

Blaylock:   Village out there by the fairgrounds.

Dalton:     Is he back at 1212, Whitey?

Green:      Uh huh.

Dalton:     Does he have guns at 1212?

Green:      They always have guns on them, they never fails, they never walk without them. Never, they always have guns on them.

Dalton:     When was the last time you bought drugs from 1212?

Green:      Uh, I got me some yesterday.

Dalton:     Yesterday. In the last 24 hours you bought drugs from 1212?

Green:      Um huh. Oh it is there, that is where it is, all drugs.

Dalton;     1212 is a store house and 814 is a rest house?

Green:      Uh huh.

Dalton:     So when they get tired they go to 814.

Blaylock:   Norton, right? Let me ask you this to establish your credibility. How much do you pay for the drugs and what did you get?

Green:      They had him selling it, but he didn't want to do it. They had threatened him harm too.

Dalton:     Who is that?

Green:      Kurt.

Dalton:     Kurt has been selling for them?

Green:      Yeah, he didn't want to do it. But see he was ready to give it up when they were talking about doing something to me. He said fuck, I can't go

*13*

with you with the things we have, you got to go, I said I ain't going for nothing. You know.

Dalton: What did you pay for the drugs you got yesterday?

Green: See what they do, they give him drugs to sell, right, like 30 packages right, they got (?) whole lot of people selling them. And they give it to him, then he has to take them like (?) $600 worth, take them like $450 or something like that, you know. What do he (?) nothing, see what I'm saying, and that could add up to a nice car and everything else, we didn't get nothing out of it. That is what I told him, stop it, it ain't worth it. He wanted to go back to work, couldn't do that, he said oh (?) tie him down. He got involved in it, didn't know how to get out of it.

Dalton: When did they have the big blow out?

Green: Oh well they supposed to go to New York sometime this week, I reckon.

Dalton: What car do they go in?

Green: See, that what I'm saying, they might get. The last time they were doing a station wagon, got a (?) Carter, live on Clay Street.

Dalton: A beat up station wagon?

Green: No, beige, kind of real long beige, brown station wagon.

Dalton: Normally when they leave, where do they leave from, 1212 or 814?

Green: Clay Street, between 1212 and Clay Street.

Dalton: Do you know when they are leaving?

Green: They are supposed to leave sometime this week, they say they about out selling, cause that is what he was telling Kurt. (can't understand) he say he just have to stop. Whenever I told him, you not getting nothing, you are making them money, you are not getting anything out of it.

Dalton: Now why did Little Doug want to kill J.R. and Whitey?

Green: Me and Cliff said Maurice would pay them to do it.

Dalton: Maurice

Green: Doug was working for John (Maurice).

Dalton: Okay. And what happened was, see if I have it right. (?) sitting there when they were discussing of killing

Green: J.R. had sit, well she had said something to J.R.

Dalton: Maurice was having it done because that is supposed to be his territory in there?

*14*

Green:     Who?

Dalton:    Was that Maurice's territory through that area?

Green:     No, Maurice was on Norton Street.

Dalton:    Maurice's territory was Norton Street?

Green:     Uh huh.

Dalton:    And they were moving in on Norton Street?

Green:     So Maurice, he          kept selling right, we had right many people selling/spending money (can't understand) but he wanted Kurt to sell coke but he said he was going to get out of it cause it ain't worth it, you know, too much behind. And that is not him no way, Kurt always had work. We got involved with them, that did it, couldn't get out of it.

Dalton:    How about Katrina? What do they know about Katrina?

Green:     Now, Katrina. Let me tell you God's truth. I don't know who did it, but when they left out of town that is when it happened.

Dalton:    When they left out of town?

Green:     Yeah when they went to get some more cane that is when she got it.

Dalton:    J.R. and Whitey were both out of town when she got it?

Green:     No Whitey wasn't no where near. J.R., V, O and Z. They (can't understand) Whitey and brought it around and all through there.

Dalton:    J.R., V, Z and O were out of town when Katrina got it?

Green:     Yeah, the guy in the station wagon he took them out of town when she got killed. But I still say J.R. did it, or had something to do with it.

Dalton:    Who?

Green:     But J.R., were real tight.

Dalton:    How come the word we got was Jerry was on our list?

Green:     Yeah, Jerry Davis was on the list too.

Dalton:    So he might be a little more cooperative.

Green:     He had messed up so much drug money, so maybe, I don't know, you know. He is on the list straight up, definitely.

Dalton:    So the word on the street is that Jerry Davis is the one who did Katrina in?

Green:     Yeah. I mean I know Jerry did, that one that called them in.

15

Blaylock:   Why did he want to kill Katrina?

Green:      I don't know, that is the only thing I've said, that is the only way I say I know that he had to do it, cause they was out of town, it was just like a set up, you know.

Dalton:     Now Jerry was into J.R. and Whitey, V, Z and O, is that right?

Green:      Whitey don't deal with them.

Dalton:     Okay.

Blaylock:   Did you say Rozier?  Oh Rochelle.

Green:      Yeah.

Dalton:     Where is Rochelle?  Is she staying at 814?

Green:      No, she live on Norton, Maurice and people out there, he asked me did I know they was tall and one other was short, dark skinned,

Blaylock:           apartments.

Green:      Okay, yeah that was Norton Street, when they got whacked.

Dalton:     Who lives at 810 Phaup?  Some blind guy?

Green:      I don't know.

Blaylock:   Do you know anything about a blind guy (can't understand) or anything?

Green:      Wear them dark glasses?

Blaylock:   Yeah.

Green:      Kind of tall, heavy set?

Blaylock:   I haven't seen him, but was told.

Green:      Blind, he not put his money and give a bag if you want one, he is supposed to be but he ain't that blind.

Blaylock:   Okay.  Did you see a bill?

Green:      I haven't seen nobody up there lately.

Blaylock:   Norton Street is kind of dead right now.

Green:      Uh huh, whole thing round there is poopy.

Blaylock:   The only one dealing are at 1212 W. Moore?

Green:      Yeah, 1212.

Blaylock:     Do you know whose house that is at 1212 W. Moore?

Green:        What the guy name, I don't know, what do they call him. Wild Man, I think that what they call him, drives tractor trailer or something. Not Wild, wait a minute, there is another one. I know the guy when I see him. Know Wild Man.

Blaylock:     Do you know that they are dealing out of the house?

Green:        No, they do what they want to do.

Blaylock:     Can you find him?

Green:        Yes sir, that is what he said, that is what he live at.

Dalton:       So if we went up to the house, of course we aren't going today, but when we go up to the house and we knock on the door, more than likely we are going to have V, Z and O, J.R.

Green:        J.R. is gone, I don't know where J.R. is staying at, he might use drugs and stay somewhere else. You are see

Dalton:       What would be the best time for us to catch them all together. In other words we don't want to go in and catch one or two and have one or two on the street, we want to get the whole crew at one time?

Green:        Yeah,

Dalton:       What would be the best time that we could knock on the door and say HI, we are the police, do you think they will talk to us?

Green:        Had you came the Super Bowl you would have had them all.

Dalton:       Well if we had got you last week we would have went to the Super Bowl.

Green:        Let's see.

Dalton:       What about basketball games, any basketball games coming up.

Green:        Well yeah he look. When we went up there Super Bowl, after the Super Bowl, all of them was there, every one of them. Every one.

Dalton:       If you hadn't laid so low for a week.

Green:        Hey, I had quick plans in a hurry. No, I wouldn't do it too soon or they know I had said something. I just don't know.

Dalton:       Is there a lot of traffic in and out of 1212?

Green:        Nope. See they have they stuff on the street, they are dealers, they have people working for them.

Dalton:       But they stash it there.

17

Green:      Stash.

Dalton:     Do you know where they hide it at?

Green:      Like I said (can't understand).  I know.  But see what I'm saying, the
            only one that come (?) I don't know nothing about where they hide it at,
            but I know it is there.  I know it is there.

Dalton:     How much do they bring back from New York, do you have any idea?

Green:      What.  I.  Kurt.  They will go with $4-5 thousand at a time.  (can't
            understand).  (?) a whole lot (can't understand).

Dalton:     Can you think of anything else that will help us right now?

Green:      I know it, it could be soon when they leaving, I'm going to tell you that
            right now, they are going to leave and go up to New York, they are
            planning to go to New York from everything they said.  They are going real
            soon.

Dalton:     Going up to New York to get a load, but they are coming back?

Green:      They will bring it back.

Dalton:     They will bring it back, okay.  We don't know when they are leaving or
            what type of car they will use.

Green:      Not yet.

Dalton:     I noticed your Pontiac was missing this morning.  I noticed your Pontiac
            was missing this morning, the gold Grand Am.

Green:      My sister.

Dalton:     That is your sister's car?

Green:      Yeah.  What about that?

Dalton:     We just            driving at.

Green:      I don't drive that, I can't drive a 4-speed, 5 speed.  Whatever it is.  I
            been driving down to her house.  See what I'm saying, people talking about
            me.

Blaylock:   Does your sister work now?

Green:      Yeah she is a manager up here at Kings Quarter in Doswell.

Blaylock:   I thought I saw her in southside and anywhere else.

Green:      Yeah she goes a lot over there.  Hey, she does not (can't understand).  No
            gun.  She, most times she goes like            and stuff over there,
            southside.

/8

Blaylock:    We are not trying to get your sister.

Green:       You can't jam her because she don't deal with that, that type of stuff. You can't jam her cause she got nothing to do with that.  I don't drive that car.

Dalton:      One more thing then we will take you on back.  Who else besides you and Kurt and J.R. were around the night that Little Doug got killed?  Course we know that Whitey was there.

Green:       Girl named Sandra, I don't know Sandra's last name,

Dalton:      How does Sandra fit in with the group, is she going?

Green:       She is going with J.R.  See what I'm saying.

Dalton:      So she is loyal to the group?

Green:       Yeah, see what I'm saying, she one that don't like me, don't like me at all.

Dalton:      Doesn't like you, okay.  How about KK?

Green:       No, KK was dealing with them till Maurice got killed.

Dalton:      Okay, but KK was he dealing?

Green:       No KK

Dalton:      Was he around the night of the murder of Little Doug?

Green:       No, Doug, KK walked around the corner.

Dalton:      Who is KK?  There are several KKs out there.

Green:       KK, I don't know where he is now, he don't do nothing wrong.  Think he be out of Gilman Street sometimes.

Dalton:      What was his, is Gilman Street where he hung out?  Before this happened where was he hanging out?

Green:       Oh, Maurice?  or KK?

Dalton:      KK.

Green:       Well see KK, he was, he used to buy his drugs from Whitey cause he was selling too see.  He was on both ends.

Blaylock:    What did KK look like?

Green:       Slim, light skinned, wear long coat all the time.

Reid:        Carry a gun?

*19*

Green:      A silver gun.  Yeah, he had a long silver gun.  Gun bigger than he is.

Reid:       How old is KK?

Green:      KK about 20-21, he be young.

Blaylock:   Hangs on Gilman Street?

Green:      Be out on Gilman Street.  But I haven't seen KK in a long time.  He be hanging around out there as far as I know, one day I went there, I was going down town and he was sitting around out there.

Reid:       Where about on Gilman Street?

Green:      Just sitting on the, one of them old porches right next to the, one they just picked up down there.  I don't know the address down there.

Reid:       Down there by the old catholic school is?

Green:      Uh huh.

Reid:       Who was around with Maurice do you know?

Green:      I don't know, thank God, I'm a (?) I don't even know.  To me it was a set up.  You know.

Blaylock:   You haven't heard anything this week?

Green:      No, cause people were saying when they found, somebody say a girl was with them.  Okay.  As I.  Who was it.  Let me get the names right too.  Who was it, that she supposedly, he supposed to went and met a girl up there.  But when they found him, they found only him.  That why I said who was the other person, it had to be a set up.  Lot of people said they found him laying dead on, sitting on his sofa.  But who had to open the door, who had the key.  See.  It had to be.  The way it was set up, it was set up damned good.

Reid:       Found so whoever came in?

Green:      Whoever came in.

Reid:       He probably knew him?

Green:      And whoever set him up had to open the door for him, they found him there sitting on the sofa like that.  I don't know if that is where they found him, but (?) said he was sitting on the sofa when they killed him.  But I don't know,  it was a set up, and it was a decent set up.  Instead it might would have been indecent if we didn't see them guys come through the alley, wouldn't nobody known.

Reid:       You say you saw them come through the alley, which alley are you talking about?

Green:      Like going where these new houses is being rebuilt, the alley right behind

2σ

them.

Reid:     Who did you see run through the alley?

Green;    It was J.R., O, and V and Z came around on Catherine Street.

Reid:     So it was four of them.

Green:    Five of them all together, and Whitey.

Reid:     Whitey was there too?

Green:    No he wasn't there, but I'm saying, oh you are talking about when he got
          shot, the four of them that I seen.

Reid:     Did he sell to anybody?

Green:    Did he tell it to anybody?

Reid:     Yeah do they sell their drugs to anybody or do they have to know you
          before they sell to you?

Green:    They don't really sell it, they are going to have to know you  to sell it.
          But there are just so many people, (?) to fuck out there.

Reid:     If I went up there to 1212, I couldn't get nothing from them?

Green:    You want a bullet in you, see them all out there doing it, then you can go
          up there and get it.  No you cannot get it, no.

Reid:     Do they have dogs or anything up there at 1212?

Green:    No sir.

Reid:

Green:    By the first of the month, that is right.  (can't understand) that back
          door they got that, but I know you always got something to get in there,
          the only thing (can't understand) can't get in there like that.

Reid:     How about the front door?

Green:    Well you can kick the front door in, but go prepared that they are going
          to be sitting there with guns.  See.  They are going to have them in
          there.  You know somebody always going to be in there with guns.
          that I was in.  Look at it on TV.

Reid:     So there is always a guard on the front with a gun?

Green:    Oh they in the house.

Reid:     I mean inside the house?

Green:    Yeah.

2/

Blaylock:   But none of this group has cars of their own?

Green:      Nope, none of them.

Blaylock:   Other people transport them.

Green:      Yeah.

Blaylock:   Have you heard how Katrina got down there or any rumors?

Green:      No I haven't, God's honest truth.  I wish I did cause she was real close to (?), real close.  He will say he had something to do with that too, I don't kill nobody.

Dalton:     Do you think Jerry, since he knows he is on the list, if he comes up, will he cooperate with us?

Green:      He sure don't know he on no list, or he be doing something by being with him, but I know, you know.

Reid:       Do you think this tape will be at 1212 or 814?

Green:      (can't understand)

Dalton:     What did the tape look like?

Green:      See it kind of black little box they carry around.  But it is a cassette tape.

Dalton:     All right.

Blaylock:   (can't understand)

Green:      He a block away (?).

Blaylock:   Did they sell at Hancock & Clay?

Green:      Yeah, girl out there named Sandra something, that the one that J.R. go with.

Reid:       You don't know Sandra's last name?

Green:      No.

Reid:       Do you know where she lives at?

Green:      Her son, (?) what his name, oh boy, that can't help with that one, can't think of his name.  Juvenile, young boy.

Dalton:     Name of Eric?

Green:      His first name, I don't know his last name.

Dalton:     Just got out of juvenile detention home?

App.0956

Blaylock:    How long ago?

Green:    Oh, he recently got out.

Dalton:    Do you know what he was in for?

Green:    Uh, him and Keith West got locked up, what was it, cocaine, I don't know. I was just going on    . But he in her custody now and she said both of them back out there selling drugs again.

Blaylock:    And Sandra?

Green:    I can't think of Sandra. She live right across the street in Ruffin Green Apts.

Dalton:    But J.R. is not staying with her right there?

Green:    Her and J.R., see she got a boyfriend, her and J.R. Sometimes they stay up in the rest area, up there on Norton Street.

Dalton:    Okay. Can you think of anything else?

Blaylock:    What is your nickname?

Green:    Mine. Pepsi.

Blaylock:    Pepsi? Okay. What is your height?

Green:    5'5". Everybody saying Pepsi.

Blaylock:    Weight?

Green:    About 110.

Blaylock:    Any scars, tatooes, anything like that?

Green:    No.

Blaylock:    What is your occupation?

Green:    Nothing.

