# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| **COREY JOHNSON,** | **:** | |
| | **:** | |
| **Movant,** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 3:92CR68** |
| | **:** | **CAPITAL CASE** |
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **Respondent**. | **:** | |

## MEMORANDUM IN SUPPORT OF MOTION FOR A RECONSIDERATION OF SENTENCE HEARING PURSUANT TO THE FIRST STEP ACT OF 2018

David E. Carney, VA Bar #: 43914
Donald P. Salzman*
Lotus D. Ryan**
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

Alexander C. Drylewski*
Judith A. Flumenbaum*
Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000

*Pending Application to Qualify as a Foreign
Attorney Under Local Criminal Rule 57.4

**Forthcoming Application for Admission

*Counsel for Corey Johnson*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iv

I.      INTRODUCTION .....................................................................................................1

II.     COVERED OFFENSES AND THEIR SENTENCES ......................................................3

III.    LEGISLATIVE BACKGROUND..................................................................................4

        A.      Fair Sentencing Act of 2010 ...................................................................4

        B.      First Step Act of 2018 ..............................................................................5

IV.     ARGUMENT............................................................................................................5

        A.      Mr. Johnson's Convictions Under 21 U.S.C. §§ 841(a)(1) and 848 Are
                Covered Offenses Under the First Step Act.............................................5

                1.      Structure of the First Step Act Review .........................................5

                2.      Mr. Johnson Was Convicted of Violating 21 U.S.C. § 841(a),
                        which Is a Covered Offense..........................................................7

                3.      Mr. Johnson Was Convicted of Violating 21 U.S.C. § 848, which
                        Is a Covered Offense....................................................................8

        B.      Mr. Johnson Meets the Eligibility Requirements under the First Step Act
                so Is Entitled to Have His Sentences Reconsidered................................11

        C.      Because Mr. Johnson's Resentencing Consideration Implicates the Death
                Penalty, He Must Be Resentenced by a Jury on His Capital Sentenced
                Counts ......................................................................................................11

        D.      A Capital Resentencing Hearing with Respect to Mr. Johnson's Capital
                Convictions Is the Only Means to Fully and Fairly Consider the 18 U.S.C.
                § 3553(a) Sentencing Factors as Required by the First Step Act ..........13

                1.      Compelling Evidence Shows that Corey Johnson's Sentences
                        Should Be Reduced....................................................................16

                2.      Corey Johnson's Childhood Was Marred by Abuse, Chaos, and
                        Neglect ......................................................................................18

                        a.      Corey suffered physical and emotional abuse as a child ...............18

                        b.      Corey was regularly uprooted from his homes and schools
                                and eventually abandoned to social service custody....................20

3.      Mr. Johnson Was a Follower Who Was Easily Manipulated—a Common Outcome for People with Intellectual Disability—and Sought Protection from People Who Led Him Down a Violent Path ...................................................................................................23

    a.      Corey Johnson drifted into a drug group after his discharge from residential placement with no plan or support .....................23

    b.      Mr. Johnson was a follower who exhibited extreme loyalty to people viewed as family ...........................................................25

4.      Mr. Johnson Is a Person with Intellectual Disability ...............................27

    a.      Mr. Johnson has significant limitations in intellectual functioning ....................................................................................28

    b.      Mr. Johnson has significant limitations in adaptive functioning ....................................................................................29

    c.      Mr. Johnson's significant limitations in intellectual functioning and in adaptive functioning were present during his childhood .....................................................................31

5.      The Jury Considering Mr. Johnson's Sentence Will Hear Evidence from Experts Who Are Specialists in Intellectual Disability— Evidence No Court or Jury Has Heard to Date..........................................32

6.      Mr. Johnson's Flawless Prison Record Indicates that a Sentence Reduction Would Not Encourage Further Crime Nor Would It Endanger the Public ..................................................................................34

7.      Mr. Johnson's Sentence Was Unwarranted Compared to Sentences to Similarly Situated Defendants ............................................................36

8.      Mr. Johnson Committed His Crimes at 22 but Is Now 51 ........................39

9.      Mr. Johnson Has Demonstrated Sincere Remorse..................................40

E.    Mr. Johnson's §§ 846, 924(c), and 1959 Convictions Are Invalid and Impermissibly Influenced His Original Sentence ................................................43

1.      Mr. Johnson's § 846 Conviction Was Vacated.........................................43

2.      Mr. Johnson's § 924(c) Convictions Are Invalid......................................43

3.      Mr. Johnson's § 1959 Convictions Were Improperly Charged and Are Invalid ...........................................................................................44

4.      Discounting These Convictions Should Result in a Sentence Less
        than Death ..............................................................................................46

V.      CONCLUSION.............................................................................................................47

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Bourgeois v. Whitley*, 784 F.2d 718 (5th Cir. 1986) ........................................................46

*Dorsey v. United States*, 567 U.S. 260 (2012) ................................................................4

*Hurst v. Florida*, 136 S. Ct. 616 (2016) ...............................................................11, 16

*James v. United States*, 476 F.2d 936 (8th Cir. 1973) ...................................................46

*Jerkins v. United States*, 530 F.2d 1203 (5th Cir. 1976) ...............................................46

*Johnson v. Mississippi*, 486 U.S. 578 (1988) ...............................................................46

*Lockett v. Ohio*, 438 U.S. 586 (1978) ...........................................................................13

*Mills v. Maryland*, 486 U.S. 367 (1988) .......................................................................46

*Pepper v. United States*, 562 U.S. 476 (2011) .............................................................34

*Ring v. Arizona*, 536 U.S. 584 (2002) ...........................................................................16

*Skipper v. South Carolina*, 476 U.S. 1 (1986) .............................................................13

*Stirone v. United States*, 361 U.S. 212 (1960) ..............................................................45

*United States v. Barnes*, No. 3:94cr80 (DJN), 2020 WL 1281235 (E.D. Va. Mar. 17,
    2020) .........................................................................................................................8

*United States v. Boulding*, 960 F.3d 774 (6th Cir. 2020) ...............................................7

*United States v. Brown*, No. 3:08-CR-00011-1, 2020 WL 3106320 (W.D. Va. June 11,
    2020) ................................................................................................................. passim

*United States v. Candelario-Santana*, 834 F.3d 8 (1st Cir. 2016) ...............................38

*United States v. Cantu-Rivera*, CR No. H-89-204, 2019 WL 2578272 (S.D. Tex. June 24,
    2019) .......................................................................................................................36

*United States v. Chambers*, 956 F.3d 667 (4th Cir. Apr. 23, 2020) ....................... passim

*United States v. Cisneros*, 385 F. Supp. 2d 567 (E.D. Va. 2005) .................................37

*United States v. Davis*, No. 5:93-cr-30025, 2020 WL 1131147 (W.D. Va. Mar. 9, 2020) ............9

*United States v. Davis*, 139 S. Ct. 2319 (2019) ...........................................................................44

*United States v. Davis*, 679 F.3d 190 (4th Cir. 2012).................................................................34

*United States v. Davis*, 611 F. Supp. 2d 472 (D. Md. 2009) .......................................................38

*United States v. Dean*, No. 97-276-3, 2020 WL 2526476 (D. Minn. May 18, 2020) ....................9

*United States v. Doan*, 498 F. Supp. 2d 816 (E.D. Va. 2007) .......................................................36

*United States v. Ealy*, 363 F.3d 292 (4th Cir. 2004).....................................................................37

*United States v. Edelin*, 134 F. Supp. 2d 59 (D.D.C. 2001) .........................................................37

*United States v. Fletcher*, No. CR TDC-05-0179-01, 2020 WL 2490025 (D. Md. May 14,
        2020) ................................................................................................................................39

*United States v. Floresca*, 38 F.3d 706 (4th Cir. 1994) (*en banc*)................................................45

*United States v. Green*, 654 F.3d 637 (6th Cir. 2011) .................................................................37

Order, *United States v. Groves*, No. 5:94-CR-97 (E.D.N.C. Nov. 21, 2019) ..................................8

*United States v. Hardnett*, 417 F. Supp. 3d 725 (E.D. Va. 2019)............................................7, 40

*United States v. Hardy*, 762 F. Supp. 2d 849 (E.D. La. 2010) .....................................................38

Order, *United States v. Hines*, No. 5:94-CR-150 (N.D.N.Y. Nov. 8, 2019)....................................9

*United States v. Jackson*, 964 F.3d 197 (3d Cir. 2020) .................................................................6

*United States v. Jackson*, No. 3:99-00015-05, 2019 WL 6245759 (S.D. W. Va. Nov. 21,
        2019) ..............................................................................................................................10

Order, *In re Johnson*, No. 20-8 (4th Cir. July 15, 2020) .............................................................44

*United States v. Johnson*, No. 7:04-CR-128-1, 2020 WL 2563541 (W.D. Va. May 20,
        2020) ..............................................................................................................................34

*United States v. Jimenez*, No. 92-CR-550, 2020 WL 2087748 (S.D.N.Y. Apr. 30, 2020) .............9

*United States v. Kehoe*, 610 F.3d 579 (8th Cir. 2002).................................................................38

Order, *United States v. Kelly*, No. 2:94-CR-163 (E.D. Va. June 5, 2020).......................................8

*United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901 (N.D. Ohio Dec. 23, 2010)...........38

*United States v. Martin*, No. 19-3905, 2020 WL 3251021 (6th Cir. June 16, 2020)....................15

*United States v. Mayhew*, 337 F. Supp. 2d 1048 (S.D. Ohio 2004)..............................................38

*United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010)...........................................................37

*United States v. Nieves*, 108 F. App'x 790 (4th Cir. 2004) ..........................................................45

*Unites States v. Northington*, Crim. Action No. 07-550-05, 2014 WL 1789151 (E.D. Pa.
      May 6, 2014)........................................................................................................................37

*United States v. Patterson*, 755 F. App'x 238 (4th Cir. 2018), *cert. denied*, 139 S. Ct.
      1576 (2019)..........................................................................................................................38

*United States v. Pitera*, 5 F.3d 624 (2d Cir. 1993) ......................................................................38

*United States v. Randall*, 171 F.3d 195 (4th Cir. 1999)...............................................................45

*United States v. Roane*, 378 F.3d 382 (4th Cir. 2004) .................................................................33

Order, *United States v. Robinson*, No. 98-CR-60 (E.D. Wis. Sept. 27, 2019).................................9

*United States v. Shaw*, 957 F.3d 734 (7th Cir. 2020)..................................................................6, 7

*United States v. Smith*, 959 F.3d 701 (6th Cir. 2020) ...............................................................7, 23

*United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006) (*Stitt IV*).......................................................12

*United States. v. Stitt*, 552 F.3d 345 (4th Cir. 2008) (*Stitt V*) .......................................2, 11, 13, 15

*United States v. Tatum*, 31 F. App'x 156 (5th Cir. 2001)..............................................................38

Order, *United States v. Taylor*, No. 19-7616 (4th Cir. Feb. 12, 2020) .........................................44

*United States v. Taylor*, No. 04 CR 495-38, 2020 WL 2476529 (N.D. Ill. May 13, 2020)...........40

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)..............................................................25, 43

*United States v. Tucker*, 404 U.S. 443 (1972) .............................................................................46

*United States v. Venable*, 943 F.3d 187 (4th Cir. 2019) ................................................................8

Order, *United States v. Walker*, No. 5:95-CR-101 (N.D.N.Y. Oct. 25, 2019)..................................9

*United States v. Whitfield*, 695 F.3d 288 (4th Cir. 2012)..............................................................45

*United States v. Wirsing*, 943 F.3d 175 (4th Cir. 2019)........................................................6, 7, 8, 9

*United States v. Williams*, 610 F.3d 271 (5th Cir. 2010) ..............................................................38

*Wright v. United States*, 425 F. Supp. 3d 588 (E.D. Va. 2019) .............................................6, 8, 15

vi

## STATUTES

18 U.S.C. § 1959.................................................................................................3, 43, 44, 45

18 U.S.C. § 3553............................................................................................... passim

18 U.S.C. § 3593.................................................................................................11, 16

18 U.S.C. § 3596.......................................................................................................33

21 U.S.C. § 841............................................................................................... passim

21 U.S.C. § 846..................................................................................................3, 43

21 U.S.C. § 848............................................................................................... passim

21 U.S.C. § 924..................................................................................................3, 43, 44

21 U.S.C. § 960.......................................................................................................10

Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 ...........................13, 14, 18, 32

Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 ..................................... passim

Federal Death Penalty Act of 1994, Pub. L. No. 103-322, 108 Stat. 1959....................................18

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194............................................... passim

## OTHER AUTHORITIES

AAIDD Ad Hoc Committee on Terminology and Classification, *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed. 2010)................................28

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders DSM-5* (5th ed. 2013) ..................................................................................28

Danielle Sered, Accounting for Violence: How to Increase Safety and Break Our Failed Reliance on Mass Incarceration, Vera Institute of Justice (2017) ....................................40

Death Penalty Information Center, *Defendants Whose Sentences Have Been Reduced Because of a Finding of "Mental Retardation" since Atkins v. Virginia (2002)* (July 19, 2012), http://www.deathpenaltyinfo.org/node/2395...........................................38

James C. Howell et al., Bulletin 5: *Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know* 17 (2013), https://www.ncjrs.gov/pdffiles1/nij/grants/242935.pdf..............................................39, 40

James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo.
Wash. L. Rev. 414 (1985) .........................................................................................25, 27

John H. Blume & Karen L. Salekin, *The Death Penalty and Intellectual Disability*,
*Analysis of Atkins Cases*, American Association on Intellectual and
Developmental Disabilities (Edward A. Polloway ed., 2015) ..........................................41

Rachel E. Barkow, *Prisoners of Politics: Breaking the Cycle of Mass Incarceration*
(2019) ...............................................................................................................................40

U.S. Sentencing Commission, *The Effects Of Aging On Recidivism Among Federal
Offenders* (2017), https://www.ussc.gov/research/research-reports/effects-aging-
recidivism-among-federal-offenders...................................................................................40

## I.   INTRODUCTION

The First Step Act, enacted on December 21, 2018, authorizes a reduced sentence for certain convictions that would have had lower statutory penalties had the Fair Sentencing Act, a 2010 law, applied at the time of the original sentencing.  The First Step Act involves a two-step inquiry.  First, a court determines eligibility, *i.e.*, whether one of the defendant's convictions is a "covered offense" per the statute.  And, second, after satisfying this threshold inquiry, a sentencer then reconsiders the original sentence and determines, after a "complete review," whether a reduced sentence is merited.

