# EXHIBIT 8

3544

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

     v.                                    CRIMINAL ACTION
                                              92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

-----------------------------------------
                    VOLUME XX

                 February 10, 1993
                 Richmond, Virginia
                    10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
               JEFFREY B. KULL
               OFFICIAL COURT REPORTER

3545
                    P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Case Number 92CV68: United
States of America versus Richard Tipton, Cory

Johnson, and James H. Roane, Jr., the twentieth day of trial.  Are counsel ready to proceed?

MR. VICK:  Government is ready.

MR. McGARVEY:  Defendant Johnson is ready.

MR. GEARY:  Defendant Tipton is ready.

MR. BAUGH:  Defendant Roane is ready.

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.).

THE COURT:  All right.  Mr. McGarvey?

MR. McGARVEY:  Thank you, Your Honor.  May it please the Court, co-counsel, ladies and gentlemen of the jury and of the prosecution:  Folks, why are we here today?  Well, I figured it would be easier to tell you why we are not here.  We are not here to try to excuse the acts of Cory Johnson.  There is no excuse for eight murders.  That's not what this is about.  We are not here to try to tell you that Mr. Johnson didn't know the difference between right or wrong.  When you folks entered your verdict, you decided that Mr. Johnson knew the difference between right and wrong.  We are not here today to ask you

3546

not to punish Mr. Johnson.  The alternatives here are life in the penitentiary without possibility of parole, to die in the penitentiary.  I should think that anyone would think that is punishment.  What we are here today to do is to decide whether or not to kill Cory Johnson.  That's what it boils down to.

Traditionally, the death penalty in this country is reserved for the most severe cases, the cases where the guilty person is completely and totally blameworthy, fully responsible for his actions.  Those factors which tend to lessen blame, which indicate that a person is not fully and totally blameworthy, should indicate that that person does not merit the most severe punishment; i.e., to be killed.

This isn't my point of view.  This is the law.  And the law requires this hearing before anyone can be given the death penalty.  The purpose of this hearing is to assure that you folks consider that the guilty person deserves the maximum sentence of death.  That person is guaranteed the right to this hearing in order to present reasons from our point of view why he doesn't deserve the maximum punishment.  These reasons are called mitigation.  The government has already put on what they called the aggravating

3547

factors.  This is our opportunity to put on what is called mitigation.

The law states that mentally retarded persons cannot be executed.  And the reason that they are excluded is because the law recognizes that mentally

retarded persons are not totally and completely blameworthy. They are not fully responsible for their actions.

Now, I'm not intending to suggest at this juncture or any other juncture that Cory Johnson is mentally retarded. It doesn't suggest that mentally retarded persons aren't responsible for their actions. It just indicates that the law recognizes that they are not as fully and totally blameworthy as an individual who has all his faculties.

Mentally retarded people have capabilities. Most mentally retarded people can hold jobs, raise families, be educated. Mildly mentally remember retarded people can be educated to, say, a sixth-grade reading level. I'm not suggesting that that is the case in the most severe cases of mental retardation, but in mildly mentally retarded cases, they can be educated. They can be arrested and they can be held accountable for their actions. However, because of the limitations that mentally retarded

people have, they are not as fully responsible, as I indicated, not as fully blameworthy.

In this case, Cory Johnson, as I said, is not mentally retarded. But he has substantial mental, intellectual deficits that he has been plagued with his entire life. His IQ is within two points of being classified by the law mentally retarded, and therefore, legally not executable. Two points. He has severe neuropsychological impairment, and he is severely learning-disabled. This was diagnosed back when he was 13 years old, and we will present evidence today by Dr. Cornell here, who has administered tests and neuropsychological tests that have verified this. He has an IQ of 77.

In listening to Mr. Tipton's presentation yesterday, I was struck by the fact that he indicated that these learning-disabled ADD-type people tend to group together. And I think ultimately that's what we are going to be able to show you folks; that they somehow gravitated to each other. And when Dr. Evans yesterday was talking about the fact that learning-disabled people and ADD people have great difficulty in problem-solving, that they are very narrow minded, very focused, inflexible, I believe we will be able to show you folks today that that is the

case with Cory Johnson. I don't just believe it. It is going to be shown. That is coupled with this severe learning disability and an IQ of 77.

Cory's situation, Cory's physical impairment, which I can't overemphasize is not Cory's fault -- what Cory did is Cory's fault, but what Cory's physical problems are are not his fault -- as I said,

they don't meet the standard definition of mental retardation. But his condition is very, very similar. As I indicated, mentally retarded people, mildly mentally retarded people can learn to read up to a sixth-grade level. But from the age of six to seven, Cory has been in special education. At 13, as I indicated, he was diagnosed with this learning disability. And after years and years of special education and the like, he is still only able to read on a second to third-grade level. So when I say that his condition is very similar to the mildly mentally retarded, in some instances it is much more severe. I've just given you an example of that. And this is after years and years of special instruction.

Now, we couple that with severe emotional deprivation as well. Again, when I was listening to Mr. Tipton's presentation yesterday I was struck by the similarity in backgrounds. Cory Johnson had a

family. And I use "family" in quotations. He met his father when he was 12 years old. In the course of his lifetime he has seen his father three to five times since he was 12 years old. From age one until he was 12 years old, Cory Johnson moved at least 12 times. He moved 12 times to some relatives, to some friends, lived principally with his mother. And again, I mean no disrespect to Mr. Johnson, but I use the term "mother" in quotes as well. His mother was a drug abuser. His mother was abusive emotionally and physically to Cory. And to make matters worse, his mother took up with a number of gentlemen who were also drug abusers and physically abusive to Cory and his younger brother.

When Cory was 12-and-a-half to 13 years old, the New York justice system took jurisdiction over Cory and his brother and placed him in a foster care situation; principally, not because Cory had done anything wrong, but because his mother was flat-out unable, to put it charitably, to take care of him.

When I talked about emotional abuse, I'd like to illustrate that. Principally, the emotional abuse from his mother came about as a result of expectations that once again Cory Johnson couldn't meet. And he couldn't meet those expectations not

because of anything that he had done, but because he was born with this severe neurological impairment. Despite that, Cory tried. His mother, believe it or not, expected Cory to go to college. And try as Cory Johnson might have, Cory Johnson couldn't read beyond the second-grade level. When the New York justice system took jurisdiction of Cory, they placed him in a foster home situation. This was the Pleasantville Cottage Home. You will hear from two people who

worked with him in this, the Jewish Child Care Association of New York. And what you will hear from these people and from the reports that we are going to give you is that despite Cory's mental and physical limitations, Cory always wanted to please. Cory was not a mean-spirited person. Despite his background, Cory wanted to learn. He wanted to learn. And I would suggest to you folks it is going to be shown that he wanted to learn because he wanted to please his mother. But there wasn't a darn thing that Cory could do to please his mother.

