**EXECUTION SCHEDULED FOR JANUARY 14, 2021**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 3:92CR68 (DJN) |
| | : | CAPITAL CASE |
| COREY JOHNSON, | : | |
| | : | |
| Defendant. | : | |

**MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO
BE EXECUTED UNDER 18 U.S.C. § 3596(c)**

David E. Carney, VA Bar # 43914
Donald P. Salzman (Admitted Pro Hac Vice)
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Ph: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

*Counsel for Corey Johnson*

**TABLE OF CONTENTS**

I.      INTRODUCTION ..............................................................................................................1

II.     STATEMENT OF RELEVANT PROCEDURAL HISTORY...........................................3

        A.      Trial Proceedings ................................................................................................3

        B.      The Penalty Hearing ...........................................................................................5

        C.      Direct Appeal .....................................................................................................9

        D.      Post-Conviction Proceedings ............................................................................9

        E.      Appeal of Post-Conviction Proceedings .........................................................13

        F.      Subsequent Proceedings and Discovery of Additional IQ Scores .........................14

III.    RELEVANT FACTS AND ISSUES ..............................................................................15

IV.     ARGUMENT...................................................................................................................20

        A.      When All the Relevant Data Are Evaluated According to Accurate,
                Complete, and Prevailing Legal and Medical Standards, Corey Johnson
                Must Be Adjudged Intellectually Disabled............................................................20

                1.      Mr. Johnson Has Significant Deficits in Intellectual Functioning
                        Diagnostic of an Intellectual Disability .....................................................21

                2.      Mr. Johnson Has Significant Deficits in Adaptive Functioning
                        Diagnostic of an Intellectual Disability .....................................................24

                        a)      Conceptual Domain .......................................................................25

                        b)      Social Domain...............................................................................33

                        c)      Practical Domain...........................................................................37

                        d)      Adaptive Behavior Composite.......................................................41

                3.      The Onset of Mr. Johnson's Intellectual and Adaptive Deficits
                        Began Well Before the Age of Eighteen....................................................42

        B.      Mr. Johnson's Motion Is Not "Second or Successive" Under the
                Gatekeeping Provision of 28 U.S.C. § 2255(h) ....................................................43

                1.      Mr. Johnson's Claim Is Not Successive Because a Statute Provides
                        for Review When an Execution Date Is Imminent ....................................44

a)     The Plain Language of § 3596(c) Demonstrates That a Determination of Mental Status Must Be Made When an Execution Date Is Set..................................................................46

b)     The Other Provisions of § 3596(c), as Well as the Broader Structure of the FDPA, Reinforce That the § 3596(c) Bar Is Properly Raised After an Execution Date Is Set............................47

c)     The Legislative History of § 3596(c) Demonstrates Congress's Intent ..........................................................................48

V.    CONCLUSION..................................................................................................51

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Brumfield v. Cain*, 135 U.S. 305 (2015) ...................................................................24

*Castro v. United States*, 540 U.S. 375 (2003)...........................................................44

*Davis v. Michigan Department of Treasury*, 489 U.S. 803 (1989)...............................47

*Ford v. Wainwright*, 477 U.S. 399 (1986) ................................................................45

*Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) .........................................................44

*Hall v. Florida*, 572 U.S. 701 (2014)............................................................12, 16, 17, 43

*Hoxha v. Levi*, 465 F.3d 554 (3d Cir. 2006) ..............................................................45

*Johnson v. United States*, 546 U.S. 810 (2005) ........................................................13

*Magwood v. Patterson*, 561 U.S. 320 (2010) ...........................................................43

*Moore v. Texas*, 137 S. Ct. 1039 (2017) ............................................................. passim

*Murphy v. Smith*, 138 S. Ct. 784 (2018) ..................................................................47

*Panetti v. Quarterman*, 551 U.S. 930 (2007)........................................................44, 45

*Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998).................................................44, 45

*United States v. Davis*, 139 S. Ct. 2319 (2019) ..........................................................4

*United States v. Davis*, 611 F. Supp. 2d 472 (D. Md. 2009) ................................. passim

*United States v. Hairston*, 754 F.3d 258 (4th Cir. 2014).............................................44

*United States v. Hardy*, 762 F. Supp. 2d 849 (E.D. La. 2010) ............................. passim

*United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901 (N.D. Ohio Dec. 23, 2010)...........24

*United States v. Nelson*, 419 F. Supp. 2d 891 (E.D. La. 2006)......................................23

*United States v. Roane*, 378 F.3d 382 (4th Cir. 2004) .................................................13

*United States v. Roland*, 281 F. Supp. 3d 470 (D.N.J. 2017) ............................... passim

*United States v. Salad*, 959 F. Supp. 2d 865 (E.D. Va. 2013) ............................... passim

iii

*United States v. Shields*,
    No. 04-20254, 2009 WL 10714661 (W.D. Tenn. May 11, 2009) ........................16, 17, 22

*United States v. Smith*, 790 F. Supp. 2d 482 (E.D. La. 2011)........................................................16

*United States v. Wilson*, 170 F. Supp. 3d 347 (E.D.N.Y. 2016)...............................................17, 18

*Webster v. Daniels*, 784 F.3d 1123 (7th. Cir. 2015) ......................................................................2

*Webster v. Watson*, 975 F.3d 667 (7th Cir. 2020)................................................................19, 22, 41

## STATUTES

18 U.S.C. § 1959.............................................................................................................................4

18 U.S.C. § 3591..........................................................................................................................47

18 U.S.C. § 3592..........................................................................................................................47

18 U.S.C. § 3593..........................................................................................................................47

18 U.S.C. § 3594..........................................................................................................................47

18 U.S.C. § 3595.....................................................................................................................46, 48

18 U.S.C. § 3596................................................................................................................... passim

18 U.S.C. § 3597..........................................................................................................................48

18 U.S.C. § 3598..........................................................................................................................48

18 U.S.C. § 3599..........................................................................................................................48

18 U.S.C. § 924..............................................................................................................................4

21 U.S.C. § 841..............................................................................................................................4

21 U.S.C. § 846..............................................................................................................................4

21 U.S.C. § 848.......................................................................................................................2, 4, 9

28 U.S.C. § 2255................................................................................................................... passim

**REGULATIONS**

28 C.F.R. § 1.10(e) ............................................................................................................ 14

**OTHER AUTHORITIES**

*Carryout*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/carryout
    (last visited Dec. 14, 2020) .............................................................................................46

## I.    INTRODUCTION

Corey Johnson[1] remained in the second grade for three years, and also repeated third and fourth grades.  When asked his birthday at age eight, while in second grade, he thought it was in March, though he was actually born in November.  When he was 13 years old, he could barely write his own name.  And while he knew there were 12 months in the year, he could recite them only up to August.  Corey was not able to tell time or perform arithmetic beyond a third-grade level.  At age 18, a high school teacher concluded that Corey could never pass the competency exams required to graduate.  When he was in his early twenties, achievement testing measured his grade-equivalent levels no higher than second grade in reading and writing.  When he was last tested at age 45, Mr. Johnson was still at an elementary school level.

As an adolescent and teenager, Corey functioned like a younger child—he struggled to prepare snacks for himself, wet his bed (until he was twelve), and could not be trusted to roam school halls without getting lost or go to the store and receive correct change.  A social worker from his residential placement reported that when he was 13, Corey was "frightened" of other children and "isolated" from them.  He was never able to make his way alone through any but the most familiar streets even up to the time of his arrest in this case.  He has never managed to live on his own.

* * *

---

[1]  Mr. Johnson's first name has been misspelled in various proceedings.  The correct spelling is Corey.  When referring to his childhood years, Mr. Johnson is referred to herein as Corey.

Even before the Supreme Court banned the execution of those with intellectual disability[2] as violative of the Eighth Amendment, Congress enacted legislation prohibiting the federal government from executing those afflicted with this condition, Federal Death Penalty Act ("FDPA" or "§ 3596"), 18 U.S.C. § 3596(c) ("A sentence of death *shall not be carried out* upon a person who is mentally retarded." (emphasis added)).[3]  The language, structure, and legislative history of the FDPA establish that the implementation of the sentence for an individual with intellectual disability is legally barred.  The execution of an intellectually disabled prisoner by the federal government would be an "intolerable result" prohibited by statute.  *Webster v. Daniels*, 784 F.3d 1123, 1139 (7th. Cir. 2015).[4]

Corey Johnson is intellectually disabled.  Experts agree he meets the three diagnostic criteria established in legal and clinical definitions of intellectual disability.  *First*, he exhibits intellectual deficits that put him in the bottom two to three percent of the American population. *Second*, he lacks the skills necessary to navigate the world on his own, to engage in normal

---

[2] The modern convention is to refer to individuals as "intellectually disabled," replacing the previous term of "mentally retarded."  However, this motion uses the term "mentally retarded" when citing statutes and case law or quoting documents that use it.

[3] The Anti-Drug Abuse Act of 1988, 21 U.S.C. § 848(*l*) ("ADAA"), under which Mr. Johnson was convicted, also prohibited carrying out a death sentence on a person who was "mentally retarded."  Mr. Johnson relies on § 3596(c) in this motion because the government agrees that it is the controlling statute.  *See, e.g.*, Defs.' Opp'n to Pl. Intervenor Dustin Lee Honken's Mot. for Prelim. Inj. at 5 n.1, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145 (TSC) (D.D.C. Nov. 12, 2019), ECF No. 36 (declaring that implementation provision of § 3596 applies because of Congress's repeal of the death penalty provisions of § 848).

[4] *See also United States v. Salad*, 959 F. Supp. 2d 865, 868 (E.D. Va. 2013) ("The [FDPA] prohibits execution of intellectually disabled defendants."); *United States v. Davis*, 611 F. Supp. 2d 472, 507 (D. Md. 2009) ("The [FDPA] and the Eighth Amendment preclude the machinery of death from turning when a defendant is mentally retarded.").

social interaction, and to respond to changing circumstances.  In legal and clinical parlance, he has extensive adaptive deficits.  *Third*, these intellectual and adaptive impairments existed well before his 18th birthday.

Nevertheless, Mr. Johnson is now scheduled to be executed on January 14, 2021.  But he cannot be executed without violating the rule of law and the will of duly elected members of Congress and the people whose interests they reflected in the FDPA.

For federal prisoners such as Mr. Johnson, § 3596 stands as the bulwark against an illegal execution.  And because the Attorney General has set his execution date, Mr. Johnson is entitled to present, now, in a non-successive action pursuant to 28 U.S.C. § 2255 ("§ 2255"),[5] proof that he is intellectually disabled and that his execution must, therefore, not be carried out.  This demonstration, and the standards by which it is judged, must "align[] with the medical community's information" to prevent "an unacceptable risk that [a] person[] with intellectual disability will be executed."  *Moore v. Texas*, 137 S. Ct. 1039, 1044 (2017) (citation omitted).

Mr. Johnson asks this Court to issue an order prohibiting his execution on January 14, 2021, and permanently enjoining the implementation of his death sentences after holding an evidentiary hearing to allow him to present the evidence of, and establish, his disability, and to grant him argument and post-hearing briefing, on any factual matters the government may dispute.

## II.    STATEMENT OF RELEVANT PROCEDURAL HISTORY

### A.    Trial Proceedings

In April 1992, Corey Johnson and six co-defendants were charged in a 33-count indictment with offenses arising from a drug conspiracy pursuant to the ADAA.  (4/24/92

---

[5] Although second in time, this § 2255 motion is not successive.  *See infra* Section IV.B.

3

Indictment, Dkt. 1.).  The government sought death for three of the co-defendants, Mr. Johnson, James Roane, and Richard Tipton.  Ex. 64 (2/8/93 Notice of Intention to Seek Death Penalty as to Mr. Johnson); Ex. 60 (5/1/92 Notice of Intention to Seek Death Penalty as to Mr. Roane); Ex. 59 (5/1/92 Notice of Intention to Seek Death Penalty as to Mr. Tipton).[6]  This was among the first federal capital trials prosecuted in the modern era of the death penalty, and the very first in which the government charged and tried co-defendants together.

In the superseding indictment under which he was ultimately tried, Mr. Johnson was charged with 27 counts, including conspiracy to violate provisions of the ADAA under 21 U.S.C. § 846, murder in the course of a continuing criminal enterprise ("CCE") under 21 U.S.C. § 848(e)(1)(A), using a firearm during a crime of violence under 18 U.S.C. § 924(c), possession of cocaine base with the intent to distribute under 21 U.S.C. § 841(a)(1), and killing and maiming in aid of racketeering under 18 U.S.C. § 1959(a).  Ex. 61 (7/20/92 Second Superseding Indictment, Dkt. 115).[7]  On February 3, 1993, the jury convicted Mr. Johnson of all 27 charged

---

[6] The government initially filed a notice of intent to seek the death penalty against co-defendant, Vernon Lance Thomas who was eventually convicted of killing four victims.  Ex. 62 (10/28/92 Notice of Intention to Seek Death Penalty as to Mr. Thomas).  Mr. Thomas's case was severed from that of the other three defendants for reasons related to the availability of his appointed counsel.

