# EXHIBIT 1

## REPORT
## Corey Johnson's Status as a Person with Intellectual Disability
### Daniel J. Reschly, Ph.D.

### I.    Executive Summary

In my opinion, Mr. Corey Johnson is clearly a person with intellectual disability based on my review of extensive prior records and evaluations, my evaluation of him, and my application of the criteria for intellectual disability established by authoritative national and international authorities.  The generally accepted three-pronged standard to classify someone as having intellectual disability is met if the individual demonstrates significant limitations in intellectual functioning and significant limitations in adaptive behavior that were apparent in the developmental period.  My evaluation has convinced me that there is evidence of Mr. Johnson's significant limitations in intellectual functioning and adaptive behavior that were documented by contemporaneous records created during his child, adolescent, and adult years and that are corroborated by a persuasive array of additional evidence.

Corey Johnson was raised in poverty by a single mother who suffered from a significant drug problem that started before the time that he was born and continued during his childhood and adolescence; in fact, his mother's family members and close friends who knew her when she was pregnant with Corey believe that she used drugs during that pregnancy.  Corey Johnson had little contact with his father until he was an adolescent and never developed a significant relationship with him.  His mother had a series of relationships with boyfriends during his childhood, and many of them were either emotionally abusive toward his mother and Corey, physically abusive to them, or both.

Because of his family circumstances, Mr. Johnson lived an unstable and transient young life.  His mother moved Corey and his brother from home to home as she began and ended relationships with various men, interspersed by periods when she, Corey, or both of her children

lived with her family. For this reason, Corey Johnson and his brother attended numerous schools as children, in both New Jersey and New York, and in both the public and private school systems. He consistently failed as a student, and was held back and repeated early elementary school grades multiple times.

Although some of his school records have not been located, the records that do exist show that some of those schools that Corey Johnson attended referred him for educational assessments and psychological evaluations, including IQ testing, as he fell far behind academically. In addition, Mr. Johnson received services from several different social services agencies, and some of those agencies conducted psychological testing, including IQ tests. Mr. Johnson's chaotic and transient childhood led professionals to administer tests of intellectual functioning to him five times between the ages of 8 and 16; he was administered a sixth IQ test at age 23, after his arrest in the present case. Four of those six IQ tests are valid measures of Corey Johnson's intellectual functioning. Taken together, these four IQ tests demonstrate that Corey Johnson had significant deficits in intellectual functioning as a child, adolescent, and young adult.[1]

**Table 1**

| Year Test Administered | 1977 | 1981 | 1985 | 1992 |
|---|---|---|---|---|
| Corey Johnson Flynn Effect Adjusted Score[2] | 71.5 | 75.3 | 65.1 | 72.8 |

---

[1] For the reasons I explain in detail below, two other IQ tests administered to Mr. Johnson as a child lack validity and reliability and should be given little weight in determining whether Corey Johnson meets the criteria for Intellectual Disability. One of these tests had been published more than 30 years before it was administered to Corey Johnson and had already been replaced by a new version of the test whose content had changed dramatically. The use of this test was improper and raises serious questions about the competence of the administrator. The other test was seriously flawed because it was given to Corey Johnson within just a few months after he took the same test, which significantly inflated and the results and invalidated them.

[2] The Flynn Effect is explained on pages 9 and 10.

2

School, social services, and other records from Corey Johnson's childhood and adolescence are filled with concrete and vivid documentation of corresponding deficits in his adaptive functioning in conceptual, social and practical domains. Those records show academic failures and a consistent inability to learn and progress in school. They also show significant communication and language deficits, challenges with social interactions, gullibility and naiveté, an inability to care for himself, or to participate in age-appropriate social activities, and other deficits. These contemporaneous records are corroborated by descriptions from Corey Johnson's family, friends, treatment and social services professionals, and others who have known him over the course of his life. They are also corroborated by the results of a standardized adaptive behavior instrument that Dr. Gregory Olley administered to three individuals who knew Corey Johnson well before he turned 18 years old, two of whom have known him since birth.

Corey Johnson's reliable IQ scores were consistently two standard deviations below the mean. This satisfies the intellectual functioning prong. Moreover, records throughout Corey Johnson's life, statements obtained from those who knew him well, and standardized adaptive behavior instruments show that Corey Johnson had significant limitations in all three adaptive function domains and those limitations are directly related to his limitations in intellectual functioning, and they demonstrate particularly deficits in executive functioning, including reasoning, judgment, and decision-making. Finally, both Corey Johnson's significant limitations in intellectual functioning and his significant limitations in adaptive functioning manifested before he turned 18 years old. Based on my review of all of this information and based on my decades of experience, and applying my clinical judgment, I have concluded that Corey Johnson meets the criteria for intellectual disability because he had significant limitations in intellectual functioning and in adaptive functioning prior to age 18.

3

## II.    Overview and Credentials

I have been asked by counsel for Corey J. Johnson (Date of Birth ███████████) to conduct an evaluation and to determine whether Mr. Johnson meets the criteria for the classification of intellectual disability.  Mr. Johnson is imprisoned at the United States Penitentiary in Terre Haute, Indiana.

My credentials to support this opinion are summarized in Appendix A.  Briefly, I have conducted clinical evaluations and developed expertise in assessing intellectual disability (ID) and learning disability (LD), engaged in research, and published in the field for over 40 years as a scholar, practitioner, and educator.  I have authored many published articles in refereed journals, book chapters, presentations at professional conferences.  I have testified in court proceedings and consulted with lawyers and state and national agencies.  In 1999 I was selected by the National Academy of Sciences to chair a panel on determining eligibility for Social Security benefits in mental retardation.[3]  (Reschly, Meyers, & Hartel, 2002).  I have attached a condensed version of my curriculum vitae and a more complete description of my background and credentials in Appendix A.

I have reviewed a substantial amount of information concerning Corey Johnson, including contemporaneous educational, social services, treatment, residential placement and other records from Corey Johnson's childhood, adolescence, and young adulthood, as well as prison records since his incarceration.  These records included academic assessments, psychological, and psychiatric evaluations, including IQ test results and other test results.  I have also reviewed witness statements from people who have known him at various times during his

---

[3] The term *mental retardation* was changed to *intellectual disability* by the American Association on Intellectual and Developmental Disabilities.  The terms have equivalent meaning. In 2010 Congress changed federal terminology from mental retardation to intellectual disability in what was called Rosa's Law (PL 111-256). In 2013 the American Psychiatric Association's DSM-5 discontinued the term mental retardation and adopted the term intellectual disability.

4

life.  I met with Corey Johnson on July 30 and July 31, 2014, and administered the Woodcock Johnson-III achievement test.  In this report I express my expert opinion that Mr. Johnson is a person with mild intellectual disability based on all of the information that I reviewed during my evaluation.

### A.  Intellectual Disability Criteria and Levels

Intellectual disability is defined in similar ways by the two leading national organizations in the field of intellectual disability, the American Association on Intellectual and Developmental Disabilities (AAIDD), in its "Intellectual Disability: Definition, Classification, and Supports" 11th Edition, Schalock et al. (2010) (AAIDD Classification Manual), and the American Psychiatric Association (APA), in its Diagnostic and Statistical Manual of Mental Disorders 5th Edition (2013) (DSM-5).  The AAIDD Classification Manual and the DSM-5 use essentially the same criteria; both groups require that three conditions exist: (a) Significant limitations in intellectual functioning; (b) Significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills; and (c) Origination of the above limitations during the developmental period, which AAIDD ends at 18 while DSM-5 leaves undefined.  In my opinion Mr. Johnson meets these criteria.

Intellectual disability can range across a wide continuum from relatively mild to profound.  Regardless of the degree of sub-average intelligence, variability in intellectual disability severity is currently described by the level of support individuals need, with individuals with greater degrees of impairment requiring higher levels of support while those with relatively mild impairments require less support in order to function adequately in society. Typical adaptive behavior limitations in conceptual, social, and practical domains are described as a guide to the meaning of each of the levels.

In older definitions of what now is called intellectual disability the levels were characterized by ranges of scores on tests of intellectual functioning with means of 100 and standard deviations of 15. The mild level was defined by intellectual functioning scores of approximately two to three standards deviations below the population mean, or a score range of about 55 to 75, with consideration of the standard error of measurement for the test. (Grossman, 1973, 1983). The DSM-5 further indicates that this range can extend slightly higher if an individual demonstrates substantial adaptive behavior deficits.

The discussion of levels is relevant to the classification of persons with intellectual disability because *qualitative* as well as quantitative differences exist between the levels. Individuals with mild levels of intellectual disability typically present no characteristic identifiable biological bases for their disability. They demonstrate strengths and weaknesses in social roles, and thus require varying levels of support, and in some social roles or behavior, demonstrate no need for any support at all and yet meet the diagnosis of intellectual disability.

The characteristics of persons with more severe or even profound levels of intellectual disability are often and *incorrectly* attributed to all persons at the upper end of the range of intellectual disability, also known as persons with mild intellectual disability. Persons at the mild level of intellectual disability typically appear normal, that is, they do not show the stereotypical physical appearance of persons with intellectual disability. Moreover, about half of this population can become, with appropriate supports, self-supporting and independent functioning in the community. Community adjustment is precarious, often requiring assistance with basic areas of functioning such as judgment about social roles, employment, money handling, travel, law compliance, and relationships such as marriage. Absent the appropriate

supports, many persons with mild intellectual disability struggle with meeting basic community responsibilities, self-support, and/or law compliance.

The most current definition of intellectual disability has moved away from strict IQ thresholds below which an individual must fall to qualify for that diagnosis. This change has been due to the recognition that significant deficits in adaptive functioning support a conclusion of intellectual disability even if IQ scores fall slightly above traditional thresholds.

The key deficits of persons with mild intellectual disability are in the areas of learning and understanding abstract relationships in the conceptual, social, and practical areas of adaptive behavior. The learning abilities of people with intellectual disabilities are more concrete and dependent on supports than individuals with greater intellectual ability. Persons with intellectual disability have a significantly reduced capacity to learn, recall, and reason. (Campione, Brown, & Ferrara, 1982; Campione, Brown, Ferrara, & Bryant, 1985; Reschly, 1987; Snell et al., 2009). Such persons are particularly limited in applying abstract reasoning to practical situations and in spontaneously recalling thinking strategies to solve problems. These fundamental intellectual deficits affect everyday activities and responsibilities. Other learning deficits reported frequently with persons with low intellectual ability include difficulty in applying basic learning to new situations and severe limitations in literacy skills.

