# EXHIBIT 7 - PART 1

```
3544
```

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

        v.                                      CRIMINAL ACTION
                                                   92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

----------------------------------------

                    VOLUME XX

                February 10, 1993
                Richmond, Virginia
                    10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
               JEFFREY B. KULL
               OFFICIAL COURT REPORTER

```
3545
```

                    P-R-O-C-E-E-D-I-N-G-S
           THE CLERK:  Case Number 92CV68: United
States of America versus Richard Tipton, Cory

Johnson, and James H. Roane, Jr., the twentieth day of trial. Are counsel ready to proceed?

MR. VICK: Government is ready.

MR. McGARVEY: Defendant Johnson is ready.

MR. GEARY: Defendant Tipton is ready.

MR. BAUGH: Defendant Roane is ready.

THE COURT: All right. Let's bring in the jury.

(The jury entered the courtroom.).

THE COURT: All right. Mr. McGarvey?

MR. McGARVEY: Thank you, Your Honor. May it please the Court, co-counsel, ladies and gentlemen of the jury and of the prosecution: Folks, why are we here today? Well, I figured it would be easier to tell you why we are not here. We are not here to try to excuse the acts of Cory Johnson. There is no excuse for eight murders. That's not what this is about. We are not here to try to tell you that Mr. Johnson didn't know the difference between right or wrong. When you folks entered your verdict, you decided that Mr. Johnson knew the difference between right and wrong. We are not here today to ask you not to punish Mr. Johnson. The alternatives here are life in the penitentiary without possibility of parole, to die in the penitentiary. I should think that anyone would think that is punishment. What we are here today to do is to decide whether or not to kill Cory Johnson. That's what it boils down to.

Traditionally, the death penalty in this country is reserved for the most severe cases, the cases where the guilty person is completely and totally blameworthy, fully responsible for his actions. Those factors which tend to lessen blame, which indicate that a person is not fully and totally blameworthy, should indicate that that person does not merit the most severe punishment; i.e., to be killed.

This isn't my point of view. This is the law. And the law requires this hearing before anyone can be given the death penalty. The purpose of this hearing is to assure that you folks consider that the guilty person deserves the maximum sentence of death. That person is guaranteed the right to this hearing in order to present reasons from our point of view why he doesn't deserve the maximum punishment. These reasons are called mitigation. The government has already put on what they called the aggravating factors. This is our opportunity to put on what is called mitigation.

The law states that mentally retarded persons cannot be executed. And the reason that they are excluded is because the law recognizes that mentally

retarded persons are not totally and completely blameworthy. They are not fully responsible for their actions.

Now, I'm not intending to suggest at this juncture or any other juncture that Cory Johnson is mentally retarded. It doesn't suggest that mentally retarded persons aren't responsible for their actions. It just indicates that the law recognizes that they are not as fully and totally blameworthy as an individual who has all his faculties.

Mentally retarded people have capabilities. Most mentally retarded people can hold jobs, raise families, be educated. Mildly mentally remember retarded people can be educated to, say, a sixth-grade reading level. I'm not suggesting that that is the case in the most severe cases of mental retardation, but in mildly mentally retarded cases, they can be educated. They can be arrested and they can be held accountable for their actions. However, because of the limitations that mentally retarded people have, they are not as fully responsible, as I indicated, not as fully blameworthy.

In this case, Cory Johnson, as I said, is not mentally retarded. But he has substantial mental, intellectual deficits that he has been plagued with his entire life. His IQ is within two points of being classified by the law mentally retarded, and therefore, legally not executable. Two points. He has severe neuropsychological impairment, and he is severely learning-disabled. This was diagnosed back when he was 13 years old, and we will present evidence today by Dr. Cornell here, who has administered tests and neuropsychological tests that have verified this. He has an IQ of 77.

In listening to Mr. Tipton's presentation yesterday, I was struck by the fact that he indicated that these learning-disabled ADD-type people tend to group together. And I think ultimately that's what we are going to be able to show you folks; that they somehow gravitated to each other. And when Dr. Evans yesterday was talking about the fact that learning-disabled people and ADD people have great difficulty in problem-solving, that they are very narrow minded, very focused, inflexible, I believe we will be able to show you folks today that that is the case with Cory Johnson. I don't just believe it. It is going to be shown. That is coupled with this severe learning disability and an IQ of 77.

Cory's situation, Cory's physical impairment, which I can't overemphasize is not Cory's fault -- what Cory did is Cory's fault, but what Cory's physical problems are are not his fault -- as I said,

they don't meet the standard definition of mental retardation. But his condition is very, very similar. As I indicated, mentally retarded people, mildly mentally retarded people can learn to read up to a sixth-grade level. But from the age of six to seven, Cory has been in special education. At 13, as I indicated, he was diagnosed with this learning disability. And after years and years of special education and the like, he is still only able to read on a second to third-grade level. So when I say that his condition is very similar to the mildly mentally retarded, in some instances it is much more severe. I've just given you an example of that. And this is after years and years of special instruction.

Now, we couple that with severe emotional deprivation as well. Again, when I was listening to Mr. Tipton's presentation yesterday I was struck by the similarity in backgrounds. Cory Johnson had a family. And I use "family" in quotations. He met his father when he was 12 years old. In the course of his lifetime he has seen his father three to five times since he was 12 years old. From age one until he was 12 years old, Cory Johnson moved at least 12 times. He moved 12 times to some relatives, to some friends, lived principally with his mother. And again, I mean no disrespect to Mr. Johnson, but I use the term "mother" in quotes as well. His mother was a drug abuser. His mother was abusive emotionally and physically to Cory. And to make matters worse, his mother took up with a number of gentlemen who were also drug abusers and physically abusive to Cory and his younger brother.

When Cory was 12-and-a-half to 13 years old, the New York justice system took jurisdiction over Cory and his brother and placed him in a foster care situation; principally, not because Cory had done anything wrong, but because his mother was flat-out unable, to put it charitably, to take care of him.

