# EXHIBIT 7 - PART 2

further behind he would fall. In the area of reading, though, he has advanced very little if at all. In arithmetic, he advanced up to about the sixth-grade level, I found in my testing.

Q    On page four there is a reference that I think you mentioned earlier in your testimony. Did Cory want to be treated for this speech disorder?

A    He wanted treatment for it very much. He got increasingly frustrated that he did not get speech therapy. He was promised it, he looked forward to it. For him it was one of the reasons why he was agreeing to not be at home. No kid wants to live in an institution. But to his credit, he wanted to live there to get help. And he did not get this help while he was there. This was frustrating to him. It was also frustrating to the other staff, who were upset that he was not receiving it.

Q    The third paragraph down on page four indicates that Cory had a very intensive evaluation in September of that year.

A    Right. That's the scores that I just mentioned. Yes.

Q    It indicates that in those five appointments, he was most cooperative during this analysis and is anxious to start therapy.

A    That's right.

Q    And that pervades these reports; is that correct?

A    That's right. For a number of years, he kept up very high motivation and ambition to do well.

Q    That speech difficulty, did it also  --  was there evidence of stuttering or such problems as that?

A    There had been stutterings, marked stuttering when he was real young, and then he continued to show some stuttering problems later.

Q    Is it normal for such disability as speech difficulty to affect one's self-esteem?

A    Absolutely. That's one of the most serious negative consequences. People who stutter or have other speech problems become acutely embarrassed. Other kids tease them about talking funny. And Cory was very sensitive about that.

MR. COOLEY: Now if I might, Your Honor, if we might, we still have a ways to go with Dr. Cornell. I don't know if the Court feels it is an appropriate time for a short break.

THE COURT: We will take a brief break. All right, everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

THE COURT: All right, Mr. Marshal, you may

remove the defendants.

(Defendants removed from courtroom.)

All right.  We will take ten minutes.

(Recess taken from 11:35 a.m. to 11:57 a.m.)

THE COURT:  Let's bring in the jury, please.

(The jury entered the courtroom.)

BY MR. COOLEY:

Q    Dr. Cornell, I want to call your attention, if you could at this point, to page 14 behind the blue tab.  This is a point in time where Cory has had a second psychiatric evaluation, and a report is made as to his circumstances at that point in time.

A    Yes.  This evaluation is by Dr. John Stadler, who is a psychiatrist and who is the clinical director of the facility.

He says, "At the Cottage School Cory has a reputation of being a good boy, one who stays out of trouble, even though he lives in a cottage where there is a good deal of trouble.  He does not drink or smoke pot.  He does not run away.  I have never known him to be suspected of stealing.  On the other hand, his learning disorder is not responding to any of our teaching methods."

He did not give him an Axis I disorder, although he noted a history of parent/child problems and of conduct disorder which he says are not present now. He did give him a diagnosis for the learning disabilities, that's Axis II, "Longstanding Developmental Reading and Arithmetic Disorders, Severe."  He also noted positive soft neurological signs and evidence on psychological testing of central neurologic dysfunction, diffuse.  I realize some of this is repetitious.  But my concern is that there was consistency across experts, across time, when people saw him.  And I spoke with Dr. Stadler and asked him about his evaluation.  He remembered Cory.  He remembered that he was very troubling to the staff because he was so well-adjusted, yet so impaired.  He also complained as the director of the agency that they had not had a speech therapist and sufficient remedial reading teachers to assist him as they wanted to, and that that was a chronic problem which they still had to the present day.

Q    On the following page, page 15, that contains -- this, time-frame-wise, we are now at a point in time where Cory has just turned 16.  He remains at the school at that point in time.  He remains in a residential program rather than being at home, and he has been transferred at this point in time from a cottage that contained younger boys to a cottage called a senior cottage; is that correct?

A      That's right.

Q      That transfer was made in the summer of 1984.

A      They made the transfer, started giving him summer employment jobs, doing manual labor.  He held a variety of summer jobs.  He was proud of the fact when I spoke with him, Cory was, that he stuck out those jobs.  He worked at them even though he didn't particularly like the manual labor that he had to do.  He also was placed in a more vocational-oriented program called BOCES.  It is a special educational program in which he was learning carpentry and did reasonably well.  He tended to do best when he did things with his hands that did not involve language.  Anything that involved language, he had serious impairment in.

Q      The last sentence in that first paragraph on page 15?

A      Yes.  "He is supposed to receive remedial reading and speech therapy, but for reasons not clear, has had no one-to-one instruction for several months."  This is a report of another psychiatrist, Dr. Clemmens.  This is, I think, the third psychiatrist to see him.  And again, they had trouble providing him with the special services he needed, and for some reason these services lapsed at various times.

Q      And this certainly was in spite of his desire to be -- to have this treatment, to address his problem; is that correct?

A      He voices it here.  I think now at 16, he has been there several years.  He says, "Cory was sarcastic and extremely resentful about receiving neither remedial reading or speech therapy."  The psychiatrist quotes him.  "'School-wise, they haven't done a thing for me.'  When I questioned the lack of remedial reading he answered angrily, 'They get my hopes up high and then you do no shit.  That's why I want to depend on nobody no more.  You are all full of shit, every one of you.  Nobody has raised a finger."

He had an angry outburst to this psychiatrist over his frustration.  And then when I read that I thought well, he is now starting to really bad mouth the institution and show a more negative attitude.  I wondered what the staff think of him.  Dr. Clemmens in that report says  --  he agreed with him.  She said, "Outside of being raised in a problematic family he has to cope with a severe learning disability which is highly frustrating and embarrassing.  It is understandable that he feels bitter and resentful about not receiving adequate help.  In addition, it is difficult for him that he

had to relate to five different social workers within one year."

