# EXHIBIT 7 - PART 3

are never completely easy, but Cory was very -- I related to him very well. He could listen. He seemed to care about succeeding. He wanted to do well in school. But he had, you know, he had serious learning difficulties which mitigated against him, you know, doing as well as he wanted to do, and as well as maybe his mom would have liked him to do. But in fact, in looking back on my notes, I described him as ingenuous, not mean-spirited, certainly not one of the more difficult boys that I worked with in my years of working with teenagers.

Q    Compared to the other boys that were in the home at the time, was Cory aggressive?

A    Well, Cory was assertive, ingenuous. He could take a stand with the boys if he felt that it had to do with right, if it had to do with being decent. He certainly wasn't afraid to assert himself and stand up. But he generally stood up for what he perceived as good values and good things.

Q    From a physical standpoint, did you see any evidence of aggression outside of the arrest?

A    Well, I mean, he was arrested. But that was kind of to help a boy out in the residence who had gotten into a --

Q    We will get to that.

A    But we were very strict in the residence that there was no physical confrontations. And Cory and all the other boys abided by that. I mean, if he got into stuff in the street, I don't remember it being a problem.

Q    Anything major?

A    No.

Q    Would you characterize his relationship with the other boys as a leader or a follower?

A    Well, he was a follower in the sense that if they had an idea that he thought he would go with, he would go with it. But he was a leader in terms of his ingenuousness and his assertiveness and his kind of openness, you know. So the boys would look to that because they knew they could go to Cory if they had a plan or an idea, that he would be ready help out and do. So I mean, it was kind of mixed. He was both a leader and a follower.

Q    When you say he was a leader, I believe you gave me an example of like haircuts, things like that.

A    Yes. Cory was perhaps a little bit more street savvy in terms of street culture than some of the boys that lived in the residence. So that they, I mean, you know teenage boys, they love to -- it is good to be bad and that kind of philosophy. So he could, you know, he could lead the way in that sort of thing. But those were not substantial things.

Those were insubstantial.

Q    So are you saying that in terms of insubstantial things he was a leader; in terms of substantial things he was  --

A    He was, you know, it is hard for me to imagine  --  I mean, it is hard for me to imagine Cory doing the kinds of things that he has been convicted of. It is just not the Cory that I knew, certainly.

Q    Now, you made reference to a robbery, a robbery charge.  Will you tell the ladies and gentlemen of the jury when that happened and what that was about --

A    It was August of 1986.  One of the boys in the residence who was probably  --  Mitch was kind of maybe a bit more fast talking and a bit more, oh, I don't, know how you describe Mitch?  But anyway, Mitch was having trouble with one of the youngsters that he worked with in the neighborhood youth corps.

3658

And he had gotten into a confrontation because Mitch was somewhat grandiose and wanted to boss people around.  So he told the kid at work that "If you don't watch out," because the kid was bossing Mitch around, and nobody should boss Mitch around, so he told the kid at work that "I am going to get my guys after you."  So he got two boys in the residence, Cory and Dwight, to rob this kid on the way to work.

Well, of course the kid immediately went to work and said, "Mitch and two friends robbed me." Immediately they came after Mitch, and then Mitch immediately told on Cory and Dwight, the other kid, and so they were arrested.  It was kind of ridiculous, but it happened.

Q    With respect to that, you were telling me earlier about Mitch.  Do you recall what the story was that Mitch had told Cory?

A    Well, I mean, I think what Mitch said is that this guy at work was giving him a hard time, he didn't like it, and he must have embellished it enough that Cory and Dwight thought that Mitch had a just problem with this kid.  So they went to help Mitch out.

Q    And what happened as a result of that?

A    Well, Mitch was arrested first, and then the

3659

police came to the residence and arrested Cory and Dwight.

Q    How old was Cory at the time?

A    I think he must have been 18 at the time.

Q    18?

A    Yes.

Q    Where was he taken?

A    He was taken to Riker's Island, which is the prison that's used kind of as a  --

Q    For how long a period of time, do you recall?
A    He was taken to Riker's and then they went to court. Or maybe they held him in court. And then it was put off until November. The arrest was August 19th, and then he went back to Court in November 26th, and then he went to Riker's for eight days after that.
Q    Did you have occasion to visit him at Riker's?
A    Yes.
Q    Will you tell the ladies and gentlemen of the jury, what was that like? What was Riker's Island like?
A    It was awful. You had to go through the guards three times, you know. I had identification. And then you had to take the bus and then you had to go show your identification again. And they took their

3660

time bringing Cory out to see us, and then Cory, of course, had to take off his shoes, you know, go through the whole thing. It was very uncomfortable. I didn't even think the guards were very nice. But it was not a pleasant place.
Q    Did Cory have occasion to tell you any stories about what he saw at Riker's Island?
A    Yes. We talked about it afterwards because he came out and he was only there eight days. He said -- he admitted it was pretty awful, and that he saw guys having sex in the beds, and of course there was the searching, and you could never use the telephones. It was a pretty awful experience for him.
Q    During this period of time, when I was asking you earlier about his mother, you had difficulty in even remembering his mother. Was that unusual?
A    Oh, yes. It was highly unusual. In most of the boys, even though they couldn't live with their families, most of the boys that lived in the residence had families that I had sessions with or I would go in a home visit with the boy, or I would have contact with the family. In fact, the two boys that were with Cory, they had families that were very involved and very concerned. But Cory's mom was very

3661

elusive. I think I met her once or twice. I mean, I knew Cory cared about her, but I didn't get any -- she didn't work with us. She didn't really try to help us help Cory. And she was almost nonexistent in Cory's life, as far as I was concerned.
Q    How many times would you say during that two-year period did you actually see her?
A    I think twice.
Q    Twice?
A    Yes.
Q    Did you have occasion to contact her on the

telephone, or attempt to contact her on the telephone?

A    Absolutely.  Part of our program is to make sure that we do try to maintain relationships with the families, because long after we are out of the guys' life, we want them to have relationships with their family.  We did a lot of reaching out to Cory's mom, but she just didn't respond.

Q    You made reference to one of your quotes in here, that Cory talked about his mother as if she was a goddess.  Can you explain that to the ladies and gentlemen of the jury?

