# EXHIBIT 15

# Affidavit of Craig S. Cooley

I hereby affirm under the penalty of perjury that the following information is true and accurate to the best of my knowledge, recollection, and belief:

1. I am an attorney licensed to practice in the Commonwealth of Virginia and, among other courts, in the United States District Court for the Eastern District of Virginia.

2. In 1992, I was appointed by Judge James R. Spencer of the United States District Court for the Eastern District of Virginia as lead counsel representing Corey Johnson, who was facing the death penalty in a multi-co-defendant case. John McGarvey was appointed as my co-counsel. Two other co-defendants also charged with capital crimes, Richard Tipton and James Roane, were tried jointly with Corey Johnson, along with a fourth co-defendant who was not facing the death penalty; another co-defendant, Vernon Lance Thomas, was also charged with capital murder but I understand that after Mr. Johnson's trial and sentencing, the Government withdrew its death notice against Mr. Thomas sometime after he presented evidence that he was intellectually disabled.

3. The capital charges that Mr. Tipton, Mr. Roane, and Corey Johnson faced stemmed from an alleged Continuing Criminal Enterprise drug conspiracy during the course of which the Government alleged that the three men and other conspirators committed a total of ten murders and, in addition, committed a number of shootings in which victims were injured, all of which occurred in Richmond, Virginia. Mr. Tipton, Mr. Roane and Corey Johnson had a joint capital sentencing hearing after the jury returned guilty verdicts on the capital counts in their case.

4. This was my first and only federal capital case. However, by 1992, I had substantial experience as lead trial counsel on death penalty cases in state courts in the Commonwealth of Virginia.

5. John McGarvey and I did not retain a defense fact investigator to conduct an investigation into the guilt phase evidence at trial. My memory is that we relied exclusively on disclosures received from the Government and on attempted (and generally uninformative) interviews with Government witnesses held in the presence of the prosecutors.

6. Before I represented Corey Johnson, I do not recall representing any capital defendants who had grown up outside of Virginia or who had spent most of their lives up until shortly before the crimes for which they were charged outside of Virginia (as Corey Johnson had). For this reason, I had never before conducted a mitigation investigation to locate out-of-state records or witnesses related to my previous capital clients.

7. In my experience, Commonwealth of Virginia judges would not approve funds for mitigation specialists in state death penalty cases, and I had never sought approval for nor did I ever use a mitigation specialist to conduct a mitigation investigation in any of my prior capital cases before I represented Corey Johnson.

8. About ten or 15 years before I represented Corey Johnson, I represented one person who had mental retardation (which was the term used for that impairment when I represented Mr. Johnson but which is now called intellectual disability). He was a juvenile charged as an adult in a capital case in Virginia and we introduced evidence of his intellectual disability as one of the mitigating factors we presented to the jury during his capital sentencing hearing. That client received a life sentence from the jury. At the time I tried that case, intellectual disability was not a bar to the imposition of the death penalty in Virginia. Other than that juvenile client, I do not recall representing anyone in a case involving the question of whether my client had intellectual disability before I represented Corey Johnson, and I did not have expertise in intellectual disability when I represented Corey Johnson on his capital case.

2

9.  Shortly after Judge Spencer appointed me to represent Mr. Johnson, I filed a motion seeking court-authorized funds to hire Dr. Dewey Cornell, an experienced forensic psychologist. In my motion, I sought authorization to hire Dr. Cornell to evaluate Corey Johnson for competency to stand trial, to determine whether he was criminally responsible for his alleged crimes, and to conduct a general mitigation evaluation of Corey Johnson's background and mental health.  Judge Spencer approved my request and I retained Dr. Cornell to conduct those evaluations.  When I retained Dr. Cornell, I had met with Corey Johnson a few times but, as I explain below, I did not suspect that Corey Johnson might be intellectually disabled at that time.

10.  I do not know whether Dr. Cornell would have been considered to be an expert in intellectual disability in 1992.  I had worked with Dr. Cornell on a previous triple homicide case involving a juvenile defendant, and I found him in that case to be thorough, prepared, assertive, and an effective witness on the witness stand.  The previous case on which I had worked with Dr. Cornell did not involve any issues related to intellectual disability.  When I contacted Dr. Cornell to request that he conduct an evaluation of Corey Johnson as to competency, criminal responsibility, and to perform a general mitigation evaluation, I did not discuss in any way with Dr. Cornell the possibility that Corey Johnson was intellectually disabled.

