# EXHIBIT 27

## AFFIDAVIT

State of New York            )
                             ) ss:
County of Westchester        )

GERALD LEFKOWITZ, being duly sworn, deposes and says:

1.      I live at 52c Heritage Hills, Somers, NY 10589.

2.      For 16 years, I was a Unit Administrator at the Pleasantville Cottage School (the "Center"), an evaluation and short-term residential treatment center for emotionally troubled youth run by the Jewish Child Care Association. I was responsible for disciplinary issues and overseeing the staff at three residential cottages within the Pleasantville Cottage School (the "Cottage", and together with the Center, "Pleasantville"), which is an affiliate of the Center that provides long-term residential care.

3.      I knew Corey Johnson from 1982-1985 while Corey was treated at the Center and then while he was living at the Cottage. I did not see Corey formally on a regular basis, as we only had semi-annual meetings.  However, I did see him on a near daily basis informally when I would visit the Cottage and Corey would have appointments with other staff members in offices near mine.

4.      I testified at the sentencing phase of Corey's trial on February 10, 1993.

5.      I am aware of at least one other individual at Pleasantville who saw Corey on a considerably more regular basis and spent considerably more time with him than I did, and therefore likely knew Corey considerably better than I did:   Richard

Benedict, who was Corey's special education teacher during the 1984-85 school year. Mr. Benedict may have been able to provide additional or different information regarding Corey than I did at his trial.

6. I personally could have provided considerably more information than I testified to at trial had I been questioned in more detail. Having more recently been questioned in more detail about Corey than I was prior to or during his trial, I now provide information that is consistent with, but in a number of respects in addition to, what I testified about at the trial.

7. Corey did not generally misbehave, so I did not see him much in a disciplinary capacity. Corey was not perceived as a threat by his peers or as a troublemaker by the staff, and I cannot remember a single instance of Corey having problems with anyone. The instances in which Corey exhibited disobedience were related to missed appointments or school days.

8. Corey got along with me but he did not confide in me. In fact, I believe that Corey did not generally confide in any staff members. He often seemed anxious but was a good kid.

9. Corey stood out as being particularly slow intellectually compared to the other residents at the Cottage.

10. Corey was very motivated to learn but could only read at about a first- or second- grade level, which was frustrating for him. In fact, I do not think Corey even knew all the letters in the alphabet. Even with special education and tutoring in reading from hardworking teachers who were all certified in special education, his

2

reading skills were still very low. He grew increasingly frustrated as his academic skills did not progress and he fell further behind his peers.

11.    Corey was able to follow basic rules (for example, to return to Pleasantville at 9:00 pm) but he had problems with more detailed instructions.  Corey was slower in understanding what was expected of him than his peers, and sometimes did not understand what was expected of him at all.  Although Corey could give the appearance of being competent, it was very clear to anyone dealing with him for more then a few minutes that Corey was "slow."

12.    I did not have sufficient expertise to assess the accuracy of any IQ tests he was administered or to give an opinion was to whether he had mental retardation.

13.    Compared to his peers at the Cottage, Corey had average social skills in that setting and had several friends, but (as I have repeatedly said), he was at the lower end academically.

14.    Corey was more easily influenced than the other children at the Cottage and was a follower.

15.    Corey constantly wanted his mother to come visit him and wished to live with his maternal grandmother.

16.    I felt that he was extremely focused on his mother because she seemed so unloving.  His mother did not visit the Cottage very much, and only sporadically attended meetings related to Corey's development with Cottage staff.  One time, Corey's mother asked Corey for a loan.  I went with them to the bank because I wanted to make sure Corey's mother did not convince Corey to withdraw all of his

3

savings. Corey lent his mother $250, which was about half of his savings, and as far as I am aware his mother never paid him back.

17. It had become apparent to the Cottage staff that his mother was not capable of or interested in providing a supportive home from Corey.

18. In 1985, we decided to transfer Corey to Elmhurst Boys Residence in Queens, New York. Corey accepted this decision, as he was the sort of person who accepted whatever you wanted to do for him.

GERALD LEFKOWITZ

Sworn before me on this
5 day of December, 2011

Notary Public

MARY LOU MARTELLI
NOTARY PUBLIC STATE OF NEW YORK
WESTCHESTER COUNTY
LIC. #01MA5071758
COMM. EXP. 1/17/2015

4