# EXHIBIT 28

## AFFIDAVIT

State of New York        )
                         ) ss:
County of New York       )

ODETTE NOBLE, being duly sworn, deposes and says:

1.    I reside at 101 W. 85th St. Apt. 6-1, New York, New York.

2.    I received my master's degree in social work in 1973.    From approximately 1973 until 1987, I was a caseworker for the Jewish Child Care Association (JCCA).  During some of that period, as part of my work for JCCA, I ran therapy sessions for boys who lived at Elmhurst Boys Residence in Queens, New York (Elmhurst).

3.    Elmhurst was a group home located in an apartment unit.  The residence housed eight boys – typically between 14 and 19 years of age – who, for various reasons, were not able to live with their families.  Several individuals acted as house parents and provided supervision at the home.  One house parent slept at the residence each night.

4.    As a social worker with responsibilities for Elmhurst, I met with each of the resident boys individually for an hour each week.  I also conducted a group session with the boys and the house parents every other week.

5.    I met Corey Johnson when he was 16 years old, shortly after he moved into Elmhurst in June 1985.  For approximately the next 20 months, until February 1987, when Corey left Elmhurst when he was age 18, Corey regularly attended my weekly individual therapy sessions as well as my bi-weekly group therapy sessions. In total, I met with Corey more than 100 times, either individually or in a group setting.

6.    After Corey left Elmhurst in 1987, I did not see Corey again until 1993, when I saw him in the court room as I testified at his trial in Richmond, Virginia.  I have not seen Corey since the trial in 1993.

7.    Compared to virtually all of the other boys I encountered at Elmhurst, Corey was much weaker cognitively.

8.    While living at Elmhurst, Corey attended special education classes at Newtown High School in Queens. Most of the other boys in the residence attended mainstream classes at high schools in the area and were expected to go on to college. I believe that this upset Corey.

9.    Corey had real intellectual limitations. During our sessions, I sometimes read to him and his comprehension of what I had read was poor. His own ability to read was very limited.

10.    Corey worked very hard, but because of these limitations, could just not perform well in school.

11.    Based on my regular interactions with Corey, I believe that Corey's cognitive problems were not limited to his school work.

12.    For example, even though he could understand the rules regarding group meetings well enough to follow those rules most of the time, he never understood the purpose or reasoning behind the rules.

13.    Corey did not pose any serious behavior problems for me. He was a very sweet kid -- not mean-spirited. He generally got along with and was liked by the other boys in the residence. Corey certainly was not one of the more difficult boys that I worked with in my years of working with teenagers.

14.    The residence had a strict policy against physical confrontations and, to my knowledge, Corey abided by that policy.

15.    During the time I knew Corey (from ages 16 to 18), he was "girl crazy" and we often spoke of him trying to develop close relationships.

2

16.   In my view, Corey was not capable of "consequential" thinking. Thus, I believe, he lacked the ability to understand the consequences that his actions could have.

17.   In social settings, he did not initiate action, but rather went along with what others did. He was very susceptible to peer pressure.

18.   Corey did not have a good "read" of situations or other people. He was not very sensitive to social cues. He had difficulty learning "the rules of the game" and understanding who was in charge.

19.   In counseling him, I spoke with him about making good decisions and trying to judge who was trustworthy and who was not, but Corey seemed unable to apply our discussions to his actions.

20.   Corey was a poor social decisionmaker. When it came to making decisions, Corey seemed to live in the moment. As a result, Corey could be easily influenced into doing what his peers wanted him to do. If some of his more intellectually developed peers convinced Corey to do something, he would go along with it even if he did not perceive any logical reason for doing so. He would act in this way in circumstances in which, if he had been more intelligent, he would have realized that his actions could get him into difficulty.

21.   I believe that Corey's arrest for robbery in August of 1986 is an example of such a circumstance. Corey was arrested for robbery, along with two other teenagers, Mitch and Dwight. Mitch worked in the Youth Corps and apparently had a bossy co-worker against whom he wanted to retaliate. It is my understanding that Mitch enlisted the help of Dwight and Corey to rob the co-worker. I believe Mitch may have explained the situation to Dwight and Corey in a way that was intended to make it seem

3

as if Mitch had somehow been wronged.  Mitch was clearly the leader in this robbery.  I believe Mitch may have chosen Corey as an accomplice due to Corey's known susceptibility to peer pressure.  True to form, Corey went along with Mitch's plan.

22.    Corey's mother very rarely visited him at Elmhurst.  I met Corey's mother only once or twice during Corey's nearly two-year stay at Elmhurst, which was an unusually low number.  By contrast, I met other boys' families much more frequently.

23.    I frequently tried to contact Corey's mother by telephone, but she did not respond.

24.    In short, Corey's mother was almost non-existent in his life while he was living at Elmhurst.

25.    Whenever we talked about his mother, Corey could not discuss or consciously express any anger towards her. He would always talk about her as if she were terrific.

26.    In my experience, Elmhurst gave a chance to youths who were coming out of bad, controlling situations to get their lives on track if they could honestly deal with their emotions.  Corey did not confront his emotions with respect to his mother, and in my view, Corey's inability to do so was a problem for his development.

27.    Elmhurst provided a structured environment for its residents.  For example, the house parents shopped and cooked for the boys and even some of the leisure time was structured by the program.

28.    That said, there was somewhat less structure at Elmhurst than at Pleasantville, where Corey had previously resided.

29.    Corey may have needed more structure and support than Elmhurst provided.

4

30. Towards the end of his time at Elmhurst, Corey began to ignore the instructions of house parents and the house rules.

31. In or about February of 1987, there was a meeting at which Corey was asked to leave Elmhurst for violating house rules. In my view, the message we were trying to communicate to Corey was "you should go away and think about this for awhile, and then come back."

32. However, Corey left Elmhurst permanently. We tried to invite Corey back to the residence, which we felt provided a structured and loving setting for him, especially compared to life with his mother or life on the streets. I, personally, as well as the rest of the staff wanted Corey to come back.

33. I believe that Corey's decisions to move out and stay out of the Elmhurst residence despite the staff's desire to have him back was an example of Corey's inability to think about the consequences of his actions and plan for his future.

34. I and my colleagues worried greatly for his future after he left Elmhurst.

35. As I mentioned above, while most of the boys living at Elmhurst were expected to (and did) go on to college, neither I nor my colleagues believed that Corey would be able to do so, because of his limited cognitive abilities.

36. Because of Corey's intellectual limitations, I had concerns that Corey would not be able to hold a job.

37. Beyond that, I questioned Corey's ability to negotiate even the simple, day-to-day tasks that community life requires, such as paying bills, obtaining a driver's license, or purchasing and maintaining a car. Somewhat more complex skills – like planning a budget – were clearly beyond Corey's abilities, in my view.

38.   In short, I doubted that Corey was equipped to make it on his own, to live independently as an adult.   Some people stay in a protected setting their entire lives and that may have been what was appropriate for Corey.

_____
ODETTE NOBLE

Sworn before me on this
1ˢᵗ day of December, 2011

Notary Public

PATRICIA TERRANOVA-GERACI
NOTARY PUBLIC, State of New York
No. 01TE5063454
Qualified in New York County
Commission Expires July 22, 2014

6