# EXHIBIT 66

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,                    }
                                             }
v.                                           } *Criminal No. 3:92CR68*
                                             }
VERNON LANCE THOMAS.                         }

## MOTION TO HAVE DEFENDANT DECLARED MENTALLY RETARDED

**COMES NOW** the defendant, Vernon Lance Thomas, by and through his counsel, Cary B. Bowen, Attorney at Law, and requests that the defendant be declared mentally retarded, and to that end states as follows:

1. That the defendant, Vernon Lance Thomas, stands charged herein with capital murder, as well as other related charges, currently scheduled for a jury trial on April 26, 1993.

2. That Henry L. Dee, Ph.D., P.A., has evaluated and tested the defendant and has determined him to be mentally retarded. (A copy of said evaluation is attached hereto as Exhibit "A" as well as a copy of Dr. Dee's CV as Exhibit "B").

3. That the American Association on Mental Retardation has defined "mental retardation" as follows:

> Mental retardation consists of substantial limitations in present functioning characterized by significantly sub-average intellectual functioning (i.e. an I.Q. of 70 - 75 or below), existing concurrently with related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.

4. That the accused's performance on the Wechsler Adult Intelligence Scale - Revised Edition fell into the retarded range with a full scale I.Q. of 71.



5. That the Wechsler Adult Intelligence Scale - Revised Edition is generally considered to be the most reliable and valid test to determine mental levels and is used throughout the country.

6. That the accused had a score of 60 on the Stanford - Binet Verbal Reasoning sub tests.

7. That the accused not only performs in the retarded range on the I.Q. testing but that he also shows significant adaptive impairments which further define and reinforce the fact that he is mentally retarded.

8. That the United States does not allow anyone determined to be mentally retarded to be executed.

**WHEREFORE**, premises considered, defendant herein should be declared mentally retarded.

Respectfully submitted,

**VERNON LANCE THOMAS**

By_____
                              Counsel

Reginald M. Barley, Esquire
2025 East Main Street
Richmond, Virginia 23219
(804) 783-8468

Cary B. Bowen, Esquire
**Bowen and Bowen, Attorneys at Law, P.C.**
304 West Broad Street
Richmond, Virginia 23220-4219
(804) 648-7400

## CERTIFICATE

I hereby certify that a true and exact copy of the foregoing Motion was mailed, postage prepaid, this 15th day of April, 1993, to Howard C. Vick, Jr., Assistant United States Attorney, Office of the United States Attorney, Main Street Centre, 600 East Main Street, Suite 1800, Richmond, Virginia 23219.

CARY B. BOWEN, Esquire

*Henry L. Dee, Ph. D., P.A.*

CLINICAL AND CONSULTING PSYCHOLOGY

1509 SOUTH FLORIDA AVENUE
LAKELAND, FLORIDA 33802
(813) 688-6477

United States v. Vernon Lance Thomas
Criminal No. 3:92CR68
EXHIBIT "A"

April 9, 1993

Resume' of Neuropsychological Evaluation

Re:   Vernon Thomas

Test Battery:  Wechsler Adult Intelligence Scale - Revised;
Selected Subtests of the Stanford-Binet: Fourth Edition;
Selected Subtests of the Woodcock-Johnson Tests of
Achievement - Revised; Minnesota Multiphasic Personality
Inventory; 16 PF Test Profile; Denman Neuropsychology Memory
Scale; Multilingual Aphasia Examination: Controlled Word
Association, Sentence Repetition, Oral Language Token Test,
Visual Naming; Benton Visual Retention Test; Finger
Localization; Right/Left Orientation; Stereognosis Test;
Judgment of Line Orientation; Facial Recognition Test; Visual
Form Discrimination; Clinical Interview and Interpretation

VERNON THOMAS

REASON FOR REFERRAL AND BACKGROUND INFORMATION

Vernon Thomas is a twenty-five year old, African-American
male who was referred for evaluation by Cary Bowen, Esquire,
appointed counsel. According to Mr. Thomas, he is charged
with, among other things, murder and conspiracy to commit
murder in a continuing criminal enterprise.

He reports that the crime allegedly occurred on February 1,
1992, although he is unable to supply the time of day or
night that it is supposed to have occurred. He reports that
the prosecutor alleges that he shot two people on February 1
He is alleged to be the person who was actually involved in
the shooting and is also alleged to have "masterminded" the
operation and ordered the murder of others.

