# EXHIBIT 68

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MAR 1 5 1999

CLERK

CORY JOHNSON, )
)
      Petitioner, )     Crim. No. 3:92CR68
v. )
)     Civil No. 3:97CV895
SAMUEL PRUETT, WARDEN, )
)
      Respondent. )

## REPLY MEMORANDUM IN SUPPORT OF

## INITIAL PETITION FOR WRIT OF HABEAS CORPUS

## PURSUANT TO 28 U.S.C. SECTION 2255

---

Barbara L. Hartung (VSB No. 38062)
1001 East Main Street
Suite 504
Richmond, VA 23219
(804) 649-1088

Edward E. Scher (VSB No. 23064)
Thorsen Marchant & Scher, L.L.P.
316 W. Broad Street
Richmond, VA 23220-4219
(804) 644-0711
(804) 643-3702 (Fax)

Counsel for Cory Johnson

March 15, 1999

Table Of Contents

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument And Note Concerning The Government's Shifting Positions . . . . . . 1

    A.    Summary Of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    The Government's Position On Many Issues Is A Moving Target . . . . . . . . 3

I.    THE PROSECUTION KNOWINGLY OR NEGLIGENTLY USED FALSE EVIDENCE TO CREATE THE ILLUSION THAT JOHNSON AND HIS CO-DEFENDANTS WERE LEADERS OF A HIGHLY ORGANIZED CONTINUING CRIMINAL ENTERPRISE HAVING ITS ROOTS IN NEW YORK AND/OR NEW JERSEY . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.    THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT JOHNSON AS A SUPERVISOR OF A CONTINUING CRIMINAL ENTERPRISE . . . . . . . . 6

    A.    The CCE Supervision Element: Governing Principles, *Jerome,* and *Barona* . . 7

    B.    The Government Does Not Challenge Johnson's Analysis of *Jerome;* instead, the Government incorrectly asserts that Johnson has already raised this argument on appeal . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.    The Government Cannot Distinguish This Case From *Barona* . . . . . . . . . . 14

        1.    The Government misstates the jury instruction given in Johnson's case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        2.    The jury instruction given in *Barona* is not materially different from the one this Court gave . . . . . . . . . . . . . . . . . . . 17

        3.    Even if this Court's instruction had suggested that management was required for CCE supervision, that instruction would still not satisfy *Barona* . . . . . . . . . . . . . . . . . . . . . . . . . 17

    D.    Prejudice arising out of the *Barona/Jerome* problem is beyond dispute . . . . 20

    E.    More Than 40 Individuals Identified By The Government As CCE Supervisees Were Not Capable, As A Matter Of Law, Of Being CCE Supervisees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

F.    Johnson Did Not Supervise Five Individuals . . . . . . . . . . . . . . . . . . . . . . 24

   1.    This issue was not raised on Johnson's behalf on appeal in a competent manner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

   2.    The Government continues to be unable to identify 5 persons who were Johnson's CCE supervisees . . . . . . . . . . . . . . . . . . . . . . 27

G.    The Government Relied Principally On The Conclusory Terms "Worker" And "Employee" To Prove Supervision; Such Terms Misled The Jury And Prejudiced Johnson And The Other Defendants . . . . . . . . . . . . . . . . . . . 36

   1.    Failure to raise this previously . . . . . . . . . . . . . . . . . . . . . . . . . . 36

   2.    The meaning of "worker" and "employee"; FRE 701 . . . . . . . . . . 37

   3.    Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

III.    JOHNSON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS . . . . . . 41

IV.    JOHNSON WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . 42

A.    Guilt Phase Ineffectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

   1.    Defense Counsel Failed To Request The Appointment Of An Investigator Pursuant To 21 U.S.C. Section 848(q) and Failed To Conduct An Adequate Factual Investigation . . . . . . . . . . . . . . . . 44

   2.    Defense Counsel Failed To Move For A Change Of Venue Despite Inflammatory Media Coverage About The Charges And The Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

