IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 3:92-cr-68 (DJN) |
| | ) | |
| COREY JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

**Government's Response to**
**Court's December 15, 2020, Order**

Corey Johnson received seven death sentences in 1993 under 21 U.S.C. § 848(e)(1)(A) and

18 U.S.C. § 2 for the murders of seven people—Peyton Maurice Johnson; Louis J. Johnson, Jr.;

Bobby Long; Anthony Carter; Dorothy Mae Armstrong; Curtis Thorne; and Linwood Chiles.

Defendant was also convicted for his role in the murder of an eighth person, Torrick Brown, Jr.,

an offense that was ineligible for a death sentence, and he was convicted of an assault resulting in

serious bodily injury to Martha McCoy. Johnson's convictions and death sentences were affirmed

on direct appeal. *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), *cert. denied*, 520 U.S. 1253

(1997). And his challenges to his convictions and death sentences were also denied under 28

U.S.C. § 2255. *United States v. Roane*, 378 F.3d 382 (4th Cir. 2004), *cert. denied*, 546 U.S. 810

(2005).

Johnson argues now that he has an intellectual disability severe enough to preclude carrying

out his seven death sentences. But Johnson has had the opportunity and motivations to advance

this argument over the past three decades, and he has done so. The argument has simply failed to

be persuasive, as Johnson is not intellectually disabled. *See, e.g.*, *Hall v. Florida*, 572 U.S. 701,

709 (2014) ("[T]hose with intellectual disability are, by reason of their condition, likely unable to

make the calculated judgments that are the premise for deterrence rationale," and the "diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment."); *Atkins v. Virginia*, 536 U.S. 304, 318 (2002) (explaining that intellectually disabled defendants "often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders"). While rejecting that he has intellectual disabilities that preclude his death sentences, courts have repeatedly and correctly concluded that Johnson's seven murders were planned to advance his drug trafficking and were not impulsive acts by someone incapable of capable making calculated judgments, and are therefore eligible for the death penalty.

Johnson played a leadership role in a continuing criminal enterprise, and in returning the death sentences under § 848(e)(1)(A), the jury found that Johnson intentionally killed each of his victims and committed the killings after substantial planning and premeditation. Each of the capital murders was carried out to advance the drug organization. Johnson shot Peyton Maurice Johnson fifteen times on January 14, 1992, because he was a rival drug dealer. Johnson later helped murder Louis J. Johnson, who was shot seven times on January 29, 1992, because he was perceived as making a threat against the defendant. Johnson shot Dorothy Mae Armstrong, known as "Mousey," multiple times on February 1, 1992, because she owed $400 on a drug debt and was believed to be cooperating with police. To complete the murder of Armstrong, Johnson also shot and killed Bobby Long and Anthony Carter, who happened to be in the wrong place at the wrong time when Johnson arrived to kill Armstrong. Johnson and his codefendants did not want any witnesses to Armstrong's murder, so Johnson shot Carter while he was seated in a chair and shot Long as he tried to get away. Linwood Chiles was also killed because of the drug organization. Fearing Chiles was cooperating with police, Tipton and Johnson instructed Chiles to put his head on a steering

wheel and then shot him at close range. Curtis Thorne was also killed, and two other passengers in the car, Gwen and Priscilla Greene, were also critically wounded.

Defendant used violence to further his drug trafficking even before the murder spree in Richmond. When the drug organization was operating in Trenton, New Jersey, Johnson beat people with a metal bat to protect his drug trafficking and carried a razor in his mouth. Even the murder of Torrick Brown, who was killed because he was friendly with James Roane's girlfriend, ultimately tied back to the drug organization. Johnson had no problem with Brown and joined in shooting Brown to help Roane, another member of the drug organization. Brown was in an apartment with his sister, Martha McCoy, along with her three children, when Roane, Johnson, and another codefendant arrived, looking for Brown. After McCoy answered the door, and the three assailants began shooting, McCoy jumped over a couch but was shot six times, resulting in twelve wounds. McCoy laid still after the shooting ended. "I guess they thought I was dead," she testified at trial. Trial tr. at 2260. Shortly after the assailants left, McCoy's brother stopped breathing, while she told him, "We are going to be all right." *Id.* at 2261. Terrified, she "didn't know if they was coming back and I didn't know what was going on." *Id.* at 2262. Taking car keys from her dead brother's pocket, she told her kids to "come on" and tried to escape, but the car would not start. At trial, McCoy's eight-year-old child testified that he saw his mother and uncle shot and saw three people doing the shooting.