Reid:    Do you know some Coles that live at 97 W. Clay?
Green:    Uh. Prostitutes and stuff.
Reid:    Were they up there when Maurice got killed?
Green:    I don't know. I don't even know.

Blaylock:    When were you born?

Green:    7/14/69.

Blaylock:

Dalton:    This tape is ending at 11:45 a.m.

Case 3:92-cr-00068-DJN    Document 17-11    Filed 07/22/20    Page 24 of 92 PageID# 1108

THE SOURCE FOR RICHMOND ARCHITECTURE AND DESIGN INFORMATION

**f**

**(HTTPS://WWW.FACEBOOK.COM/PAGES/ARCHITECTURERICHMOND**

🐦 **(HTTPS://TWITTER.COM/ARCHRICHMOND)** 🔊

**(HTTP://ARCHITECTURERICHMOND.COM/FEED/)**

# ARCHITECTURE RICHMOND

(http://architecturerichmond.com)

**MENU**

ARCHITECTURE RICHMOND    >    SERIES    >    NEIGHBORHOOD PROFILE    >    NEIGHBORHOOD PROFILE: GILPIN COURT

# NEIGHBORHOOD PROFILE: GILPIN COURT







Perhaps no other neighborhood in Richmond has been the object of as much stigmatization as Gilpin Court. Topography, racial dynamics, contemporary infrastructure, and public housing developments have all played a role in isolating this valuable piece of the city. Though these issues continue to obscure the history and culture which remain there, the resurgence of Richmond's urban core may harken an economic and architectural restoration of the neighborhood.

Gilpin Court, or Shockoe Hill, as it was initially known, has a history stretching back some two centuries. Its eastern reaches were sparsely settled beginning in the post-colonial period, becoming integrated with the urban residential district of Court End in the early 19th century. The Shockoe Hill Cemetery (http://architecturerichmond.com/inventory/shockoe-hill-cemetery/) was founded here in 1820 and was followed shortly by the neighboring Hebrew Cemetery.

App.0959

By the Civil War, the neighborhood's street grid was fully established and integrated with the burgeoning commercial district of Jackson Ward to the south. The streets shaping its unusual trapezoidal blocks were named for saints, giving it the name Apostle Town. The neighborhood was composed largely of townhomes, retailers, and small scale workshops which fed off of the intensity of Broad Street and Second Street. Notably, prominent black business woman Maggie L. Walker chose to erect the headquarters of her St. Luke Penny Savings Bank in Apostle Town. That building, which stands abandoned near the southern end of St. James Street, is of immense importance to the visual and historic identity of the neighborhood.

1942 proved to be a bellwether year for Apostle Town, marking the beginning of the City's ill-conceived interventions in the area. The City cleared acres of substandard housing and established in its place the Gilpin Court Housing Project, Richmond's first. Built atop an unadorned plane of grass, the elongated rows of two and three story brick structures have an austerity that must have seemed appropriate for wartime. This initial foray into government housing was partly well intentioned, but its heavy handed implementation was a direct function of the neighborhood's political disenfranchisement. In a society still governed by Jim Crowe, majority African American neighborhoods like Apostle Town were unable to object.

Emboldened by their work at Gilpin Court, the City embarked upon an urban experiment the likes of which Richmond had never seen: Interstate 95. The all-white power structure of the Richmond-Petersburg Turnpike Authority elected to route the highway through the heart of this predominantly black community, destroying hundreds of homes and businesses in the name of 'slum clearance.' Apostle Town was dealt a blow from which it has never recovered. The highway, which opened in 1958, cut Gilpin Court off from the more active commercial districts along Broad Street which had traditionally sustained it.

In the aftermath, the Richmond Redevelopment and Housing Authority continued to clear large portions of the existing neighborhood for the expansion of Gilpin Court. Developments in 1957 and 1970 completed the total redefinition of the neighborhood's character. Including the Frederick A. Fay Towers, a pair of 11 story apartments for seniors, Gilpin Court is home to some 800 residential units, by far the largest single public housing community in Richmond.

The 1957 expansion of Gilpin Court was similar in style to the original, but the 1970s version featured a new and more radical architectural program. While maintaining the familiar elongated east-west orientation, these units introduced new, more expressive facades of concrete and sloped metal roofing. A new landscape strategy using large boulders and other hardscaping as a basis for hillocks of poured concrete was highly inventive, if unwelcoming in effect. The generous spaces found between housing blocks across the development often expose normally hidden functions; clothes lines and trash bins extend into plazas and playgrounds without clear division.

Since the interventions by the City in the mid 20th century, Gilpin Court has been in steady decline. The few blocks of prewar townhomes and commercial buildings which remained after the completion of the public housing complexes have been mostly reduced to vacant fields. The

App.0960

Case 3:92-cr-00068-DJN    Document 17-11    Filed 07/22/20    Page 27 of 92 PageID# 1111

housing projects themselves lack commercial spaces, so the few businesses that dot the landscape inhabit older structures.  Convenience stores predominate, leading residents to venture out for necessities like groceries and banking.

The highway to the south and the ravine of Bacon's Quarter Branch to the north leaves Gilpin Court largely isolated, a problem made worse by gradual alterations to the surrounding infrastructure, including changes to 5th Street which now bypasses most of the neighborhood. Marginalized as it is, the community has benefitted little from the revitalization seen in other areas of Downtown.

Despite the difficulties, a plan (http://www.richmond.com/news/article_d66a8bcf-3d62-5ac0-a448-064d4bd0cd60.html) for the revitalization and reintegration of the neighborhood with the city's urban core is developing. The Richmond Redevelopment and Housing Authority, together with private sector developers and architects, have drafted a scheme which includes new mixed income housing, retail and commercial space, and a school. The plan also proposes rebranding the area under the name North Jackson Ward, a title indicative of the larger goal of reintegration and normalization. Funding sources and timelines remain vague.

The salvaging of Gilpin Court is a major test of how equitably distributed the growing prosperity of the urban core will be. The past performance of City-led developments, both in terms of concept and implementation, however, has made skepticism a default position. Whether or not the plan can overcome that skepticism, and the very real doubts on which it is founded, is unclear. Despite the depth of its history and the fortitude of its residents, the Gilpin Court of recent decades is a portrait of much of what is wrong with the American urban landscape.


DOK

Photographs by author

Archival image of Interstate 95 courtesy of the Library of Virginia.

(/#facebook)       (/#twitter)       (/#google_plus)       (/#pinterest)       (/#linkedin)

(/#email)


(https://www.addtoany.com/share#url=http%3A%2F%2Farchitecturerichmond.com%2F2016%2F01%2F29%profile-gilpin-court%2F&title=Neighborhood%20Profile%3A%20Gilpin%20Court)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

**FILED**
DEC 10 2014
U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

| | |
|---|---|
| James H. Roane, Jr., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) C.A. No. |
| | ) |
| JOHN F. CARAWAY; | ) **2:14-cv-0377 JMS-WGH** |
| TODD ROYER; | ) |
| JOHN EDWARDS; | ) |
| MELISSA BAYLESS; | ) |
| CHARLES E. SAMUELS; | ) |
| PAUL M. LAIRD | ) |
| | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## VERIFIED COMPLAINT

James H. Roane, Jr., through his undersigned counsel, hereby complains and alleges the following:

### INTRODUCTION

1.    Plaintiff James H. Roane, Jr., is an inmate at the Special Confinement Unit ("SCU") of the United States Penitentiary in Terre Haute, Indiana ("USP-TH"). On February 22, 2012, Mr. Roane was stabbed by Donald Fell, another inmate in the SCU when USP-TH staff failed to follow proper procedures for separating inmates.

2.    Federal Bureau of Prisons ("BOP") is a federal law enforcement agency subdivision of the United States Department of Justice, and is responsible for the administration

SCANNED

1

App.0962

of federal prisons, including USP-TH. The Defendants are federal officials, agents, and employees of USP-TH, a United States Penitentiary operated by the BOP, who have acted and continue to act, with deliberate indifference to the substantial risk that another inmate will make another attempt to harm Mr. Roane, in violation of the Eighth Amendment to the United States Constitution.

3.      Although Mr. Roane suffered life-threatening injuries when he was stabbed in the neck by Donald Fell, and although several inmates have threatened Mr. Roane, that they would "finish the job," the Defendants have failed to keep Mr. Fell, and other inmates believed to be acting in concert with Mr. Fell, from coming into close contact with Mr. Roane. This has placed Mr. Roane's life to be in constant jeopardy.

4.      The Defendants have the responsibility to ensure that Mr. Roane's constitutional rights and legal rights are respected. This requires, at a minimum, that Defendants protect Mr. Roane from the substantial risk of inmate violence by ensuring that he does not come into contact with his attacker and the inmates who have threatened his life. Defendants' repeated failure to provide this protection, despite repeated requests by Mr. Roane and his counsel, manifests the Defendants' deliberate indifference to the substantial risk of serious harm that Mr. Roane faces.

5.      Mr. Roane meets all required conditions precedent to commencement of this action, including the exhaustion of all administrative remedies. *See* 42 U.S.C. §1997e.

6.      Mr. Roane seeks injunctive and declaratory relief requiring the Defendants to comply with the requirements of the Eighth Amendment to take reasonable measure to guarantee the safety of inmates, including the protection of prisoners like Mr. Roane from imminent violence at the hands of other prisoners.

2

7.   Mr. Roane's complaint arises from activities that are ongoing.  Therefore, he reserves the right to amend this Complaint as new developments arise.


## JURISDICTION AND VENUE

8.   This action is brought pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

9.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

10.   Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, because the events giving rise to this action take place at the Special Confinement Unit at the USP-TH, which is located in the Terre Haute Division of the Southern District of Indiana.


## PARTIES

11.   Plaintiff James H. Roane, Jr., is an inmate in the SCU at USP-TH.

12.   Defendant, John F. Caraway, is an individual who is employed by the BOP and serves as the current Complex Warden of USP-TH and has been employed as such since September 2012.

13.   Defendant Melissa Bayless is an individual who works at USP-TH and is the current SCU Unit Manager (hereinafter "Unit Manager Bayless").

14.   Defendant, John Edwards, is an individual who works at USP-TH and is the SCU Counselor (hereinafter "Counselor Edwards").

15.   Defendant, Todd Royer is an individual works at USP-TH and is an SCU Case Manager (hereinafter "Case Manager Royer," and together with Unit Manager Stevens, Unit Manager Bayless, and Counselor Edwards, the "SCU Unit Team Defendants").

3

App.0964

16. Defendant Charles E. Samuels is the Director of the BOP.

17. Defendant Paul M. Laird is the Regional Director of the BOP's North Central Region.

## STATEMENT OF FACTS

### A. Mr. Roane is Stabbed in the Neck by Another Inmate on February 22, 2012

18. Upon information and belief, Dustin Honken, an inmate at USP-TH and a member of the Aryan Brotherhood, ordered a "hit" on Mr. Roane because Honken falsely believed that Mr. Roane was a "snitch."

19. Upon information and belief, Donny Fell, another inmate at USP-TH was a "student" of Honken, and decided to carry out the "hit."

20. Fell was in the same leisure group as Mr. Roane in the Range Lower B section of USP-TH.

21. On February 22, 2012, when the members of that leisure group gathered for leisure time, Fell attacked Roane with a homemade weapon. The weapon was a 10 inch long piece of curved metal that had a cloth wrapped "handle" with lanyard, and on the other end, an edge that had been sharpened to a point. *See* Exhibit A. Fell stabbed Mr. Roane in the face and upper torso of his body.

22. During the attack, Fell told Mr. Roane that he was being stabbed because he had "snitched."

23. The officer on duty reported the attack to the Lieutenant's office and ordered Fell to stop.

24. Fell continued to stab Mr. Roane despite this order.

4

Case 3:92-cr-00068-DJN-M Document 17-11 Filed 07/22/20 Page 32 of 92 PageID#
Case 2:14-cv-00587-DWS-MJD Document 1-1 Filed 12/12/14 Page 5 of 10 PageID 5
1116

25.     As a result of the attack, Mr. Roane sustained serious and significant injuries including a laceration on the left side of his neck, a quarter dollar sized hematoma on the anterior neck, and a fracture in his hand.

26.     Due to the extent of his injuries, Mr. Roane was transported to an outside hospital's emergency room for medical treatment. He was then transferred to the Indiana University Medical Center at Methodist Hospital and was taken into surgery.

27.     In order to treat Mr. Roane's injuries from the stabbing, the surgeons had to perform a partial thyroidectomy, removing half of his thyroid. Following surgery, Mr. Roane was moved to the Intensive Care Unit, where he remained until he was transferred to another facility for further rehabilitation.

28.     He remained at the hospital from February 22, 2012 to March 5, 2012 recovering from the injury.

**B.     USP-TH Response To Stabbing**

29.     The prison officials that responded to the stabbing filed incident reports and prepared an evidence log.

30.     However, upon information and belief, no formal investigation was conducted regarding the stabbing. Neither the Defendants, nor any of their agents, spoke with Mr. Roane regarding the stabbing incident. Mr. Roane and his attorneys repeatedly requested that the Defendants conduct a meaningful investigation and provide the results of any investigation that had been conducted. However, Defendants have refused to respond to these requests, and no evidence of an investigation has been provided to Mr. Roane or his attorneys.

5

App.0966

### C. Mr. Roane's Requests for Protection

31. Following the stabbing, Fell was demoted to Phase I for his attempted murder. Demotion to Phase 1 is a sanction that an inmate would receive for minor infractions, such as having a messy cell. Fell was not penalized in any other manner, and has been allowed to remain in close proximity to his victim. Mr. Roane has tried to achieve a "no-contact" status between himself, his attacker, and the other inmates that have threatened him. *See infra* Section D. However, despite assurances that Mr. Roane would be kept separate from his attacker, he has repeatedly come into close contact with both Fell and Honken.

32. On or before September 18, 2012, Warden Caraway was alerted to the fact that Mr. Roane had encountered both Fell and Honken after the stabbing in places such as the law library and visiting facilities.

33. Upon information and belief, the SCU Unit Team Defendants were also aware that Mr. Roane encountered these inmates following the stabbing.

34. During an in person meeting in November 2012, Warden Caraway assured one of Mr. Roane's attorneys that Mr. Roane would not come into contact with the individual who stabbed him.

35. On or before December 12, 2012, Mr. Roane and his attorneys reiterated their request that Fell and any other inmate who was involved in the stabbing be removed from Mr. Roane's proximity.

36. This was not done, however. For example, on January 25, 2013, Mr. Roane was taken to the law library at the same time as Fell.

6

App.0967

**D.   Mr. Roane Receives Threats That They Will "Finish The Job"**

37.   Since the stabbing, Mr. Roane received multiple threats from several inmates. Specifically, Mr. Roane received threats from several inmates who have said that they would "finish the job" that Fell started on February 22, 2012.

38.   On or before May 6, 2013, Warden Caraway was made aware that of these threats, that Mr. Roane had made efforts to achieve a "no-contact" status between himself and those planning harm him, and that Mr. Roane continued to come into frequent and close contact with these individuals.

39.   Upon information and belief, the SCU Unit Team Defendants were also aware of the threats directed at Mr. Roane.

40.   Despite being alerted to these warnings, the substantial risk that these threats would materialize, and their representations that "Mr. Roane is kept out of contact with the inmates who have been identified as part of the attack," Warden Caraway and the SCU Unit Team Defendants continue to create and allow situations where these inmates come into close proximity with Mr. Roane, giving those inmates the opportunity to carry through with their threats.

41.   Defendants know of these risks, and their intentional failure to keep these inmates from coming into close proximity with Mr. Roane manifests their deliberate indifference in violation of the Eighth Amendment.

7

## COUNT I

### (Eighth Amendment - Defendants' Failure To Protect The Plaintiff in Violation of the Eighth Amendment)

42. Mr. Roane incorporates herein by reference the allegations contained in paragraphs 1 through and including 51.

43. The unlawful conduct of the Defendants in failing to separate Mr. Roane from the inmates who have threatened is intentional and knowing, and manifests a deliberate indifference to the serious risk of attempted murder that Mr. Roane faces, and violates Mr. Roane's constitutional right to be protected from violence at the hands of other prisoners, as guaranteed by the Eighth Amendment.