As demonstrated below, Corey Johnson is eligible for a sentence reconsideration because ten of Mr. Johnson's 1993 convictions are drug-related crimes deemed "covered offenses" by the First Step Act.  Seven of Mr. Johnson's convictions that meet the eligibility requirements of the First Step Act are death sentences and, by law, reconsideration of those convictions must be conducted by a jury.

In step two of the First Step Act consideration, a jury would receive evidence in order to determine a sentence that fulfils the sentencing goals of 18 U.S.C. § 3553(a)—one that is sufficient, but not greater than necessary, taking into account the history and characteristics of the defendant, the nature and circumstances of the crime, and the need for the sentence imposed.  Mr. Johnson has significant evidence, much of which has never been previously presented to any factfinder, that will better shape an understanding of his moral culpability.  Among the wide array of factors that a jury should weigh in reconsideration of his death sentences are:

- Mr. Johnson suffered horrific abuse, neglect, and abandonment throughout his childhood.  *See infra* at 18-23.
- As is often the case with people with intellectual impairments who lack life skills— particularly those who were physically and emotionally abused as children—Mr. Johnson, a follower, not a leader, was easily manipulated, and would do anything to

> please others.  This element of his character is critical to an understanding of his role in the crimes of which he was convicted.  *See infra* at 23-27.

- The evidence, science, and law demonstrate that Mr. Johnson is a person with intellectual disability.  This evidence includes three opinions of experts who specialize in identifying and diagnosing intellectual disability.  *See infra* at 27-33.

- Mr. Johnson has an essentially flawless prison record, and a sentence reconsideration would not encourage future crime or endanger the public.  Mr. Johnson has been incarcerated for 28 years, and during that time he has been a model inmate.  *See infra* at 33-36.

- Mr. Johnson's sentence is disproportionate compared to sentences imposed on his co-defendant Vernon Lance Thomas, who has intellectual disability, like Mr. Johnson, but was spared the death penalty despite being found guilty of four murders in furtherance of a continuing criminal enterprise, and is disproportionate compared to other similarly situated defendants.  *See infra* at 36-38.

- Mr. Johnson was only 22 at the time of his arrest.  Now, Mr. Johnson is 51 years old and poses no threat to the prison population at large.  *See infra* at 38-40.

- Mr. Johnson has demonstrated sincere remorse.  Even with his limited ability to express himself, he conveyed his profound regret and accepted responsibility for his crimes at his sentencing hearing.  *See infra* at 40-41.

To be clear, on his death sentenced counts, Mr. Johnson does not suggest that there should be any choice before the jury other than life in prison or the death penalty as required by law.

Accordingly, Mr. Johnson respectfully submits that the Court should order a capital resentencing hearing at which a new jury would determine whether to reduce his sentences pursuant to § 404(b) of the First Step Act.  *United States v. Stitt*, 552 F.3d 345, 354-55 (4th Cir. 2008) (hereinafter, "*Stitt V*").  With respect to his non-death sentenced counts that are covered offenses pursuant to the First Step Act, because those counts are eligible for First Step Act relief, the Court must reconsider those sentences.  Mr. Johnson further submits that, after the jury resentencing proceeding, this Court should use its discretion to reduce those counts in light of all of the evidence, pursuant to § 3553(a).

## II.   COVERED OFFENSES AND THEIR SENTENCES

On February 3, 1993, Mr. Johnson was convicted of the following offenses that are eligible as covered offenses under the First Step Act: engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(a) (Count 2); murder in furtherance of a continuing criminal enterprise in violation of 21 U.S.C. § 848(e)(1)(A) (Counts 8, 11, 17-19, 24, and 25); and distribution of crack cocaine base ("crack cocaine") and possession with intent to distribute in violation of § 841(a)(1) (Counts 31 and 32).[1]

Mr. Johnson was also convicted of violating 21 U.S.C. § 846 for having possessed with intent to distribute, and for having distributed, 50 grams or more of crack in violation of 21 U.S.C. § 841(a) (Count 1).  His sentence for this Count was later vacated by the Fourth Circuit on direct appeal, but the jury had been instructed at the conclusion of the guilt phase that Count 1 could serve as part of the basis for finding Mr. Johnson had participated in a continuing criminal enterprise under § 848.

After the guilt phase of the trial, the same jury then considered whether to impose the death penalty on Mr. Johnson.  During a penalty hearing in which the government relied largely on the same evidence presented at trial, Mr. Johnson presented limited evidence of his learning

---

[1]   Mr. Johnson was also convicted of killing and maiming in aid of racketeering under 18 U.S.C. § 1959 (Counts 10, 13, 14, 16, 21-23, and 27-30); and use of a firearm during and in relation to any crime of violence or drug trafficking crime under 21 U.S.C. § 924(c) (Counts 9, 12, 15, 20, and 26).

difficulties and traumatic childhood through a defense psychologist and two other witnesses. Even with this spare presentation,[2] the jurors found significant mitigating evidence existed.[3]

Nevertheless, the jury sentenced Mr. Johnson to death on his § 848(e)(1)(A) convictions (Counts 8, 11, 17-19, 24, and 25); and the court imposed a life sentence plus 85 years for his § 848 conviction (Count 2); and 20 years and 40 years, to run concurrently for his § 841(a) convictions (Counts 31 and 32).[4]

### III.   LEGISLATIVE BACKGROUND

**A.   Fair Sentencing Act of 2010**

In 2010, President Obama signed into law the Fair Sentencing Act, which codified the long-recognized reality that federal drug statutes had imposed overly harsh penalties for cocaine-base offenses, *i.e.*, crack cocaine, by comparison to the penalties for powder cocaine offenses, with a disproportionate effect on African-American defendants.[5] *Dorsey v. United States*, 567 U.S. 260, 268-69 (2012). Congress adjusted the penalties for offenses involving crack cocaine by increasing the threshold drug quantities required to trigger mandatory minimum sentences under § 841(b)(1). Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 2, 124 Stat. 2372, 2372. Per those amendments, under § 841, the quantity needed to trigger the five-year mandatory minimum was increased from five grams of cocaine base to 28 grams of cocaine base, and the

---

[2]   The jurors were not asked to consider whether Mr. Johnson was intellectually disabled.

[3]   *See infra* note 36 (discussing Special Findings (Feb. 16, 1993) ("Special Findings") at 7-11 (Ex. 1)).

[4]   The Court also imposed a life sentence plus 85 years for Counts 10, 14, 21-23, 27, and 28; 30 years for Counts 29 and 30, to run concurrently; 20 years for Count 16, to run concurrently; five years for Count 9, to run consecutively; and 20 years for Counts 12, 15, 20, and 26, to run consecutively.

[5]   Mr. Johnson is African-American, as are the co-defendants and the victims in this case.

quantity needed to trigger the ten-year mandatory minimum was increased from 50 grams of cocaine base to 280 grams. *Id.* These changes have had a ripple effect because convictions under § 841, and their designation as felonies, are predicates for other provisions of Title 21, including § 848.

**B.      First Step Act of 2018**

On December 21, 2018, President Trump signed the First Step Act of 2018 into law. Section 404 of that law made the Fair Sentencing Act retroactive to defendants convicted of crack cocaine offenses whose statutory penalties were modified by the Fair Sentencing Act. First Step Act of 2018, Pub. L. No. 115-391, § 404(b), 132 Stat. 5194, 5222. Specifically, under the First Step Act, the Fair Sentencing Act relief was made available to defendants convicted of a "covered offense"—defined as "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010, that was committed before August 3, 2010." *Id.* Section 404(b) of the First Step Act provides that defendants who were convicted of such covered offenses would now be entitled to have their sentences reconsidered and possibly reduced. *Id.*

### IV.    ARGUMENT

**A.      Mr. Johnson's Convictions Under 21 U.S.C. §§ 841(a)(1) and 848 Are Covered Offenses Under the First Step Act**

**1.      Structure of the First Step Act Review**

First Step Act cases proceed in a series of steps; there is, in effect, an order of operations to them. As an initial matter, a movant must show that he committed an offense: (1) before August 3, 2010; (2) that he was not sentenced or resentenced under the Fair Sentencing Act; and

(3) that he has not previously been denied a request for reduction under the First Step Act after "a complete review of the motion on the merits."[6]  *Id.*

Section 404(b) states: "A court that imposed a sentence for a covered offense may . . . impose a reduced sentence as if sections 2 or 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed."  *See also United States v. Wirsing*, 943 F.3d 175, 186 (4th Cir. 2019) (holding that "*all* defendants who are serving sentences for violations of 21 U.S.C. § 841(b)(1)(A)(iii) and (B)(iii), and who are not excluded pursuant to the expressed limitations in § 404(c) of the Act, are eligible to move for relief under that Act" (emphasis added)); *Wright v. United States,* 425 F. Supp. 3d 588, 595 (E.D. Va. 2019) ("[T]he Court finds that the FIRST STEP Act grants broad discretion to the district courts in providing relief under this Act.").

The movant must demonstrate that the offense was a "covered offense."  To decide that a conviction is a covered offense, a court must make a legal determination that the Fair Sentencing Act modified the penalty associated with the statute of conviction.  Importantly, the court is *not* to concern itself with the actual quantities of crack involved in the offense.  *See Wirsing*, 943 F.3d at 185-86; *see also United States v. Jackson*, 964 F.3d 197, 206 (3d Cir. 2020) (holding that "§ 404 eligibility turns on a defendant's statute of conviction, not on his possession of a certain quantity of drugs"); *United States v. Shaw*, 957 F.3d 734, 735 (7th Cir. 2020) ("To determine whether a defendant is eligible for a reduced sentence under the First Step Act, a court needs to look only at a defendant's statute of conviction, not to the quantities of crack involved in the offense.").

---

[6]  Mr. Johnson meets these requirements.  He committed his offenses long before 2010; he was not sentenced or resentenced under the Fair Sentencing Act; and no court has previously denied him any request for a reduction under the First Step Act.

6

Once a movant has made this showing, and the court has determined the movant was convicted of a covered offense, the movant is eligible for First Step Act relief and the movant's sentence must be reconsidered.  In reconsidering the sentence, the sentencer exercises its discretion as to whether ultimately to reduce it.  Before exercising that discretion, the sentencer must first take into account the factors listed in 18 U.S.C. § 3553.  *See* Pub. L. No. 115-391, § 404(c) (2018) (requiring the district court to "complete review on the merits" and consider the sentencing factors enumerated in 18 U.S.C. § 3553(a)); *see also United States v. Hardnett*, 417 F. Supp. 3d 725, 735 (E.D. Va. 2019) (stating that after determining a movant is eligible under the Act, the sentencer then "'consider[s] whether the authorized reduction is warranted, either in whole or in part, according to the factors set forth in § 3553(a)'") (quoting *Dillon v. United States*, 560 U.S. 817, 826 (2010)); *Shaw*, 957 F.3d at 742 (holding that record must show that the sentencer "considered the arguments presented" and "accounted for the 18 U.S.C. § 3553(a) factors"); *United States v. Boulding*, 960 F.3d 774, 776 (6th Cir. 2020) (holding that "an eligible defendant is entitled to an accurate amended guideline calculation and renewed consideration of the 18 U.S.C. § 3553(a) factors"); *United States v. Smith,* 959 F.3d 701, 703 (6th Cir. 2020) (holding that a district court must consider the factors in § 3553(a) to determine a sentence "not greater than necessary").  These factors include, *inter alia*, the nature and circumstances of the crime and the history and characteristics of the defendant, and the reconsideration must always be guided by the statute's admonition that the sentence be sufficient, but not greater than, necessary.