The reports are rife with references to the fact that Cory was not visited by his mother; that his mother took no interest in the fact that he was trying; and that on the few occasions that his mother actually did visit him, the notes suggest that she

was very rejective of him to the point that the staff there made comments about it; that she would get phone calls from the Home, and she wouldn't return the phone calls. She would call only to cancel an appointment, and not reschedule them. But despite this, Cory tended to treat his mother like a goddess.

There was a quote that you folks are going to have in front of you that I found particularly instructive and particularly touching, and I'd like to read it to you now. This is from a January, 1983 treatment review of Cory Johnson by Gail Turnquest, the caseworker at the Pleasantville Cottage School.

"Child care workers note that Cory's behavior deteriorates when he has no contact with his mother. He can also become quite depressed when he has not heard from or seen her for a period of time. It is the opinion of his child care workers that Pleasantville is good for him and that he is functioning fairly well here. Cory realizes his learning disabilities. However, he struggles to do his homework. He is truly motivated to do well and to succeed, and has not yet given up on himself.

"Cory presents with no real behavior problems. Within the last two weeks, there has been some

decline. Cory fantasizes that his mother will come up in a car and take him to Pizza Hut. Child care workers report that Cory's mood is basically that of a depressed child. He longs for his mother and acts out his realization that in fact his mother is emotionally unavailable to him. However, he denies his feelings when confronted directly. He also struggles to involve his father --" his father who he had seen three to five times in his life "-- who also does not come through for him. Sundays can be very difficult for Cory because he usually doesn't

have any visitors."
From the age of twelve-and-a-half until he was 18, this basically was Cory Johnson's life: attempting to learn and not being able to learn; attempting to be accepted by the only family that he had, his mother, and to be continually rejected by his mother. And you couple that with a childhood that was -- if you can call it a childhood -- basically, Cory took care of himself since he was three years old because his mother was too busy doing drugs and taking care of herself and living with her boyfriends.
When you couple this background of abuse, depression, lack of acceptance, rejection by the one

3554

person who mattered most to him, along with the severe, and I'm talking severe, cognitive deficiencies in Cory, it might provide somewhat of an explanation of what happened. As I suggested to you, there is no excuse.
At the conclusion of this presentation, I would suggest to you folks that the question you have to ask yourself is not whether Cory is guilty, not whether he should be punished, not whether he knew what he was doing was right or wrong. Those have already been decided. But whether he is fully and completely blameworthy; whether he is totally responsible for his actions. This penalty phase is, as the Supreme Court says, a narrowing process. Because as I indicated, the death penalty is reserved for those who are totally and completely blameworthy in the most severe cases.
When you ask yourself that question, you have to ask whether or not, after this presentation, Cory is fully and totally blameworthy; whether he is completely responsible for his actions. Has he lived his life as the normal, average person, who might be totally and fully responsible? Or has he lived his life under these situations that I have described.
We will demonstrate to you today that Cory is

3555

not a normal young person. He is 24 years old now. He has severe neurological impairment. He is two points above being mentally retarded. And when you couple that with this abusive background, I think you are going to be able to see that he is not as totally and completely responsible as a person who doesn't have those deficits. And life in the penitentiary without possibility of parole is no bargain, either. Thank you, folks.
THE COURT: All right. Call your first witness.
MR. COOLEY: Our first witness will be Dr. Dewey Cornell.

DEWEY CORNELL, called as a witness by and on behalf of defendant Johnson, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COOLEY:

Q    Dr. Cornell, good morning to you.

A    Good morning.

Q    Would you please tell the ladies and gentlemen of the jury your full name and your profession?

A    Dr. Dewey G. Cornell.  I'm a clinical psychologist and associate professor.

Q    And where are you employed?

A    University of Virginia.

Q    And is your title there associate professor?

A    I'm associate professor of education in the programs in clinical and school psychology at the University of Virginia.  I am also a faculty associate of the Institute of Law, Industry and Public Policy.

Q    And what are your professional duties as an associate professor?

MR. VICK:  We would stipulate as to his expertise.

MR. COOLEY:  I very much appreciate that, Your Honor.  I would like for the jury to know something about him.

THE COURT:  Go ahead.

BY MR. COOLEY:

Q    Doctor, what are your professional duties as an associate professor?

A    My principal duties are teaching, research, and service at the University of Virginia.  I teach graduate courses in our training program that trains Ph.D.s in clinical and school psychology.  I teach courses in personality assessment, in psychopathology; that is, in mental disorders.  I am I am also the assistant director of our training clinic, which is a clinic that provides psychological assessments, and I'm in charge of the psychological assessments that our university clinic provides.  I also am involved in the training of psychologists and psychiatrists who specialize in forensic mental health, and I conduct research in those areas as well.

Q    I see.  Doctor, can you describe briefly your educational background and any training that you had in clinical psychology?

A    My training in clinical psychology began at the University of Michigan.  I obtained my Master's degree in 1979 and my Ph.D. in 1981 at the University of Michigan from the Department of Psychology, from

Q    All right.  And did you include certain things such as definitions of some of the conditions that Cory has?

A    Yes.  I also included the federal and accepted professional definitions for learning difficulties, learning disabilities, and mental retardation as well.

MR. COOLEY:  Your Honor, with the Court's permission, we have a copy of the full report and appendages for each member of the jury.  The government already has their copies, and also a copy for each defense counsel and the Court.

THE COURT:  All right.

(Documents proffered to Court, counsel, and jury.)

MR. COOLEY:  If I could be so bold as to request of those folks who have received a copy if they could try to follow along with us as we go through it rather than leafing through, which I think is a tendency, naturally.  We would appreciate that in presenting it in the form Dr. Cornell has set it up.

THE COURT:  All right.

BY MR. COOLEY:

Q    Doctor, if you would, we would like to start with a review of Cory's life and ask you, based on your evaluation and various sources of information that you have described to the ladies and gentlemen of the jury and obtained during the course of your evaluation, did you formulate an opinion about the psychological background, development of Cory Johnson?