Following authorization, but prior to trial, Mr. Thomas presented an expert report to the government that concluded Mr. Thomas had an IQ of 71 and was "mentally retarded."  Shortly thereafter, the government withdrew its death authorization, and Mr. Thomas faced a maximum penalty of life without parole at his trial.  *See, e.g.*, Ex. 66 (4/15/93 Mot. to Have Def. Declared Mentally Retarded).

[7] Mr. Johnson's death sentence is itself infirm on several grounds.  He is therefore currently seeking authorization from the U.S. Court of Appeals for the Fourth Circuit to challenge his § 924(c) convictions under *United States v. Davis*, 139 S. Ct. 2319 (2019).  Mot. for Authorization to File a Successive Mot. Pursuant to 28 U.S.C. § 2255(h)(2), *In re Corey Johnson*, No. 20-8 (4th Cir. May 22, 2020), ECF No. 2-1.  He is also appealing to the Fourth Circuit the denial of relief

4

counts, including seven CCE murders.  *See* Ex. 63 (2/3/93 Verdict Form, Dkt. 466); Ex. 6 (2/3/93 Trial Tr. 3259-63).

###    B.    The Penalty Hearing

A penalty phase hearing followed shortly after conviction in front of the same jury.  Mr. Johnson's defense team presented evidence in mitigation, which included his difficult and tumultuous childhood and his severe mental impairments and their manifestations in his day-to-day life.  The defense presented much of the mitigating evidence, including about Mr. Johnson's impairments, through Dewey Cornell, Ph.D., a University of Virginia psychologist hired by the defense to evaluate Mr. Johnson as part of a standard mental health evaluation and to offer mitigation to the jury.[8]  As described below, while the mitigation case noted Mr. Johnson's severe limitations, the defense informed the jury, in both opening and closing arguments, that Mr. Johnson was *not* intellectually disabled and that jurors would not be asked to make such a determination.  Ex. 7 (2/10/93 Trial Tr. 3547); Ex. 9 (2/12/93 Trial Tr. 3921).

Instead, although Dr. Cornell testified that Mr. Johnson's mental impairments made him "unprepared to function in society, unprepared to survive on his own when he left institutional care . . . and made him unable to cope and adapt to society in a way that a normal individual would," Ex. 7 (2/10/93 Trial Tr. 3574), Dr. Cornell also affirmatively told the jury that Mr. Johnson did not meet the criteria for a diagnosis of mental retardation.  He explained that Mr. Johnson did not satisfy that diagnosis because, on an IQ test Dr. Cornell had administered, Mr.

---

he sought pursuant to the First Step Act.  Mem. Order (Nov. 19, 2020), ECF No. 75, *appeal docketed*, *United States v. Johnson*, No. 20-15 (4th Cir. Nov. 23, 2020).

[8] The defense specifically asked Dr. Cornell to: (1) determine whether Mr. Johnson was competent to stand trial; (2) determine if he was criminally responsible for his crimes; and (3) gather, analyze, and prepare potential mitigation evidence for the capital sentencing hearing.  Ex. 15 ¶ 9 (9/20/16 Aff. of C. Cooley).

Johnson had scored 77, "just above the level of mental retardation," "two points above that." Ex. 7 (2/10/93 Trial Tr. 3691-92). This, he said, failed to satisfy the first prong of a such a diagnosis—that Mr. Johnson had a significant intellectual deficit, as represented by this one IQ score.[9]

Because Dr. Cornell did not believe Mr. Johnson satisfied prong one, no attempt was made during these proceedings to establish that Mr. Johnson met the clinical definition of intellectual disability,[10] and neither the judge nor the jurors were asked to determine whether Mr. Johnson is a person with intellectual disability.[11] The defense, through Dr. Cornell's testimony, simply presented as mitigation Mr. Johnson's documented, ongoing educational failures; diagnoses he had received as an adolescent of diffuse organic brain damage;[12] and standardized

---

[9] Dr. Cornell reached this conclusion even though he also testified that Corey had received an IQ score of 69 when he was 16, which Dr. Cornell acknowledged was a score below the threshold for a mental retardation diagnosis. Ex. 7 (2/10/93 Trial Tr. 3607-09).

Dr. Cornell's disregard of this IQ test score of 69, which satisfies the first prong of the diagnosis, can only be explained by a belief that a single score above the default threshold disqualifies one for the diagnosis even when there are scores that satisfy the prong. This view is contrary to the law. *See infra* pp. 17-18.

[10] The test for intellectual disability generally accepted in both the legal and medical communities is a three-pronged analysis requiring findings of a significant intellectual deficit, significant adaptive deficits, and onset before the age of 18. *See infra* Section III.

[11] Because he believed Mr. Johnson failed to qualify under the first prong, requiring a significant deficit in intellectual functioning as measured by IQ scores, Dr. Cornell never engaged in the full consideration of the second prong—deficits in adaptive behavior—which under modern diagnostic standards is given relatively more weight in an intellectual disability diagnosis than the intellectual functioning prong. *See infra* note 20. Nevertheless, his testimony described many documented adaptive impairments observed during Mr. Johnson's childhood that would have satisfied that prong, and which have since been corroborated by numerous other witnesses.

[12] Brain damage is considered one of several potential causes of, and a contributing factor to, intellectual disability. Mr. Johnson's brain damage is so severe and widespread that, unlike many people who have localized damage, Mr. Johnson is unable to develop "workarounds" that employ healthy sections of his brain. Dr. Cornell himself testified, "The problem with Cory (sic)

6

test scores that placed him in the bottom one to two percent of children his age, Ex. 7 (2/10/93 Trial Tr. 3590). Dr. Cornell also identified concrete ways Mr. Johnson fell far below his age-peers in his life skills.[13] These included Mr. Johnson's inability into early adolescence to make it through the night without wetting or soiling himself, or to recite all the months of the year by age 13, Ex. 7 (2/10/93 Trial Tr. 3576, 3585); and by late adolescence, his inability to read beyond a second-grade level, tell time, count money, do math beyond simple arithmetic, or to navigate any but the most familiar streets, Ex. 7 (2/10/93 Trial Tr. 3545-3714), though he did not describe them as being indicative of a diagnosis of mental retardation for Mr. Johnson.

While he ruled out mental retardation as an explanation for Mr. Johnson's deficits, Dr. Cornell did testify to other afflictions Mr. Johnson had been diagnosed with or appeared to manifest. During the course of his testimony, Dr. Cornell referred to records created during Mr. Johnson's childhood showing he had been diagnosed with brain damage, resulting in serious deficits in nonverbal abstract reasoning, perception organization, visual perception and perceptual motor functioning, comparable to a child five years below his chronological age. Ex. 7 (2/10/93 Trial Tr. 3583-84). Dr. Cornell discussed records showing that Mr. Johnson had severe neurologic dysfunctions, including reading and arithmetic disorders, and that observations of these disorders were consistent across evaluators and across time. Ex. 7 (2/10/93 Trial Tr.

---

is that his—his disability was so severe, so diffuse, he couldn't compensate." Ex. 7 (2/10/93 Trial Tr. 3592, 3678-79).

[13] Unaware (because trial counsel had not found them) that Mr. Johnson had two additional childhood IQ scores—one from a test given to him when he was eight years old that at the time of his trial would have placed him in the diagnostic range for intellectual disability and another from a test administered at age twelve that under modern standards is also within the intellectual disability range—Dr. Cornell mistakenly understood these impairments as only being indicative of a calamitous learning disability and noted that, but for his out-of-range IQ, these impairments aligned with the adaptive deficits one would find in a person who was mentally retarded. Ex. 7 (2/10/93 Trial Tr. 3692-97).

3604).  He recounted notations in records from adolescent institutionalization in residential treatment and group homes in which professional staff (who routinely dealt with special education students) noted that Corey was among the most severely learning-disabled children they had taught.  Dr. Cornell told the jury that one doctor deemed Corey the *most* severe case of learning disability—a misdiagnosis of Corey—he had ever seen, despite Corey's valiant efforts to learn.  Ex. 7 (2/10/93 Trial Tr. 3589, 3591).[14]  Dr. Cornell also testified that achievement test scores Corey received throughout his childhood placed him in the range of mental retardation. Ex. 7 (2/10/93 Trial Tr. 3592, 3600, 3608).[15]

The mitigation evidence Dr. Cornell testified to, that Mr. Johnson had diffuse brain damage, neurologic dysfunction, and learning disabilities, was all consistent with a diagnosis of intellectual disability; these are considered risk factors for and comorbidities with, intellectual

---

[14] It is worth noting that an intellectual disability can be a co-morbid state with learning disabilities.  Ex. 77 at 39-40 (Diagnostic and Statistical Manual of Mental Disorders ("DSM-5")); Ex. 75 at 60-62, 65-66 (American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11"));  *see, e.g.*, *Davis*, 611 F. Supp. 2d at 482, 485; *United States v. Roland*, 281 F. Supp. 3d 470, 480, 546 (D.N.J. 2017).  Note, however, that Dr. Reschly, an expert who has since evaluated Mr. Johnson, *see infra* Section IV.A, believes Mr. Johnson was misdiagnosed as having a learning disability and did not meet the diagnostic criteria for one.  Ex. 1 at 32-38 (Reschly Report).

[15] During the period of time Corey was attending public schools, and living in a residential facility and later in a group home while in foster care, he was receiving the same social and educational supports a person with intellectual disability would receive.  He was not, however, given a designation of intellectual disability.  This was likely due in part to the then-prevalent notion that if an intellectually disabled child already had access to individualized services it was preferable not to stigmatize the child with a label of mental retardation.  *See* Ex. 1 at 37-45 (Reschly Report).  In addition, the evidence strongly suggests that those evaluating Mr. Johnson did not have access to all his IQ test scores, or sufficient documentation or expertise to evaluate the outlying higher scores he had received.  *See infra* note 34.

disability.[16]  Additional evidence from family members likewise described biomedical, educational, and social circumstances the medical community deems risk factors for intellectual disability.  But the jury was never asked to consider this extensive evidence for any purpose other than as mitigating evidence of disadvantage and general impairment.

Even though the jury found several mitigating factors associated with Mr. Johnson's cognitive impairments, it returned a verdict of seven death sentences, one for each of his CCE convictions.  Ex. 65 (2/16/93 Special Findings, Dkt. 508); Ex. 10 (2/15/93 Trial Tr. 4027-31). Considering mental retardation was not an option.

### C.     Direct Appeal

Mr. Johnson timely appealed to the Fourth Circuit, raising issues relating to the guilt and penalty phases of his trial.  No issue regarding intellectual disability was raised in his direct appeal.

### D.     Post-Conviction Proceedings

In June 1998, Mr. Johnson's attorneys filed a motion for collateral relief pursuant to § 2255.  In both initial and supplementary pleadings, counsel asserted for the first time that their client was ineligible for a death sentence pursuant to 21 U.S.C. § 848(*l*) and 18 U.S.C. § 3596 because he was mentally retarded.

In their pleadings, recognizing that Dr. Cornell had failed to take into account the age of the IQ tests on which he had relied during his trial testimony, post-conviction counsel asserted that Dr. Cornell should have adjusted all of Mr. Johnson's IQ scores using the Flynn Effect—a testing phenomenon that causes IQ scores to inflate over time and requires scores to be corrected

---

[16] Given the current state of the law and medical science (including the Flynn Effect) as well as the discovery of two additional childhood IQ results, a finding today of Mr. Johnson's intellectual disability would be virtually indisputable.  *See infra* Sections III and IV.A.

accordingly[17]—and that, had Dr. Cornell made these necessary adjustments, Mr. Johnson's IQ scores would have fallen within the standard error of measurement ("SEM") diagnostic of mental retardation, and a full evaluation would not have been ruled out.  Habeas counsel also asserted that trial counsel was constitutionally ineffective for not pursuing a claim that their client was mentally retarded, regardless of the advice and assessment they had received from Dr. Cornell. Ex. 67 at 108-11 (6/15/98 Mem. in Supp. of Initial Petition for Writ of Habeas, Dkt. 714 (Excerpt)).  To support both these claims, counsel attached to the reply to the § 2255 motion three IQ test results (which had been admitted into evidence at trial), Ex. 68 (3/15/99 Reply Br., Dkt. 761 (Excerpt)), Ex. 69 (3/15/99 Reply Br. Ex. 14), and a single social services record, Ex. 70 (3/15/99 Reply Br. Ex. 15).  An excerpt from the same social services record that § 2255 counsel attached to the reply was admitted in evidence at trial, and Dr. Cornell mentioned the record in his testimony as well.  *See* Ex. 7 (2/10/93 Trial Tr. 3617-18, 3712); *compare* Ex. 55 at 1, 7-9 (6/28/86 Service Plan Review 6 Month) *with* Ex. 8 at 10 (Excerpt of Cornell Mitigation Information and Report) (admitted into evidence at trial and same as Ex. 55 at 1) *and* Ex. 70 (3/15/99 Reply Br. Ex. 15) (same as Ex. 55 at 7-9).