My evaluation of Corey Johnson as a person with mild intellectual disability is supported by evidence of his deficits in intellectual functioning and adaptive behavior that originated in the developmental period and continued to the time of the crime and beyond in his adult years. The AAIDD Classification Manual and DSM-5 classification criteria emphasize that the intellectual disability classification is defined by *deficits* and that intellectual disability typically is marked by a pattern of strengths and weaknesses. Identified strengths cannot, therefore, be used to rule

out the existence of mild intellectual disability. Mr. Johnson exhibited numerous deficits in his functioning in every-day life that are well documented, consistent, and compelling.

## B. Significant Considerations in Interpreting Intellectual Functioning Results for Corey Johnson

Significant limitations in intellectual functioning are a defining feature of intellectual disability. Tests of intellectual functioning, called IQ tests, typically are used as part of the determination of limitations in intellectual functioning. Current clinical standards define significant limitations in intellectual functioning as performance in the range of IQ of approximately 75 or below, which is approximately two standard deviations below the mean (taking into consideration the standard error of measurement, which I describe in more detail below), *assuming* that appropriate consideration of several characteristics of tests of intellectual functioning occurs in interpreting scores. These considerations include the appropriateness of normative standards and correction for the obsolescence of norms (Flynn Effect), application of professional standards for administration, scoring, and interpretation of tests, and probable error in the assessment process, as well as application of the expert's clinical judgment.

Standards for the assessment of intellectual functioning in the context of mild intellectual disability diagnoses are described in the AAIDD Classification Manual. Briefly, these standards require use of a comprehensive, multiple factor measure of general intellectual functioning that is individually administered to the client by a professional with appropriate graduate education and supervised experience in order to administer, score, and apply appropriate clinical judgment to the interpretation of the test results. The testing must meet high professional standards for reliability and validity. The testing must be administered, scored, and interpreted in accordance with the standardized procedures developed by the test author/publisher. Cultural, social, individual, and situational conditions as well as special artifacts of intellectual assessment (such

8

as the Flynn Effect and Practice Effects, which I explain below) must be considered as part of decisions about general intellectual functioning. Finally, test scores on tests of intellectual functioning must be considered in relation to the individual's everyday functioning in conceptual, social, and practical skills.

In my review of the intellectual assessments administered to Mr. Johnson, I have given special attention to the obsolescence of normative standards, the qualifications and decision making of examiners, the standard error of measurement, and practice effects.

### 1. Obsolescence of normative standards (Flynn effect)

Sophisticated analysis of IQ test result data has shown that IQ scores across populations steadily rise over time after a specific IQ test has been normed and standardized. This phenomenon was corroborated by research conducted by James Flynn, is commonly known as the Flynn Effect (and more formally as "normed obsolescence"), and has been validated internationally.

The practical significance of the Flynn Effect is that scores across the population that are produced by a particular IQ test rise over time. The Flynn Effect is an especially important consideration when tests with outdated norms (also referred to as less stringent norms) are used in evaluations of persons with potential significant intellectual limitations. (Pietschnig & Voracek, 2015; Trahan et al., 2014). This is true because intellectual functioning for purposes of an intellectual disability diagnosis is assessed based on whether an individual's IQ scores deviate from the mean by approximately two standard deviations. Because the mean for IQ scores rises steadily over time due to the Flynn Effect, the significance of any particular IQ test that is given a significant time after the norming of the IQ instrument must be considered in light of the Flynn Effect. The existence of the declining stringency of norms has been established by hundreds of

9

articles from multiple nations involving a vast array of data (see recent review by Pietschnig & Voracek, 2015).

Flynn calculated the steady rise in IQ scores (across populations) at the rate of just above 0.3 points per year or a little more than three points for every ten years after an IQ test was normed; his calculation has been corroborated by numerous research studies conducted since he published his findings. See AAIDD *User's Guides* (Schalock et al., 2007, 2012); Pietschnig & Voracek, 2015; Trahan, Stuebing, Fletcher, & Hiscock, 2014 (meta-analysis from over 100 research reports concluded that Flynn Effect is a valid phenomenon scientific, the rate of norms obsolescence described as approximately 0.3 points per year is confirmed (the most up-to-date measurements calculate the rise as .33 points per year), and test interpretation should use the Flynn correction when IQ test results are used in high stakes decisions).

As a real world example of how the Flynn effect works, if the norms for an intelligence test are ten years old, the population mean on the test which ordinarily is set at 100 would no longer be 100. Instead, the population mean would become 103 [100 + (0.3 x 10)]. Moreover, the point that is two standard deviations below the mean would no longer be 70, but ten years later would be 73 (assuming a mean of 100 and standard deviation of 15).

In Mr. Johnson's case, all of known IQ tests administered to him as a child and adolescent had outdated norms necessitating the corrections described by Flynn.

## 2. Examiner expertise and experience and importance of clinical judgment.

One of the most basic competencies an examiner must exhibit is to select an appropriate test, including knowledge about the availability of tests, their characteristics, and the applicability to a specific client when they are administered. Best professional practices always

have emphasized the choice and use of the most recently standardized test in a series of tests such as the Wechsler Scales or the Stanford Binet Scales of Intelligence. Current professional standards are explicit regarding the use of the most recent version of standardized tests. *Standards for Educational and Psychological Testing* 2014, Standard 5-11, pp. 104-105; AAIDD *User's Guide* (Schalock et al., 2007) ("T]he clinician needs to use the most current version of an individually administered test of intelligence"). This basic premise was violated in the assessment of Mr. Johnson in 1979 when an outdated version of a Weschler IQ test was administered by Nathalie Smith to Corey Johnson five years after a new version of the test had been released (see later discussion).

In addition, examiners must be well prepared and educated about key decisions required in intellectual assessment. They must be objective and make sure that they neither intentionally nor inadvertently influence the test results. Examiners who stray from careful adherence to these principles can produce unreliable and invalid test results. During the administration of an IQ test to Corey Johnson in February 1982, there is documented evidence in the report by Dr. Cary Gallaudet that she provided assistance to Corey Johnson during her administration of that test, which compromised the reliability of her results (see the detailed discussion below).

### 3. Standard error of measurement (SEM)

Errors of measurement always must be considered in interpreting tests of intellectual functioning. Because IQ tests produce estimates of intellectual functioning, they are always subject to errors, which can be predicted statistically using the standard error of measurement (SEM). Once the SEM for a particular IQ test has been calculated, experts can determine the likelihood that the subject's score accurately reflects his or her true IQ within a particular range using a degree of confidence, which is called a confidence interval. While there is no correct or

11

definitive answer as to which level of certainty to use, a common confidence interval used for IQ tests is the 95 percent confidence interval (plus or minus two SEM), which means that subject's true IQ is likely to fall within the range of 95 percent certainty. For the typical IQ test, two SEM produces a range of plus or minus five points at the 95 percent confidence interval.

The AAIDD Classification Manual and the DSM-5, using two SEM, recognize a range of intellectual functioning scores of 65-75 as the approximate upper range for the mild intellectual disability classification, and this plus or minus five point range is generally used by professional practitioners, public and private agencies, and the courts in making determinations of intellectual functioning for purposes of an intellectual disability diagnosis.

Every IQ test has its own specific standard error of measurement which is established during the norming of the test. Furthermore, each test has an SEM depending on the age of the individual to whom the IQ test is administered at the time of the test  As an alternate and more accurate method for determining the upper range of intellectual functioning that would be consistent with intellectual disability based on the individual's age and the specific test, it is also appropriate to use the SEM for the specific instrument and the age of the individual at the time the test was administered.

### 4. Practice Effect

Intellectual test performance also is influenced by the practice effect, meaning test scores tend to increase when the same test is used repeatedly. Repeated administrations of the same test can produce artificially inflated scores on individually administered tests of general intellectual functioning. Calamia, Markon & Tranel (2012) (showing practice effects are greater and more persistent than previously research had shown). This is because a test subject will become

familiar with the tasks involved in and concepts tested by a particular standardized instrument and can learn strategies for solving those tasks when exposed to the same test more than once.

The closer in time that the same test is given to a subject, the larger the practice effects. Practice effects undoubtedly significantly affected at least one of the intellectual functioning scores reported for Mr. Johnson, the February 1982 IQ results obtained by Dr. Gallaudet. As discussed below, Dr. Gallaudet administered the WISC-R test to Corey Johnson only four months after another psychologist gave him the exact same WISC-R IQ test in October 1981.

### III.    Corey Johnson Intellectual Functioning Assessment

As described above, Mr. Johnson's childhood was unstable and transient. As a result, Corey Johnson attended numerous schools and also came to the attention of several social services agencies and he was administered five IQ tests between age 8 and 16. Each of these IQ tests, and the IQ test administered to him during a mitigation evaluation when he was 23 years old after his arrest for the capital murder charges in this case, were a version of the Weschler intelligence tests. Specifically, Wechsler IQ tests were administered to Mr. Johnson in 1977, 1979, 1981, 1982, 1985, and 1992 as demonstrated in the following table:

**Table 2**

| Date (administered by) | Test | Full-Scale Score | Flynn-Adjusted Score |
|---|---|---|---|
| March 25, 1977 (Figurelli) | WISC-R | 73 | 71.5 |
| May 3, 1979 (Smith) | WISC | 91 | 81.4 |
| October 1981 (Adams) | WISC-R | 78 | 75.3 |
| Feb. 5 & 8, 1982 (Gallaudet) | WISC-R | 88 | 85 |
| March 15, | WISC-R | 69, (74) | 65.1, (70.1) |

13

| 1985 (Barish) | | | |
|---|---|---|---|
| October 9, 1992 (Cornell) | WAIS-R | 77 | 72.8 |

The IQ results from these six tests have varying degrees of validity due to the obsolescence of norms, practice effects, and probable administration errors. I discuss each in turn below.