When I talked about emotional abuse, I'd like to illustrate that. Principally, the emotional abuse from his mother came about as a result of expectations that once again Cory Johnson couldn't meet. And he couldn't meet those expectations not because of anything that he had done, but because he was born with this severe neurological impairment. Despite that, Cory tried. His mother, believe it or not, expected Cory to go to college. And try as Cory Johnson might have, Cory Johnson couldn't read beyond the second-grade level. When the New York justice system took jurisdiction of Cory, they placed him in a foster home situation. This was the Pleasantville Cottage Home. You will hear from two people who

worked with him in this, the Jewish Child Care Association of New York. And what you will hear from these people and from the reports that we are going to give you is that despite Cory's mental and physical limitations, Cory always wanted to please. Cory was not a mean-spirited person. Despite his background, Cory wanted to learn. He wanted to learn. And I would suggest to you folks it is going to be shown that he wanted to learn because he wanted to please his mother. But there wasn't a darn thing that Cory could do to please his mother.

The reports are rife with references to the fact that Cory was not visited by his mother; that his mother took no interest in the fact that he was trying; and that on the few occasions that his mother actually did visit him, the notes suggest that she

was very rejective of him to the point that the staff there made comments about it; that she would get phone calls from the Home, and she wouldn't return the phone calls. She would call only to cancel an appointment, and not reschedule them. But despite this, Cory tended to treat his mother like a goddess.

There was a quote that you folks are going to have in front of you that I found particularly instructive and particularly touching, and I'd like to read it to you now. This is from a January, 1983 treatment review of Cory Johnson by Gail Turnquest, the caseworker at the Pleasantville Cottage School.

"Child care workers note that Cory's behavior deteriorates when he has no contact with his mother. He can also become quite depressed when he has not heard from or seen her for a period of time. It is the opinion of his child care workers that Pleasantville is good for him and that he is functioning fairly well here. Cory realizes his learning disabilities. However, he struggles to do his homework. He is truly motivated to do well and to succeed, and has not yet given up on himself.

"Cory presents with no real behavior problems. Within the last two weeks, there has been some

decline. Cory fantasizes that his mother will come up in a car and take him to Pizza Hut. Child care workers report that Cory's mood is basically that of a depressed child. He longs for his mother and acts out his realization that in fact his mother is emotionally unavailable to him. However, he denies his feelings when confronted directly. He also struggles to involve his father --" his father who he had seen three to five times in his life "-- who also does not come through for him. Sundays can be very difficult for Cory because he usually doesn't

have any visitors."

From the age of twelve-and-a-half until he was 18, this basically was Cory Johnson's life: attempting to learn and not being able to learn; attempting to be accepted by the only family that he had, his mother, and to be continually rejected by his mother. And you couple that with a childhood that was -- if you can call it a childhood -- basically, Cory took care of himself since he was three years old because his mother was too busy doing drugs and taking care of herself and living with her boyfriends.

When you couple this background of abuse, depression, lack of acceptance, rejection by the one person who mattered most to him, along with the severe, and I'm talking severe, cognitive deficiencies in Cory, it might provide somewhat of an explanation of what happened. As I suggested to you, there is no excuse.

At the conclusion of this presentation, I would suggest to you folks that the question you have to ask yourself is not whether Cory is guilty, not whether he should be punished, not whether he knew what he was doing was right or wrong. Those have already been decided. But whether he is fully and completely blameworthy; whether he is totally responsible for his actions. This penalty phase is, as the Supreme Court says, a narrowing process. Because as I indicated, the death penalty is reserved for those who are totally and completely blameworthy in the most severe cases.

When you ask yourself that question, you have to ask whether or not, after this presentation, Cory is fully and totally blameworthy; whether he is completely responsible for his actions. Has he lived his life as the normal, average person, who might be totally and fully responsible? Or has he lived his life under these situations that I have described.

We will demonstrate to you today that Cory is not a normal young person. He is 24 years old now. He has severe neurological impairment. He is two points above being mentally retarded. And when you couple that with this abusive background, I think you are going to be able to see that he is not as totally and completely responsible as a person who doesn't have those deficits. And life in the penitentiary without possibility of parole is no bargain, either. Thank you, folks.

THE COURT: All right. Call your first witness.

MR. COOLEY: Our first witness will be Dr. Dewey Cornell.

                    DEWEY CORNELL,
called as a witness by and on behalf of defendant
Johnson, having been first duly sworn by the Clerk,
was examined and testified as follows:
                    DIRECT EXAMINATION
BY MR. COOLEY:
Q    Dr. Cornell, good morning to you.
A    Good morning.
Q    Would you please tell the ladies and gentlemen
of the jury your full name and your profession?
A    Dr. Dewey G. Cornell.  I'm a clinical
psychologist and associate professor.

Q    And where are you employed?
A    University of Virginia.
Q    And is your title there associate professor?
A    I'm associate professor of education in the
programs in clinical and school psychology at the
University of Virginia.  I am also a faculty
associate of the Institute of Law, Industry and
Public Policy.
Q    And what are your professional duties as an
associate professor?
        MR. VICK:  We would stipulate as to his
expertise.
        MR. COOLEY:  I very much appreciate that,
Your Honor.  I would like for the jury to know
something about him.
        THE COURT:  Go ahead.
BY MR. COOLEY:
Q    Doctor, what are your professional duties as an
associate professor?
A    My principal duties are teaching, research, and
service at the University of Virginia.  I teach
graduate courses in our training program that trains
Ph.D.s in clinical and school psychology.  I teach
courses in personality assessment, in
psychopathology; that is, in mental disorders.  I am

I am also the assistant director of our training
clinic, which is a clinic that provides psychological
assessments, and I'm in charge of the psychological
assessments that our university clinic provides.  I
also am involved in the training of psychologists and
psychiatrists who specialize in forensic mental
health, and I conduct research in those areas as
well.
Q    I see.  Doctor, can you describe briefly your
educational background and any training that you had
in clinical psychology?
A    My training in clinical psychology began at the
University of Michigan.  I obtained my Master's
degree in 1979 and my Ph.D. in 1981 at the University
of Michigan from the Department of Psychology, from

the training program in clinical psychology.  As part of my doctoral training, I had course work in clinical psychology, in diagnosis assessment, treatment of individuals with mental and emotional disorders.  I also had internship training, clinical practice training.  I worked at the Yorkwood Center, which was a children's psychiatric hospital working with emotionally disturbed children and adolescents. I also worked at the University of Michigan psychological clinic, which is a psychotherapy clinic for young adults with emotional problems.