I spoke with Dr. Clemmens. She also remembered Cory well despite the passage of time, and she similarly expressed frustration. She was not offended at his criticism of his treatment. She agreed with him that he had not received the kind of treatment that he had been promised, and that he was very frustrated by that.

Q   On page 16, and what has just been placed before the jury, is a report of the fourth psychological evaluation of Cory, being done in March of 1985.

A   Right. He is sixteen-and-a-half. A psychologist who had seen him before who had first diagnosed the severe learning disability came back, did a second evaluation, and found a decline in his performance, found that his scores, his IQ scores, had dropped and were now in the mentally retarded range or close to the mentally retarded range, depending on the particular score. In the verbal area, his verbal IQ was 68 to 70. That is in what he calls "mentally deficient," same thing as mentally retarded borderline range. His performance IQ was slightly higher. His ability to form non-language, nonverbal tasks with his hands, 78 to 81. That's in the borderline to low average range. So he is better in that area. His full IQ, though, which combines those two, was 69 to 74, which is in the mildly retarded range. It is right on the edge, on the upper limit of the borderline mentally retarded range. But it falls into a range of mentally retarded individuals. Dr. Barish says these scores reflect a significant decline since Cory was tested in 1982. "This decline is difficult to account for. However, several factors may be involved. The current scores may reflect in part the increasing demands of the task presented..." that is, the tests are now harder because he is an older fellow, so he is getting harder questions, as well as Cory's failure to learn at an expected pace, that he is not learning at a regular pace. He is falling further behind.

He also says, "They also undoubtedly reflect the effects of Cory's severe discouragement and depression with respect to cognitive tasks." That is, he is starting to become discouraged and to give up. And elsewhere in this report, not quoted here, Dr. Barish points out that when he gave Cory some extra help and gave him some extra opportunity, he showed that he could do a little bit better. But he is becoming discouraged.

He also did personality testing, and this last

paragraph says that. "Personality assessment reveals a thoughtful, highly reflective, but affectively constricted adolescent. Cory expends considerable energy in his efforts to suppress anger. He appears vulnerable to periods of depression and frustration. There is also evidence of feelings of aloneness and a desire for help that is not being heard. Several responses suggest that Cory feels he is not being listened to. Cory's test responses also reveal an effort toward maturity that is particularly impressive considering his severe learning disabilities."

So they are noting mounting frustration, mounting difficulties, continued motivation, continued attempts to do well, but considerable stress that he is showing now.

Q    If you would continue on to the March, 1985 treatment conference. Paraphrase that, if you will.

A    They summarized, sort of did a summary of why he was there, what kind of problems he had when he came there. They point out in this quotation that it was arranged for him to have remedial education. They say, "However, due to Cory's reluctance to attend, and staff's miscommunications around the time of the appointment, sessions were infrequent, irregular, and this was not beneficial to Cory."

They shift some of the blame on to Cory for not showing up for some of the classes. They also do acknowledge, this person does, that there were some problems with arranging services. As I've mentioned before, I talked with Dr. Stadler and Dr. Clemmens about that, and they felt that they did not have the appropriate staff to give him services at those times.

Q    Now, on page 18 in the March treatment conference, March of 1985, they continue to see difficulties with the programs being able to have any meaningful contact or for Cory to have any meaningful contact with his mother; is that correct?

A    That's right. Now he has been there several years. This is a time ordinarily when you send people back to their home. And they have had very little contact with the mother. She has not been available. And in fact, she seems to withdraw more. They say, "Ms. Johnson withdrew more from Cory. She requested home weekend trips go back to two times a month. Cory had been going home weekly, and refused a visit at the last minute. Cory reacted with anger, and it was seen as a good sign that for the first time he was able to verbally state his anger with her. Cory regressed somewhat during this time period. He refused to attend school on several

days.  He was despondent, depressed, acting inappropriately in the cottage, making animal noises, and he avoided sessions with the worker.  Cory was able to mobilize self and pull out of the depression before acting out in any serious manner.  This is seen as a positive progression for Cory."

As his mother pulls away from him, he becomes very upset and frustrated and his behavior deteriorates.  He is still attached to her; he very much wants to be with her.  She is someone that he admires.

Continuing this report:  "Ms. Johnson continues to be surfacely involved with Cory and PCS.  Though available to attend some meetings with the agency, she has frequently canceled appointments for apparently valid reasons.  She does not visit Cory on campus.  Ms. Johnson is a self-focused woman concerned primarily with her own needs.  Though verbally expressing her concern for Cory, her actions continue to speak to her emotional unavailability to him."

This is very strong language for somebody to put in writing.  I can tell you from working at agencies like that that you are very careful when you criticize a parent and you don't write things like this unless it is quite serious and you can back it up.  So when I read this, I was quite impressed by this level of criticism of her.

Q    The Freedom of Information Act would allow her to get this and potentially file an action against these folks?

A    Absolutely.

Q    Could and probably would have.  Whatever.

A    We are all concerned about this when we write these things.

Q    The petition that is shown on page 19, this involves a change of manner in which Cory is going to be held, or the type of facility that's going to be available for him?

A    Yes.  The usual plan in Cory's situation and in all similar situations is to return home.  Children are placed in institutions temporarily, and the goal is to return them to their parents.  It is unusual for a change in that plan.  They felt they had to change that plan; that Cory's mother was not capable or willing to take him back.  The Court petition, Family Court of the State of New York, says, "Father is not involved.  Mother is involved in her own personal problems and shows only minimal interest in child.  She does not cooperate with agency in planning for child, and reveals only scant information about herself.  Child is equally

secretive about his mother's lifestyle and will not discuss it. However, he has adjusted well in the group home and is on good terms with staff and peers."

This reference to the secretiveness is because they had concerns that she was involved in criminal activity and drug use. They could not prove it or establish it, although subsequently she was arrested,

and although Cory revealed that he learned of it himself. But they worded that very carefully in this legal statement here.