A    Well, it was hard for Cory, I think, to admit to himself, and furthermore to us, that his mom just

3662

wasn't there for him.  He wished that she would have been, but to admit it to himself and to us would have been hard.  So he acted as if his mother was terrific.  You know, and he and I would try to talk about it, but it was hard for him to admit much.  But you sensed by his behavior that he was really very hurt and that his mother wasn't all he said she was.  But she is attractive, and I think kind of interesting to be with when he was with her face-to-face, right?  So then you know, he would have those moments of being with her, and then when he wasn't with her, she was gone from him.  But it was not an area that was easy for Cory to discuss with me.  We tried, but I didn't want to push too hard.

Q    You have indicated that you were aware of a very severe learning disability with respect to Cory.  In terms of the other boys, how would you rate that or relate that?

A    Well, Cory was in a house where all the other kids went to regular classes.  So that Cory certainly was their peer when it came to the playground, playing basketball, doing things socially, but when it came to going to school they all went to Newtowne High School, but he went to special classes.  He wasn't their peer in terms of his educational level.

3663

That was a source of distress for him.  All the other kids were mainstream, had mainstream classes.  I don't know if it is true here in Virginia, but there is also issues of kids in special ed, you know, in regular high school, and Cory was in special ed classes.

Q    At that point, would you characterize him as very susceptible to peer pressure?

A    Sure.

Q    In terms of his motivation, though, while he was at school or at the boys' residence, were you aware of a very severe learning disability?  Did he remain motivated to learn?

A    You know, it is hard.  He always tried.  But then I think when he got into  --  as you look back on the situation, maybe he was getting more and more discouraged, I think, as he was getting older.  And then the experience of Riker's in August, and then going to  --

Q    Let me stop you there.  Did you notice a change in Cory after he went to Riker's Island?

A    Well, yes.  Because then he left our residence two months after he got out of Riker's.

Q    Can you characterize that?  I mean in terms of the change, I understand he left, but did you notice

3664

a change in his attitude?

A    Well, I think he started being more difficult with the house parents and not wanting to abide by the expectations, because we had fairly clear expectations.  And so, I mean, he didn't verbalize it at the time, but looking back on it, I wonder if he didn't just say "I can't live up to these expectations, I can't do it," and so that ultimately when he left in February, it was, you know, that he didn't want to be in our residence anymore, didn't want to keep trying.

Q    Do you feel like he gave up after that?

A    Right.

Q    Threw up his hands and gave up?

A    Right.

Q    When he left, did you folks ask him to leave or did he leave on his own, or how did that happen?

A    Well, our residence was a program to help young people grow up.  We were not a rescue operation.  So if youngsters wanted our help, we would give as much as we could to help them.  And sometimes if one of the boys went home for awhile, they would come back with a renewed sense that "Hey, this is the lifestyle I want to live, this is the way I want to be."  So Cory was showing by his behavior that maybe it wasn't

3665

working out.  So he went home to his mother and we were hoping he would come back.  We wanted him to come back.

Q    Why did you feel he would come back if he went back to his mother?

A    Because then maybe he would begin to think about, well, our expectations weren't so hard, and that maybe he could build a life for himself, and that we were people who cared about him and this was a place where he could get his life together.  And so we wanted him to come back.  We were hoping he would come back.

Q    Personally, you wanted him to come back as well as the rest of the staff?

A    Absolutely.

Q    After he left, you haven't heard from him since; is that correct?
A    No.
Q    His mom, though, in fact registered a complaint against your school for sending him back home, didn't she?
A    Right.
          MR. McGARVEY:  Thank you, Ms. Noble. Please answer the questions of the government.
          THE COURT:  Any questions?

3666

          MR. VICK:  Yes, sir.
                    CROSS-EXAMINATION
BY MR. VICK:
Q    It is fair to say that the environment you attempted to provide for Cory Johnson was a loving, care environment, supportive?  Correct?
A    Yes.
Q    That was your purpose.
A    Right.
Q    And Cory ultimately rejected that environment, didn't he?
A    Well, in a way, yes.
Q    Isn't it clear that that's what he did?  And I refer you to your letter of February 18th, 1987, to the Principal at Newtowne High School.  In your last two lines you say, "We felt Cory needed some time away from our residence to reconsider his behavior and attitude.  We have not heard from Cory, so it would appear he is not interested in changing his behavior and attitude and returning to the residence."  It is pretty clear when you wrote that that he had rejected that caring atmosphere that you were providing, correct?
A    I think maybe he was despairing that he couldn't do it, giving up.

3667

Q    But he walked away willingly?
A    Right.  Well, I don't know how willingly, but yes, he walked away.
Q    Did you force him out?
A    No.  Well, we said, "Your behavior has to change."
Q    But you told him he could come back, and he stayed away?
A    Yes.
Q    He didn't want what you had to offer, did he?
A    I have to say that.
Q    While he was there, he exhibited a great amount of street savvy?
A    Yes.
Q    He was socially very able with the other students, the other residents?
A    Yes.

Q    A leader of sorts?
A    Yes.  He was liked and cared about, and respected.
Q    And very interactive with them?
A    Yes.
Q    Very much able to express himself and his position?
A    Yes.

3668

Q    And very much aware of what was right and what was wrong?
A    Yes.
Q    You no indication whatsoever that he didn't know what was right as opposed to what was wrong?
A    No.  Cory knew right from wrong.
Q    In fact, he had a very good sense of what good values were, didn't he?
A    I think so, yes.
Q    Yet he was able on at least a couple of occasions there to commit robberies?
A    Well, just one occasion.
Q    Didn't he rob tennis shoes from another boy there?
A    Oh, no.  I don't think he  --
Q    I'll read you your report from September 28th, 1985.  "Cory is one of the first to speak up and was recently involved in an event in the community where his tendency to speak up caused a bit of a problem. One of the other boys ended up getting his sneakers stolen.  When we discussed this in an emergency meeting, Cory was able to acknowledge his responsibility and help contribute money to replace the man's sneakers."
A    That didn't mean he stole the sneakers.  He

3669

spoke up.  I can't remember the details of that.  I read that in preparing for this.  But I don't think that meant that Cory stole the sneakers.
Q    He indicated his responsibility?
A    Yes.  I think it was one of the kids.  I don't remember the details.
Q    But he did go on to rob another young man with Mitch, didn't he?
A    Robbery wasn't the motive.  It was to get even, to help Mitch.  They took a watch.  The kid didn't even have a lot of money.  It wasn't like he was wealthy.
Q    Ended up taking his paycheck, too?
A    Yes.  But it was a blank paycheck.  They couldn't cash it.
Q    But they tried to take it from him, didn't they?
A    Yes.
Q    They robbed him of it, didn't they?