11.  In addition to seeking authorization to retain Dr. Cornell, I asked Judge Spencer to authorize funds to hire an assistant, Julie Goodwin, to help the Mr. Johnson's defense team request records related to Corey Johnson.  Ms. Goodwin was not a trained mitigation specialist and her role was not to conduct a mitigation investigation.  Instead, she wrote letters on my behalf to various organizations and government agencies seeking records related to Corey Johnson, and followed up with phone calls when necessary, in the search for records.  Ms. Goodwin did the same when Dr. Cornell identified witnesses that he wanted to locate.  Ms.

Goodwin had a good manner with people, which is why I retained her to assist with locating records and witnesses related to Mr. Johnson's mitigation case.

12. I never considered requesting court-approved funds to hire a separate mitigation specialist to assist me and John McGarvey with our representation of Corey Johnson. I do not know whether the court would have approved court funds to retain a mitigation specialist if I had made such a request.

13. Because of my prior experience with Dr. Cornell, John McGarvey and I requested that Dr. Cornell take the lead on the mitigation investigation in Corey Johnson's case, and Dr. Cornell did so. Our expectation and practice was for Dr. Cornell to reach out to potential witnesses, including school teachers, mental health professionals, and Corey Johnson's family, among others.

14. During the course of our representation, neither John McGarvey, Julie Goodwin, nor I (nor anyone else on Corey Johnson's legal team), ever traveled to New York or New Jersey, where Corey Johnson had lived before he came to Richmond, Virginia, in order to conduct any investigation into Corey Johnson's background by searching for records related to him and interviewing witnesses who knew him. Similarly, I do not believe that Dewey Cornell traveled out of Virginia in order to conduct his mitigation investigation into and evaluation of Corey Johnson's background, or to find records related to his background or to interview witnesses who knew him. I believe Dr. Cornell conducted his mitigation investigation from his office at the University of Virginia. Dr. Cornell also met with Corey Johnson in jail to interview him and to conduct psychological testing.

15. The only member of Corey Johnson's family that anyone on our defense team, including Dr. Cornell, met with prior to Mr. Johnson's trial was his mother, Emma Johnson. Julie

4

Goodwin spoke briefly by telephone with Mr. Johnson's aunt and his grandmother. But she did not ask them detailed questions about his childhood or about Mr. Johnson's mother, Emma Johnson and gathered very limited information. No one else on the defense team spoke with any other members of Mr. Johnson's family and no one ever spoke with any family friends about him. I understand from Dr. Cornell that he spoke with a handful of professional staff at two of Corey Johnson's residential placements during the course of his evaluation.

16. After Dr. Cornell completed some psychological testing of Corey Johnson, Dr. Cornell reported to me that Mr. Johnson's IQ was 77 and that he just missed being mentally retarded. Dr. Cornell told me that Corey Johnson's IQ is within two points of the borderline for mental retardation. Dr. Cornell told me that Corey Johnson instead had a severe learning disability. He said that Mr. Johnson's substantial intellectual deficits made him "almost mentally retarded" and that "his condition is similar" to mental retardation and "involves the same kinds of deficits that a person with mental retardation has."

17. As a result of Dr. Cornell's evaluation of Corey Johnson and in reliance upon his conclusion that Mr. Johnson was not intellectually disabled, John McGarvey and I decided that we could not argue that Corey Johnson was intellectually disabled and could not argue that he was barred from eligibility for the death penalty under the statutory prohibition on the imposition of the death penalty upon the intellectually disabled. Instead, we presented Dr. Cornell's testimony during the sentencing phase hearing that Corey Johnson was not "mentally retarded" but instead was learning disabled. Similarly, during the sentencing phase of Mr. Johnson's trial, John McGarvey told the jury during his argument that while Corey Johnson is not "mentally retarded," his severe learning disability was a mitigating factor that the jury should rely upon to choose not to sentence Mr. Johnson to death.

5

18. I have recently learned that Corey Johnson's current lawyers and mitigation specialists have located school records from elementary schools that Corey Johnson attended in New York, New York and Jersey City, New Jersey, that the defense team (John McGarvey, Julie Goodwin, Dewey Cornell, and I) did not have in our possession and were not aware of during the time we represented Corey Johnson. I have also recently learned that Mr. Johnson's current defense team has located mental health records, including several prior IQ test results, that our defense team did not have in our possession during the time we represented Corey Johnson. Finally, I understand that Mr. Johnson's current defense team has interviewed numerous family members, friends of Corey Johnson, teachers, and mental health professionals who knew Corey Johnson during his childhood and adolescence that no member of our trial defense team had interviewed, as well as a few drug associates from the time he lived in New Jersey.

19. From my understanding of the contents of the new records located and witness interviews by the current defense team after I represented Corey Johnson, I believe this information would have been significant mitigating evidence that would have strengthened the mitigation case we presented to the jury.