He reports that he is accused of having conspired with his
co-defendants to distribute drugs and to murder.

With regard to his Competence to Proceed, Mr. Thomas
apparently understands the function of his attorney, the
prosecution, the role of the jury, and the judge. He
understands the nature of a Plea Bargain.


HISTORY

Mr. Thomas was born on ███████████, at St. Luke's
Hospital in New York, to Illona Miller Thomas and Richard
Thomas. Mrs. Thomas is currently forty-six years of age and
disabled with heart problems. Mr. Thomas reports that his
father, Richard Thomas, lives in Chicago and he denies any
knowledge of what he does, and indeed, reports that since his
parents separated when he was approximately eight or nine
years of age, he rarely ever saw his father.

Further evidence revealed that Mr. Thomas believed that his
father fled New York with a homosexual lover and took up
residence in Chicago, which has led to some of his bitter
comments about the fact that "It's like I don't have any
father", etc.

Mr. Thomas reports that he went through eleven years of
schooling and left because "I was getting too old", and
revealed that he had "reading problems" in school. While he
reports that he learned these skills afterwards "on the
street", there is good reason to question this statement
because of his present abilities (see below).

Henry L. Dee, Ph.D., P. A.
Page 2

It would appear from his school record that by the time he was roughly twelve years of age, Mr. Thomas was placed in special education. According to the report of Jerry Kulba, who was in charge of the special education program at the time Vernon was in PS 143 in New York City, Vernon was seen as a "very low functioning" child. Even in this special education program, he was in the low functioning group and Mr. Kulba estimated his IQ at that time to be roughly 60. At first, he was classified as CRMD (children with retarded mental development). Later, the labels in the school system were changed and he was classified as EMR or educable mentally regarded. At that time, the perameters for EMR were an IQ between 50 and 75. At that time, his estimated IQ was well below 70 and his achievement scores were very low. Mr. Kulba also described Mr. Thomas as being "a follower.....easily swayed......could be drawn by the promise of anything....friendship.....not necessarily money."

Phyllis Williams, the principal at PS 143, was at that time a special education teacher while Mr. Thomas attended school. She describes him as "limited....very limited." She had him in her Social Studies class and describes his writing as "very poor and his reading ability very limited." Indeed, she describes his attempts at reading as "painful to watch...". She too reported that his IQ was clearly below 75. She described him as "not well cared for.....disheveled", and also describes him as having been easily led. She felt he had grave difficulties in premeditating or planning anything and stated that he needed "simple, clear directions from others."

While his high school records have been diligently searched for, his special education records have somehow been lost or destroyed.

Rodney Lofton, the supervisor of special education at Mr. Thomas' middle school IS 143 notes that Mr. Thomas had "learning disabilities with attention and concentration problems", and that while very extensive efforts had been made to locate the special education records, they simply cannot be found anywhere in the city school system.

Mr. Thomas' brother, Ralph Miller, notes that he recalls that Vernon had problems in school and that other children frequently made fun of him. He reported that it was difficult for Vernon to admit that he couldn't do the work and couldn't understand what he was reading. While he was allegedly somewhat better with math, his reading was always a serious impediment. Ralph recalled that Vernon would try to look for jobs after leaving high school, but was unable to

Henry L. Dee, Ph.D., P. A.
Page 3

obtain work.  He had not completed high school, had no job
training or skills and frequently asked his brother for
money.  Indeed, the only job that he apparently successfully
carried on for any period of time was that with a messenger
service for roughly six months, and a  Federally Funded
summer youth job funded by the city.  It involved delivering
mail to different buildings.  The only other work that he
apparently was able to do was clean-up work at the U. S.
Tennis Open, a job that was obtained for him by others.

Fran Leichter, Vernon's home room teacher, noted that he was
a lad who "could be swayed.....not very bright."  She too
felt that he was probably retarded and described the family
as dysfunctional. She described Vernon as a person who wanted
to please other people.  He would frequently comply with the
requests of other people.