   3.    Defense Counsel Failed To *Voir Dire* The Jury Pursuant To Morgan v. Illinois . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

   4.    Defense Counsel Failed To Object To The Prosecution's Strikes Against Women Jurors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

   5.    Defense Counsel Failed To Object To Johnson's Absence From *Voir Dire* And Johnson Lost His Right To Participate In Jury Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

   6.    Defense Counsel Failed To Challenge The Government's Evidence That Johnson Was A Supervisor Of A CCE . . . . . . . . . . . . . . . . 62

7.      Defense Counsel Failed to Object To Or Ask For Proper Jury Instructions On The Substantive Counts Charged . . . . . . . . . . . . . 64

8.      Defense Counsel Failed To Object To The Prosecutor's Barter of Favorable Treatment For Witness Testimony . . . . . . . . . . . . . . . 64

B.      COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE SENTENCE PHASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

1.      Defense Counsel Failed To Argue That Johnson's Mental Ability Was Not Accurately Reflected By His I.Q. Test And, In Fact, His I.Q. Was Below 77 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

2.      Defense Counsel Failed To Present Evidence Of The Prison Conditions Johnson Would Endure If Given A Life Sentence . . . . . . 74

C.      INEFFECTIVE ASSISTANCE ON APPEAL . . . . . . . . . . . . . . . . . . . . 76

V.   PROSECUTORIAL MISCONDUCT DEPRIVED JOHNSON OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL . . . . . . . . . . . . . . . . . . . . . . . 76

A.      The prosecutors misled the jury by vouching, in inflammatory terms, to their personal belief regarding Johnson's guilt and the veracity of witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

B.      The prosecutors introduced inadmissible evidence showing that Johnson and the other defendants threatened the lives of witnesses . . . . . . . . . . . . . . . 81

C.      The prosecutors misled the jury into believing it had a *duty* to convict and to impose death sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

D.      The prosecutors misled the jury by making misleading and inflammatory arguments to the jury, unsupported by the evidence, regarding the conditions Johnson would face if given a life sentence . . . . . . . . . . . . . . 90

E.      The Government prosecutors misled the jury by improperly emphasizing that Johnson and the other defendants did not testify . . . . . . . . . . . . . . 92

F.      The prosecutors improperly suggested that a Government witness passed a polygraph test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

G.      The Government prosecutors misled the jury by treating Johnson and the other defendants as a group, rather than the defendants as individuals . . . . . 98

H.      The Prosecutors Improperly Argued That Sentencing Should Be Based On Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

I.      Misconduct relating to testimony without foundation . . . . . . . . . . . . . . . . 98

J.      The Prosecutors misled the jury by suggesting that they had not influenced witnesses to use the terms "partner," "worker," and "employee." . . . . . . 98

K.      The Government Excluded Women From the Jury In Violation of *J.E.B. v. Alabama*, 114 S.Ct. 1419 (1994). . . . . . . . . . . . . . . . . . . . . . . . . 99

L.      Misconduct relating to the CCE supervision element . . . . . . . . . . . . . . . . 99

M.      The Prosecutors Violated 18 U.S.C. Section 201(c)(2) When Obtaining and Presenting The Testimony Of Several Cooperating Witnesses At Johnson's Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

VI.     THE PROSECUTION IMPROPERLY DISCRIMINATED AGAINST WOMEN IN SELECTING THE JURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

VII.    JUROR MISCONDUCT VIOLATED JOHNSON'S RIGHTS TO AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW . . . . . . . . . . . . . . . . 104

VIII.   JOHNSON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL RIGHT TO JUSTICE WITHOUT DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . 108

IX.     SECTION 848'S DELEGATION OF AUTHORITY TO PROSECUTORS TO CREATE NON-STATUTORY AGGRAVATOR IS AN UNCONSTITUTIONAL DELEGATION OF AUTHORITY THAT VIOLATES THE SEPARATION OF POWERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