As explained below, because Johnson has not obtained the requisite pre-filing authorization from the Fourth Circuit, his § 2255 motion is an unauthorized successive petition and this Court lacks jurisdiction to rule on it.

### A.    Johnson is indicted, convicted, and sentenced.

On July 20, 1992, Johnson, along with six others, was charged as part of a 33-count indictment with:

- Conspiracy to possess with intent to distribute and to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846 (Count 1);

- Engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(a) (Count 2);

- Capital murder in furtherance of a criminal enterprise, in violation of 21 U.S.C. § 848(e) and 18 U.S.C. § 2 (Counts 8, 11, 17, 18, 19, 24, and 25);

- Commission of violent crimes in aid of racketeering activity, in violation of 18 U.S.C. § 1959 (Counts 10, 13, 14, 16, 21, 22, 23, 27, 28, 29, and 30);

- Use of a firearm in relation to a crime of violence or a drug-trafficking offense, in violation of 18 U.S.C. § 924(c) (Counts 9, 12, 15, 20, and 26); and

- Possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Counts 31 and 32).

(Second Superseding Indictment.) These charges stemmed from Johnson's leadership role, along with Richard Tipton and James Roane, in a continuing criminal enterprise, the "New York Boyz," that trafficked large quantities of cocaine in the Richmond, Virginia area between 1990 and 1992.

The trial evidence established that Johnson, Titpon, and Roane were "principal 'partners' in a substantial drug-trafficking conspiracy," in furtherance of which they committed multiple murders, including those described above. *Tipton*, 90 F.3d at 868–69. In February 1993, a jury convicted Johnson of seven capital murders under § 848(e) (Counts 8, 11, 17, 18, 19, 24, 25); conspiracy to possess cocaine base with the intent to distribute under § 846 (Count 1); engaging in a continuing criminal enterprise under § 848(a) (Count 2); committing violent crimes in aid of racketeering activity under § 1959 (Counts 10, 13, 14, 16, 21, 22, 23, 27, 28, 29, 30); using a firearm in relation to a crime of violence or a drug-trafficking offense under § 924(c) (Counts 9, 12, 15, 20, 26); and possession of cocaine base with the intent to distribute under § 841(a)(1) (Counts 32, 33). Following a penalty hearing on the capital murder counts, the jury recommended that Johnson be sentenced to death for all of the seven murders for which he was convicted under

§ 848(e). *See Tipton*, 90 F.3d at 870.

The jury also sentenced Richard Tipton to death on three of the § 848(e)(1)(A) murders for which he had been convicted, and sentenced James Roane to death for one of the three § 848(e)(1)(A) murders for which he was convicted. *Id*. After sentencing, the Court refused to order the defendants' execution on the grounds that Congress neither authorized the means by which the death sentences were to be carried out nor authorized the Attorney General to implement regulations to that effect. *Id*.

All three defendants appealed their convictions and sentences and the government cross-appealed the Court's stay of execution of the death sentences. *Id*. The Fourth Circuit affirmed the defendants' convictions and sentences, with the exception of the Count One § 846 cocaine conspiracy, which it vacated as being a lesser included offense of the § 848 continuing criminal enterprise convictions. *Id*. at 891, 903. In addition, the Fourth Circuit reversed and "remand[ed] with instructions to enter appropriate orders for the executions in accordance with regulation promulgated by the Attorney General." *Id*. at 903.

### B.    Johnson's first 28 U.S.C. § 2255 motion.

Following the Fourth Circuit's decision, Johnson sought relief under 28 U.S.C. § 2255, and he appealed after the district court dismissed or denied all of his claims. *See Roane*, 378 F.3d at 389. As relevant here, Johnson argued that his death sentence violates the Eighth Amendment because "he is mentally retarded and cannot constitutionally be executed, and that his counsel were ineffective in failing to address this issue at sentencing and on direct appeal." *Id*. at 395–96 & n.8.