44. Each Defendant is aware that on February 22, 2012, Mr. Roane was stabbed in the neck with a 10-inch sharpened steel weapon by an inmate who intended to kill him.

45. Each Defendant is aware that Mr. Roane has received threats to "finish the job" from his attacker and four other inmates.

46. Despite the knowledge that the current conditions at USP-TH poses a substantial risk that Mr. Roane will the target of violent attacks, each Defendant has acted with deliberate indifference to this risk and have allowed these inmates to frequently come into close proximity with Mr. Roane.

### PRAYER FOR RELIEF

47. WHEREFORE, the Plaintiff respectfully requests that this Court grant the following relief in his favor:

App.0969

Case 3:92-cr-00068-DJN - Document 17-11   Filed 07/22/20   Page 36 of 92 PageID#
1120
Case 3:14-cv-00087-JWS-MDD   Document 11   Filed 12/16/14   Page 9 of 10 Page ID 9

48.     A declaration that the Defendants' acts and omissions, as set forth above, violated the Eighth Amendment of the United States Constitution.

49.     Enter an injunction directing the Defendants to remove, from Plaintiff's proximity, Plaintiff's attacker and the other identified inmates who have threatened his life.

50.     Enter an injunction directing an independent actor to conduct a thorough formal investigation of the February 22, 2012 stabbing.

51.     Grant an award of attorneys' fees and costs; and

52.     Grant such other and further relief as this Court deems just and proper.


Date: December 8, 2014               **JAMES H. ROANE, JR.**

                                     By his Attorneys,


                                     _____
                                     Paul F. Enzinna
                                     Angela M. Papalaskaris
                                     Jina Moon
                                     Brown Rudnick LLP
                                     601 Thirteenth Street NW Suite 600
                                     Washington, DC 20005
                                     (202) 536-1732
                                     (617) 289-0512 Fax

9

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2014, I served a true copy of the Verified Complaint by, first class mail, postage prepaid, upon:

| | |
|---|---|
| John F. Caraway | John Caraway, Complex Warden<br>UNITED STATES PENITENTIARY<br>USP-Terre Haute<br>4700 Bureau Road South<br>Terre Haute, IN 47802 |
| Todd Royer | Todd Royer, Special Confinement Unit Case Manager<br>UNITED STATES PENITENTIARY<br>USP-Terre Haute<br>4700 Bureau Road South<br>Terre Haute, IN 47802 |
| John Edwards | John Edwards, Special Confinement Unit Counselor<br>UNITED STATES PENITENTIARY<br>USP-Terre Haute<br>4700 Bureau Road South<br>Terre Haute, IN 47802 |
| Melissa Bayless | Melissa Bayless, Special Confinement Unit Manager<br>UNITED STATES PENITENTIARY<br>USP-Terre Haute<br>4700 Bureau Road South<br>Terre Haute, IN 47802 |
| Charles E. Samuels | Charles E. Samuels, Director<br>Federal Bureau of Prisons<br>320 First St., NW<br>Washington, DC 20534 |
| Paul M. Laird | Paul Laird, Regional Director, North Central Region<br>Federal Bureau of Prisons<br>400 State Avenue, Suite 800<br>Kansas City, KS 66101 |

Paul F. Enzinna, Esq.

10

App.0971

## DECLARATION OF HERMAN TAYLOR
## PURSUANT TO 28 U.S.C. § 1746

1.      My name is Herman Taylor.  I am the Clinical Director of a residential drug treatment facility in Cartersville, Virginia.  The agency I work for also offers an outpatient methadone clinic and other outpatient rehabilitation services.

2.      From 1972 to 1981, I worked at the Friends Association for Children in Richmond, Virginia, as a Social Group Worker.  The Friends Association always had a large number of children involved in its programs from the Gilpin Court Housing projects.  In 1976, it moved to its current location right in the Gilpin Court projects.

3.      As a Social Group Worker I led groups of boys in various areas, including employment preparation and personal development.  My goal was to try to provide structure to inner city kids.

4.      I met James Roane, Jr. through the Friends Association when he was about eight or nine years old.  James was in some of my groups, but he also came to me to speak with me one on one.  James was never a behavioral problem.  He stood out in that manner, because most of the boys were problems.  James was more of a follower.  I would bet that every time James got into trouble, it was with other boys or because an older boy pressured him.  James never initiated anything.  He was always in a group and went along with the group.  James was slow mentally, and would find himself in the middle of things he didn't intend to get into.

5.      James's mother, Ms. Jeanette, never came to any parent meetings.  The meetings were designed so that the parents could come and be proud of their children, and to see how they were doing and developing in the programs.

1

6.      James was mostly in general service type groups at Friends Association, in which we would go for group bike rides, do some writing, or something like that. We would meet once each week. I generally saw James several times a week.

7.      I didn't know James's father to be a part of his life, but I did know of James Roane, Sr. Through my work at the methadone clinic, I've known many patients whose supplier of drugs was James, Sr. I never saw James, Sr. around Gilpin Court, but knew him to live in the Newtowne area.

8.      I have worked in drug rehabilitation since 1983. Around that time, in the early 1980s, there were so many people on heroin, Preludin, cough syrup, and other drugs that the projects were becoming intolerable. I realized for there to be change, and for kids like James to have any hope in life, there had to be help for people to get off drugs. But it got worse, rather than better.

9.      During James's childhood, Gilpin Court was a very hard place. Everyone in the projects was surrounded by drug use. But the Roane children in particular didn't have any good adult guidance. James's dad wasn't around, and the family friends that were around weren't a good influence. I know that Junior Perry, a family friend, was a really bad heroin user. The Dandridges and the Tunstalls were two families around the projects that were bad news.

10.      Jody Dandridge in particular was a major bully and picked on the younger and smaller kids a lot. He was older and bigger than James. The Dandridges sold a lot of drugs in the projects. Their parents let them do whatever they wanted as long as they brought in money selling drugs.

11.      But the Tunstalls dominated the projects at that time. They were a really violent

2

group of brothers who sold and used drugs. There were at least five Tunstall brothers. One of them, "Sweet Love," got his nickname because he was gay. Knowing Sweet Love, it would not surprise me at all to learn that he had raped boys in the area. I knew him and his family; he was very rough and very violent.

12.    Gilpin Court at that time was extremely violent. It wasn't uncommon for people to find bodies behind the store on Hill Street every weekend. It was always said that the Tunstall brothers were killing people. On nice summer nights, there would be 100-150 people out on Saint John Street trying to buy drugs. It was commonplace for kids like James to know people that were killed. It was also commonplace for kids like James to see people strung out or shooting up.

13.    The Roane household was very crowded and the kids didn't receive any attention. There was no male figure for James. James had to learn how to defend himself to survive in the projects, especially with the Dandridges and Tunstalls around. It was a tough situation to grow up in. There was no escaping the violence or drugs.

14.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746

_____ ( 08-12-68 )
Herman Taylor

Richmond, VA
DATED:

3

## DECLARATION OF TYRONE MAYO
## PURSUANT TO 28 U.S.C. § 1746

1)    My name is Tyrone Mayo. I am twelve years older than James Roane, Jr. I have known James and his family all my life. I remember when James was born.

2)    Jeanette Roane, James Roane, Jr.'s mother, is older than me. Because she had kids so young, I always thought of her as much older than me. I realize now that she's only a few years older than I am. It's just that with having kids so young, she didn't have much of a childhood herself. She protected me and was like a big sister to me until she started to have her own family. Then she sort of fell apart.

3)    James Sr. used to beat Ms. Jeanette something awful. I saw him hit her and I often saw the aftereffects: her bruises, swollen face, black eyes. I was only a kid myself, but one time I remember that I was just disgusted with it and had enough. I decided that I was going to kill James Sr. the next time he came over to beat Jeanette.

4)    I was in the back of the house when James Sr. came over the next time. James Jr. ran out back and told me that his dad was beating his mom, and he was crying. I got pissed and said I was gonna kill him. James Jr. started crying harder and screaming for me not to kill his daddy. He said, "Don't hurt my dad." I didn't know what else to do. I felt like my only options were to kill James Sr. or do nothing. So I guess I did nothing.

5)    I know that James Jr. suffered physical abuse and verbal abuse. His mama suffered raising them. I remember at least one time that James Sr. gave James Jr. a bad beating and then made James stay in the house to hide the marks. I heard James Sr. upstairs beating James Jr. I was going to go upstairs, but Jeanette asked me to leave it alone because

1

she didn't want more problems. I understood that if I intervened, she would get a beating herself. She sacrificed James so she didn't get beaten.

6)    I can remember another time that James Sr. came outside of their apartment and grabbed James Jr. by his arm. James Sr. had a big leather belt. James Jr. was a little kid, no more than seven or eight, and James Sr. beat him like he was a grown man. Everybody was out there in the projects watching. James Jr. just looked scared to death. Finally some older guys in the neighborhood started walking over. I don't know what they were going to do but when James Sr. saw them coming, he took James into the house. The older guys hung around a while, like they were waiting for James Sr. to come out, but he wouldn't come out.

7)    I remember another incident when James Sr. brought some friends to his home. They were drinking and doing drugs and Jeanette was next door at Ms. Delores's apartment. Ms. Jeanette was next door feeding the kids because she didn't have any food in her house. James Sr. saw one of the kids and told the kid to tell Jeanette to come on home. She took her time getting over there, and you could hear him yelling and cursing. Finally he came on over to Ms. Delores's apartment and kicked the door in. Jeanette tried to run outside and he stopped her and grabbed her. He took her inside their apartment and slammed the door so no one could see, but we all knew he was beating the hell out of her. He just wasn't right. She didn't deserve to be treated like that. She deserved better. Those kids deserved better. It was something I'll never forget, but at the same time, it was like a regular occurrence around there. That family lived through pure torture.

8)    James Sr. stole any little money that people gave to Jeanette to feed the kids. I

2

knew that James Sr. raped her also. Her life was absolute terror. I could hear her scream sometimes. My mother usually called me into the house when the screaming started. Jeanette kicked the children out of the house sometimes, and the kids were frightened, embarrassed and crying. I clearly remember hearing those screams from Ms. Jeanette when she was in the house with James Sr., and seeing James Jr. outside the house looking sad and ashamed. Sometimes they looked like they were in terror.

9)    I knew the Tunstall family, too. They lived in Gilpin Court and they were the family that everyone tried to stay away from. They were fighters and big-time drug dealers. One of the brothers was known as "Sweet Love." Sweet Love had been in prison and was very manipulative, especially toward younger kids. Sweet Love used to give things to younger kids, like cigarettes, and then ask for them back the next day. That's an old prison game. When the kid couldn't give him back the same cigarette the next day, Sweet Love would fight him or rape him. Everyone in the projects knew Sweet Love was doing that and raping kids. I heard that Sweet Love raped James. Sweet Love was at Jeanette's house a lot. He used to play cards there and try to fit in there.

10)    Jeanette always kept a house full of people there to protect her, but James, Sr. would stalk her and always come the second there was no one there. I came over to her house many times to see the door kicked in and Jeanette beat up inside the house.

11)    The Roane apartment itself was really sad as well. They only had really old furniture that had been given to them. People were sleeping on sofas and everywhere. The house smelled. The kids all wet the bed and everything smelled like urine. The dishes were

3

always all dirty and piled up. And the children were always running around in dirty diapers.

12) The children went hungry, I could see that. James Jr. was stealing food. I remember seeing him one time with something hidden in his shirt. Turns out, it was bologna. I knew he had stolen it. When I asked him, "Where'd you get that package of bologna?" He just said, "Someone gave it to me." I knew he was lying, but how could I be mad at a child just trying to eat? I didn't even know how to talk to him about stealing.

13) There were always a lot of people at Jeanette's apartment. Even after James Sr. stopped coming around as much, she continued to have tons of people there to party. I guess Jeanette thought these people were her friends, but they were only being friendly because she let them do anything they wanted in the house. A lot of them had agendas-- getting high, drinking, bringing friends over, you know. It was a nonstop party. You had addicts there, people having sex, shooting up; anything went. Those children saw a lot.

14) Jeanette herself drank beer a lot. When she got really depressed, she drank more. She also took Valium. I can recall her taking Valium first thing in the morning with her beer to cope with the day.

15) Jeanette was really depressed sometimes. She just looked like she didn't care anymore and had given up all hope. Sometimes she just looked like a zombie. Other times she staggered around being loud and boisterous. I didn't like that side of her. On those days it was like she was a totally different person. It wasn't her normal personality at all.

16) I love James Jr. I call him my nephew and he calls me his "Uncle Ty", we were really close.

4

17)    James didn't have any good male role models in his life. I know I wasn't a good role model for him. I started using heroin in the early seventies. I used some weed and some alcohol before that. I know that James's uncle, Haywood Jones, who lived with them, was using heroin before I was. Haywood was just an addict. He didn't do anything positive.

18)    I started dealing to support my habit. It was James Sr. and his brother, Roscoe, who taught me to deal and gave me drugs to deal when I was just fifteen years old. Even after I started using, they gave me drugs to sell. I used drugs. I also became a hustler. I've served 14 years in prison myself for drugs, robbery, and gun charges.

19)    James Sr. and Roscoe sold a lot of heroin. Later they sold crack, too. James Jr. worked for his father and his Uncle Roscoe. James was always looking to impress his father. I know when James got older, he continued to want validation from his father. He did this by selling drugs for him.

20)    I was in the military in Korea in the 1970s. James was still a pretty young kid when I left for the military. I didn't see him again until around 1982 or 1983, when I saw him at my sister's house. Her name is Michelle Mayo. James Jr. walked in and called me, "Uncle Ty." James and I spent the next three days at Michelle's house doing nothing but shooting up heroin on a binge. By this time James was really hardened and an addict himself. I guess it shouldn't have surprised me, since the only role models around were drug dealers and hustlers.

5

21)    I have Post Traumatic Stress Disorder.  I recently graduated from the in-patient PTSD treatment program at the V.A. hospital in Hampton, Virginia.  I know that I got high a lot to deal with my nightmares, flashbacks, screaming and sweats.  Back then I didn't know what PTSD was, but now that I know, I am certain I had it even before I went to the war.  I have PTSD from my childhood.  And I know James had it even worse than I did.  Growing up in Gilpin Court caused it for me; Vietnam only solidified it.

22)    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

8/13/08

Tyrone Mayo

Hampton, VA
DATED:

6

## DECLARATION OF PHYLLIS WASHINGTON
## PURSUANT TO 28 U.S.C. § 1746

1.    My name is Phyllis Washington.  Jeanette Roane is my older sister. We both live in Richmond, Virginia.

2.    My sister Jeanette married James Roane, Sr. and started having kids when she was young. James, Sr. was just mean.  He used to fight my sister.  He was very aggressive with her. He used to call her all kinds of ugly names.  I've seen James, Sr. beat my sister.  He would hit her, slap her, kick her and pick up whatever was around and hit her with it. She was very scared of him.  He used to butter her up afterwards, he was like Jekyll and Hyde – split personalities.  Jeanette deserved so much better than that.

3    Jeanette and James had six children together, including two sets of twins.  I remember when the second set of twins, Kevin and Kathy, were born.  One of the twins was born at her apartment on Charity Street.  An ambulance came for her and the second twin was born at the hospital.  I remember that James, Sr. and Jeanette had gotten into a fight just before she went into labor.  I call Kevin and Kathy the hideaway twins.  My sister didn't know she was having twins until her stomach starting hurting her real bad after the first baby was born.

4.    After James, Sr. beat my sister and she was hurt I would go and stay with her until things calmed down.  Jeanette never learned to drive a car so I would drive over there and stay

1

with her or drive her back to my place or send a cab after her. My sister struggled to care for her children. James, Sr. would not give her any money. She would call sometimes and say that she didn't have food. I think it was tough sometimes for her to call. I think there probably were times that she didn't call. The rest of her family and I used to give her money so that she would have something to buy food for the kids. We used to tell her to hide it so that James, Sr. wouldn't see it. We would encourage her to spend it right away. We'd say, 'Come on, lets go to the store and spend it' – so that he couldn't take it from her.

5.   Jeanette was mostly too scared to call the police on James, Sr. She worried that he would come back later and about what he would do next.