### 2.    Mr. Johnson Was Convicted of Violating 21 U.S.C. § 841(a), which Is a Covered Offense

Mr. Johnson was convicted under Counts 31 and 32 of offenses under 21 U.S.C. § 841(a). The Fourth Circuit has already determined that 21 U.S.C. § 841(a) is a covered offense.  *Wirsing*,

943 F.3d at 186; *see also United States v. Venable*, 943 F.3d 187, 193 (4th Cir. 2019) ("841(a) falls within the First Step Act's definition of 'covered offense.'"); *United States v. Barnes*, No. 3:94cr80 (DJN), 2020 WL 1281235, at *2 (E.D. Va. Mar. 17, 2020).  Thus, Mr. Johnson is eligible and must have his sentences reconsidered.

In reaching this result, the Fourth Circuit in *Wirsing* established two essential points about the meaning of the First Step Act.  First, it determined that, under the First Step Act, the court must look only to the statute of conviction, not the specific manner in which it was violated in the instant case.  943 F.3d at 185 (finding that the phrase "the statutory penalties for which" modifies the term "Federal criminal statute," not the term "violation of a federal criminal statute").  Second, Congress specifically used the term "statutory" to identify the type of penalty that was modified by operation of the Fair Sentencing Act, not whether the sentencing ranges assessed against the particular defendant were necessarily changed by the 2010 enactment.  *Id.* at 185-86.  Thus, a statute is a covered offense if: (a) it is a federal criminal statute; and (b) the statutory penalties for that criminal statute were modified by the Fair Sentencing Act.  The Court emphasized, moreover, that "[t]here is no indication that Congress intended a complicated and eligibility-limiting determination at the 'covered offense' stage of the analysis."  *Id.* at 186 (citation omitted).

### 3. Mr. Johnson Was Convicted of Violating 21 U.S.C. § 848, which Is a Covered Offense

Numerous district courts around the country, including the Eastern District of Virginia and others within the Fourth Circuit, have already determined that 21 U.S.C. § 848 is a covered offense.  *See, e.g.*, *United States v. Brown*, No. 3:08-CR-00011-1, 2020 WL 3106320, at *4 (W.D. Va. June 11, 2020); Order at 5, *United States v. Kelly*, No. 2:94-CR-163 (E.D. Va. June 5, 2020); *Wright v. United States*, 425 F. Supp. 3d 588, 598 (E.D. Va. 2019); Order at 1, *United*

*States v. Groves*, No. 5:94-CR-97 (E.D.N.C. Nov. 21, 2019); *United States v. Dean*, No. 97-276-3, 2020 WL 2526476, at *3 (D. Minn. May 18, 2020); *United States v. Jimenez*, No. 92-CR-550, 2020 WL 2087748, at *2 (S.D.N.Y. Apr. 30, 2020); Order at 4, *United States v. Hines*, No. 5:94-CR-150 (N.D.N.Y. Nov. 8, 2019), ECF No. 607; Order at 4, *United States v. Walker*, No. 5:95-CR-101 (N.D.N.Y. Oct. 25, 2019), ECF No. 620; Order at 4, *United States v. Robinson*, No. 98-CR-60 (E.D. Wis. Sept. 27, 2019), ECF No. 606.

The government itself has conceded that an offense is a covered offense under the First Step Act where the statute under which the movant was convicted makes reference to or has as a predicate statute amended by sections 2 and 3 of the Fair Sentencing Act, including 21 U.S.C. § 848. *See, e.g.*, United States' Mot. to Remand at 8, *United States v. Maupin*, No. 19-6817 (4th Cir. Aug. 29, 2019), ECF No. 26; *see also United States v. Davis*, No. 5:93-cr-30025, 2020 WL 1131147, at *2 (W.D. Va. Mar. 9, 2020) ("The government acknowledges that the defendant is eligible for a sentence reduction under the 2018 FSA for all three counts, including Count Two due to § 848's requirement of a § 841(b)(1)(A) violation.").

The court in *United States v. Brown*, No. 3:08-cr-00011-1, 2020 WL 3106320 (W.D. Va. June 11, 2020), employed an analysis similar to that used by the Fourth Circuit in *Wirsing*. The court reasoned that 21 U.S.C. § 848(c) defines a single criminal act—engaging in a continuing criminal enterprise—and § 848(a), (b), and (e) define the applicable penalties, including penalty enhancements, for the criminal conduct defined in subsection (c).[7] The *Brown* court noted (as the government acknowledged) that § 848(b) was modified by the Fair Sentencing Act. 2020

---

[7]   The court noted, for example, that Congress titled § 848(a) "Penalties, Forfeitures," and § 848(e) "Death Penalty." *Id*. at *4. Section 848(b) is likewise entitled "Life imprisonment for engaging in continuing criminal enterprise." *Id.* at *2. All three sections define levels of punishment based on the commission of a continuing criminal enterprise based on drug trafficking.

WL 3106320, at *2, and that a sister court had previously found that the penalty imposed under §

848(e)(1)(A) was modified by the Fair Sentencing Act, *id.* at *4 (citing *Davis*, 2020 WL

1131147 at *2).  The court in *Brown* thus concluded that 21 U.S.C. § 848 is a covered offense *in*

*toto* "because at least one of the penalties . . . was modified by Section 2 or 3 of the Fair

Sentencing Act."  *Id.* at *4.  Thus, any violation of § 848—that is, any continuing criminal

enterprise as defined by § 848(c) and penalized under any provision of § 848—constitutes a

covered offense.

In any event, there is nothing about § 848(e) that would suggest a different approach or a

different result here.  To the contrary, § 848(e) references and relies upon as predicates §

841(b)(1)(A) and § 960(b)(1), both of which were specifically modified by the Fair Sentencing

Act.[8]  *See* Fair Sentencing Act of 2010, Section 2, Cocaine Sentencing Disparity Reduction §

401(b)(1), Pub. L. No. 111-220, 124 Stat. 2372.

Accordingly, Mr. Johnson's §§ 841 and 848(a) and (e) convictions are covered offenses

under the First Step Act.[9]

---

[8]  Section 848(e)(1)(A) provides that

> any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

[9]  Even if the Court determines one of Mr. Johnson's convictions is not eligible for resentencing under the First Step Act (and it should not), Mr. Johnson's sentences could still be reduced by applying the sentencing package doctrine.  The Fourth Circuit has adopted a sentence-package theory wherein if "an appellate court . . . rejects one of the grounds on which [a] sentence is based" and "vacates and remands a prisoner's sentence," a "district court may not simply re-enter the non-offending portions of the original sentence, but must conduct a new resentencing hearing to reformulate the entire sentence package." *United*

**B.**    **Mr. Johnson Meets the Eligibility Requirements under the First Step Act so Is Entitled to Have His Sentences Reconsidered**

Mr. Johnson committed his crimes before 2010. He has never been resentenced under the Fair Sentencing Act. He was never previously denied a sentence reduction after a complete review of the merits of a First Step Act motion. Mr. Johnson was convicted of, and sentenced for, covered offenses.

He is, therefore, entitled to reconsideration of his sentences, including the capital sentences imposed for his convictions under 21 U.S.C. § 848(e).

**C.**    **Because Mr. Johnson's Resentencing Consideration Implicates the Death Penalty, He Must Be Resentenced by a Jury on His Capital Sentenced Counts**

When reconsideration of a death sentence is required, the new sentencing must be done by a jury. *See* 18 U.S.C. § 3593(b)(2)(D) (providing that where defendant is subject to the death penalty, a sentencing hearing shall be conducted "before a jury impaneled for purposes of the hearing if . . . after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary"); 21 U.S.C. § 848(g), (i)(1)(B)(iv) (1988) (repealed 2006) ("A person shall be subjected to the penalty of death for any offense under this section only if a hearing is held in accordance with this section," and "[t]he hearing shall be conducted before a jury impaneled for the purpose of the hearing.") (Ex. 2); *see also Hurst v. Florida,* 136 S. Ct. 616, 624 (2016). The Fourth Circuit has likewise held that a jury, not a court, must be fact-finder with respect to a capital resentencing. *Stitt V*, 552 F.3d at 354-55 (finding that a defendant who was sentenced to death under § 848(e)(1)(A) and whose sentence was vacated

_____

States v. Jackson*, No. 3:99-00015-05, 2019 WL 6245759, at *4 (S.D. W. Va. Nov. 21, 2019) (alteration in original) (quoting *United States v. Hadden*, 475 F.3d 652, 669 (4th Cir. 2007)).

11

and reconsidered after §§ 848 (g)-(r) were repealed by Congress, was entitled a jury resentencing under § 848(i)(1)(B)(iv) because the Savings Statute preserved this remedy for him).

The implications of the *Stitt* opinions go beyond merely preserving the right to jury resentencing despite the repeal of §§ 848 (g)-(r).  An earlier decision in *Stitt* addressed the relief available for capital litigants under 28 U.S.C. § 2255.  *United States v. Stitt*, 459 F.3d 483, 486-87 (4th Cir. 2006) (hereinafter, "*Stitt IV*").  *Stitt IV* demonstrates that, when a statute provides relief applicable to both non-capital and capital defendants, the courts have the equitable obligation to shape relief for the capital defendants notwithstanding that the express statutory language only provides a mechanism for relief to non-capital defendants.  *See id*. at 485 (holding that because *Andrews v. United States*, 373 U.S. 334 (1963), required resentencing before a grant of relief pursuant to § 2255 could be appealed in a non-capital case, the same requirement necessarily applied in a capital case).  When a court does so, it must fashion the remedy to comport with established principles of Eighth Amendment jurisprudence and statutory provisions that reflect those principles—by empaneling a jury to resentence.

Thus, although the First Step Act speaks in terms of a "court" engaging in reconsideration of an eligible movant's sentence, applying this provision to a capital litigant, a jury must be empaneled to engage in the necessary sentencing determination.  *See, e.g.*, *Stitt IV* at 485.  Once a jury has determined whether to resentence Mr. Johnson to death or to life without possibility of parole, this Court would be the appropriate sentencer (as the statute contemplates) for determining whether Mr. Johnson is entitled to any other sentence reductions for his non-capital covered offenses.  For the sake of judicial efficiency, the Court should hold one resentencing hearing where the jury is the sentencer for the capital offenses, and this Court, thereafter, is the sentencer for the non-capital offenses.

12

**D.**   **A Capital Resentencing Hearing with Respect to Mr. Johnson's Capital Convictions Is the Only Means to Fully and Fairly Consider the 18 U.S.C. § 3553(a) Sentencing Factors as Required by the First Step Act**

As previously noted, the First Step Act entitles an eligible litigant to have his sentence reconsidered in light of the factors set forth in § 3553(a).  Section 3553(a) directs that the sentence imposed shall be "sufficient, but not greater than necessary" to comply with its purposes of deterrence, punishment, and rehabilitation.  Significantly, these factors include: (i) both the nature and circumstances of the offense, and the history and characteristics of the defendant; and (ii) the need to avoid unwarranted sentence disparities.  In considering a sentence reduction, the sentencer can also consider all post-conviction behavior.  *United States v. Chambers*, 956 F.3d 667, 675 (4th Cir. Apr. 23, 2020) (holding that post-sentencing evidence is properly considered in a First Step Act motion to reconsider sentence).