A    Yes, I did.

Q    Could you summarize for us what you concluded?

A    When I put all the information that I reviewed together, I think there are two primary factors that I felt the jury should be informed about for purposes of mitigation.  The first of these is Cory Johnson's upbringing in a severely unstable, neglectful, and abusive family environment, which had a devastating effect on his psychological development and his emotional maturity.

The second main factor that I felt was important was his degree of brain impairment, which is exhibited as a very severe learning disability, a speech impairment which he suffered during his childhood years and still has remnants of today, and his generally impaired intelligence, which places him just above the level of mental retardation.  Those two factors in combination, I feel, made Cory unprepared to function in society, unprepared to survive on his own when he left institutional care

and had no place to turn to, and made him unable to cope and adapt to society in a way that a normal individual would.

Q    I'd like for you to explain to me and to the ladies and gentlemen of the jury, if you would, how you came to those conclusions. Can you tell the Court what information about Cory's background led you to this, or these, conclusions?

A    This would take some time. First, regarding his upbringing, I looked at his life as being in three phases: the first phase being his life with his mother up until about age 13; and then the years that he spent in institutional settings; and then finally, the third phase, after he left the institutions and was out pretty much on his own.

During that first phase of time when he was with his mother, or at least mother had formal legal custody of him, he lived in an extremely unstable situation. He actually was under his grandmother's care initially as an infant. When I interviewed his mother, she had very poor recollection of his upbringing and was not very involved in his child care. That was either taken care of by her own mother, when she lived at home for a couple of years, or he was left basically unattended for long periods of time. The mother could not recall details of his life, basic things that most mothers can recall about their children, such as when they learned to walk and talk, and how they were potty-trained, and how they did when they were in school. Stories from their childhood.

She was not around very much during his upbringing. She was involved in jobs that she held. She was involved in relationships with a series of men. And as she said a number of times, he couldn't fit into her life, and neither could his half-brother, Robert. The father, of course, was not in the picture at all. He was in prison. He had no contact with Cory. Cory was led to believe by his mother that his father was actually a man named Robert Butler, who was actually father to Cory's brother. Cory only met his father, basically by coincidence, when he was 12 or 13 years old. And up until that time, he thought the man named Robert Butler was his father. This was a man that his mother lived with for a short period of time. He was abusive. They had a parting of the ways and he was one of a series of men that she lived with at various times who were abusive to her and to the children, and who were involved in drug abuse. And at various times, those individuals moved in and out of the residence.

Now, it was very difficult for me to determine where Cory lived and how many times he moved. I know that at least 12 times, his mother changed residence. But there were many more times in which Cory was sent back and forth to other relatives. He didn't have a stable place that was his home. He didn't have a single individual that he could regard as a parent in the sense of someone who is going to always be there, be there and take care of him. His mother nominally would be his parent, but his involvement with her was neglectful and abusive. And he and his brother had evidence of serious emotional problems well before they were teenagers.

He had troubles with enuresis, bedwetting, up until age 11; encopresis, fecal soiling of pants, when he was 10 and 11 years old, which are signs of quite serious emotional disturbance. His brother Robert, at a young age, I believe ten or eleven, made a suicide attempt and was hospitalized for five months in a psychiatric setting. So both these boys were quite emotionally troubled; understandably so, given the kind of extremely unstable environment that they grew up in.

And I mentioned also that there were abusive boyfriends. And the mother related to me a number of violent incidents in which either she or the boys were physically assaulted and threatened by various boyfriends. And Cory had quite serious difficulties with one boyfriend, to the point that she did not think it was safe for him to stay in her residence any longer. That is basically the first phase of Cory's life up until about age 13.

Q    If I could ask the ladies and gentlemen of the jury to go, and you as well, to the green tab and to turn that over to the chronology of events in Cory Johnson's life.

You have basically described what would be the top third of that chronology, I believe.

A    Yes.

Q    And he was, of course, born in Brooklyn, and his birthdate was in ███████████. You have indicated a number of movements by Cory with his mother or without his mother during the time frame from birth to the age of 13, at which time he was committed by her to the state, and ultimately placed in foster care; is that correct?

A    That's correct. At approximately age 13, he was placed in the Pleasantville Diagnostic Center, a residential facility for diagnosis of children with emotional disturbance. He was there for two months of evaluation, and at that point they felt it was more appropriate for him to be placed in an

institutional setting.  It is called the Pleasantville Cottage School.  It is called Cottage School, but actually what it involves is that he lives in a home that's supervised  --  in a cottage with several other emotionally-disturbed boys on the grounds.  There is also a school that he would attend during the day.  And he was placed there basically because the Court determined that his mother was not appropriate, and that he could not be well-raised at home.  He remained there from about age 13 to 16.

Q    If I could refer the jury to the blue tab in your book, open that first document that is behind the blue tab.

Doctor, you have blown that up, I believe.  You have taken a quotation from the petition which removed Cory from the home and indicated -- and I don't want to belabor this because I know that each person who has this can read for themselves -- but in that petition, and this is the language from the Court itself, there was a determination that the child, Cory, had been removed from his home on February 1st, 1982, and that the parent was unable to make adequate provision for his care, maintenance, and supervision; is that correct?

A    That's correct.  And in this tab are the quotations that I selected.  Now, in order to give you the context for these quotations, the next tab has the report, the legal petition, for example, that the quote comes from.  So I'm going to focus on the quotation, but it is possible for anyone to look at where that quotation came from and to read what came before it and what came after it.  In addition, there are other reports as well.

Q    If I can, so that everyone can understand what we are doing, the volume that's behind the blue tab are quotations which you have drawn from reports from the child care agencies.

A    Right.

Q    The specific reports from which these quotations are drawn are behind the orange tab.

A    That's right.

Q    We do not intend to read all of those reports or to require you to read them, but they are there in case there was a concern that your quote had been taken out of context; is that correct?

A    That's correct.

Q    And the items that are behind the orange tab are excerpts from the reports that are contained in these volumes that were supplied by the child care agencies.

A    That's right.

Q    If you would, can you relate to the ladies and

gentlemen what occurred and how things were occurring once this second stage arrives in Cory's life, where he has been voluntarily, by his mother, removed from his home or her home and placed with the state?