---

[17] Research scientist James Flynn discovered IQ tests across populations increase slowly over time—approximately .3 points per year or 3 points over ten years.  In the context of an intellectual disability assessment, at the time an IQ test is normed, the upper range of IQ scores in support of an intellectual disability diagnosis would range from approximately 70 to 75. According to the Flynn Effect, if the same IQ test were given to a subject ten years after the IQ test was normed, the upper end of the intellectual disability range would have risen from approximately 75 to approximately 78.  For example, as applied in Mr. Johnson's case, his 1992 IQ score of 77 would be adjusted to 73.7, which is in the range for mild intellectual disability. While experts in intellectual disability have now weighed in on this issue, § 2255 counsel did not present expert support for this proposition during § 2255 proceedings and relied exclusively on scientific literature.  *E.g.*, Ex. 1 at 8-10 (Reschly Report); Ex. 2 at 3-5 (Olley Report); Ex. 3 at 3-4, 10 (Siperstein Letter).

In light of Dr. Cornell's failure to adjust the IQ scores to account for the Flynn Effect, an omission on which his opinion hinged, counsel made relevant discovery requests during these post-conviction proceedings. They asked for information about the criteria the Department of Justice used to evaluate whether a defendant charged with a capital crime was mentally retarded. They also sought to learn in what specific federal capital cases defendants had asserted their execution should be barred due to mental retardation, and also requested all reports and memoranda specifically related to the application of the mental retardation bar against the defendants in the case.[18]  Finally, they sought any documents regarding the government's knowledge of Mr. Johnson's "mental impairments."  Ex. 71 at 32 (6/24/99 Joint Mot., Dkt. 770).

The district court denied Mr. Johnson's mental retardation-related discovery requests as unnecessary, summarily resolving the question of whether Dr. Cornell's scoring should have been modified on the grounds that "[e]vidence at trial indicated that [Mr. Johnson's] I.Q. is 77, and he is therefore not mentally retarded . . . clearly Johnson cannot prevail on this claim in light of the evidence presented at trial."  Ex. 72 at 12 (5/3/00 Mem. Op., Dkt. 803).

In 2003, the district court granted the government's motion for summary judgment, denying Mr. Johnson relief on all grounds.  *See* Ex. 73 (5/1/03 Mem. Op., Dkt. 896).  In light of the fact that no new evidence had been offered with respect to the issue of Mr. Johnson's mental retardation, the Court found that "the record before the Court demonstrates that Johnson is not mentally retarded" and that Mr. Johnson's trial counsel was not ineffective for failing to raise the issue that Mr. Johnson's IQ score was overstated because counsel had reasonably relied on Dr.

---

[18] This discovery was especially relevant because of the outcome of Vernon Lance Thomas's case.  *See supra* note 6.

11

Cornell's assessment.[19]  Despite § 2255 counsel's explanation of the Flynn Effect and the fact

that Mr. Johnson had childhood scores under 75 as reported by Dr. Cornell, the district court

nevertheless relied on Dr. Cornell's conclusion that Mr. Johnson was not mentally retarded.[20]

The court concluded that Mr. Johnson could, therefore, not be deemed mentally retarded; with

Dr. Cornell having testified at trial he had "rechecked" that Mr. Johnson's score of 77 was

accurate, his IQ was simply too high to qualify.  Ex. 73 at 81 (5/1/03 Mem. Op., Dkt. 896).  Had

§ 2255 counsel introduced expert testimony about the Flynn Effect, as is now routinely done in

cases,[21] or if counsel had located the childhood IQ scores that Dr. Cornell was not aware of, the

district court almost certainly would not have come to its conclusion, on the limited record

before it, that Mr. Johnson is not mentally retarded.

---

[19] Ex. 73 at 80-84 (5/1/03 Mem. Op., Dkt. 896).  The district court rejected counsel's argument
that Mr. Johnson's IQ score was inflated on the basis that Dr. Cornell's testimony "belies the
suggestion that Dr. Cornell's analysis did not account for possible variations in his testing
instrument."  *Id.* at 81-82.  But Dr. Cornell merely testified that he double-checked his findings
and consulted colleagues before concluding that Mr. Johnson was not mentally retarded because
he was aware that finding Mr. Johnson's IQ to be above 75 made him death penalty-eligible.  Ex.
7 (2/10/93 Trial Tr. 3691).

Dr. Cornell never mentioned the Flynn Effect at trial nor was evidence provided to the court in §
2255 proceedings that Dr. Cornell had taken the Flynn Effect into account.

[20] To the extent that the court's decision could be read to require that all of one's IQ scores must
be under 75 to be considered intellectually disabled or that a court can ignore adaptive deficits if
a single score is above 75, such requirements would be inconsistent with the consensus of the
current legal and medical communities.  *See Hall v. Florida*, 572 U.S. 701, 712 (2014); *Moore*,
137 S. Ct. at 1049; Ex. 77 at 37 (DSM-5); Ex. 76 at 23 (AAIDD-11 User's Guide).

[21] The Flynn Effect is now routinely regarded as valid, "persuasive," and "best practice," by the
courts considering federal capital cases, including those in the Fourth Circuit, and must be taken
into account when expert testimony supports its use.  *See Davis*, 611 F. Supp. 2d at 488; *Roland*,
281 F. Supp. 3d at 503; *see also Salad*, 959 F. Supp. 2d at 872 n.10 ("The Flynn Effect describes
a documented increase in IQ levels over time.  As a result, IQ tests must be periodically re-
normed to account for the population becoming more intelligent; a score on an outdated test
might overstate IQ relative to the contemporary population.").

### E.      Appeal of Post-Conviction Proceedings

In 2004, § 2255 counsel appealed to the Fourth Circuit.  They argued with regard to Mr. Johnson's mental retardation claim that the district court had made a mistake in refusing to consider scores corrected for the Flynn Effect because the court had simply assumed that Dr. Cornell had considered the Flynn Effect, even though no evidence supported that assumption. Ex. 74 at 145-46 (Br. for Appellants Cory Johnson and Richard Tipton, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt)).  The court sidestepped the issue and instead adopted the district court's rationale—that the IQ score Dr. Cornell had assigned Mr. Johnson placed him outside the diagnostic range for mental retardation and that ended the inquiry.  The Fourth Circuit also agreed with the district court that Mr. Johnson's counsel were not ineffective for failing to consider the Flynn Effect at sentencing because they were "under no mandate to second-guess" Dr. Cornell's report.  *United States v. Roane*, 378 F.3d 382, 408-09 (4th Cir. 2004).

Subsequently, the Fourth Circuit denied Mr. Johnson's petition for rehearing.  Still convinced of Mr. Johnson's intellectual disability, counsel again raised the issue, along with several others, in a petition for certiorari to the U.S. Supreme Court.  The Court denied the petition.  *Johnson v. United States*, 546 U.S. 810 (2005).

In late 2005, counsel filed a motion to recall the mandate and for rehearing in light of new Fourth Circuit decisions remanding cases to trial courts to consider evidence of Flynn Effect adjustments to IQ scores above 75 that would bring the scores below 75—exactly what Mr. Johnson had asked the district court to do in his own § 2255 motion.  The Fourth Circuit, however, denied the motion to recall, without opinion.

13

### F.    Subsequent Proceedings and Discovery of Additional IQ Scores

In 2006, the government set an execution date for Mr. Johnson.  Mr. Johnson applied for executive clemency, a feature of which was a plea that then President George W. Bush reduce his sentence from death to life without possibility of parole because of his intellectual disability. Because Mr. Johnson's execution was stayed as a result of litigation challenging the government's planned method of execution, counsel withdrew his clemency application before it was ruled upon.[22]

Following the entry of the lethal injection stay, new counsel began representing Mr. Johnson.  Convinced that their client's intellectual limitations had not been adequately explored and concerned that a full case for intellectual disability had never been presented, counsel searched for and located two additional scores from IQ tests he had been administered as a child. One of these scores was a 73 at age eight; the other was a 75, when properly corrected for the Flynn Effect.  Both of these scores constitute evidence of a significant intellectual deficit, satisfying the first prong for a diagnosis of intellectual disability.  Counsel also arranged to have three nationally renowned experts in intellectual disability conduct full evaluations of Mr. Johnson.[23]  Dr. J. Gregory Olley interviewed numerous witnesses, both old and new, who

---

[22] Because Department of Justice regulations provide a petitioner with only one determination on a request for clemency, 28 C.F.R. § 1.10(e), applicants often withdraw their petitions if a ruling becomes unnecessary because of a stay or for another reason.

[23] Dr. J. Gregory Olley is a clinical psychologist and professor emeritus at the University of North Carolina with more than 40 years of experience and a researcher and clinician focused on the diagnosis of intellectual disability in children and adults.  *See* Ex. 2(a) (Olley CV).  Dr. Daniel J. Reschly is a psychologist and professor emeritus at Vanderbilt University with more than 40 years of expertise in intellectual disability and learning disabilities.  *See* Ex. 1(a) (Reschly CV).  Dr. Gary N. Siperstein is a psychologist with more than 50 years of expertise on intellectual disability and is founder and director of the Center for Social Development and Education at the University of Massachusetts at Boston.  *See* Ex. 3(a) (Siperstein CV).

14

described Mr. Johnson's pervasive adaptive deficits.[24]  Many of these witnesses—teachers, psychologists, counselors at the institutional boarding schools Mr. Johnson attended—had documented their observations of Mr. Johnson during his childhood.  All three experts, considering all three prongs, concluded that Mr. Johnson is intellectually disabled.

Although he had no scheduled execution date, Mr. Johnson again requested clemency in 2016 at the close of the Obama Administration.  A central feature of Mr. Johnson's clemency request was a plea to reduce his sentence from death to life without parole in light of the strong evidence of his intellectual disability, based on the assessments of top experts in the field who, applying up-to-date diagnostic standards, were able to take into account all the evidence amassed during the course of trial and § 2255 proceedings, plus the newly found childhood IQ scores and other childhood records, and extensive lay witness records and declarations.

As before, he (along with other applicants at the time) withdrew his petition in early 2017 before it was ruled upon by the departing Administration.

## III.    RELEVANT FACTS AND ISSUES

In order to determine whether § 3596 bars Corey Johnson's execution, because of his intellectual disability, this Court must apply the prevailing medical and legal standards to the evidence.  Under these standards, a finding of intellectual disability requires proof of three

---

[24] Dr. Olley conducted in-person and phone interviews with more than two dozen witnesses. This included family and friends who had known Mr. Johnson all his life and professionals trained to work with children, who had spent time with, observed, and/or evaluated Mr. Johnson at various points in his development.

elements: (1) significant deficits in intellectual functioning, usually represented by IQ scores of 75 or below; (2) significant deficits in adaptive functioning (*i.e.*, "the inability to learn basic skills and adjust behavior to changing circumstances"); and (3) onset before the age of 18. *Moore*, 137 S. Ct. at 1042, 1045 (quoting *Hall*, 572 U.S. at 710), 1048 (recognizing these standards and emphasizing that the AAIDD-11 and DSM-5 are "the most recent (and still current) versions of the leading diagnostic manuals"); *see also* Ex. 75 (AAIDD-11); Ex. 77 (DSM-5).[25]

    *Significant deficits in intellectual functioning.* A deficit in intellectual functioning is typically demonstrated by proof of a valid, reliable IQ score that falls two or more standard deviations below the norm for the general population. An IQ score of approximately 75 or below falls within the presumptive range for intellectual disability because it takes into account the SEM.[26] *Hall*, 572 U.S. at 713, 723; *see also Moore*, 137 S. Ct. at 1049 ("[T]he [SEM] is 'a statistical fact, a reflection of the inherent imprecision of the test itself.' . . . [T]his imprecision

---

[25] These are the standards district courts within the Fourth Circuit have adopted in other federal capital cases, *e.g.*, *Salad*, 959 F. Supp. 2d at 868-69 (applying the AAIDD-11 and DSM–IV–TR standard and holding that "[a]ll three elements are essential to a finding that an individual is intellectually disabled"); *Davis*, 611 F. Supp. 2d at 475, as have other district courts around the country, *e.g.*, *United States v. Hardy*, 762 F. Supp. 2d 849, 856 (E.D. La. 2010); *United States v. Shields*, No. 04-20254, 2009 WL 10714661, at *1-2 (W.D. Tenn. May 11, 2009); *United States v. Smith*, 790 F. Supp. 2d 482, 485 (E.D. La. 2011).

[26] A score of 75 represents an IQ that is two standard deviations below the population mean and accounts for the typical five-point SEM. *See, e.g.*, *Davis*, 611 F. Supp. 2d at 475 ("[T]he SEM in IQ assessments is approximately 5 points, therefore raising the operational definition of mental retardation to 75."); *Hardy*, 762 F. Supp. 2d at 856-57 ("[T]he [American Psychiatric Association or "APA"] and [the American Association on Mental Retardation] direct that the test's measurement error must be taken into account when interpreting its result," and there is "almost universal agreement" that "a score of 75 should be used as the upper bound of the IQ range describing mild mental retardation."); *Smith*, 790 F. Supp. 2d at 490 (same); *see also* Ex. 1 at 8 (Reschly Report).

in the testing instrument 'means that an individual's score is best understood as a range of scores on either side of the recorded score'" within which the individual's true score must be understood to lie. (citations omitted)).