### A. Figurelli WISC-R (1977).

The first administration of an individually administered test of intellectual functioning was by Dr. Jennifer Figurelli, a school psychologist for the Jersey City Public Schools. Dr. Figurelli assessed Corey Johnson in March 1977, when he was age 8 years 4 months and in the second grade. The assessment was prompted by the typical reasons school age children are referred for consideration of disability classification and special education services, specifically chronic and severe achievement problems including extremely low reading skills and poor concepts of numeracy resulting in academic failure and grade retention. Dr. Figurelli administered to Corey Johnson the Wechsler Intelligence Scales for Children-Revised (WISC-R; Wechsler, 1974); the WISC-R had been normed five years before this testing. The obtained scores using the uncorrected and Flynn corrected scores were Full Scale 73 (Flynn 71.5), Verbal 67 (Flynn 65.5), and Performance 84 (Flynn 82.5).

Unfortunately, Dr. Figurelli did not report subtest scores in her evaluation report nor has a copy of the test booklet that would contain the results of those individual subtests been discovered. The absence of raw data and the individual subtest scores makes it difficult to identify patterns of strengths and weaknesses within the scales. However I have known Dr. Figurelli for many years, am familiar with her experience and care, and have high regard for her

14

qualifications. Dr. Figurelli's test results were apparently free of practice effects since this was the first known time that a Wechsler Scale was administered to Mr. Johnson.

**B. Smith WISC (1979).**

The results from a second administration in 1979 of a Wechsler Scale are in sharp contrast to the first because the examiner used a significantly outdated, 30+year old test version that had already been replaced by a new version of the Wechsler test. This circumstance raises serious questions about the professional judgment of the administrator and undermines reliability of the results.

Nathalie Smith, who worked in the Evaluation Unit of the West Manhattan Center, gave Corey Johnson the WISC IQ test (Wechsler Intelligence Scale for Children, 1949). I am unfamiliar with Ms. Smith or her qualifications, background, and experience. Ms. Smith administered the WISC to Mr. Johnson in 1979, five years *after* Wechsler published a revised edition and 32 years after the normative standards for the original version were established. The reported WISC scores are Full Scale IQ 91 (Flynn Adjusted Full Scale IQ 81.4).

However, there are significant and serious flaws that undermine any reliability and validity from this test result. Most importantly, the original WISC version was completely outdated and had been replaced years before by an updated, culturally relevant version. For this reason, I believe the 1979 WISC results are not valid and should be given little if any weight in determining whether Corey Johnson meets the intellectual functioning prong of an intellectual disability evaluation.

The use of the 1949 WISC in 1979 rather than the revised 1974 WISC-R (which was the version given to Corey Johnson two years earlier by Dr. Figurelli) violated what was then and is currently a widely understood best practice of using the most recently standardized version of a

15

test. Current testing standards are explicit about using the recently developed version of a test

series. *Standards for Educational and Psychological Tests*, 2014, pp. 104-105. The AAIDD

Classification Manual starkly makes this point:

> The main recommendation resulting from this work [regarding the Flynn Effect]
> is that all intellectual assessments must use a reliable and appropriate individually
> administered intelligence test. In cases of multiple versions, the most recent
> version with the most current norms should be used at all times.

AAIDD Classification Manual at 37, quoting *User's Guide: Mental retardation definition,*

*classification, and systems of supports*. (Schalock 2007). Even in 1979, practitioners widely

understood that using the most current version of an IQ test was the generally accepted best

practice. In this instance, the newer version had been available for five years and the vast

majority of psychologists in 1979 used the newer rather than the older version. This

circumstance raises questions about whether the examiner in 1979 had the appropriate

experience and applied the proper and critical clinical judgment necessary to reach a reliable and

valid result during the testing of Corey Johnson in 1979.

The 1979 WISC test was not only severely outdated when it was administered to Corey

Johnson, many of the subtests were significantly revised because substantial cultural and societal

changes occurred during the more than three decades between the time the WISC was normed

and the time it was administered to Corey Johnson. Wechsler 1974, pp. 10-16. In fact,

significant parts of the WISC test had been replaced in the WISC-R because those outdated

portions of the WISC had a weak correlation to general intelligence. For all of these reasons, it

is impossible to conclude that the 1979 WISC scores are valid and reliable measures of Corey

Johnson's intellectual functioning. In my opinion, the Smith IQ tests results cannot be

considered to be valid and should be given little if any consideration in determining if Mr.

Johnson has significant limitations in intellectual functioning.

16

### C. Adams WISC-R (1981).

The WISC-R was administered twice to Mr. Johnson within a short four month period in late 1981 and early 1982. Earnest Adams, M.S., who at the time worked at the Council's Center for Problems of Living, administered the WISC-R in October 1981, obtaining a Full Scale IQ of 78, converted to Full Scale IQ that was a fraction above 75 using the Flynn Correction for the age of the WISC-R norms. The subtest scores for Dr. Adams are available and there is nothing in those results or other aspects of Dr. Adams' evaluation that raises concerns about the reliability and validity of his results. The Full-Scale IQ of 78 adjusted for the obsolescence of the WISC-R norms (Flynn 75.3) is in the range of scores that can support a diagnosis of Intellectual Disability. Although the general SEM is commonly described as five points, the specific SEM for the WISC-R test administered by Dr. Adams to Corey Johnson, given his age at the time of the test (12 and a half years old) using the 95 % confidence interval is +/- 6.46 points, which would give a Flynn-adjusted Full Scale IQ of 68.84. Thus, Corey Johnson' 1982 IQ test administered by Dr. Adams falls well within the intellectual disability range.

### D. Gallaudet WISC-R (1982).

Dr. Cary Gallaudet, a psychologist at the Pleasantville Diagnostic Center, administered the same WISC-R test to Mr. Johnson in early February 1982, four months after Dr. Adams' testing. Dr. Gallaudet obtained a Full-Scale IQ result of 82. Dr. Gallaudet has indicated in an affidavit that she was unaware of Dr. Adams' administration of the WISC-R just four months earlier. She has stated that had she known of Dr. Adams' recent use of the WISC-R test with Corey Johnson she would likely not have administered the WISC-R to him again. In fact, she has stated that she believes the practice effect impacted Corey Johnson's performance on the WISC-R tests she gave to him.

17

Studies have consistently shown that the practice effect is most pronounced when the same test is administered within a short period of time. Four months between test administrations is an extremely short period of time and, in my opinion, the repeat administrations of the exact same test inflated the results of the Gallaudet WISC-R results. Evidence of the practice effect in Corey Johnson's case stemming from the October 1981 and February 1982 administration of the exact same IQ tests can be seen on the following subtest scores, which all rose between the two administrations of the identical test: Information; Similarities; Comprehension; Picture Completion; Block Design; Object Assembly; and Coding. The two subtests that had the greatest increase between the Adams administration in October 1981 and the Gallaudet administration in February 1982 were Similarities and Object Assembly, and studies have shown that Object Assembly is one of the tests that is particularly prone to practice effects.

As noted previously, practice effects on psychological tests are larger than generally believed by psychologists. Calamia, et al., 2012. Verbal scale and performance scale subtests show varying degrees of practice effects with the latter scale generally showing larger practice effects than the former; Corey Johnson's scores on the performance scales rose slightly more than on the verbal scales, consistent with the research. Given the extremely short interval between the Adams and the Gallaudet administrations of the WISC-R and the clear evidence of the practice effect, the validity and reliability of the Gallaudet IQ test results are sorely undermined.

In addition, Dr. Gallaudet has conceded that she was an inexperienced practitioner at the time she administered the WISC-R to Corey Johnson. She was practicing under the supervision of a more experienced practitioner during the time she assessed Corey Johnson and he too has

18

noted her inexperience at the time that she evaluated Mr. Johnson. Dr. Gallaudet's evaluation report reflects her inexperience, because she noted in her report that "[f]requently Corey would interrupt his own work with irrelevant questions . . . and at those times, the examiner would have to help him refocus on the task at hand." Such efforts by the practitioner administering an IQ test artificially inflate the test score results. Moreover, Dr. Gallaudet has indicated that she was administering a large volume of evaluations during this time period and may have had a heightened chance for making errors during the testing of Corey Johnson. Dr. Gallaudet has specifically indicated that she believes that she may have made errors in her scoring of Corey Johnson's WISC-R testing.

Dr. George Sakheim was the chief psychologist at Pleasantville when Corey Johnson was a resident and he directly supervised Dr. Gallaudet during the time period when she evaluated Corey Johnson. Dr. Sakheim describes Dr. Gallaudet as a very inexperienced practitioner who had just started her professional career three months earlier. He notes Dr. Gallaudet's testing report indicating that she helped refocus Corey Johnson on task during testing and says he has observed such assistance from less experienced practitioners during his career. Dr. Sakheim said Dr. Gallaudet's evaluation report is consistent with her personality and her desire to be helpful to test subjects. Dr. Sakheim has further indicated that if an examiner provides assistance or extra time to a subject, the test findings are compromised. Dr. Sakheim has specifically indicated that he believes the results from Dr. Gallaudet's 1982 testing of Corey Johnson "may have been so compromised."

Although apparently Dr. Galluadet did not know of Mr. Adams' prior evaluations, the validity of the 1982 results are highly questionable regardless of her knowledge of prior assessments. There is no question that the practice effect elevated Corey Johnson's performance

on the Gallaudet IQ administration. Moreover, her inexperience, her statement upon reflection that she may have made scoring errors due to the volume of evaluations she was performing during that time, and the assistance she apparently provided to Corey Johnson during the testing all raise serious concerns about the reliability and validity of her results. For all of these reasons, the Full Scale WISC-R IQ score of 85 reported by Dr. Gallaudet cannot be considered to be valid and should be given little or no weight in determining if Mr. Johnson has significant limitations in intellectual functioning.

### E. Barish WISC-R (1985).

Dr. Kenneth Barish, psychologist for the Pleasantville Cottage School where Mr. Johnson was placed, administered the WISC-R to Mr Johnson in 1985. This test yielded a Full Scale IQ score of 69. Moreover, application of the Flynn Effect correction to this score changes the Full Scale IQ score from 69 to 65.1. Either with or without correction for the Flynn Effect, the results of Dr. Barish's IQ test to Corey Johnson are clearly within the range for concluding that Mr. Johnson had significant limitations in intellectual functioning during the developmental period.