I also worked at the learning evaluation clinic by the School of Education in the University of Michigan, which is involved in the diagnosis and assessment of learning problems in children.

I completed those training experiences and my doctoral research in 1981, and at that point I accepted a post-doctoral position as a post-doctoral scholar in psychology in the Medical School at the University of Michigan, where I worked in the adult psychiatric hospital providing diagnosis assessment and treatment of individuals, of adults, with mental disorders.  And I conducted research there on these same problems and disorders.  I was there for two years.

Q    All right.  Doctor, would you explain to the folks, the ladies and gentlemen of the jury, the distinction between clinical psychology and forensic clinical psychology?

A    Yes.  Clinical psychology is the branch of psychology that is concerned with clinical practice, with working with individuals who have emotional disorders or problems in living that require treatment.  Forensic clinical psychology is a subspecialty.  It is the application of clinical psychology to legal matters.  And it is an area in which the person may evaluate individuals who have been charged with crimes, or may assist the Court in some way in answering legal questions that require some psychological information.  So it is a specialty of providing information in psychology that's relevant to legal questions.

Q    Doctor, have you had any special training in the field of forensic clinical psychology?

A    Yes, I have.  Beginning in 1983, I began specialized training and practice in forensic clinical psychology.  I was employed as a forensic clinical psychologist in Michigan at the Center for Forensic Psychiatry.  This is a state institution, a hospital, which provides diagnosis and treatment to individuals who have been charged with serious crimes, individuals who are violent, who are either

not competent to stand trial, or who might be considered legally insane, or for other reasons cannot be managed in the legal system or in the prison system. And those individuals are treated at the forensic center. I completed six months of training at that agency and became a certified forensic examiner for the State of Michigan and worked and conducted research and provided treatment

3560

in that setting.

Q    Doctor, have you conducted forensic evaluations of criminal defendants?

A    Many. Hundreds of them.

Q    And did those include defendants charged with murder?

A    Yes.

Q    Have you treated individuals who have committed murder?

A    I have treated dozens of individuals who have committed murders of various kinds.

Q    Doctor, in terms of your professional background, are you licensed in clinical psychology?

A    Yes. I'm licensed in the State of Virginia as a psychologist and as a clinical psychologist.

Q    Are you a member of any professional organizations in psychology?

A    I am a member of the American Psychological Association, the Virginia Psychological Association, several divisions of the American Psychological Association, the Society for Personality Assessment, the American Orthopsychiatric Society, and several other professional organizations.

Q    Within your profession, have you presented any papers in the area of forensic clinical psychology,

3561

any conferences? And if so -- or professional meetings -- if so, briefly tell the ladies and gentlemen of the jury about them.

A    I am very actively involved in the forensic field and in conducting research and presenting the findings of my research at meetings of professional organizations. This would include presentations I've made at national conferences of the American Psychological Association, the American Psychiatric Association, as well as state and local conferences as well.

Q    And have you published any books or articles in the area of forensic clinical psychology?

A    I have published a number of articles, particularly in the area of homicide. I have published a book with Eliza Benedict on juvenile homicide, a series of articles on the origins and development of violent behavior in young persons. I have also conducted research on malingering, which is

the tendency of some individuals to present false symptoms or to try to deceive mental health professionals.  I have also published research on the assessment and diagnosis of mental disorders that are found commonly in individuals who are charged with violent crimes, such as depression, borderline

3562

personality disorder, other types of personality disorders.

Q   Your curriculum vitae indicates that you are a journal reviewer for national journals.  Would you tell the ladies and gentlemen of the jury what a journal reviewer is?

A   Scientific journals in the field publish research articles and theoretical articles only after an extensive review process.  Articles are submitted to the journal.  They are then reviewed anonymously by a panel of experts in the field, who evaluate and critique the articles, reject the majority of them, and accept a small number of them as acceptable for publication.  And I have had the opportunity to be selected as a journal reviewer for a number of journals in the forensic area:  Law and Human Behavior, Behavioral Sciences and the Law, for example.

Q   Have you received any grants to conduct research in forensic clinical psychology?

A   I received a series of grants to conduct research on violent behavior; on the family background, personality, and development of individuals who commit violent crimes.  I have received grants from the State of Michigan and

3563

national grants from the Guggenheim Foundation.

Q   Have you had any experience in training others to work in the field of forensic clinical psychology?

A   In my current position, which I've held since 1986, I have been involved in training individuals in the State of Virginia to be certified to conduct forensic evaluations.  That is, the state has a training program to train psychologists and psychiatrists to do court evaluations.  And those individuals come to our agency at the University of Virginia for training.  I'm a lecturer there, also a supervisor of the cases that we conduct there.

Q   You indicated a little earlier that you had personally conducted forensic evaluations, somewhere between 400 and 500 criminal defendants; is that correct?

A   Probably 400 to 500 criminal defendants that I have evaluated for forensic purposes, yes.

Q   Did the referrals requesting you to do those evaluations, did they come from the prosecution, or

do they come from the defense?

A   They come from both sides of the case.

Q   And when you were doing these in Michigan, where did the referrals come from?

A   Michigan has a system whereby the referrals come from the court.  The referrals that I received were from the court, not from either one side or the other.  I would submit a report and then either the prosecution or the defense would call me depending on which side felt my testimony would be of value to them.

Q   How many times altogether, Doctor, have you been called to testify in court proceedings?

A   Including other states other than Michigan, probably 40 to 50 times.

Q   And during the course of that testimony, was it more often for the prosecution or more often for the defense?

A   I have been called many times by both sides.  I would guess that I have been called more by the prosecution than by the defense.

Q   And you have testified not only here in Virginia, but also in some other states; is that correct?

A   Yes.

Q   Those would include Maryland and Michigan and Wisconsin?

A   And Virginia, yes.  Those four states.

Q   And that would also include some experience being qualified as an expert in federal courts in Virginia; is that correct?

A   On one occasion I have testified in federal court in Virginia as well.

Q   If we can, let's turn to your role here today.  I'd like for you to help us clarify that for the ladies and gentlemen of the jury.  You are aware that Mr. Cory Johnson has been convicted of seven murders in the course of or in furtherance of a Continuing Criminal Enterprise; is that correct?