Q    That petition placed Cory in a group home, occurred when he was 17 years old; is that correct? This came from June of 1986.

A    June of 1986. That's right. They decided that rather than send him back to his home, they would try to find a group home for him. Initially, they didn't have a place. They didn't know where he was going to go, but they felt he couldn't go to his home. And eventually an opening became available in an apartment in Queens, New York, in a large apartment building where they had several boys of his age living there with some foster parents who took care of him. So there was an opening and that became the goal, for him to go live there. This was, of course, quite disappointing to him. All along he had been planning to return to live at home. He had been making weekend visits home, and then that wasn't going to happen. He was going to have to go somewhere else, live in Queens.

Q    This additionally would have been a change in setting for this young man; is that correct?

A    A very big change. He is going to be living in

a large apartment building, highrise, in an apartment in that building. He is not going to be in the Cottage School, which is basically a campus that has its own athletic facilities, own school, own residential area. There are comments not included in the record where he expressed apprehension about that; that he felt protected and safe in the Cottage School. He didn't want to go back into the streets of New York where he had -- where he had been threatened, been assaulted, where he had seen a lot of violence take place. And he was none too happy to go live, not with his mother, but with strangers in an apartment there.

Q    The report there by Odette Noble, a social worker on page 20 --

A    Yes, this is a change. Odette Noble began to work with him when he went to the group home. That is, he left Pleasantville Cottage, went to the foster group home, Elmhurst Boys' Residence. It is an

apartment in a highrise. A social worker is assigned to meet with him weekly, to meet with the mother, and to continue to work towards Cory eventually going home. That's the plan. She expressed in this quotation her frustration.

"Ms. Johnson is extremely elusive. I have made

3616

numerous appointments with her and she has not kept them. She will call and cancel, but she will not follow up and make another appointment. She is also not terribly responsible about calling and arranging for Cory to come home over the weekend. Even though Ms. Johnson is quite irresponsible in her relationship to Cory, Cory talks about her as if she is a goddess and is terribly responsible in relation to her. It is as if he is compensating for her real neglect of him." This is stated several times in the records.

Q    Ms. Noble makes a second report in the group home conference report on page 21.

A    Right. It is now 1986, six months later or so. "On the whole, Cory continues to be using the residence well, and would seem to want to remain living there. He has made relationships with both the house parents and the boys, and is liked by both. Cory continues to be quite active and assertive in how he handles himself. And he can be a bit of a monopolizer. But the boys continue to take this in their stride and not seem to mind it. He talks a lot, apparently, in group meetings. Part of the boys' acceptance would seem to be related to Cory's ingenuousness and decency. Cory is very in

3617

earnest about succeeding and articulates that point of view to the other boys." At another place, they talk about him sort of almost like having a preacher quality. He is telling the other boys they have to do well.

MR. VICK:    The editorialization, I thought, was not appropriate. I object to it.

THE COURT:    The objection is overruled.

BY MR. COOLEY:

Q    That reference is not  --  that's coming out of the reports, isn't it?

A    I'm referring to portions of the report that I read, that are not in the quotation, to try to explain them. Let me just read verbatim what he says here. "One senses that periodically Cory might feel the wish to live with his mother, but he doesn't discuss it openly and, I think, deep down he knows that his mother is just not able to provide a stable, secure home for him. Cory is quite secretive about his mother's lifestyle and doesn't share with me and, I don't believe, with the house parents, some of his

chagrin at what his mother does. We only pick it up by his behavior and what he does not say."

Q    Finally, Doctor, the difficulties with his mother continued to be reported in the June, 1986

3618

report. They had not seen her or had any contact with her at that point in time?

A    Right.

Q    And then Cory became aware of her own -- of her, being his mother's, difficulties with the authorities.

A    That's right. It says at the beginning of March '86, Cory learned that she was arrested and was in jail in New Jersey. He told his house parent to inform me, and then Cory and I discussed it. I haven't heard from her or any other family member. Cory states he doesn't believe his mother is guilty and that she was framed. He acknowledged it had something to do with the use of credit cards. I suspect Cory knows the truth, but is keeping it from us."

Q    Doctor, let me ask you if you would to go back to the chronology, which is behind the green tab at the front of the book. At this point in time, you have brought him down through the summer of 1986.

A    Yes.

Q    In the summer of 1986, the entry there on chronology that shows his age, 17, he was involved in something that brought him into the criminal justice system.

3619

A    Yes. That's right. During this time he became aware of his mother's increasing involvement in drug abuse, crack addiction. He was very upset by that. His attitude declined dramatically. And he became more involved with several of the other boys, Dwight and Mitch, who lived in the group home. And he related to me that he wanted very much to be accepted by these boys; they were his friends. He felt like they were -- like he was loyal to them. And one fellow, Mitch, whom he looked up to, told him he was having trouble with another boy. He referred to him as a Hispanic young man. And Mitch encouraged Dwight and Cory to go with him to try to intimidate this other boy.

And Cory related to me that they in fact did go up to this boy and threatened him, and that this boy, somewhat to his surprise, pulled out his paycheck -- Mitch and this boy worked together -- and gave it to them. So in essence, they robbed him. He told me at first they hadn't intended to do that, but when they saw that this boy did it, they went back and did it a second time. And when that happened, the police were contacted. Mitch was arrested. Mitch then was

interviewed by the police and revealed that he was assisted by Cory and Dwight. Cory and Dwight then spoke with their foster care people and went down to the jail or to the police department and turned themselves in.

Q He was, in fact, incarcerated at that time at Riker's Island?

A He was put in jail initially. He was bailed out by the foster parents. He then pled guilty and received a sentence of, I think, ten to twelve days in Riker's Island, which is a rather well-known, rather rough jail in an island in New York City. And he was very distressed by that experience. That was a very troubling experience. He had never been exposed to quite that kind of environment before. But he had got involved with Dwight and Mitch, wanted to be accepted by them. Mitch wanted to take revenge on another boy, and Cory, who I don't think really knew this boy, wanted to be loyal to his friends and do what his friends did, and he got himself involved. He admitted this candidly do me.