A   Yes.
Q   But he knew the difference between right and wrong.
A   Yes.
        MR. VICK:  No further questions.
BY MR. McGARVEY:

3670

Q   I hesitated to bring this up on direct, but Mr. Vick asked you about a loving, caring environment. You made reference in one of your reports to  --  you used the term "sadistic" in terms of the house parents or some of the house parents.  Can you explain what that meant?
A   Well, you know, child care  --  I mean, raising children is not easy.  And getting house parents who are really caring and loving and nurturing all the time is rough.  And Cory, I mean, the house parents that he had were not  --  I have worked with a lot of house parents through the years.  They were not the greatest.  They were okay, but they were not as good as many of the other cycles of house parents that I have.  So that a couple of his house parents I really didn't feel were real enlightened in terms of handling not only Cory, but some of the other boys, and could be a little bit mean and subtly sadistic in their approach to discipline and how they tried to teach the guys what was the proper way to handle a problem.
Q   Was that part of the  --  what was your responsibility with respect to the house parents vis-a-vis the kids?
A   Well, you have to be real careful not to split,

3671

you know, so if one of the boys would come and say, "Ms. Noble, John is," so on, complain, my role is to try to help them go back to the house parent and resolve it with the house parents.  Because even if I couldn't have a great relationship with the house parents, sometimes the youngsters themselves could find a way to work things out.  I would always send them back to the house parent and then maybe indirectly we would talk about it in a staff meeting, to try to get the house parent to see a different approach might work or something else might work. But as tempting as it was, I never could really take the side of the youngsters.  I would always have to send them back to the house parent to try to resolve whatever problem they might have, unless it was, you know, unless the house parent did something immoral or illegal.  Then it would be a different answer.
Q   So in terms of what Mr. Vick asked you about, the loving and caring environment, in fact Cory had voiced some displeasure, in fact a lot of displeasure with some of these house parents; and in fact, you

were constrained to side with the house parents. Is that correct?

A    Yes. For the sake of the guys.

Q    I understand that.

3672

MR. McGARVEY:  Thank you.

THE COURT:  You may stand down, ma'am.

(Witness stood aside.)

Call your next witness.

MR. COOLEY:  We recall Dr. Cornell.

DR. DEWEY CORNELL, recalled as a witness by and on behalf of defendant Johnson, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COOLEY:

Q    Dr. Cornell, you obviously were previously sworn, and I would ask you to continue, if you would. I want to ask you about your reliance on Cory as a source of information for the report and the exhibits that you have prepared.

A    Okay.

Q    How much did you rely on what Cory told you?

A    Well, I never completely rely on what a defendant tells me. Defendants may well be motivated to present themselves in the most favorable light, so as much as is practically possible, I try to confirm or disconfirm whatever I am told through collateral sources of information.

Q    Did you have any doubts about the things when

3673

Cory talked with you? Did you have doubts about what he was telling you? And if so, can you be somewhat specific about them?

A    There were several points which I doubted what he was telling me. He told me he was very well adjusted while he was at the Pleasantville Cottage School, for example. And initially, I was skeptical of that. And I went to great lengths to try to confirm that and find out if in fact that was not the case. I found out that he was in fact telling me the truth. I also didn't think he was being completely forthcoming about his mother. He initially described her in very glowing terms, which also didn't seem plausible to me given the problems that he had.

Q    Did he tell you that she was very devoted and very loving?

A    Yes.

Q    That sort of thing?

A    Yes. Devoted, loving, responsible, always taking him places, doing things for him. He described her as a kind of an ideal mother. I mean, it didn't seem plausible to me.

Q    And when you began to check it, of course that

did not pan out.

A      That's right.  And I went back and talked with

3674

him subsequently when I had records and further information, and he was willing to acknowledge a little bit, that there were areas in which his mother was a disappointment to him.  When I interviewed the mother, also, I also was able to confirm my impression of her.

Q      If we can, I'm going to turn your attention to the area of learning disability.  I'm going to ask you, if you would, to somewhat briefly describe to the ladies and gentlemen what is involved when we talk about a learning disability.  Make reference to this.

MR. COOLEY:  This will be, ladies and gentlemen and Your Honor, this will be the second green tab in the book.

BY MR. COOLEY:

A      In a nutshell, learning disability is a form of impairment in the brain that affects the person's ability to learn.  A person might have adequate intelligence, they might have adequate motivation, but because of some defect in their ability to use language or understand language, or process language, they are impaired in some academic area.  It may be one area or it may be multiple areas.  In Cory's case, reading and spelling were the main areas.  This

3675

term "learning disability" is a fairly broad term. It is used sometimes to describe pretty mild conditions.

In Cory's case, it is a severe learning disability.  Sometimes the term dyslexia is used for individuals who have a specific reading disability. Sometimes the term minimal brain dysfunction or developmental aphasia, those are all terms that are used somewhat interchangeably.  The federal definition of learning disability of 1977, which I included in here, is one that sort of pulls all those terms together and gives a more general definition of learning disability.  It also points out that this is not because the person is mentally retarded or has emotional disturbance or who has economic disadvantage.  It is a defect in the basic psychological process of using or interpreting or understanding language.  There is a second definition that's also used in the field on the next page.  The National Joint Committee for Learning Disabilities. It echoes very much the federal definition.  It also adds to it; that these individuals may have problems in their social behavior, not just in reading and writing, but they may not be able to perceive and interact socially in a normal fashion as well, even

3676

though that's not a learning disability by itself. But that seems to be a secondary problem.

It also points out that you can be learning disabled and mentally retarded and/or emotionally disturbed in addition. You can have more than one problem. Those two definitions are the definitions I use and that are the generally-accepted definitions in the field of learning disability.

Q   What causes a learning disability like Cory's?

A   Well, there are probably multiple causes of learning disability, anything that can damage the brain or impair the brain. This may be genetic. Certainly there is research which finds that learning disabilities run in families. Anything toxic to the brain, particularly drug use by a mother during pregnancy, can be a factor, or a head injury sustained at some point in life. But we don't know all of the different causes or the different ways in which the brain can be injured to produce a learning disability. And we don't know what was the cause in Cory's case.

Q   Certainly it is not a voluntary thing, not something one says "I want this," or "I don't want this." It is not something that can be discarded?

A   Right. Correct.

3677

Q   Now, when was Cory first diagnosed as learning disabled?

A   To my knowledge, when he was 13 when he went to the Pleasantville Diagnostic Center.