20. I understand that among the records for Corey Johnson that the current defense team has located is an IQ test given to him when he was 8 years old which produced an IQ score of 73. Corey Johnson's original trial team did not locate this IQ test and were not aware of its existence. I also understand that Corey Johnson's current defense team has located another IQ test, when he was 12 years old, that was given to Mr. Johnson just four months before he was given the exact same IQ test at age 13 by Dr. Cary Gallaudet that produced an IQ score of 88. We were aware of the Gallaudet IQ test but were not aware of the IQ test given four months before.

6

21. I understand that research has shown that if an IQ test is given to an individual shortly after the same IQ test was given, the results of the second IQ test can be artificially inflated and would not accurately reflect the person's IQ.

22. If I had known about Corey Johnson's prior IQ test when he was 8 years old that produced a score of 73 and if I had known that Dr. Gallaudet's IQ results may have been artificially inflated and may have not been an accurate measure of Corey Johnson's IQ, I would have discussed those facts with Dr. Cornell because they are evidence that we could have used to show that Corey Johnson was intellectually disabled and was statutorily ineligible for the death penalty.

23. During the time I represented Corey Johnson, I was not aware that after IQ tests are published, there is a slow but measurable increase over time in the IQ scores of populations to whom the IQ tests are administered, which I now understand is a scientifically proven phenomena known as the "Flynn effect." I was not aware at the time of Corey Johnson's case that correcting the IQ test that Dr. Cornell administered to Corey Johnson for the Flynn effect would lower Mr. Johnson's IQ score from 77 (which Dr. Cornell told me and testified was just above the intellectual disability range) to approximately 73 (which I understand is within the range considered to be consistent with intellectual disability).

24. During the time that I represented Corey Johnson, I do not recall if Dr. Cornell discussed with me the Flynn effect or the concept that IQ scores rise slowly over time. In retrospect, knowing what I know now, I would have sought to use evidence related to the Flynn effect to show that Corey Johnson was intellectually disabled and was statutorily ineligible for the death penalty if I was aware of it at the time.

7

25. John McGarvey and I met with Corey Johnson at the jail many times during the course of our representation of him. Mr. Johnson was always pleasant and cooperative with us, but he was also very passive and rarely asked us any questions. For these reasons, we rarely wrote things to Mr. Johnson but instead we discussed almost everything verbally with him when we discussed his case with Mr. Johnson. We often had to explain legal concepts or terms to Mr. Johnson in order for him to understand, and this occurred more frequently than I had experienced with other clients. Mr. Johnson would shake his head as if he understood what we were telling him, but often we realized later that he did not understand what we were discussing or explaining.

26. Because I had only met with Corey Johnson a few times before I decided to retain Dr. Cornell to assist in Mr. Johnson's case and because I did not have any expertise in intellectual disability, I did not suspect that he might be intellectually disabled when I asked Judge Spencer to approve funds to retain Dr. Cornell. I have since come to understand that individuals with intellectual disability can appear to observers untrained in intellectual disability to be more intellectually capable than their actual abilities. I also have come to learn that individuals with intellectual disability can nevertheless have strengths in areas of functioning alongside their disability.

27. The only member of Corey Johnson's family that I ever met was his mother, Emma Johnson. Ms. Johnson was a very difficult person; in fact, I can only recall one other family member of any client during my career who was equally difficult. We paid for Ms. Johnson to travel to Richmond for her son's trial and we paid for her hotel in a nice, safe section of Richmond about five miles outside of downtown. We also gave her money for meals during the time she was in Richmond. Ms. Johnson complained repeatedly about the quality of her

Richmond hotel and about the food at the Olive Garden restaurant next to the hotel, and she insisted that we give her money so that she could take taxis downtown and eat in more expensive restaurants. Ms. Johnson never went to see her son at the jail during the whole time she was in Richmond.

28. After the jury sentenced Mr. Johnson to death, Judge Spencer held a sentencing hearing on a later date to officially enter the jury's sentence. A class of high school students was present during that sentencing hearing. Neither Mr. Johnson's defense lawyers nor Mr. Johnson knew in advance of the hearing that the students would be present. When Judge Spencer asked Mr. Johnson whether he had anything to say before the Court imposed its sentence, Mr. Johnson stood up and turned to address the students in the courtroom, which came as a surprise to me and Mr. McGarvey and was not something we or anyone else discussed or suggested to Mr. Johnson. In an extremely sincere, powerful, and moving moment, Mr. Johnson urged the high school students not to commit crimes in any way or make the mistakes he had in his life.

Craig Cooley

Sworn before me on this
20th day of September, 20016

Notary Public
Commission expires: 1/31/2019
222897

9