Mr. Thomas lived at home with his mother until age twenty-
one, apparently because he could not maintain employment and
a home of his own.  He did get an apartment with a Nicole
Bishop at age twenty-four, but never really lived on his own.
Ms. Bishop reports that while Vernon talked about wanting to
find a job, he really did not know how to go about looking
for work and had no idea of what he could do.  She reports
that he never had a checking or savings account and would
carry only small amounts of cash.  He occasionally could give
her $50.00 or $60.00 for groceries.

He was and is lacking in the skills required to seek out
employment and certainly has no vocational training.  His
lack of formal education is clearly a bar to gainful
employment, particularly with his academic limitations (see
below).

As much of his school records as could be found were
reviewed.  As of the time that he left school in the eleventh
grade, he was still failing in reading and math, as he
frequently had in school previously.  On the California Test
of Basic Skills at that time, he was reading some place
between Grade Level 3 and 3.6, which is, of course, not
functional literacy for someone of his age or educational
level.  It certainly would not allow him to do high school
work, something that he alluded to when he said that he was
leaving school in part because he was getting too old, and it
was implied, that it was also in part because he was learning
nothing.  Consistent with this, throughout his school
history, he seems to most of the time not met the criteria
for promotion and nowhere could I find evidence that he read
above Grade Level 3.5 or 3.6 or that any of his general
educational development exceeded this.

Henry L. Dee, Ph.D., P. A.
Page 4


His early school records contain frequent comments about his
behavior which suggests that he suffered an Attention Deficit
Disorder with Hyperactivity.  He rarely completed his work
and needed constant attention even though interestingly, he
was frequently noted to be "courteous".  As he grew older, he
apparently began to outgrow the hyperactivity and was able to
sit and do more of his work but continued to require constant
support and attention.

Information gathered by Jill Miller, MSSW, indicated that
besides the rather distressing loss of his father at age
nine, there was apparently significant neglect of he and his
five siblings.  His mother attempted to raise the children
alone, but also tried to carry on some life of her own and
apparently indulged in some alcohol abuse.  On one occasion,
when Vernon was but seventeen months of age, she left the
children alone and the family apartment caught fire.  The
firemen, after pulling the children from the blaze, found it
necessary to resuscitate Vernon twice, suggesting potential
for possible brain damage from lack of oxygen. The possible
etiology of his later educational and mental handicaps.


## INTELLECTUAL AND NEUROPSYCHOLOGICAL FACTORS

### Wechsler Adult Intelligence Scale - Revised

| Area Measured | Approximate Percentile | Rating |
|---|---|---|
| Information | 1 | Very Low |
| Digit Span | 5 | Low |
| Vocabulary | 1 | Very Low |
| Arithmetic | 16 | Low |
| Comprehension | 1 | Very Low |
| Similarities | 0.4 | Very Low |

Verbal Abilities:  1st Percentile

| Picture Completion | 9 | Low |
|---|---|---|
| Block Design | 5 | Low |
| Digit Symbol | 37 | Average |

Performance Abilities:  7th Percentile


General Intellectual Functioning:  3rd Percentile

Mr. Thomas' performance on the Wechsler Adult Intelligence
Scale - Revised Edition, fell into the retarded range, with a

Henry L. Dee, Ph.D., P. A.
Page 5

Full Scale IQ of 71. Mental retardation, as defined by the American Association on Mental Retardation, consists of substantial limitations in present functioning characterized by significantly sub-average intellectual functioning (i.e. an IQ of 70 - 75 or below), existing concurrently with related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. It is also a condition that is manifest before age eighteen, and this is clearly the case in Mr. Thomas as can be seen from the history and the history of his testing.

The Wechsler Adult Intelligence Scale - Revised Edition, is generally considered the most reliable and valid test of mental level, being in absolutely standard use throughout the country. It is the standard which other tests are compared because of its superior norms, construction, and validity.

The Woodcock-Johnson Tests of Achievement - Revised Edition, is similarly regarded as an absolutely objective, standard measure of practical academic skills, and is once again, probably the most frequently used test of these abilities. On these tests, his performance indicated broad written language capacities at Grade Level 2.1, letter-word identification at Grade Level 4.7, passage comprehension at Grade Level 4.6, dictation skills at Grade Level 2.5 and writing samples at Grade Level 2.4. He, thus, has little in the way of reading or writing skills, which is consistent with his previous history and general mental level.