X.      JOHNSON ADOPTS BY REFERENCE THOSE CLAIMS PRESENTED BY HIS CO-PETITIONERS, TIPTON AND ROANE, TO THE EXTENT THAT THEY ARE APPLICABLE TO HIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

Johnson was prejudiced by counsel's failure to object.  The testimony of the "bought"

witnesses[56] was central to his conviction on all counts and to his death sentences.  While Johnson

might not have succeeded at the trial level, counsel would have preserved an important issue for

appellate review.  The ultimate outcome of the *Singleton* case is yet to be determined.  Defense

counsel does not render effective assistance when he strips his client of viable appellate issues

prior to reaching the appellate court.  The claim should not be dismissed.

B.    COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT
      THE SENTENCE PHASE.

1.    Defense Counsel Failed To Argue That Johnson's Mental   Ability   Was   Not
      Accurately Reflected By His I.Q. Test And, In Fact, His I.Q. Was Below 77.
      (Johnson Memo. at 108-111; Government Response at 224-229.)

Under federal law, a mentally retarded defendant cannot be executed.  21 U.S.C. §848(1);

18 U.S.C. §3596(c) [Added 9/13/94].  Moreover, as a matter of common sense, the actual or near

mental retardation of a defendant can be an important mitigating factor to a jury.

Substantial evidence indicated that Johnson's I.Q. score at the time of trial was not an

accurate measure of his intelligence.  Defense counsel had the results of three separate I.Q. tests

available to them.  The three tests documented a wide variation in Johnson's scores over a period

of time.  In February 1982 when he was 13 years old, Johnson was given the WISC-R, a test

designed to measure a child's I.Q., and achieved a full scale I.Q. score of 88.  The test evaluator

described this score as within the low average range of intellectual functioning. (Johnson Ex.14).

---

[56] Greg Scott, Robert Davis, Dennis Moody, Stanley Smithers, Valerie Butler, Sterling
Hardy, and Jerry Gaiters all received some benefit in exchange for their testimony.  See Johnson's
First Amendment at 12-13.

A second WISC-R was given in March 1985, only three years later, when Johnson was 16 years old. This time Johnson achieved a full scale I.Q. of only 69-74, placing him in the mentally retarded range (JA 4433), and was described by the evaluator as "Deficient-Borderline range." (Johnson Ex. 14). Shortly prior to Johnson's capital trial, he took the WAIS-R intelligence test, which is the adult version of the WISC-R. JA. 4505. He was then 23 years old and in October 1992 achieved a full scale I.Q. score of 77. (Johnson Ex. 14). The evaluator, Dr. Dewey Cornell, concluded that Johnson was in the "borderline mentally retarded range." (JA 4515, 4517: 70-75 I.Q. can be considered in the range of mental retardation).

This wide variation in his scores, without more, should have suggested to counsel that further inquiry was required. The disparate scores were known to defense counsel and required no special training to realize that they would very likely be significant for Johnson's defense. Defense counsel, in fact, included the testing information in the evidence presented to the jury at the sentencing phase but failed to recognize and to argue its significance.

Defense counsel had, at the time of trial, substantial evidence suggesting that (1) Johnson was mentally retarded, and (2) his I.Q. test taken just before trial either was inaccurate or potentially supportive of a finding of mental retardation. This evidence was obvious and impossible for a reasonably diligent lawyer to miss. Nevertheless, defense counsel either missed it or ignored it. Counsel failed to investigate the evidence further or present it to the jury in a meaningful way. Had Johnson's counsel explored, developed, and used the evidence at trial, substantial doubt would have been raised about Johnson's mental capacity. Had the evidence been presented at trial, there is a high probability that at least one juror would have declined to vote for the death sentence based on a reasonable doubt about Johnson's actual mental capacity.