The Fourth Circuit rejected those arguments in a lengthy opinion. *Id*. at 396–407. As relevant here, Johnson argued that "he is mentally retarded and that, under federal law, he cannot be executed[] … [and] that his counsel were ineffective for failing to argue this point during sentencing." *Id.* at 408. Like the district court, the Fourth Circuit disagreed:

5

The district court found, based on data of the American Association on Retardation, that an IQ of 75 or below places a person in the retarded category. At the penalty phase of Johnson's trial, Dr. Dewey Cornell, a psychologist, testified that, on October 10, 1992, he had administered a Wechsler Adult Intelligence Scale Test ("WAIS Test"). Johnson exhibited an IQ of 77, which indicated a "generally impaired intelligence," placing him "just above the level of mental retardation." Importantly, Dr. Cornell testified that he knew the significance of finding Johnson's IQ to be above 75 (i.e., this finding would render Johnson death-eligible), and that he double-checked his numbers and consulted colleagues before reaching this conclusion.

Despite Dr. Cornell's evidence, Johnson asserts that he is in fact mentally retarded. In support of this proposition, Johnson points to evidence offered during the penalty phase that his IQ was somewhere between 69 and 74 in 1985, and he relies on a 1996 publication concluding that the WAIS test tends to inflate IQ scores over the years:

> Individuals appear to gain 3-5 IQ points over a ten year period. Since the WAIS-R was published in 1981, this inflation factor could mean that the average IQ could be as high as 105-107 points rather than the accepted value of 100.

Based on these authorities, Johnson maintains that his actual IQ is below 75 and that his score of 77 is a product of score inflation. As the district court explained, however, Dr. Cornell's evidence that he double-checked his findings and consulted with colleagues before concluding that Johnson was not mentally retarded "belies the suggestion that Dr. Cornell's analysis did not account for possible variations in his testing instrument." Accordingly, Johnson is not barred from execution due to mental retardation.

*Id*. at 408–09 (internal citations omitted). The Fourth Circuit also rejected Johnson's related

ineffective assistance of counsel argument:

> Johnson next contends that his counsel was ineffective for failing to assert possible IQ-score inflation at sentencing. We agree with the district court that Johnson's trial attorney was not ineffective for failing to raise this issue. Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." And "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." In this instance, Johnson's lawyer was presented with a mental health report, and he was under no mandate to second-guess that report. In these circumstances, Johnson's counsel was not constitutionally ineffective in this respect.

*Id*. at 409 (internal citations omitted).

### C.    Johnson's second 28 U.S.C. § 2255 motion

On November 20, 2020, the government informed Johnson that it had set his execution date for January 14, 2021. (ECF No. 78.) On December 14, 2020, Johnson filed a § 2255 motion in this Court seeking to enjoin his execution because he is intellectually disabled. (ECF No. 86.) This Court promptly ordered the government to provide its position as to whether Johnson's motion constitutes a successive petition and whether the Court possesses jurisdiction to entertain such a motion. (ECF No. 95.) The United States therefore does not address the merits of Johnson's claim here.

### Argument

Once a "prisoner has filed one unsuccessful § 2255 motion, . . . he may not file another except under very limited circumstances." *Lester v. Flournoy*, 909 F.3d 708, 710 (4th Cir. 2018). A federal district court may consider a "second or successive" § 2255 motion only upon certification from the appropriate court of appeals that the motion meets certain criteria.  28 U.S.C. § 2255(h); *United States v. Winestock*, 340 F.3d 200, 205 (4th Cir. 2003) ("a prisoner seeking to file a successive application in the district court must first obtain authorization from the appropriate court of appeals" (citing 28 U.S.C. § 2244(b)(3))). The relevant statute makes no room for exceptions: "Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). Specifically, a successive § 2255 motion must be certified as provided in 28 U.S.C. § 2244 to contain:

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

*See* § 2255(h); *see In re Vassell*, 751 F.3d 267, 271 (4th Cir. 2014) ("Section 2255(h) requires a

7

court of appeals considering whether to authorize a second or successive § 2255 motion to follow the gatekeeping procedure 'provided in section 2244.'"). The Fourth Circuit "will authorize a petitioner to file his successive § 2255 motion in the district court only if one of these gatekeeping requirements is satisfied." *Farkas v. Butner*, 972 F.3d 548, 555 (4th Cir. 2020). Crucially, however, the "initial determination of whether a claim satisfies these [gatekeeping] requirements must be made by *a court of appeals*." *In re Williams*, 364 F.3d 235, 238 (4th Cir. 2004) (citing § 2244(b)(3)(A)) (emphasis added); *accord Gonzalez v. Crosby*, 545 U.S. 524, 530 (2005) ("before the district court may accept a successive petition for filing, the court of appeals must determine that it presents a claim not previously raised that is sufficient to meet § 2244(b)(2)'s new-rule or actual-innocence provisions."). Through § 2244(b)(3)(A), Congress chose to place the responsibility for authorizing successive petitions squarely with courts of appeals, not district courts. As such, absent pre-filing authorization from the Fourth Circuit, Johnson cannot lodge his successive § 2255 petition in this Court.