6.   I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Phyllis M. Washington
Phyllis Washington

Richmond, VA
DATED: 8-9-08

2

AFFIDAVIT/DECLARATION OF _Haywood Tunstall_
PURSUANT TO 28 U.S.C. §1746

I, _Haywood Tunstall_____, do hereby declare and verify as follows:

1. JAMES ROANE AND I GREW UP IN THE GILPIN COURT PROJECTS IN RICHMOND, VIRGINIA

2. I USED TO SEE JAMES IN THE NEIGHBORHOOD, BUT WE BECAME VERY CLOSE WHEN I WAS ABOUT TWENTY-THREE YEARS OLD. JAMES CAME TO MY HOUSE ONE DAY AND WE MADE LOVE. THAT WAS THE BEGINNING OF OUR RELATIONSHIP.

3. OUR RELATIONSHIP WASN'T JUST SEXUAL. IT WAS LOYAL AND RESPECTFUL, TOO. I SPENT A LOT OF TIME WITH JAMES AND I STILL LOVE HIM.

4. MY DATE OF BIRTH IS AUGUST 7, 1951

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to 28 U.S.C. §1746.

_Haywood E. Tunstall_

Dated: _9/10/08_

All right, let's bring in the jury, please.

(The jury entered the courtroom.)

All right, this morning we are going to have the closing arguments in the aggravation and mitigation phase. Mr. Vick?

MR. VICK: Thank you, Your Honor. Good morning again, ladies and gentlemen. First, I'd like to take the time very briefly to thank you for your attention throughout this five weeks of trial. Your attention this week has also been admirable, and I'm sure that you will go back and apply that same sort of diligence to the verdict that you render on this phase of trial.

Ladies and gentlemen, now it is your time. The lawyers have had their time. The evidence has all been presented. Now it is time for you to go back and do your duty.

Each of you during the voir dire, prior to your selection as members of this jury, stated that in the appropriate case, given the appropriate circumstances, that you could indeed render a verdict of death against a defendant. Ladies and gentlemen, I submit that based upon the evidence that you have seen from this witness stand over the last five weeks, that this is the appropriate case to render a verdict of death as to each and every defendant.

You took an oath. It is an awesome responsibility. It is an awesome duty. But nonetheless, it is just that, a duty. Your duty, ladies and gentlemen of the jury, given the evidence that you have heard, requires no less verdict than death.

As I said in my opening this week, and as I remind you now, ladies and gentlemen, this is a case where you are deciding the fate of mass murderers. Each of these defendants has been convicted by you of being just that, a mass murderer. Each of these defendants comes before you for sentencing having killed a number of people.

The human cost of what these three men have done to support their drug dealing, to further their drug dealing, is immeasurable. Absolutely immeasurable. The evidence is clear, beyond a reasonable doubt, that they have laid waste to the lives of a number of people for their own personal gain, for their own personal satisfaction, for their own personal machismo. They have left ten dead people on the streets of the City of Richmond. They have left two people so seriously wounded that they will never recover. They have left one other seriously wounded person. They have shot one person in front of her children.

Think of the immeasurable harm that has been done to the minds of Montez McCoy and his sisters, who saw their uncle brutally mowed down in front of them, and saw their mother shot by James Roane and Cory Johnson.  You can't quantify or qualify the amount of harm that has been caused by these people.

As I said at the beginning of this week and I remind you now, we have the burden -- that is, the United States, the government -- of proving the aggravating factors which need to be proven in order to impose the death penalty beyond a reasonable doubt.  I also told you that we would not put on a great deal of evidence this week.  And you saw.  We did not put on a great deal of evidence.  Our evidence came prior to this week, in the four weeks of testimony which led you to find these people guilty.  That evidence, as you know, has already been reintroduced and is in front of you in total this

3884

week.  That evidence is to be considered by you in total this week when rendering the appropriate sentence against these defendants.

The aggravating factors are listed in the jury's instructions, in the Court's instructions to you.  There are specific aggravating factors as to each and every defendant.  In most cases, they repeat themselves as to each defendant:

That the defendant intentionally killed the victim; that the defendant intentionally inflicted serious bodily injury which resulted in the death of a victim; that the defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim which resulted in the death of the victim; that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense and which resulted in the death of the victim.

Those four aggravating factors are repeated as to each and every defendant in this case.  And given the evidence that is presented to you, the government has shown beyond a reasonable doubt that each and every one of those factors has been satisfied.  Each

3885

and every murder committed in furtherance of the Continuing Criminal Enterprise satisfies all four of those aggravating factors.

Remember I told you at the beginning of the week that the aggravating factors are to a certain extent duplicative or overlapping?  But going back, applying your common sense, what you understand to be the normal meaning of those words, you will see that the government has proven each one of those aggravating

factors beyond a reasonable doubt as to each one of the defendants.

That is the first group of aggravating factors out of which you must find that at least one exists. I submit all four exist as to each and every defendant, each and every murder that they are being sentenced on here today.

In the second group of aggravating factors, defendant Cory Johnson and defendant Richard Tipton have been charged with, in the commission of the offenses enunciated in the indictment, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense. Clearly they have done that in the case of Gwendolyn and "Pepsi" Greene. That has been proven to you beyond a reasonable doubt. You have already

3886

found that aggravating factor beyond a reasonable doubt, as you have already found the other aggravating factors beyond a reasonable doubt, shown by the verdict you returned on the guilt phase of this case.

As to each one of the defendants, it is charged that the defendant committed the murders enunciated after substantial planning and premeditation. The Court will provide you instructions on that, and I submit to you that you have already found beyond a reasonable doubt that these murders were committed after substantial planning and premeditation. Each one of these murders was premeditated. You know that from the evidence that has been presented.

And I remind you just briefly of the evidence that indeed shows premeditation. Remind yourself of the clear testimony from the mouths of "J.R." and "Whitey" to Ronita Hollman and others in the Newtowne area. "We are going to take over up here." Remind yourself of that credo following them down here from New York, from New Jersey, with the New York Boyz, where they clearly intended to take over blocks in New Jersey. They brought that mind set, that modus operandi, that way of operating, to Richmond. And indeed, they implemented it in the most violent

3887

fashion that they could. They laid waste the bodies that they promised they would lay waste in order to take over. Clear premeditation. But as to each one of the specific murders charged in the indictment, you also have clear premeditation based upon the evidence that you have heard, and substantial planning.

The Court's instruction to you as to substantial planning says that substantial planning means planning which is considerable, or ample, for the commission of the crime at issue. Ample for the

commission of the crime at issue.  Clearly, as to each one of the murders perpetrated by these defendants, they put in ample enough planning to carry it out.  Start with murder number one, the murder of Doug Talley by Richard Tipton and James Roane: 84 stab wounds, most of them to the head and upper body.  84 stab wounds where they clearly intended to plan that murder by taking him to South Richmond, by recovering the knife that was used to stab him 84 times.  They got out of the car and talked about it with each other, James Roane and "Whitey," got back in the car.  James Roane grabbed him around the neck, and "Whitey" began to stab him for four or five minutes.  They then took that knife, disposed of that knife by giving it to "Pepsi" Greene to hold.

And you have the lead-in to the clear premeditation and murder of the next victim, Douglas Moody.  They went and retrieved that knife.  Why did they retrieve that knife, ladies and gentlemen?  They retrieved that knife with one thought in mind: killing Doug Moody.  Clear premeditation, substantial planning.  They intended the consequences of their actions.  They intended to kill these people to clear their way for drug dealing in Newtowne.

Go next to the murder of Peyton Maurice Johnson.  They stalked that man.  "J.R." stalked that man.  They went and retrieved the weapons, which is further planning, further evidence of premeditation and planning, as indeed the purchase of the weapons themselves is evidence of premeditation and planning.  Why do you think they purchased those weapons?  To carry out their plan of taking over Newtowne.  And they used them beginning the day they got them, January 14th, 1992.  They stalked Peyton Maurice Johnson.  "J.R." found him.  "C.O." and "E.B." walked in that house and blew that man away like he was an animal.  They then took the guns and, planning and premeditating their next murder, gave them to "Papoose" to wipe down and hide.

They went and retrieved those guns and indeed killed Louis Johnson with those guns on January 29th.  Remember the statements of Sterling Hardy and Jerry Gaiters, where "J.R." told them "Keep him in the alley."  Keep Louis Johnson in the alley.  They pulled up clearly intending to kill that man.  They got out of the car, put the guns to his head, and blew him away like an animal in the street, also.  Clear planning and premeditation as to that murder.

The triple homicide in Church Hill, "Mousey" Armstrong, again hunted down like an animal by "C.O."  He made Jerry Gaiters take him and find "Mousey"

Armstrong.  Could there be any question in your mind as to the premeditation and planning of that.

Could there be any question in your mind as to the premeditation and planning of the killings on February 19th, 1992, where "C.O." and "Whitey" hunted down Linwood Chiles and Curt Thorne, found them with "Pepsi" and Gwen and mowed all of them down because they had received a telephone call from "V" in the jail indicating that they might be cooperating with the police?  How much more clear planning and premeditation could there be than that particular murder.

3890

The aggravating factors, ladies and gentlemen, have been proven to you already beyond a reasonable doubt.  Your jury verdict on the guilt phase of this trial establishes that.  There is listed, as to each of the defendants, other factors, non-statutory factors, that you can consider when rendering the proper verdict of sentence against these defendants: that the defendants committed multiple murders. Indeed, that they are mass murderers.  That the defendants have substantial criminal histories.  In the case of James Roane, you will see a series of convictions against him.  You will see two convictions against Cory Johnson.  No convictions of record have been introduced into evidence as to Richard Tipton, but I suggest to you that based upon the evidence you have heard, Richard Tipton, Cory Johnson, and James Roane were virtual crime waves in and of themselves.  Wherever they went, crime followed, be it New York, New Jersey, or Richmond. They were virtual crime waves with substantial criminal histories.  Remind yourself of Anthony Howlen and his mutilated face; the arrest of Richard Tipton by the police in New Jersey.  They are in and of themselves crime waves.

That the defendant, each of them, has been

3891

charged with seriously wounding individuals in the course of the murders outlined.  Remind yourself again of Gwen and "Pepsi," of Martha, and the woundings that they received because these people wanted to carry out their drug business.  And each of them has been charged in the statutory aggravating factor with knowingly and willfully being a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant has been charged.  And that's important. You need to remember that.

Now, you can find that a verdict of death should be entered as to each one of these defendants only on the CCE murders that they have been found guilty of. So for example, you could find that Richard Tipton

deserves to die for the murder of Doug Talley, or that Cory Johnson deserves to die for the murder of Linwood Chiles, or that James Roane deserves to die for the murder of Peyton Maurice Johnson. You have got to decide that individually as to the murders charged in the indictment.

But in rendering that decision, you are free to remember all of the evidence of other murders and crimes that were carried out in furtherance of this conspiracy. You are not constrained in making that decision as to what the appropriate punishment is for that CCE murder to limit yourself only to that murder. You can consider the goals of the conspiracy. You can consider the actions of other co-conspirators and what they did in furtherance of this conspiracy when rendering that. You cannot kill James Roane, statutorily, because of his murder of Torrick Brown. But you can indeed consider that when determining whether that's the appropriate verdict for him based upon his murder of Peyton Maurice Johnson. You can consider the fact that he, in reptillian-like coldness went in and shot Torrick Brown. That can all be considered by you. It is in evidence. It has been proven beyond a reasonable doubt.

You can consider the evidence that's been put on this week by the government concerning the fact that from jail, while incarcerated, these defendants continued to try to have people killed. Specifically, you can consider that "Whitey" wanted C.T. Woody killed and wanted "Wildman" killed. You can consider that Cory Johnson wanted C.T. Woody killed and wanted Valerie Butler killed. You can consider that James Roane wanted Martha McCoy and Montez McCoy and the other witnesses killed, and was even going to take action against Doug Cunningham and the uncle of Martha McCoy if they testified at trial. You can properly consider that in rendering the right verdict and deciding what is the proper verdict in this situation of mass murder.

Go back and look at what the government has to prove. I submit to you each and every one of the aggravating factors has been proven to you beyond a reasonable doubt. You have already found them in your guilt phase verdict.

The defense case this week -- let me back up a second. In reaching your decision, what you need to do, and the Court will instruct you about this, what you need to do is take the government's aggravating factors that have been proven beyond a reasonable doubt, take the mitigating factors that you find to have been proven, and simply weigh them. It is not a

mathematical formula.  You don't have to go back there and say the government has proven 16 aggravating factors and the defense has proven 83 based upon the Court's submission to me, so therefore, the defense evidence weighs more.  No. Any one aggravating factor can be found by you to outweigh the entire defense case as to the mitigating factors that you must decide.  It is a weighing

3894

decision that you must make.  Given what you saw in the first four weeks of trial concerning these men's actions as opposed to given what you have seen this week concerning the mitigation, what is the appropriate sentence?  What should these men be sentenced to?

And while we are speaking about that, let's talk about the evidence that you have heard this week in mitigation.  The evidence that you have heard in aggravation is clear, clear beyond a reasonable doubt.  What have you heard this week?  From defendant Tipton, you heard that it is not his fault. His bad youth made him do it.  His bad relationship with his mother made him do it.  It is not his fault.

We are sorry he has had an unfortunate youth. He is not the only child who has had an unfortunate youth.  Indeed, each one of these defendants has put on evidence this week about attention deficit problems, learning disabilities.  I suggest that each one of you on that jury knows someone who has a learning disability.  Is that an excuse for murder.

Each one of the defense counsel stood up and said to you, "We don't intend this as an excuse." That's a smokescreen, ladies and gentlemen.  That's

3895

exactly what it is intended as.  It is intended as a smokescreen.  It is intended as an excuse.  These people cannot be forgiven their actions because they had a hard time learning.  And that's in essence what you have been asked to do this week.  That would substantially negate all the hard work that has been done by all those other people with learning disabilities and bad backgrounds who overcome that. People with those learning disabilities and bad backgrounds don't have a license to kill.  Indeed, you remember Dr. Bright's testimony about Richard Tipton.  He has worked with thousands of children with learning disabilities.  Never before, ever, has he worked or seen one who has committed six murders. None of the doctors who testified here this week, despite their extensive involvement with children with these problems, has testified that they ever have seen anybody commit the amount of murders that these defendants have been found guilty of

committing.  It is offered to you as an excuse.  It is not an excuse.

Indeed, defendant Tipton had that loving environment in certain situations that he complained he didn't.  His grandmother clearly loved him.  He was welcome in that house in New York.  He rejected that.  He walked away from it.  Brenda Williams came and testified as to the nice, loving environment she gave him.  He rejected that and walked away.  I'm not saying the man had a perfect upbringing.  I'm not saying life couldn't have been easier or better for him.  I'm just telling you that it does not excuse what he did.  I would bet that if you looked at the lives of each one of the victims, you would find similarities in their background, too.  Does that mean that they should be brutally mowed down in the streets?  No.

Ask yourself about the story you heard from Richard Tipton's witnesses as to why it is if his background is so bad that each and every one of his cousins is productive, hold jobs.  That background has produced productive people.  He cannot be excused his actions because of his background.

The evidence is clear, too, presented by the defense witnesses this week, that Richard Tipton is set in his ways; that he has cognitive rigidity.  He is impulsive and reacts violently to emotional stimuli.  That evidence is clear, presented by the defense, that that is Richard Tipton.  Given his unfortunate youth, given what went into making him what he is today is all unfortunate.  But it has created a virtual killing machine.  The doctors that have testified for Mr. Tipton have been clear in that regard.  Ask yourself if it was a smokescreen when the defense argued that indeed perhaps he might be able to rehabilitate himself in jail, when not in a period of one year since his incarceration has one step been taken for him to change his behavior, to change the way he is.  I submit to you he cannot.  He is who he is.

I remind you of another important fact concerning the testimony that you have heard this week from Richard Tipton.  A number of people have talked to him for hours.  Hans Selvog talked to him, Dr. Evans talked to him.  In fact, he has poured his heart out to these people concerning the deprivation of his youth, the unfortunate circumstances with his mother.  He has gone into intimate detail in his life with these people and they have testified to you based upon what he has told them.  I ask you, have you seen once from that witness stand this week an iota of remorsefulness from that man?