Mr. Johnson was sentenced to death in 1993 under the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (the "ADAA").  The ADAA requires the jury to consider mitigating factors similar to those prescribed under § 3553(a), such as: Mr. Johnson's "capacity to appreciate the wrongfulness of his crime," his age at the time of the crime, his lack of prior criminal record, and whether "another defendant or defendants, equally culpable in the crime will not be punished by death,"[10] as well as other mitigating factors.  *See* Special Findings (Ex. 1); 21 U.S.C. § 848(*m*) (1988) (repealed 2006) (Ex. 2).  Although it was not presented with the variety of critical evidence about his background and development that was available, the jury nevertheless recognized the evidence before it at the time was compelling and mitigating.  For

---

[10]   While the provisions of this section of the ADAA are no longer in effect, capital jurisprudence has long required jurors to take these factors into consideration.  *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986).  Moreover, the Fourth Circuit has held that certain provisions of the ADAA continue to have effect despite its subsequent repeal as a result of the Savings Statute.  *Stitt V*, 552 F.3d at 354.

example, all 12 jurors found that Mr. Johnson "was subjected to emotional and physical abuse, abandonment and neglect as a child, and was deprived of the parental guidance and protection that he needed" and that his "severe learning disability based on neurological impairment (brain damage) could impair his ability to exercise good judgment," and eleven jurors found that Mr. Johnson had "eagerness to be accepted by others" and that he was "easily manipulated." Special Findings at 7-11 (Ex. 1). However, in 1993, the jury was not presented with the most compelling evidence of Mr. Johnson's lack of moral culpability, namely his intellectual disability, evidence of which would make him ineligible for a death sentence. In fact, the ADAA, under which Mr. Johnson was sentenced to death, contained an absolute bar providing that "a sentence of death shall not be carried out upon a person who is mentally retarded."[11] § 848(*l*) (1988) (repealed 2006) (Ex. 2).

Nearly 30 years later, a full record of Mr. Johnson's severe impairment and childhood abuse exists. The mitigation evidence, much of which was not presented at the time of trial, is even more powerful and compelling than the evidence the original jury heard during the penalty phase of trial, and includes evidence and findings by experts that Mr. Johnson is intellectually disabled. The sentencer—in this case, a jury at a new capital resentencing hearing, with respect to Mr. Johnson's death sentenced counts, and the Court, with respect to the remaining counts—is required to examine all § 3553(a) factors. 18 U.S.C. § 3553(a); *Chambers*, 956 F.3d at 675. In addition, the jury would be required to consider the capital sentencing factors established by the ADAA.

---

[11]  The modern convention is to use the terminology of "intellectual disability" or "intellectually disabled." However, because the statute uses "mentally retarded" and "mental retardation," this memorandum will at times use those terms when discussing the statutes and trial testimony.

14

In the resentencing, the jury and Court should consider relevant evidence regarding Mr. Johnson which was not presented at the time of sentencing.  Neither the new capital resentencing jury nor the Court is precluded from looking at evidence that was not presented at the time of sentencing—in fact, both are required to do so because such evidence is highly relevant.  *Chambers*, 956 F.3d at 675 (*"*Having concluded that the § 3553(a) factors apply in the § 404(b) context, post-sentencing evidence 'may be highly relevant to several of [those] factors.'") (quoting *Pepper v. United States*, 562 U.S. 467, 491 (2011)).  In Mr. Johnson's case, had the substantial evidence of his intellectually disability and his chaotic and abusive childhood, particularly the expert opinions that he is a person with intellectual disability, been presented to the jury in 1993, Mr. Johnson should have been spared the death penalty.

As explained below, there is significant evidence that indicates that the new capital resentencing jury and the Court should impose reduced sentences in light of the § 3553(a) factors in Mr. Johnson's case.  And, as explained above, in light of the statutory requirement (and the constitutional implications) that juries sentence in federal capital cases, this Court should grant Mr. Johnson a full sentencing proceeding before a jury.  At such a proceeding, Mr. Johnson is prepared to present to the jury evidence concerning his intellectually disability, his chaotic and abusive childhood, and his post-incarceration rehabilitation.  *See Wright*, 425 F. Supp. 3d at 597; *United States v. Martin*, No. 19-3905, 2020 WL 3251021, at *2 (6th Cir. June 16, 2020) (concluding that the "district court erred in limiting what information it could consider for resentencing under the First Step Act" and observing "that it is within the district court's discretion to hold a hearing on remand").  Indeed, clearly established law provides that any capital resentencing hearing must be held before a jury.  *See Stitt V*, 552 F.3d at 354-55; 21

U.S.C. § 848(g); 18 U.S.C. § 3593; *see also Hurst*, 136 S. Ct. at 624; *Ring v. Arizona*, 536 U.S. 584, 609 (2002).

> **1.     Compelling Evidence Shows that Corey Johnson's Sentences Should Be Reduced**

The full scope of evidence supporting the reduction of Corey Johnson's sentences pursuant to the First Step Act has never been presented previously. The jury that sentenced Mr. Johnson to death heard some, but not nearly all, of the evidence about his trauma-filled childhood, early adult experiences, and other mitigating circumstances discussed below.[12] That evidence was presented primarily through testimony from the defense psychologist, Dr. Dewey Cornell, who conducted a pretrial examination of Mr. Johnson.[13] In addition to meetings with Mr. Johnson, Dr. Cornell interviewed Mr. Johnson's mother in person, and had phone calls with five professionals who worked with Corey Johnson during his residential and group home placements as a teenager. The jury did not hear testimony from any family member, close family friend, or witness who knew Corey Johnson outside of his residential placement and who could

---

[12]   Undoubtedly, Mr. Johnson was involved in a terrible series of crimes that weighed heavily on the original jury as it considered the appropriate punishment (though without evidence in mitigation essential to its decision making) and contributed to their ultimate decision to sentence him to death. However, there have been a number of cases in which the death penalty was never sought or in which juries or the courts have concluded that sentences other than death were the appropriate sentences despite the heinous nature of the crimes committed by those defendants. *See infra* note 33. In addition, shortly after the jury returned its recommendation that Mr. Johnson be sentenced to death, the government withdrew its death penalty notice for Mr. Johnson's co-defendant, Mr. Thomas, who was charged and convicted of four separate murders, shortly before trial after Mr. Thomas produced evidence of his intellectual disability. There have been numerous capital defendants who committed crimes equally as violent as Mr. Johnson's who did not receive the death penalty because of their intellectual disability. *See infra* note 34.

[13]   The jury also heard from two other defense witnesses who worked with Corey Johnson when he was a teenager in residential placements.

describe from personal knowledge the trauma he suffered as a young child and adolescent (as well as the other evidence also described below).

At a new capital resentencing hearing, the jury would hear from some of the following witnesses:

- Mr. Johnson's family members, including his maternal aunt; his brother; his cousins; his stepfather; and his stepmother;

- Friends who knew Mr. Johnson during his childhood, adolescence, and as a young adult, including his godmother and her daughter;

- Individuals who knew Mr. Johnson during his childhood, adolescence, and/or as a young adult, including a high school friend and the son of one of his mother's abusive boyfriends;

- Individuals who knew Mr. Johnson through their involvement in drug trafficking offenses, including former girlfriends during that period and the leaders of the Trenton drug-dealing group (*see infra* at IV.D.3.a);

- At least five professionals who worked with or evaluated Mr. Johnson during his childhood and adolescence, some of whom administered psychological and/or academic achievement assessments (including IQ tests) to him;

- Individuals who have known Mr. Johnson since his incarceration for the offenses in this case, including church and other religious officials who ministered to him and other inmates; a criminal justice reform advocate; and a former warden;

- A mitigation specialist who conducted a comprehensive investigation into his background, history, and characteristics; and

- Experts who have evaluated Corey Johnson and can speak to his intellectual impairments.

As summarized below, Mr. Johnson's witnesses will describe persuasively the trauma Mr. Johnson experienced throughout his life, including: (1) the abuse and neglect he suffered at the hands of those who were supposed to care for and nurture him; (2) his utter inability to learn in school; (3) his transient life as a child and adolescent; (4) his ultimate abandonment by his mother; (5) his placement in structured residential settings where he continued to severely struggle and fail academically, socially, and practically; (6) his discharge into the community without a plan and without independent living skills at age 18; and (7) his extreme vulnerability

17

to being manipulated by others, particularly in light of his desire to be accepted by and to please them.  This and other evidence will underscore and explain Mr. Johnson's significant intellectual functioning deficiencies and his impaired adaptive functioning skills which all directly establish his diminished moral culpability and, combined with all of the other relevant factors, demonstrate why a sentencing reduction from the death penalty to life in prison is the necessary and appropriate outcome in his case.

### 2.      Corey Johnson's Childhood Was Marred by Abuse, Chaos, and Neglect[14]

The First Step Act, § 3553(a)(1), and the capital sentencing provisions of the ADAA and the Federal Death Penalty Act of 1994, Pub. L. No. 103-322, 108 Stat. 1959, require the sentencer to consider "the history and characteristics of the defendant" and all relevant mitigating evidence.  Corey Johnson's full life history is central to that inquiry. Contemporaneous records from his childhood and scores of interviews with family members, friends, social workers, educators, and professionals document his traumatic background.  Below is a summary of some of the key events that shaped him and some of the evidence he would present during a capital resentencing hearing before a jury.

#### a.      Corey suffered physical and emotional abuse as a child

Corey Johnson is 51 years old now.  He was born in 1968 to parents Emma Johnson and James Sykes, who were both teenagers at the time of his birth.  James Sykes was in prison for most of Corey's childhood and never played a significant role in his upbringing.  Emma Johnson, an immature, cocaine-addicted, narcissistic single mother lacking empathy and capacity, abused

---

[14]   Unless specifically noted, the facts contained in this section are documented in contemporaneous records created during Corey Johnson's childhood and adolescence and in declarations from witnesses who knew him during those periods and/or during adulthood, which are attached to this memorandum as exhibits 3 through 29.

her children, both physically and emotionally. She allowed them to be abused by others. And, ultimately, she abandoned them.

Key individuals from Corey's childhood will attest that Emma Johnson physically and emotionally abused Corey and his brother. His godmother recalled that Emma Johnson threatened to kill or get rid of her children "because they were getting on her nerves" or "because she was tired of them." Ex. 3. Family members say that Emma Johnson was particularly physically abusive toward Corey, and several witnessed her beating Corey.

Some of this abuse was specifically driven by Corey's undiagnosed intellectual disability. Emma Johnson was cruel to Corey, often criticizing his low intelligence and comparing Corey to his younger brother, whom she viewed as smarter and better than Corey. Frustrated, Emma Johnson would hit Corey when he struggled at school. Corey's aunt recalled:

> I saw Emma hit and smack Corey many times . . . . One time, Emma and Corey separately told me that she had beaten Corey with her high heel shoe because he either got left back in school or failed in school.

Ex. 4. After this incident, Emma Johnson realized she was out of control and sent Corey to live with his godmother for six or seven months.

Corey's mother also frequently derided and beat Corey for wetting or soiling the bed, which he often did until at least the age of 12. Corey tried to hide the sheets after he had an accident. If Emma Johnson discovered Corey had wet the bed, she did not wash his bedding, leaving him to sleep on sheets dirty with urine and feces.

Corey's childhood was scarred by Emma Johnson's volatile and abusive relationships with a series of men. Bobby Koger, a heroin addict, was the most violent of her boyfriends. Koger, who lived with Emma Johnson and Corey for about four years, from the time he was nine to 12, once tried to set fire to their apartment. Emma Johnson reported to psychiatrists and social workers that Koger abused both of her children and once expressed her fear, because of Koger's

19

violence, that "Corey [would be] at risk were he to return home" from a residential placement. Ex. 5.  Family and friends saw bruises on Corey, Robert, and Emma Johnson, which they believed Koger had inflicted.  Emma Johnson herself acknowledged that this was a destructive and chaotic relationship.

Family members and others will testify that Corey was severely neglected at various times throughout his childhood.  Emma Johnson was often absent.  She would leave her sons with others for "days, weekends, and sometimes even weeks and months."  Ex. 6.  Frequently, Corey and his brother were locked out of the apartment when they returned from school because Emma Johnson was gone.  Corey's brother summed up their situation: "From an early age, Corey and I were pretty much on our own."  *Id.*  When Emma Johnson was home, she often partied and used drugs, even while Corey and his brother were present.  "Corey told me that Emma always had visitors in their apartment and music would be played so loudly that Corey could not sleep at night.  He said that he was tired at school during the day and couldn't concentrate on his schoolwork."  Ex. 4.

Witnesses will describe how the abuse and neglect significantly impacted Corey. Corey's aunt is available to share her observations of young Corey, including that he was "sad a great deal of the time."  *Id.*  His godmother reported that he had "difficulty dealing with the situation."  Ex. 3.  Corey reported to counselors at the time that he "felt at times like wanting to stab himself."  Ex. 7.  When he was 13, Corey told a psychiatrist, "If he got lost in a forest, he did not know who would come looking for him."  *Id.*

> **b.**      **Corey was regularly uprooted from his homes and schools and eventually abandoned to social service custody**

Witnesses will testify that, by the time he was 12, Corey had lived in roughly a dozen different places throughout Brooklyn, Manhattan, Queens, and Jersey City, New Jersey.  Due to

20

her volatile relationships, drug use, and intermittent employment, Emma Johnson moved frequently, taking Corey and Robert with her from apartment to apartment.  Because of this transience, Corey also attended numerous schools.  Corey attended at least six different elementary schools before the end of second grade and at least ten schools before the age of 13.