A    Yes.  Once he was placed with the state he had a series of psychiatric, psychological, and educational evaluations.  He had those initially when he first came there so that they could decide what needed to be done, and then he had further evaluations repeatedly over the years that he was there as they tried to monitor his progress and refine their treatment to help him.

And what I have done is I've gone through all of those records page by page, and what I have selected here are the ones that I felt that were most influential to me in formulating my opinion, and which I think accurately reflect his time spent at this institution.  And then I follow that up by contacting the authors of most of these reports.  I talked to six individuals that I could identify, and spoke with them about the reports to make sure I understood what they were saying and that I had an appropriate interpretation of what was said.

First of all, from the very beginning, they assessed that he had serious emotional problems. They reported emotional disturbance that he had prior to coming to the child agency, and then they described what he was like once he is there.

The first psychiatric evaluation, which actually is page six of these quotations, describe that he was cooperative, that he related well, but that he had a slurred speech, and he said he doesn't want to come home for awhile so that "I can straighten my head and my mother can straighten herself out."  Quotations that he made to the psychiatrist who saw him, Collimuttam.

Cory feels he has problems with learning and reading.  He likes the school and the counselor here.  Cory feels sad when his mother keeps telling him about his father being in jail.  He has felt at times like wanting to stab himself, but has never done anything to hurt himself and doesn't think he will ever do it.  Cory talked about his brother trying to kill himself, "because of my mother," he said, and says that he feels very sad about it.

Q    Cory's brother was younger?

A    His brother was two years younger.  He made a suicide attempt and was placed at another agency called Children's Village, and he was there for awhile and then later was switched to Pleasantville as well.

Dr. Collimuttam I thought, summarized well his

early impression on page seven.  He says, "life has been very chaotic for this family with Cory's mother having had financial problems, having difficulties with her job and her relationships.  Mother appears depressed and unavailable to the child emotionally.  There have been frequent moves, stays in the homes of relatives often with the mother and children being in different homes.  This was followed up with a period of being with the mother's boyfriend, who Cory did not get along with and would steel from to get back at home.  Cory is a child who has been reacting to the chaotic life in the last four years.  In addition, he has shown evidence of mild to moderate neurological deficits of dyslexia and speech impairment."

     And then Dr. Collimuttam gave him diagnoses using our standard diagnostic manual, the DSM-III.  He saw him as having an adjustment disorder, which means he was reacting to stressful events in his life with symptoms.  He was diagnosed as having a special developmental reading disorder.  It is another term for dyslexia.  It is another term for learning disability.  Those are all interchangeable terms.  He was also diagnosed as having positive soft neurological signs, which means that there was evidence that he had brain damage.

     He was then given a psychological evaluation by a psychologist.  This is a little bit out of order.  This is on page five.  Dr. Cary Gallaudet gave him a series of psychological tests.  He described serious problems, deficits in nonverbal abstract reasoning, perceptual organization, visual perception and perceptual motor functioning.  These weaknesses were also evident in his Bender-Gestalt test, which was characterized by rotations and distortions.  Performance was comparable to a child five years below his chronological age, an underlying neurological deficit.

Q    Cory was age 14 at this point in time.  Then he would have been operating at the level of a normal nine year old?

A    At the level of a 9 year old, yes.  Yes, in these areas where he showed brain impairment.  It says, "In summary, Cory is a sensitive and dependent boy who is struggling with issues revolving around independence.  An underlying organic component," that means brain damage, "serves to exacerbate the anxiety, dependence, affectional needs, and hostile impulses, and as a result, Cory has an extremely hard time trying to integrate emotional challenges.  Although evidence of a learning disability exists, he continues to be an ambitious boy who is motivated to

improve his situation and would benefit highly from both remediation in academic areas as well as psychotherapy."

What's surprising about this statement and other statements that follow is that Cory remained very motivated.  He remained cooperative, eager to learn, and willing to take on the challenge of his disability.  If any of you have had experience with learning-disabled youngsters, you know that even mildly disabled youngsters become discouraged.  They try to avoid their disability, understandably so. What was unique about Cory was, first of all, that he had a very severe learning disability -- I'll talk more about that later -- but that he continued to be motivated to try to overcome it.  He had an educational evaluation.  That's page eight of the quotations, by an education specialist who again pointed out that he was reading on the second-grade level.  Third-grade level was too difficult to read. His spelling was second-grade level.  His arithmetic was mid-third grade.  It said that he couldn't multiply by three.  He couldn't divide a number by two.  He couldn't read digits of more than four digits.  He could recite the months of the year only up to August.  He knew there were 12 months, but he couldn't say them all.  So this is when he is 13 years old.  And he doesn't know all the months in the year, he can't read and do arithmetic beyond about a second or third-grade level.  Of course, he has moved at least 12 times and had to change schools and classrooms, and I'm sure that he wasn't given much of an opportunity for teachers to work with him while he was in schools.

I also looked at part of this at what his mother was like at this time.  Because a very important part of any kind of treatment is to get the family involved and to work with them.  And I got very consistent descriptions of his mother, who was the only family member that they had any contact with. This is on page nine, Gloria Caro, caseworker assigned to work with him, they have a conference report.  This conference involves a psychiatrist, a psychologist, teachers.  The mother is invited to come, although most of the time she did not come, and Cory participates in parts of these conversations. But the caseworker -- he had a series of caseworkers --  the first one said, "Ms. Johnson is an attractive, stylishly-dressed woman who works as a receptionist.  She is an articulate woman who reacted to my statement with anger, indicating she is trying to put her life together.  She says right now she does not have too much energy or time for her kids.

She believes they will have to understand it.

"The message is, if her kids can live her life right now, okay.  If not, she can't see them.  She says she loves her kids, but putting her life together comes first.

"A joint interview with Cory elicited almost no comment from Cory, who stared at the ceiling while his mother pretty much lectured to him on how insensitive he was to 'where I am now and have to be.'  It was not concern for him and his situation, being separated from family, being institutionalized."

She continues.  She says, "It is difficult to see how Ms. Johnson can be engaged unless her needs are seen as primary.  She refuses referral for treatment for herself.  Further contact will reveal how fixed she is in this narcissistic, self-focused stand."