Although not commonly understood at the time Mr. Johnson was tried, it is now well-recognized that IQ tests administered years after such tests were originally developed produce measurably inflated scores, a phenomenon known as the Flynn Effect. *Davis*, 611 F. Supp. 2d at 488 (finding that because Flynn Effect evidence is "both relevant and persuasive," adjusted scores should be used in place of raw scores, and the failure to do so "would be unwise—if not reckless" where a life and death categorization depends on a strict numerical cutoff ); *Shields*, 2009 WL 10714661, at *12 (finding that Flynn Effect "must be considered").[27] Scores on such older tests must be adjusted to correct for this effect; without such adjustments, the scores are invalid reflections of the subject's true intellectual functioning. *Hardy*, 762 F. Supp. 2d at 860 (observing that "where a test with aging norms is used, a correction for the age of the norms is warranted" and collecting cases from the Fourth and Eleventh Circuits, explicitly endorsing use of the Flynn Effect).

An individual need only one qualifying score of 75 or below, even if other scores are above 75. *Hall*, 572 U.S. at 719-20. In *Hall*, the Supreme Court rejected a "rigid rule" that foreclosed further examination of cognitive functioning when an individual has met the threshold on one valid and reliable IQ test because such a rule "creates an unacceptable risk that persons with intellectual disability will be executed." *Id.* at 704; *see also United States v. Wilson*, 170 F. Supp. 3d 347, 366 (E.D.N.Y. 2016) (holding that prong two adaptive deficit analysis is necessary

---

[27] The experts in intellectual disability who evaluated Mr. Johnson employed this standard approach. Ex. 1 at 9-10 (Reschly Report); Ex. 2 at 3-4 (Olley Report); Ex. 3 at 4 (Siperstein Letter).

"if any IQ test, evaluated in the context of a 95% interval, reflects a range falling to 70 or below"). Thus, once a defendant establishes an IQ score of approximately 75 or below, the sentencing court must consider the adaptive functioning criterion of the intellectual disability test. For example, the court in *Wilson* ruled that a federal inmate who had taken *nine* IQ tests between the ages of six and 30, with full-scale scores ranging from 70 to 84 (seven of which were higher than 75) met the intellectual deficit prong for significantly subaverage intellectual functioning because *one* test was reasonably reliable and below the threshold. 170 F. Supp. 3d at 351.

　　*Significant deficits in adaptive functioning.* Adaptive functioning describes "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Salad*, 959 F. Supp. 2d at 877 (quoting DSM-IV-TR at 42); *see also Davis*, 611 F. Supp. 2d at 491 (observing that adaptive functioning encompasses "skills that are required for people to function in their everyday lives"). Thus, a diagnosis of intellectual disability requires significant deficits in at least one of three areas of adaptive functioning: (1) conceptual functioning, (2) social functioning, or (3) practical functioning. *Moore*, 137 S. Ct. at 1050 (citing AAIDD-11 at 47; DSM-5 at 33, 38). Conceptual functioning "includes language, reading and writing, money and time/number concepts, and a range of skills related to self-direction." *Salad*, 959 F. Supp. 2d at 881; *see also* Ex. 2 at 17 (Olley Report). Social functioning "includes interpersonal skills, social responsibility, self-esteem, and gullibility." *Salad*, 959 F. Supp. 2d at 880 n.32. Practical functioning involves "skills related to daily living, personal care, occupational skills, and safety." *Id*. at 882.

18

The adaptive deficits prong is satisfied by a showing of impairment in just one of the three adaptive functioning domains. *Webster v. Watson*, 975 F.3d 667, 685 (7th Cir. 2020) ("*Webster II*") (citing DSM-5 at 38; AAIDD-11 at 27). Moreover, legal and medical standards recognize that within any individual, strengths co-exist with weaknesses; thus, a relative strength in one domain does not serve as a counterweight to an established deficit. *Moore*, 137 S. Ct. at 1050; Ex. 75 at 47 (AAIDD-11). In *Moore*, the Supreme Court emphasized that

> the medical community focuses the adaptive-functioning inquiry on adaptive
> *deficits*. *E.g.*, AAIDD-11 at 47 ("significant limitations in conceptual, social or
> practical adaptive skills [are] not outweighed by the potential strengths in some
> adaptive skills."); DSM-5, at 33, 38 (inquiry should focus on "[d]eficits in
> adaptive functioning"; deficits in only one of the three adaptive-skills domains
> suffice to show adaptive deficits).

137 S. Ct. at 1050 (alterations in original).[28]

Adaptive deficits are typically established by records from childhood, retrospective interviews using modern standardized assessment tools with people who knew the individual well during childhood, and testimonial evidence supplied by family members, friends, teachers, employers, mental health professionals, and others who interacted regularly with him or her. *See Davis*, 611 F. Supp. 2d at 492 (There is a "relative consensus that the best way to retroactively assess a defendant's adaptive functioning is to review the broadest set of data possible and to look for consistency and convergence over time."); *see also, e.g.*, *Roland*, 281 F. Supp. 3d at 478 ("'A valid diagnosis of ID is based on multiple sources of information that include a thorough

---

[28] Intellectual disability evaluations focus on the limitations, not the relative strengths, because it is the impairments that characterize and define an intellectual disability diagnosis. Many people with mild intellectual disability can hold simple jobs, maintain relationships, and sometimes live independently, but they often require significant support. This group of the intellectually disabled (those who are not the severely impaired) can have relative strengths that co-exist with their significant impairments. Ex. 75 at 47 (AAIDD-11).

19

history (social, medical, educational), standardized assessments of intellectual functioning and adaptive behavior, and possibly additional assessments or data relevant to the diagnosis.' [AAIDD-11 at 100]."); Ex. 76 at 18-20 (AAIDD-11 User's Guide).

*Onset before the age of 18.*  Intellectual disability is considered a developmental disability.  Thus, evidence that supports findings of intellectual and adaptive deficits will stem from observations of behavior and capabilities made during the defendant's childhood.[29]  Ex. 77 at 38 (DSM-5).

## IV.    ARGUMENT

### A.    When All the Relevant Data Are Evaluated According to Accurate, Complete, and Prevailing Legal and Medical Standards, Corey Johnson Must Be Adjudged Intellectually Disabled

Drs. Reschly, Olley, and Siperstein, three nationally-recognized experts in intellectual disability who have extensively reviewed Mr. Johnson's life history, testing data, and records, agree that Mr. Johnson is intellectually disabled.  Their opinions are based on a broad universe of information, much of which comes from test results and observations recorded during Mr. Johnson's childhood.  This Motion seeks to place before this Court evidence that, when judged by prevailing legal and medical standards, establishes, as a matter of law, Mr. Johnson's intellectual disability and prohibits the implementation of his death sentence.

---

[29] Additionally, causation is often informative of, but not necessary to, a finding of intellectual disability.  A diagnosis of intellectual disability does not require any determination of a cause; a person must be found to have an intellectual disability if he or she meets the diagnostic criteria, irrespective of causation.  The origins of a person's intellectual disability can be manifold and apparent, or remain unknown.  Still, experts recognize four categories of risk factors— biomedical, social, behavioral, and educational—that form a common pathway that can result in the disability.  *See, e.g.*, *Roland*, 281 F. Supp. 3d at 479; Ex. 77 at 39 (DSM-5); Ex. 75 at 57-61 (AAIDD-11).  Poor education and socialization, and brain damage, for example, do not explain away intellectual disability—rather, they can contribute to it.

### 1. Mr. Johnson Has Significant Deficits in Intellectual Functioning Diagnostic of an Intellectual Disability

Mr. Johnson satisfies the first prong of intellectual disability with four valid and reliable full-scale IQ scores within the presumptive range for intellectual disability.  The following table shows the results of three IQ tests administered to Mr. Johnson during his childhood and one IQ test administered to Mr. Johnson on the eve of his capital trial, with the scores listed with and without correction for the Flynn Effect.

| Corey Johnson's IQ Tests | | | | |
|---|---|---|---|---|
| IQ Test | Year | Age | Full Scale IQ Score | Flynn Corrected IQ Score |
| WISC-R | 1977[30] | 8 | 73 | 72 |
| WISC-R | 1981[31] | 12 | 78 | 75 |
| WISC-R | 1985[32] | 16 | 69 | 65 |
| WAIS-R | 1992[33] | 23 | 77 | 73 |

Ex. 1 at 13-22 (Reschly Report).

These four IQ scores fall within the requisite range when corrected for the Flynn Effect. Even *uncorrected* (though law and medicine demand they all should be corrected), two of Mr. Johnson's scores are within the requisite intellectual disability range.[34]  *See Moore*, 137 S. Ct. at

---

[30] Ex. 33 at 1 (3/25/77 Psychological Exam).

[31] Ex. 38 at 2 (12/11/81 Psychodiagnostic Eval.).

[32] Ex. 51 at 1 (4/15/85 Psychological Eval.).

[33] Ex. 8 at 12 (Excerpt of Cornell Mitigation Information and Report).

[34] In addition to these four valid tests, Corey was administered two additional tests that suffered serious methodological flaws and must be disregarded as invalid. *See Webster II*, 975 F.3d at 686 ("Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence." (citing DSM-5 at 37)).  First, in 1979, when Corey was ten, he was given the original Wechsler Intelligence Scale for Children ("WISC") test.  Ex. 36 at 6-8 (5/21/79 Comm. on the Handicapped Records).  This severely outdated test (from 1949), which yielded a score of 91, was over 30 years old at the time of testing and had been replaced with an updated version of the WISC, five years earlier.  Using an outdated test violates the APA's *Standards for Educational and Psychological Testing*, at that time and now.  Ex. 1 at 15-16 (Reschly Report); Ex. 2 at 13-14 (Olley Report) ("By current psychometric standards, the norms were so old and so culturally out-of-date that their use was inexcusable and their results invalid."); *see also Shields*, 2009 WL 10714661 at *10 (concluding that a test that had been standardized nearly 40 years prior to its administration could have resulted in a "significant" inflation of 25-30 points and was not a true indicator of the defendant's intellectual functioning).

Second, when Corey was twelve and thirteen, he was given the same WISC-R IQ test twice in a span of four months.  In October 1981, Dr. Ernest Adams, staff psychologist at the Council's

22

Center for Problems of Living, administered the WISC-R to Corey, yielding a Flynn Effect adjusted score of 75.  Ex. 38 at 2 (12/11/81 Psychodiagnostic Eval.); Ex. 1 at 17 (Reschly Report).  Then, four months later, on February 8, 1982, Dr. Cary Gallaudet, an inexperienced and unlicensed psychologist, administered the same test and obtained an IQ score of 88.  *See* Ex. 39 at 1 (2/1/82 Psychological Eval.); Ex. 18 ¶  5 (3/19/12 Decl. of C. Gallaudet); Ex. 29 ¶ 13 (6/17/11 Decl. of G. Sakheim).  The Gallaudet test administration was flawed for two main reasons.  The first was its re-administration.  Dr. Gallaudet was unaware that Corey had taken the exact same IQ test four months prior.  Ex. 18 ¶¶ 13-15 (3/19/12 Decl. of C. Gallaudet) (declaring that she would not have administered the same test had she known Corey's past experience taking it).

Re-administration of IQ testing typically results in an inflated score on the second administration due to the "practice effect."

> The *practice effect* refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same instrument."  AAIDD-11 at 38.  According to the AAIDD, "established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence."  *Id.*; *see also* User's Guide at 23.  The APA also recognizes that practice effect is one of the factors that may affect test scores.  *See* DSM-5 at 37.

*Roland*, 281 F. Supp. 3d at 509; *see also Salad*, 959 F. Supp. 2d at 872 (noting "the court should be cognizant of the 'practice effect' . . . phenomenon [that] describes the likelihood of inflated scores on re-administrations of similar IQ tests within a short period of time"); *Hardy*, 762 F. Supp. 2d 849, 857 (disregarding higher score due to practice effect); *United States v. Nelson*, 419 F. Supp. 2d 891, 897-99 (E.D. La. 2006) (giving higher scores less weight because of the practice effect); Ex. 1 at 12-13 (Reschly Report) (discussing practice effect); Ex. 2 at 14-15 (Olley Report) (same); Ex. 3 at 3 (Siperstein Letter) (same).

Dr. Gallaudet also improperly took steps to help Corey better focus his attention on the tasks at hand, actions known to artificially inflate IQ scores.  Ex. 39 at 1 (2/1/82 Psychological Eval.) ("Frequently Corey would interrupt his own work with irrelevant questions about toys, games, and at those times, the examiner would have to help him refocus on the task at hand."); *see also* Ex. 29 ¶¶ 13-21 (6/17/11 Decl. of G. Sakheim); Ex. 1 at 11 (Reschly Report) ("During the administration of an IQ test to Corey Johnson in February 1982, there is documented evidence in the report by Dr. Cary Gallaudet that she provided assistance to Corey Johnson during her administration of that test, which compromised the reliability of her results (see the detailed discussion below)."); *id.* at 19; Ex. 2 at 14 (Olley Report).