Dr. Barish also engaged in a process of "testing the limits." Testing the limits is done *after* a subtest has been given using the standardized procedures. It involves observing the improvement in performance when re-administering previously failed items giving additional time or hints and prompts to assist the examinee. Even with such assistance, Mr. Johnson's performance did not improve significantly through the testing the limits process and remained well within the intellectual disability range. Dr. Barish's test results make clear that he appropriately used the testing the limits process because he reported completely separate scores without assistance and with assistance.

20

Dr. Barish has indicated that he was not aware of Dr. Adams' IQ testing nor was he aware that Dr. Gallaudet's WISC-R testing occurred just four months after Dr. Adams administered the exact same IQ test to Corey Johnson. Dr. Barish's 1985 evaluation report reflects his lack of knowledge. In comparing Dr. Gallaudet's WISC-R Full Scale IQ result of 85 to his WISC-R Full Scale IQ result of 69, Dr. Barish stated: "This decline in IQ scores is difficult to account for." Dr. Barish has indicated that if he had known that these two WISC-R tests (Gallaudet's and Adams's) had been given within such close proximity, he would not have given weight to Dr. Gallaudet's testing and likely would have considered a "mental retardation" diagnosis (the term used at the time) for Corey Johnson.

Dr. Barish's declaration explains his original classification of Mr. Johnson as deficient-borderline in intellectual functioning. He recalled Mr. Johnson as one of the lowest functioning individuals he evaluated in his career. His report indirectly indicated that he followed all standardized procedures rigorously (note the testing the limits results) and his later declaration further verified that he knew Mr. Johnson well at the time of the evaluation and that he recalled him clearly.

Dr. Sakheim was also a colleague of Dr. Barish at Pleasantville. Dr. Sakheim indicates that in comparison to Dr. Gallaudet, Dr. Barish was a more experienced and objective psychologist at the time. His review of Dr. Barish's evaluation report has led him to believe that Dr. Barish's results are sound and more reliable than Dr. Gallaudet's for the reasons described above and because he concludes that Dr. Gallaudet's results may have been artificially inflated due to the practice effect. For all of these reasons, I believe the WISC-R IQ test results obtained by Dr. Barish are valid and reliable measures of Corey Johnson's intellectual functioning.

**F. Cornell WAIS-R (1992).**

21

In 1992 after being incarcerated on capital murder charges, Mr. Johnson was administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R: Wechsler, 1981) by Dr. Dewey Cornell, a psychologist retained by Mr. Johnson's trial counsel. The obtained score of 77 by Dr. Cornell was based on normative standards that were 14 years out of date. The Flynn Correction to this score yields a Full Scale IQ of 72.8.

Dr. Cornell did not adjust his WAIS-R IQ test results in Corey Johnson's case for the Flynn Effect. This is not surprising because, while the Flynn Effect is a now a widely understood and accepted scientific fact, broad knowledge of the Flynn Effect and overwhelming scientific support for its existence did not emerge until at least the mid to late 1990s, well after Dr. Cornell's testing and testimony in Mr. Johnson's case. In fact, application of the Flynn Correction to adjust scores to take into account obsolete norms emerged as a practice about 2005, over a decade after Dr. Cornell's evaluation of Corey Johnson. In any event, the Flynn adjusted WAIS-R Full Scale IQ score of 73 places Corey Johnson well within the range significant limitations in intellectual functioning to support a current diagnosis of intellectual disability.

### C. Analysis of Corey Johnson IQ results

Given the history of the Flynn Effect and particularly the fact that it did not become widely discussed within the psychology profession until after the six IQ tests were administered to Mr. Johnson, it is not surprising that corrections for the Flynn Effect were not applied to any of the Wechsler Scales at the time they were administered to Mr. Johnson. The necessity of applying the Flynn Correction now is amply established and I have adjusted Corey Johnson's IQ scores in Table 3 below.

I have summarized Mr. Johnson's performance on tests of intellectual functioning in Table 2, and provide the following opinion of the validity of the six IQ tests administered to him.

22

Two test administrations, by Smith and Gallaudet, clearly are outliers and suffer from significant flaws that undermine their validity. They deserve little if any weight due to significant interference from well-known features that compromise validity: obsolescence of item content (Smith); and practice effects, inappropriate examiner assistance, and possible examiner error (Gallaudet).

Smith's use of the 1949 WISC (normed in 1947) in 1979, a test with item content and norms that were over 30 years out of date, was inappropriate. Those results must be given little if any weight in consideration of Mr. Johnson's intellectual performance.

Gallaudet's WISC-R results obtained in February 1982 likewise must be given little if any weight due to significant flaws that compromise their validity, including practice effects, apparent on subtests most likely to be affected by prior exposure to the test items, and the admitted assistance provided to Corey Johnson during the test administration by an inexperienced examiner. Although the repeat administration of the same test after a short three to four month interval was apparently because Gallaudet was unaware of the recent test administered by Adams, such repeat administration would be indefensible professionally if done knowingly. Similarly, Dr. Gallaudet's WISC-R results are also compromised due to her admitted coaching/assistance to Corey Johnson during her administration of that IQ test, and her acknowledgment that due to her inexperience, she believes she may have made errors in the scoring of his IQ test results.

The remaining four IQ test results, each of which appear to be valid measures of intellectual functioning, establish that Mr. Johnson meets the standard for significant limitations in intellectual functioning based on obtained full-scale scores between 65 and 75 over the course of his life.

**Table 3. Validity and Summary of Corey Johnson's Intellectual Functioning Results**

| Test | Year | Full-Scale IQ with Flynn Correction | Validity |
|---|---|---|---|
| WISC-R | 1977 (March) | 71.5 | No threats to validity are apparent. However, subtest scores are not available and thus it is difficult to interpret strengths and weaknesses. |
| WISC | 1979 (May) | 81.4 | Invalid for many reasons. Specifically, obsolete item content, limited normative sample, and obsolete population stratification due to use of 3-decade old test that had been superseded by WISC-R released 5 years before test administered to Corey Johnson. Serious questions exist about examiner experience, competence, and clinical judgment due to choice/use of obsolete test. |
| WISC-R | 1981 (Oct.) | 75.3 | Valid; Norms were 7 years outdated requiring Flynn adjustment. |
| WISC-R | 1982 (Feb.) | 85.3 | Invalid due to large practice effects. Examiner later disclosed she was unaware of October 1981 WISC-R, described her inexperience, and conceded: "I may have made errors in my scoring." |
| WISC-R | 1985 (March) | 65.1 | Valid results from a measure that was administered, scored, and interpreted by a psychologist described as competent and experienced by his supervisor. |
| WAIS-R | 1992 (Oct.) | 72.8 | Valid administration and scoring. Norms were 13 years outdated requiring a Flynn Correction of 4 points. |

Those four Wechsler Scale administrations were at least two standard deviations below the mean (between 65 and 75) using the general SEM of plus or minus five points and with appropriate corrections for the Flynn Effect and were clearly in the range signifying significant limitations in intellectual functioning according to the AAIDD Classification Manual and the DSM-5): (1) Figurelli in 1977; (2) Adams in 1981;[4] (3) Barish in 1985; and (4) Cornell in 1992. Mr. Johnson's valid intellectual performance results were obtained when he was a child (age 8),

---

[4] The actual SEM for the WISC-R administered by Dr. Adams to Corey Johnson, based on Mr. Johnson's age at the time that test was administered to him, was +/- 3.23. If the actual SEM was calculated at the 95 percent confidence interval (+/- 6.46 points), rather than using the general 5 point SEM at the 95 percent confidence interval, the Adams test with a correction for the Flynn Effect would be 68.915 on the low end of the range, which is clearly two standard deviations below the mean and well within the range for significant deficits in intellectual functioning.

24

an adolescent (ages 13 and 16), and an adult (age 23), documenting significant limitations in intellectual functioning in childhood through adulthood.

### IV.   Corey Johnson Adaptive Behavior Assessment

My evaluation of the substantial educational, treatment, social services, and other records provided to me has persuaded me that Corey Johnson exhibited significant limitations in all three domains of adaptive behavior that are related to his limitations in intellectual functioning. After reaching my own conclusions, I had an opportunity to review the excellent and comprehensive adaptive behavior report by Dr. Gregory Olley that summarizes the extensive evidence supporting the conclusion that Mr. Johnson had significant adaptive behavior limitations during the developmental period (age birth to 18) that continued into the adult years. I agree with the analysis and conclusions in Dr. Olley's report. I address one further issue regarding adaptive behavior, specifically Mr. Johnson's competencies in the Conceptual Domain including educational performance, literacy, and his public education classification of emotional disturbance or specific learning disability rather than mild intellectual disability.

Adaptive behavior has been organized into different areas or domains in prior authoritative intellectual disability classification systems. The number of areas varied from ten adaptive skills in AAIDD 9th edition (Luckasson et al., 1992), 11 areas in DSM-4 TR (2000) and three broad domains in AAIDD's 10th and 11th editions (Luckasson et al., 2002, 2010 and the Classification Manual respectively) and the DSM-5.

The Conceptual Skills Domain of adaptive behavior is defined in the most recent AAIDD *Classification Manual* as "language; reading and writing; and money, time, and number concepts." In the DSM-5, conceptual skills are defined similarly. DSM-5 at 37. Literacy skills are an important component of both groups' constructs for the Conceptual Domain; indeed,

inadequate literacy skills establish an enormous barrier to adequate adjustment in the adult years. Failing school performance prior to age 18 is another important indicator of significant limitations in the Conceptual Skills Domain during the developmental period; continuing, life-long deficits in the Conceptual Skills Domain usually follow very poor school performance in literacy skills. Functional intelligence typically is revealed in several adaptive behavior domains, particularly the Conceptual Skills Domain.

### A. Corey Johnson's school performance

Mr. Johnson's severe and chronic achievement problems were apparent early in his school career and continued into his high school and early adult years. Although some of the educational records have been destroyed, likely due to mandatory state legal requirements for purging special education records, sufficient evidence exists to clearly support the conclusion of chronic and severe achievement problems consistent with the classification of mild intellectual disability.