A   Yes.  I am very aware of the charges and his conviction on them.

Q   In addition, one other murder that was not related to the Continuing Criminal Enterprise for a total of eight; you are aware of that?

A   I am aware of eight, yes.

Q   All right.  Are you here today to testify that Cory Johnson is not responsible for his actions in committing those crimes?

A   No, I am not.

Q   Are you here to testify that Cory Johnson should be excused for the crimes for which he has been convicted?

A    Absolutely not.
Q    Now, if you believe that Mr. Johnson is

3566

responsible for his actions and shouldn't be excused for his crimes, tell the ladies and gentlemen of the jury what the basis of your testimony is today.
A    The basis of my testimony is very narrow. That is, when a person is charged with a capital crime, there is a capital sentencing evaluation. And the purpose of that evaluation is to provide the jury with as much information as possible that they would need to make a decision of mitigation. And in this case, the decision on which my evaluation is based is whether there is information relevant to the jury's decision of receiving the death penalty or life in prison without parole. And so all of my testimony and evaluation today is only intended to give the jury information on making that distinction, and I want to make that very clear: that it is not an issue of whether Cory should be excused for the actions or not considered responsible for the crimes that he has been convicted of.
Q    Now, Doctor, you have been asked to evaluate Cory in a number of capacities; is that correct?
A    There are three issues that I was asked to evaluate him for, one being mitigation, the capital sentencing evaluation that I am testifying about. There are two prior issues that I also evaluated him

3567

for. One was whether he was competent to stand trial, whether the trial could proceed because he was capable of doing that; and the other was whether he could be considered criminally responsible or not responsible -- that is, insane -- at the time of the offenses. And so I did separate evaluations of him addressing  --  I addressed those questions separately, I should say.
Q    Now, Doctor, so let's take them individually. As to the evaluation as to Cory's competence to stand trial, did you find that he was competent or incompetent?
A    Well, despite his intellectual limitations, I thought he met the very low standard for being considered competent to stand trial, minimally competent to stand trial.
Q    As to your evaluation relating to what would commonly be called sanity at the time of the offense, did you find that Cory was insane or not criminally responsible, or did you find that he was sane and criminally responsible?
A    I could not support a finding that he was insane or not responsible.
Q    Your testimony today relates only to the area of presenting to the ladies and gentlemen of the jury

3568

those elements and conditions which might be considered by them to be mitigating; is that correct?

A    That's right.

Q    If you would, let's focus on the mitigation evaluation. Would you describe for these folks what you did that constituted a mitigation evaluation?

A    Yes. Mitigation evaluation for capital sentencing should be a very thorough evaluation. And first of all, there are several parts to my evaluation. The first part of my evaluation was that I met with him individually and interviewed him. I met with him on three occasions. I spent approximately 15 hours with him, interviewing him and giving him psychological tests. I tested his intelligence, his school achievement, his personality. I also obtained from him a complete account of his life, from his earliest recollections up to the present time, in order to provide the jury with a complete account of who he is and how he became the person that he is today. That is the first part of my evaluation.

The second part of my evaluation is really to review as much collateral information, independent information, as I can to either confirm or disconfirm

3569

what Cory Johnson tells me, and also to add additional information that he did not touch upon. For that purpose, I had really extensive records that I received to evaluate him. I had records received from the prosecution --

MR. COOLEY: Judge, if I could, those would be the items that I am holding up here; is that correct?

THE WITNESS: That would be about the right size of it, yes.

BY MR. COOLEY:

Q    These were items supplied by whom?

A    My understanding is that they were supplied by the prosecution, describing the allegations and the offenses.

Q    I'm sorry to interrupt you.

A    I also received additional records, school records, from New York City Public Schools, records from the Jewish Child Care Association, where Cory spent time at a residential treatment center there for about four years. So there are about four years of records there. He also spent some time in a group home, over a year there, and I received records from them. He also spent some time in Riker's Island jail in New York City, and I received records from them.

3570

Q    Let me ask you, if I may, are those records

contained in these four notebooks?

A    I have a copy very much like that, four binders with those records in them.

Q    Quantity-wise, this would appear to be consistent with the records that were available to you and reviewed by you?

A    That's right.

Q    Were those records reviewed in depth?

A    Yes. And they were well over 500 pages of records that I reviewed.

Q    In addition to your meetings with the defendant, with Cory, did you have occasion to interview anyone else relating to developing your mitigation testimony?

A    I conducted additional interviews. I had the opportunity to meet and have a face-to-face interview with his mother. I also conducted telephone interviews with individuals who worked with Cory when he was at the Pleasantville Cottage School in New York, and Elmhurst Boys' Home in New York. There were about six individuals, staff members there, two psychiatrists, a psychologist, and several social workers that I interviewed as well.

Q    And two of those folks are here today; is that

3571

correct?

A    Yes. I had the opportunity to meet them this morning face-to-face.

Q    I see. Doctor, did you also refer Cory for any specialized testing which has been made a part of your evaluation?

A    Yes. Based on my initial testing, I felt that there was strong evidence of brain impairment. So I referred him for a more specialized testing, neuropsychological testing by a neuropsychologist, Dr. Edward Peck. And I received a written report from Dr. Peck, and then I also spoke with him about his report and got an oral report as well from him.

Q    Doctor, based on all of the information that you had at your disposal and that was made available to you, you prepared a mitigation report; is that correct?

A    Yes.

Q    Did you prepare anything beyond that report?

A    In addition to the report itself, I also assembled together quotations from the records that I reviewed, quotations that I thought best summarized the mitigation reports, my mitigation report. I also assembled Dr. Peck's report, a series of materials that I felt summarized the basis for my mitigation

3572

report; that is, the primary findings that I relied on, including some charts of my own psychological test results.

Q    All right.  And did you include certain things such as definitions of some of the conditions that Cory has?

A    Yes.  I also included the federal and accepted professional definitions for learning difficulties, learning disabilities, and mental retardation as well.

MR. COOLEY:  Your Honor, with the Court's permission, we have a copy of the full report and appendages for each member of the jury.  The government already has their copies, and also a copy for each defense counsel and the Court.

THE COURT:  All right.

(Documents proffered to Court, counsel, and jury.)