Q No disputing he was guilty of that?

A No. He told me he was guilty. He told me what he did. He told me he was in jail.

Q He continued after that to stay at Elmhurst for some months; is that correct?

A Well, he came back to Elmhurst, after his time in jail. He showed a real decline in attitude. He seemed very uncooperative with the foster parents there. He expressed a lot of anger. They continued to press him about what was going on with his mother. He got angry. He was offended by that and he defended his mother. And at one point, I believe in February, several months after this arrest, he had an argument with the staff and they laid down the law to him. They told him "Look, if you aren't more cooperative, if you don't agree to follow our rules, you are going to have to leave." I checked into it carefully. He had not assaulted anyone. He had not broken laws there. But he was showing a bad attitude and they didn't accept boys there who didn't show that they wanted to be there. So they told him that he would have to temporarily go home until his attitude improved. And so he abruptly left, and he did not return.

Q And thereafter, was there an occasion in which he was charged with an offense?

A That's right. He returned home to his mother, continued going to school, was suspended from school for squirting a teacher with a fire extinguisher the last week of school, did not attend his graduation.

Q Was he to receive a diploma if he graduated?

3622

A   Well, there is  --  the mother couldn't tell me.  She didn't know.  My best understanding from the records and from what Cory told me is that he was to get a certificate of completion; that he couldn't get a full diploma because he was in the occupational training program and he could not pass the literacy test to get a diploma.

Q   Thereafter, he got into some trouble; is that correct?

A   Yes.  After that time, he was arrested and accused of another robbery with several other young men.  He was put in a police line-up and he was identified in the police line-up.  He strongly indicated to me and also indicated in the record at that time that he was mistakenly identified; that he was not  --  that he did not commit this offense.

Q   So as to that alleged attempted robbery, he denied that he was indeed the person who had committed that?

A   Yes.  That's the only thing he ever denied to me.

Q   From the birth through age 21.

A   Ever.

Q   In discussing those items with him, he acknowledged guilt and wrongdoing at any point where

3623

it was raised.

A   Yes.

Q   But as to this issue he did not, and in fact adamantly proclaimed his innocence; is that right?

A   That's right.  He acknowledged to me a number of extensive involvement in some drug dealing and illegal activity.  This is the only incident of which he was accused which he told me he did not do and that he was falsely accused.

Q   In spite of his proclamation of innocence, based on one-on-one identification of Cory, he was indeed convicted.

MR. COOLEY:  And Judge, we would reference for the record, I believe it is Government Exhibit PP-1, which is the conviction for attempted robbery.

BY MR. COOLEY:

Q   And he received what penalty?

A   I don't know the exact penalty.  He decided to plead guilty because he was told that he would receive several years in prison if he were convicted, and that he would be convicted.  And he decided that if he pled guilty he would get a period of up to a year.

MR. COOLEY:  And indeed, Judge, if we can ask the Court to take judicial notice of that, that

3624

exhibit, there is a one-year sentence to Riker's

Island.

BY MR. COOLEY:

Q   And that is when he went to Riker's Island the second time; is that right?

A   That's right.

Q   During that period of time at Riker's Island, did Cory express to you any circumstances which concerned him?

A   Well, he was  --  after he pled, he became distraught. He regretted his decision. He became upset. He had had some plans and hopes of entering into the military, of joining the Navy, and came to the belief that because of this conviction he would not be allowed to do that. I don't know whether that's true or not, but that was his belief. He also received a letter from his father which was very upsetting to him and he began to have nightmares and to be very troubled, appear very troubled in the jail.

He was seen by a chaplain in the jail who was sufficiently concerned about him to refer him to a psychologist, who then saw him weekly for, I think, about two months up until the time he was released. This psychologist reported that at that time, Cory was expressing regret that he had pled guilty to something that he didn't do, a great deal of emotional distress over what had happened to him, and he was seen as someone in need of psychological counseling for this time in jail. And subsequent to that, he finished out his time at Riker's Island and was released.

Q   Now, the first visit when he admits he got into the situation where he went down and turned himself in but spent some days at Riker's Island, he was 17 at that time. At the time when he receives this 12-month or one-year sentence at Riker's, he is 18 and serves during his 18th and 19th year; is that correct?

A   That's correct.

Q   In terms of his one year at Riker's Island, of what are you aware in terms of any visitation by family or others?

A   Well, the records indicate that he complained that he did not receive visitors during the lengthy time period that he was there, and he was quite despondent that he didn't have family contact while he was there.

Q   And based on your discussions with him during the course of that one year, did his mother or any other family member ever visit him?

A   He told me that she did not. His mother told me, quote, "I wasn't there for him." She said she

was too involved in her drug problems and her relationship with her boyfriend, and that she could not be available, and that she regretted that but she couldn't.

Q    Following release from Riker's, he went back to New York, or did he move to another area?

A    After he was released he went to North Carolina for several months and spent part of that time with his half-brother's father, I believe, Mr. Butler, a person that he had lived with when he was young who agreed to take him in for a period of time.  He spent several months there in North Carolina, and then subsequently returned to New York.

Q    All right.  He ultimately, after working for awhile with a warehouse job loading or unloading trucks, he then moved to New Jersey and became involved with drug distribution?

A    He met some young men while in New York whom he had met on the streets who told him that he could make a much better living selling drugs in New Jersey.  He had by this time already become involved in using marijuana, and had sold marijuana, he told

me.  And he began to sell marijuana to support himself at this time.

Q    Ultimately, after that he moved back to New York for a brief period of time, and then came to Virginia in the fall of 1991 at the age of 22; is that correct?

A    That's correct.

Q    All right, sir.