Q   I refer you to the yellow tab, the fifth page of your mitigation report, and I'm somewhat rapidly going to move you through that. But on page five of that report in the yellow tab, the last  --  the first yellow tab, pardon me. The last three paragraphs contain comments made by various psychiatrists or psychologists in his case. The first of those was from John Stadler. He stated Cory was a remarkably peaceful kid trying very hard to do better. And this is a quote:  "He had a terrible neurological impairment to learning and though he wanted to learn, he couldn't." And Dr. Stadler felt that Cory did very well in a structured setting, "but like many boys like him, I imagine he is very susceptible to his environment."

That is a quote from the reports; is that correct?

A   Yes. That's a quote that he said to me. He stated to me.

Q   Stated to you.

A   Yes.

3678

Q   All right. And he did express some regret that

Pleasantville didn't have some of the resources to address Cory's problems; is that correct?

A    Yes.  He expressed regret about that.

Q    You spoke with Dr. Elizabeth Clemmens; is that correct?

A    Yes.

Q    She described that Cory is a severely learning-disabled boy who became very frustrated when he did not receive the remedial help in speech therapy that he was promised?

A    Yes.

Q    She felt he was right to feel frustrated.

A    Yes.

Q    Because of the limitations and those things that were not being addressed.

A    Yes.

Q    You also spoke with Dr. Ken Barish, and he described to you and recalled Cory and described Cory to you as one of the most severe cases of learning disability he has ever encountered.

A    That's right.

Q    And that his impairment was so severe and so pervasive in his cognitive processes that Cory was unable to learn how to compensate for his problems like other learning-disabled children.

A    That's correct.

Q    In other words, that even other disabled children, learning disabled, could learn to do things Cory simply could not do and he was not able to compensate for that.

A    That's correct.

Q    Indeed, when he gives lectures, he cites Cory's case in his lectures as an example of that type of severe disability.

A    He, for example, recalled that when he asked Cory to spell the word arm, A-R-M, that Cory replied H-M-E as his spelling for arm.  And I have, too, in my evaluation found those kinds of spelling problems.

Q    And he also felt that there was absolutely no question in his mind that Cory's disability was a result of neurological impairment.

A    He had no question about that.

Q    You have testified now that Cory has this learning disability.  That's obvious from the reports that are before the ladies and gentlemen of the jury.

    Is there further documentation of that coming from a more recent test?

A    As you might imagine, I'm trying to be thorough about this.  And in fact, I gave him my own set of tests to confirm that this learning disability was

still present and that I would arrive at the same diagnosis based on my own sources of information.  So I went back and conducted my own psychological testing of Cory.

Q    Now, these would be found behind the white tab in the book; is that correct?

A    Yes.

Q    And there are some blown-up  --  Marshal, could you help me?

(Documents displayed on easel before jury.)

BY MR. COOLEY:

Q    Doctor, can you tell the ladies and gentlemen of the jury the results of your tests?  And they have before them in an expanded version, blown-up version, the graph.

A    Yes.  I'll try to be brief about this.  First, I wanted to document his level of intelligence.  I gave him the standard individual intelligence test called the Wechsler Adult Intelligence Scale-Revised Version.  It is a standard test for adults to assess their intelligence.  He had been previously given the children's version of that test when he was younger.

This test is composed of a number of sub-tests that are listed here: information, digit span, vocabulary, and so on.  And those scores are combined to give you the person's IQ.  You expect that on each of these tests, the average score is a 10.  That is, the person right at the fiftieth percentile, right in the middle of the population in his age group, would attain a 10 sub-test score.  The average person gets a 10, sometimes you get a 9, 11, 12.  You vary a little bit around 10 as a big point.

Obviously, a very bright person gets scores over 10, and a less intelligent person gets scores much lower than 10.  In Cory's case, you will see he started off getting 5's and 6's in all of these first set of tests.  Those are consistent with someone who is mildly retarded.  That is, if he had continued to get that pattern of 5's and 6's on all his tests he would have scored in the retarded range.  Those initial tests, the first ones that are listed there where he got the 5's and 6's, are all of the verbal tests, the language tests, vocabulary, arithmetic, comprehension, all things that involve use of language.

The latter tests where he started to score higher are the nonverbal tests, sometimes called the performance tests.  These are tests that involve puzzles, blocks, things that he does with his hands.  You will recall he had some carpentry training that probably enhanced his skills in that area.  And in those areas, he did better.  And actually, on one of

them he got a 10, which would be the average expected score for a normal individual.

Because these latter scores were higher, his overall IQ fell above the range of mental retardation, just above that range.

(Another document displayed on easel.)

BY MR. COOLEY:

Q    The next to the last page in that section is a bar graph that is entitled "Reading and Math Scores."  Would you tell the ladies and gentlemen of the jury very briefly what that entails and what that shows us?

A    I gave him an intelligence test, but also gave him an achievement test.  Again, I gave him the standard individually-administered achievement test, the Woodcock-Johnson Test of Achievement.  This is a test.  Actually, I didn't give him the entire test.  There are 20-some parts to this test.  But I gave him specifically the tests in reading, two tests in reading and two tests in math, identification, and

3683

comprehension.  Identification is his ability to identify a word -- identify words.  He is presented a word, has to be able to pronounce what that word is to show he can identify it.  In Comprehension, he has to be able to comprehend the meaning of a sentence and choose the correct word to complete a sentence.  Those turn out to be too easily objectively scored tests of reading ability.  On both of those he scored at the second-grade level, a 2.4 means at the second-grade level, a 2.6 also is at the second-grade level.

In the area of mathematics.  The first is calculation, which is ability to do arithmetic problems: addition, subtraction, division, multiplication.  And there he scored at the sixth-grade level, 6.7.  He also had applied problems, which are kind of common sense word problems, such as how much change should you get back if you are buying something that costs a certain amount of money, so forth.  That's sort of a practical arithmetic skill.  There he was at the fourth-grade level.  So certainly, the second-grade scores in reading were very consistent with what he had obtained when he was a teenager.  The somewhat higher scores reflect the fact that he was able to do

3684

somewhat better in arithmetic, although obviously still a very low level.

Q    Finally, the last bar graph, the last page of that section, is labeled "Intelligence and Achievement."  Can you tell the ladies and gentlemen of the jury what that represents?