In the area of self-direction, one indication that can be gained (aside from the above testimony of those that knew him) is his performance on the verbal reasoning subtests of the Stanford-Binet, which yield a Verbal Reasoning score of 60, which is well below two standard deviations below the mean, indicating little capacity for competent verbal reasoning to assist him in handling situations requiring judgment and ability to make appropriate decisions.

On the Denman Neuropsychology Memory Scale, a clinical assessment of immediate recall, short term memory, and long term memory in both verbal and nonverbal areas, his performance yielded a Full Scale Memory Quotient of 75, which may be compared to his Full Scale Intelligence Quotient of 71, which indicates that his memory is about at the same level as his compromised general mental level, i.e. severely impaired.

On the Multilingual Aphasia Examination, a clinical

Henry L. Dee, Ph.D., P. A.
Page 6

assessment of linguistic skills, he showed basically intact verbal fluency and auditory verbal language comprehension, but defective immediate verbal repetition and very marginal capacity to name a variety of common visual objects, his performance falling at the 5th percentile.

His performance on tests of finger localization and right/left orientation were broadly intact.

His performance on a test of stereognosis (crossmodal spatial perception) was basically intact.

The same may be said of his performance on a test of facial recognition, although his performance was done in such a slow fashion that it was apparent that it was an extremely difficult task for him.

On a test of judgment of line orientation, he shows severely defective performance.

These findings are consistent with a diagnosis of mental retardation. He shows an IQ in the retarded range, with significant adaptive impairments in the area of academic skills, capacity to seek and maintain employment, difficulties with self-direction and planning, limited social skills (see below) and the fact that this retardation has apparently been an aspect of his life that has been constant throughout his life. Like most individuals who are retarded, and this examiner has seen thousands of them, Mr. Thomas has acquired certain ways of interacting and behaving which allow him to "pass" as a nonretarded individual, particularly to the casual observer. Nonetheless, careful intellectual assessment certainly confirms this examiner's clinical impression of mental retardation.

He has needed support and direction for all of his life and will probably continue to need it for the rest of his life.

Looking at Mr. Thomas from a neuropsychologist's point of view, which is, of course, the purpose of this examiner, it is clear that Mr. Thomas suffers an Organic Brain Syndrome based on his performance on the Wechsler (which is actually a neuropsychological instrument) and other scattered cognitive deficits, including memory impairment, difficulties with spatial orientation and certain personality features (see below).

PERSONALITY FACTORS

Mr. Thomas' performance on the personality tests indicate

Henry L. Dee, Ph.D., P. A.
Page 7

that he is a person who feels lonely, misunderstood, and not a part of his social environment. This is apparently based upon a lifelong history of mild to moderate rejection by his peers because of his mental retardation, something of which he is acutely aware.

His profile also indicates that he is likely to be overactive and impulsive as well as undercontrolled. This is, of course, not surprising, since people who have cerebral involvment of whatever etiology show most frequently two behavioral characteristics: memory impairment and increased impulsivity and an incapacity to control their impulses. Such people frequently show poor social judgment, and all of these characteristics are clear in Mr. Thomas' case.

Parenthetically, it might be added that the same is true of people who show mental retardation, but after all, mental retardation and cerebral damage or disease are but two sides of the same coin, i.e. two ways of looking at the same phenomenon.

He is an extremely concrete-thinking person who has difficulty reasoning through things. The notion of abstract reasoning or analogies is almost totally foreign to him.

Interestingly enough, he does appear on the psychological tests to be a person who is somewhat easily led and who tends to go along with others in order to win their approval and support. Once again, this probably has its origin in his feelings of alienation and rejection by his peers, i.e. a general desire to want to be "one of the guys".

SUMMARY IMPRESSION

1 - Mental Retardation, with multiple deficits in adaptive functioning.

2 - Organic Brain Syndrome with Mixed Features, i.e. generally lowered intellectual capacity, memory, and difficulties in impulse control and judgment.

*Henry L. Dee Ph.D.*

Henry L. Dee, Ph.D., P. A.