67

There is no case law defining the meaning of "mental retardation" under the applicable statutes. In *Penry v. Linaugh*, 492 U.S. 302, 109 S. Ct. 2934 (1989), which involved issues not directly relevant here,[57] the Supreme Court reflected on the vagueness of the term "mental retardation":

> Persons who are mentally retarded are described as having "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." American Association on Mental Deficiency (now Retardation) (AAMR), Classification in Mental Retardation 1 (H. Grossman ed. 1983). *To be classified as mentally retarded, a person **generally** must have an IQ of 70 or below.* Id., at 11. Under the AAMR classification system, individuals with IQ scores between 50-55 and 70 have "mild" retardation. Individuals with scores between 35-40 and 50-55 have "moderate" retardation. "Severely" retarded people have IQ scores between 20-25 and 35-40, and "profoundly" retarded people have scores below 20 or 25. Id., at 13. Approximately 89% of retarded persons are "mildly" retarded. Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 423 (1985).

492 U.S. at 308, n.1, 109 S. Ct. 2941 (emphasis added).   The outer boundaries of mental retardation were not identified in *Penry*.  The Supreme Court did not suggest that there was an absolute maximum I.Q. score that defined mental retardation.  Rather, it suggested only that there are "general" criteria.   Indeed, the George Washington University law review article cited in

---

[57]    In *Penry,* the Supreme Court considered two specific issues:

> First, was Penry sentenced to death in violation of the Eighth Amendment because the jury was not adequately instructed to take into consideration all of his mitigating evidence and because the terms in the Texas special issues were not defined in such a way that the jury could consider and give effect to his mitigating evidence in answering them? Second, is it cruel and unusual punishment under the Eighth Amendment to execute a mentally retarded person with Penry's reasoning ability?

*Penry,* 109 S. Ct. at 2944.

*Penry* specifically states that there is no absolute rule regarding the meaning of I.Q. tests. That article states that the American Association On Mental Deficiency ("AAMD") reports that the "upper limit [of 70 as a standard for retardation] is intended as a guideline; *it could be extended upward through IQ 75 or more*, depending on the reliability of the intelligence test used." Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 422 n. 44 (1985). Significantly, the Supreme Court recognizes the AAMD as "the country's oldest and largest organization of professionals working with the mentally retarded." *Id.* at 2955.

The absence of governing legal standards, and the recognized vagueness inherent in the term "mental retardation," should have led defense counsel to use care in analyzing and exploring the evidence, and determining what should and could be presented to the jury and the Court.

According to the generally accepted definition of mental retardation in the mental health field, a person is deemed mentally retarded if three conditions are satisfied. First, the person must have impaired adaptive functioning. J.A. at 4515-16. Second, the person must have an I.Q. test score in the mental retardation range before the age of 18. DSM-IV at 39.[58] Third, the person must have a current I.Q. test score in the mental retardation range. As discussed below, Johnson indisputably satisfied the first two conditions. Whether or not Johnson satisfied the third condition was not fully considered by trial counsel, who should have investigated the matter further and

---

[58]    Dr. Cornell testified:

> Individuals that fall in the range of 70-75 can be considered in the range of mental retardation. And then of course, anything lower than that indicates mental retardation.

J.A. at 4515; DSM-IV (4th ed. 1994) at 39-40 (mental retardation may include those with IQ of 70-75 when coupled with significant deficits in adaptive behavior).

should have presented his findings to the jury and to the Court.

The first condition of mental retardation is impaired adaptive functioning. As to that issue, although Dr. Cornell's final conclusion was that Johnson was "just above the level of mental retardation," he testified:

> [Y]ou need to show that the person has impaired adaptive behavior in any two of about ten areas that are listed there. Certainly functional academics, the ability to do academic work is one in which he has impairment. Also, communication deficits with his speech impairment and communication problems, he has some deficits there. Self care, social skills, work, the ability to maintain a job, to have good work habits, to use the kind of common sense you need to hold a job, all of those are possible areas in which *his functioning is not at a normal level*.

J.A. at 4515-16 (emphasis added). There is no question that Johnson suffered from the requisite impaired adaptive functioning. For example, a school report from 1986 when Johnson was 17 years old set forth as one of his goals learning to "handle money so he can shop for himself" and "learn enough simple arithmetic that he will be able to figure out correct change." See Johnson Ex. 15. Thus, Johnson possessed the first characteristic of mental retardation.