This procedure was a deliberate choice on Congress' part. Indeed, the "problem of repetitive collateral litigation ha[d] absorbed the attention of Congress" prior to the passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See id*. at 238. Congress therefore enacted § 2244(b)(3)(A) in order to codify the courts of appeals' new role as gatekeepers between repeat litigants and district courts. *Id*. ("By assigning this role to the court of appeals, the AEDPA transfer[red] ... to the court of appeals a screening process previously performed by the district court." (internal quotations marks and citation omitted)). This case is a perfect example of why AEDPA mandates that repeat litigants seek pre-filing authorization from a court of appeals. Johnson not only seeks to file a second § 2255 motion, but to re-litigate the same intellectual disability claim he pursued in his first round of collateral attacks, and which both this Court and

the Fourth Circuit rejected. *See Roane*, 378 F.3d at 408–09.

Because Johnson has not obtained, or even sought, pre-filing authorization from the Fourth Circuit to pursue the claim raised in the instant § 2255 motion, this Court lacks jurisdiction to consider it. *See Burton v. Stewart*, 549 U.S. 147, 157 (2007) ("Burton neither sought nor received authorization from the Court of Appeals before filing his 2002 petition, a 'second or successive' petition challenging his custody, and so the District Court was without jurisdiction to entertain it."); *Winestock*, 340 F.3d at 205 ("In the absence of pre-filing authorization, the district court lacks jurisdiction to consider an application containing abusive or repetitive claims."); *United States v. Elliott*, 785 F. App'x 201, 202 (4th Cir. 2019) ("In the absence of prefiling authorization from this court, the district court lacked jurisdiction to consider the motion." (citing 28 U.S.C. § 2244(b)(3))). As the Seventh Circuit has put it, "[b]ecause a district judge lacks jurisdiction to rule on a successive such application without [the court of appeals'] permission, if he does so we must order his judgment vacated." *Curry v. United States*, 507 F.3d 603, 605 (7th Cir. 2007). If Johnson wishes to pursue the claim raised in the instant motion, he "must file in the court of appeals a motion for leave to file a second or successive habeas application in the district court." *Felker v. Turpin*, 518 U.S. 651, 657 (1996). Having failed to do so, he cannot initiate his latest collateral challenge before this Court.

Notwithstanding those well-established principles discussed above, Johnson contends that his motion is not a successive petition and is therefore not subject to pre-filing authorization under § 2244(b)(3). Johnson's sole argument on this score is that Federal Death Penalty Act (FDPA), 18 U.S.C. § 3596(c), "creates an independent, substantive prohibition on the implementation of the sentence based on intellectual disability." (ECF No. 86 at 45.) And, he claims, § 3596(c) "contemplates that, where applicable, a determination of 'mental retardation' will be made when

9

the government sets an execution date." *Id.*

First, Johnson ignores that, as this Court and the Fourth Circuit have already concluded, Johnson's death sentence is controlled by the repealed procedures in 21 U.S.C. § 848, rather than the FDPA. *United States v. Roane*, No. 3:92cr68, 2020 WL 6370984, at *16 n.8 (E.D.Va. Oct. 29, 2020) (citing *United States v. Stitt*, 552 F.3d 345, 354 (4th Cir. 2008)). Indeed, in Johnson's direct appeal, the Fourth Circuit squarely held that the FDPA's "general implementation provision, which authorize[s] the execution of any defendant 'sentenced to death *pursuant to this chapter*,' … does not by its terms apply to death sentences imposed under §848(e)." *Tipton*, 90 F.3d at 902 (citation omitted). Johnson suggests that the government nonetheless "agrees" with him that the FDPA controls here, citing the government's position with respect to Dustin Honken, who was executed in July 2020, Dkt. No. 86 at 2 n.3, but in that case the government was bound by Honken's 2005 criminal judgment, which—in stark contrast to Johnson's Execution Order—expressly invoked the FDPA. *See United States v. Honken*, CR01-3047-001-MWB (N.D. Iowa Oct. 11, 2005), Judgment in Criminal Case (attached as Exhibit C) at 2. In reality, the government has never represented that the FDPA is applicable to defendants like Johnson who were not sentenced under the FDPA, and Johnson errs by invoking the FDPA here.