App.0991

MR. GEARY:  I object.

THE COURT:  The objection is sustained. Mr. Vick, don't get stupid in the end of this, please.

MR. VICK:  Yes, sir.  As to Mr. Cory Johnson, he, too, says, "I've had a bad youth.  I've got a learning disability.  I should therefore be excused from blameworthiness for what I have done." You can't do that, ladies and gentlemen.  The testimony of the doctors who testified for him have made it clear that he knew right from wrong; that he had a clear moral compass.  Indeed, the testimony from the people from the New York Cottage School was clear:  that he had a strong moral compass; that he has at some point in his life rejected it.

MR. BAUGH:  I hesitate to rise, but we are going to have to object and approach the bench in the middle in light of that.  We have discussed it and it has to be raised.

THE COURT:  No, you don't have to come up. I'll do an instruction, cautionary instruction, after this is over.

MR. BAUGH:  Objection.

MR. VICK:  Remind yourself about the evidence presented from the experts in his defense. I would submit to you that that evidence was one-sided.  I'll give you an example.  In his testimony, the doctor said that he had an IQ of 77, two points above mentally retarded, and submitted that to you as if it were a fact.  That's two points above mental retardation.  He therefore is two points above where the law would not allow you to assess a penalty of death against him.

That's disingenuous, ladies and gentlemen.  By the very definition given you by that same expert, it is clear that IQ goes only as to one factor of a man's mental retardation.  And his ability to socialize and communicate is another factor, as are all the others.  Cory Johnson has had absolutely no problem, based upon the evidence you have heard here in the last four weeks, in maintaining himself and keeping care of himself and keeping a home and dressing himself, in socializing, in talking.  He is not mentally retarded.  He is not close to mentally retarded.  I submit to you the more accurate IQ test was given in 1982, where it was shown he had an IQ of 88.  Remember, the last IQ test done of Mr. Johnson by Dr. Cornell was done in anticipation of testimony for this trial, done by Cory Johnson knowing that this would be the subject of that man's testimony in the penalty phase of trial.  That is disingenuous, ladies and gentlemen.  That man is not nearly

mentally retarded.  All the evidence you have heard this week rejects that.  Dr. Cornell told you, in

3900

essence, that he could not have run a drug organization, he could not have organized and supervised that.  You found that he had.  The evidence is clear that he did.  Contrasted by the testing that showed he was in the superior range in structure of word fluency.  He knew enough math to know that "Mousey" Armstrong owed him $400 for crack cocaine.  He certainly had no problem with that.  He is not mentally retarded.

Again, he might have had a learning disability and an unfortunate youth.  He was offered a structured environment.  He was offered everything that the State of New York had to offer him in an effort to right him.  And that was rejected by him. He is, too, given the doctor's testimony, who he is. He is, too, at this point, given his unfortunate youth, a killing machine.

As to defendant James Roane:  His case this week has basically amounted to it is not his fault, it is society's fault.  "They let me down.  They didn't take care of me the way I should have been taken care of.  Those four murders that I am charged with weren't really my fault; they are society's fault." You can't accept that, ladies and gentlemen.  That is not an excuse for what he has done.

3901

The doctors said clearly about James Roane that he is intelligent, that he knows right from wrong, that he can clearly premeditate.  They have also clearly testified that he rejected the help that was given him.  He did not do well in the Charlottesville school.  He went away.  The evidence is clear in their record.  He did not adjust.  He left Mr. Brunson, who tried to give him a loving environment.

MR. BAUGH:  I object.  That is not the record.

THE COURT:  Overruled.

MR. VICK:  And look at Mr. Brunson's last entry.  He said that the last phone call he got was from a friend of James Roane, who said that James was back into drugs.  It is the last time he heard from James Roane.  It is clear that James Roane walked away from Mr. Brunson.  You can't believe that Mr. Brunson would have cut him off and had no contact with him had James wanted continued contact with him.

Again the evidence is clear that in the last year he has been in jail he has made no efforts to change.  They will ask you to find a mitigating factor that he will make a good adjustment to jail. There has been no evidence that he has attempted to

3902

change in any way over the last year.  Indeed, the evidence has shown that from jail he has tried to orchestrate murders.

The evidence has shown that he, too, is who he is.  He is impulsive and violent, with cognitive rigidity.  That is James Roane.  He, too, is a killing machine.

Some thoughts, ladies and gentlemen, about the propriety of the death penalty:  And I know each one of you have given a great deal of thought as to whether the death penalty is ever an appropriate sanction, and if indeed the death penalty is an appropriate sanction in this case.  I submit to you that the death penalty is an appropriate sanction for three reasons.  The first reason is that our laws act as a deterrence.

MR. BAUGH:  Objection.  They cannot argue deterrent effect in a capital case.  That's called billboard, and it is illegal.

THE COURT:  Sustained.

MR. BAUGH:  We would ask the jury be instructed that cannot be considered as an aggravator.

THE COURT:  The objection is sustained.

MR. VICK:  Is this the appropriate

3903

punishment given the actions of these defendants?  I submit to you, ladies and gentlemen, it is indeed the appropriate punishment.  As you know from the testimony that's come from that witness stand, people can get life, penitentiary terms, based only upon drug dealing.  Drug dealing alone could lead you to a life of incarceration.  And indeed, there are many people incarcerated for life from drug dealing alone.  These defendants have gone far further than simply dealing drugs.  They have killed ten people in furtherance of their drug-dealing operation.  They deserve a punishment greater than those other people who are in jail for life based upon drug dealing alone.

A sentence of life in the penitentiary by you will in essence tell them and other drug dealers that you can sell drugs and kill people and you will get punished no more severely  --

MR. BAUGH:  That's deterrent effect again. That cannot be argued.

THE COURT:  Overruled.

MR. VICK:  -- than if you sell drugs only. They deserve the maximum punishment, ladies and gentlemen, because in addition to their drug dealing, they chose to kill ten people.

3904

Ask yourself, should they be punished beyond

incarceration?  I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment.  But think about each and every day of their existence in jail.  They will wake up, bathe, be fed.  They will be able to watch TV, read books.  They will be able to use the telephone to talk to their loved ones.

MR. McGARVEY:  There is no evidence whatsoever of that in the record.

THE COURT:  Sustained.

MR. BAUGH:  Jesus.

MR. VICK:  They have sentenced Richard Tipton and Cory Johnson, have sentenced Gwen Greene to a life of less mobility than that.  Their punishment --

MR. BAUGH:  I thought you just sustained the objection.

THE COURT:  The objection is sustained.

MR. VICK:  Given their actions, ladies and gentlemen, the punishment in this case should indeed be the maximum punishment; that is, the death penalty.

These people have continued in jail to try to harm others.  Detective C.T. Woody, Valerie Butler,

3905

Martha McCoy, Doug Cunningham.  You can consider that when determining whether life in the penitentiary is the appropriate punishment, or whether the death penalty is the appropriate punishment.  And I suggest to you that it leads you to but one conclusion:  That in this case, given their actions, death is the only appropriate sanction for these people.

I began this by saying that this is an awesome duty that you have undertaken, and indeed it is an awesome duty you have undertaken.  But the law is clear that in certain cases, the death penalty should be imposed.  It is the will of Congress.  It is the law that you must follow.  What you must determine is, given the evidence that you have heard, is this one of those appropriate cases?  And I suggest to you, ladies and gentlemen, it is the appropriate case.  Remind yourself of the pictures that you have seen of the people that they have laid waste to.  Remind yourself of the clear choices that they made on each and every occasion which led to these murders.  Each one of us make choices that could shorten our lives.  We smoke, we ride motorcycles at 80 miles an hour, hand-glide.  We make choices that might shorten our lives.  These people made ten clear choices to kill other people that should result in

3906

the shortening of their life given the law that you operate under.

Ladies and gentlemen, it is a strong duty you

have.  But it is just that.  It is a duty.  This case warrants the imposition of the maximum punishment possible, the imposition of the death penalty as to each defendant:  Cory Johnson, Richard Tipton, and James Roane.  Thank you.

THE COURT:  All right.  Ladies and gentlemen, before we get started with the first defense argument, I have to give you a cautionary instruction.  Mr. Vick, in the zeal of his argument, indicated that Mr. Tipton had spoken many times and openly to the defense experts and they took the stand and discussed that.  He then followed that up with "But you haven't seen one iota of remorse from the witness stand."

You cannot, you will not, ever require a defendant to take the stand.  The defendant doesn't have to testify.  The defendant doesn't have any burden to prove that he should not be put to death.  The burden is on the government to prove beyond a reasonable doubt that a defendant should be put to death.

As I will indicate to you in further instructions, as I've said to you earlier in the first part of the trial, the argument on the part of the counsel is just that.  It is not evidence.  And you must consider it in that light.  But under no circumstances are you to take that kind of argument as indicating that the defendant has an obligation to take the stand and tell you something, even if to indicate remorse.  Do you understand?

MR. BAUGH:  Can we reserve our motion at this time?

THE COURT:  All right.

MR. COOLEY:  Also on that and another point.

THE COURT:  All right.  Mr. Tipton's counsel?

MR. GEARY:  May it please the Court.  Back in April of 1992, Eric White and I were appointed to represent Richard Tipton.  And the point I didn't want to be at back then and through May, June, July, August, through January, February, was being here right now.  That's the point where a defense lawyer doesn't want to have to be, where his client has been convicted of capital murder, where 12 members of the jury have just heard a moral-authority argument from the prosecutor to put his client to death and he has to stand up here and try to find words to convince you that you shouldn't do that.

I have had the privilege, in over 22 years of doing this, of seeing what I consider to be two classic closing arguments.  One was in this Court

about seven years ago by a prosecutor in a murder case, and the other was about 15 years ago in Richmond Circuit Court by a defense lawyer in the first capital murder case brought in Central Virginia after the statute was changed in Virginia in 1978. I was co-counsel to that lawyer. And he made, he and the lawyer that I talked about before, made arguments that I can close my eyes and still see them. The other lawyer is now a judge in Richmond, and the prosecutor who made that closing argument was Judge Spencer here about six or seven years ago. I don't have that ability. I don't have that magic wand to wave to you to say, "Put him in prison for life." I don't know if I can do that. I don't know if David Baugh can do it, or John McGarvey can do it. The problem with having a case for eight months, ladies and gentlemen, is you get to know your client. I have been to the jail to see Richard Tipton anywhere from 70 to 90 times, and I've gotten to know him.

And this report that Mr. Selvog prepared tells you the bad background. And believe me, that's not a smokescreen. That's simply to tell you who that boy is over there. Because as he sits there, he is 22 years old. And I can tell you from what Mr. Selvog told me in here, from what Tina Wilkerson said, and Brenda Anderson, that he is about seven or eight years old. He has the maturity of a young, young boy because of what his mother and father did or didn't do to him.

When we started this case I thought if we could get the Marshal sitting here to move over and get Cory to move over a little bit, we should put two chairs next to Richard Tipton and put two people in there -- his father and mother -- and let them hear and find out what he did in the City of Richmond, the drug dealing he did before then, and to say to those two people, When you decide to bring a child into the world you must take care of that child. You must not abandon that child," like the Tipton family did. I mean exactly that: his father, paternal grandmother, Ruby Tipton, his uncles. They abandoned that boy to New York City to a very tiny apartment where a shooting gallery took place. His mother and her series of friends and junkies shot drugs day and night.

When you go through this report, take a look, for instance, at page 21 in the report. I'm going to read some of it to you, where Mr. Selvog interviewed Martrice, his sister, and Tina Wilkerson. And Tina on page 21 talks about when Martrice moved out of the house; she couldn't stand it anymore. She went across the street, and the video showed you where the

grandmother lived as opposed to Charlene Tipton.  He quotes Tina saying, "I remember when Martrice moved out of Charlene and "Pimp's" apartment and came to live with us."  She was 14 years old, meaning Richard Tipton was ten.  She said, "Can I come and sleep on your floor?  If not, I'll put myself in a home.  I can't stand it there anymore."

She came across the street.  There wasn't any room for Richard to come, so he stayed with this woman that uses the term "mother."  On page 21, Tina is asked about him, what he was like when he was a young boy.  And she said Manny understood from a very early age that all he had was himself to rely on.  He would often comment on self-reliance by saying, quote, "I don't ask for anything, I'm not a burden on anyone.  I don't ask for any money."

This particularly exacerbated when grandfather died, Tina said.  Henry Wilkerson died in 1986, richard Tipton's grandfather.  He was a longshoreman, mechanic, forklift operator.  Probably the only male influence that Richard Tipton had in his life as a young boy who was in any way positive and of assistance to him.  Certainly Richard Tipton, the father, was of absolutely no weight in his life.  He was abandoned when he was two years old in Richmond when Charlene Tipton went back to New York.  This is all to point out to you in every kind of graphic detail that you could ask for in this report, which is based, as Mr. Selvog said, on numerous consultations, interviews with a lot of people.

Again, I suggest to you we are not here to put up a smokescreen on you, which the government says we are trying to do.  We are trying to show you his upbringing, that's all.  Because you have to decide between two punishments.  It is not that you are going to let him go, but two very severe punishments.  Which one should this kid get.

He is a kid.  I tell you that.  He is a kid.  Because he is a child.  He may be, in fact he was, as your verdict suggested, in January and February of last year, because he was convicted of six capital murders, he may have been a killing machine, as Mr. Vick said.  But that's not the issue here.  The issue is not whether he was then.  The issue is what sentence you should give him.

The doctors in this case are not here again to offer you any excuses for Richard's behavior, but simply to indicate what his processes were.  He is learning disabled, has all these very difficult problems that existed along with the violence and drug abuse that were so integral a part of his life.  And the doctors say to you with medication and the

proper structure, this kid can survive. This 22-year-old kid can survive. He needs to survive for another reason. He needs to make redemption, needs to do penance. "Papoose" had it right, Robert Davis, when he testified. "What are you here for 'Papoose?'" "I'm not here for revenge. God's going to take care of that." And that's what's going to happen. And Richard Tipton needs redemption for what he did, his involvement in six murders.

You know what your judgments were on the six murders in regard to the Talley and Church Hill and Stony Run murders. We don't know what degree of involvement you have found in the last series of murders. That's something you have decided. We don't know. But I suggest to you when you go through these instructions and deliberation process,

3913

Instruction Number 6, you are going to have the aggravating factors that Mr. Vick talked about and then you will come to the mitigating factors which, for Richard Tipton, are about three-and-a-half pages long. And again, I'd like to go over, talk about some of these, not again as an excuse for his behavior, because I don't excuse his behavior. Eric White doesn't.

Judge Spencer on Instruction 14 has listed ten of these, Instruction 12 lists about eight or ten others. I ask that you do what you did in the first portion of the case; that you take your time. You have over here the exhibits that are going to be given to you in terms of Mr. Selvog's report. There is also a very thick book which is not replicated, but which has the appendices to all the data that Mr. Selvog selected. That list of appendix on the back of each one of your social histories is supported by the documentation over there that tells you something about Richard Tipton.

The ultimate decision, ladies and gentlemen, is yours, as Mr. Vick says. You have to decide if the aggravator has been proven by the government beyond a reasonable doubt; decide whether these many mitigators have been shown by a preponderance of the

3914

evidence. I suggest when you listen to the witnesses that we had and read the social history, you will find most if not all the mitigators were proven beyond a reasonable doubt. You must go into the weighing process then.

I suggest if you weigh, you will weigh in favor of life without parole. If you get past that point, if you have to go to the next stage, the 12 of you collectively do not act anymore. You become 12 individual jurors. As the instruction indicates, any one of you can then say for whatever reason that you

care to have -- whether that reason is published to the rest of the jury or not makes no difference -- you simply say, "I do not vote for the death penalty." It can be a reason that you can keep in your head for the rest of your life without telling anyone. You can tell the rest of the members of the jury. You can do whatever you want. Because the death penalty is never required.