When he was 13, Corey's mother abandoned Corey, voluntarily surrendering him to the social service system—not because Corey was acting out, misbehaving, or otherwise causing problems, but instead because she was focused on her desires, not her son's needs.  Following two months of evaluation at the Pleasantville Diagnostic Center, Corey was moved to the Pleasantville Cottage School, a residential treatment facility for emotionally disturbed boys.  He lived and attended school there for three years.  Upon arrival, Corey underwent diagnostic screening which showed that he was functioning on second- and third-grade levels in word recognition, spelling, and arithmetic.  The Pleasantville records describe Corey as having a "severe learning disability," an erroneous classification that nevertheless reflected awareness that Corey simply could not learn, no matter the strategies used to help him.[15]  Despite his constant

---

[15]   At sentencing, Dr. Cornell testified that Corey Johnson was "severely learning disabled" but was not intellectually disabled.  *See* 2/10/93 Trial Tr. 3573-3574; 3682; 3684; 3690-3692 (Ex. 8).  Corey Johnson is indeed intellectually disabled.  *See infra* IV.D.4.  Dr. Cornell's misdiagnosis of Corey Johnson was the result of a series of systematic failures occurring long before Dr. Cornell conducted his evaluation that resulted in the mischaracterization of Corey's intellectual impairments.  Throughout childhood, Corey was repeatedly labeled as learning disabled, first in the public school system and then at Pleasantville, where he was deemed "severely learning disabled."  However, as noted *infra* at note 22, experts in learning disabilities and intellectual disability—knowledgeable about the evaluation and diagnoses of children with learning disabilities and intellectual disability in New York City during the 1970s and 1980s—have since concluded that Corey Johnson did not meet the clinical guidelines for a learning disability at the time he was diagnosed, and he does not today.  They also have described how young African-American children who met the criteria of "mental retardation" were mislabeled as learning disabled, a classification viewed as having less of a stigma, due to the threat of litigation and regulatory changes that occurred during that era.

failure, his teachers praised his commitment to improving; Corey wanted to learn, but he could not.  They observed that Corey was eager and motivated to improve his situation.

Witnesses who worked in these residential settings will explain that, when Corey turned 16, he was transferred to a group home called Elmhurst Boys Residence because he was too old to remain at Pleasantville.  At Elmhurst, the primary focus of the social workers and staff was to prepare Corey for the time when he would age out of the group home and would have to live independently.  Yet, despite significant efforts, Corey was unable to learn even minimal independent living skills during his two years at Elmhurst, a cause for significant concern for the social workers and staff responsible for him.

In his residential settings, Emma Johnson continued to inflict emotional abuse upon Corey.  She would cancel Corey's weekend home visits or lobby to reduce them, and she fell out of contact with Corey for long stretches of time.  Contemporaneous records from Corey's residential placements will provide descriptions of Emma Johnson as "a narcissistic" and "self-focused woman" who showed a "lack of empathy and sensitivity toward Corey," and was only "surfacely [sic] involved with Corey," "elusive," and "impossible to engage."  Exs. 9-12.

Nevertheless, even with their concerns about his ability to be safe outside the Elmhurst environment and in his mother's care, witnesses will testify that staff told Corey to leave Elmhurst for ten days when he refused to participate in group discussions and exhibited disrespectful behavior toward staff.  Some staff felt they clearly communicated to Corey that he should go home to his mother's house, use the ten days to consider how to improve his attitude and behavior, and then return to Elmhurst.  But another staff member had doubts at the time whether Corey understood that he was welcome to return.  Ex. 13.  Over the next few weeks, staff wrote to Emma Johnson and Corey urging them to contact Elmhurst but never received any

22

reply.  Shortly after that, the Department of Social Services closed Corey's case and discharged him from the foster care system permanently.  Ex. 14; Ex. 12.

One of the social workers who worked with Corey will share her realization that, in hindsight, the system, which was supposed to protect and nurture Corey, let Corey fall through the cracks, depriving him of the security, stability, and structure of the residential placements where he had lived since he was 13.  Like his mother had done six years before, the system abandoned Corey without providing him the independent living and the social, practical, and other life skills vital to his survival.  With nowhere else to turn and without the life skills to survive on his own, Corey returned—as a highly vulnerable young man—to a highly volatile environment to live with his mother (who was using hard drugs) and his younger brother (who was dealing them).

**3.      Mr. Johnson Was a Follower Who Was Easily Manipulated—a Common Outcome for People with Intellectual Disability—and Sought Protection from People Who Led Him Down a Violent Path**

Section 3553(a)(1) requires the sentencer to consider "the nature and circumstances of the offense" in addition to the "history and characteristics of the defendant."  *Smith*, 959 F.3d at 703.  Mr. Johnson acknowledges that his offenses are among the most serious possible.  However, it is vital to understand the context within which he committed those crimes.

**a.      Corey Johnson drifted into a drug group after his discharge from residential placement with no plan or support**

A social worker will testify that she had written a tragically prophetic case note (just months before he was sent home) that foreshadowed the results when Corey was sent home from his last residential placement without any supports in place.  The social worker, who conducted individual and group therapy sessions with Corey at Elmhurst, documented her grave concerns about his mother's impact on Corey and his future.

> I suspect that Corey will be at risk when it comes time to leave us and the security that we have provided him all this time . . . [which] is necessary if he is going to be able to survive in the community and make constructive choices and not perpetuate the same patterns that he learned from his mother.

Ex. 15.  This is exactly what happened.

With severe cognitive, social, and practical deficits due to his intellectual disability, no job skills, and no support community, Corey was highly vulnerable.  He idolized his younger brother Robert, who first started selling drugs when Robert was 13 years old.  Soon after his discharge from Elmhurst, Corey tried to sell drugs, too.  Because of his intellectual disability, Corey had problems figuring out how much money he was owed in exchange for the drugs he sold.  Once, Robert gave Corey drugs to sell—50 vials of crack to sell for $5 each—but Corey returned with only $50, not the expected $250.  After that, Robert could not trust Corey to calculate the money owed him and therefore stopped giving him drugs to sell.  Ex. 6.

In 1989, still just 18, Corey joined a group of men he knew from his Brooklyn neighborhood who were selling drugs in Trenton, New Jersey, led by brothers Darnell and Darold Brown.  The leaders recognized that Corey was slow, and Corey's role in the Trenton group was very limited.  Corey viewed the Trenton group as his surrogate family: "Corey considered our group to be his family and was very protective of the group."[16]  Vernon Thomas, as well as Richard Tipton, his co-defendants in the case that brought him to death row, were a part of this group.  Tipton was viewed much differently than Corey by the leaders of the Trenton group.  Tipton was "active, hyper, and rowdy . . . very loud" and "considerably more intelligent than Corey."  Ex. 16.

---

[16]  *See* Ex. 16; Ex. 17.  Prosecution witnesses during Corey Johnson's death penalty trial confirmed that members of the group called each other "brother" and "cousin" and Corey viewed them as his family.

In 1991, the police raided a home where the members of the Trenton drug group were staying, and its leaders and many other members were arrested. Mr. Johnson, Vernon Thomas, and Richard Tipton were not at the house during the raid, and they were not arrested. Tipton suggested to the remnants of the Trenton group who were not in jail that they move to Richmond, Virginia, where Tipton had ties and believed they could make "big money" selling drugs. Tipton, Thomas, and Corey Johnson soon relocated to Richmond, and Tipton connected them there with James Roane. 1/15/93 Trial Tr. 921-922 (Ex. 18). In Richmond, the group engaged in the violent crimes underlying their capital convictions.[17]

### b.    Mr. Johnson was a follower who exhibited extreme loyalty to people viewed as family

It is well recognized that individuals with intellectual disability often act on impulse, that they are easily influenced, and that in group settings, they are usually followers rather than leaders. James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 429 (1985) (hereafter "Ellis *et al*.").[18] Witnesses will describe significant

---

[17]    While trial testimony depicted Corey as a "supervisor" of the activities in Virginia, witnesses who knew him at the time would testify to their observations of Corey that provide a more complete and accurate depiction of his limitations and his role. "Compared to Roane and Tipton, Corey appeared to be a follower. Tipton and Roane could have been the bosses; they had the strong personalities, unlike Corey. Corey wanted to be accepted and could have been influenced by others." Ex. 20. "I would have expected [Tipton], rather than Corey or [Thomas], to be the leader of the group in Virginia." Ex. 17. "Both [Tipton] and Corey were followers, but between the two, Corey would follow [Tipton]." Ex. 16. In any event, the meaning of being a "supervisor" for purposes of establishing the crimes for which Corey Johnson was convicted ("exercis[ing] power and authority by a person who occupies some position of management or supervision," *see United States v. Tipton*, 90 F.3d 861, 886 (4th Cir. 1996) (citation omitted)), is not inconsistent with the evidence powerfully demonstrating Corey Johnson's significant deficits in life skills that began during his childhood but continued up until his incarceration.

[18]    *See infra* at IV.D.4 (summary of expert evidence that Mr. Johnson will present to the jury that he is a person with intellectual disability).

25

evidence that Corey Johnson was a follower, not a leader, throughout his life. He has always exhibited traits of a follower, rather than a leader. Teachers, caseworkers, family, and friends will attest to the same, describing him as someone desperate to be accepted by peers and who was willing to do anything he was told, regardless of the consequences. They also described Corey as being "easily manipulated" and victimized by others, including peers and his mother and brother. Exs. 16 & 22. Corey would do whatever his friends told him to do, going to great lengths to fit in with the crowd, including jeopardizing his own wellbeing by doing things that could get him injured or killed. Corey's cousin, Priscilla Hodges, recalls that as a young teenager, he performed reckless acts—like riding his bike through traffic across a busy street and roller-skating down a steep hill—simply on a dare by his peers. Ex. 21.

Witnesses who worked with Corey in his residential placements will explain that he was perceived as someone who was so limited that he would always remain a follower. Counselors at Corey's placement stated that he was easily influenced and taken advantage of by his peers. He often required protection from the other children in his class because he was frequently scapegoated. Corey was desperate to be accepted by his peers and would do anything that someone told him to do.

This understanding is consistent with numerous trial witnesses who will describe Tipton as the leader of the Richmond group. At trial, Mr. Johnson was described as one of Tipton's "stickmen"—an enforcer—in the Richmond group's drug business. In short, due to his intellectual disability and consistent with the fact that individuals with cognitive limitations are usually followers, Mr. Johnson was willing to follow Tipton and Roane, who used him not for his drug dealing ability, but to do their bidding. While in no way excusing his actions, it is important to understand that Mr. Johnson viewed the Richmond group as his surrogate family,

26

just as his similar feelings toward the Trenton group had made him extremely "protective" toward them. In fact, during the penalty phase, the jury was convinced of Mr. Johnson's susceptibility to manipulation—all 12 jurors voted that Corey was easily manipulated and eager to be accepted by others. *See* Special Findings at 11 (Ex. 1).[19]

People who knew Mr. Johnson, Tipton, and Roane similarly concluded that Mr. Johnson followed Tipton and Roane's lead. "Compared to Roane and Tipton, Corey appeared to be a follower." Ex. 20. A criminal justice reform advocate who interacted with all three men on eight to ten different occasions while visiting inmates on death row did not perceive Mr. Johnson to be the leader of the group; in fact she believed "no one could reasonably have thought of Corey as the leader in that group." Ex. 22; *see also* Ex. 17 ("I would have expected [Tipton], rather than Corey or [Thomas], to be the leader of the group in Virginia."); Ex. 16 ("Both [Tipton] and Corey were followers, but between the two, Corey would follow [Tipton]."). Even Roane and Mr. Tipton indicated to the criminal justice advocate that Corey was the follower of the group and that they were aware that Mr. Johnson was slow. Ex. 22.

### 4.  Mr. Johnson Is a Person with Intellectual Disability

A jury reconsidering Mr. Johnson's sentence will be provided with considerable evidence establishing that he is a person with intellectual disability. This evidence will include the findings of three nationally renowned experts in the field of intellectual disability who evaluated Mr. Johnson and concluded that he is a person with intellectual disability. These experts base their conclusions on numerous records from Mr. Johnson's childhood of the type regularly relied

---

[19]  What the jury was not given was an understanding that the "follower" and "eager-to-please" attributes are frequently seen among those with intellectual disability. *See* Ellis *et al*. at 429.

on by specialists in intellectual disability, as well as interviews with individuals who observed him through the years and other measures that are standard in the field.