This is June.  He has been in the setting for about four months.  They are concerned that they cannot work with the mother, and this continued.  In January of 1983, this is page ten, he now had a new caseworker, had a change in caseworker.  He has now been in the institution almost a year.  And here we have the quotation you may have heard before:  "Child care workers note that Cory's behavior deteriorates when he has no contact with his mother.  He can become quite depressed when he has not heard from or seen her for a period of time.  It is the opinion of the child care workers that Pleasantville is good for him, that he is functioning fairly well here.  Cory realizes his learning disabilities.  However, he struggles to do his homework.  He is truly motivated to do well and succeed, and he has not yet given up on himself.  Within the last two weeks, there has been some decline.  Cory fantasizes that his mother will come up in a car and take him to Pizza Hut.  Child care worker reports that Cory's mood is basically that of a depressed child."

It continues to report that Cory wants to have contact with his mother, wants to have contact with his father.  He tries to maintain the view that they are available to him.  He cares about them, but not accepting that they are not available to him.

Q    If I might, obviously, these reports being written by his workers in 1982 and 1983, and for that matter, the remaining ones that you are going to comment on, obviously were not done in anticipation of a trial proceeding.

A    That's right.

Q    These are excerpts taken from the reports of evaluations being done of Cory in an effort to help

A    That's right.

Q    That transfer was made in the summer of 1984.

A    They made the transfer, started giving him summer employment jobs, doing manual labor.  He held a variety of summer jobs.  He was proud of the fact when I spoke with him, Cory was, that he stuck out those jobs.  He worked at them even though he didn't particularly like the manual labor that he had to do.  He also was placed in a more vocational-oriented program called BOCES.  It is a special educational program in which he was learning carpentry and did reasonably well.  He tended to do best when he did things with his hands that did not involve language.  Anything that involved language, he had serious impairment in.

Q    The last sentence in that first paragraph on

3606

page 15?

A    Yes.  "He is supposed to receive remedial reading and speech therapy, but for reasons not clear, has had no one-to-one instruction for several months."  This is a report of another psychiatrist, Dr. Clemmens.  This is, I think, the third psychiatrist to see him.  And again, they had trouble providing him with the special services he needed, and for some reason these services lapsed at various times.

Q    And this certainly was in spite of his desire to be  --  to have this treatment, to address his problem; is that correct?

A    He voices it here.  I think now at 16, he has been there several years.  He says, "Cory was sarcastic and extremely resentful about receiving neither remedial reading or speech therapy."  The psychiatrist quotes him.  "'School-wise, they haven't done a thing for me.'  When I questioned the lack of remedial reading he answered angrily, 'They get my hopes up high and then you do no shit.  That's why I want to depend on nobody no more.  You are all full of shit, every one of you.  Nobody has raised a finger."

He had an angry outburst to this psychiatrist

3607

over his frustration.  And then when I read that I thought well, he is now starting to really bad mouth the institution and show a more negative attitude.  I wondered what the staff think of him.  Dr. Clemmens in that report says  --  he agreed with him.  She said, "Outside of being raised in a problematic family he has to cope with a severe learning disability which is highly frustrating and embarrassing.  It is understandable that he feels bitter and resentful about not receiving adequate help.  In addition, it is difficult for him that he

apartment in a highrise.  A social worker is assigned to meet with him weekly, to meet with the mother, and to continue to work towards Cory eventually going home.  That's the plan.  She expressed in this quotation her frustration.

"Ms. Johnson is extremely elusive.  I have made numerous appointments with her and she has not kept them.  She will call and cancel, but she will not follow up and make another appointment.  She is also not terribly responsible about calling and arranging for Cory to come home over the weekend.  Even though Ms. Johnson is quite irresponsible in her relationship to Cory, Cory talks about her as if she is a goddess and is terribly responsible in relation to her.  It is as if he is compensating for her real neglect of him."  This is stated several times in the records.

Q   Ms. Noble makes a second report in the group home conference report on page 21.

A   Right.  It is now 1986, six months later or so. "On the whole, Cory continues to be using the residence well, and would seem to want to remain living there.  He has made relationships with both the house parents and the boys, and is liked by both.  Cory continues to be quite active and assertive in how he handles himself.  And he can be a bit of a monopolizer.  But the boys continue to take this in their stride and not seem to mind it.  He talks a lot, apparently, in group meetings.  Part of the boys' acceptance would seem to be related to Cory's ingenuousness and decency.  Cory is very in earnest about succeeding and articulates that point of view to the other boys."  At another place, they talk about him sort of almost like having a preacher quality.  He is telling the other boys they have to do well.

MR. VICK:  The editorialization, I thought, was not appropriate.  I object to it.

THE COURT:  The objection is overruled.

BY MR. COOLEY:

Q   That reference is not  --  that's coming out of the reports, isn't it?

A   I'm referring to portions of the report that I read, that are not in the quotation, to try to explain them.  Let me just read verbatim what he says here.  "One senses that periodically Cory might feel the wish to live with his mother, but he doesn't discuss it openly and, I think, deep down he knows that his mother is just not able to provide a stable, secure home for him.  Cory is quite secretive about his mother's lifestyle and doesn't share with me and, I don't believe, with the house parents, some of his

chagrin at what his mother does.  We only pick it up by his behavior and what he does not say."

Q    Finally, Doctor, the difficulties with his mother continued to be reported in the June, 1986

3618

report.  They had not seen her or had any contact with her at that point in time?

A    Right.

Q    And then Cory became aware of her own  --  of her, being his mother's, difficulties with the authorities.

A    That's right.  It says at the beginning of March '86, Cory learned that she was arrested and was in jail in New Jersey.  He told his house parent to inform me, and then Cory and I discussed it.  I haven't heard from her or any other family member.  Cory states he doesn't believe his mother is guilty and that she was framed.  He acknowledged it had something to do with the use of credit cards.  I suspect Cory knows the truth, but is keeping it from us."

Q    Doctor, let me ask you if you would to go back to the chronology, which is behind the green tab at the front of the book.  At this point in time, you have brought him down through the summer of 1986.

A    Yes.

Q    In the summer of 1986, the entry there on chronology that shows his age, 17, he was involved in something that brought him into the criminal justice system.

3619

A    Yes.  That's right.  During this time he became aware of his mother's increasing involvement in drug abuse, crack addiction.  He was very upset by that.  His attitude declined dramatically.  And he became more involved with several of the other boys, Dwight and Mitch, who lived in the group home.  And he related to me that he wanted very much to be accepted by these boys; they were his friends.  He felt like they were  --  like he was loyal to them.  And one fellow, Mitch, whom he looked up to, told him he was having trouble with another boy.  He referred to him as a Hispanic young man.  And Mitch encouraged Dwight and Cory to go with him to try to intimidate this other boy.