23

1049-50 (concluding that IQ score of 74 satisfied the intellectual-functioning prong); *Brumfield v. Cain*, 135 U.S. 305, 315 (2015) (concluding that IQ score of 75 was "squarely in the range of potential intellectual disability"); *Davis*, 611 F. Supp. 2d 472 (concluding that IQ scores ranging from 62 to 73 supported intellectual disability finding); *Hardy*, 762 F. Supp. 2d at 863, 878-79 (concluding that IQ scores of 68 to 71 supported intellectual disability finding); *United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901 at *12-13 (N.D. Ohio Dec. 23, 2010) (concluding that IQ scores of 67 and 72 supported intellectual disability finding).

Drs. Reschly, Olley, and Siperstein agree that Mr. Johnson's IQ test results show a person with significant intellectual functioning deficits. Ex. 1 at 3 (Reschly Report) ("Corey Johnson's reliable IQ scores were consistently two standard deviations below the mean. This satisfies the intellectual functioning prong."); Ex. 2 at 15 (Olley Report) ("Corey Johnson meets the intellectual functioning prong of the intellectual disability framework, because his IQ test results show significant limitations in his intellectual functioning before the age of 18."); Ex. 3 at 4 (Siperstein Letter) ("[B]ased on my 50 years of work in the field of intellectual disability, the conclusions Dr. Reschly draws concerning Corey Johnson's intellectual functioning are irrefutable.").

Mr. Johnson meets the intellectual deficit prong of the diagnostic standards for intellectual disability.

### 2. Mr. Johnson Has Significant Deficits in Adaptive Functioning Diagnostic of an Intellectual Disability

Mr. Johnson also meets the adaptive deficit prong of the diagnostic standard of an intellectual disability. In order to meet this prong, one need only have significant limitations in a single domain of adaptive behavior. Mr. Johnson has significant deficits in all three domains— conceptual, social, and practical—as evidenced by childhood records, standardized assessment

24

tools, information obtained from more than two dozen family members, friends, teachers, and mental health professionals who knew Corey throughout his childhood, and expert evaluations conducted by Drs. Reschly, Olley, and Siperstein.[35]

### a)      Conceptual Domain

As his academic performance records document, and interviews with family and teachers and assessment instruments confirm, Mr. Johnson has had significant deficits in the conceptual domain since childhood.  "The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others."  *Roland*, 281 F. Supp. 3d at 528 (quoting the DSM-5).

*Academic failures.*  Mr. Johnson's school records document his consistent academic failure, reflective of deficits in the conceptual domain, from a young age.  He repeated several grades, including second grade three times, and, as he got older, he fell further and further behind.  Ex. 3 at 35 (Nelson Report); Ex. 2 at 18-19 (Olley Report); Ex. 35 at 2 (2/26/79 Referral to the Comm. on the Handicapped).  At age eight, Corey had "no concept of number facts, no reading skills, [could not] retain sight vocabulary words," and "had difficulty saying the alphabet."  Ex. 31 at 1 (3/4/77 Social History); Ex. 32 at 3 (3/18/77 Learning Consultant Evaluation).  Two years later, at age ten, Corey was referred to the Committee on the Handicapped for "school failure" and, after testing, was placed in Special Education classes.  Ex. 36 at 1, 4 (5/21/79 Comm. on the Handicapped Records); Ex. 2 at 19-20 (Olley Report).

---

[35] Dr. Cornell's mitigation testimony at trial, *see e.g.*, Ex. 7 (2/3/93 Trial Tr.), would have fully supported a finding of the adaptive deficit prong, as well, had he conducted a comprehensive adaptive functioning evaluation.

Corey's academic failures continued in his teens.  At age 13, a social worker reported, "Corey's academic deficits have been a serious problem and he has been left back twice in 3rd and 4th grade. . . .  He currently reads on 2nd grade level and has not improved in quite some time."  Ex. 41 at 1 (3/15/82 Psychosocial Summary).  That same year, another assessment concluded that Corey's reading level was "not quite up to second-grade level."  Ex. 43 at 2 (6/9/82 Current Assessment and Transfer Summary).  A year later, when he was 14, a psychiatrist who evaluated Corey concluded, "He needs very Special Education, and I know of no methods to suggest to remediate his defects, beyond a great deal of individual attention and drill."  Ex. 46 at 2 (8/26/83 Psychiatric Eval.).  And the next year, when he was 15, Corey's academic year was classified as "ungraded" and his assessment once again notes that he "never progressed beyond the 2nd grade reading level."  Ex. 49 at 1 (9/4/84 Current Assessment).

While at the Elmhurst Boys Residence, a group home, from ages 16 to 18, he attended high school but was placed in remedial, special education, and vocational classes.  Even then, Corey failed or got Ds in nearly every class.  Ex. 2 at 21 (Olley Report); Ex. 57 at 1-2 (12/7/87 Scholastic Transfer Record).  His teachers determined that he was unable to pass school competency tests, and he ultimately left high school without graduating.  Ex. 2 at 21 (Olley Report); Ex. 56 at 3 (2/23/87 Form D Final Discharge).

Mr. Johnson stood out to staff and evaluators at his residential placements because of his intellectual deficits.  Ann Harding, a staff member at Pleasantville, observed, "Corey was very slow intellectually. . . .  I do not remember anyone else at Pleasantville who was similarly slow intellectually."  Ex. 19 ¶ 6 (11/21/11 Decl. of A. Harding).  Gerald Lefkowitz, Unit Administrator at Pleasantville Cottage Center, noted, "Corey stood out as being particularly slow intellectually compared to the other residents at the Cottage."  Ex. 27 ¶ 9 (12/5/11 Aff. of G.

26

Lefkowitz).  Corey's caseworker at Elmhurst, Odette Noble, saw Corey's comparatively weaker intellectual abilities.  "Compared to virtually all of the other boys I encountered at Elmhurst, Corey was much weaker cognitively."  Ex. 28 ¶ 7 (12/1/11 Aff. of O. Noble).  And, David Washington, a childcare worker at Elmhurst, had a similar perspective.  "My impression was that while there were many boys with below normal intellectual ability and various levels of functioning, almost all of the other boys there were more intelligent than Corey."  Ex. 30 ¶ 7 (3/1/12 Aff. of D. Washington).

Corey failed academically despite having an evident strong self-motivation to learn.  He "wanted to live [at Pleasantville Cottage School] to get help."  Ex. 7 (2/10/93 Trial Tr. 3601); *see also* Ex. 39 at 3 (2/1/82 Psychological Eval.) (reporting that "he continues to be an ambitious boy who is motivated to improve his situation"); Ex. 44 at 1 (1/31/83 Current Assessment) ("He is truly motivated to do well and to succeed and has not yet given up on himself. . . .  Corey's progress in his class has been very, very, very slow almost to the point where one might feel that he is not learning.").  Throughout his time there, Corey generally "remained cooperative, eager to learn, and willing to take on the challenge of his disability."  Ex. 7 (2/10/93 Trial Tr. 3584).

*Reading, writing, and math deficiencies.*  When he was 13, one school evaluator noted that Corey was barely able to write his own name and "was unable to read single syllable short vowel words in isolation" and "did not know the sounds of g and c[,] . . . was not sure of the consonant sound of m and y, [and] did not know the rule of silent e."  Ex. 40 at 1-2 (2/22/82 Screening Upon Admission).  In 1983, when Corey was 14, he scored in the bottom one percent on an achievement test, which means he scored "as low as you go" and "at the bottom."  Ex. 7

27

(2/10/93 Trial Tr. 3590).[36]  At age 16, Corey's reading comprehension, oral comprehension, sight vocabulary, and arithmetic ability were on a second- to third-grade level.  Ex. 2 at 20-21 (Olley Report); *see also* Ex. 53 at 3 (7/1/85 IEP - Phase 1).  When Mr. Johnson was 24, Dr. Cornell administered the Test of Written Language and the Woodcock-Johnson Test of Achievement-Revised, which measures both language and math skills.  Mr. Johnson scored grade-level equivalents between second and sixth grades.  Ex. 2 at 21 (Olley Report); Ex. 8 at 14-17 (Excerpt of Cornell Mitigation Information and Report).  As Dr. Cornell testified, achievement test scores at the sixth-grade level or below are consistent with intellectual disability.  Ex. 7 (2/10/93 Trial Tr. 3693) ("We now know that a mildly retarded person can be educated up to about the sixth-grade level.").

Although experts caution against evaluating behavior in an institutional setting when assessing intellectual disability, prison testing may, in certain instances, be relevant.  Prison records note that obtaining his GED by passing the required examination is one of Mr. Johnson's lifetime goals.  Since his incarceration almost 30 years ago, Mr. Johnson has diligently studied to become eligible to take GED exams.  However, he has remained in the pre-GED stage, never having passed the test.  In 2014, when Mr. Johnson was 45, Dr. Reschly administered the then-latest version of the Woodcock-Johnson Test of Achievement III.  Mr. Johnson's results placed him in the second- to fourth-grade range for every subject area except concrete math

---

[36] This testimony by Dr. Cornell was based on the results of an achievement test administered in March 1983 by Dr. Kenneth Barish.  Ex. 45 at 2 (4/29/83 Psychological and Educational Eval.). Dr. Barish later stated, "Nearly 30 years after I met and evaluated him, Corey still stands out in my mind due to his profound impairment in learning.  Corey's deficit in phonological processing remains the most profound impairment of this kind I have encountered in three decades of clinical practice."  Ex. 11 at ¶¶ 8-9 (7/22/14 Decl. of K. Barish).  Dr. Barish considered Corey's deficit "so profound that [he has] used it over the past 30 years as a teaching example in [his] classes."  *Id*. at ¶ 11.

calculations,[37] and his overall total grade equivalent, even accounting for his relative strength in math, was still in the fourth-grade range, as represented in the table below.

| Achievement Cluster | Standard Score | Grade Equivalent |
|---|---|---|
| Broad Written Language | 74 | 2.8 |
| Oral Language | 83 | 3.5 |
| Broad Reading | 76 | 4.1 |
| Broad Math | 89 | 8.2 |
| Total Achievement | 77 | 4.6 |

Ex. 1 at 30 (Reschly Report).

*Language and communications deficiencies.*  Mr. Johnson's records show that his significant deficits in language and communication started at an early age.  Dr. Olley, after reviewing scores of records, concluded, "Corey Johnson has never demonstrated the conceptual aspects of communication appropriate for his age, and, instead, his language and communication abilities are significantly impaired."  Ex. 2 at 24 (Olley Report).  When Corey was eight, Dr. F. A. Figurelli, a psychiatrist, noted that he "reveal[ed] a speech defect."  Ex. 2 at 23 (Olley Report).  Similarly, Mr. Johnson's records from Pleasantville repeatedly described him as having speech difficulties and deficits as a teenager.  Ex. 2 at 23 (Olley Report).  When Corey was just shy of 15, speech, language, and vocabulary testing revealed that he was approximately two or five years below his chronological age in several categories, leading the evaluator to conclude that he had "a significant speech and language disorder of a receptive and expressive nature."  Ex. 47 at 4 (10/5/83 Speech and Language Eval.).  Dr. Cornell testified to Mr. Johnson's

---

[37] Dr. Olley attributes this improvement in prison to significant practice and efforts on Mr. Johnson's part to improve his performance.  Ex. 2 at 22 (Olley Report).

29

"communication deficits with his speech impairment and communication problems." Ex. 7 (2/10/93 Trial Tr. 3691).

Mr. Johnson's friends and family recall similar limitations in his communication and comprehension skills. Both his aunt, Minnie Hodges, and his grandmother, Esther Johnson, recall that Corey had trouble following oral directions and that they often had to repeat themselves many times before he understood. Ex. 2 at 23-24 (Olley Report). His cousin, Queenie Hodges, recalls, "[W]henever [Corey] talked, he was disorganized in his speaking and would frequently change topics. Over the past 19 years, I have seen a number of letters Corey has written. The letters he writes are similarly disorganized; the letters are almost nonsensical." Ex. 22 ¶ 5 (4/30/11 Aff. of Q. Hodges). In general, Corey "had difficulty communicating." Ex. 16 ¶ 13 (5/21/11 Aff. of C. Daniels).

*Problems with numbers, money, and time.* Mr. Johnson fares badly with concepts involving numbers, money, and time. At age eight, contemporaneous records document that he had "[n]o concept of number facts," and, when asked his date of birth, "[h]e thought he was born in March," although he was actually born in November. Ex. 2 at 24-25 (Olley Report); Ex. 33 at 1 (3/25/77 Psychological Exam).

When he was 13, although he understood that there are twelve months in the year, he could recite them in sequence only up to August. Ex. 40 at 3 (2/22/82 Screening Upon Admission); *see also* Ex. 22 ¶ 12 (4/30/11 Aff. of Q. Hodges). At 13, Corey was also unable to tell time. Ex. 26 ¶ 13 (6/3/11 Decl. of L. Klerer). He was assessed to have, at best, third-grade math skills; he could not divide a single digit number by two, multiply by three, or read numbers that were more than four digits long. Ex. 40 at 2 (2/22/82 Screening Upon Admission).