Mr. Johnson experienced consistent academic failure throughout his school career. He was retained multiple times in elementary school, repeating second grade at least three times. Mr. Johnson was in special education from the third grade through the remainder of his school career and he was classified as learning disabled and was never diagnosed as mentally retarded for a number of reasons that I explain below. When in the public school context, Corey Johnson was placed in a self-contained special class, the special education placement used most frequently with students with mild intellectual disability. Students with specific learning disability (SLD) typically were not placed in special self-contained classes where all of the students generally had similar and equally severe disabilities; rather, they were educated in part-time resource-teaching programs for time periods of approximately 40 to 120 minutes.

26

Even when placed in special classes, Mr. Johnson experienced academic failure. Over numerous school reports and teacher observations, Mr. Johnson had very low scores on language measures, including both expressive and receptive components. His reading performance varied little over numerous measures and was extremely low. When he attended the Jersey City Public Schools, Corey Johnson was described as "... having no concept of reading skills. He cannot retain sight vocabulary words." Third graders were expected to read approximately 110 words per minute in third grade reading materials. Mr. Johnson could not come close to this average level of performance. His math Grade Equivalent score on an achievement test at that time was at the first grade, fourth month, also markedly below grade level. There was little variation across his general intellectual functioning and educational achievement in key areas, a significant pattern more consistent with classification as mild intellectual disability than specific learning disability (see later paragraphs).

**B. Corey Johnson's achievement test results as a child**

The scores from standard achievement assessments support the above conclusion about chronic and severe achievement deficits.

**Table 4: Corey Johnson Wide Range Achievement Test Results**

| Date | Age | Administrator | Arithmetic Grade Level/ Percentile | Reading Grade Level/ Percentile | Spelling Grade Level/ Percentile | Word Recognition Grade Level/ Percentile |
|---|---|---|---|---|---|---|
| 3/25/77 | 8 | Figurelli | 1-44 | | | |
| 5/79 | 10 | Price | 3-9 (Level 1) | | | |
| 2/22/82 | 13 | Klerer | 3 | | 2 | 2 |
| 3/83 | 14 | Barish | 2%[5] (SS[6] 68) | 1% (SS 62) | 1% (SS 64) | |

[5] "Percentile" means the percentile rank which indicates the percentile of people who scored below a particular point, e.g., in Corey Johnson's case, 98% of students of his age scored higher on an arithmetic subtest in 1983.

| 7/85 | 15 | Hopper | 3.4 (computation) | | | 3.7 (sight vocabulary) |

In 1981 when he was age 13 his math was about four years behind and his reading about six years below his chronological age. In 1982 on the Gray Oral Reading Test his oral reading and reading comprehension were both at the second grade level, approximately six grade levels below his grade placement. In 1983 at age 16 on the Woodcock Johnson his reading was still at the second grade level, but his math was about 5th grade, still well below expectations for his grade level and chronological age.

The reading, language, and mathematics performance patterns persisted through the school years. Mr. Johnson's skills as they were assessed during his childhood were consistently at an extremely low level and the contemporaneous school and achievement records show that Corey Johnson had significant limitations in language, communication, math and number concepts as a child during his developmental period.

## C. Corey Johnson's achievement test results as an adult.

Mr. Johnson's literacy skills were assessed by Dr. Dewey Cornell in 1993 as part of an evaluation prior to his trial on the charges for which he was convicted. Dr. Cornell used a highly regarded achievement battery, the Woodcock-Johnson Tests of Achievement-Revised. Mr. Johnson obtained Grade Equivalent scores in Broad Reading and Broad Math of 2.5 and 5.9. While there was a minor discrepancy between these results, it is important to understand that this discrepancy does not meet the definition of nor support a conclusion that Corey Johnson was learning disabled (see Section V.A below for a detailed discussion). In order to classify a learning disability, "a child [must have] a severe discrepancy between achievement and intellectual ability." Reschly & Hosp, 2004; 34 C.F.R. 300.541. It is understandable that Dr.

---

[6] "SS" refers to standard scores on a scale with a mean of 100 and a standard deviation of 15.

28

Cornell likely interpreted this discrepancy as a sign of a learning disability because he did not apply the State of Virginia or the typical US criteria for a learning disability diagnosis.

Dr. Cornell also did not know about the severe practice effect that distorted the results of Gallaudet IQ tests. He did not discuss Dr. Adams or his evaluation at all in his report or his testimony during Corey Johnson's death penalty hearing, and the list of records he reviewed likewise does not include any materials from Adams. The only prior IQ tests that he reviewed were the 1982 Gallaudet, which his records describe as Mr. Johnson's first psychological evaluation, and the 1985 Barish test, which Dr. Cornell's records describe as Corey's second psychological evaluation. Thus, Dr. Cornell had no context to appreciate why Dr. Barish (who was also not aware of the recent prior WISC-R administration by Adams) did not conclude that Corey Johnson was intellectually disabled despite Barish's WISC-R results, which placed Mr. Johnson solidly in the intellectual disability range.

In any event, Mr. Johnson's broad reading and broad math scores on the achievement tests administered by Dr. Cornell (shown in Table 5 below) placed him well below basic adult literacy and math levels. On a language test Mr. Johnson scored at the second percentile, or to put it differently, 98% of a representative sample from the general population had language skills above his level.

**Table 5: Corey Johnson Woodcock-Johnson Revised Results from January 1993 (age 23)**

| Test Name | Age | Raw Score | Age Equivalent | Grade Equivalent[7] |
|---|---|---|---|---|
| Letter-Word Identification | 23 | 30 | 7-11 | 2.4 |
| Passage Comprehension | 23 | 15 | 8-1 | 2.6 |
| Calculation | 23 | 28 | 12-2 | 6.7 |

[7] GE stands for Grade Equivalent. The GE indicates that the score is at the level obtained by children with a specified amount of school experience. A GE of 3.4 means that the individual has obtained a score at the average of persons in third grade, in the fourth month of the year.

29

| | | | | |
|---|---|---|---|---|
| **Applied Problems** | 23 | 33 | 10-4 | 4.9 |
| **Broad Reading** | 23 | | 7-10 | 2.5 |
| **Broad Math** | 23 | | 11-3 | 5.9 |

Mr. Johnson's recent achievement results on a test I administered mirror the clear documentation of comprehensive deficits in his educational records from his childhood. In Table 6, Mr. Johnson's achievement results are summarized from the Woodcock-Johnson Tests of Achievement (3rd Ed.) Standard Battery (WJ-3) Woodcock, McGrew, & Mather, 2001) administered by me on July 30, 2014 during my evaluation at USP Terre Haute.

**Table 6: Corey Johnson Woodcock Johnson III Results, July 2014 (Age 46)**

| Achievement Cluster[8] | Standard Score | Grade Equivalent |
|---|---|---|
| **Broad Written Language** | 74 | 2.8 |
| **Oral Language** | 83 | 3.5 |
| **Broad Reading** | 76 | 4.1 |
| **Broad Math** | 89 | 8.2 |
| **Total Achievement** | 77 | 4.6 |

Mr. Johnson's achievement test results from 1993 and 2014 are remarkably consistent and reflect scores substantially below his grade level. Most important, Corey Johnson's achievement test results when he was 23 and 46 years old respectively are not consistent with someone with a learning disability because they are not unexpected given his intellectual functioning as measured by his IQ tests. In order to diagnose someone with a learning disability, there must be a severe discrepancy between achievement and intellectual ability. Put another way, a person with a learning disability demonstrates unexpected low achievement in one or more areas than would be anticipated by assessments of the individual's intellectual functioning.

---

[8] Note: Woodcock Johnson-III Achievement Cluster scores are composed of two or more subtests as follows: (a) Broad Written Language is composed of Writing Samples, Spelling, and Writing Fluency; (b) Oral Language is composed of Understanding Directions and Story Recall; (c) Broad Reading is composed of Letter-Word Identification, Reading Fluency, and Passage Comprehension; (d) Broad Math is composed of Calculation, Math Fluency, and Applied Problems; (e) Total Achievement is composed of summary or composite score of the Woodcock Johnson-III subtest scores.

30

In Corey Johnson's case, his summary scores are extremely low except for his performance in Broad Mathematics. The highest score in this domain (GE 8.2, standard score 89) represents the results of the many years Mr. Johnson has studied the General Educational Diploma (GED) educational materials; Mr. Johnson reported to me and prison records support his statement that he has been studying for working toward his GED for 20 years. However, prison records show that Mr. Johnson has not advanced beyond the pre-GED phase and, therefore, he has never attempted to take the GED exam. Mr. Johnson brought his GED study materials to my evaluation. While he has made some progress in mathematics, particularly in simple calculations, he continues to have difficulty with fractions, decimals, negative numbers, and percentages, which are more conceptual and complicated math skills. The mathematics materials he was studying appeared to be at about the 7th to 8th grade levels. However, this must be put in context. Prison records show that Mr. Johnson has been practicing these broad math skills (basic arithmetic problems) consistently for several decades. Thus, while Mr. Johnson has done relatively better in simple math calculations than in other areas, his achievement in that area is not unexpected and is consistent with his significant limitations in intellectual functioning.

Mr. Johnson's 1993 and 2014 scores in language based achievement domains show little improvement. He obtained scores at the second to fourth grades levels in Broad Written Language (GE 2.8), Oral Language (GE 3.5), and Broad Reading (GE 4.1) despite concentrated efforts over many years to prepare for the GED. My review of the GED reading and grammar materials he was studying showed he was at a level involving basic parts of a sentence and reading materials at or below the fourth grade level. It appears from examining the GED preparation materials including the unit tests associated with the program that Mr. Johnson has

31

worked very hard to improve his literacy and numeracy skills. Despite his concerted efforts, his total achievement remains at the grade level of fourth grade sixth month, an overall level typical of adults with mild intellectual disability. Reschly (2013).

The materials I reviewed have convinced me that Mr. Johnson has significant limitations in the Conceptual Domain of adaptive behavior that appeared early in his life and continue to the present. Moreover, ample evidence gathered and summarized by Dr. Gregory Olley document Mr. Johnson's deficits with concepts of money, time, and numbers. It is critical to understand that these deficits emerged early and continued through the time of the crimes he committed.