MR. COOLEY:  If I could be so bold as to request of those folks who have received a copy if they could try to follow along with us as we go through it rather than leafing through, which I think is a tendency, naturally.  We would appreciate that in presenting it in the form Dr. Cornell has set it up.

THE COURT:  All right.

BY MR. COOLEY:

Q    Doctor, if you would, we would like to start with a review of Cory's life and ask you, based on your evaluation and various sources of information that you have described to the ladies and gentlemen of the jury and obtained during the course of your evaluation, did you formulate an opinion about the psychological background, development of Cory Johnson?

A    Yes, I did.

Q    Could you summarize for us what you concluded?

A    When I put all the information that I reviewed together, I think there are two primary factors that I felt the jury should be informed about for purposes of mitigation.  The first of these is Cory Johnson's upbringing in a severely unstable, neglectful, and abusive family environment, which had a devastating effect on his psychological development and his emotional maturity.

The second main factor that I felt was important was his degree of brain impairment, which is exhibited as a very severe learning disability, a speech impairment which he suffered during his childhood years and still has remnants of today, and his generally impaired intelligence, which places him just above the level of mental retardation.  Those two factors in combination, I feel, made Cory unprepared to function in society, unprepared to survive on his own when he left institutional care

and had no place to turn to, and made him unable to cope and adapt to society in a way that a normal individual would.

Q    I'd like for you to explain to me and to the ladies and gentlemen of the jury, if you would, how you came to those conclusions. Can you tell the Court what information about Cory's background led you to this, or these, conclusions?

A    This would take some time. First, regarding his upbringing, I looked at his life as being in three phases: the first phase being his life with his mother up until about age 13; and then the years that he spent in institutional settings; and then finally, the third phase, after he left the institutions and was out pretty much on his own.

During that first phase of time when he was with his mother, or at least mother had formal legal custody of him, he lived in an extremely unstable situation. He actually was under his grandmother's care initially as an infant. When I interviewed his mother, she had very poor recollection of his upbringing and was not very involved in his child care. That was either taken care of by her own mother, when she lived at home for a couple of years, or he was left basically unattended for long periods of time. The mother could not recall details of his life, basic things that most mothers can recall about their children, such as when they learned to walk and talk, and how they were potty-trained, and how they did when they were in school. Stories from their childhood.

She was not around very much during his upbringing. She was involved in jobs that she held. She was involved in relationships with a series of men. And as she said a number of times, he couldn't fit into her life, and neither could his half-brother, Robert. The father, of course, was not in the picture at all. He was in prison. He had no contact with Cory. Cory was led to believe by his mother that his father was actually a man named Robert Butler, who was actually father to Cory's brother. Cory only met his father, basically by coincidence, when he was 12 or 13 years old. And up until that time, he thought the man named Robert Butler was his father. This was a man that his mother lived with for a short period of time. He was abusive. They had a parting of the ways and he was one of a series of men that she lived with at various times who were abusive to her and to the children, and who were involved in drug abuse. And at various times, those individuals moved in and out of the residence.

Now, it was very difficult for me to determine where Cory lived and how many times he moved. I know that at least 12 times, his mother changed residence. But there were many more times in which Cory was sent back and forth to other relatives. He didn't have a stable place that was his home. He didn't have a single individual that he could regard as a parent in the sense of someone who is going to always be there, be there and take care of him. His mother nominally would be his parent, but his involvement with her was neglectful and abusive. And he and his brother had evidence of serious emotional problems well before they were teenagers.

He had troubles with enuresis, bedwetting, up until age 11; encopresis, fecal soiling of pants, when he was 10 and 11 years old, which are signs of quite serious emotional disturbance. His brother Robert, at a young age, I believe ten or eleven, made a suicide attempt and was hospitalized for five months in a psychiatric setting. So both these boys were quite emotionally troubled; understandably so, given the kind of extremely unstable environment that they grew up in.

And I mentioned also that there were abusive boyfriends. And the mother related to me a number of violent incidents in which either she or the boys were physically assaulted and threatened by various boyfriends. And Cory had quite serious difficulties with one boyfriend, to the point that she did not think it was safe for him to stay in her residence any longer. That is basically the first phase of Cory's life up until about age 13.

Q    If I could ask the ladies and gentlemen of the jury to go, and you as well, to the green tab and to turn that over to the chronology of events in Cory Johnson's life.

You have basically described what would be the top third of that chronology, I believe.

A    Yes.

Q    And he was, of course, born in Brooklyn, and his birthdate was in ███████████. You have indicated a number of movements by Cory with his mother or without his mother during the time frame from birth to the age of 13, at which time he was committed by her to the state, and ultimately placed in foster care; is that correct?

A    That's correct. At approximately age 13, he was placed in the Pleasantville Diagnostic Center, a residential facility for diagnosis of children with emotional disturbance. He was there for two months of evaluation, and at that point they felt it was more appropriate for him to be placed in an

institutional setting. It is called the Pleasantville Cottage School. It is called Cottage School, but actually what it involves is that he lives in a home that's supervised -- in a cottage with several other emotionally-disturbed boys on the grounds. There is also a school that he would attend during the day. And he was placed there basically because the Court determined that his mother was not appropriate, and that he could not be well-raised at home. He remained there from about age 13 to 16.

Q   If I could refer the jury to the blue tab in your book, open that first document that is behind the blue tab.

Doctor, you have blown that up, I believe. You have taken a quotation from the petition which removed Cory from the home and indicated -- and I don't want to belabor this because I know that each person who has this can read for themselves -- but in that petition, and this is the language from the Court itself, there was a determination that the child, Cory, had been removed from his home on February 1st, 1982, and that the parent was unable to make adequate provision for his care, maintenance, and supervision; is that correct?

A   That's correct. And in this tab are the quotations that I selected. Now, in order to give you the context for these quotations, the next tab has the report, the legal petition, for example, that the quote comes from. So I'm going to focus on the quotation, but it is possible for anyone to look at where that quotation came from and to read what came before it and what came after it. In addition, there are other reports as well.

Q   If I can, so that everyone can understand what we are doing, the volume that's behind the blue tab are quotations which you have drawn from reports from the child care agencies.

A   Right.

Q   The specific reports from which these quotations are drawn are behind the orange tab.