MR. COOLEY:  Your Honor, in discussions with the government, and I will ask the Court for its preference in this, we have still more to produce through Dr. Cornell.  We have two witnesses, one of which we would like to call out of order.  I think the government does not object.

MR. VICK:  I have no objection.

MR. COOLEY:  We would like to call one of those witnesses before lunch, or if the Court prefers immediately after lunch.  The second witness we would like to put after lunch, and then finish with Dr. Cornell.  That witness I would anticipate being roughly 20 minutes.  Whatever the Court's preference is.

THE COURT:  I think we may have to put it off.

(Court conferring with Clerk.)

All right, let's say about 20 minutes.  Let's go ahead and try to get that in.

MR. COOLEY:  If we could excuse Dr. Cornell for just a moment and call Mr. Jerry Lefkowitz.

(Witness stood aside.)

GERALD LEFKOWITZ,
called as a witness by and on behalf of defendant
Johnson, having been first duly sworn by the Clerk,
was examined and testified as follows:
                    DIRECT EXAMINATION
BY MR. COOLEY:
Q    Good afternoon to you.  If you would address
your responses to the ladies and gentlemen of the
jury.  Would you tell them, please, your full name?
A    My name is Gerald Lefkowitz.
Q    Your profession?
A    I am a social worker.
Q    And do you have any particular education or
license, any background?
A    I have a Master's in social work degree from
Adelphi University in Long Island.
Q    And you are employed by whom?
A    I am employed as the director of the
Pleasantville Diagnostic Center, which is a branch of
the Jewish Child Care Association.

3629

Q    How long have you been associated with the
Jewish Child Care Association, and specifically, with
the Pleasantville facility?
A    Eleven years.
Q    All right.  Can you tell the ladies and
gentlemen of the jury, please, the components of the
facility there at Pleasantville?
A    There are two basic programs in the residence.
One is the Pleasantville Diagnostic Center, which is
a short term two-month program where kids come for an
evaluation.  And the second part of the program is a
long term residential treatment center called the
Pleasantville Cottage School.
Q    Now, the diagnostic center is associated with
the Jewish Child Care Association?
A    Yes.
Q    And on the facility grounds, is there a school?
A    Yes.
Q    And what is the name of the school?
A    The Mt. Pleasant Cottage School.
Q    And is that school, that academic school,
associated formally with the Jewish Child Care
Association?
A    It is not part of the Jewish Child Care
Association, although it is mandated to provide an

3630

education for all the children who are on the grounds
of the Pleasantville Cottage School and the
diagnostic center.
Q    Is it affiliated with and licensed by New York
State?
A    Yes.
Q    Now, in your capacity there, the Pleasantville

Cottage School, does it involve a residential program for youth?

A   Yes.  The kids live there.

Q   And they are educated at, I take it, Mt. Pleasant Cottage School, they live at Pleasantville Cottage School, and before they are allowed entry to either of those they must pass through a diagnostic center called Pleasantville Diagnostic Center?

A   Not everyone comes through the diagnostic center.  Some of the kids come referred from the Family Court or from the Department of Social Services or from other agencies.

Q   I see.  The residential treatment center is set up with what type of residences?

A   The kids live in cottages.  There are about 14 kids to a cottage, four staff members working in taking care of the kids in the cottage.

Q   Are there potential goals once a youngster comes through or comes to the school, is placed at the residential facility?  Are there goals set up for that child?

A   There are goals that are set up immediately when we interview the child and the family upon admission.  Then there is an initial treatment plan in which goals are set up.  That's done two months after a child is there.  And then those goals and plans are evaluated every six months thereafter with the team, with the child, and with the family.

Q   Mr. Lefkowitz, the ultimate goal for any child who is brought into the program, are there indeed three ultimate goals, one of which must be selected?

A   Well --

Q   In terms of the ultimate placement of the child?

A   In the State of New York all children coming into foster care, and this is part of the foster care system, there can only be three possible goals for the child.  It is either return home or free the child for adoption, or when the child becomes fourteen, a goal can be for him to, or her, to go to independent living.  So those are the three possibilities, possible goals.

Q   Mr. Lefkowitz, during the mid-1980's, 1982 and 1983 and 1984 and 1985, did you have occasion to have contact with the young man seated over here, Cory Johnson?

A   Yes.

Q   And did Cory come into your facility by first passing through the diagnostic center?

A   Yes.

Q   And he was, I believe, placed there by a voluntary petition from his mother which would have

brought him into that circumstance; is that correct?

A    That's correct.

Q    You have reviewed --

MR. COOLEY:  And for the jury and the Court, I would make reference to page one under the blue tab.

BY MR. COOLEY:

Q    There is a petition that was entered, or a ruling entered by the Family Court of the State of New York which indicated that it had found and determined that Cory Johnson, said child, was removed from his home on February 1st, 1982; that the parent is unable to make adequate provision for the care, maintenance, and supervision of the child in her home, and it is determined to be in the best interests and welfare of Cory that  --  his interests would be promoted by removal of the child, Cory, from his home.  And in your discussions with me regarding that, what is the necessity of that finding by the Court?  Why was that made?

A    Those findings are applied to voluntary placements.  And shortly after a voluntary placement is made between the mother and the Department of Social Services or the parent and the Department of Social Services, the Court must review that that agreement was in fact something that the parent has knowledge of, understands, and is in agreement with. And that was the nature of that document.

Q    For a youngster, once they arrive there where a parent has voluntarily turned them over, even so, the state prefers that that child be returned to the home; and in order for the child to stay, a review must be made after two months to determine whether the family, or the mother in this case, is ready to take him back, able to take him back.  And if not, this ruling would allow the child to stay in foster care?

A    Not quite.  The purpose of that review was that the parent understood the nature of what the placement was going to be; that she agreed with it; that not only did she agree with it, but she understood what she was agreeing to.  And a Family Court Judge would oversee that.  That was the case.