A    This bar puts together those two tests.  That

is, we look at someone's intelligence and look at their achievement and see if they correspond. We expect that a person's achievement should be commensurate with their intelligence. That is, even if you have got low intelligence, you ought to achieve up to the level of your intelligence. Now, if you look here on just the right-hand side, you will see where it says "Math." The black bar graph where it says 100, that's the expected level that the average person at the 50th percentile would get in both intelligence and achievement. So that's sort of our standard. In intelligence he gets a 77. That was his IQ result. That's clearly well below average. It is close to the level of mental retardation. In math he gets a 77. If I take those grade-level scores and I can look them up in a table and transform them into a standard score, he gets a 77. So his math level is equivalent, exactly

3685

equivalent, to what his intellectual level is. That to me is an indication that he is not learning disabled in math. He is low in math, but he is at the level you would expect, given his intelligence.
    If we look on the left, those three bars are not even. We have the 100 standard bar that's black on the left, and he has a 77, which is the same intelligence score. But then his reading is 53. That is, if you transform that second-grade reading level into a standard score, it is a standard score of 53. And that is clearly in the mentally retarded range, in the moderately retarded range, actually. So that we cannot only see in this graph that his general intelligence is low, but his ability to learn in the area of reading is lower still. So a person can be both mentally retarded and learning disabled. In his case, he is very low in general intelligence, although not retarded, and learning disabled.

Q    Doctor, also, I believe you did a test in the course of this relating to Cory's writing.
    (Document displayed on easel.)
A    I gave him a standard test of his ability to write, a test of written language, TOWL, the part of the test that is most commonly used. The person is given a picture. You see this outer-space scene.

3686

And the young person is asked to make up a story to go with the picture. They are given 15 minutes to write up a story. Then you evaluate the story for its vocabulary, spelling, grammar, for its complexity of the themes that are presented, and this is the story that Cory gave me to this picture. This was very striking to me because this story is very immature. The writing is very immature. The spelling is very immature, leaving aside the

penmanship.

Q    This is reprinted in the book before the ladies and gentlemen.  It is the fourth page back in behind the white tab.  And the third page back is your findings related to that; is that right?  And it also includes your typed-out interpretation of what Cory wrote.

A    Yes, I typed out what I thought he wrote.  There were a couple words I couldn't decipher, but I typed out the story which you can read and see is a very immature story.  And then below that, I have listed the scores that he received for this story, and the typical age level of someone who writes a story of that type.

Q    He begins his story with "Me and my mom."

A    You want me to read that?

3687

Q    Well  --

MR. VICK:  It is all in front of the jury.

MR. COOLEY:  I'm not going to use it.

THE COURT:  All right.  Go on.

BY MR. COOLEY:

Q    But the story was about Cory and his mother going to the moon?

A    That's right.  He chose to tell a story about he and his mother going on a trip together to see the rockets.

Q    And obviously there was more space, but he ended where he did.

A    Yes.  His story was a little short for someone of his age.

Q    Now, Doctor, you also had an opportunity to refer Cory for evaluation by Dr. Peck; you made some reference to that.  Dr. Peck is a neuropsychologist.  His report is found behind the pink tab in the book.  And I will ask you to somewhat rapidly summarize what the findings from Dr. Peck showed.

A    I gave intelligence and achievement.  I asked Dr. Peck to give him neuropsychological tests, which are sensitive to brain damage, to see if we could identify specific areas of brain impairment or dysfunction.  These tests are commonly given when

3688

someone has had a head injury or has  --  there is reason to believe that they have had some kind of brain impairment.  They are very technical tests.  There is a large number of them.  Nobody is expected to do poorly on all of them; that is, they tap as many areas of brain functioning as we have tests for, everything from abstract reasoning to fine motor coordination, visual motor coordination, auditory processing, lots of different areas.

And what Dr. Peck found is that Cory's performance indicated abnormal neuropsychological

functioning.  That is, it did indicate impairment, brain impairment, in a number of areas.  First of all, he found that he had impairment in visual memory, memory for things he sees, and visual sequencing.  That is, the ability to keep things in proper order sequentially, visually.  Now, if you think about reading, those are two critical skills. You have to keep the letters in the proper order and the words in the proper order, and you have to be able to remember what words are, how they are spelled and so forth, in order to read.  He has deficits in both those areas.

In addition, Dr. Peck found that he had deficits in auditory processing.  That is, often, if somebody

3689

can't read and they have visual problems, you try to teach them auditorily through the spoken word.  But he has deficits in auditory discrimination; that is, the ability to listen and understand what is said to him.  At the end of this complicated report that Dr. Peck has written, he points out that this kind of person could have difficulty understanding what people are saying, and that that could create social and interpersonal difficulties for him.  He doesn't quite understand when people are arguing with him or talking with him, what they are saying and what their intention is, and he doesn't have good skills in that area.  Abstract reasoning and judgment were poor. For example, on the category test, which is a highly sensitive test to brain impairment, he shows inflexible thinking; that is, kind of approach to problems where he cannot shift from one approach to another approach.  He cannot, when he is making an error or making a mistake in solving a problem, he does not show the ability to recognize a mistake and to shift from that mistake to another strategy.  He tends to persist in a poor strategy of solving problems.

So in a number of different areas, he shows neuropsychological impairment.  Not all areas.

3690

Rarely does anyone show impairment in all areas.  But he shows impairment in quite a number of them.

Q    If I could, I would move your attention to the concept of mental retardation.  I would ask you to look at this last chart that's being displayed to the jury.  Can you tell the ladies and gentlemen of the jury what they are being shown at this point?  And this would be the last page behind the second green tab, the definition of mental retardation.

A    Yes.

Q    What does the term mean?

A    Mental retardation means that the person has significantly sub-average intelligence which can be

measured by a general intelligence test, as well as impairment in adaptive behavior. Adaptive behavior means their ability to sort of function in every day life; to have practical intelligence, if you will, and good survival skills. And you can measure the first part by giving them an intelligence test. Individuals that fall in the range of 70 to 75 can be considered in the range of mental retardation. And then of course, anything lower than that indicates mental retardation. In addition to having low intelligence, you need to show that the person has impaired adaptive behavior in any two of about ten

3691

areas that are listed there. Certainly functional academics, the ability to do academic work is one in which he has impairment. Also, communication deficits with his speech impairment and communication problems, he has some deficits there. Self care, social skills, work, the ability to maintain a job, to have good work habits, to use the kind of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level. As I said before, my conclusion was that he is just above the level of mental retardation.

Q     And Doctor, when you made that, reached that conclusion, you were aware that if he could be categorized as mentally retarded, that Cory would not be death-eligible under the statute; is that right?