HLD/ab

MAR 01 '93 16:25   LPC 904-681-3788

CURRICULUM VITAE

United States v. Vernon Lance Thomas
'minal No. 3:92CR68

EXHIBIT "B"

## HENRY L. DEE

BORN:

████████████
Chattanooga, Tennessee

DEGREES:

| | |
|---|---|
| B.A. | University of South Florida, 1964 |
| M.A. | University of Iowa, 1966 |
| Ph.D. | University of Iowa, 1969 |

APPOINTMENTS:

1964-65    Research Assistant in Psychological Psychology, University of Iowa

1965-66    Graduate Assistant in Psychology, University of Iowa

1966-67    Intern in Psychology, Connecticut Valley Hospital

1967-68    Graduate Assistant in Psychology, Scott County Mental Health Center, Davenport, Iowa

Summer, 1968    Lecturer in Psychology, University of Iowa

1968-70    Research Associate in Neurology and Psychology, University of Iowa

1970-73    Consultant in Psychology, Veterans Administration Hospital, Iowa City, Iowa

1973-77    Consulting Psychologist, Byron Harless, Reid and Associates, Inc., Lakeland, Florida

1977-    Consulting Psychologist, independent practice Lakeland, Florida

1988-    Supervising and Consulting Psychologist for the Child Protection Team, Lakeland, Florida (Polk Highland, and Hardee counties)

1988-    Consulting Psychologist, Vocational Rehabilitation, Winter Haven, Florida (Polk and Highlands counties)

MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS:

American Psychological Association
American Adademy of Neurology
Academy of Aphasia
Society of Neuroscience
American Association for the Advancement of Science
Sigma Xi
Iowa Academy of Science

HENRY L. DEE                                                              Page Two

Publications:

Dee, H. L. & Fontenot, D. J. Use of the non-preferred hand in graphomotor performance: a methodological study. Confinia Neurologica, 1969, 31, 273-280

Dee, H.L. Visuoconstructive and visuoperceptive deficit in patients with unilateral cerebral lesions. Neuropsychologia, 1970, 8, 305-314.

Dee, H. L. & Benton, A. L. A crossmodal investigation of spatial performances in patients with unilateral cerebral lesions. Cortex, 1970, 6, 261-272.

Dee, H.L., Benton, A.L. & Van Allen, M. W. Apraxia in relation to hemispheric locus of lesion and aphasia. Transactions of the American Neurological Association, 1970, 95, 147-150.

Dee, H.L. Auditory asymmetry and strength of manual preference Cortex, 1971, 7, 236-245.

Dee, H.L. & Van Allen, M. W. Simple and choice reaction time and motor strength in unilateral cerebral disease. Acta Psychiatrica Scandinavica, 1971, 47, 315-323.

Dee, H.L. Mental Retardation and brain damage. Paper presented at the 1972 meeting of the American Association on Mental Deficiency.

Dee, C. K. & Dee, H.L. Objective assessment of the characteristics of parents of children with developmental problems: Journal of Consulting & Clinical Psychology, 1972, 38, 464.

Dee, H.L. & Van Allen, M. W. Psychomotor testing as an aid in the recognition of cerebral disease. Neurology, 1972, 22, 845-848.

Dee, H.L. & Van Allen, M. W. Hemispheric differences in complex reaction time. Transactions of the American Neurological Association, 1972, 97.

Dee, H.L. & Van Allen, M. W. Speed of decision-making processes in patients with unilateral cerebral disease. Archives of Neurology, 1972, 28, 163-166.

CURRICULUM VITAE

HENRY L. DEE                                                    Page Three

Publications: (Continued)

Dee, H. L. & Fontenot, D.J. Cerebral dominance and lateral differences in perception and memory. Neuropsychologia, 1973, 2, 167-173.

Dee, H. L. & Hannay, H. J. Asymmetry in perception: attention vs. other determinants. Acta Psychologia, 1973, 37, 241-247.

Dee, H. L. & Hannay, H. J. Asymmetry in Perception: Familization and labeling as determinants (two papers in preparation).

Dee. H. L. & Hannay, H. J. Asymmetry in perception: attention vs. other determinants. Acta Psychologica, 1973, 37, 241-247.

Dee, H. L. & Hannay, H. J. Reversal of Asymmetry in Human Perceptual Performance as a function in labeling, Mode of Response, and Familiarity. In press, Cortex

Dee, H. L. & Hannay, H. J. Experimental REversal of a Left Visual Field Superiority for Forms. In press, Percept. Mot. Skills