The second factor in determining mental retardation is an intelligence test score in the mental retardation range before the age of 18. DSM-IV at 39. There is no question that Johnson was mentally retarded under this factor, as he had tested in the I.Q. range of 69-74 in 1985 when he was 16 years old.

The third factor is a current I.Q. test in the mental retardation range. Given that the first two factors were easily satisfied, this third one was essential to Johnson's defense. As to that factor, in October 1992 (shortly prior to his capital trial), Johnson took the WAIS-R intelligence test, which is the adult version of the WISC-R. JA. 4505. He was then 23 years old and achieved a full scale I.Q. score of 77. (Johnson Ex. 14). The evaluator, Dr. Cornell, concluded

70

that Johnson was in the borderline mentally retarded range. JA 4515, 4517. He testified:

> Individuals that fall in the range of 70-75 can be considered in the range of mental retardation. And then of course, anything lower than that indicates mental retardation.

J.A. at 4515 (testimony of Dr. Dewey Cornell); DSM-IV (4th ed. 1994) at 39-40 (mental retardation may include those with IQ of 70-75 when coupled with significant deficits in adaptive behavior).

In short, counsel was presented with the situation where only a single fact suggested that Johnson was not mentally retarded: an IQ score he received in 1992. That score was demonstrably suspect for several reasons, but counsel failed to investigate further.

First, as Johnson has explained in this proceeding,[59] the disparity between Johnson's scores, combined with the known phenomenon of I.Q. inflation, plainly suggest that the 1992 score was suspect and suggestive of artificially high intelligence. (Even the Government acknowledges that reports demonstrate "the need to develop sub-tests that more accurately measure the abilities of persons with very low intellectual functioning." Government Response at 226. ) Second, as discussed above, the AAMD reports that the "upper limit [of 70 as a standard for retardation] is intended as a guideline; *it could be extended upward through IQ 75 or more*, depending on the reliability of the intelligence test used." The disparity in Johnson's I.Q. test scores, the phenomenon of I.Q. inflation, and the AAMD's recognition that a test above 75 can be consistent with mental retardation, should have alerted trial counsel to develop these issues with his expert and present evidence of these matters to the jury.

---

[59]*See* Johnson Memo at 108.

Even minimal inquiry by counsel into the law of mental retardation, I.Q. testing, and the mental health profession's criteria of mental retardation would have produced sufficient information to alert trial counsel to these issues and the potential unreliability of the 1992 test. All of the necessary information was readily available to trial counsel. In response to Johnson's argument in this proceeding, the government asserts that the report provided by Johnson in this proceeding as evidence of I.Q. score inflation was published in 1996, after Johnson's trial. But that report relied on studies by Prof. James Flynn that were published in 1984 and 1988 and that are well-known within the field. See Johnson's Ex. 7 at 14 (section entitled "References"). This was not new information at the time of trial. As for the AAMD's report indicating that I.Q. scores above 75 can be consistent with mental retardation, that information was located by habeas counsel within thirty minutes of Lexis research on the subject of mental retardation. As noted above, that information is set forth in the very first footnote of *Penry*.

While trial counsel was altogether unaware of these issues due to their neglect, other issues were actually known to counsel and simply not followed up. For example, defense expert Cornell testified:

> The IQ score I got was 77. If he had gotten a 75, he would be within the range that counts as mental retardation. 70 to 75 is kind of the gray area. If you are in that area, you can be mildly retarded. *He was two points above that, which is a matter of one or two questions on an intelligence test that would make the difference there.*

J.A. 4517 (emphasis added). Here, Cornell handed defense counsel an excellent basis to attack the 1992 test result. Defense counsel should have been explored, and presented to the jury, how it was that Johnson's answer to a single question made the difference between a "retarded" finding and otherwise. Could a single question -- especially in view of his adaptive impairment and

72

previous low I.Q. test result -- push Johnson above the mental retardation line? This issue, combined with the other information available to counsel, should have explored, analyzed, and argued to the jury. A competent lawyer would have had a field day attacking the 1992 I.Q. test and the conclusion that it showed that Johnson was not mentally retarded. *Rather than do anything like this, defense counsel simply conceded to the jury that Johnson was **not** mentally retarded.* JA. 4372, 4374.