Second, neither the FDPA nor a similarly-worded provision of the Anti-Drug Abuse Act of 1988 (under which Johnson was actually sentenced) functions, *sub silentio*, as an exception to § 2244(b)(3)(A)'s requirements. Johnson states that "[t]he plain language, structure, and statutory history of the FDPA establish that Mr. Johnson is permitted to raise his status as a person with intellectual disability now, at the time when he has a pending execution date." (*Id.* at 44.) But § 3596(c) does not override the limits on successive § 2255s, even if § 3596(c) applied to this case. *See Bourgeois v. Watson*, 977 F.3d 620, 632 (7th Cir. 2020), *cert. denied*, No. 20-

10

6500, 2020 WL 7296816 (U.S. Dec. 11, 2020) (explaining, in rejecting a similar FDPA claim, that "there are two exceptions to [the] rule" that Section 2255 limits prisoners to "one shot at relief": prisoners can pursue a "second or successive motion" at the court of appeals, or can seek to invoke the "savings clause" of 2255(e)).

Johnson cites no relevant authority for the proposition that § 3596(c) operates as a standalone exception to the bar on successive petitions, and the government is aware of none. Couching a claim in the language of § 3596(c) is simply not enough to circumvent the requirements of § 2244(b)(3)(A). *Accord In re Wright*, 826 F.3d 774, 782 (4th Cir. 2016) ("Wright's assertion—that simply because he chose to fill out his claims on a form labeled '28 U.S.C. § 2241,' he should reap the benefits of § 2241's broad construction and subvert AEDPA's restrictions—would defeat this purpose. Such an interpretation would allow state prisoners to sidestep the statutory gatekeeping mechanisms present in § 2244 and § 2254, thereby thwart[ing] Congressional intent to restrict[] the availability of second and successive petitions through Section 2244(b). We cannot embrace such an interpretation." (internal quotations marks and citation omitted)).

Johnson's reliance on *Panetti v. Quarterman*, 551 U.S. 930 (2007), and *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), for the proposition that "similar claims are not successive even though they are second-in-time because they should be litigated when an execution date is set" is misplaced. (ECF No. 86 at 45.) *Martinez-Villareal* declined to treat an identical second-in-time claim as successive because it was initially dismissed for failure to exhaust state remedies. 523 U.S. at 642–45; *see also id.* at 644 ("We believe that respondent's *Ford* claim here—previously dismissed as premature—should be treated in the same manner as the claim of a petitioner who returns to a federal habeas court after exhausting state remedies."). *Panetti* held that a numerically second § 2254 habeas petition was not successive because the claim was not ripe at

the time of the initial petition. 551 U.S. at 942–47. *Martinez-Villareal* is irrelevant to the question presented, and *Panetti* is inapposite because Johnson did, in fact, raise the same intellectual disability claim in his prior § 2255 motion and on appeal. *Roane*, 378 F.3d at 408–09. He cannot, therefore, argue that his claim was unripe at the time of his first § 2255 motion when he raised that precise claim in 2004. Moreover, *Panetti* addressed unripe incompetency claims under *Ford v. Wainwright*, 477 U.S. 399 (1986), not intellectual disability claims under § 3596(c) or *Atkins v. Virginia*, 536 U.S. 304 (2002). That difference is critical to determining whether late-breaking claims should be deemed so unripe as to evade the strictures on successive petitions. As the Seventh Circuit recently noted in a related context, intellectual disability is a permanent condition, whereas incompetency may come and go in a short span of time. *See Bourgeois v. Watson*, 977 F.3d 620, 637–38 (7th Cir. 2020), *cert. denied*, No. 20-6500, 2020 WL 7296816 (U.S. Dec. 11, 2020); *see also Busby v. Davis*, 925 F.3d 699, 714 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 897 (2020); *Williams v. Kelley*, 858 F.3d 464, 472 (8th Cir. 2017).