In one of the many tributes paid to Arthur Ashe this week, there was an article in the Times Dispatch that dealt with a visit that he paid to a Richmond public school, I don't know, six months or a year ago. And he spoke to a group of students that were about nine or ten years old. And the focus of the

3915

article was that Arthur Ashe told them that the best thing he could tell them was to stay off the streets. I thought about this: Suppose Arthur Ashe was in a Harlem elementary school back in 1978 when Richard Tipton was 8 or 9 years old, if he went to that school and said to him and his class, "My best advice to you is to stay off the streets." I would suggest to you as good as that advice was when Mr. Ashe gave it to these schoolchildren in Richmond and as good as that advice would have been back in 1978 to the schoolchildren in New York, for Richard Manny Tipton, it would have been bad advice. Because the streets were a far better place than his home.

You heard the testimony from Tina, who has firsthand knowledge, 32-year-old cherubic woman who came here to testify about the box that her cousin lived in, an oversized closet, of being punched in the face almost daily by his mother, having heroin parties going on endlessly. That's the environment he grew up in. That's not a privileged environment by any stretch of the imagination. That's not a perfect environment. It is horrible. It is living absolute hell. I can't imagine anybody growing up the way he did. I'm not suggesting to you, as Mr. Vick tried to tell you that I would, that that means

3916

he is going to kill somebody. Because it doesn't. It indicates to you that he has obstacle after obstacle to overcome. He couldn't do it. He fell in with some other people who accepted him. He finally found a family. Those family that he found were not blood relatives. They were people like Cory Johnson, people that accepted him.

And you heard the evidence in the beginning of the case in the first phase of the case that they referred to each other and cousins and brothers. They weren't legally, but they did, because they became a family. They finally found somebody who could accept them for what they were. That's a

horrible commentary on growing up, that I would have to come to that stage, when Mr. Vick makes these absurd suggestions to you that Richard Tipton walked away from love and caring. He never did. He never had it. He never had the seat next to him where his father should have been, and he obviously didn't have a mother. If he had Brenda Williams, the lady who works for the Henrico County Tax Department, if he had her all his life, I'll guarantee he wouldn't be here. If he had had the father that Arthur Ashe had, he wouldn't be here. I guarantee you. It is a lot like the doctor said in answering Mr. Baugh. "It is

3917

a guarantee." If he had had C.T. Woody as a father, Richard Tipton wouldn't be here. C.T. Woody wouldn't let his children do things like that. He would have kicked butt. If he had John Thompson, the coach at Georgetown, he wouldn't be here. But he didn't. That's not to excuse him, but to tell you, "Hey, look, there is something in this little fellow here. There is something in this eight-year-old. There is redemption possible here." It is to tell you that the death penalty in this case is not the answer.

Eric White asked Tina when she was on the witness stand, the last question, he said to her, "Tina, why are you and your brother Henry here?" She said to you 12, you 15, "I'm not here to excuse my cousin. I'm here because I love him."

Where was his mother? What was her comment to Eric about Charlene Tipton? Charlene said to Tina Monday before Tina got on the train to come down here, Charlene said, "Tina, make me look good when you testify." Do you have to know anything more about the environment he had? When her son is on trial for capital murder, when he is facing the death penalty, his mother is concerned that she look good. Does that tell you why she wasn't here?

And Brenda Wilkerson, who has a very responsible

3918

position, who knows him for a six-month period as a son, she called him. He went to Highland Springs High School during that period of time, got a job. He didn't walk away from her. He felt the way she said, that things were getting to be a burden on her because she was having a bad financial problem. 16 years old, after his grandfather had died, after the Tiptons had virtually thrown him out again: "You are not staying with Vincent or your father." He did. Eric said to her, "Why did you come to this Court?" She said, "I'm a mother. I could not live with myself if I did not testify for Richard Tipton." Thank you.

THE COURT: All right. Just one brief thing before we get to the next argument. Mr. Geary

App.1001

misspoke.  He was talking about considering the aggravating factors and then the mitigating factors, and he said before you have resolved what the mitigating factors are, found them beyond a reasonable doubt.  That is not the standard.  The standard that would relate to the mitigators is by a preponderance of the evidence.  I will explain this to you more in detail.  Go ahead.

MR. McGARVEY:  May it please the Court:  It has been an emotional five weeks.  And I'm going to

3919

start with asking you folks to do something.  The law says that each one of our defendants are entitled to individualized consideration.  So I'm going to ask you good folks to draw a curtain here and a curtain here.  And I'm going to ask you folks to focus on this man, my client, Cory Johnson.  I am going to ask you to tune out everything else, and I'm going to ask you to consider my client, Cory Johnson.  Mr. Geary quite artfully put it:  That when you represent someone who has been charged, and at this point convicted, of the types of crimes that he has been convicted of, we as defense counsel live with that person continuously.  We have lived with Cory, Mr. Cooley and myself, it seems like forever.  And we know what he did, but we have gotten to know him as a person.  And that person, that man, in quotes, is a man with the mind of a gradeschool child.  And you have heard that from the stand.  And that's who Cory Johnson is.

I came up here with a semi-set pat thing to say to you folks, and I found that I can't do it.  I'm going to do it the best that I can.

At the outset, I feel constrained to reply to the prosecutor in terms of what he said about the aggravation here or the aggravating factors.

3920

He talked about Cory Johnson trying to have Valerie Butler and C.T. Woody killed from the jail.  Do you folks remember Rodney Tucker?  When I stood up here in opening, I told you we are not trying to make excuses.  Cory is guilty of the crimes for which you have convicted him.  But to bring in a professional snitch in the aggravation stage to come in here and try to enhance the prosecution's case is beneath the prosecution.  Rodney Tucker was with Cory Johnson for a grand total of 14 days in the isolation section of the Richmond City Jail, the isolation section, with one cellblock in between them.  And supposedly, Cory Johnson is hollering across one cellblock to another individual one cellblock down, with guards and everybody else.  And the man, the man is a professional snitch.  There is no other way to put it.  He came in here, testified earlier in another

trial, got dispensation from the government, and came in here on the coattails and tried to enhance the government's story.  And by God, the government used him.  It is bad enough.  They didn't have to try to enhance it.

I told you, we are not trying to make Cory Johnson not responsible.  We are not trying to make excuses for Cory Johnson.  He talked about Dewey

3921

Cornell, Dr. Cornell, being disingenuous.  Dr. Cornell, by his own testimony, has testified more for the prosecution than he has for the defense.  He knew what the standard for mental retardation was.  75.  And that if Cory Johnson had an IQ of 75, then by law he could not be executed.  If he was coming in here to be disingenuous to you folks, do you think he couldn't hedge on two points?  But the prosecution has the gall to come in here and tell you folks that.  That mitigation isn't disingenuous.

If you look at Dr. Lordi's testimony, he indicated that IQ's with age, especially with someone who has a severe learning disability, diminish.  They diminish simply because that person has not been able to learn.  And so logically, of course, their IQ's diminish.  You couple that with severe brain dysfunction, you don't have to be a doctor, you don't have to be a rocket scientist to figure out that someone with a severe learning disability, who can't learn, and we are all dependent on what we can retain, obviously is going to have a diminishing IQ.  And I would suggest that it is beneath the prosecution to come in here and blow smoke at you folks like that.  As I said, it is bad enough, it is bad enough.  They don't need to try to enhance it.

3922

Once again, Cory's fate is in the hands of strangers.  And I trust and I believe and I hope that they are compassionate strangers.  There is nothing new to Cory about that.  His fate has always been in the hands of strangers.

In January, early January of this year, in these batteries of tests that Cory was given by Dr. Cornell and Dr. Peck -- this is in your packet, folks -- he was asked to write a story.  And when he wrote the story, he started it like this:  "This is January of this year.  Me and my mom went to the moon."  This is the same mother who doesn't have the decency to even show up at this trial when her son's life hangs in the balance.  Cory Johnson is alone.  He is alone as he has been all his life.  Not one family member comes here.  Not one person, not even the mother who he spoke of as a goddess can come here when his life hangs in the balance.  And they want to make light of that?

Cory Johnson in January of this year is still waiting for his mom to take him to the Pizza Hut.

(Counsel turns to face defendant Johnson.)

Cory, she is never going to show up.  She is never going to show up.

Folks, you have heard a lot about mitigators and aggravators.  You will be submitted a list of mitigators.  The mitigation, as I indicated, was presented to you in the second phase of this trial.  The burden is on the defense to prove those mitigators by a preponderance of the evidence, 51 as opposed to 50 percent of the evidence.  I would respectfully suggest to you folks that that has happened here.  The government hasn't produced an iota of evidence rebutting any of the mitigation.  And as I indicated to you at the very beginning of this, the death penalty is a narrowing process by law, according to the Supreme Court of this nation.  It is to narrow the class of people who can be executed.  And I submitted to you folks earlier, and I submit to you again, that the death penalty is reserved for those who are totally blameworthy, who are fully responsible for those actions, for their actions.  Fully.

I didn't stand before you folks and tell you that Mr. Johnson wasn't blameworthy.  I didn't stand before you folks and tell you that he didn't know the difference between right or wrong.  I didn't stand before you folks and tell you that he wasn't responsible.  But I did stand and tell you that Cory Johnson, with that mind of a child, is not fully responsible.  He is not totally blameworthy.  There is mitigation before you folks that alleviates some of that responsibility.  And those are factors that Cory Johnson had no control over.  Cory Johnson was born into a family.  That family consisted of no father, a mother, a narcissistic, selfish mother, drug-addicted mother, a mother who actually gave up her own kids when Cory was 13 years old and when his brother, who had attempted to commit suicide at the ripe old age of ten, when he was 11 years old, gave them up, put them in foster homes.  She is a mother who expected of Cory to go to college.  Cory, to go to college.  Cory, who can't read beyond a second-grade level.  Cory, who tried and tried and tried to learn to please his mother.  But he couldn't do it.  And that wasn't his fault.  To be rejected by the only person who was family, the only semblance of family that he ever had, to be given up for adoption, what does that do to a normal, quote/unquote, person?  And ask yourselves, what does that do to a person with a severe, severe learning disability,

with severe brain damage, neurological impairment, with severe impairment in the way that he reasons, with severe problems in the area of problem-solving, logical thinking, severe problems in terms of understanding the consequences of what he does?  And you have heard that testimony from our disingenuous expert who testifies more for the prosecution than the defense.

What does it do to a person?  Well, I'll tell you what it did to Cory Johnson.  Cory Johnson didn't have a family.  The only family he had was his mother.  And just as Dr. Lordi said, people with disabilities don't shop in the mezzanine.  They shop in the basement.  They shop in the basement.  Cory Johnson found a family.  He found something he could do.  He could deal drugs.  He found a family.  Let me introduce you to them.  This is his cousin over here; this is James Roane.  This is his brother; this is Richard Tipton.  And Cory, with those impairments, would do anything, anything, including murder, to protect his family from a threat that he perceived, or that he was led to believe was real.

Odette Noble told you that Cory was not a leader.  Why?  Because he wasn't smart enough.  But he would have been the point man.  And within the family, he was the point man.

Don't go any further than that, folks.  That's what happened here.  That is exactly what happened here.  And is he responsible for those murders?  No two ways about it.  Absolutely he is responsible for those murders.  Did he know the difference between right and wrong?  We didn't try to come up here and throw any wool over your eyes.  Yes, he is responsible.  He knew the difference between right and wrong.  But is he totally and completely blameworthy?  Were there factors in his life that he had no control over that contributed to the actions, the ill-fated actions for all involved that he took?

I don't quite understand the dynamic here.  But I do know that if you look back on Cory's history, you see a kid who tried, despite all of those limitations.  You see a kid who wanted to please.  You see a kid who was a good-hearted kid by all accounts.  And then suddenly he finds a family and he changes.

Folks, with what we presented to you, that much compassion, that much mercy; because the difference we are talking about here is whether or not you are going to kill Cory or whether or not he is going to die in the penitentiary.  That much compassion.  Was he completely and totally blameworthy?  Or were there factors in his life over which he had no control that

contributed to this?  And I think when you look at that packet and you think about the evidence that was

3927

presented to you, the conclusion is inescapable. Certainly there were.  It doesn't excuse it.  It doesn't lessen the pain of the families who have lost people here.  It doesn't lessen anything.  But I would submit to you that if you follow the logic of the prosecution, and you don't show that much compassion and that much mercy (Counsel indicating with fingers.) then what separates the neurologically-impaired, learning-disabled Cory Johnson from us?

As I told you, once again, and maybe for the last time, Cory Johnson finds his life, his fate, his existence, in the hands of strangers.  Once again, he is alone.  I believe you are compassionate strangers and I believe that you will show that much compassion.  Don't kill Cory Johnson.  Don't kill him.  Thank you.

THE COURT:  Mr. Baugh?

MR. BAUGH:  May it please the Court, counsel:  The United States, the government, the crown, whatever you want to call them, they would have you determine the death penalty based solely upon one issue; and that is, were the acts committed by these people bad?  And they are.  And it is not disingenuous when we tell you we do not make any

3928

excuse for them.  They are bad.  The acts are bad.  A lawyer that I respect once told me the difference -- and I was a prosecutor; I prosecuted for five years, in this courtroom, in fact -- the difference between prosecutors and defense attorneys is that prosecutors prosecute acts.  They want you to look at what happened.  Defense attorneys defend people.  And therein lies the difference.

In this part of the trial, that's what you are supposed to be about.  I'm reading from what I anticipate the Judge will give you in Instruction 11.  A mitigating factor, instead, versus an aggravating factor, is intended to present extenuating facts about the defendant's life or character or the circumstances surrounding the capital crime for which he has been convicted that would suggest a sentence of death is not appropriate.

We are here in this stage of the trial, according to the jury instructions, according to what Congress gave you, to determine whether or not there is something about their lives and their individuality that should justify not killing them. We are not here to look at the acts again.  We are here to look at the people.  We are charged with

3929

putting on evidence about their character.  And the United States, if they wished, they can put on evidence about their character.  And they chose not to.  Instead, they go back to the act, the acts. Murder is horrible.  But under the law, and you have sworn an oath to follow the law.  All murderers cannot be sentenced to death.

Secondly, the United States, the prosecution, comes in here and they say they have left these bodies out in the street.  I'm going to tell you, we gave you these books yesterday.  And at the very least -- and first, you don't owe James Roane anything.  You have sworn an oath.  But you notice that Jeff, the court reporter, he doesn't go back there with you.  When you go in that room, you all can go back there and flip coins and no one will ever know.  So if you don't want to do anything, if you want to violate your oath, you can.  But for God's sake, don't sentence someone to death until you read about his life, understand him.  That's what this is about, understanding James Roane.

The United States gets up and says he never tried to get help for himself.  He was in Adventure Bound and he left.  I'll tab it for you.  First page behind Tab 1.  Up until approximately one-and-a-half

3930

years ago James Henry Roane was being regularly seen in the Lor-Berg Clinic.  The state, which was paying for these visits, terminated payment and James Roane's participation with Dr. Lordi ceased.  Did he walk away?  No.  His family didn't have the money, so they dropped him.

You read through, I think it is, page 74 of the chronology.  The United States, Mr. Vick, just got up here and told you that he walked away from Adventure Bound.  You read pages 74, 75, and 76.  No, he went and made application at the Job Corps because he wanted to be a heavy equipment operator.  And they told him, the people at Adventure Bound, said, "You go down there and make an application."  They helped him.  But he was told he couldn't get an interview for two months.  And they sent him home.  He tried.

In these records, and you heard Mr. Brunson, he asked to be kept on probation.  A youngster says, "Keep me under the restraint of the law because I need the supervision."  There is one statement here from his Probation Officer.  "It appears that James prefers jail to his home."  Is that lazy?  Now see, laziness is a nice thing because like I say, I used to prosecute.  That's a good thing.  You see, there was a time when we were less civilized, when we

3931

thought that all evil behavior was attributable to

the devil, you see.  Like for instance, epileptics. There was a time when the treatment for epileptics was to tie them to a post and we beat them with sticks to beat the devil out of them.  Because they are not really sick, they are just possessed.  They are just wrong.  And if we hurt them enough, they can develop the strength to resist the temptation to commit crimes.  Oh, drug addicts don't have an illness.  No, no, no.  They are just weenies.  They are not strong like me.  If they could stand up and just say no, their drug addiction go away.  These people aren't the products of a horrible society. No.  They are just morally lazy.  So therefore, let's just fry 'em.  And that will teach them a lesson.