To be considered intellectually disabled, a person must meet the criteria established by the leading professional organizations in the field.  The American Psychiatric Association ("APA") in its *Diagnostic and Statistical Manual of Mental Disorders DSM-5* (5th ed. 2013) (hereinafter, "DSM-5") and the American Association on Intellectual and Developmental Disabilities in its Ad Hoc Committee on Terminology and Classification, *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed. 2010) (hereinafter, "Classification Manual") set forth three-prong standards that essentially mirror each other.  Both standards require: (1) significant limitations in intellectual functioning, as measured by a reliable and valid IQ test; (2) significant limitations in adaptive functioning, which gauges how effectively individuals cope with everyday life demands and how well they meet the standards of personal independence of someone in their age group, sociocultural background, and community setting;[20] and (3) the onset of these significant deficits during the development period.[21]

### a.    Mr. Johnson has significant limitations in intellectual functioning

At a capital sentencing hearing before a jury, Mr. Johnson's experts will show that he has an IQ in the intellectual disability range.  For example, Corey had a valid and reliable full scale IQ score of 69 on the gold-standard WISC-R that was administered by an experienced

---

[20]   A diagnosis of intellectual disability requires significant deficits in at least one of three areas of adaptive functioning—(1) conceptual functioning, (2) social functioning, or (3) practical functioning.  DSM-5 at 33; Classification Manual at 6-7.

[21]   DSM-5 at 33; Classification Manual at 6-7.

psychologist when Corey was 16 years old and living in the Pleasantville residential facility.[22] Mr. Johnson's valid IQ score below 70, namely the 69 IQ test noted above, is sufficient evidence of his significant limitations in intellectual functioning to proceed with an evaluation of Mr. Johnson under the second prong of the intellectual disability diagnostic criteria, an assessment of adaptive behavior.

### b.     Mr. Johnson has significant limitations in adaptive functioning

Mr. Johnson's evidence will show that he has significant limitations in adaptive functioning as well.  That evidence is based on well-documented, detailed, and consistent contemporaneous records from teachers, social workers, psychologists, and psychiatrists who worked with Corey before and during his residential placements.  It is corroborated by interviews with and statements by several dozen people (family members, friends, acquaintances, professionals who worked with Corey as a child, and adults who have interacted with him in prison) who describe further examples of his broad limitations in learning, social interactions, and practical living skills.  Finally, the evidence will include the results of standardized adaptive behavior instruments administered by an experienced expert to three people (a family member, a very close friend, and a teacher) who knew Corey well during his childhood and teenage years and that place Corey Johnson in the intellectual disability range of adaptive behavior.

---

[22]  As noted *supra* note 15, Mr. Johnson's experts in the evaluation and diagnosis of learning disabilities have concluded that Corey was misdiagnosed as a child with severe learning disabilities for a number of reasons, rather than correctly diagnosed as a child with intellectual disability.  Those reasons include pressure, during the era when Corey entered the New York City school system, to classify children who met the criteria to be diagnosed with "mental retardation" as children with learning disabilities so as not to place the negative label of "mental retardation" on children, particularly African-American children in urban environments.  Another reason for his erroneous "learning disability" diagnoses were two flawed and invalid IQ tests given to Corey as a child and the lack of awareness of the timing and circumstances related to all of the assessments by those who lacked complete records related to his childhood.

29

At a capital resentencing hearing before a jury, Mr. Johnson will present testimony that demonstrates his broad adaptive behavior impairments during childhood.  The following highlights some of the evidence and testimony he would present.

### i.        Corey was unable to learn

Corey's school records document his consistent academic failure from a young age.  He repeated several grades, and as he got older, he fell further and further behind.  Corey was in the second grade from 1975, when he was six, until 1979, when he was ten.  At age ten, Corey was referred to the Committee on the Handicapped for "school failure" and, after testing, was placed in Special Education classes.

Corey's academic failures continued in his late teens.  When he was 16, his reading comprehension, oral comprehension, sight vocabulary, and arithmetic ability were all on second- or third-grade levels.  While at Elmhurst, he attended high school but was placed in remedial, special education, and vocational classes, but, even then, failed or got Ds in nearly every class. His teachers determined that he was unable to pass school competency tests and he ultimately left high school without graduating[23] or obtaining a certificate of attendance.

Corey stood out to staff and evaluators at his residential placements because of his severe disability.  "Corey was very slow intellectually . . . .  I do not remember anyone else at Pleasantville who was similarly slow intellectually."  Ex. 19.  "Compared to virtually all of the other boys I encountered at Elmhurst, Corey was much weaker cognitively."  Ex. 23.  "My impression was that while there were many boys with below normal intellectual ability and various levels of functioning, almost all of the other boys there were more intelligent than

---

[23]   Prison records confirm that, since his incarceration almost 30 years ago, Mr. Johnson has continued taking courses and trying to pass his General Equivalency Diploma (hereinafter, "GED") exams.

Corey." Ex. 13. A Pleasantville psychologist who evaluated Corey twice in three years later said,

> Nearly 30 years after I met and evaluated him, Corey still stands out in my mind due to his profound impairment in learning. Corey's deficit in phonological processing remains the most profound impairment of this kind I have encountered in three decades of clinical practice.

He considered Corey's deficit "so profound" that he has "used it over the past 30 years as a teaching example in [his] classes."

### ii.    Corey failed to learn skills for independent living

Toward the end of his residential placement, professionals at Elmhurst recognized that returning to his mother's residence was not in Corey's best interests, and they worked with him to focus on independent living skills. But Corey was not able to develop independent living skills, nor did he possess the judgment to ensure his own safety. One social worker who worked with Corey at Elmhurst, questioned Corey's ability to handle "simple, day-to-day tasks that community life requires, such as paying bills, obtaining a driver's license, or purchasing and maintaining a car," noting that "[s]omewhat more complex skills—like planning a budget—were clearly beyond Corey's abilities." Ex. 23. According to family and friends, Corey never lived alone and always lived with girlfriends or more competent peers.

### c.    Mr. Johnson's significant limitations in intellectual functioning and in adaptive functioning were present during his childhood

Finally, Mr. Johnson will present evidence that his significant limitations in intellectual functioning and in adaptive functioning were manifested during his childhood, the developmental period for intellectual disability diagnoses. Accordingly, his experts will testify before the capital resentencing jury that Mr. Johnson is a person with intellectual disability because he meets the current diagnostic criteria.

31

**5.     The Jury Considering Mr. Johnson's Sentence Will Hear Evidence from Experts Who Are Specialists in Intellectual Disability—Evidence No Court or Jury Has Heard to Date**

While Mr. Johnson previously raised an intellectual disability claim in his § 2255 proceeding, the court was not provided with evidence from experts in the field of intellectual disability.  Nor has Mr. Johnson ever had an opportunity to present comprehensive evidence of his intellectual disability to any trier of fact at an evidentiary hearing.

Mr. Johnson's capital trial was among the first federal death penalty cases after the enactment of the ADAA, and defense practices then were not as developed as they are today. His trial attorneys did not obtain all available school, social services, and other similar records created during his childhood.[24]  In addition, Dr. Cornell, the psychologist they retained to assess Mr. Johnson's competency to stand trial, to determine if there were any grounds to assert a not-criminally-responsible claim, and to assist with preparing mitigation evidence generally, was not an expert in intellectual disability.  For a number of reasons, Dr. Cornell was unable to accurately evaluate Mr. Johnson's intellectual capabilities.  Because of that inability, he did not complete a comprehensive assessment of Mr. Johnson's adaptive functioning.  Accordingly, Dr. Cornell erroneously testified before the jury that Mr. Johnson was not "mentally retarded." 2/10/93 Trial Tr. 3692 (Ex. 8).  Dr. Cornell's conclusion was unfortunately incorrect, based on the complete record of Mr. Johnson's valid and reliable childhood IQ scores and broad and significant impairments in adaptive functioning (which were not presented to Dr. Cornell).

After his convictions and death sentences were affirmed on direct appeal, Mr. Johnson was appointed new counsel to represent him on proceedings to vacate his sentences, pursuant to § 2255.  Mr. Johnson's § 2255 attorneys raised a claim that he is "mentally retarded" and that his

---

[24]   *See, e.g.*, *supra* note 15.

32

execution was therefore barred by 21 U.S.C. § 848(*l*) and 18 U.S.C. § 3596(c), both of which provide that a "sentence of death shall not be carried out upon a person who is mentally retarded," and they asserted that Mr. Johnson's trial attorneys provided ineffective assistance of counsel by failing to argue at sentencing that he could not be executed because he is "mentally retarded."[25]  However, Mr. Johnson's § 2255 counsel did not submit any expert opinions or expert reports in support of their barebones claims that he had "mental retardation."

This Court rejected Mr. Johnson's claims related to "mental retardation," concluding: "Hence, the record before this Court demonstrates that Johnson is not mentally retarded."[26]  The Court further concluded that Mr. Johnson's trial counsel did not provide deficient representation because counsel reasonably relied upon the conclusion of the psychologist they retained to assist them, who informed them that Mr. Johnson was not "mentally retarded."  Mem. Op. at 82-84.

Mr. Johnson appealed the dismissal of his § 2255 petition and raised, among other issues, the denial of his "mental retardation" claim.[27]  The Fourth Circuit later affirmed this Court's ruling on appeal.  *United States v. Roane*, 378 F.3d 382, 408-09 (4th Cir. 2004).

---

[25]  *See* Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255 at 108-11 (June 15, 1998) and subsequent filings related to Mr. Johnson's mental retardation claims.

[26]  Memorandum Opinion (May 1, 2003) at *80-82 (hereinafter, "Mem. Op.") (observing that Mr. Johnson was "granted another full opportunity to demonstrate that he is mentally retarded" and that "Johnson rejected the Court's invitation to submit any new evidence of his mental retardation").

[27]  *See* Petitioner Johnson's Motion for a Certificate of Appealability Pursuant to 28 U.S.C. §§ 2253(c)(1)(B) and 2255 at 43-45 (October 10, 2003); Brief for Appellants Corey Johnson and Richard Tipton at 139-45, *United States v. Johnson & Tipton*, Nos. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004).

**6.      Mr. Johnson's Flawless Prison Record Indicates that a Sentence Reduction Would Not Encourage Further Crime Nor Would It Endanger the Public**

The sentencing factors require the "need for the sentence imposed" to "afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B), (a)(2)(C).  In *Pepper v. United States*, 562 U.S. 476 (2011), the Supreme Court instructed courts to consider a defendant's post-sentencing mitigation evidence at the time of resentencing.  *See also United States v. Davis*, 679 F.3d 190, 195-96 (4th Cir. 2012) (holding that the sentencer "can consider other sentencing factors" when reducing a sentence). Courts have relied on post-sentencing mitigation efforts by petitioners in granting First Step Act motions.  *See*, *e.g.*, *Chambers*, 956 F.3d at 674-75 ("There are generally no limitations on the types of character and background information a court may consider for sentencing purposes."); *Brown*, 2020 WL 3106320, at *4 ("After consideration of the 3553(a) factors, in particular the history and characteristics of the Defendant and the need for the sentence imposed, the Court finds that a [reduced sentence] is appropriate . . . .").

Mr. Johnson's immaculate prison record weighs in favor of sentence reduction.  *See United States v. Johnson*, No. 7:04-CR-128-1, 2020 WL 2563541, at *7 (W.D. Va. May 20, 2020) ("The court finds that his ability to stay out of trouble and his efforts to improve himself indicate that he has learned to respect the rules of the institution and that he does not present the same threat to the public that he did prior to his incarceration.").  Mr. Johnson has been incarcerated for the past 28 years.[28]  For more than two decades, he has been a model inmate, following prison rules and doing what he was told to do by prison officials.  In the last 20 years,

---

[28]   For the first approximately seven years of his incarceration after his arrest in 1992, both before and after his federal trial and sentencing, Mr. Johnson was held in the custody of the Virginia Department of Corrections.  Since 1999, Mr. Johnson has been incarcerated on the federal death row in the USP in Terre Haute, Indiana.

Mr. Johnson only received one disciplinary infraction for using a staff restroom without permission in 2002 while working in the kitchen at USP Terre Haute. He has avoided getting into altercations with other inmates and he has never engaged in violence. His lack of any violent behavior in prison and his long period without any infractions is a strong demonstration that he does not pose a danger in prison. Special Confinement Unit reports described Mr. Johnson as being quiet, civil, quick to smile, and a relaxed person.