And Cory related to me that they in fact did go up to this boy and threatened him, and that this boy, somewhat to his surprise, pulled out his paycheck -- Mitch and this boy worked together -- and gave it to them.  So in essence, they robbed him.  He told me at first they hadn't intended to do that, but when they saw that this boy did it, they went back and did it a second time.  And when that happened, the police were contacted.  Mitch was arrested.  Mitch then was

interviewed by the police and revealed that he was assisted by Cory and Dwight.  Cory and Dwight then spoke with their foster care people and went down to the jail or to the police department and turned themselves in.

Q    He was, in fact, incarcerated at that time at Riker's Island?

A    He was put in jail initially.  He was bailed out by the foster parents.  He then pled guilty and received a sentence of, I think, ten to twelve days in Riker's Island, which is a rather well-known, rather rough jail in an island in New York City.  And he was very distressed by that experience.  That was a very troubling experience.  He had never been exposed to quite that kind of environment before.  But he had got involved with Dwight and Mitch, wanted to be accepted by them.  Mitch wanted to take revenge on another boy, and Cory, who I don't think really knew this boy, wanted to be loyal to his friends and do what his friends did, and he got himself involved.  He admitted this candidly do me.

Q    No disputing he was guilty of that?

A    No.  He told me he was guilty.  He told me what he did.  He told me he was in jail.

Q    He continued after that to stay at Elmhurst for some months; is that correct?

A    Well, he came back to Elmhurst, after his time in jail.  He showed a real decline in attitude.  He seemed very uncooperative with the foster parents there.  He expressed a lot of anger.  They continued to press him about what was going on with his mother.  He got angry.  He was offended by that and he defended his mother.  And at one point, I believe in February, several months after this arrest, he had an argument with the staff and they laid down the law to him.  They told him "Look, if you aren't more cooperative, if you don't agree to follow our rules, you are going to have to leave."  I checked into it carefully.  He had not assaulted anyone.  He had not broken laws there.  But he was showing a bad attitude and they didn't accept boys there who didn't show that they wanted to be there.  So they told him that he would have to temporarily go home until his attitude improved.  And so he abruptly left, and he did not return.

Q    And thereafter, was there an occasion in which he was charged with an offense?

A    That's right.  He returned home to his mother, continued going to school, was suspended from school for squirting a teacher with a fire extinguisher the last week of school, did not attend his graduation.

Q    Was he to receive a diploma if he graduated?

3622

A    Well, there is  --  the mother couldn't tell me.  She didn't know.  My best understanding from the records and from what Cory told me is that he was to get a certificate of completion; that he couldn't get a full diploma because he was in the occupational training program and he could not pass the literacy test to get a diploma.

Q    Thereafter, he got into some trouble; is that correct?

A    Yes.  After that time, he was arrested and accused of another robbery with several other young men.  He was put in a police line-up and he was identified in the police line-up.  He strongly indicated to me and also indicated in the record at that time that he was mistakenly identified; that he was not  --  that he did not commit this offense.

Q    So as to that alleged attempted robbery, he denied that he was indeed the person who had committed that?

A    Yes.  That's the only thing he ever denied to me.

Q    From the birth through age 21.

A    Ever.

Q    In discussing those items with him, he acknowledged guilt and wrongdoing at any point where

3623

it was raised.

A    Yes.

Q    But as to this issue he did not, and in fact adamantly proclaimed his innocence; is that right?

A    That's right.  He acknowledged to me a number of extensive involvement in some drug dealing and illegal activity.  This is the only incident of which he was accused which he told me he did not do and that he was falsely accused.

Q    In spite of his proclamation of innocence, based on one-on-one identification of Cory, he was indeed convicted.

        MR. COOLEY:  And Judge, we would reference for the record, I believe it is Government Exhibit PP-1, which is the conviction for attempted robbery.

BY MR. COOLEY:

Q    And he received what penalty?

A    I don't know the exact penalty.  He decided to plead guilty because he was told that he would receive several years in prison if he were convicted, and that he would be convicted.  And he decided that if he pled guilty he would get a period of up to a year.

        MR. COOLEY:  And indeed, Judge, if we can ask the Court to take judicial notice of that, that

3624

exhibit, there is a one-year sentence to Riker's

still present and that I would arrive at the same diagnosis based on my own sources of information.  So I went back and conducted my own psychological testing of Cory.

Q    Now, these would be found behind the white tab in the book; is that correct?

A    Yes.

Q    And there are some blown-up  --  Marshal, could you help me?

(Documents displayed on easel before jury.)

BY MR. COOLEY:

Q    Doctor, can you tell the ladies and gentlemen of the jury the results of your tests?  And they have before them in an expanded version, blown-up version, the graph.

A    Yes.  I'll try to be brief about this.  First, I wanted to document his level of intelligence.  I gave him the standard individual intelligence test called the Wechsler Adult Intelligence Scale-Revised Version.  It is a standard test for adults to assess their intelligence.  He had been previously given the children's version of that test when he was younger.

This test is composed of a number of sub-tests that are listed here: information, digit span, vocabulary, and so on.  And those scores are combined to give you the person's IQ.  You expect that on each of these tests, the average score is a 10.  That is, the person right at the fiftieth percentile, right in the middle of the population in his age group, would attain a 10 sub-test score.  The average person gets a 10, sometimes you get a 9, 11, 12.  You vary a little bit around 10 as a big point.

Obviously, a very bright person gets scores over 10, and a less intelligent person gets scores much lower than 10.  In Cory's case, you will see he started off getting 5's and 6's in all of these first set of tests.  Those are consistent with someone who is mildly retarded.  That is, if he had continued to get that pattern of 5's and 6's on all his tests he would have scored in the retarded range.  Those initial tests, the first ones that are listed there where he got the 5's and 6's, are all of the verbal tests, the language tests, vocabulary, arithmetic, comprehension, all things that involve use of language.

The latter tests where he started to score higher are the nonverbal tests, sometimes called the performance tests.  These are tests that involve puzzles, blocks, things that he does with his hands. You will recall he had some carpentry training that probably enhanced his skills in that area.  And in those areas, he did better.  And actually, on one of

them he got a 10, which would be the average expected score for a normal individual.

Because these latter scores were higher, his overall IQ fell above the range of mental retardation, just above that range.

(Another document displayed on easel.)