30

Multiple family members reported that he was not trusted with money because he was unable to calculate change.  Ex. 22 ¶ 12 (4/30/11 Aff. of Q. Hodges); Ex. 20 ¶ 40 (4/30/11 Aff. of M. Hodges); Ex. 24 ¶ 62 (6/29/11 Aff. of R. Johnson); Ex. 23 ¶ 26 (4/30/11 Decl. of E. Johnson); Ex. 25 ¶ 39 (5/21/11 Aff. of A. Joseph).  When Corey was 16, social worker Gerald Maier included as an objective for Corey to work toward: "learn[ing] enough simple arithmetic th[at] he will be able to figure out correct change."  Ex. 52 at 9 (5/28/85 Discharge/Transfer Plan).

*Lack of judgment, planning, and problem-solving skills.*  Mr. Johnson has deficits in judgment, planning, and problem solving that manifested themselves in childhood.  Corey displayed the naïve and highly gullible behavior often associated with those suffering from intellectual disabilities.  Also indicative of intellectual disability, in his teens and later, Mr. Johnson exhibited poor judgment and made rash decisions, often to his own detriment and physical harm.  Ex. 2 at 25-26 (Olley Report); Ex. 25 ¶ 39 (5/21/11 Aff. of A. Joseph); Ex. 21 ¶ 15 (4/30/11 Aff. of P. Hodges).

Mr. Johnson lacks problem-solving skills.  For example, Darold Brown, a member of the Trenton drug group with which Mr. Johnson was involved, observed, "Corey could not handle a job where unexpected problems came up, as he would not know what to do."  Ex. 14 ¶ 29 (6/15/11 Aff. of Darold Brown).  When Mr. Johnson was living in Trenton, his girlfriend once asked him to pay a phone bill in downtown Trenton.  She reported that he went downtown to do so but did not pay the bill.  He claimed he had forgotten, but she believed he could not figure out how to do it.  Ex. 17 ¶ 5 (7/16/12 Decl. of M. Dawkins).

*Expert opinions and results of the ABAS-II test of adaptive deficits.*  Each of the experts has concluded that Mr. Johnson has significant adaptive deficits in the conceptual domain.  Ex. 2

31

at 27 (Olley Report); Ex. 1 at 32 (Reschly Report); Ex. 3 at 4-5 (Siperstein Letter).[38]  The three

expert witnesses arrived at this conclusion based on their review of contemporaneous records of

Mr. Johnson's youth from teachers, social workers, psychologists, and psychiatrists who knew or

treated Mr. Johnson, the results of achievement tests administered to Mr. Johnson, and

statements from more than two dozen family members, friends, acquaintances, other prisoners,

and professionals who knew him as a child, adolescent, and/or adult.[39]

In addition, Dr. Olley administered the ABAS-II, a standardized tool developed to assess

adaptive functioning,[40] to three adults who knew Mr. Johnson well when he was a child.  Much

like IQ scores, ABAS-II scores are reported as standardized scores with a mean of 100, a

standard deviation of 15, and the intellectual disability range beginning approximately two

standard deviations below the mean (approximately 70).  As noted in the table below, one of his

---

[38] Dr. Cornell also found deficits in Mr. Johnson's language skills and judgment. Ex. 7 (2/10/93 Trial Tr. 3685-86) (describing the results of a written language test Dr. Cornell had given Mr. Johnson and noting his writing and spelling were "very immature"); *id.* 3693-94 (acknowledging Mr. Johnson had "impaired ability to use good judgment to control his behavior" and "impaired ability to understand and foresee the consequences of his actions").

[39] Drs. Olley and Reschly met with Mr. Johnson in person, and Dr. Reschly administered the achievement tests to him.  In addition, Dr. Olley interviewed approximately two dozen people who have known Mr. Johnson at various stages of his life.  For a complete recitation of information considered in reaching their opinions, see Exhibits 1 and 2.

[40] As described in Dr. Olley's report, the ABAS-II is a rating scale administered to individuals familiar enough with the subject to rate the subject in certain areas related to adaptive functioning.  Ex. 2 at 16 (Olley Report).  Dr. Olley administered the ABAS-II to three individuals, who provided responses to standardized questions, which produced scores that assess Mr. Johnson's adaptive functioning.  The individuals were Antoinette Daniels Joseph, the best friend of Mr. Johnson's mother and Corey's godmother; Minnie Hodges, Mr. Johnson's maternal aunt; and Richard Benedict, Mr. Johnson's former teacher and administrator at Pleasantville Cottage School.

conceptual domain scores fell two standard deviations below the mean when accounting for the

SEM; and the others fell well below that.[41]

| ABAS-II RATERS | CONCEPTUAL DOMAIN SCORES |
|---|---|
| Antionette Joseph | 63 |
| Minnie Hodges | 57 |
| Richard Benedict | 74 |

Ex. 2 at 27 (Olley Report).

### b)      Social Domain

Mr. Johnson has significant impairments in the social domain, as reflected in

contemporaneous records created during his childhood and anecdotes reported by people who

knew him during his childhood, adolescence, and adulthood, as well as standardized adaptive

functioning test results.  The social domain of adaptive functioning includes interpersonal skills,

friendships, leadership, gullibility, naivete, and victimization.[42]

*Interpersonal skills and friendships.*  In his youth, Mr. Johnson was a loner who was

often taken advantage of by his family and school peers.  Corey's grandmother, Esther Johnson,

---

[41] Richard Benedict was a teacher for several years at Mr. Johnson's institutional school placement.  It is well documented that people with intellectual disability will fare better within almost any institutional setting because they are getting the very supports they need in such placements.  *See infra* note 46.

Yet even with the substantial aids provided in the highly supportive institutional setting of this boarding school for children requiring special education, Mr. Johnson still performed at a significantly impaired level.  This is borne out by Mr. Benedict's own assessment.  He noted that "[w]hile the diagnostic testing results are generally consistent with my personal experience teaching Corey, I believe that, if anything, the results may have somewhat overstated Corey's abilities.  Corey performed worse in an uncontrolled environment." Ex. 12 ¶ 9 (12/5/11 Aff. of R. Benedict).

[42] Ex. 75 at 43-45 (AAIDD-11); Ex. 76 at 15 (AAIDD-11 User's Guide).

observed that "growing up, Corey did not engage much with other children and did not make friends easily." Ex. 2 at 29 (Olley Report). She viewed him as "withdrawn socially both as a child and a teenager." *Id*. When he was ten, a teacher referred Corey for special education services, noting that he had "poor peer relations." Ex. 34 at 1 (12/11/78 Case Service). At age 13, records indicate that Corey "relate[d] like a younger child and appear[ed] limited. . . . Corey does not have friends." Ex. 41 at 3 (3/15/82 Psychosocial Summary). Later that year, another caseworker observed that Corey was "frequently isolated from the other children," did "not appear ready to engage with other children," and was "frightened and expects to be rebuffed." Ex. 43 at 2-3 (6/9/82 Current Assessment and Transfer Summary). She concluded that Corey "will need a good deal of experience and contact before he will be ready to engage." *Id*. at 3. Dr. Olley concluded that Corey was "a solitary, fearful child who had few friends and felt most comfortable playing by himself or with younger children." Ex. 2 at 27 (Olley Report). And, as he got older, "Corey had real problems in understanding how to interact with his peers and adults and marked difficulty in understanding social cues and norms." *Id*. at 28.

Psychiatrist Richard Dudley, a trauma expert who evaluated Mr. Johnson in person as an adult and conducted an extensive review of his social and educational history, noted that Mr. Johnson's "placement records indicate that although he clearly was willing to do anything to be liked, he lacked the social skills required to successfully do that in appropriate ways." Ex. 5 at 7 (Dudley Report).[43]

---

[43] Dr. Dudley attributed much of this to the "extremely difficult childhood that [Mr. Johnson] endured [which] also directly resulted in other underlying developmental difficulties" related to his social functioning, including interpersonal relationships, self-image, affects, and decision-making, all important aspects of the social domain. Ex. 5 at 11 (Dudley Report).

34

*Leadership, gullibility, naivete, and victimization.* Multiple reporters described Mr. Johnson as a follower, not a leader. This, too, can be a hallmark of intellectual disability.[44] Ms. Harding, who knew Corey from 1982 to 1985 when Corey was a teenager, observed, "I do not think Corey possessed leadership qualities. To the contrary, he was more of a follower than a leader in his interactions." Ex. 2 at 31 (Olley Report). Janet Valentine, a counselor at Pleasantville Cottage School, noted, "He was a follower. He was not a leader at all." *Id.*; Ex. 58 at 2 (Outline for Cottage Report) ("Most of the time he stays by himself. He [is scared] of the other kids."). Mr. Benedict thought Corey wanted to "please" adults and was not a leader. Rather, "[b]eing a leader doesn't match Corey." Ex. 2 at 31 (Olley Report); Ex. 27 ¶ 14 (12/5/11 Aff. of G. Lefkowitz) ("Corey was more easily influenced than the other children at the Cottage and was a follower."); *see also* Ex. 12 ¶ 12 (12/5/11 Aff. of R. Benedict).

Mr. Johnson was victimized by his peers. Mr. Johnson's aunt, Minnie Hodges, reported:

> Other people took advantage of him, such as taking his lunch money. People found it easy to take advantage of him all throughout his childhood and teen years. He wouldn't understand others but didn't want to look bad, so other children easily tricked and manipulated him.

Ex. 20 ¶ 44 (4/30/11 Aff. of M. Hodges). His cousin, Priscilla Hodges, said other kids "would take his money, ball, or other possessions. Corey would not assert himself with these other kids." Ex. 21 ¶ 14 (4/30/11 Aff. of P. Hodges). She continued:

> Corey was easily influenced by others and could be persuaded to do things that, in my view, showed very poor judgment. He would go to great lengths—and jeopardize his own well-being—just to fit in with the crowd.

*Id.* ¶ 15; *see also* Ex. 25 ¶ 39 (5/21/11 Aff. of A. Joseph) ("[P]eople took advantage of [Corey] because he would readily give his money away.").

---

[44] Ex. 75 at 43-45 (AAIDD-11); Ex. 77 at 38 (DSM-5).

35

Similarly, at Elmhurst, people knew him "as someone who could be convinced to do what you asked him to do."  Ex. 30 ¶ 13 (3/1/12 Aff. of D. Washington).  Mr. Washington, a childcare worker at Elmhurst, recalled that Corey "would generally go along with what others wanted to do."  *Id.* ¶ 12.  Corey's caseworker also reported that he was "susceptible to peer pressure" and "did not have a good 'read' of situations or other people."  Ex. 28 ¶¶ 17-18 (12/1/11 Aff. of O. Noble).  She explained:

> Corey could be easily influenced into doing what his peers wanted him to do. If some of his more intellectually developed peers convinced Corey to do something, he would go along with it even if he did not perceive any logical reason for doing so.  He would act in this way in circumstances in which, if he had been more intelligent, he would have realized that his actions could get him into difficulty.

*Id.* ¶ 20.

Mr. Johnson was a "poor social decisionmaker."  *Id.*; *see also* Ex. 7 (2/10/93 Trial Tr. 3694-95).  He "lacked the ability to understand the consequences that his actions could have." Ex. 28 ¶ 16 (12/1/11 Aff. of O. Noble).  Corey's desire to be accepted by his peers led him to engage in risky behavior.  Ex. 2 at 35 (Olley Report); Ex. 21 ¶ 16 (4/30/11 Aff. of P. Hodges) (describing an incident when peers persuaded Corey to roller skate down "an incredibly steep hill, an act that no one else would attempt"); *id.* ¶ 17 ("[W]hen Corey was also a young teen, Corey's 'friends' told him to ride his bike across a busy two-way street in the middle of traffic.  I warned Corey not to do it, but he did it anyway. He made it across the street but was nearly hit by a car.  The driver had to slam on his brakes to avoid hitting Corey.").

*Expert opinions and results of the ABAS-II test of adaptive deficits.*  The ABAS-II results noted in the table below show that one of the raters' observations resulted in a score for the social domain considerably lower than two standard deviations below the mean.  The two other scores were significantly above this level, but Dr. Olley notes in reporting these two scores that

36

they are inconsistent with information the raters provided in interviews with him.  Ex. 2 at 33

(Olley Report).

| ABAS-II RATERS | SOCIAL DOMAIN SCORES |
|---|---|
| Antionette Joseph | 56 |
| Minnie Hodges | 81 |
| Richard Benedict | 88 |

*Id.*

Drs. Olley, Reschly, and Siperstein all believe that interviews conducted with an

extensive array of professionals, family, and friends who provided vivid descriptions of Mr.

Johnson's social abilities, along with the documented historical evidence, provide strong support

that Mr. Johnson has significant limitations in the social domain, consistent with intellectual

disability.  Ex. 2 at 34 (Olley Report); Ex. 1 at 32, 37 (Reschly Report); Ex. 3 at 4 (Siperstein

Letter); *see also* Ex. 5 at 7, 11 (Dudley Report).

### c)      Practical Domain

As with the conceptual and social domain, Mr. Johnson's inability to perform practical

tasks and life skills are consistently reflected in contemporaneous records created during his

childhood, achievement testing results, anecdotes described during interviews with people who

knew him during his childhood, and the ABAS-II test results.  The practical domain is generally

considered to encompass skills that involve navigating through the typical tasks that one faces on

a regular basis, including things like personal and self-care; travel and transportation; health and

safety; home living; and work.  Ex. 77 at 37 (DSM-5).  Those who know him have observed that

Corey did not have the capacity to take care of himself.