Significant limitations in one of the three adaptive domains is sufficient to meet the adaptive behavior prong of the AAIDD 11th and DSM-5 intellectual disability classification criteria. Based on Mr. Johnson's limitations in the Conceptual Domain he meets the adaptive behavior prong of the intellectual disability classification. Mr. Johnson also has significant limitations in the Social and Practical Domains.

### V.    Analysis of Corey Johnson's Childhood Diagnosis of Severe Learning Disability

While Mr. Johnson meets all of the criteria for intellectual disability, he was not diagnosed as a child with mental retardation. Instead, at various times in his childhood, Mr. Johnson was diagnosed as severely learning disabled even though he did not meet the common classification criteria for specific learning disability—*unexplained* low achievement—that dominated SLD classification in the US from 1977 to 2006. Nor does he meet the definition for learning disabled today.

32

## A. Learning disability classification

Achievement expectations related to specific learning disability can be established in a number of ways; however, the principal method in the US from 1977 through 2006 was the student's performance on achievement measures in defined areas and an individually administered test of general intellectual functioning such as the Wechsler or Stanford-Binet battery of tests. The key phrase in Federal and state legislation was the requirement that "a child has a severe discrepancy between achievement and intellectual ability" in one of seven specified areas of achievement (Reschly & Hosp, 2004; 34 C.F.R. 300.541). The achievement had to be at a level below intellectual ability that constituted a severe discrepancy.

## B. Corey Johnson does not have a learning disability

Careful examination of Mr. Johnson's intellectual ability and achievement during his school age years *fails* to meet the requirement of achievement significantly *below* his intellectual ability. In fact, Mr. Johnson's record involving multiple measures of achievement and intellectual functioning revealed that his achievement was commensurate with his intellectual ability. Mr. Johnson did not meet the classification criteria for SLD.

### 1. Corey Johnson's IQ results are not consistent with learning disability

As discussed in earlier sections of this report, Mr. Johnson's IQ test results are consistent with intellectual disability and are not consistent with specific learning disability despite some variation across some of his subtest scores. Significant variation across the Wechsler subtest scores is typical for persons of *all* levels of intellectual ability, including persons with mild Intellectual Disability. As noted in the authoritative source AAIDD Classification Manual at p. 7, "Within an individual, limitations often coexist with strengths." This statement also is true of the intellectual and educational performance of persons with mild intellectual disability.

33

A finding of variability in an individual's sub-test scores has often led to the erroneous diagnosis of learning disability. This is because the typical profile for *groups* of people with intellectual disability (not individuals) is flat (relatively consistent scores showing little variability). However, the *individual* profiles of persons with mild intellectual disability typically show considerable variability across subtests or scale scores on a comprehensive test battery such as the Wechsler series of intellectual ability measures. Bergeron & Floyd, 2013.[9] The finding of considerable variability in the individual profiles of persons with mild intellectual disability requires re-examination of many prior interpretations of the performance of persons diagnosed as borderline rather than mild intellectual disability.

In addition to the variability in subtest scores due to an individual with intellectual disability's strengths and weaknesses, variability is also due to the Wechsler IQ test instruments themselves. Subtest scatter, that is, differences between Wechsler Scales subtest scores, should not be over-interpreted because a large component of the difference scores found by subtracting one subtest score from another is due to error.[10] The Wechsler subtests scores are on a standard score scale with a mean of ten and standard deviation of three. For example the difference between hypothetical scores for Vocabulary (8) and for Block Design (4) seems like a large difference. In fact, many children, youth, and adults have score differences of this and greater magnitude. Such variations are not unusual among the general population and persons with mild intellectual disability. Moreover, difference scores are less reliable than either of the scores that are compared. Cronbach, 1984, pp. 237, 312-314.

---

[9] Similarly, persons in the average range of ability (not those with mild intellectual disability) also show flat profiles as a group. But considerable variability has been known to exist for about 40 years in typical *individual* profiles of persons with average ability. Kaufman, 1976a, b.

[10] A difference score is a variable that has been formed by subtracting one variable from another.

34

Corey Johnson's performance appears to be a case on point. He had considerable variability across the components of intellectual measures that likely influenced interpretations that he was learning disabled rather than a person with intellectual disability. But, most critically to the proper conclusion that Corey Johnson did not have a learning disability but instead has a mild intellectual disability, Mr. Johnson never displayed *unexpected* low achievement, the most salient feature of the specific learning disability (see later paragraph). Put another way, Corey Johnson never exhibited a significant discrepancy between his IQ and his achievement, which in 1992 was the accepted federal definition of a learning disability. Code of Federal Regulations; Reschly & Hosp (2004). My review of the records suggests that Dr. Cornell interpreted Corey Johnson's 1992 performance on the WAIS-R as borderline performance for a number of reasons. The records he reviewed for Corey Johnson did not contain the October 1981 WISC-R results for the IQ testing administered by Adams and, therefore, he was not aware of the significant practice effect that artificially elevated the results of the Gallaudet testing just four months later. In fact, Dr. Cornell quoted in the materials he prepared as part of his evaluation of Corey Johnson Dr. Barish's discussion of the IQ results Barish obtained: "These scores reflect a significant decline since Corey was tested in 1982 [by Gallaudet] . . . . This decline is difficult to account for." What neither Barish nor Cornell appreciated was that the IQ test results from Gallaudet's administration were dramatically artificially inflated because of the practice effect. So the decline Barish observed in Corey Johnson's IQ results was due to severe practice effect from the administration of the identical IQ test twice within four months. In reality, there was no significant difference between Adams' IQ testing and Barish's and both should have led to the consideration of Corey Johnson's adaptive functioning deficits and to the conclusion that Corey

35

Johnson was likely intellectually disabled. That did not occur because neither Gallaudet nor Barish were aware of the Adams IQ testing shortly before Gallaudet's.

And, of course, Gallaudet's report notes that she refocused Corey on task, and that inappropriate assistance by an inexperienced practitioner most certainly skewed the results and inflated Corey Johnson's performance on the 1982 IQ test, as did the practice effect. Thus, considered in isolation, the Gallaudet scores clearly appeared to Barish and to Cornell to be outside of the intellectual disability range when, in fact, the Adams, Barish, and Cornell IQ results were within the intellectual disability range.

Dr. Cornell also did not adjust his WAIS-R results for the Flynn Effect, which is not surprising since the Flynn Effect was not widely understood in the early 1990s; such an adjustment alone would have placed Dr. Cornell's WAIS-R results clearly within the intellectual disability range, but without the proper Flynn adjustment, those results and the Gallaudet erroneously appeared more consistent with a learning disability diagnosis rather than an intellectual disability diagnosis.

## 2. Corey Johnson performed best on outdated subtests with weak correlations with general intelligence

We now know that typical variability across subtests for average performers *also* applies equally to persons with mild intellectual disability. Bergeron & Floyd, 2013. Variability across subtests should be expected both with persons scoring in the average range and in the extremely low range of intellectual ability. While the Object Assembly subtest is one of the performance scales that typically show the largest practice effect on studies of practice effects on the Wechsler Scales, it is critical to understand the Object Assembly and Picture Arrangement

36

subtests, the ones on which Corey Johnson performed best, are the WAIS-R performance tests that constituted relatively weak measures of general intelligence.

Moreover, for the most recent update of the Wechsler Adult Intelligence Scale (4th Ed.) (WAIS IV; Wechsler, 2008) these subtests were either deleted (Object Assembly), placed in a category of supplemental tests (Picture Arrangement), or reorganized into a third scale, (Processing Speed), that has a lower relationship to general intellectual functioning (Wechsler, 2008). Notably, these weaker subtests all appeared on the WAIS-R Performance Scale where Mr. Johnson obtained a higher score of 82. Thus, the Performance Scale subtests on which Corey Johnson produced the highest scores have been deleted or marginalized in the newer versions of the WAIS, because they have been shown to have less validity as measures of general intellectual functioning than previously believed.

When all of Corey Johnson's valid and reliable IQ test administrations are considered and the results properly corrected and when those results are compared to his achievement, it becomes clear that Corey Johnson does not meet and never met the learning disability diagnostic criteria. Instead, his valid IQ tests show that he had significant limitations in intellectual functioning, satisfying the intellectual functioning prong of the intellectual disability diagnosis. Moreover, my analysis of Corey Johnson's adaptive functioning, which is consistent with the comprehensive and detailed evaluation by Greg Olley, persuades me that Mr. Johnson has significant limitations in all three domains of adaptive behavior. As noted in authoritative sources, significant limitations in just one of the three critical domains meets the second prong for a classification of intellectual disability. Mr. Johnson's across the board impairments in adaptive functioning are also inconsistent with a diagnosis of learning disability. Finally, my review of all of the information related to Corey Johnson shows that his significant limitations in

intellectual and adaptive functioning began during the developmental period and persisted into adulthood.

### 3.  Corey Johnson's diagnosis had little significance to his educational services

As a practical matter the classification of specific learning disability rather than mild intellectual disability made little or no difference in the special education services delivered to Mr. Johnson.  For most of Mr. Johnson's career he was essentially in a self-contained special education class with speech therapy services, rather than a part-time resource program for students with learning disabilities.  Yet, despite significant resources, a range of educational services and varied strategies devoted to supporting his learning, Corey Johnson did not advance, his performance improved only marginally while his peers surpassed him, and, thus, he fell further and further behind.  Moreover, it is important to note that these types of self-contained classrooms were mostly used during this time period for students with intellectual disabilities, not children with learning disabilities.  Regardless of whether students were classified as intellectually disabled (or at that time, as mentally retarded) or as learning disabled, the self-contained classroom setting was the manner for educating students with intellectual disabilities in that era.  Children in such classes, regardless of diagnosis or clinical classification, received the same range of services.  Given the controversy that raged around the over-classification of black students as mentally retarded (discussed below), the Bureau of Child Guidance (the New York City agency responsible for evaluating special education students) shied away from labeling students as "mentally retarded" at that time.