A   That's right.

Q   We do not intend to read all of those reports or to require you to read them, but they are there in case there was a concern that your quote had been taken out of context; is that correct?

A   That's correct.

Q   And the items that are behind the orange tab are excerpts from the reports that are contained in these volumes that were supplied by the child care agencies.

A   That's right.

Q   If you would, can you relate to the ladies and

gentlemen what occurred and how things were occurring once this second stage arrives in Cory's life, where he has been voluntarily, by his mother, removed from his home or her home and placed with the state?

A    Yes.  Once he was placed with the state he had a series of psychiatric, psychological, and educational evaluations.  He had those initially when he first came there so that they could decide what needed to be done, and then he had further evaluations repeatedly over the years that he was there as they tried to monitor his progress and refine their treatment to help him.

And what I have done is I've gone through all of those records page by page, and what I have selected here are the ones that I felt that were most influential to me in formulating my opinion, and which I think accurately reflect his time spent at this institution.  And then I follow that up by contacting the authors of most of these reports.  I talked to six individuals that I could identify, and spoke with them about the reports to make sure I understood what they were saying and that I had an appropriate interpretation of what was said.

First of all, from the very beginning, they assessed that he had serious emotional problems.  They reported emotional disturbance that he had prior to coming to the child agency, and then they described what he was like once he is there.

The first psychiatric evaluation, which actually is page six of these quotations, describe that he was cooperative, that he related well, but that he had a slurred speech, and he said he doesn't want to come home for awhile so that "I can straighten my head and my mother can straighten herself out."  Quotations that he made to the psychiatrist who saw him, Collimuttam.

Cory feels he has problems with learning and reading.  He likes the school and the counselor here.  Cory feels sad when his mother keeps telling him about his father being in jail.  He has felt at times like wanting to stab himself, but has never done anything to hurt himself and doesn't think he will ever do it.  Cory talked about his brother trying to kill himself, "because of my mother," he said, and says that he feels very sad about it.

Q    Cory's brother was younger?

A    His brother was two years younger.  He made a suicide attempt and was placed at another agency called Children's Village, and he was there for awhile and then later was switched to Pleasantville as well.

Dr. Collimuttam I thought, summarized well his

early impression on page seven.  He says, "life has been very chaotic for this family with Cory's mother having had financial problems, having difficulties with her job and her relationships.  Mother appears depressed and unavailable to the child emotionally.  There have been frequent moves, stays in the homes of relatives often with the mother and children being in different homes.  This was followed up with a period of being with the mother's boyfriend, who Cory did not get along with and would steel from to get back at home.  Cory is a child who has been reacting to the chaotic life in the last four years.  In addition, he has shown evidence of mild to moderate neurological deficits of dyslexia and speech impairment."

And then Dr. Collimuttam gave him diagnoses using our standard diagnostic manual, the DSM-III.  He saw him as having an adjustment disorder, which means he was reacting to stressful events in his life with symptoms.  He was diagnosed as having a special developmental reading disorder.  It is another term for dyslexia.  It is another term for learning disability.  Those are all interchangeable terms.  He was also diagnosed as having positive soft neurological signs, which means that there was evidence that he had brain damage.

He was then given a psychological evaluation by a psychologist.  This is a little bit out of order.  This is on page five.  Dr. Cary Gallaudet gave him a series of psychological tests.  He described serious problems, deficits in nonverbal abstract reasoning, perceptual organization, visual perception and perceptual motor functioning.  These weaknesses were also evident in his Bender-Gestalt test, which was characterized by rotations and distortions.  Performance was comparable to a child five years below his chronological age, an underlying neurological deficit.

Q    Cory was age 14 at this point in time.  Then he would have been operating at the level of a normal nine year old?

A    At the level of a 9 year old, yes.  Yes, in these areas where he showed brain impairment.  It says, "In summary, Cory is a sensitive and dependent boy who is struggling with issues revolving around independence.  An underlying organic component," that means brain damage, "serves to exacerbate the anxiety, dependence, affectional needs, and hostile impulses, and as a result, Cory has an extremely hard time trying to integrate emotional challenges.  Although evidence of a learning disability exists, he continues to be an ambitious boy who is motivated to

improve his situation and would benefit highly from both remediation in academic areas as well as psychotherapy."

What's surprising about this statement and other statements that follow is that Cory remained very motivated. He remained cooperative, eager to learn, and willing to take on the challenge of his disability. If any of you have had experience with learning-disabled youngsters, you know that even mildly disabled youngsters become discouraged. They try to avoid their disability, understandably so. What was unique about Cory was, first of all, that he had a very severe learning disability -- I'll talk more about that later -- but that he continued to be motivated to try to overcome it. He had an educational evaluation. That's page eight of the quotations, by an education specialist who again pointed out that he was reading on the second-grade level. Third-grade level was too difficult to read. His spelling was second-grade level. His arithmetic was mid-third grade. It said that he couldn't multiply by three. He couldn't divide a number by two. He couldn't read digits of more than four digits. He could recite the months of the year only up to August. He knew there were 12 months, but he couldn't say them all. So this is when he is 13 years old. And he doesn't know all the months in the year, he can't read and do arithmetic beyond about a second or third-grade level. Of course, he has moved at least 12 times and had to change schools and classrooms, and I'm sure that he wasn't given much of an opportunity for teachers to work with him while he was in schools.

I also looked at part of this at what his mother was like at this time. Because a very important part of any kind of treatment is to get the family involved and to work with them. And I got very consistent descriptions of his mother, who was the only family member that they had any contact with. This is on page nine, Gloria Caro, caseworker assigned to work with him, they have a conference report. This conference involves a psychiatrist, a psychologist, teachers. The mother is invited to come, although most of the time she did not come, and Cory participates in parts of these conversations. But the caseworker -- he had a series of caseworkers -- the first one said, "Ms. Johnson is an attractive, stylishly-dressed woman who works as a receptionist. She is an articulate woman who reacted to my statement with anger, indicating she is trying to put her life together. She says right now she does not have too much energy or time for her kids.

She believes they will have to understand it.

"The message is, if her kids can live her life right now, okay. If not, she can't see them. She says she loves her kids, but putting her life together comes first.