Q    During those years I've described, 1982 to 1985, what was your role at Pleasantville?

A    I was unit administrator.

Q    And your duties would have involved what?

A    I was in charge of a unit that consisted of three living cottages and all the staff associated with those three cottages.  That's child care staff, social work staff, psychiatrist, psychologist.  I did the liaison work with the school people and

recreation and that kind of thing.

Q You were the head man of that unit?

A That's correct.

Q And you were supervising these other folks and you also, I believe, were in charge of discipline; is that correct?

A That's correct.

Q All right. Did you have occasion -- and I don't want to give the false impression by having asked you the question about discipline -- but did you have, in the course of your dealings with the staff and such and the children that were placed there, have occasion to see the students, to see the children who were in the care?

3635

A I would see the kids in the course of a working day daily. I would visit the cottages, see them at school. When they came in for their social work appointments or testing, they would stop by and I would get a chance to see them. And I would also see the kids when they were brought into me for disciplinary reasons.

Q Now, in the course of your day-to-day functioning and supervising, did you have occasion on a daily basis, or near daily basis, to see Cory Johnson?

A Yes.

Q I take it that was not in a disciplinary mode on a daily basis?

A No.

Q Or anything like that; is that correct?

A That's correct.

Q Do you recall Cory during those years?

A Yes.

Q Can you give a brief description to the ladies and gentlemen of the jury of your impressions of Cory when he first came to the program?

A When he first came to the program?

Q Yes.

A Anxious youngster, a good kid, a kid who was not

3636

a troublemaker, a kid who knew that he couldn't read, knew that he had learning problems, wanted to do something about it.

Q Was he motivated to improve his skills?

A He was motivated to learn.

Q In the early years that he was there, was it your impression that Cory saw himself as ultimately being able to conquer these problems and to advance and to live the normal American life?

A I believe that he felt that he could learn and that he wanted to learn, even though there was nothing in his experience that would lead him to believe that. I think we held out the hope that he

could learn and he would learn. And I think he wanted to. He was one of the few kids who did not hide that fact from the other kids. I think everybody knew that Cory had this problem because Cory let everybody know in those early years.

Q    That he couldn't read?

A    That he couldn't read, that that was a problem for him, and that he wanted to do something about it.

Q    And in terms of  --  let me ask you just briefly about his family. There was a point in time where he had a younger brother that actually was placed as well at this institution; is that correct, this facility?

A    His brother, Robert, was placed at another facility before Cory came into placement, another institution, another residential treatment center similar to ours. His brother was the first of the two boys to be placed.

Q    Did there ever come a point in time where Robert was transferred to Pleasantville as well?

A    Robert left that agency, went home, and within  --  I don't remember exactly how many months, but within a number of months he began to be problematic seriously at home and he went to the Pleasantville Diagnostic Center for an evaluation while Cory was in placement with us.

Q    Now, as relates to the goal for Cory, when Cory first came to Pleasantville the three goals you indicated of ultimately getting either back home, independent living, or adoption, which of those goals was set by the staff along with Cory? What was designed for him ultimately when he left Pleasantville?

A    To return home.

Q    To return home. Was that his desire?

A    That was his desire.

Q    And during the course of the time he was there, did there come a point in time where a change in his ultimate goal had to be made?

A    Well, I don't know if it had to be made. We made the change. At about the halfway point, for many reasons, we changed the stated goal from return home to independent living.

Q    For most of the kids who come through there, the goal is to return home; is that correct?

A    That's correct.

Q    For most of the kids that come through there, they do ultimately return home?

A    That's correct.

Q    But for Cory, that just never happened.

A    No, it didn't happen. He didn't go home from

Pleasantville. He went, after three years, to a group home.

Q   And normally, before a final discharge, kids are allowed to start visiting with their home, go home for weekends and such; is that correct?

A   Well, right from the beginning, the kids go home. We have a calendar of visits, and it is about every other weekend. And Cory would go home most of the time every other weekend, and then there was a time when, upon his request and for many different reasons, we increased it to every weekend. I recall it because it was  --  there was contention in the team in that we had changed the goal to independent living, and yet we were sending him home every weekend. Some of the team felt that there was something incongruous about that.

And those of us who prevailed felt that he needed to come to grips with the reality of his situation at home, and the more frequent visits would bring that home to him. Plus there was another advantage: that he would be able to negotiate the  --  become more independent with the traveling by himself, be able to do those things that would make him more independent.

Q   So at the same time the goal was changed to independent living, rather than to return home, he was asking to go home more often?

A   That's correct.

Q   That was allowed because he wanted it.

A   Right.

Q   And also, because of you all's hope would be that he would begin to recognize, as he matured, the facts of life at home; that he really wasn't wanted there, and that there were other problems. Is that fair to say?

A   Yes.

Q   All right. Now, in the course of things, do you recall having discipline problems with Cory?

A   Not many discipline problems, no. Not in the sense that he was a troublemaker or that he broke rules or that he fought a lot. Not in that sense. Where we would have some problems with him was when he would kind of like shut down. He would not go to school for a couple of days or not come to a conference or not come to his social work appointments. It was that kind of problem that you had to help him get through, rather than discipline problems of an acting out or a criminal nature.

Q   As he stayed for the second and third years there at Pleasantville, and it was not aiming at that point to go home, he still of course suffered from this severe learning disability; is that correct?

A    Well, he never really progressed much with it at all.

Q    And as the other kids got older and as Cory got older, did the disparity between what he should be able to do and what he could do increase?

A    Yes. Obviously, it increased. What also increased was his -- you know, I wouldn't say he gave up, that he really gave up, but he became terribly frustrated, terribly angry.

Q    As he got further and further behind, that frustration got more and more?

A    Yes.

Q    Obvious, I suppose.

A    Yes.