A     Yes. I realized this was a very serious issue. The law states very specifically that if he were mentally retarded, we would not have this sentencing hearing for the death penalty. So I checked my scores, went back, and saw him a second time. I consulted with colleagues. I wanted to make very sure that this was an accurate score. Because the definition of mental retardation is not a hard and fast absolute. It is a gray area. And people have

3692

stereotypes of mental retardation as someone who looks very impaired and looks unusual and so forth. But in fact, many mentally-retarded people look very normal and can function fairly well in daily life. So I did not very easily reach this conclusion that he is just above the level of mental retardation.

Q     And exactly where is he? How close is he to being mentally retarded?

A     The IQ score I got was 77. If he had gotten a 75, he would be within the range that counts as mental retardation. 70 to 75 is kind of the gray area. If you are in that area, you can be mildly retarded. He was two points above that, which is a matter of one or two questions on an intelligence test that would make the difference there.

Q    Doctor, would it be fair to say that most mentally-retarded folks are only mildly retarded?
A    Yes.  There is a social stereotype we have of the retarded person that really is of the more seriously retarded person.  We used to think that everybody who was mentally retarded would have to be put in an institution and they could never live on their own or function or hold a job.  In fact, if you put people in institutions they will become institutionalized and sort of look and function that

3693

way.
    We now know that a mildly retarded person can be educated up to about the sixth-grade level.  We know that a mildly retarded person can hold a job if they have good training, if it is a structured job, if they have good supervision.  We know that many mildly retarded people get married, live on their own, pay their bills, have families.  So we know that mild mental retardation doesn't mean that the person is completely dysfunctional, the way that you might characterize it on television, but has some capabilities.  And so I had to compare that to Cory.
Q    On some tests Cory was given by you and on some of the tests he was given by the folks at Pleasantville Cottage School back in his adolescent years, Cory in fact scored in the mentally retarded range, did he not?
A    Yes.
Q    And would it be fair to say that in some areas, Cory functions on the same level as someone who is mentally retarded?
A    That's correct.
Q    And is it fair to say that because of his intellectual limitations, that Cory Johnson has impaired ability to reason?

3694

A    Yes.
Q    Would it be fair to say that Cory Johnson has an impaired ability to use good judgment to control his behavior?
A    Absolutely.
Q    Would it be fair to say that Cory Johnson has impaired ability to understand and foresee the consequences of his actions?
A    He has impairment in that area, yes.
Q    Is there anything in the scientific literature on mental retardation about individuals with these limitations committing illegal acts?
A    Yes.  It is not uncommon for individuals who are mildly retarded to commit illegal acts.  We find, in part of assessing their adaptive behavior, that very commonly they do break the law.  They use poor judgment.  They don't have good self control.  And

they do break the law.

Q    Is it the case that mentally retarded individuals are often very dependent on others and tend to rely on others in the decisions they make?

A    Yes.  That's one of the factors you have to consider, because part of the limitation is that the person then is more vulnerable to what other people tell them to do or suggest that they do, or look for cues in what other people are doing and try to fake it, emulate them.  And individuals with severe intellectual deficits are very susceptible to that kind of pressure.

Q    And while Cory Johnson is technically not mentally retarded, because he does have these similar intellectual limitations, would it be fair to say that he may be overly dependent on others and tend to rely on others for decisions?

A    Yes.

Q    Is it not the case that mentally retarded individuals are often overly susceptible to influence by others, doing what others direct them to do?

A    That's a standard part of when you evaluate anyone who is mentally retarded; you expect that that problem is going to be present to some degree, and it usually is.

Q    Part of their brain impairment is impairment in the ability to use independent judgment when somebody wants them to do something.

A    Yes.  And to foresee future consequences of actions.  That is, you can put a mildly retarded person and give them a very structured question, a very specific situation, and they can sort of give you the right answer.  But then you put them in a different situation when they are in a different emotional state and they don't give you the right answer anymore.  They don't use the same level of judgment.  They are variable in their level of functioning.

Q    Would it be fair to say with the limitations that Cory Johnson has, as you and the other professionals and the reports have indicated, would it be fair to say that he, too, could be lacking in independent judgment and susceptible to being influenced by others?

A    To some degree, yes.  He would have to be.

Q    Does learning ability only affect ability to read and write or to do other kinds of schoolwork?

A    No.  That term is used because that's where it is first identified, but there is more to it.

Q    Is that just your opinion?

A    No, it is not.  If you take any standard textbook on learning disability, Handbook of Learning

Disabilities, the Kaufmann textbook on learning disabilities, any standard textbook will have a chapter or chapters on the non-academic problems that learning-disabled children and young adults have. That is, they have social problems. They don't judge and reason well in social situations. They have very poor self-esteem. They are much more prone to get involved in delinquent activity. In fact, that's a whole research area. Delinquency and learning disability are linked.

Q    Why would learning disability have anything to do with someone getting involved with criminal behavior?

A    What you find is that the deficit that they have that affects their ability to learn also affects their judgment, their ability to control their behavior, and to foresee the consequences of their action. In my own research with violent delinquent youth, they consistently have verbal deficits. That is, their IQ is consistently lower in those verbal areas. They don't reason well. And we rely on language to a large extent to guide our behavior and to tell us right from wrong and to tell us "Wait a minute, think about this, consider some other course of action." If you have deficits in language, those whole steps in the reasoning process get aborted, get skipped.

Q    And your findings that folks with these learning disabilities may well gravitate to that or be more susceptible to that, is that also consistent with the other studies in the field?

A    Yes. There are a number of studies in the field which find that having a learning disability makes one at risk to become involved as a delinquent in anti-social and criminal behavior. And if you were to assess -- I'm doing a study right now in which we are assessing individuals at Staunton State Prison. There is a high incidence of learning disabilities in this general population.

Q    Now, Doctor, you have spent several hours here talking with these ladies and gentlemen describing Cory's learning disability and his background. I am going to ask you again, do the things that you have brought forward in your mind, was there an effort to excuse the acts for which Cory has been convicted?

A    No. And this is very important to me to make this distinction. I don't want any of my testimony to be construed that I am condoning what he is doing or minimizing what the crimes are that he has been convicted of. I am only here to inform the jury and address the very specific issue of whether he has complete blameworthiness that would indicate that he

would receive a death sentence as opposed to life in prison without parole. And I would be very uncomfortable presenting my testimony under any other basis than that, that narrow basis.

3699

Q    Doctor, the factors that you have described, do they make -- do they, in fact, make Cory Johnson less responsible for his actions --

MR. VICK:  That's the jury's ultimate province.

THE COURT:  He can answer the question.

BY MR. COOLEY:

Q    -- than a person who has full cognitive skills?