Prejudice is obvious. As the government acknowledges, Johnson cannot be executed if he is mentally retarded. A jury presented with evidence that cast doubt on the accuracy of the 1992 I.Q. score very likely would have decided that the death penalty could not, and should not, be imposed on Johnson. As a death sentence must be unanimous, persuading only one juror of the unreliability of the 1992 I.Q. score could have resulted in a life sentence.

The government asserts Johnson is now attacking the performance of his expert Dr. Cornell. Government Response at 225. The Government is wrong. Johnson's claim concerns trial counsel's performance. Counsel, not Dr. Cornell, was responsible for determining whether the legal standard for mental retardation was subject to question; for determining whether authority existed (such as the AAMD report) from a source deemed reputable by the courts that could be used to support a finding of mental retardation and argued to the Court and the jury; and for marshalling the facts and the law and arguing them to the jury, rather than simply conceding the issue away. Counsel alone was responsible for each of these duties. Counsel alone was responsible for failing to perform these duties and for causing prejudice to Johnson.

Trial counsel simply accepted, without challenge, the preposterous conclusion that a mere two I.Q. points on the 1992 test -- possibly only one question -- meant that Johnson was not

73

mentally retarded.    Despite Johnson's previous low I.Q. test result, despite his adaptive impairment, despite I.Q. inflation, despite the AAMR report indicating that the 77 I.Q. could be consistent with mental retardation, counsel never questioned this result.    Trial counsel accepted that proposition,  knowing that a finding of mental retardation would have protected Johnson from a death sentence, and never argued these facts to the Court or to the jury.

Even short of a finding of actual retardation, trial counsel knew that the issue could have been argued to the jury in mitigation.    As poor as counsel's effort was, eight jurors concluded that Johnson's low I.Q. was a mitigating factor.    There is a substantial probability of a different verdict at the sentencing phase if the jurors had been presented with evidence that Johnson was actually more impaired than his 1992 scores indicated.    Given the importance to Johnson of an accurate evaluation of his admittedly deficient abilities and of a complete explanation of those abilities to the court and the jury, counsel provided deficient representation in this area.    This claim should not be dismissed.    Further discovery and an evidentiary hearing are required.

> 2.    Defense Counsel Failed To Present Evidence Of The Prison Conditions Johnson Would Endure If Given A Life Sentence.
> (Johnson's Memo. at 111-114; Government Response at 221-224.)

The jurors never learned about the harsh conditions facing a prisoner sentenced to a life term. Based on this omission, Johnson has alleged ineffective assistance of counsel.    The government has responded with a strawman.    The government argues first that such evidence is not "mitigating" since it does not deal with any aspect of a defendant's character, record, or the circumstances of the offense. Johnson never contended that this evidence was "mitigating" in that sense.    The government argues second that such evidence is relevant only to rebutting future

74

<u>CERTIFICATE OF SERVICE</u>

I certify that on March *15*, 1999 a copy of this document was mailed to:

Robert J. Erickson, Deputy Chief
Criminal Division
Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Bldg.
601 D. Street, N.W.
Washington, D.C.  20530

Donald R. Lee, Jr., Esquire
Frederick R. Gerson, Esquire
McCauley, Lee & Powell
1015 E. Main Street, 4th Floor
Richmond, VA 23219

Scott L. Nelson, Esquire
Paul F. Enzinna, Esquire
Michael J. Barta, Esquire
Miller, Cassidy, Larroca & Lewin
2555 M Street, N.W.
Washington, D.C.  20037.

*Edward Esher*