For similar reasons, Johnson errs in contending that the FDPA's prohibition on executing a person who "is" intellectually disabled means that he must be given the opportunity to bring a new intellectual-disability claim today based on "development and refinement in the medical profession." Dkt. No. 86 at 50 n.51. As the Seventh Circuit observed, Congress's use of the present tense verb "is" simply reflects the fact that "[i]ntellectual disability is a *permanent* condition that must manifest before the age of 18." *Id.* at 637 (emphasis added); *see Atkins*, 536 U.S. at 318. Given the early manifestation and continuous nature of intellectual disability, it would not have made sense for Congress to have phrased the statute differently, so as to proscribe, for example, "the execution of someone who merely 'was' intellectually disabled when they were sentenced, or who 'will be' intellectually disabled when their sentence is carried out." 977 F.3d at

12

637. As a permanent and continuing condition that must have manifested during youth, intellectual disability differs from "the temporary condition of incompetency, which may come and go." *Id.*; *see Ford v. Wainwright*, 477 U.S. 399 (1986).[1] Thus, unlike a competency claim—which challenges the *implementation* of the sentence during a particular, potentially transient, period of time—a claim of intellectual disability asserts that the sentence can *never* be carried out and is thus fundamentally unlawful. Such a challenge to the inherent lawfulness of the sentence is the proper subject of a § 2255 motion, *see* 28 U.S.C. § 2255(a), and is not exempt from that statute's requirements.

The legislative history of the FDPA does not suggest otherwise. The provision at issue here, § 3596(c), derives from language in the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, Tit. VII, Subtit. A, § 7001(l), 102 Stat. 4390. *See, e.g., Atkins*, 536 U.S. at 314 & n.10. During debate on that legislation, the sponsor of the amendment that added the pertinent language stated that a defendant's intellectual-disability claim "would be handled *as any other defense* would be when it came to this kind of a crime or the sentencing thereof." 134 Cong. Rec. 22,993 (1988) (statement of Rep. Levin) (emphasis added). That statement undermines Johnson's argument that a prisoner can assert a new intellectual-disability claim "regardless of other relief sought previously." Dkt. No. 86 at 48. There is likewise no indication that Congress embraced petitioner's view of § 3596(c) when it adopted the current version of the FDPA.[2] The broader debate in

---

[1] Intellectual disability likewise differs from pregnancy, which Congress addressed separately in 18 U.S.C. § 3596(b). Notably, although Congress provided that a death sentence could not be carried out "upon a woman *while* she is pregnant," 18 U.S.C. § 3596(b) (emphasis added)—implying a transient condition—it did not use the same language in § 3596(c).

[2] From 1989 to 1994, Congress debated several iterations of the legislation that ultimately became the FDPA and based Section 3596(c) on language from the Anti-Drug Abuse Act of 1988. *See* S. Rep. No. 170, 101st Cong., 1st Sess. 23 (1989).

Congress centered on streamlining and shortening the federal appeals process, not lengthening it. *See, e.g.*, 140 Cong. Rec. 10,238-10,240 (1994) (statement of Sen. Specter) ("appeals process has been vastly overdone").

Johnson notes (Dkt. No. 86 at 49) that, at one point during congressional debate, Senator Hatch expressed concern that the intellectual-disability provision would allow federal prisoners to raise the issue of intellectual disability "at any time," 136 Cong. Rec. 12,254 (May 24, 1990), and supported an amendment that would have modified the intellectual-disability provision to prohibit only the execution of intellectually disabled persons "who do not know the difference between right and wrong," *id.* at 12,251 (statement of Sen. Thurmond); *see id.* at 12,254-12,255. Johnson suggests that because the FDPA does not include that proposed language, Congress necessarily agreed with Senator Hatch that the provision would permit federal prisoners to raise the issue of intellectual disability "at any time." But the Supreme Court has cautioned against attributing the views of a single legislator to the entire Congress and against drawing inferences from proposed, but unenacted, legislation. *See, e.g., Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). Both of those admonitions apply here, and in any event, the most natural inference to be drawn from the history highlighted by Johnson is that Congress wished to prohibit the execution of all intellectually disabled persons, not just those "who do not know the difference between right and wrong." 136 Cong. Rec. at 12,251.

### Conclusion

Johnson seeks to re-litigate the intellectual disability claim that this Court and the Fourth Circuit rejected in 2004. But he failed to obtain preauthorization for his filing from the Fourth Circuit, depriving this Court of jurisdiction to adjudicate his successive § 2255 motion.

14

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney


By:  _____/s/_____

Richard D. Cooke
Joseph Attias
Assistant United States Attorneys

**Certificate of Service**

I certify that on December 21, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.


By:                    /s/

                 Richard D. Cooke
                 Assistant United States Attorney

16