We have gone beyond that.  Just like Dr. Semone yesterday said, 20 years ago we didn't know the stuff we know now.  And believe me, as an aside, nobody in this courtroom knows ADD better than I do.  Nobody knows better the difference between him and others.

The question for you now is, are the acts committed by James Roane the acts of a free and unimpaired mind, under the control of volition?  Or is it an attribute of something over which he had no control?  That's the question.  And I've got a

3932

question for you that he can't answer.  If it is a product of his free and unencumbered will, then how in the name of all that's good and holy could Lordi predict it 20 years ago.  Lordi says, "Unless he is treated he will have emotional and behavioral problems."  In there, it says, "Time is passing.  He is going to be dangerous to himself and to others." It couldn't be a product of his brain.  It couldn't be a free and unencumbered act.  It has to arise out of the condition.  Because the people that recognized the condition predicted it.

I will tell you something else.  You have heard about the records of these young men.  And you have heard that they were violent.  But you know what's fascinating -- oh, and my client has assaultive behavior.  Yes, fights with girlfriends and all kinds of stuff.  The real violence doesn't begin in their lives until one or two of them get together. Individually, it wasn't there.  Isn't that fascinating?

Now, does that mean that these doctors are right when they say that people with this problem gravitate to one another?  Yes, it does.  Now, one thing good about this trial is like most.  I went to law school in Texas.  We are real butch, you know.  My whole

3933

attitude toward the science of psychology and psychiatry has changed.

This was predicted.  Unless Dr. Lordi has a

crystal ball hidden in that locker of his, there is a science and there is predictability to this, and that's what caused this thing.  It is not because James Roane is not as strong as I am, or Mr. Vick. No.  He is not weaker than we are.  He was born with a birth defect.  And you don't kill people because of birth defects.  They say, "No, we are not going to kill him because of the birth defect.  We are going to kill him because of the acts."  But the acts arose from the defect, because Dr. Lordi predicted it would.  Was he weak in receiving treatment?  No, he was broke.

"Wait a minute, everyone who has an ADD problem doesn't go out and kill."  You heard that.  And everyone from James Roane's environment doesn't go out and kill.  You heard that.  But then you heard me ask Dr. Semone, "A person with James Roane's mental impairment, his brain damage, and that environment, what is the likelihood he would end up this in courtroom today?"  He said you could make book on it.  You heard that.  And he didn't try to question it.  It was going to happen.

3934

Now, one of the reasons I get emotional about this is that it was partially my fault.  Because I don't get upset when everybody doesn't get the education my kids get.  Yes, maybe I feel a little guilty.  Maybe I should have been his Big Brother.

The United States next argues that my client, our client, James Roane, is a killing machine.  I believe the term was "reptillian."  I love that.  A reptillian killing machine, incapable of formulating or making the moral judgments to constrain himself. And then he turns around and says, "Not only is he like that, but we want you to make him your teacher. We want you to suppress and repress your civilization and act like him to punish him."

Faith is hard.  It is real hard being civilized.  Because when you are civilized, sometimes you have to stand up to things you don't like and remind yourself by doing what I know is right, I will eventually win.  By doing what is right I will make a difference, even though the person I'm dealing with doesn't appreciate it.  I am a child of the 60's. SCLC, NAACP, Legal Defense Fund, all that good stuff.  It was hard getting whipped during the national sit-ins, but we were told if we had faith and if we do this, it will get better, even though

3935

these people don't deserve what we are doing.

MR. VICK:  This is objectionable.

THE COURT:  Sustained.  Quit personalizing the argument, please.

MR. BAUGH:  It is going to be very hard for

you all not to kill.  It is going to be hard. Because you are going to have to, as the law says, just think about the people.  In fact, if you sit back and say nothing in that room, if you have a feeling and you don't say it, you will probably hasten his execution.  The law says you should consider the aggravators and, if proven beyond a reasonable doubt, that weighs down on one side, the aggravators.  They already proved the aggravators. We proved them guilty.

Then you have to look at the mitigators by a preponderance, a very low standard.  51 percent? They offered no evidence in mitigation, so we must have won those.  But then the law goes on to say that once you find the existence of these, regardless of how they come out, if you have something new, even if you can't articulate it, that says, "I don't think they should die, or I don't think Mr. Roane should die," you should vote not to, even if you can't even recognize what it is yourself that you are feeling, even if you can't articulate it to fellow jurors. And what could that feeling be?  Conscience?  I would submit it is not weakness.  And the law says in the instructions -- let's take a moment and find that. Excuse me.  It has been a long trial and I'm getting disorganized.  I can't begin to tell you how rough this is.

(Counsel perusing instructions.)

I believe the Judge will instruct you that if even one juror finds a mitigating factor present which in that juror's mind is not outweighed by the aggravating factors that you have agreed, the jury may not sentence that defendant to death.  If even one juror finds that a sentence of death is not justified, the jury cannot return a decision in favor of capital punishment.

I also remind you again that whatever the findings you make with respect to the aggravating and mitigating factors, you are never required, and it is underlined, to impose a death sentence.  For example, there may be something about this case or about one of the defendants that one or more of you are not able to identify as a specific mitigating factor, but that nevertheless creates a reasonable doubt that the death penalty is justified as to that defendant. In such a case, the jury must, must, render a decision against the death penalty.  Moreover, even where a sentence of death is fully supported by the evidence, Congress has nevertheless given each of you the discretion to temper justice with mercy, to the high road, even for those who don't deserve it. That is going to be very hard.

It is remarkable when I sit here and realize I am asking on behalf of Mr. Roane and my co-counsel that you take a 26-year-old man and not give him death, but sentence him to life in prison without parole.  These youngsters don't even understand what they are going to miss if they win that.  Yesterday, Mr. Roane's seven-year-old daughter stood up.  He isn't going to be there for any of the decisions.  He is not going to be there when she comes home and says she met somebody.  He isn't going to be there for prom night.  He is not going to see that dress.  He has given all that up.

You know, sometimes in the morning when you wake up, no matter how long you have been there, you are in a fog.  "God, where am I?"  He is going to wake up the same day at the same place.  He is going to know it is never, ever, ever going to change.  It is never going to get better.  He will die in that room.  His life is wiped out.  And I don't want to say it is not his fault.  God, no, I don't want to say that.  Maybe it is Lordi's fault because Lordi wrote this down.

The United States also makes it sound as though my client -- and I want you to read this book.  Please.  If you are going to sentence somebody to death, if you are thinking about killing somebody, the least you can do is find out about them.  They give the impression that my client came into this idyllic neighborhood and brought with him death and destruction and terrorized the neighborhood.  My client was born of the death and destruction.

There are 30 death certificates, or about 30, in the back of this book: personal friends and acquaintances of my client, as testified to by Ms. Noakes.  Look at how they died.  In fact, these guys would have probably been killed in another year anyway.

To violently take their lives, to strap them into a chair and run electricity through them, is not going to bring these other people back.

I wish that I could show you, and I can't, to disassociate from the facts and talk about the things that our client wants.  You have heard these other attorneys talk about meeting their clients and talking with them, seeing them as human beings.  It is always easier to do things to people that we don't relate to, that are different from us.  And one of the purposes of prosecution is to make these people as different from you as possible.  They want you to view them as something else, because it is easier to give punishment.

We have to sit there.  We get one shot, because it is the government's burden, and then we have to

sit down.  We don't get to get up here again and we don't get to rebut anything he comes up with this time.  But I do want to remind you of one or two points, and perhaps I'm reemphasizing them.  These reports are excerpts from reports that are in that book.  Read them.  Look at what was said.

I am convinced that we have proven to you that the acts that Mr. Roane committed were for foreseeable and predictable because they are a consequence of his birth defect.  The birth defect is not his fault.  In fact, the assignment of blame is for children.

I love the way the government always wants to figure out who is to blame.  But really, it doesn't matter who is to blame.  The bottom line is, did he suffer from it?  I don't care who caused it.  I know his mother tried hard with what she had.  I know Dr. Lordi is not supposed to provide services for free.  I don't know this young man's entitled to treatment.  But the bottom line is, everything that he is here for was caused by his life experience coupled with his brain defect.  We know of the seven siblings born in that house.  Five have had drug problems.  Is it coincidence, like the family got together and said, "My, why don't we all do drugs?"  Or is it perhaps something about that environment that encourages that?  We know that these three young men got together.  Was it coincidence?  Was it like the stars got crossed one day?  Or is it as these doctors say, that they gravitated?  It is a science.  It was predictable.

I know that Mr. Vick is going to get up here and argue that everybody who is ADD, everybody who has brain damage, doesn't murder.  And he is right.  And everyone who comes from this environment doesn't murder.  That is right.  Absolutely.  But Dr. Lordi said 50 percent of the people in the prison suffer from this disorder.  And even though it is redundant, and if I have to be redundant in order to save my client's life, I will:  There is only one person, or three people in this courtroom who have been found to have that environment and that birth defect.  And we know what Dr. Semone said.  You can make book on the fact they will end up in trouble with the law.  You can take it to the bank.

It has been very hard during this argument not to be emotional.  But according to these instructions, emotions are not weak.  Emotions are to be applied.  That's what the instructions say.  I hope that when you as jurors go back, emotions aren't comfortable.  I know when people get emotional, other people get uncomfortable.  I hope that when you go

back there, you feel the emotion that the law has asked you to feel; that you apply those human -- don't be like what Mr. Vick says my client is like. No.  Be like someone who should teach them.  Don't use those values that my client has.

You have been very attentive, and I know you have worked hard.  And believe me, these people have worked hard, too.  It would be very simple for you to go back there and come back with an extremely efficient and extremely quick verdict, to go back there and not read these exhibits, not look at them. But I should remind you, we are not here for efficiency.  Democracy is inefficient.  The presumption of innocence is inefficient.  Everything

3942

that is beautiful is inefficient.  As my mother told me, Michaelangelo could have done the Sistine Chapel in three days with a roller, but it wouldn't be the same.  That's what you have to do here.  Look at these people.  Not about the acts.  Look at the people.  Ask yourself "Has the government rebutted what has been proven about the people?"  And I would submit to you that if you do  --

MR. VICK:  Your Honor, we don't need to rebut anything.

THE COURT:  Sustained.

MR. BAUGH:  Look at what evidence has been offered concerning their lives.  And we would submit that at the conclusion, you will find that life in prison without ever hope of release is significant enough punishment for James Henry Roane, Jr.  Thank you.

THE COURT:  All right.  Brief rebuttal?

MR. PARCELL:  Ladies and gentlemen, you have heard our colleagues once again telling you what they think their evidence was.  And we got through the first phase of this trial and in the rebuttal, I told you then my colleagues had done a good job of trying the government, police, and their witnesses. At the conclusion of phase two in rebuttal, I find

3943

myself once again realizing that they have once again tried in their phase two evidence the parents, society, the legal system, and the doctors and social workers who missed certain points in these young men's lives.  But that's not a defense.

They talk about their records, the things that led them to be where they are today.  Let's talk about that for a moment.  Because you know from what you have heard as far as Mr. Tipton that he and his friend, Cory Johnson, to his left, stabbed with razor blades a young man in New Jersey in 1989, 169 stitches' worth.  That is a choice and a decision they made.  They chased him down, as my colleague

said, like an animal in the street and with razor blades cut him in 1989.

Of course you are aware that Mr. Tipton had two other drug arrests in New Jersey in 1989 and 1990. They talk about their inability to think, their mental deficiencies. But what did Mr. Tipton tell them his name was? He told Officer McMillian it was Robert Baker. A lie. A deception. Why did he do that? To avoid getting caught again.

Then you had the second police officer, Keim, who arrested him. And what was his name that time? Manny Wilkerson. Another lie. Another deception. And they tried to get us to believe they don't have the abilities or facilities to make those decisions and plan ahead. Their actions have spoken louder than any words any doctor, any social worker, has told you.

Cory Johnson, you know he was convicted of a robbery and possession of a controlled substance before 1991 when he came to Richmond. And go back to his arrest in New York City at the transit station in February 29th, 1992 carrying a concealed weapon. What name did he give that police officer? Kevin West. A lie. A deception. Why did he do that? As he told Valerie Butler, "I wanted to get bonded before they realize that gun has heads on it," and that gun did have heads on it. It had four: two alive and two dead.

James Henry Roane, Jr. Mr. Baugh talks about the fact of the seven-year-old daughter not being able to see him when she meets someone in life. He talks about his record of assaults. Strangely enough, six of those assaults and trespasses are against the mother of his children. Six of them. He had an unlawful wounding, too.

These crimes were between 1989 and 1990. There are certified copies that the government introduced Monday. He wants you to believe he is this great family man. And the government asked the social worker yesterday who gave you the family tree, "Did you interview Iris Smith, the mother of his children?" No. "Did you interview Robin Cooper, the mother of his children?" No. And he has committed at least six acts of violence against those two women.

Then we graduate to where we are now and we have gone through things this week about choices and decisions. They are important. The decision-making process you folks are going to engage in is very important, too. Let's think about choices and decisions for a few moments. We have been together in this trial for five weeks, the same length of time

within a week that these three people killed ten --

MR. WHITE:  Objection as to "these" and the amount of murders.

THE COURT:  Sustained.

MR. PARCELL:  Well, we will go over it. Mr. Tipton started on January 5th, 1992, with the assistance of James Henry Roane, Jr.  This gentleman made a decision in the life of Douglas Talley, who had a family, too, who missed him at Christmas just like their families will.  They made a decision.

3946

They made 84 of those decisions, 84 stab wounds in a human being.  That's a choice those two people made. Then we go to "Little Doug" Moody, shot twice, and 18 more decisions by James Henry Roane, Jr., stab wounds.  Then we go next to Peyton Maurice Johnson. As Mr. Vick told you, he was stalked by Mr. Roane. Cory Johnson and "E.B." came in and made 15 decisions for him with their 9mm handguns.  That was their choice, their premeditation.  And every expert told you all three of these men, all three of these killers, have the ability to make premeditated decisions; they know right from wrong.  And these are the choices, these are the decisions they made.

Then we go to Louis Johnson.  They made seven decisions in his life.

MR. WHITE:  Objection to "they."

THE COURT:  Sustained.

MR. PARCELL:  That's Henry Roane and Cory Johnson and Lance Thomas.  Those are decisions those three people made that took another life.

And Torrick Brown.  Mr. Roane, Mr. Johnson, and Mr. Thomas made 16 decisions for him as they shot him in front of his sister and her three children.  They made six decisions for Martha McCoy.

MR. GEARY:  I object to "they."  We are

3947

right back in the beginning of the trial.

THE COURT:  Sustained.  Be specific.

MR. PARCELL:  Thank you, Judge.  Roane, Johnson, and Thomas made six decisions for her.  Then we go to Dorothy Armstrong.  Cory Johnson made nine decisions for her, after having left South Richmond and killing someone else and shooting him sixteen times, 16 decisions for another victim.  He made three decisions for Bobby Long, that being Mr. Johnson.  He made two for Anthony Carter.

Then we go to Linwood Chiles, Curt Thorne, "Pepsi" Greene, and Gwen Greene.  Mr. Johnson and Mr. Tipton got their new Glocks on February 4th, 1992.

MR. GEARY:  No evidence of that, Judge.

THE COURT:  Objection overruled.

MR. PARCELL:  And what did they do?  We keep hearing this thing about decisions and ability

to think.  Before we discuss this last one, let's think a minute.  They had Pam Williams purchase their first three handguns, that being Roane, Johnson, Tipton, and Lance Thomas, purchased their first three handguns that the police seized on February 1st, 1992.  What did they tell her?  They gave her the money.  And what did they tell her when they got back from getting the guns?  They gave her an extra $30.

Mr. Roane and Mr. Johnson said, "Fake a breaking and entering, here is $30 to pay for your window, and tell the police somebody stole the guns so they can't be traced back to you or back to us."  Does that sound like the mental processes that these charts lead you to believe?  No.  They knew how to do these crimes.

MR. McGARVEY:  I object to "they" again.

MR. PARCELL:  Roane, Johnson, and Tipton, all three collectively, continued discussing, planning, making decisions.  Then after Roane was arrested on February 2nd, 1992, Mr. Johnson and Mr. Tipton were still on the loose, for lack of better terms.  Then Tipton and Roane make arrangements through Charlotte Denise Moore to purchase two more Glocks.