A pastor who ministered to Mr. Johnson every other week for several years while he was held in Virginia after his sentencing met with Mr. Johnson in Terre Haute, Indiana five times after he was transferred to the Bureau of Prisons, and spoke with him another dozen times by phone, described Mr. Johnson as "less vocal and opinionated" than most inmates, "soft-spoken, quiet, and humble [and] seemed eager to please." Ex. 29. During all the times he observed him, Mr. Johnson appeared to get along with the other inmates and never got into any "disagreements with anyone." *Id.* In contrast, the pastor believed that Tipton and Roane, whom he also knew, were quick to anger and engage in confrontations with prison officials, while Mr. Johnson "seemed to 'go with the flow.'"[29]

Although he is a person with intellectual disability, Corey Johnson, despite his inability to do so, continues to believe that he can obtain a GED, and has been diligently trying since 2006 to obtain it.[30] Achieving his GED is one serious goal that Mr. Johnson set for himself. After decades of dedicated effort, Mr. Johnson has never been able to take, much less pass, the GED test because he has never progressed past the pre-GED stage, even though—year in and year

---

[29] Ex. 29. A volunteer chaplain who also knew Tipton, Roane, and Mr. Johnson well at the same prisons describes Mr. Johnson as "pleasant and eager for acceptance . . . [and] polite, respectable, and kind." Ex. 20.

[30] Inmate Education Data Transcript, Mar. 25, 2012 (Ex. 30).

out—his prison programming reviews note he "[w]orks hard in the GED program" and each year they set the coming December as the target for Mr. Johnson to get his GED. To this day, he continues to study for the GED test regularly and works on his reading, social studies, and math abilities.

Mr. Johnson has also held a number of very simple jobs and has received positive performance evaluations, in both the Virginia prisons and federal prison. In addition to these jobs, he has also learned to sew and has been mending old undershirts for himself. He has developed other pastimes such as learning to knit and creating painting projects such as paint-by-numbers. Throughout his incarceration, Mr. Johnson has worked hard to become a better person.

### 7. Mr. Johnson's Sentence Was Unwarranted Compared to Sentences to Similarly Situated Defendants

An especially compelling factor in this case is the mandate to avoid unwarranted sentence disparities among defendants who are guilty of similar misconduct. 18 U.S.C. § 3553(a)(6); *see also United States v. Cantu-Rivera*, CR No. H-89-204, 2019 WL 2578272, at *2 (S.D. Tex. June 24, 2019) (finding a reduced sentence would "also avoid unwarranted disparities among defendants with similar records convicted of similar conduct" because defendant's time served "exceeds the sentences imposed on other members of the . . . conspiracy"). Moreover, the Fourth Circuit has allowed the consideration of a co-defendant's sentence when determining a defendant's sentence. *United States v. Doan*, 498 F. Supp. 2d 816, 819-20 (E.D. Va. 2007) (discussing Fourth Circuit authority).

Here, Mr. Johnson's co-defendant Thomas was spared the death penalty despite being found guilty of four murders in furtherance of a continuing criminal enterprise ("CCE").[31]

---

[31] Thomas's case was severed from Mr. Johnson's and the other co-defendants, and he was tried and sentenced after Mr. Johnson. However, after Mr. Johnson's sentencing hearing, all

36

Shortly after Mr. Johnson was sentenced to death, Thomas's lawyers submitted an expert report

showing that Thomas had an IQ score of 71.[32]  And soon afterward, on the eve of trial, the

government withdrew its death notice with respect to Thomas.

   While the facts of the crime here are certainly horrendous and evoke sympathy for the

victims, there are several federal capital juries that have returned life sentences in cases that were

at least as aggravated as the instant case.[33]  The disparity between their sentences is contrary to

---

twelve jurors still found that other defendants who were "equally culpable in the crime(s), will not be punished by death."  *See* Special Findings at 8 (Ex. 1).

[32]  Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993) (Ex. 31).

[33]  *United States v. Ealy*, W.D. Va. No. 00-CR-104 (Defendant was convicted of the 1989 murder of a family of three—a husband, wife, and son.  The husband and wife were found shot to death outside their home; their son was found shot to death in a closet inside the home.); *see also United States v. Ealy*, 363 F.3d 292 (4th Cir. 2004); *United States v. Oscar Grande and Israel Cisnero*s, E.D. Va. No. 04-CR-83 (Defendants, who were members of the MS-13 street gang, were convicted of the stabbing murder of a pregnant teenager in 2003.  The victim was 17-years-old and was targeted because she was a former member of the gang and had become a federal informant.  Shortly after she left the witness protection program, defendants repeatedly stabbed her.); *see also United States v. Cisneros*, 385 F. Supp. 2d 567 (E.D. Va. 2005); *United States v. Moussaoui,* E.D. Va. No. 01-CR-455 (Defendant was convicted of being a co-conspirator in the September 11, 2001, terrorist attack on the World Trade Center and Pentagon, which killed over 3,000 people and resulted in four airplane crashes in New York, Pennsylvania, and Virginia); *see also United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010); *United States v. Edelin*, D.D.C. No. 98-264 (Defendant was convicted of ordering four murders that he ordered as the so-called "drug kingpin" of DC-area gang known as the "1-5 Mob."  Two of those murders involved ordering the killing of a 14-year-old and a 19-year-old.); *see also United States v. Edelin*, 134 F. Supp. 2d 59 (D.D.C. 2001); *United States v. Northington*, E.D. Pa. No. 2:07-CR-00550-RBS (Defendant was convicted of a 2004 arson fire that killed six people, including four children—ages 1, 10, 12, and 15.  The fire was set to retaliate against a federal informant."); *see also United States v. Northington*, Crim. Action No. 07-550-05, 2014 WL 1789151, at *1 (E.D. Pa. May 6, 2014); *United States v. Green*, W.D. Ky. No. 5:06-CR-00019-TBR (Defendant was convicted of the 2006 murders of a family of four, including two children, and the rape and murder of the daughter.); *see also United States v. Green*, 654 F.3d 637 (6th Cir. 2011); *United States v. Kehoe,* E.D. Ark. No. 97-243 (Defendant was convicted of the murder of a family of three— an Arkansas gun dealer, his wife, and their 8-year-old daughter—in furtherance of a white supremacist racketeering enterprise.  Along with her parents, Defendant disposed of the 8-

this sentencing factor's goal of "promot[ing] national uniformity in sentencing rather than uniformity among codefendants in the same case." *United States v. Patterson*, 755 F. App'x 238, 241 (4th Cir. 2018) (citation omitted), *cert. denied*, 139 S. Ct. 1576 (2019).[34]

---

year-old girl's body by dumping her in a swamp.); *see also United States v. Kehoe*, 310 F.3d 579 (8th Cir. 2002); *United States v. Candelario-Santana*, D.P.R. No. 3:09-CR-00427-JAF (Defendant, who already had 13 prior murder convictions, was convicted of 20 murders, including the October 17, 2009 "Tombola Massacre," where eight people were killed and twenty wounded in a shooting at a bar, including an unborn child.); *see also United States v. Candelario-Santana*, 834 F.3d 8 (1st Cir. 2016); *United States v. Pitera*, E.D.N.Y. No. 90-0424 (RR) (Defendant, a contract killer for the Mafia, was convicted of six murders. Several of the murders involved torturing the victims, dismembering their bodies, and burying them in a deserted marsh on Staten Island.); *see also United States v. Pitera*, 5 F.3d 624 (2d Cir. 1993); *United States v Tatum,* E.D. Tex. No. 2:99-CR-5 (Defendant, a member of the "Crips" gang, was convicted of murdering three people, one of whom was a 63-year-old retired minister whom defendant also kidnapped and murdered.); *see also United States v. Tatum*, 31 F. App'x 156 (5th Cir. 2001); *United States v. Williams*, S.D. Tex. No. 03-CR-221 (Defendant was convicted for his participation in an immigrant smuggling operation that led to 19 people's deaths by dehydration, overheating, and suffocation in the back of a truck trailer driven by him.); *see also United States v. Williams*, 610 F.3d 271, 274-75 (5th Cir. 2010); *United States v. Mayhew*, S.D. Ohio CR No. 02 03-165 (Defendant was convicted of murdering his ex-wife, her boyfriend, and defendant's own 18-year-old daughter, with whom defendant had an incestuous relationship.); *see also United States v. Mayhew*, 337 F. Supp. 2d 1048 (S.D. Ohio 2004).

[34] Mr. Johnson's death sentences are also disparate to other federal defendants who committed similar crimes and have similar characteristics and history who did not receive the death penalty because of their intellectual disability. *See* Corey Johnson's IQ Scores Compared to IQ Scores of Federal Death Penalty Defendants Found Intellectually Disabled After Contested *Atkins* Hearings (the "IQ Chart") (Ex. 32). The IQ Chart does not include other federal defendants for whom the government did not authorize seeking the death penalty or in whose cases the government withdrew its death notice based on IQ scores similar to Mr. Johnson's IQ scores. *See* Death Penalty Information Center, *Defendants Whose Sentences Have Been Reduced Because of a Finding of "Mental Retardation" since Atkins v. Virginia (2002)* (July 19, 2012), http://www.deathpenaltyinfo.org/node/2395. Further, Mr. Johnson's IQ scores are similar to the Flynn-corrected IQ scores for three defendants whose *Atkins* claims were granted and who were found to be ineligible for the death penalty due to their intellectual disability after applying the Flynn effect. *United States v. Hardy*, 762 F. Supp. 2d 849, 857 (E.D. La. 2010); *United States v. Davis*, 611 F. Supp. 2d 472, 477-78 (D. Md. 2009); *United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901, at *8-9 (N.D. Ohio Dec. 23, 2010).

8. **Mr. Johnson Committed His Crimes at 22 but Is Now 51**

The age of the defendant is a factor that can be considered on a First Step Act motion. *See*, *e.g.*, *Brown*, 2020 WL 3106320, at *4 ("Also weighing in the Court's consideration is that Defendant is now fifty-five years old . . . ."); *United States v. Fletcher*, No. CR TDC-05-0179-01, 2020 WL 2490025, at *4 (D. Md. May 14, 2020) (finding a downward variance in sentencing appropriate "particularly in light of Fletcher's advanced age and health conditions"). It is also a factor the jury will consider in assessing the sentence.

First, Mr. Johnson committed these offenses at only 22 years old. Even in 1993, the jurors on Mr. Johnson's case found his age at the time of the crime compelling. Nine of 12 jurors found Mr. Johnson's youthfulness mitigating at sentencing. Since then, there has been significant advancement in understanding how adolescent and young adult brains develop. For instance, in a study funded by the Department of Justice, researchers opined that, "unlike logical-reasoning abilities, which appear to be more or less fully developed by age 15[,] psychological capabilities that improve decision making and regulate risk taking—such as impulse control, emotion regulation, delay of gratification, and resistance to peer influence—continue to mature well into young adulthood." James C. Howell et al., Bulletin 5: *Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know* 17 (2013), https://www.ncjrs.gov/pdffiles1/nij/grants/242935.pdf. The study found that "adolescents and young adults simply do not have the physiological capacity of adults over age 25 to exercise judgment or control impulses" and concluded that policymakers should implement a "categorical rule of youthfulness as a mitigating factor in sentencing" as opposed to "individualized discretion." *Id.* at 18, 29.

Second, Mr. Johnson is now over 50, a critically important factor that demonstrates that he is unlikely to pose a risk of violence if his sentence were to be reduced and he remained in prison for the rest of his life.[35]  Studies of crime patterns generally demonstrate "that as a general matter, people age out of crime . . . .  Not only are most crimes committed by people under 30, but even the criminality that continues after that declines drastically after age 40 and even more so after age 50."  *Id.* at 17.  Lifers are often model inmates because nearly all criminals "mature out of lawbreaking before middle age."  Danielle Sered, Accounting for Violence: How to Increase Safety and Break Our Failed Reliance on Mass Incarceration at 20, Vera Institute of Justice (2017).  Research concludes that most people "age out of crime," meaning that "[f]or most crimes, the likelihood that someone will continue committing them once they hit 40 is negligible."  Rachel E. Barkow, *Prisoners of Politics: Breaking the Cycle of Mass Incarceration* 44-45 (2019).  Mr. Johnson is not a risk to fellow prisoners or prison officials; he does not pose a danger in prison.

### 9. Mr. Johnson Has Demonstrated Sincere Remorse

Courts, including in the Fourth Circuit, have considered a petitioner's remorse in determining a First Step Act motion.  *See, e.g.*, *Hardnett*, 417 F. Supp. 3d at 743 (granting a sentence reduction and relying on, among other things, the petitioner's "letter describing remorse for his behavior sixteen years ago"); *United States v. Taylor*, No. 04 CR 495-38, 2020 WL 2476529, at *5 (N.D. Ill. May 13, 2020).

---

[35]  U.S. Sentencing Commission, *The Effects Of Aging On Recidivism Among Federal Offenders* at 22 (2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

Mr. Johnson is remorseful for taking the lives of his victims and those he injured, and the awful pain and loss he caused for their families. However, due to his intellectual disability, the genuine remorse he feels may not be apparent to untrained observers.