BY MR. COOLEY:

Q    The next to the last page in that section is a bar graph that is entitled "Reading and Math Scores."  Would you tell the ladies and gentlemen of the jury very briefly what that entails and what that shows us?

A    I gave him an intelligence test, but also gave him an achievement test.  Again, I gave him the standard individually-administered achievement test, the Woodcock-Johnson Test of Achievement.  This is a test.  Actually, I didn't give him the entire test.  There are 20-some parts to this test.  But I gave him specifically the tests in reading, two tests in reading and two tests in math, identification, and comprehension.  Identification is his ability to identify a word -- identify words.  He is presented a word, has to be able to pronounce what that word is to show he can identify it.  In Comprehension, he has to be able to comprehend the meaning of a sentence and choose the correct word to complete a sentence.  Those turn out to be too easily objectively scored tests of reading ability.  On both of those he scored at the second-grade level, a 2.4 means at the second-grade level, a 2.6 also is at the second-grade level.

In the area of mathematics.  The first is calculation, which is ability to do arithmetic problems: addition, subtraction, division, multiplication.  And there he scored at the sixth-grade level, 6.7.  He also had applied problems, which are kind of common sense word problems, such as how much change should you get back if you are buying something that costs a certain amount of money, so forth.  That's sort of a practical arithmetic skill.  There he was at the fourth-grade level.  So certainly, the second-grade scores in reading were very consistent with what he had obtained when he was a teenager.  The somewhat higher scores reflect the fact that he was able to do somewhat better in arithmetic, although obviously still a very low level.

Q    Finally, the last bar graph, the last page of that section, is labeled "Intelligence and Achievement."  Can you tell the ladies and gentlemen of the jury what that represents?

A    This bar puts together those two tests.  That

is, we look at someone's intelligence and look at their achievement and see if they correspond.  We expect that a person's achievement should be commensurate with their intelligence.  That is, even if you have got low intelligence, you ought to achieve up to the level of your intelligence.  Now, if you look here on just the right-hand side, you will see where it says "Math."  The black bar graph where it says 100, that's the expected level that the average person at the 50th percentile would get in both intelligence and achievement.  So that's sort of our standard.  In intelligence he gets a 77.  That was his IQ result.  That's clearly well below average.  It is close to the level of mental retardation.  In math he gets a 77.  If I take those grade-level scores and I can look them up in a table and transform them into a standard score, he gets a 77.  So his math level is equivalent, exactly equivalent, to what his intellectual level is.  That to me is an indication that he is not learning disabled in math.  He is low in math, but he is at the level you would expect, given his intelligence.

If we look on the left, those three bars are not even.  We have the 100 standard bar that's black on the left, and he has a 77, which is the same intelligence score.  But then his reading is 53.  That is, if you transform that second-grade reading level into a standard score, it is a standard score of 53.  And that is clearly in the mentally retarded range, in the moderately retarded range, actually.  So that we cannot only see in this graph that his general intelligence is low, but his ability to learn in the area of reading is lower still.  So a person can be both mentally retarded and learning disabled.  In his case, he is very low in general intelligence, although not retarded, and learning disabled.

Q    Doctor, also, I believe you did a test in the course of this relating to Cory's writing.

(Document displayed on easel.)

A    I gave him a standard test of his ability to write, a test of written language, TOWL, the part of the test that is most commonly used.  The person is given a picture.  You see this outer-space scene.  And the young person is asked to make up a story to go with the picture.  They are given 15 minutes to write up a story.  Then you evaluate the story for its vocabulary, spelling, grammar, for its complexity of the themes that are presented, and this is the story that Cory gave me to this picture.  This was very striking to me because this story is very immature.  The writing is very immature.  The spelling is very immature, leaving aside the

penmanship.

Q    This is reprinted in the book before the ladies and gentlemen.  It is the fourth page back in behind the white tab.  And the third page back is your findings related to that; is that right?  And it also includes your typed-out interpretation of what Cory wrote.

A    Yes, I typed out what I thought he wrote.  There were a couple words I couldn't decipher, but I typed out the story which you can read and see is a very immature story.  And then below that, I have listed the scores that he received for this story, and the typical age level of someone who writes a story of that type.

Q    He begins his story with "Me and my mom."

A    You want me to read that?

3687

Q    Well --

MR. VICK:  It is all in front of the jury.

MR. COOLEY:  I'm not going to use it.

THE COURT:  All right.  Go on.

BY MR. COOLEY:

Q    But the story was about Cory and his mother going to the moon?

A    That's right.  He chose to tell a story about he and his mother going on a trip together to see the rockets.

Q    And obviously there was more space, but he ended where he did.

A    Yes.  His story was a little short for someone of his age.

Q    Now, Doctor, you also had an opportunity to refer Cory for evaluation by Dr. Peck; you made some reference to that.  Dr. Peck is a neuropsychologist.  His report is found behind the pink tab in the book.  And I will ask you to somewhat rapidly summarize what the findings from Dr. Peck showed.

A    I gave intelligence and achievement.  I asked Dr. Peck to give him neuropsychological tests, which are sensitive to brain damage, to see if we could identify specific areas of brain impairment or dysfunction.  These tests are commonly given when

3688

someone has had a head injury or has  --  there is reason to believe that they have had some kind of brain impairment.  They are very technical tests.  There is a large number of them.  Nobody is expected to do poorly on all of them; that is, they tap as many areas of brain functioning as we have tests for, everything from abstract reasoning to fine motor coordination, visual motor coordination, auditory processing, lots of different areas.

And what Dr. Peck found is that Cory's performance indicated abnormal neuropsychological

functioning.  That is, it did indicate impairment, brain impairment, in a number of areas.  First of all, he found that he had impairment in visual memory, memory for things he sees, and visual sequencing.  That is, the ability to keep things in proper order sequentially, visually.  Now, if you think about reading, those are two critical skills. You have to keep the letters in the proper order and the words in the proper order, and you have to be able to remember what words are, how they are spelled and so forth, in order to read.  He has deficits in both those areas.