*Self-care.*  Corey wet and soiled his bed until he was about 12 years old.  Ex. 2 at 34

(Olley Report); Ex. 20 ¶ 36 (4/30/11 Aff. of M. Hodges); Ex. 21 ¶ 9 (4/30/11 Aff. of P. Hodges);

Ex. 22 ¶ 9 (4/30/11 Aff. of Q. Hodges); Ex. 7 (2/10/93 Trial Tr. 3576).  Corey neglected his

teeth, and dental problems resulted.  Ex. 2 at 34 (Olley Report); Ex. 37 at 1 (12/9/81 Child

Assessment Eval.) (noting Corey's dental cavities and gingivitis).  He needed constant reminders

to keep himself clean.  Ex. 2 at 34 (Olley Report).  When he was living in Trenton as a young

adult, people who visited him described his home as "filthy," "old, dark, and dirty" and "strewn

with trash, dishware, and clothes."  Ex. 24 ¶ 70 (6/29/11 Aff. of R. Johnson); Ex. 2 at 34 (Olley

Report).

*Transportation and travel.*  As a child through adolescence and his teen years, Corey was

not trusted to travel alone, and he relied on others to get around.  As a child, caregivers asked

Corey's *younger* half-brother, Robert, to lead Corey around when they went out together.  Ex. 2

at 34 (Olley Report).[45]  His individualized education plan from Pleasantville notes, "Corey needs

travel training until he is familiar with route and new neighborhood."  Ex. 53 at 7 (7/1/85 IEP -

Phase 1); Ex. 2 at 36 (Olley Report).  Mr. Benedict, Corey's teacher when he was 16-17,

reported that the Pleasantville staff "assigned an aide to accompany Corey to the bathroom and

waited outside when Corey was using it.  Previously, when no aide was assigned to do so, Corey

would get lost on his way back to our class and wander into other classrooms."  Ex. 12 ¶ 17

(12/5/11 Aff. of R. Benedict).  Corey never obtained a driver's license; as an adult, he relied

primarily on cabs for transit.  Ex. 2 at 34 (Olley Report).

*Home living.*  Mr. Johnson has never been able to develop the skills necessary to live on

his own.  This was not surprising given the limitations recognized in records from Pleasantville

---

[45] Records indicate Corey even had trouble navigating his residential placement.  Ex. 42 at 5
(5/21/82 Reassessment Summary) ("[Corey] [age 13 and a half] is slow to understand things.
Cottage staff will make special effort to acclimate him to routine and provide a predictable
environment for him.").

(age 13, 15 and 16) and Elmhurst (age 17).  According to Gloria Caro, a caseworker at Pleasantville, at 13 and a half, Corey was "slow to understand things.  Cottage staff will make special effort to acclimate him to routine and provide a predictable environment for him."  Ex. 42 at 5 (5/21/82 Reassessment Summary).  Both Pleasantville and Elmhurst established goals for him such as, "Corey will use opportunities offered him to learn independent living skills," and "Corey will learn how to handle money so that he can shop for himself."  Ex. 48 at 2 (4/13/84 Change in Permanency Plan); *see also* Ex. 50 at 8 (12/12/84 Visitation Plan) (setting the same goals); Ex. 52 at 9 (5/28/85 Discharge/Transfer Plan) (same); Ex. 54 at 6 (11/21/85 Service Plan Review 6 Month) (same); Ex. 55 at 7 (6/28/86 Service Plan Review 6 Month) (same).  There are no indications in the records that Corey ever achieved these goals.

After leaving institutional school settings, Corey moved in with his mother and half-brother, had a brief stay with the father of his half-brother and his wife, and then lived with a series of girlfriends and acquaintances.  Ex. 2 at 8 (Olley Report).  Ms. Noble told Dr. Olley, "He's the kind of kid who I don't think could make it on his own—pay his rent, etc.  Some people should stay in a protected setting all their lives."  *Id*. at 37; *see also* Ex. 28 ¶ 38 (12/1/11 Aff. of O. Noble).

Corey's aunt remembers his inability to do simple tasks to take care of himself.  For example, "[a]t age 10-13, he couldn't prepare a meal or even a simple sandwich.  By age 15, he only improved a little in that he didn't make as much of a mess when preparing simple meals.  I didn't give him much to do because he couldn't do it."  Ex. 20 ¶ 38 (4/30/11 Aff. of M. Hodges).  When Corey was 18 and living with Ann and Robert Butler, Ms. Butler noted, "[H]e was still like a little boy. He could not have taken care of himself on his own."  Ex. 2 at 38 (Olley Report).

39

*Work.*  Mr. Johnson has a very limited work history.  While at Pleasantville, he had a couple of summer jobs doing manual labor, which he could not maintain.  Ex. 2 at 39 (Olley Report).  His family and friends did not recall that he ever held a job.  *Id.*; Ex. 52 at 6 (5/28/85 Discharge/Transfer Plan) ("[Corey] work[ed] for a few weeks in a grocery store.  He was not able to maintain this, an indication of how much work needs to be done in this area.").

Other than participating in structured job programs while at Elmhurst, Mr. Johnson's only "job" was selling drugs.  Even his acquaintances in these activities depicted Corey as challenged in his ability to count money and keep track of drug sales.  They described him as a passive participant who followed the directions of others.  Ex. 24 ¶¶ 60-63 (6/29/11 Aff. of R. Johnson); Ex. 13 ¶¶ 9-11 (10/14/11 Aff. of Darnell Brown); Ex. 14 ¶¶ 11-12, 20, 25-26 (6/15/11 Aff. of Darold Brown).

At trial, Dr. Cornell concluded, "Self care . . . work, the ability to maintain a job, to have good work habits, to use the kinds of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level."  Ex. 7 (2/10/93 Trial Tr. 3691).

*Expert opinions and results of the ABAS-II test of adaptive deficits.*  The ABAS-II results noted in the table below show that two of the raters' observations resulted in scores for the practical domain considerably lower than two standard deviations below the mean.  Mr. Benedict's scores were significantly above this level, but Dr. Olley noted that this was understandable given that Mr. Benedict only knew Mr. Johnson while he was living in an institutional setting where supports and structure can artificially inflate the scores.[46]

---

[46] Experts caution against evaluating institutional behavior when assessing adaptive functioning. *See Hardy*, 762 F. Supp. 2d at 899 (noting that "an institutional environment of any kind necessarily provides 'hidden supports'"); *Roland*, 281 F. Supp. 3d at 544 (Experts testified that institutional settings, including prisons, typically provided ongoing support and a structured environment that enabled intellectually disabled persons to improve.).  As a result, modern

| ABAS-II RATERS | PRACTICAL DOMAIN SCORES |
|---|---|
| Antionette Joseph | 60 |
| Minnie Hodges | 65 |
| Richard Benedict | 88 |

Ex. 2 at 40 (Olley Report).

Drs. Olley, Reschly, and Siperstein all believe the records, interviews, and ABAS-II results strongly support a finding that Mr. Johnson has significant limitations in adaptive functioning in the practical domain, beginning in childhood and continuing through adolescence, and into adulthood.  Ex. 2 at 1-2, 34-41 (Olley Report); Ex. 1 at 3, 25, 32 (Reschly Report); Ex. 3 at 4-6 (Siperstein Letter).

### d)      Adaptive Behavior Composite

As noted earlier, in order to meet the adaptive behavior prong of an intellectual disability diagnosis, an individual need only have significant limitations in a single domain.  As noted above, Mr. Johnson has significant deficits in all three.

In addition, the ABAS-II produces a composite score, the General Adaptive Composite (the "GAC"), which both measures the degree to which a person's overall adaptive functioning

---

scientific standards emphasize, for example, assessing skills "not within the structured prison environment but 'within the context of ordinary community environments typical of the person's age peers and tied to the person's individualized needs for support.'"  *Webster II*, 975 F.3d at 686 (citing AAIDD-11 at 16 and DSM-5).

Yet even with the substantial aids provided in the highly-supportive institutional setting of this boarding school for children requiring special education, Mr. Johnson still performed at a significantly impaired level.  This is borne out by Mr. Benedict's own assessment.  He noted that "[w]hile the diagnostic testing results are generally consistent with my personal experience teaching Corey, I believe that, if anything, the results may have somewhat overstated Corey's abilities. Corey performed worse in an uncontrolled environment."  Ex. 12 ¶ 9 (12/5/11 Aff. of R. Benedict).

departs from the mean, and identifies the percentile of the population into which an individual fits, relative to the general population. A score of 75 or below meets the standard for the adaptive prong of an intellectual disability diagnosis. Ex. 2 at 40 (Olley Report).

The table below shows the GAC for each of the three raters. Mr. Johnson has GAC scores below 75 from each of them.

| ABAS-II RATER | GENERAL ADAPTIVE COMPOSITE SCORE | PERCENTILE OF POPULATION |
|---|---|---|
| Antoinette Joseph | 60 | 0.4 |
| Minnie Hodges | 64 | 1 |
| Richard Benedict | 74 | 4 |

*Id*.

Drs. Olley, Reschly, and Siperstein agree that Mr. Johnson meets the adaptive behavior prong of an intellectual disability diagnosis and has deficits in all three domains. Ex. 2 at 2, 17, 40 (Olley Report); Ex. 1 at 3, 25, 32 (Reschly Report); Ex. 3 at 4-5 (Siperstein Letter).

### 3. The Onset of Mr. Johnson's Intellectual and Adaptive Deficits Began Well Before the Age of Eighteen

Mr. Johnson's significant limitations in intellectual and adaptive functioning manifested themselves during his developmental period, as evidenced by the IQ test scores he achieved during childhood and the contemporaneous records created during his childhood, and corroborated by interviews with numerous reporters who knew Mr. Johnson during his formative years as well as the results of standardized adaptive functioning instruments. This evidence has been assessed by Drs. Reschly, Olley and Siperstein, who all agree his disability began in childhood. Ex. 2 at 1 (Olley Report); Ex. 1 at 45 (Reschly Report); Ex. 3 at 7 (Siperstein Letter). These experts also have reported that Mr. Johnson experienced the biomedical, behavioral,

42

educational, and social risk factors that can result in intellectual disabilities.[47]  While an

intellectual disability diagnosis does not require proof of causation, Mr. Johnson's personal,

family, and social history lend support to the corroborated evidence of his intellectual disability.

*Roland*, 281 F. Supp. 3d at 479.

In sum, Mr. Johnson is a person with intellectual disability and meets all requirements for

such a diagnosis according to the standards identified by the medical community and in federal

capital case law.  Under 18 U.S.C. § 3596(c), his death sentence cannot be "carried out."

**B.      Mr. Johnson's Motion Is Not "Second or Successive" Under the Gatekeeping Provision of 28 U.S.C. § 2255(h)**

Although this Motion is not the first Mr. Johnson has filed, it is nevertheless not a

successive pleading.  It is properly before this Court.

As the Supreme Court has repeatedly explained, the phrase "second or successive" "does

not simply 'refe[r] to all [§ 2255] applications filed second or successively in time.'"  *Magwood*

*v. Patterson*, 561 U.S. 320, 332 (2010) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 944

(2007)).  Rather, the phrase "second or successive" is a "term of art" that takes its full meaning

from the Supreme Court's case law, including decisions predating the enactment of the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  To determine whether a

---

[47] Mr. Johnson's childhood trauma is well documented.  Debra Nelson, a mitigation specialist, prepared a comprehensive report of his life.  Ex. 4 (Nelson Report).  Dr. Dudley provided an analysis of the systematic trauma that Corey suffered throughout his childhood and adolescence. Ex. 5 (Dudley Report).  Mr. Johnson's childhood history includes many specific risk factors as well, including: young parents, poverty, domestic violence, parental drug use, parental immaturity, parental abandonment, and child abuse and neglect.  *See Hall*, 572 U.S. at 706 (recognizing that the defendant's upbringing, which was "under the most horrible family circumstances imaginable," "appeared to make his deficits in adaptive functioning all the more severe" (citation omitted)); *Moore*, 137 S. Ct. at 1051 ("[T]raumatic experiences, however, count in the medical community as "risk factors" for intellectual disability").

43

second-in-time pleading should be deemed successive, a court must look to the purposes of the

AEDPA, which are "to further the principles of comity, finality, and federalism." *Panetti*, 551

U.S. at 947. The Supreme Court has cautioned courts to ensure that "petitioners [do not] 'run the

risk' under the proposed interpretation of forever losing their opportunity for any federal review"

and to "resist[] an interpretation of the statute that would . . . 'close our doors to a class of habeas

petitioners seeking review without any clear indication that such was Congress' intent.'" *Id*. at

946 (citation omitted); *see also Castro v. United States*, 540 U.S. 375, 380-81 (2003).