### C.  Factors that led to the reduction in the classification of with mental retardation during the period starting in the 1960s through the 1980s

Some further context is needed to explain why Mr. Johnson was not identified by school personnel as a child with mild intellectual disability even though his educational performance

38

and his scores on valid tests of general intellectual functioning would have been more consistent with intellectual disability rather than specific learning disability. Mr. Johnson was classified as "severe[ly]" learning disability at several different times as reflected in his school records, and by the staff at the Pleasantville residential facility. There is no differentiation of levels of specific learning disability in any special education classification system at the federal or state level (Mercer, King-Sears, & Mercer, 1990; Reschly & Hosp, 2004). When the adjective "severe" was attached to specific learning disability it often denoted a set of symptoms consistent with mild intellectual disability, for reasons that are explained below.

Mild intellectual disability was the most frequent classification of children served in special education programs in the first 75 years of the 20th century. Moreover, minority children, particularly African American children, were overrepresented in their classification as intellectually disabled (or, as they were classified at the time, mentally retarded) compared to their percentage in the population. However, a number of factors—including policy and practice changes, public attention brought on by litigation and advocacy efforts, and other reasons—modified this pattern beginning in the early 1970s and led to rapid reductions in the number of children and youth diagnosed with mild intellectual disability. And, as part of that rapid reduction and because of a public outcry about the overrepresentation of black students classified as intellectually disabled, schools and psychologists began to avoid the classification of children as having mild intellectual disabilities, and specifically, avoided classifying children with mild intellectual disability as mentally retarded.

### 1. The national growth of the specific learning disability classification

Specific learning disability (SLD) was emerging as a special education category in some states and in federal legislation in the late 1960s and early 1970s. It was incorporated into

Federal mandatory special education law (Education of All Handicapped Children Act, 1975) after considerable controversy in Congress about identification procedures and likely prevalence (Reschly & Hosp, 2004; Federal Register, 1976, 1977).

SLD was approved and adopted by the states in the mid to late 1970s, producing an immediate impact on the classification of children with mild intellectual disability and SLD. In only four years, 1976 to 1980, SLD surpassed intellectual disability prevalence at a time when children and youth with more severe levels of intellectual disability were gaining access to the public schools for the first time. Reschly (2013). The national pattern of increasing classification of specific learning disability and declining classification of mild intellectual disability is represented in Figure 1. From 1976 to 2000 SLD increased steadily and dramatically while intellectual disability declined significantly. The national trend remained relatively stable from 2000 to 2010, with SLD continuing to be far more common than intellectual disability in special education classification.



Even though during this period more children with severe levels of ID were gaining access to the public schools, the prevalence of intellectual disability classifications overall was

declining. This meant that the classification of children with mild intellectual disability was declining even more rapidly, and thus the decline in the number of children classified as having mild intellectual disability during this period was even larger than the depiction in Figure 1.

Modern research studies have consistently shown that beginning in the 1970s, as many as one-third of children diagnosed by schools as having a learning disability actually met the clinical criteria for mild intellectual disability. Gottlieb, J.C. Alter, M. Gottliebe, B.W. & Wischner, J. Special education in urban America: It's not justifiable for many. The Journal of Special Education, 27, 457-465; Gottlieb, J. Alter, M. & Gottlieb, B.W. Mainstreaming academically handicapped children in urban school districts. In A.C. Repp, J. Lloyd, and N. Singh (Eds.) The Regular Education Initiative. DeKalb, IL; Sycamore Press. 1992; MacMillan, Gresham & Bocian, (1998); Donald L. MacMillan and Gary N. Siperstein, Learning Disabilities as Operationally Defined by Schools (2002); McMillan, Siperstein, Leffert, "Children with Mental Retardation: A Challenge for Classification Practices" (2006).

### 2. Similar trend to classify children as learning disabled in New York City

The same general pattern that developed nationally is apparent in the classification of students for special education services in New York (see Figure 2). These changes in policies and practices likely explain why Corey Johnson was classified as a child with SLD while he was in the New York City Public Schools rather than mentally retarded or educable mentally retarded, terms used by the school district when Mr. Johnson was in the New York City public schools. The number of students classified as specific learning disabled (SLD) increased dramatically from 1976-77 to 1990-91, then leveled off over the last 20 years. In sharp contrast, the number of students in New York classified with intellectual disability declined significantly

41

from 1976-77 through 2010-11. The disability identification trends in the US and New York likely influenced the decisions regarding Mr. Johnson's special education classification.



**Figure 2:**
**Number of Students Classified as ID and SLD in New York by Year**

The movement away from mild intellectual disability to SLD was especially strong in urban school districts and with African-American children and youth. Further enforcing the national trends away from mild ID was the *Jose P.* and *Lora* litigation that led to a judgment concluding that the New York City Public Schools were seriously out of compliance in implementing the Education of the Handicapped Act of 1975, including the nondiscrimination provisions (Jose P., 1979, 1980; Lora v. Board of Education, 1978, 1980, 1984). The combined judicial orders placed intense pressure on the system and school psychologists to meet timelines, address language differences, avoid discrimination in assessment and overrepresentation of minority students in special education. The same trends in special education toward greater use of SLD and markedly diminished use of intellectual disability were apparent in both public and private schools in New York and overall in the US.

In an Appendix to *Lora* (1984) the court approved a statement on *Nondiscriminatory Standards and Procedures* that even by contemporary standards is well conceived and

42

constructive. These standards and the various decisions in *Lora* were concerned with fair assessment of minority students and avoidance of minority overrepresentation in special education programs, particularly mild intellectual disability and emotional disturbance. These standards, however, specify aspirations for improved assessment and decision making that are not easily applied to all cases and situations. The inherent ambiguity in the standards and the continuing *Jose P.* and *Lora* litigation and court ordered monitoring of the New York City special education practices created a situation where personnel were reluctant to make decisions that might be rejected by parents or be seen as discriminatory toward minority students. As a black student in an urban school district, Mr. Johnson presented the kind of case most likely to be influenced by the legal requirements that contributed to the large decline in mild intellectual disability identification in the late 1970s, 1980s and 1990s.

Due to political and social pressures and the desire not to stigmatize children with labels carrying perceived negative consequences, many schools and school districts simply stopped using the mental retardation label for children in the educational system. As noted previously, this development had little impact on how those children were taught or the programs made available to them so, from the schools viewpoint, there was little significance to classifying children as learning disabled rather than mentally retarded.

This phenomena was recognized by leading national organizations in the field. The National Research Council Panel report, *Mental retardation: Determining eligibility for social security benefits* (Reschly, Myers, & Hartel, 2002) expressed concern about the unreliability of public school assigned disability labels. The problem for the panel was how to interpret school-based diagnoses of SLD when the data developed by the school were more consistent with the mild intellectual disability classification. This question pertained directly to whether a person

43

with a school classification of SLD met the developmental origin criterion for mild intellectual disability.

The panel reviewed extensive evidence on school-assigned disability categories and concluded that school assigned diagnoses were unreliable, particularly with regard to mild intellectual disability. The panel recommended paying close attention to school generated data on achievement, intellectual functioning, and behavior in decisions about the SSI eligibility of children and adults for mild intellectual disability classification, but to largely ignore the actual disability assigned by school teams.

My evaluation suggests a number of factors that led Corey Johnson to be erroneously classified as learning disabled during his school years rather than the correct classification as mentally retarded (or now, intellectually disabled). Several of the early IQ tests administered to him were flawed due to poor choice of instrument, examiner inexperience and inappropriate assistance provided during testing, and the lack of awareness of the recent prior administration of the identical test by subsequent examiners. The lack of appreciation of the need to correct for normed obsolescence at the time Corey Johnson's IQ tests were being interpreted (since Flynn did not first publish his research until after Mr. Johnson's last IQ test as an adolescent) played a significant role, and combined with the flaws in some of the tests obscured the strong evidence that mental retardation was the appropriate classification. Finally, the reluctance to label school children, particularly minority school children like Corey Johnson, with mental retardation also very likely led to the alternate, and erroneous classification of him as severely learning disabled which, as I noted above, has no educational meaning and was a euphemism for mental retardation.

## VI.    Summary and Conclusions

44

Mr. Johnson is a person with mild intellectual disability as conceptualized and defined by the AAIDD Classification Manual and the DSM-5. Significant limitations in intellectual functioning and adaptive behavior existed during child, adolescent, and adult years. He is by definition and classification criteria a person with intellectual disabilities.

_____
Daniel J. Reschly, Ph.D.
Professor Education and Psychology Emeritus
Vanderbilt University

8-26-2016
Date

## References Cited in Report

American Association on Intellectual and Developmental Disabilities (2010). *Intellectual disability: Definition, classification, and systems of supports.* Washington DC: Author. (Note also cited as Schalock et al., 2010.)

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders (5th ed.)* Washington, DC: Author.

*Atkins v. Virginia,* 536 U.S. S. Ct. 304 (2002).

Bergeron, R., & Floyd, R. G. (2013). Individual part score profiles of children with intellectual disability: A descriptive analysis across three intelligence tests. *School Psychology Review, 42,* 22-38.

Calamia, M. Markon, K., & Tranel, D. (2012). Second time around: Meta-analyses of practice effects in neuropsychological assessment. *Clinical Neuropsychologist, 26(4),* 543-570.

Campione, J. C., Brown, A. L., & Ferrara, R. A. (1982). Mental retardation and intelligence. In R. J. Sternberg (Ed.), *Handbook of Human Intelligence* (pp. 392- 490). Cambridge, England: Cambridge University Press.

Campione, J. C., Brown, A. L., Ferrara, R. A., & Bryant, N. R. (1985). Breakdowns in flexible use of information: Intelligence-related differences in transfer following equivalent learning performances. *Intelligence, 9,* 297-315.

Cronbach, L. J. (1984). *Essentials of psychological testing* (4th Ed.). New York: Harper & Row.

Duvall, J. C., & Morris, R. J. (2006). Assessing mental retardation in death penalty cases: Critical issues for psychology and psychological practice. *Professional Psychology: Research and Practice, 37,* 658-665.

*Federal Register* (1976). Assistance to states for education of handicapped children: Notice of proposed rulemaking. November 29, *41*(230), pp. 52404-52407.