"A joint interview with Cory elicited almost no comment from Cory, who stared at the ceiling while his mother pretty much lectured to him on how insensitive he was to 'where I am now and have to be.' It was not concern for him and his situation, being separated from family, being institutionalized."

She continues. She says, "It is difficult to see how Ms. Johnson can be engaged unless her needs are seen as primary. She refuses referral for treatment for herself. Further contact will reveal how fixed she is in this narcissistic, self-focused stand."

This is June. He has been in the setting for about four months. They are concerned that they cannot work with the mother, and this continued. In January of 1983, this is page ten, he now had a new caseworker, had a change in caseworker. He has now been in the institution almost a year. And here we have the quotation you may have heard before: "Child care workers note that Cory's behavior deteriorates when he has no contact with his mother. He can become quite depressed when he has not heard from or seen her for a period of time. It is the opinion of the child care workers that Pleasantville is good for him, that he is functioning fairly well here. Cory realizes his learning disabilities. However, he struggles to do his homework. He is truly motivated to do well and succeed, and he has not yet given up on himself. Within the last two weeks, there has been some decline. Cory fantasizes that his mother will come up in a car and take him to Pizza Hut. Child care worker reports that Cory's mood is basically that of a depressed child."

It continues to report that Cory wants to have contact with his mother, wants to have contact with his father. He tries to maintain the view that they are available to him. He cares about them, but not accepting that they are not available to him.

Q    If I might, obviously, these reports being written by his workers in 1982 and 1983, and for that matter, the remaining ones that you are going to comment on, obviously were not done in anticipation of a trial proceeding.

A    That's right.

Q    These are excerpts taken from the reports of evaluations being done of Cory in an effort to help

him adjust to the problems that he had; is that correct?

A    That's right.

Q    Different from, obviously, your report which has been prepared in anticipation of this trial.

A    That's right.

3589

Q    But these excerpts are not so.

A    That's correct.

Q    Go ahead.

A    These individuals had no inkling of what would happen in Cory's future. In fact, when I interviewed them they were shocked at what had happened, very troubled by it. As one of them said, "There is lots of boys that I work with here that I wouldn't have been so surprised if you told me what he was charged with," but they were very shocked to hear this about Cory. Cory was one of the better-adjusted boys at this school. But he was hampered because he was one of the most severely learning-disabled boys that they had seen. And they reported that he worked and worked, and try as he might, he couldn't read above about a second or third-grade level. And over a period of months and years he became extremely frustrated by that. He was given some educational tests after he had been there one year. They did a fairly comprehensive reevaluation of where is he, why isn't he learning, what is the problem here. This was Dr. Barish, a clinical psychologist called in as a consultant to test him to try to find out why isn't Cory learning in school, why is it that he appears motivated but isn't able to learn.

3590

Q    I am going to ask if we could put the easel close enough for the jury to see. This is a blow-up of what is already included on page 13. The jury may want to make reference to that.

(Easel displayed to jury.)

The second psychological evaluation that's now before the jury on page 13, what did it show?

A    Well, it showed that he was severely learning disabled. This psychologist gave him not only tests of his school achievement and found that after a year in this setting he still is reading at the first percentile, he has spelling at the first percentile, arithmetic at the second percentile. That means compared to other children his age, he is in the bottom one percent.

Q    Is it possible under the testing that was available then, and I suspect available now, for one to test lower than the first percentile?

A    That's as low as you go. He was at the bottom. That is, 99 percent of other kids were ahead of him despite his being in special education, despite his

good motivation. He could not learn to read or spell. He is a little bit better in arithmetic, and that turned out to be a little bit better for him later on. He was also given neuropsychological tests

3591

similar to what Dr. Peck gave him this year, which also confirmed that there was brain impairment; that this was not a problem that he wasn't motivated, or was emotionally disturbed, but the brain was not functioning properly for him to learn.

"The present test findings confirm the presence of severe learning disabilities in reading, spelling and arithmetic. There is an abundance of findings which strongly suggest diffuse neurological dysfunction with associated impairment in many aspects of cognitive functioning."

I spoke with the doctor. He said this is the most severe case of learning disability that he has, up until now, ever encountered.

Q    For those of us who are not -- I'm certainly one -- not familiar with the phraseology, can you tell these folks what "diffuse neurological dysfunction with associated impairment" might mean?

A    Pardon me for just rushing over that. Diffuse neurological dysfunction means that there is evidence of impairment in his nervous system in his brain. It is diffuse, meaning that it occurs not in one specific area, but in a number of different areas in the brain. So that this is one of the reasons he couldn't learn. Many individuals with learning

3592

disabilities have local deficits, or specific deficits. They can't process visual information very well.

They learn to compensate for that. Most learning-disabled children can learn to compensate. If they can't learn one way, they learn another way. If they can't learn by reading something, they have it read to them. Or, if they can't learn through writing, they learn orally. They can learn a number of different ways and they compensate. The problem with Cory is that his  --  his disability was so severe, so diffuse, he couldn't compensate. There was no area that was unimpaired so that he could rely on that area. These scores, they also have standard scores, 66, 64, 64. Those are all in the mentally retarded range. Scores in the 60's are in the mildly retarded range.

Q    On the chart that is before the ladies and gentlemen of the jury on the easel, as well as on page 13, not only was he testing in the lowest possible percentile on two of the three, and in the second percentile in arithmetic, but his standard test scores at that time would have put him

well-within the mentally retarded range?

A    Yes.

3593

Q    Is this the same point in time where those workers who were dealing with him and working with him were reporting that he remained highly motivated, was trying to learn, trying to do the best he could?

A    That's correct.

Q    Was there anything in these reports at that point in time that indicated in any manner that Cory was, for instance, faking or refusing to participate in these tests, trying to score low?

A    Well, not -- certainly not faking.  Certainly he tried his best whenever he was tested.  However, I think they report that there were times he was very frustrated by this.  And I don't want to give the impression that any 13-year-old is always motivated and always on task and always trying to learn.  I think there were undoubtedly times when Cory was less motivated, would give up on something he was trying to learn.  But what is most striking, very different from other records I've seen and other kids I've seen, is the level of motivation he showed at this time; that he was trying very hard.

Q    Psychologists, of course, are trained to watch for things which would suggest that the person was intentionally trying to do poorly.