Q    Now, the mother's role in assistance there, was she ever a factor, a help, a benefit to you all?

A    That's a very complicated question.

Q    Let me break it down. Was she easy to contact for you all?

A    Well, let me say she didn't come up to the institution much. She didn't participate very much in our meetings. She would come to her appointments in the city. We have an office in the city, and the social workers would come to the city on a regular basis and she would come to those. But she was unpredictable in the way in which she worked with us.

Q    Do you recall a specific incident in which Ms. Johnson called upon Cory, while he was there as a child, for help, for him to help her?

A    Yes. I didn't know Ms. Johnson very well, because she didn't come up to the institution very much. I might have had contact with her three or four, maybe five times in the three years. But there was one time that I did, and that involved her asking Cory for a loan. And I remember this very well because I have a very, very firm policy that I never, ever altered. And that is that when kids had the opportunity of working and earning some money, I made them open up a bank account and save half their money. 50 percent of what they earned they had to put in the bank and they couldn't touch that. They couldn't touch that money, even though they always argued with me about the fact that it was their money. The other 50 percent they could do what they wanted with, within reason, but that 50 percent of the money, I was adamant that it was theirs when they left and they would have some kind of a stake when they left the Cottage School.

And I never varied from that except in this one instance, where I believe the mother asked Cory for the loan. Cory came to me and said she was going to

pay it back. And I vaguely recall that it was for the payment of rent, that she was falling behind. I think she always presented that she had financial problems, but this was, you know, unique. And I went with them to the bank to take out the money. And I went with them because I was afraid that if I didn't go, that the bank book would be wiped out. And I think it was a couple of hundred dollars, $250 maybe, maybe half of what he had earned over a couple of years. And I don't think he ever got that money back.

Q    She took the money from the bank?

A    Yes. She was going to pay it back.

Q    To the best of your knowledge, that was never returned.

A    No.

Q    There came a point in time where Cory aged out of one cottage and was placed in another. Was that an easy transition for him; was he anxious for change or did he resist change?

A    I don't think change was ever easy for Cory. In his first cottage he was comfortable. He was comfortable with the people there, comfortable with the routine. I think he understood that he had to move on, that he was older, you know. The kids in the older cottage were doing things that were more age-appropriate. With Cory, it kind of took longer to prepare him, to get him to accept moving on. He eventually did, eventually did okay.

Q    Now, Mr. Lefkowitz, he then ultimately was moved on to Elmhurst; is that correct? To the group home program?

A    Right.

Q    And was that because he was difficult to deal with or lacked motivation or what occurred when that time frame came?

A    It was time to move on. He had been there a couple of years. It didn't look like we could pin the mother down to plan with us to take him back, and then it was a question of what would happen to him. He was in a vocational program, doing okay in the vocational program. You know, there comes a point of diminishing returns and it seemed like that was happening for Cory. He was getting more frustrated with being here and being with us.

Q    And his inability to advance in terms of academics?

A    I think we were all kind of stuck. And he needed to move on. That's what we felt. Cory accepted it, you know. Cory was the kind of kid at that time who kind of accepted, you know, whatever you wanted to do for him. He would accept it.

MR. COOLEY: Mr. Lefkowitz, if you would, answer any questions that either counsel for the government might have.

THE COURT: Do you have any questions for this witness?

MR. PARCELL: Briefly, Judge.

CROSS-EXAMINATION

BY MR. PARCELL:

Q   Good morning, sir. Are you aware that I think it is the orange tab, that the young man was tested at your school in February of 1982; is that correct, given a psychological evaluation?

MR. COOLEY: I don't think he has this book.

MR. PARCELL: I will ask him to be given it.

(Document proffered to witness.)

BY MR. PARCELL:

Q   Just the fifth tab, sir. If you would go to the fourth page.

A   Yes, sir.

Q   And at the top it says, "In the verbal area Cory achieved his highest score in comprehension"; are you following me? Page two?

A   Yes.

Q   Would you read this first three lines, if you would?

A   "In the verbal area, Cory achieved his highest score on comprehension."

Q   Next two lines, also.

A   "His average score here suggests that Cory has a maturing conscience and moral sense. His thinking is appropriate and his ability to use practical judgment in every-day social situations is a strength."

Q   And then you indicated he was doing well in school. And I would ask you to look at what's been given to the government labeled Mt. Pleasant Cottage School Report Card, 1983 through 1984. And would you please read the writing on periods three and four?

A   "Cory's attitude has greatly changed since the first two marking periods. He has become much more difficult behaviorially in class. He often comes without homework assignments. His overall academic development and personality suffered.

Q   Thank you, sir. Your facility is one that's funded and established by the State of New York?

A   It is a private agency that gets its funding from the New York City Department of Social Services.

Q   And you all try to have a very caring, supporting environment for the students?

A    Yes, we do.

Q    And the other gentlemen who testified before you

3647

has indicated that Mr. Johnson was better adjusted than most of your students; is that a fair statement?

A    I think he was less problematic in terms of antisocial behavior than most of the students, yes.

Q    And is it safe to say that his biggest problem at your school was his learning disability?

A    I think that was a major problem, yes.

Q    You understand he stands before this jury convicted of eight murders?

A    I understand that.

MR. PARCELL:  No further questions.  I will ask that that card be returned.

MR. COOLEY:  Could I see it, please?

THE COURT:  All right.  May the witness stand down, Mr. Cooley?

MR. COOLEY:  One question.

REDIRECT EXAMINATION

BY MR. COOLEY:

Q    Mr. Lefkowitz, from that 1982 form that you were asked to read from which is not yours, but the comment about his efforts at the beginning, did that change as his frustration level increased, as he began to lose ground over those next few years?

A    Are you referring to the conscious and moral

3648

sense?

Q    Yes, sir.