A    I would have to say they make him less than normal.  They make him substantially less than normal.  They impair his judgment, his ability to control his actions, foresee the consequences of his actions.  I don't think they excuse his behavior.  I don't think that means he does not know that things are wrong, that killing is wrong, and that drug dealing is wrong.  I have to leave it to the jury to make the value judgment of how much to weigh that and what to do with that.  I believe it does make him not a normal individual, not as responsible as the ordinary citizen.

MR. COOLEY:  Thank you.  Answer any questions of the government.

CROSS-EXAMINATION

BY MR. VICK:

Q    Good afternoon.  As I understand your testimony,

3700

you have spent a total of some 15 hours, approximately, with Cory Johnson interviewing him concerning the subject of your testimony here this afternoon.

A    Yes.

Q    Indeed, you went into great detail with him concerning his involvement in crime.

A    Yes, I did.

Q    He detailed that to you in an open, candid manner?

A    Surprisingly open, yes.

Q    He detailed extensive criminal involvement on his part?

A    He detailed extensive drug dealing.

Q    Throughout this, it is clear, is it not, that he knew exactly what he was doing when he was dealing drugs?

A    He knew that it was wrong to deal drugs, yes.

Q    The ladies and gentlemen of the jury have heard several weeks of testimony which outlined a structure to this drug dealing; that is, Cory Johnson, other people involved here, maintained a level of supervision and organization and had people working

for them.  That indeed is inconsistent with someone who is mentally retarded, isn't it?

A    I don't think Cory was pulling strings and giving orders and directing people around.
Q    That's based upon your testing of him?
A    And the review of records.  My complete evaluation.
Q    You weren't out there on the street with him, so you really don't have any idea?
A    That's correct.  I wasn't out on the street with him.
Q    If the testimony was that indeed Cory was one of the people who organized and supervised people to distribute drugs, that's inconsistent with mild mental retardation, or close to it?
A    I would be very skeptical of that, yes.
Q    Indeed, when you gave these tests to Cory Johnson and you came up with a mental -- with an IQ, he knew he was being tested for this very testimony in Court, if indeed he happened to be found guilty and was facing the death penalty.
A    I don't think his understanding was as specific as that.
Q    He didn't know you were testing him in an effort -- so that you could testify for him in the death penalty phase of this case?
A    He did know that, yes.

Q    Very simply, he did know that.
A    Yes.
Q    All right.  The testing that had been done previously shows a different IQ than that for Mr. Cory Johnson, doesn't it?
A    As is always the case in testing, there are some scores higher and some lower.  Mine is in the middle.
Q    Indeed, Dr. Gallaudet, I believe, gave him a full scale IQ of 88, a performance IQ of 93, in 1982.
A    When he was 13 years old, yes.
Q    That's in the very normal range of IQ, isn't it?
A    No, that's in the low average.
Q    Average.
A    For some areas that were deficient, yes.
Q    Indeed, you have quoted here extensively the test given by Dr. Barish which resulted in his appearing to be mildly retarded in some categories, correct?
A    Yes.
Q    In that same report he goes on to say that Cory's very deficient score on the block design subtest is the result of several rotations of design

3703

that he easily corrected when his error was pointed out to him. These scores should therefore not be taken as an indication of Cory's intellectual potential.

A    Of his potential, that's correct. It is common for brain-damaged individuals to rotate the designs, and then after somebody else points out the rotation they say, "Oh, yes, it is rotated," and then fix it.

Q    But his --

MR. COOLEY: I would ask he be allowed to finish.

THE COURT: Sustained.

BY MR. VICK:

Q    Were you finished?

A    What I wanted to say about that, I think you are misinterpreting that particular sentence. The fact that he was able to recognize that he had rotated the design is very commonly found in brain-damaged individuals. It doesn't mean that he wasn't trying hard, and it doesn't mean that he actually is smarter than that. What it means is that that was another indication that he had the kind of deficit of a brain-damaged person.

Q    Intellectual potential is another way of saying IQ, isn't it?

3704

A    Not really.

Q    What did the doctor mean when he said, "These scores should not therefore be taken as an indication of his intellectual potential"?

A    He is trying to be as optimistic as he can about a very difficult situation.

Q    IQ is only one of a number of factors that are to be considered when determining whether someone is mentally retarded or not?

A    That's probably the main one and first one, but it is not the only factor.

Q    In fact, before the jury, I believe, there are a number of other factors that go into that.

A    Adaptive behavior is the other.

Q    Socialization? Is that another way of putting that? His ability to get along with others?

A    No. Not the ability to get along with other people, no.

Q    Did you happen to be in the courtroom during the testimony of Ms. Odette Noble?

A    I came in in the middle of her testimony.

Q    Did you hear the portion of her testimony that indeed Cory Johnson was a leader of sorts in the residence that she ran?

A    Well, not only did I hear that, but I asked her

3705

about it when I interviewed her over the phone, and

then talked with her about it again today to understand what she meant by that.

Q    Very able to express himself verbally to the others, very able to take care of himself?

A    They said he was a big talker, that he was the first one to adopt new styles on the street, such as hair styles and clothing styles.  I think trend-setter is probably a better term in terms of what she described.  I asked her specifically whether he was a leader in terms of ability to initiate and carry out criminal activity, because that's really the issue I'm concerned about.  And what she said, which I put in my report, I quoted her in my report because I thought that was important.  She said Cory wouldn't be the leader because he wouldn't have the brains, but he would be the point man.  He would be the one to stand up and do the speaking, he wanted to belong so much.  That was my impression.  That if somebody says, "Cory, go do something," he might be the first one to go do it, because he is trying so hard to do what the other person wants him to do. That's a different sense of the term "leader" than I thought you had in mind.

Q    But he was able to socialize and express himself

and tell the other people in the residence exactly what was going on in his mind, correct?

A    He would express himself, apparently, a lot in the group therapy meetings.

Q    In fact, throughout his Mt. Pleasant Cottage stay, that was a consistent theme.  He is able to handle himself very well verbally, isn't he?

A    He has speech articulation problems.  But he has no reluctance to express himself, to try to say what is on his mind.

Q    In fact, Dr. Peck found that he was in the superior range, structure, as to word fluency.  He scored at the 85th percentile.

A    He could come up with words and say a lot of words one after another, and was not reluctant at all to give a series of words.

Q    That's inconsistent with mental retardation, too, isn't it?

A    Not inconsistent with mental retardation.

Q    It would be a factor that would tend to make you think he was not mentally retarded, isn't it?