MR. BAUGH:  I have to object.  That's not true.  Mr. Roane was in jail at that time.

THE COURT:  Sustained.

MR. PARCELL:  I misspoke.  It was Mr. Johnson and Tipton.

MR. McGARVEY:  That's not the evidence, either.

THE COURT:  Mr. Baugh's objection will be sustained.

MR. PARCELL:  After the weapons were purchased, "Whitey" gave Charlotte Denise Moore $100 for purchasing two more guns for he and Cory Johnson.  And then we go to February 19th, 1992.  These people can't make decisions?  You heard the evidence of the phone call at 8:30 p.m.  "Whitey" gets back in the car and says "'C.O.' has got them."

MR. BAUGH:  Excuse me, wait, "they" again.  My client was in jail for all of this.

THE COURT:  Overruled.  That was clear.

MR. PARCELL:  And what happens at 10:17?  An independent witness goes down a highway and sees someone he describes dressed as Gwen told you he was --

MR. GEARY:  That is absolutely not the evidence.  That's a total misstatement of the evidence.

THE COURT:  Objection sustained.

MR. PARCELL:  He testified that the person

he saw was tall, thin, had on jeans and a brown coat, the same thing Gwendolyn Greene told you he had on, richard Tipton.  He saw someone flying in front of the automobile.  And what was that?  A human body. That night, Tipton and Johnson made two decisions for Linwood Chiles, two for Curt Thorne, one for "Pepsi"

3950

Greene and one for Gwen Greene.  We know the results of that decision.

The doctors and social workers have basically told you they have learning problems, low to moderate IQ's, bad upbringing, 10 to 20 percent of society has the same learning disability these folks have.

MR. McGARVEY:  Once again, he is collectivizing, and that is not the evidence with respect to Mr. Johnson at all.

THE COURT:  The objection will be sustained.  Mr. Parcell, if you are going to refer to somebody, do it individually, please.

MR. PARCELL:  But they told you Roane, Tipton, and Johnson all had opportunities as they grew up for structured environments.  Mr. Tipton left his.  Mr. Johnson left his.  Mr. Roane left his.

Roane, Tipton, and Johnson, all three then, all three now, know the difference between right and wrong.

Tipton, Johnson, and Roane, all three are responsible for their activities or their actions. And once again, Tipton, Johnson, and Roane all had the ability then and now to premeditate their crimes.  I'm sure they have taken cheap shots at the government.  Two weeks ago Rodney Tucker was called

3951

as a witness for Sandra Reavis, the defense.  You heard no one call him a snitch then, did you?

MR. McGARVEY:  That is a mischaracterization.  Ms. Reavis' counsel called her, not the rest of us.

THE COURT:  The objection is sustained.

MR. PARCELL:  And today, he is the snitch of the world.  Take that for what it is worth.

As I said before, you do not have an easy responsibility.  But contrary to what Mr. Baugh told you, you are not killing these people.  You are making a decision based on the law and the evidence. And you have a choice: the death penalty or life in prison.  Once again, the government would urge you to come back with a death penalty verdict, and don't let them insinuate you are making some  --

MR. BAUGH:  Objection to "them."

MR. PARCELL:  Don't let Mr. Baugh make you believe you are making some immoral or uncivilized decision.  Because that's an oath, an obligation you made to all of us five weeks ago.

I will leave you with this thought. And as you go through your deliberations, remember: No longer should the innocent suffer a punishment greater than the person who caused that injury. Thank you.

3952

THE COURT: All right. I think we will stop now for lunch. The next thing is instructions, and that's going to take awhile. We have heard a lot of talking this morning, and I'll give you a break before we hear some more. I need to say this before you go, though. I will emphasize it in my instructions, but I need to say it over and over again, and I'm sure you know it by now. This is argument that you have heard. The lawyers are putting the facts before you as they recall them and in the light that reflects best on their case. Your recollection controls in regard to the evidence, and you are to take argument in that way.

I believe your food will probably be arriving around 12:30.

THE CLERK: Yes.

THE COURT: So we will say 1 o'clock, and we will get back in and finish up. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right. I'll hear your motions.

MR. BAUGH: First, on behalf of the defendant, James Roane, we have a motion for mistrial because of the United States' comment upon a defendant's failure to testify. As the Court

3953

adequately indicated, it was a stupid statement to make. I'm not asking the Court to declare -- I'm asking the Court to declare the mistrial, but the act was not committed by the Court. The United States, after a five-week trial, makes a comment on the most basic constitutional right there is to the point where the Court has to give an instruction. And the Court is well aware that when you have to do that, not only are you clearing it up, but at the same time mentioning it again. It has to be done that way. And this is a capital case.

For that reason we move for mistrial. Additionally, we move for mistrial again on the issue of severance. Mr. Parcell just got up and said that because these attorneys did not object to Mr. Wagner's witness, who was gone, because we didn't call him names and attack him on cross-examination, that in some kind of way we were accepting or condoning his credibility. He did not offer testimony against our clients. If it had been an individual trial, it would not have been an issue. And all of us had to suffer as a consequence of that.

For those reasons, Your Honor, we have urged

CURRICULUM VITAE
*RALPH ROBERT TRESSEL*

**DATE OF BIRTH:** ▮▮▮▮▮▮

**NATIONALITY: U.S. CITIZEN**

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮

**PROFESSION:** **FORENSIC INVESTIGATOR/CONSULTANT FORENSIC EVIDENCE AND INVESTIGATION**

**TITLE: OWNER –** *FORENSIC INVESTIGATIVE SERVICES*

**EDUCATION:**

**GRADUATED: SPRAYBERRY HIGH SCHOOL 1971**

**KENNESAW JR. COLLEGE – 1971-1972**

**SPECIALIZED TRAINING:**

**BASIC RECRUIT TRAINING
COBB REGIONAL POLICE ACADEMY
1973 80 HOURS**

**BASIC MANDATE TRAINING
GEORGIA POLICE ACADEMY
1973 120 HOURS**

**ROBBERY & BURGLARY SEMINAR
COBB REGIONAL POLICE ACADEMY
1974 16 HOURS**

**RAPE INVESTIGATION COURSE
COBB REGIONAL POLICE ACADEMY
1975 16 HOURS
GOVERNOR'S CRIME AWARENESS PROGRAM**

Page 2
CV – Robert Tressel

**COBB REGIONAL POLICE ACADEMY**
**1976 16 HOURS**

**SEX CRIMES WORKSHOP**
**GEORGIA STATE UNIVERSITY**
**1977 40 HOURS**

**ARSON & BOMB WORKSHOP**
**COBB REGIONAL POLICE ACADEMY**
**1978 40 HOURS**

**BASIC HOSTAGE NEGOTATIONS**
**F.B.I. – ATLANTA, GEORGIA**
**IN ASSOCATION WITH F.B.I., QUANITICO, VIRGINIA**
**1977 40 HOURS**

**ADVANCED CRIMINOLOGY**
**GEORGIA POLICE ACADEMY**
**IN ASSOCATION WITH F.B.I., QUANTICO, VIRGINA**
**1978 50 HOURS**

**HOMICIDE INVESTIGATION**
**UNIVERSITY OF GEORGIA**
**1979 40 HOURS**

**TERRORISM SEMINAR**
**UNIVERSITY OF GEORGIA**
**1979 40 HOURS**

**POLICE SUPERVISION**
**UNIVERSITY OF GEORGIA**
**1979 40 HOURS**

**INTERVIEWS AND INTERROGATIONS**
**GEORGIA POLICE ACADEMY**
**1979 40 HOURS**

**POLICE DISCIPLINE**
**COBB COUNTY POLICE DEPARTMENT**
**1980 4 HOURS**

**FIREARMS INVESTIGATION TECHNIQUES**
**DEPARTMENT OF THE TREASURY**
**1981 40 HOURS**

Page 3
CV – Robert Tressel

**STRESS MANAGEMENT**
**COBB COUNTY POLICE DEPARTMENT**
**1981 4 HOURS**

**BLOOD STAINS/SPATTER WORKSHOP**
**FLORIDA INSTITUTE OF LAW ENFORCEMENT**
**ST. PETERSBURG, FLORIDA**
**1981 40 HOURS**

**SEX CRIMES**
**GEORGIA POLICE ACADEMY**
**1981 40 HOURS**

**INTERVIEWS AND INTERROGATIONS**
**LEVEL II**
**GEORGIA POLICE ACADEMY**
**1981 40 HOURS**

**HOSTAGE NEGOTIATIONS**
**COBB REGIONAL POLICE ACADEMY**
**1982 40 HOURS**

**SEARCH AND SEIZURE**
**COBB REGIONAL POLICE ACADEMY**
**1982 16 HOURS**

**COMPUTER APPLICATIONS IN LAW ENFORCEMENT**
**GEORGIA POLICE ACADEMY**
**1984 40 HOURS**

**SEARCH WARRANTS & AFFIDAVITS**
**GEORGIA POLICE ACADEMY**
**1984 16 HOURS**

**LAW ENFORCEMENT SUPERVISION**
**GEORGIA POLICE ACADEMY**
**1984 120 HOURS**

**MEDICO-LEGAL DEATH INVESTIGATION**
**ST. LOUIS UNIVERSITY SCHOOL OF MEDICINE**
**ST. LOUIS, MISSOURI**
**1985 40 HOURS**

Page 4
CV – Robert Tressel

**ARSON INVESTIGATION SEMINAR**
**ATLANTA, GEORGIA**
**1986 16 HOURS**

**HOMICIDE INVESTIGATION**
**NATIONAL LAW ENFORCEMENT INSTITUTE**
**ATLANTA, GEORGIA**
**1986 16 HOURS**

**POLICE MEDICO-LEGAL INVESTIGATION OF DEATH**
**UNIVERSITY OF MIAMI SCHOOL OF MEDICINE**
**MIAMI, FLORIDA**
**1986 40 HOURS**

**BLOODSTAIN EVIDENCE SEMINAR**
**NATIONAL LAW ENFORCEMENT INSTITUTE**
**SANTA ROSA, CALIFORNIA**
**1988 40 HOURS**

**SATANIC & CULT INFLUENCES IN HOMICIDE**
**VALENCIA COMMUNITY COLLEGE**
**1989 28 HOURS**

**SECOND NATIONAL CONFERENCE ON CHILD FATALITIES AND**
**PHYSICAL ABUSE**
**NATIONAL CENTER FOR PROSECUTION OF CHILD ABUSE**
**AMERICAN PROSECUTOR'S RESEARCH INSTITUTE**
**SAN DIEGO, CALIFORNIA**
**1991 32 HOURS**

**FORENSIC SYMPOSIUM 2011**
**FORENSIC EXAMINATION & CRIME SCENE PROCESSING**
**NORTH GEORGIA COLLEGE & STATE UNIVERSITY**
**DAHLONEGA, GEORGIA**
**MARCH 2011, 16 HOURS**

**CRIME SCENE RECONSTRUCTION**
**PATTERN INJURY INTERPRETATION**
**DR. JOSEPH L. BURTON**
**MARIETTA, GEORGIA**
**1985 - 2010**

**EXECUTIVE TRAINING**
**GEORGIA CHIEFS OF POLICE**
**DULUTH, GEORGIA**
**OCTOBER 2011 60 HOURS**

Page 5
CV – Robert Tressel


**GEORGIA CHIEFS OF POLICE CONFERENCE**
**ATLANTA, GEORGIA**
**JANUARY 2012 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**SAVANNAH, GEORGIA 14 HOURS**
**JULY 2012**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**ATHENS, GEORGIA**
**JANUARY 2013 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**SAVANNAH, GA**
**JULY 2013 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**ATLANTA, GEORGIA**
**JANUARY 2014 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**SAVANNAH, GEORGIA**
**JULY 2014 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**ATLANTA, GEORGIA**
**JULY 2015 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**ATLANTA, GEORGIA**
**JANUARY 2016 14 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**SAVANNAH, GEORGIA**
**JULY 2016 20 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**SAVANNAH, GEORGIA**
**JULY 2017 20 HOURS**

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**SAVANNAH, GEORGIA**
**JULY 2018 20 HOURS**

Page 6
CV – Robert Tressel

**GEORGIA CHIEFS OF POLICE CONFERENCE**
**SAVANNAH, GEORGIA**
**JULY 2019 20 HOURS**

**BIOMECHANICS AND OCCUPANT KINEMATICS**
**DR. JOSEPH L. BURTON**
**MARIETTA, GEORGIA**
**1990 – 2010**

**PREVIOUS EMPLOYMENT:**

**CHIEF CRIMINAL INVESTIGATOR**
**COBB COUNTY DISTRICT ATTORNEY'S OFFICE**
**70 HAYNES STREET**
**MARIETTA, GA. 30090**
**2011-2019**
**Retired Sept 27, 2019**

**SENIOR FORENSIC INVESTIGATOR**
**BURTON & ASSOCIATES**
**ALPHARETTA, GEORGIA**
**1998 – 2010**

**OPERATIONS MANAGER**
**COBB COUNTY MEDICAL EXAMINER'S OFFICE**
**MARIETTA, GEORGIA**
**1985 – 1997 (RETIRED)**

**SERGEANT, CRIMES AGAINST PERSONS UNIT**
**COBB COUNTY POLICE DEPARTMENT**
**MARIETTA, GEORGIA**
**1978 – 1985**

**DETECTIVE, CRIMES AGAINST PERSONS UNIT**
**COBB COUNTY POLICE DEPARTMENT**
**MARIETTA, GEORGIA**
**1975 – 1978**

**POLICE OFFICER – PATROL DIVISION**
**COBB COUNTY POLICE DEPARTMENT**
**MARETTA, GEORGIA**
**1973 – 1975**

Page 7
CV – Robert Tressel

**ADDITIONAL INFORMATION:**

**MEMBER:**

**FRATERNAL ORDER OF POLICE (inactive)**
**POLICE OFFICER'S ASSOCATION OF GEORGIA (inactive)**
**GEORGIA CHIEFS OF POLICE ASSOCIATION**
**INTERNATIONAL ASSOCIATION OF CHEIFS OF POLICE**
**ATLANTA METROPOL**

**INSTRUCTOR:**

**DEATH INVESTIGATION**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1983 – 1998**

**HOMICIDE INVESTIGATION**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1983 – 1998**
**CRIME SCENE PROCESSING**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1990 – 1998**

**INMATE AND JAIL DEATHS**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1990 – 1998**

**DRUG DEATHS**
**COBB COUNTY DISTRICT ATTORNEY'S DRUG AWARENESS PROGRAM**
**1985 – 1998**

**ADVANCED CRIME SCENE PROCESSING**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1993 – 1998**

**ADVANCED CRIME SCENE PROCESSING**
**NORTH WEST GEORGIA LAW ENFORCEMENT ACADEMY**
**1995 – 1996**

**CONSULTANT**

• **ABUSED AND BATTERED CHILDREN**
• **BLOOD SPATTER INTERPRETATIONS**
• **CRIME SCENE RECONSTRUCTION**
• **HOMICIDE INVESTIGATIONS**
• **TRAFFIC ACCIDENT RECONSTRUCTION**

Page 8
CV – Robert Tressel

- **INJURY PATTERN INTERPRETATIONS**
- **CRIME SCENE EVIDENCE COLLECTION**
- **EVIDENCE COLLECTION/RETENTION**

**APPOINTMENTS:**

**JANUARY 1990**
**ELECTED BOARD OF DIRECTORS**
**NATIONAL SUDDEN INFANT DEATH SYNDROME**
**GEORGIA CHAPTER**

**MAY 1990**
**APPOINTED**
**COBB COUNTY CHILD ABUSE PROTOCOL COMMITTEE PURSUANT TO**
**GEORGIA H.B. 1318**

**JULY 1990**
**RECIPIENT**
**INSTRUCTOR'S CERTIFICATE TO TEACH DEATH INVESTIGATION TO**
**LAW ENFORCEMENT OFFICERS OF THE STATE OF GEORGIA (RENEWED**
**1995)**

**JANUARY 1991**
**ELECTED**
**BOARD OF DIRECTOR'S OF SUDDEN INFANT DEATH RESEARCH**
**FOUNDATION**
**ASSISTED WITH INCORPORATION OF SAME**

App.1026