> Due to their impairments, there [are] a host of reasons, including . . . a lesser ability (due to limited communications skills) to effectively testify on their own behalf, that "in the aggregate," [render] offenders with intellectual disability subject to an unacceptable "risk of wrongful execution" (*Atkins v. Virginia*, 2002, pp. 320-21). The Court also noted the particular danger that their "demeanor may create an unwarranted impression of lack of remorse for their crimes," which could enhance the likelihood that the jury will impose the death penalty due to a belief that they pose a future danger (*Atkins v. Virginia*, 2002, p. 321).

John H. Blume & Karen L. Salekin, *The Death Penalty and Intellectual Disability*, *Analysis of Atkins Cases* 39, American Association on Intellectual and Developmental Disabilities (Edward A. Polloway ed., 2015).

Nevertheless, at his sentencing hearing, before this Court ordered the death sentences recommended by the jury, Mr. Johnson expressed, to the best of his ability given his significant limitations, his regret for his crimes and accepted responsibility: "I'm sorry for the great number of people who are dead, you know, and there is a lot on us, and I feel we are no angels."

In an impromptu statement, Corey Johnson also extemporaneously addressed a group of high school students who neither his counsel nor he had known would be present during his sentencing immediately before the judge imposed his death sentence. His lead trial attorney, Craig Cooley, recalls that Mr. Johnson gave a sincere, powerful, and moving statement to the high school students urging them not to commit crimes in any way or make the mistakes he had in his life.

> All crimes, crimes is not good, period. All crimes, period, is not good. Being the fact that you are here, take a lesson to what's going on. I mean, you get old enough and realize that this is not the life that you are living. I am unfortunate that I never had nobody. That's no excuse . . . . And I would hope you discuss this. Because I would hate to see you all end up this way. I would hate to see you have kids in this way, because this is not right.

41

6/1/93 Tr. 22#:1-14 (Ex. 33).  This evidence of Mr. Johnson's clear remorse is important to the sentencer's review.

* * *

The above summary demonstrates the type of evidence Mr. Johnson would present to the sentencer—here, the jury—to show that he should be sentenced to life in prison without parole rather than death.  In addition, under the First Step Act, that sentencer must consider post-conviction evidence as well all the evidence that was previously presented.  *See Chambers*, 956 F.3d at 674-75 (holding there is no limit to scope of evidence court can consider for purposes of First Step Act resentencing).  At the jury sentencing in 1993, some evidence was presented in mitigation, albeit through just two witnesses and a psychologist, as to some of the factors that influenced Mr. Johnson's upbringing.  Indeed, even based on that limited evidence, the jury unanimously recognized that the abuse; the absence of a stable home life; and the poverty and violence and the drug addictions that Corey grew up around all mattered.  *See* Special Findings at 7-11 (Ex. 1).[36]

Some but not all of the jurors found his low IQ,[37] as well as his youth and his adjustment to prison, mitigating.  *Id.*  What the jury knew at that point, which pales in comparison to his model prison record of more than twenty years, is proof that he can be kept secure and will not

---

[36]  Jurors unanimously found eight separate mitigating factors related to the physical and emotional abuse, abandonment, and neglect he suffered as a child, his extremely violent, unstable, and neglectful family, the impoverished and violent environment in which he was raised, the extreme violence to which he was exposed as a child, and his "severe learning disability," among other mitigation findings by the jury. *Id.*  Mr. Johnson will show that the last of those findings, that he had a "severe learning disability," was based on erroneous testimony that he was not "mentally retarded, "when the evidence he will now present shows that he is a person with intellectual disability.

[37]  Of course, as noted above, the jurors were mistakenly not told that he is a person with intellectual disability, a bar to the death penalty.

42

create problems for staff or other prisoners. If a jury that saw only a glimpse of Mr. Johnson's background found it mitigating, it is highly likely that the wealth of evidence that is available to be presented will convince the sentencer to reduce his punishment.

**E. Mr. Johnson's §§ 846, 924(c), and 1959 Convictions Are Invalid and Impermissibly Influenced His Original Sentence**

Mr. Johnson was convicted of additional counts that, while not the subject of this motion, are invalid. While the statutes and case law are clear that only a jury can reconsider Mr. Johnson's previous, death-sentenced counts, the First Step Act provides that the Court must reconsider the sentences for his non-capital counts and must decide whether to reduce them in light of all of the § 3553 factors. In considering whether to reduce Mr. Johnson's non-capital sentences, which Mr. Johnson suggests the Court should do after the capital resentencing hearing, this Court should account for the effect of these improper convictions on the original sentencing determinations.

### 1. Mr. Johnson's § 846 Conviction Was Vacated

Mr. Johnson was convicted of conspiracy to possess cocaine base with intent to distribute in violation of 21 U.S.C. § 846 (Count 1). On appeal, however, the Fourth Circuit vacated Mr. Johnson's § 846 conviction because it violated the Constitution's double jeopardy clause, as it "is a lesser included offense within the § 848 CCE as charged." *Tipton*, 90 F.3d at 891. Mr. Johnson should be resentenced without the influence of this superadded, unconstitutional conviction on the sentencing decision.

### 2. Mr. Johnson's § 924(c) Convictions Are Invalid

Mr. Johnson was also convicted of five counts (Counts 9, 12, 15, 20, and 26) of using a firearm in relation to a crime of violence or a drug trafficking crime in violation of 21 U.S.C. § 924(c). Mr. Johnson has moved the Fourth Circuit for authorization to file a successive motion

43

pursuant to 28 U.S.C. § 2255 in this Court that will seek relief from these unconstitutional convictions in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), which he believes has rendered those § 924(c) convictions unconstitutional.  That pleading addresses Mr. Johnson's arguments in more detail.  Motion for Authorization to File a Successive Motion Pursuant to 28 U.S.C. § 2255(h)(2), *In re Johnson*, No. 20-8 (4th Cir. May 22, 2020).  On July 15, 2020, the Fourth Circuit ordered that motion placed in abeyance pending its upcoming decision in *United States v. Taylor*, No. 19-7616.  Order, *In re Johnson*, No. 20-8 (4th Cir. July 15, 2020).  *Taylor*, in turn, will address "whether an 18 U.S.C. § 924(c) conviction is subject to vacatur where the indictment charged multiple predicates, one of which is invalid." Order, *United States v. Taylor*, No. 19-7616 (4th Cir. Feb. 12, 2020).

### 3.      Mr. Johnson's § 1959 Convictions Were Improperly Charged and Are Invalid

Mr. Johnson was convicted of eight counts of murder "to maintain or increase position in racketeering enterprise" (Counts 10, 13, 14, 21-23, 27, and 28) and three counts of maiming "to maintain or increase position in racketeering enterprise" (Counts 16, 29, and 30), all in violation of 18 U.S.C. § 1959.  In the Second Superseding Indictment under which Mr. Johnson was tried, these § 1959 counts each defined the illegal racketeering enterprise simply as "dealing in narcotic or other dangerous drugs."  None of these counts identified a state or federal statute, and none referenced other counts in the indictment.  When instructing the jury, however, the trial court defined "racketeering activity" as "any act or threat involving *murder* or dealing in narcotic or other dangerous drugs."  Jury Instructions 232a (Ex. 34).

This instruction constructively amended the indictment.  Based upon the instruction, the jurors could have convicted Mr. Johnson of these § 1959 offenses based upon conduct that *was not charged in the indictment*: an enterprise whose racketeering activity was murder.

44

As the Fourth Circuit has recognized, a jury instruction which "broadens the bases for conviction beyond those charged in the indictment" creates "a constructive amendment" or "fatal variance" which so alters the indictment as "to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (internal quotations and citations omitted). Where constructive amendment occurs, "it cannot be said with certainty that with a new basis for conviction added, [the defendant] was convicted solely on the charge made in the indictment the grand jury returned." *Stirone v. United States*, 361 U.S. 212, 217 (1960). As such, constructive amendment "destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." *United States v. Floresca*, 38 F.3d 706, 712 (4th Cir. 1994) (*en banc*).

Because such constructive amendments "violate[] the Fifth Amendment right to be indicted by a grand jury," the violation "is error *per se*, and must be corrected on appeal even when the defendant did not preserve the issue by objection." *Randall*, 171 F.3d at 203; *see also United States v. Whitfield*, 695 F.3d 288, 309 (4th Cir. 2012) (quoting *United States v. Robinson*, 627 F.3d 941, 958 (4th Cir. 2010)); *Floresca*, 38 F.3d at 712 (holding that a constructive amendment is "not subject to review for harmlessness"). "[E]ven if there was sufficient evidence to convict the defendant on the specific charges made out by the grand jury," reversal is required. *United States v. Nieves*, 108 F. App'x 790, 793 (4th Cir. 2004) (citing *Floresca*, 38 F.3d at 711).

Mr. Johnson did not challenge the constructive amendment of his § 1959 counts on appeal or in post-conviction proceedings. When resentencing him on his covered offenses, however, the appropriate sentencer can and should consider that these invalid convictions

45

influenced the original sentencing decisions—including his original jury's decision to sentence him to death.[38]

### 4.        Discounting These Convictions Should Result in a Sentence Less than Death

As the Supreme Court recognized in *United States v. Tucker*, "the real question" is "whether the sentence" for those convictions of Mr. Johnson that remain in place "might have been different if the [jury] had known that [Mr. Johnson's] previous convictions had been unconstitutionally obtained."  404 U.S. 443, 448 (1972).  In keeping with *Tucker,* courts have held that a defendant must be resentenced on any valid convictions "unless it can be ascertained from the record that a [jury's] sentence on a valid conviction was not affected" by invalid convictions.  *Bourgeois v. Whitley,* 784 F.2d 718, 721 (5th Cir. 1986); *see also Jerkins v. United States,* 530 F.2d 1203, 1204 (5th Cir. 1976) (same); *James v. United States,* 476 F.2d 936, 937 (8th Cir. 1973) (same).  That assessment must be guided by the principle that "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to *a special need for reliability* in the determination that death is the appropriate punishment in any capital case."  *Johnson v. Mississippi,* 486 U.S. 578, 584 (1988) (citation omitted) (emphasis added).  Indeed, because "[t]he decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make," the Supreme Court has made clear that "[t]he *possibility* that [a defendant's] jury conducted its task improperly certainly is great enough to require resentencing."  *Mills v. Maryland,* 486 U.S. 367, 383-84 (1988) (emphasis added).

---

[38]    The record shows that the government's penalty phase case almost exclusively relied on evidence from the guilt-innocence phase of the trial.  The government "did not put on a great deal of evidence" during the penalty phase.  *See* 2/12/93 Trial Tr. 3883 (Ex. 35).  Rather, it urged the jury to rely upon its findings "in your guilt phase verdict."  *Id.* at 3893.

46

Mr. Johnson has shown above why a jury must be empaneled since he meets all the requirements for reconsideration under the First Step Act. The sentencer (here, the jury) will also have to determine whether to sentence Corey Johnson to life imprisonment without possibility of parole rather than death in light of the impact of these vacated convictions in addition to the affirmative evidence in mitigation, including his intellectual disability, described above. Given that the original jury was told by the prosecution to rely upon its findings "in your guilt phase verdict," the harm from the jury's consideration of these invalid criminal charges in sentencing Mr. Johnson should not be underestimated. It is not merely possible, but likely, that these invalid convictions profoundly affected the jury's decision to impose a sentence of death. This provides yet another reason why reconsideration of Mr. Johnson's sentences is required.

## V.    CONCLUSION

Mr. Johnson requests that the Court first determine his eligibility for reconsideration and resentencing, which he respectfully submits is an issue of law. As a matter of law, Mr. Johnson respectfully submits that Fourth Circuit precedent and other persuasive authority demonstrate that he was convicted of "covered offenses" and therefore is entitled to consideration of whether resentencing is appropriate in his case.

Furthermore, he respectfully submits that the case law is clear that reconsideration and sentencing of the counts for which he has been sentenced to death must be held before a jury, while the remaining, non-death sentenced counts, are for the Court's consideration.

For all the reasons set forth above, Mr. Johnson respectfully requests that the Court grant his motion.

Dated: August 19, 2020                          Respectfully submitted,

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Donald P. Salzman*
Lotus D. Ryan**
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com


Alexander C. Drylewski*
Judith A. Flumenbaum*
Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000

*Pending Application to Qualify as a Foreign
Attorney Under Local Criminal Rule 57.4


**Forthcoming Application for Full Admission


*Counsel for Corey Johnson*

48

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of August 2020, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will then send notification of such

filing to all parties and counsel included on the Court's Electronic Mail notice list.


/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com