In addition, Dr. Peck found that he had deficits in auditory processing.  That is, often, if somebody can't read and they have visual problems, you try to teach them auditorily through the spoken word.  But he has deficits in auditory discrimination; that is, the ability to listen and understand what is said to him.  At the end of this complicated report that Dr. Peck has written, he points out that this kind of person could have difficulty understanding what people are saying, and that that could create social and interpersonal difficulties for him.  He doesn't quite understand when people are arguing with him or talking with him, what they are saying and what their intention is, and he doesn't have good skills in that area.  Abstract reasoning and judgment were poor. For example, on the category test, which is a highly sensitive test to brain impairment, he shows inflexible thinking; that is, kind of approach to problems where he cannot shift from one approach to another approach.  He cannot, when he is making an error or making a mistake in solving a problem, he does not show the ability to recognize a mistake and to shift from that mistake to another strategy.  He tends to persist in a poor strategy of solving problems.

So in a number of different areas, he shows neuropsychological impairment.  Not all areas. Rarely does anyone show impairment in all areas.  But he shows impairment in quite a number of them.

Q    If I could, I would move your attention to the concept of mental retardation.  I would ask you to look at this last chart that's being displayed to the jury.  Can you tell the ladies and gentlemen of the jury what they are being shown at this point?  And this would be the last page behind the second green tab, the definition of mental retardation.

A    Yes.

Q    What does the term mean?

A    Mental retardation means that the person has significantly sub-average intelligence which can be

measured by a general intelligence test, as well as impairment in adaptive behavior. Adaptive behavior means their ability to sort of function in every day life; to have practical intelligence, if you will, and good survival skills. And you can measure the first part by giving them an intelligence test. Individuals that fall in the range of 70 to 75 can be considered in the range of mental retardation. And then of course, anything lower than that indicates mental retardation. In addition to having low intelligence, you need to show that the person has impaired adaptive behavior in any two of about ten areas that are listed there. Certainly functional academics, the ability to do academic work is one in which he has impairment. Also, communication deficits with his speech impairment and communication problems, he has some deficits there. Self care, social skills, work, the ability to maintain a job, to have good work habits, to use the kind of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level. As I said before, my conclusion was that he is just above the level of mental retardation.

Q    And Doctor, when you made that, reached that conclusion, you were aware that if he could be categorized as mentally retarded, that Cory would not be death-eligible under the statute; is that right?

A    Yes. I realized this was a very serious issue. The law states very specifically that if he were mentally retarded, we would not have this sentencing hearing for the death penalty. So I checked my scores, went back, and saw him a second time. I consulted with colleagues. I wanted to make very sure that this was an accurate score. Because the definition of mental retardation is not a hard and fast absolute. It is a gray area. And people have stereotypes of mental retardation as someone who looks very impaired and looks unusual and so forth. But in fact, many mentally-retarded people look very normal and can function fairly well in daily life. So I did not very easily reach this conclusion that he is just above the level of mental retardation.

Q    And exactly where is he? How close is he to being mentally retarded?

A    The IQ score I got was 77. If he had gotten a 75, he would be within the range that counts as mental retardation. 70 to 75 is kind of the gray area. If you are in that area, you can be mildly retarded. He was two points above that, which is a matter of one or two questions on an intelligence test that would make the difference there.

Q    Doctor, would it be fair to say that most mentally-retarded folks are only mildly retarded?

A    Yes.  There is a social stereotype we have of the retarded person that really is of the more seriously retarded person.  We used to think that everybody who was mentally retarded would have to be put in an institution and they could never live on their own or function or hold a job.  In fact, if you put people in institutions they will become institutionalized and sort of look and function that way.

     We now know that a mildly retarded person can be educated up to about the sixth-grade level.  We know that a mildly retarded person can hold a job if they have good training, if it is a structured job, if they have good supervision.  We know that many mildly retarded people get married, live on their own, pay their bills, have families.  So we know that mild mental retardation doesn't mean that the person is completely dysfunctional, the way that you might characterize it on television, but has some capabilities.  And so I had to compare that to Cory.

Q    On some tests Cory was given by you and on some of the tests he was given by the folks at Pleasantville Cottage School back in his adolescent years, Cory in fact scored in the mentally retarded range, did he not?

A    Yes.

Q    And would it be fair to say that in some areas, Cory functions on the same level as someone who is mentally retarded?

A    That's correct.

Q    And is it fair to say that because of his intellectual limitations, that Cory Johnson has impaired ability to reason?

A    Yes.

Q    Would it be fair to say that Cory Johnson has an impaired ability to use good judgment to control his behavior?

A    Absolutely.

Q    Would it be fair to say that Cory Johnson has impaired ability to understand and foresee the consequences of his actions?

A    He has impairment in that area, yes.

Q    Is there anything in the scientific literature on mental retardation about individuals with these limitations committing illegal acts?

A    Yes.  It is not uncommon for individuals who are mildly retarded to commit illegal acts.  We find, in part of assessing their adaptive behavior, that very commonly they do break the law.  They use poor judgment.  They don't have good self control.  And

they do break the law.

Q    Is it the case that mentally retarded individuals are often very dependent on others and tend to rely on others in the decisions they make?

A    Yes.  That's one of the factors you have to consider, because part of the limitation is that the person then is more vulnerable to what other people tell them to do or suggest that they do, or look for cues in what other people are doing and try to fake it, emulate them.  And individuals with severe intellectual deficits are very susceptible to that kind of pressure.

Q    And while Cory Johnson is technically not mentally retarded, because he does have these similar intellectual limitations, would it be fair to say that he may be overly dependent on others and tend to rely on others for decisions?

A    Yes.

Q    Is it not the case that mentally retarded individuals are often overly susceptible to influence by others, doing what others direct them to do?

A    That's a standard part of when you evaluate anyone who is mentally retarded; you expect that that problem is going to be present to some degree, and it usually is.

Q    Part of their brain impairment is impairment in the ability to use independent judgment when somebody wants them to do something.

A    Yes.  And to foresee future consequences of actions.  That is, you can put a mildly retarded person and give them a very structured question, a very specific situation, and they can sort of give you the right answer.  But then you put them in a different situation when they are in a different emotional state and they don't give you the right answer anymore.  They don't use the same level of judgment.  They are variable in their level of functioning.

Q    Would it be fair to say with the limitations that Cory Johnson has, as you and the other professionals and the reports have indicated, would it be fair to say that he, too, could be lacking in independent judgment and susceptible to being influenced by others?

A    To some degree, yes.  He would have to be.

Q    Does learning ability only affect ability to read and write or to do other kinds of schoolwork?

A    No.  That term is used because that's where it is first identified, but there is more to it.

Q    Is that just your opinion?

A    No, it is not.  If you take any standard textbook on learning disability, Handbook of Learning