A second-in-time petition should be treated as non-successive where the asserted claims

did not arise until after a prior petition was filed, where the claim was premature, or where a

subsequent filing is contemplated by statute. *See United States v. Hairston*, 754 F.3d 258, 262

(4th Cir. 2014); *see also Garza v. Lappin*, 253 F.3d 918, 922-23 (7th Cir. 2001) (allowing

second-in-time claim where issue, by its very nature, could only be raised after first post-

conviction review was completed).[48] Mr. Johnson's motion presents such a claim.

### 1. Mr. Johnson's Claim Is Not Successive Because a Statute Provides for Review When an Execution Date Is Imminent

Mr. Johnson brings his claim pursuant to 18 U.S.C. § 3596(c), a statute governing

implementation of a death sentence. The plain language, structure, and statutory history of the

FDPA establish that Mr. Johnson is permitted to raise his status as a person with intellectual

---

[48] Mr. Garza proceeded under § 2241 but only after the Fifth Circuit deemed his pleadings successive. The Seventh Circuit, in its subsequent opinion, questioned that holding and suggested that, under *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), his claim should have been considered non-successive. *Garza*, 253 F.3d at 923. Ultimately, the Seventh Circuit speculated that the Fifth Circuit must have rejected such an argument because Martinez-Villareal had previously raised the claim and it had been dismissed whereas Garza had not raised it in his initial § 2255. *Id*. at 924. As this Court is aware, the Supreme Court in *Panetti* explicitly rejected that Fifth Circuit reasoning several years later.

44

disability now, at the time when he has a pending execution date.  Unlike other claims by federal inmates seeking to challenge their convictions or sentences that must be raised in an initial § 2255 motion, this provision contemplates that, where applicable, a determination of "mental retardation" will be made when the government sets an execution date.

This statute creates an independent, substantive prohibition on the implementation of the sentence based on intellectual disability.  It is unique to the federal death penalty: the § 2254 statute, pursuant to which state prisoners must raise their challenges, lacks a corresponding proscription.  One analogue in § 2254 proceedings, however, is the jurisprudentially required mechanism for resolving mental competency claims when an execution becomes imminent.  *See Panetti*, 551 U.S. at 934-35; *Martinez-Villareal*, 523 U.S. at 644-45; *Ford v. Wainwright*, 477 U.S. 399, 418 (1986).

As *Panetti* and *Martinez-Villareal* make clear, similar claims are not successive even though they are second-in-time because they should be litigated when an execution date is set.  The Bureau of Prison's action setting an execution date triggers the need for a determination of Mr. Johnson's mental status under § 3596(c).  Prior to the Bureau of Prison's notice of an execution date, adjudication pursuant to § 3596(c) is premature.  *Cf. Hoxha v. Levi*, 465 F.3d 554, 564-65 (3d Cir. 2006) (finding, in habeas proceeding challenging extradition, that Administrative Procedures Act challenge under particular federal statute premature because agency action had not yet occurred and the government "may ultimately decide not to extradite Petitioner").

Section 3596(c) provides more specific process for inmates with compelling claims of intellectual disability than is afforded by the Eighth Amendment.  Limiting § 3596 to the minimum process required by the Constitution ignores the reality of the FDPA.  Indeed, the

45

FDPA includes provisions clearly intended to provide greater protection than the minimum required by the Constitution.  This particular section, however, differs from other such provisions because it is not restricted by or dependent upon another avenue of review.  *Cf.* 18 U.S.C. § 3595(c) (mandating independent review of death sentence to ensure it is free from arbitrariness and clearly stating this review is a part of the direct appeal).  In contrast, the review required by § 3596 is not confined to an earlier stage of review and it articulates no limitation on claims previously raised.  When there is evidence that a prisoner scheduled for execution is a person with intellectual disability (mental retardation in the statute and legislative history), § 3596(c) requires that assessment to be made when the sentence is set to be implemented, even if that issue had been previously litigated.[49]

a)    **The Plain Language of § 3596(c) Demonstrates That a Determination of Mental Status Must Be Made When an Execution Date Is Set**

Section 3596(c) applies when the sentence of death is to "be carried out."  In its plainest terms, the § 3596(c) bar pertains to the period of time in which the sentence is "complete[d]" or "accomplish[ed]"—or "put into execution."  *Carryout*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/carryout (last visited Dec. 14, 2020).  It applies *after* the defendant is "sentenced" and *after* a federal death row inmate has "*exhaust[ed] . . . the procedures for appeal of the judgment of conviction and for review of the sentence*." 18 U.S.C. § 3596(a) (emphasis added).  As made clear by the title of the section, § 3596(c) applies at the "implementation" of the sentence.  Congress did not otherwise qualify this statutory bar.

---

[49] As addressed below, this was openly discussed during Congressional debate.

**b)**       **The Other Provisions of § 3596(c), as Well as the Broader Structure of the FDPA, Reinforce That the § 3596(c) Bar Is Properly Raised After an Execution Date Is Set**

Statutory terms must be interpreted "in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).  The "statutory scheme surrounding the specific language" of § 3596(c) "reinforces" its plain text.  *Murphy v. Smith*, 138 S. Ct. 784, 789 (2018).

Congress placed the FDPA's prohibition on carrying out the execution of persons with mental retardation in the "implementation" section of the statute, situating the intellectual disability bar between the pregnancy bar and mental competency bar—all challenges that are raised once execution is imminent.  By structuring the statute in this manner, Congress made plain and clear its intent that an inmate seeking relief under these three prohibitions should do so when an execution is imminent.

First, the placement of the "mental retardation" provision within § 3596 is dispositive.  The first subsection, § 3596(a) (entitled "In General"), circumscribes this section of the U.S. Code and provides instructions about how the sentence is be implemented.  Importantly, it also contains a temporal restriction which specifies *when* the rest of the statutory provision becomes relevant: implementation shall occur after all appeals have concluded and the prisoner is released to the custody of a U.S. marshal.  Subsection (b) and (c) are therefore limitations on the marshal's implementation of the sentence and enumerate prohibitions to be raised "[w]hen the sentence is to be implemented."  18 U.S.C. § 3596(a).

The FDPA's structure as a whole further supports this conclusion.  The FDPA has nine sections which generally follow the chronological stages of a capital case.  The first four FDPA provisions, §§ 3591 through 3594, involve the pretrial and trial stages of death penalty proceedings, including, *inter alia*, crimes eligible for the death penalty, aggravating and

47

mitigating factors, and sentencing hearing requirements.  Next, § 3595 concerns the process for the direct appeal.  As discussed above, § 3596 covers prisoner custody procedures once execution is imminent as well as bars on the implementation of the sentence for pregnancy and mental capacity (including both intellectual disability and mental competency to be executed).  Then, § 3597 addresses execution procedures once the U.S. marshals take custody of the prisoner.  The last two sections of the FDPA are miscellaneous provisions that do not have any temporal components: § 3598 governs capital proceedings for crimes occurring within the boundaries of Indian country, and § 3599 addresses the right to counsel in capital cases.

Congress's decision to place the mental retardation bar after the provisions governing ordinary judicial review of a capital proceeding, and specifically in the section titled "Implementation of a sentence of death," is telling.  Congress intended that claims related to § 3596 prohibitions could be raised up to the eve of execution.  The legislative history of the mental retardation bar, discussed below, strongly corroborates Congress's intent in this regard.

### c)    The Legislative History of § 3596(c) Demonstrates Congress's Intent

Congress passed the FDPA with the intent of providing a prisoner with the opportunity to assert the statutory mental retardation bar after an execution date has been set and before execution, regardless of other relief sought previously.  In fact, the legislative history confirms that Congress understood that the FDPA would allow defendants to raise such claims "at any time," including between judgment and execution, and including after an execution date has been set, even if a claim based on intellectual disability was litigated earlier.  *See* Ex. 79 (136 Cong. Rec. S6873, S6876 (daily ed. May 24, 1990) (comments by Sen. Hatch)).

During debate of the FDPA in May 1990, Senator Strom Thurmond of South Carolina introduced an amendment (the "Thurmond Amendment") to Senate Bill 1970, 101st Cong.

48

(1990), which had been introduced by then-Senator Joseph Biden of Delaware.  The amendment proposed to modify the existing mental retardation provision in the ADAA, which had passed two years earlier.  Specifically, Senator Thurmond proposed to limit the mental retardation prohibition to only cases in which the defendant "lack[ed] the capacity to appreciate the wrongfulness of his actions" so that "it would prohibit the execution of mentally retarded persons who do not know the difference between right and wrong."  Ex. 79 (136 Cong. Rec. S6873, S6873 (daily ed. May 24, 1990) (comments by Sen. Thurmond)).  During the debate on the Thurmond Amendment, Senator Orrin Hatch expressed his understanding of the intellectual disability prohibition both as incorporated in Senate Bill 1970, and as enacted in the ADAA.

> Let us understand something.  The trial comes up.  Defendants can raise any issue about mental capacity, disability or retardation they want. . . .
>
> Then the sentencing comes up.  They have the right to come in and do it all over again. . . .
>
> The Biden amendment in this bill[50] then goes and *gives them a third time*, only it says it a little bit differently.  It says, if you can show you are mentally retarded, you cannot be executed.  You will stay in jail the rest of your life, but do you not [sic] have to suffer the death penalty.  *This is better than habeas corpus for prisoners.  They can raise it at any time.*

Ex. 79 (136 Cong. Rec. S6873, S6876 (daily ed. May 24, 1990) (comments by Sen. Hatch) (emphasis added)).

Several other times during the debate, Senator Hatch reiterated his understanding that the FDPA would permit federal death row inmates to raise mental retardation defenses "at any time" and "ad infinitum."  *Id.* at S6876.  "People who are not mentally retarded . . . will claim that they are . . . these people will be making these claims ad infinitum, long after the trial . . . and long

---

[50] Senator Hatch's reference to the "Biden Amendment in this bill" is a reference to the already enacted "mental retardation" death penalty bar in the 1988 ADAA.

after . . . all these repetitive habeas appeals or petitions . . . if that is what we adopt here today."
*Id*. at S6877. Later, Senator Hatch emphasized the temporal lengths during which one could assert a § 3596(c) bar. He attacked § 3596(c) by contending that, long after trial and sentencing, a capital defendant who finds an expert even "years and years and decades" later to say he is intellectually disabled "can stop the death penalty in that case."[51] *Id*. at S6880.

Notably, none of the supporters of § 3596(c) contradicted Senator Hatch's interpretation of S. 1970 that an intellectual disability claim could be brought long after an inmate was sentenced to death and could be brought more than once. Instead, the Senate rejected the Thurmond Amendment by a vote of 59 to 38. Ex. 79 (136 Cong. Rec. S6873, S6883 (daily ed. May 24, 1990)). Both houses of Congress passed the FDPA, with bipartisan support, and it was signed into law in 1994, with the intellectual disability provision intact.[52]

---

[51] Of course, this is not what has happened here. Mr. Johnson's case relies not on finding a new expert but on the development and refinement in the medical profession, and the subsequent adoption by the courts, of standards for diagnosing intellectual disability that did not exist at the time he was tried in 1993 or pursued remedies in § 2255 in the late 1990s.

[52] The plain language and legislative history of the ADAA, which preceded the FDPA, reflects a similar commitment to ensuring that a person with intellectual disability will not be executed by the federal government. Ex. 78 (134 Cong. Rec. 22,926, 22,993 (1988)).

## V.    CONCLUSION

Mr. Johnson is a person with intellectual disability and his execution is, therefore,

prohibited by federal law.  For these reasons, Mr. Johnson respectfully requests that this Court

provide the following relief:

1.    Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing Section 2255 Proceedings in the United States District Courts, specifically admitting or denying the factual allegations set forth above;

2.    Permit Movant to file a Reply to the Respondent's Answer, responding to any affirmative defenses raised by the Answer;

3.    Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Motion, or by Movant's Reply to any affirmative defenses raised by the Respondent.  Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

4.    Enter an order prohibiting the carrying out of a death sentence on Mr. Johnson due to his intellectual disability; and

5.    Grant such further and additional relief as may be just and proper.

Dated: December 14, 2020                    Respectfully submitted,

                                            /s/ David E. Carney
                                            David E. Carney, VA Bar #: 43914
                                            Donald P. Salzman (Admitted Pro Hac Vice)
                                            Skadden, Arps, Slate, Meagher & Flom, LLP
                                            1440 New York Avenue, NW
                                            Washington, DC 20005
                                            Telephone: (202) 371-7246
                                            Fax: (202) 661-8295
                                            Email: david.carney@skadden.com

                                            *Counsel for Corey Johnson*


## CERTIFICATION PURSUANT TO RULE 2(b)(5) OF THE RULES GOVERNING SECTION 2255 PROCEEDINGS

The undersigned, being authorized to sign for the movant, declares under penalty of

perjury that the foregoing is true and correct to the best of my knowledge.

Executed on: December 14, 2020


                                            /s/ David E. Carney
                                            David E. Carney, VA Bar #: 43914
                                            Skadden, Arps, Slate, Meagher & Flom, LLP
                                            1440 New York Avenue, NW
                                            Washington, DC 20005
                                            Telephone: (202) 371-7246
                                            Fax: (202) 661-8295
                                            Email: david.carney@skadden.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th of December, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all parties and counsel included on the Court's Electronic Mail notice list.

<u>/s/ David E. Carney</u>
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com