Federal Register (1977). Procedures for evaluating specific learning disabilities. December 29, 42(250), pp. 65082-65085.

Flynn, J. R. (1984). The mean IQ of Americans: Massive gains 1932 to 1978. *Psychological Bulletin, 95,* 29-51.

Flynn, J. R. (1998). IQ gains over time: Toward finding the causes. In U. Neisser (Ed.), *The rising curve: Long-term gains in IQ and related measures* (pp. 25-66). Washington DC: American Psychological Association.

Flynn, J. R. (2012). *Are we getting smarter? Rising IQ in the twenty-first century.* Cambridge, England: Cambridge University Press.

46

Grossman, H. (Ed.). (1973). *Manual on terminology and classification in mental retardation.* Washington, DE: American Association on Mental Deficiency. Also 1977 revision.

Grossman, H. J. (Ed.) (1983). *Classification in mental retardation.* Washington D.C.: American Association on Mental Deficiency.

*Hall v. Florida,* 134 S. Ct. 1986 (2014).

*Jose P. v. Ambach,* 557 F. Supp. 1230 (E.D.N.Y. 1979, 1980, 1983).

Kaufman, A. (1976a). A new approach to interpretation of test scatter on the WISC-R. *Journal of Learning Disabilities, 9,* 160-168.

Kaufman, A. (1976b). Verbal performance IQ discrepancies on the WISC-R. *Journal of Consulting and Clinical Psychology, 44,* 739-744.

*Lora v. Board of Education, 456 F. Supp. 1211 (E.D.N.Y. 1978, 1980, 1984)*

Luckasson, R., Borthwick-Duffy, S., Buntinx, W. H. E., Coulter, D. L., Craig, E. M., Reeve, A., Schalock, R. L., Snell, M. E., Spitalnik, D. M., & Spreat, S., & Tasse, M. J. (2002). *Mental retardation: Definition, classification, and systems of support* (10th Ed.) Washington DC: American Association on Mental Retardation.

Luckasson, R., Coulter, D. L., Polloway, E. A., Reiss, S., Schalock, R. L., Snell, M. E., Spitalnik, D. M., & Stark, J. A. (1992). *Mental retardation: Definition, classification, and systems of support* (9th Ed.) Washington DC: American Association on Mental Retardation.

Mercer, C. D., King-Sears, P., & Mercer, A. R. (1990). Learning disabilities definitions and criteria used by state education departments. *Learning Disability Quarterly, 13,* 141-152.

Pietschnig, J., & Voracek, M. (2015). One century of global IQ gains: A formal meta-analysis of the Flynn Effect. *Perspectives on Psychological Science, 10, 282-306.*

Reschly, D. J. (1987). Learning characteristics of mildly handicapped students: Implications for classification, placement, and programming. In M. C. Wang, M. C. Reynolds, & H. J. Walberg (Eds.), *The handbook of special education: Research and practice* (Vol. I)(pp. 35-58). Oxford, England: Pergamon Press.

Reschly, D. J., & Hosp, J. L. (2004) State SLD policies and practices. *Learning Disability Quarterly, 27,* 197-213.

Reschly, D. J., Myers, T. G., & Hartel, C. R. (Eds.) (2002). *Mental retardation: Determining eligibility for social security benefits.* Washington DC: National Academy Press. http://www.nap.edu/catalog/10295.html?se_side

Schalock, R. L., Borthwick-Duffy, S. L., Bradley, V. J., Buntinx, W. H. E., Coulter, D. L., Craig, E. M., Gomez, S. C., Lachapelle, Y., Luckasson, R., Reeve, A., Shogren, K. A., Snell, M. E., Spreat, S., Tasse, M. J., Thompson, J. R., Verdugo-Alonso, M. A., Wehmeyer, M. L.,

47

& Yeager, M. H. (2010). *Intellectual disability: Definition, classification, and system of supports* (11th Ed.). Washington D. C.: American Association on Intellectual and Developmental Disability.

Schalock, R. L., Luckasson, R., Bradley, V., Buntinx, W., Lachapelle, Y., Shogren, K. A., .....Wehmeyer, M. (2012). *User's guide: Mental retardation definition, classification, and systems of support.* Washington DC: American Association on Intellectual and Developmental Disabilities.

Schalock, R. L., Buntinx, W. H. E., Borthwick-Duffy, S. L., Luckasson, R., Snell, M. E., Tasse, M. J., & Wehmeyer, M. (2007). *User's guide: Mental retardation definition, classification, and systems of support.* Washington DC: American Association on Intellectual and Developmental Disabilities.

Snell, M. E., & Luckasson, R. with Borthwick-Duffy, S., Bradley, V., Buntix, W. H. E. .....Yeager, M. H. (2009). Characteristics and needs of people with intellectual disability who have higher IQs. *Intellectual and Developmental Disabilities, 47,* 220-233.

*Standards for educational and psychological testing* (2014), Washington DC: American Educational Research Association. (Prepared by the Joint Committee on Standards for Educational and Psychological Testing of the American Educational Research Association, American Psychological Association and National Council on Measurement in Education).

Trahan, L. H., Stuebing, K. K., Fletcher, J. M., & Hiscock, M. (2014). The Flynn Effect: A meta-analysis. *Psychological Bulletin, 140, 1332-1360.*

Wechsler, D. (1949). *Manual Wechsler Intelligence Scale for Children.* San Antonio, TX: Psychological Corporation.

Wechsler, D. (1974). Manual for the Wechsler Intelligence Scale for Children-Revised. San Antonio, TX: Psychological Corporation.

Wechsler, D. (1981). *Manual for the Wechsler Adult Intelligence Scale-Revised.* San Antonio, TX: Psychological Corporation.

Wechsler, D. (2008). *Wechsler Adult Intelligence Scale-Fourth Edition.* San Antonio, TX: Psychological Corporation.

Woodcock, R. W., McGrew, K. S., & Mather, N. (2001). *Woodcock-Johnson Tests of Achievement III-Third Edition (WJ-3).* Itasca, IL: Riverside Publishing.

48

Appendix B
Sources Used in Report

In addition to the references previously cited, the following sources were considered in preparing this report.

- Notes by social worker, Bureau of Child Guidance, Upper West Side, 1978.
- Social History Report, Bureau of Child Guidance, Upper West Side, March 1977.
- Bureau of Special Service, Jersey City Public Schools, March 1977 evaluation including Learning Consultant Evaluation Report, March 1977; Psychological Examination Record, March 1977; Psychiatric Examination Record, March 1977; Progress Notes, November-December, 1978. (WISC-R administered by Jennifer Figurelli).
- Referral to Committee on the Handicapped, New York City Public Schools, February 1979.
- Evaluation Unit handwritten report, West Manhattan Center, New York Public Schools, May 1979. (WISC administered by Nathalie Smith).
- Psychodiagnostic Evaluation, Council's Center for Problems in Living, December 1981. (WISC-R administered by Earnest Adams).
- Pleasantville Cottage School in February, 1982: Psychological Evaluation, Psychiatric Evaluation, Screening Upon Admission (Educational Testing), Psychosocial Summary, Conference Summary, (WISC-R administered by Cary Gallaudet).
- Pleasantville Cottage School: January 1983 Current Assessment Report.
- Pleasantville Cottage School: Psychological and Education Evaluation (March 1983), Psychiatric Evaluation (September 1983, Speech and Language Evaluation (September-October 1983), Current Assessment Summary (December 1983).
- Pleasantville Cottage School: Psychiatric Evaluation (June-December 1984); Grades in subjects (1984-85), Speech and Language Evaluation (September-October 1983), Current Assessment Summary (August 1984), Social History Report (March 1985).
- Psychological Evaluation, Pleasantville Cottage School in March, 1985 (WISC-R administered by Kenneth Barish).
- Jewish Child Care Association JCCA) of New York, Group Home Division, Initial Treatment and Service Plan (June-July 1985); Three Month Conference Note (September 1985).
- New York City Foster Care Review (June 1986). Newtown High School note regarding special education (n.d., likely 1986), Odette Noble note regarding counseling (June 1986).
- Psychological Evaluation, October 1992 (WAIS-R, Test of Written Language, Woodcock-Johnson-Revised, and Millon Clinical Multiaxial Inventory II, administered by Dewey Cornell)
- Dewey C. Cornell vita (n.d., approximately 1992).
- WAIS-R Record Form, evaluation October 1992).
- Dewey C. Cornell correspondence with Craig S. Cooley and others regarding arrangements for the evaluation and evaluation results (October 1992 through January 1993).
- Neuropsychological Services of Virginia Neuropsychological Evaluation (January 1993)

57

- Phone Interviews with JCCA staff regarding their recollections of Corey Johnson, Jerry Lefkowitz, John Stadler, Kenneth Barish, Elizabeth Clemmons, Odette Noble, and Christine Aron (Phone conversation, January 1993).
- Mitigation Report by Dewey C. Cornell (January-February 1993).
- Gary N. Siperstein correspondence with Lisa Greenman (January 2008).
- Kenneth Barish correspondence with Lisa Greenman (February 2008).
- Dewey C. Cornell testimony in Corey Johnson trial (n.d.)
- US Department of Justice, FBI Identification Division, Corey Johnson legal violations history (April 1991).
- Gregory Olley Adaptive Behavior Report regarding Corey Johnson (March 2012).
- JCCA Child Care Book I (pp. 1-110), Book II (pp. 111-480), Book III (pp. 481-692), Book IV (pp. 693-986).
- Affidavits signed and notarized by Ernest Adams, Kenneth Barish, Ammon Brown, Darnell Brown, Darold Brown, Ann Butler, Robert Butler, Courtney Daniels, Monica Dawkins, Cary Gallaudet, Ann Harding, Sonya Hilton, Minnie Hodges, Priscilla Hodges, Queenie Hodges, Esther Johnson, Robert Johnson Antoinette Daniels Joseph, King Salim Abdullah Khafani, Leona Llerer, Kevin Koger, Gerald Lefkowitz, Julie McConnell, Odette Noble, George Sakheim, Holly Scott, Mary Sitgraves, Elizabeth Sykes, James Sykes, David Washington, Bobby West, Sarah Jane Woodson West, Darryl Williams.