A    Absolutely.

3594

Q    Is there any indication in any of these tests that they found these tests to be invalid?

A    No.  I don't have any concern about these test results.  They are very consistent.

Q    If I could ask you to refer back to Page 11.  This remains under the blue tab.  Page 11 and 12 are the reports that indicate his treatment review and progress in school immediately preceding the testing that is currently sitting on the easel and also on page 13.

A    Yes.

Q    Would you comment as to those two pages, either read or clarify them?

A    The statement "His progress in class has been very, very, very slow, almost to the point where one might feel he is not learning.  He received remedial reading two to three times per week.  However, his reading and spelling is on a second-grade level."

This is why they did this kind of extensive evaluation.  The teachers were frustrated.  They were working with him, they saw him trying, and they saw no progress.  And so it was very mysterious to them how this could be, and why he wasn't performing better.  Because in many respects, Cory looks like a normal young man.  He can act like a normal young

3595

man. So, you know, if he had been disfigured, if he had looked like someone who was maybe mentally retarded with a syndrome that involves facial abnormalities or something, then that would make some sense to them. They would see evidence that he wasn't normal. Instead, they don't see that. All they see is a motivated boy who can't learn.

Q    The second paragraph on Page 11 makes reference to the fact that he had been referred to his speech therapist at that point in time.

A    Yes.

Q    Back on the quotation from page two in November of 1983, he had been early on -- there was a determination that he had significant speech disorder.

A    Yes.

Q    And can you comment briefly on what that would have involved?

A    Individuals with learning disabilities and with brain impairment may also have speech problems. And they noticed slurred speech and other speech problems early on. They referred him for speech therapy. He was very eager to receive it, because in fact it was very embarrassing for a youngster to talk funny, as he would have put it. And he was referred -- they

3596

did not have available staff to give him speech therapy. Actually, he got a very extensive evaluation at an independent center, independent hospital, and had a very thorough evaluation which again confirmed a learning disability and speech impairment, quite serious speech impairment. And they strongly recommended that he receive speech therapy.

And after several months, they did a follow-up, found out he still wasn't receiving speech therapy, and they wrote a rather heated letter saying, "What's happened here, why hasn't he received that speech therapy that he needs?"

Q    The third paragraph on Page 11, and this would have been the point in time where Cory, by age, would have been 14 years old --

A    Yes.

Q    -- that paragraph indicates that he still was a well-related, but depressed, anxious, and severely learning-disabled boy.

A    Yes.

Q    And it also makes references to his continuing experience with his mother.

A    That's right. This continues to be a problem, that they can't make contact with the mother. They

3597

can't get the mother to be involved in treatment. He

would go home to spend some weekends with her, but he wouldn't have much contact with her. She would go off and do her own thing and he would be on his own to do whatever he found that he could do on his own. She couldn't get her involved in treatment. They became concerned that she was verbally abusive of him. That is, she would deride him and castigate him because he couldn't do better in school.

And they tried repeatedly to explain to her that he had a learning disability, that this was not his fault, that he wanted to learn, and that there was no way, as they found out, that he could do better than he was doing. I mean, it is analogous to if a child had a handicap and couldn't walk and the mother says, "You have got to get up and walk," and there is no way he could. Because his disability was not visible, it wasn't tangible, the mother wouldn't accept it. She wanted him to go to college. She told him he was dumb. And Cory was very devastated by this, to have the only person, really, in his life, the only family member that he could have some connection to other than his brother, telling him to do something impossible.

Q     You indicated in your preliminary remarks to the jury that your conclusions, you had come to the conclusion that there were two factors that affected Cory's psychological development and his ability to adjust in society.

A     Right.

Q     And you indicated that one of those was the unstable family circumstances and rejection of his mother.

A     Yes.

Q     And the second was his severe learning disability.

A     That's right.

Q     And in January of 1983, when he was age 14, Ms. Turnquest's comment in that third paragraph on Page 11 is simply that, that Cory is a well related, depressed, anxious, severely learning-disabled boy who has experienced his mother's rejection and emotional unavailability."

A     Yes.

Q     So that diagnosis is certainly not a new one for Cory; is that correct?

A     That's right. This is not my retrospective diagnosis. This was written time and time again in the records. This is echoed later on in further records, too, that we can come to if you wish.

Q     On page 12, the December, 1983 treatment review, can you touch upon that?

A     Yes. "Cory readily states he does not want to

go home at this time and that he needs to work on his problems. Cory's primary concern is his learning difficulties. He is quite frustrated by his reading disabilities and worries about his future. Cory receives remedial reading three times weekly."

Then it says, "It is important to note that Ms. Johnson spent the entire day with Cory and child care workers observed how extremely rejecting his parent is towards Cory. In the cottage later in the day, she had almost nothing positive to say to him."

Consistently, when the child care workers saw Cory with his mother, they became discouraged and concerned, because she was so habitually negative and demeaning to him. And this just simply aggravated his low self-esteem, his sense of himself as not good enough, and uncapable.

Q   I don't want to take you out of an order that you want to follow, but if we could address the speech and language disorder problems and the testing which followed that.

A   Right. That was November of 1983 is when they sent him to Phelps Memorial Hospital Center and gave

3600

him a very extensive evaluation. That's on page two and three. It is out of order here.

Q   That is the initial diagnosis, and then was there a testing done of him, and is that contained on page three?

A   Page three are some of the test results from that November, 1983 evaluation. So he has been there a year-and-a-half now, and had this evaluation. Chronological age is 14 years, and on these tests he ranges from nine years to 12 years in his level of functioning on these speech and language-related tasks.

Q   The Peabody Picture Vocabulary Test, where he had a demonstrated standard score of 69 and that would equate to a roughly nine-and-a-half year old child --

A   That's right. That's in the mentally retarded range.

Q   That would have --

A   That's the performance of somebody 14 years old who is mildly mentally retarded. They did not view him as mildly retarded because they knew of his learning disability, but his function in that area was that low.

Q   Dr. Cornell, as Cory aged over a period of time

3601

to his current age, did he advance or did his abilities stay at this age level?

A   Well, they advanced somewhat, but he wasn't advancing at his chronological growth rate. That is, he was falling behind. And the older he gets, the