A    It is a hard question.  Cory for the most part kept away from some of the things that were going on, the kids -- some of the things that his friends were doing.  Whether they were smoking pot or they were sneaking out of the cottage or fighting with each other, he kept away, and for a period of time expressed contempt for that.  I had a sense that as he left, that was not as strong a position that he felt and took.

MR. COOLEY:  Thank you very much.

THE COURT:  All right.  You may stand down, sir.  Thank you very much.

(Witness stood aside.)

All right.  We will stop here for lunch and we will get started up at around 2 o'clock.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Mr. Marshal, you may remove the defendants.

(The defendants were removed from the courtroom.)

We will be in recess until 2 o'clock.

(Luncheon recess taken from 1:05 p.m. to 2

o'clock p.m.)

(In Chambers.)

MR. GEARY:   We requested an ex parte meeting with you.

THE COURT:   All right, Mr. Vick, go outside.  You may have to come back in.

MR. GEARY:   We have asked for it, not to raise anything that the government would be required to be here, but simply to state what we perceive as a problem for the record for later on if that becomes necessary.  In the joint penalty phase of the case, the problems are developing which we can't actually go to the other counsel with on the defense side or the prosecutors.  Fingerprints, yesterday Mr. Baugh's cross-examination of Dr. Evans was totally unexpected.  We sit there wondering what is going to open up.  This morning, Mr. McGarvey's case for Cory Johnson will show that Johnson was a leader.  The obvious question the jury  --  excuse me, a follower.  If he is the follower, whose the leader?  That's replete with what he said in the opening and in their documentation.  We just want to alert the Court to the fact that we are aware of these things and I think we have a duty to make it known in some shape or form to the Court.  Eric and I discussed how you do this.  You really can't be antagonistic to the other lawyers.  But I think we need to preserve for the record, and I think that's the reason we have to come back here.

THE COURT:   I understand what you are saying, especially about Mr. Baugh.  I don't know what you can do about that.  But I certainly was shocked to see him stand up to ask anything.

MR. GEARY:   One thing off the record.

(Off the record discussion held with the Court, Mr. Geary, and Mr. White.)

THE COURT:   All right, let's bring in the jury, please.

(The jury entered the courtroom.)

All right, call your next witness, please.

MR. McGARVEY:   I call Odette Noble, Your Honor.

ODETTE NOBLE, called as a witness by and on behalf of defendant Johnson, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. McGARVEY:

Q   Good afternoon, ma'am.  Would you tell the ladies and gentlemen of the jury your name, please?

A   My name is Odette Noble.

Q    And what is your profession, ma'am?
A    I'm a social worker.
Q    And back in 1985, let's say 1985 through 1987, were you employed as a social worker?
A    Yes, I was.
Q    Will you tell the folks your background, educational?
A    I have my Master's in social work, which I received in 1973, and I worked even before I got my Master's as a social worker. And then in 1973 I started working at Jewish Child Care Association.
Q    And you were employed there from 1985 until 1987?
A    From 1973 to 1987.
Q    But you were employed there during that period of time?
A    Right.
Q    Now, during that period of time, did you have an association with Elmhurst Residential Home?
A    Yes, I did.
Q    Will you tell the folks what that residential home was?
A    It was a group home in the community, in Queens, where eight teen-aged boys lived who essentially were not able to live with their families. They went to school in the community; they made friends in the community. And I as the social worker met with each boy every week for an hour a week and also ran a group meeting then with the boys and the house parents every other week.
Q    How about physically the layout of the house? Where was it situated?
A    It was in an apartment unit in Queens, in kind of a shopping neighborhood, residential neighborhood. It was a residential community, Queens is, about 40 minutes from my office in Manhattan.
Q    So in order to get to your office, the individuals at the house had to take a bus or cab?
A    They took the subway.
Q    They took the subway. Now, how was the house set up?
A    It was two apartments made into one. So there was one room that had just one boy and then there were, I think, two with three in them, so that eight boys could live there all together. The house parents lived with the boys.
Q    Who were the house parents? Not names, but generally what were their duties?
A    They alternated sleeping in. One would maybe come on a Monday and stay until Wednesday; another one would come Wednesday and stay until Thursday. Sometimes there would be two people on at the same

time.  But only one house parent slept in with the eight boys.

Q    And always there was some house parent there for supervision?

A    Yes, always.

Q    Were they controlled by someone else or were they supervised by someone else?

A    Well, the agency was very involved because the people downtown like myself, we were very closely involved.  So they came down every other week, the house parents, for treatment team meetings with the psychiatrist and the psychologist and the director and myself.  They also came downtown every other week for group meetings with myself and the boys.  And they had their own staff meeting, so there was a lot of effort to try to help them be more successful in their relationships with the boys.

Q    Can you give us just an overall view of what kind of boys came to that group home?

A    Well, they were generally about 14 to 19, youngsters who for various reasons couldn't live with families.  And they had kind of come to the

3654

determination that while we wanted to help them maintain good relationships with their families, that living together was not something that was possible.  So that our goal with almost all the boys in the residence was that they would eventually be able to move into the community and function independently, get jobs, do what they needed to do.

Q    Now, do you know Cory?

A    Yes, I do.

Q    Can you tell the ladies and gentlemen of the jury when you met Cory and in what capacity?

A    He came to the Elmhurst Boys' Residence from Pleasantville Cottage School.  He moved in in June of 1985.  We had had a preparation process where he came to the residence and met the boys and then went back to Pleasantville and talked about it, and then he moved in in June of 1985.

Q    And how long was he there?

A    He left in February of 1987.

Q    And during that period of time, you were his only social worker; is that correct?

A    Yes.

Q    And you saw him on a weekly basis?

A    Yes, I did.

Q    Did you get to know Cory pretty well?

3655

A    Yes, I did.

Q    Will you characterize Cory for us during that period of time, that two-year period of time?  What kind of a boy was he?

A    Cory was a really sweet guy.  I mean, teenagers