A    No.  It is not in the mentally retarded range. But even someone who is mildly retarded is not retarded in every single area of their functioning. And there are mentally retarded kids who are very

verbal, who talk a lot, who talk and chatter all the time.  There are others who say very little.  It varies.

Q    There is no doubt Cory is able to express himself and tell you where he stands.
A    I would agree with that.
Q    And socialize to the point of being a peer in a group of people?
A    He is very talkative socially.
Q    If the testimony that this jury has heard over the last several weeks is that he has indeed been one of these people who organized others to work below him selling drugs, it is consistent with that, isn't it?
A    What do you mean by "organized others"?
Q    Just that.  Organized other people to sell drugs.
        MR. COOLEY:  I am not sure he is correct. The government gave a very specific definition of "organized."  So to say it is in its normal sense --
        THE COURT:  Mr. Vick, I don't know how helpful it is to tell this witness about all that we have heard and get his estimation of it.  Go ahead and ask your questions, but hurry up.

3708

BY MR. VICK:
Q    His ability to verbalize himself is very consistent with an ability to organize people to work for him, wouldn't it be?
A    No.  I think he has the ability to abstractly decide what people should do and to give them commands and to foresee what the consequences are of their actions.  When you talk about organize and to be in a leadership position, I think you have got to be able to say, "I want you to do X, Y, and Z because I think this will happen or that will happen."  Now, just being able to talk to somebody and express your views to somebody, I think, is very short of that.
Q    You are saying he would be incapable of saying to someone, for example, "I want you to take me to a certain residence because there is something I want to do there"?
A    To that limited degree, I don't think that would be a problem.
Q    He could make those decisions?
A    He could say, "Take me somewhere, I want to go somewhere," sure.
Q    "I want to kill somebody because they bothered me"?
A    I think he could say that.

3709

Q    He also could hold a job, couldn't he?
A    Well, I have doubts about that.
Q    Your own report indicates that he held a job and walked away from it.
A    He held jobs during the Summer Youth Corps.  He

also held a job apparently, for a brief time, at a grocery store, and apparently on a loading dock. But the fact that he could not maintain those jobs is why I'm not sure he can hold a job.

Q   People who have low intelligence don't necessarily all resort to criminal behavior, do they?

A   You are quite right about that.

Q   And people, you are certainly not excusing his -- you are not saying his low intelligence is an excuse for his resorting to criminal behavior?

A   That's correct.

Q   People who have low intelligence certainly don't resort, all of them, to violent activity, do they?

A   Well, more so than a normal person.

Q   My question is   --

A   But not the overwhelming majority.

Q   As I understand your testimony, he is very suggestible?

A   I would qualify that a little bit. But he is suggestible.

Q   And susceptible to pressure?

A   To his environment.

Q   If that has resulted in the past in his committing very violent acts, does that mean that that sort of pressure   --

          MR. McGARVEY:  I object.
          THE COURT:  The objection is sustained.
          MR. McGARVEY:  Thank you.

BY MR. VICK:

Q   In jail, do you think he will be susceptible to peer pressure?

          MR. McGARVEY:  Same objection.
          THE COURT:  Sustained.
          MR. VICK:  Beg the Court's indulgence.
      (Counsel conferring with co-counsel.)
      I have no further questions.
          THE COURT:  All right.  May the witness stand down?
          MR. COOLEY:  He may, Your Honor.
      (Witness stood aside.)
      Mr. Cooley, call your next witness.
          MR. COOLEY:  We don't have any more witnesses.  There is one matter we may want to seek regarding a potential stipulation.

      (At Bench.)
          MR. COOLEY:  The only other thing we have is we would want to put in as part of our case the stipulation that I believe Mr. Baugh has filed regarding Jerry Gaiters, the fact that he was not death-eligible under that conviction.
          MR. VICK:  We never sought the death

penalty against him, never intended to seek the death penalty against him prior to his pleading guilty.

MR. COOLEY:  I'm not disputing that.

MR. VICK:  I don't think this is the stipulation.  Jerry Gaiters was charged in the indictment, and we have ample evidence to argue that he was not death-eligible.

MR. BAUGH:  As we obviously tell the United States in the position that it did not qualify him to be, we would submit that the Court, as a matter of law, must acknowledge that it was not an issue in controversy that can be argued to the jury to decide one way or the other.  As a matter of law, Mr. Gaiters pled guilty to 848 death penalty charges, and they didn't move for the death penalty.  Therefore, he would not get the death penalty.  That's a matter of law.

THE COURT:  No.  It is just not something that I want to get involved in.  You all can argue that to the jury or Mr. Vick can state it.

MR. BAUGH:  We object.

THE COURT:  I understand.

MR. COOLEY:  Judge, respectfully, I would move into evidence the book, the mitigation book.  And we will obviously have no objection if the Court wants to allow a sufficient number of copies to go to the jury.

THE COURT:  All right.

MR. COOLEY:  With the possible exception of wanting to join in and adopt the testimony of a witness relating to the discussion we just had at the bar conference, defendant Johnson rests at this time.

MR. VICK:  We obviously have no objection to that going in.

(In Open Court.)

THE COURT:  All right.

Ladies and gentlemen, that completes Mr. Johnson's mitigation presentation.  I need to give you all some direction about how things are going to proceed.  I need to tell you today so that you all can make some planning.  Some of you may not like this very much, but I have decided, in consultation with the lawyers, that this is the better course to proceed on and this is what we are going to do.

We now know that tomorrow we will hear from Mr. Roane, his mitigation case.  That should take up the better part of tomorrow.  Then we would have our instructions conference to go through, then we would have the arguments to you on the penalty phase, which would probably start on Friday morning.  And then, of course, I will give the instructions.

If that time line follows as we expect it to, you would then, therefore, get the case to start your deliberations in this phase Friday afternoon. Early, late, somewhere in the afternoon on Friday.

Now, once you start to deliberate on this phase, we are going to keep you until you have finished deliberating. What that means for you practically is when you come here on Friday, I want you to pack a little bag as though you may be staying for two or three days. Because we will keep you Friday night at a hotel, and we will bring you back in and start your deliberations again on Saturday. You would deliberate during the course of Saturday. And if your deliberations are not complete, we will keep you until it is over. So Friday when you come here, come prepared to stay for a couple of days. We will explain in more particularity through the Marshals how this all will be handled. But I wanted you to know that now so you can start to make your preparations. I've held off on this as long as I can.

All right, we will see you tomorrow morning at 10 o'clock.

(The jury left the courtroom.)

Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

All right. We will be in adjournment until 10:00 a.m.

(Proceedings adjourned at 3:35 p.m.)